## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| NORTHWEST HARDWOODS, INC., *et al.*,[1] | ) | Case No. 20-13005 (___) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |

## DISCLOSURE STATEMENT FOR THE JOINT PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION OF NORTHWEST HARDWOODS, INC. AND ITS DEBTOR AFFILIATES

**GIBSON, DUNN & CRUTCHER LLP**

David M. Feldman (*pro hac vice* pending)
J. Eric Wise (*pro hac vice* pending)
Matthew K. Kelsey (*pro hac vice* pending)
Alan Moskowitz (*pro hac vice* pending)
200 Park Avenue
New York, NY 10166
T: (212) 351-4000
F: (212) 351-4035

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

Dated: November 13, 2020

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

Sean M. Beach (No. 4070)
Jacob D. Morton (No. 6684)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
T: (302) 571-6600
F: (302) 571-1253

THIS IS A SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN IN ACCORDANCE WITH SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE AND ANY APPLICABLE NON-BANKRUPTCY LAW. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. THE DEBTORS INTEND TO SUBMIT THIS DISCLOSURE STATEMENT TO THE BANKRUPTCY COURT FOR APPROVAL FOLLOWING COMMENCEMENT OF SOLICITATION AND THE DEBTORS' FILING FOR RELIEF UNDER CHAPTER 11 OF THE BANKRUPTCY CODE. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Northwest Hardwoods, Inc. (5401), Hardwoods Intermediate Holdings II, Inc. (7760), and Hardwoods Holdings, Inc. (3443).  The location of the Debtors' service address in these chapter 11 cases is: 1313 Broadway, Suite 300, Tacoma, WA 98402.

**IMPORTANT INFORMATION REGARDING THIS DISCLOSURE STATEMENT**
**DISCLOSURE STATEMENT, DATED NOVEMBER 13, 2020**

**SOLICITATION OF VOTES TO ACCEPT OR REJECT**
**THE JOINT PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION OF NORTHWEST**
**HARDWOODS, INC. AND ITS DEBTOR AFFILIATES FROM THE HOLDERS OF OUTSTANDING**
**CLAIMS AND INTERESTS (EACH A "HOLDER")**

**YOU ARE RECEIVING THIS DOCUMENT AND THE ACCOMPANYING MATERIALS BECAUSE AS**
**OF THE VOTING RECORD DATE, YOU HELD A CLAIM AGAINST OR INTEREST IN THE DEBTORS**
**IN ONE OF THE FOLLOWING CLASSES AND THEREFORE YOU ARE ENTITLED TO VOTE ON**
**THE PLAN:**

| VOTING CLASSES | NAME OF CLASS UNDER THE PLAN |
|---|---|
| **CLASS 4** | **Secured Notes Claims** |
| **CLASS 9** | **Existing Equity Interests** |

| **DELIVERY OF BALLOTS** |
|---|
| 1.  Ballots or master ballots (each, a "***Ballot***") must be actually received by Prime Clerk LLC (the "***Solicitation Agent***") before 5:00 p.m., prevailing Eastern Time, on December 16, 2020 (the "***Voting Deadline***"). |
| 2.  Ballots must be completed by following the instructions received with the Ballots, so that such Holder's Ballot including their vote is actually received by the Voting Deadline. |
| If you have any questions on the procedures for voting on the Plan, please contact the Solicitation Agent by emailing nwhballots@primeclerk.com and referencing "NWH" in the subject line, or by calling (877)-930-4312 (Toll Free) or (347) 532-7901 (International), and asking for the solicitation group. |

   This disclosure statement (as may be amended, supplemented, or otherwise modified from time to time in accordance with its terms, this "***Disclosure Statement***") provides information regarding the *Joint Prepackaged Chapter 11 Plan of Reorganization of Northwest Hardwoods, Inc. and Its Debtor Affiliates* (as may be amended, supplemented, or otherwise modified from time to time in accordance with its terms, the "***Plan***"),[2] which the Debtors will seek to have confirmed by the United States Bankruptcy Court for the District of Delaware (the "***Bankruptcy Court***"). A copy of the Plan is attached hereto as **Exhibit A.** The Debtors are providing the information in this Disclosure Statement to certain Holders of Claims and Interests for the purpose of soliciting votes to accept or reject the Plan (the "***Solicitation***").

   This Disclosure Statement contains, among other things, descriptions and summaries of provisions of the Plan being proposed by the Debtors. The Debtors reserve the right to modify the Plan consistent with section 1127 of title 11 of the United States Code (as now in effect or hereafter amended, the "***Bankruptcy Code***"), Rule 3019 of the Federal Rules of Bankruptcy Procedure (together with the local rules of the Bankruptcy Court, as now in effect or hereafter amended, the "***Bankruptcy Rules***").

   Pursuant to the Restructuring Support Agreement, the Plan is currently supported by the Debtors, Noteholders holding more than 95% of the Secured Notes Claims, and Equityholders holding approximately 82% of the Existing Equity Interests.

---

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Plan.

The consummation and effectiveness of the Plan are subject to certain material conditions precedent described herein and set forth in <u>Article IX</u> of the Plan. There is no assurance that the Bankruptcy Court will confirm the Plan or, if the Bankruptcy Court does confirm the Plan, that the conditions necessary for the Plan to become effective will be satisfied or, in the alternative, waived.

The Debtors urge each Holder of a Claim or Interest to consult with its own advisors with respect to any legal, financial, securities, tax, or business advice in reviewing this Disclosure Statement, the Plan, and each proposed transaction contemplated by the Plan.

Holders of Claims and Interests should not construe the content of this Disclosure Statement as providing legal, business, financial, or tax advice. The Debtors strongly encourage Holders of Claims and Holders of Existing Common Equity Interests as of the Voting Record Date in Classes 4 and 9 to read this Disclosure Statement (including the Risk Factors described in <u>Section VIII</u> hereof) and the Plan in their entirety before voting to accept or reject the Plan. Assuming the requisite acceptances to the Plan are obtained, the Debtors will seek the Bankruptcy Court's approval of the Plan at the Confirmation Hearing.

---

**<u>RECOMMENDATION BY THE DEBTORS</u>**

EACH OF THE DEBTORS STRONGLY RECOMMENDS THAT ALL HOLDERS OF CLAIMS AND INTERESTS WHOSE VOTES ARE BEING SOLICITED SUBMIT BALLOTS TO <u>ACCEPT</u> THE PLAN BY RETURNING THEIR BALLOTS SO AS TO BE <u>ACTUALLY RECEIVED</u> BY THE SOLICITATION AGENT NO LATER THAN DECEMBER 16, 2020 AT 5:00 P.M. (PREVAILING EASTERN TIME) PURSUANT TO THE INSTRUCTIONS SET FORTH HEREIN AND ON THE BALLOTS.

THE BOARD OF DIRECTORS FOR EACH DEBTOR HAS APPROVED THE TRANSACTIONS CONTEMPLATED BY THE PLAN AND DESCRIBED IN THIS DISCLOSURE STATEMENT, AND EACH DEBTOR BELIEVES THAT THE COMPROMISES CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF EACH OF THE DEBTOR'S ESTATES, AND PROVIDE THE BEST RECOVERY TO CLAIM AND INTEREST HOLDERS.

AT THIS TIME, EACH DEBTOR BELIEVES THAT THE PLAN AND RELATED TRANSACTIONS REPRESENT THE BEST ALTERNATIVE FOR ACCOMPLISHING THE DEBTORS' OVERALL RESTRUCTURING OBJECTIVES.

---

**SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS**

The Bankruptcy Court has not reviewed this Disclosure Statement or the Plan, and the Securities to be issued on or after the Effective Date will not have been the subject of a registration statement filed with the U.S. Securities and Exchange Commission (the "*SEC*") under the U.S. Securities Act of 1933, as amended (the "*Securities Act*"), or any securities regulatory authority of any state under any state securities law ("*Blue Sky Laws*"). The Plan has not been approved or disapproved by the SEC or any state regulatory authority and neither the SEC nor any state regulatory authority has passed upon the accuracy or adequacy of the information contained in this Disclosure Statement or the Plan. Any representation to the contrary is a criminal offense. The Debtors are relying on section 4(a)(2) and/or Regulation D of the Securities Act, and similar Blue Sky Laws provisions, to exempt from registration under the Securities Act and Blue Sky Laws the offer to certain Holders of Claims or Interests that are "accredited investors" as defined in Rule 501 of the Securities Act ("*Accredited Investors*"), respectively, of new securities, if any, prior to the Petition Date, including in connection with the Solicitation.

After the Petition Date, the Debtors will rely on section 1145 of the Bankruptcy Code or, to the extent not available, Section 4(a)(2) and/or Regulation D of the Securities Act and similar Blue Sky Laws provisions, to exempt from registration under the Securities Act and Blue Sky Laws the issuance of Securities, including the New Common Stock, in connection with the Plan. Neither the Solicitation nor this Disclosure Statement constitutes an offer to sell or the solicitation of an offer to buy Securities in any state or jurisdiction in which such offer or solicitation is not authorized.

## DISCLAIMER

This Disclosure Statement contains summaries of certain provisions of the Plan and certain other documents and financial information. The information included in this Disclosure Statement is provided solely for the purpose of soliciting acceptances of the Plan and should not be relied upon for any purpose other than to determine whether and how to vote on the Plan. All Holders of Claims or Interests entitled to vote to accept or reject the Plan are advised and encouraged to read this Disclosure Statement and the Plan in their entirety before voting to accept or reject the Plan. The Debtors believe that these summaries are fair and accurate. The summaries of the financial information and the documents that are attached to, or incorporated by reference in, this Disclosure Statement are qualified in their entirety by reference to such information and documents. In the event of any inconsistency or discrepancy between a description in this Disclosure Statement, on the one hand, and the terms and provisions of the Plan or the financial information and documents incorporated in this Disclosure Statement by reference, on the other hand, the Plan or the financial information and documents, as applicable, shall govern for all purposes.

Except as otherwise provided in the Plan or in accordance with applicable law, the Debtors are under no duty to update or supplement this Disclosure Statement. The Bankruptcy Court's approval of this Disclosure Statement does not constitute a guarantee of the accuracy or completeness of the information contained herein or the Bankruptcy Court's endorsement of the merits of the Plan. The statements and financial information contained in this Disclosure Statement have been made as of the date hereof unless otherwise specified. Holders of Claims or Interests reviewing the Disclosure Statement should not assume at the time of such review that there have been no changes in the facts set forth in this Disclosure Statement since the date of this Disclosure Statement. No Holder of a Claim or Interest should rely on any information, representations, or inducements that are not contained in or are inconsistent with the information contained in this Disclosure Statement, the documents attached to this Disclosure Statement, and the Plan. This Disclosure Statement does not constitute legal, business, financial, or tax advice. Any Person or Entity desiring any such advice should consult with their own advisors. Additionally, this Disclosure Statement has not been approved or disapproved by the Bankruptcy Court, the SEC, or any securities regulatory authority of any state under Blue Sky Laws. The Debtors are soliciting acceptances to the Plan prior to commencing any cases under chapter 11 of the Bankruptcy Code.

## FORWARD LOOKING STATEMENTS

The financial information contained in or incorporated by reference into this Disclosure Statement has not been audited, except as specifically indicated otherwise. The Debtors' management, in consultation with the Debtors' advisors, has prepared the financial projections attached hereto as Exhibit D and described in this Disclosure Statement (the "*Financial Projections*"). The Financial Projections, while presented with numerical specificity, necessarily were based on a variety of estimates and assumptions that are inherently uncertain and may be beyond the control of the Debtors' management. Important factors that may affect actual results and cause the management forecasts not to be achieved include, but are not limited to, risks and uncertainties relating to the Debtors' business (including their ability to achieve strategic goals, objectives, and targets over applicable periods), industry performance, the regulatory environment, general business and economic conditions, and other factors. The Debtors caution that no representations can be made as to the accuracy of these projections or to their ultimate performance compared to the information contained in the forecasts or that the forecasted results will be achieved. Therefore, the Financial Projections may not be relied upon as a guarantee or other assurance that the actual results will occur.

Regarding contested matters, adversary proceedings, and other pending, threatened, or potential litigation or other actions, this Disclosure Statement does not constitute, and may not be construed as, an admission of fact, liability, stipulation, or waiver by the Debtors or any other party, but rather as a statement made in the context of settlement negotiations in accordance with Rule 408 of the Federal Rules of Evidence and any analogous state or foreign laws or rules. As such, this Disclosure Statement shall not be admissible in any non-bankruptcy proceeding involving the Debtors or any other party in interest, nor shall it be construed to be conclusive advice on the tax, Securities, financial or other effects of the Plan to Holders of Claims against, and Interests in, the Debtors or any other party in interest. Please refer to Section VIII of this Disclosure Statement, entitled "Risk Factors" for a discussion of certain risk factors that Holders of Claims or Interests voting on the Plan should consider.

Except as otherwise expressly set forth herein, all information, representations, or statements contained herein have been provided by the Debtors. No Person is authorized by the Debtors in connection with this Disclosure

Statement, the Plan, or the Solicitation to give any information or to make any representation or statement regarding this Disclosure Statement, the Plan, or the Solicitation, in each case, other than as contained in this Disclosure Statement and the exhibits attached hereto or as otherwise incorporated herein by reference or referred to herein. If any such information, representation, or statement is given or made, it may not be relied upon as having been authorized by the Debtors.

This Disclosure Statement contains certain forward-looking statements, all of which are based on various estimates and assumptions. Such forward-looking statements are subject to inherent uncertainties and to a wide variety of significant regulatory, business, economic, and competitive risks and contingencies, which are difficult or impossible to predict accurately and may be beyond the control of the Debtors, including, but not limited to, those summarized herein. When used in this Disclosure Statement, the words "anticipate," "believe," "estimate," "think," "will," "may," "intend," and "expect" and similar expressions generally identify forward-looking statements. Although the Debtors believe that their plans, intentions, and expectations reflected in the forward-looking statements are reasonable, they cannot be sure that they will be achieved. These statements are only predictions and are not guarantees of future performance or results. Forward-looking statements are subject to known and unknown risks, uncertainties and other factors that could cause actual results and performance to differ materially from any future results or performance contemplated by a forward-looking statement, including under the heading "Risk Factors" below. Accordingly, the Debtors cannot give any assurance that their expectations will in fact occur and caution that actual results may differ materially from those in the forward-looking statements. All forward-looking statements attributable to the Debtors or Persons or Entities acting on their behalf are expressly qualified in their entirety by the cautionary statements set forth in this Disclosure Statement. Forward-looking statements speak only as of the date on which they are made. Except as required by law, the Debtors expressly disclaim any obligation to revise or update any forward-looking statement, or to make any other forward-looking statements, whether as a result of new information, future events, or otherwise.

*[Remainder of Page Intentionally Left Blank]*

**TABLE OF CONTENTS**

I.  Executive Summary .............................................................................................................1

    A.  Purpose of this Disclosure Statement and the Plan. ..............................................1
    B.  Overview of the Transactions Contemplated by the Plan. .....................................1
    C.  Summary of Treatment of Claims and Interests and Description of Recoveries under the Plan. ....................................................................................................................2
    D.  Voting on the Plan. ................................................................................................5
    E.  Confirmation and Consummation of the Plan. ......................................................5

        1.  Confirmation Hearing. ...............................................................................6
        2.  Effect of Confirmation and Consummation of the Plan. ............................6

    F.  Additional Plan-Related Documents. .....................................................................6

II.  The Debtors' Business Operations and Capital Structure .....................................................7

    A.  Corporate History. .................................................................................................7
    B.  The Company's Business and Operations. .............................................................7
    C.  The Debtors' Prepetition Capital Structure. ..........................................................8

        1.  ABL Facility. .............................................................................................8
        2.  The Secured Notes. ....................................................................................8
        3.  Operating Debt and Similar Unsecured Obligations. ................................9
        4.  Intercompany Financing. ...........................................................................9
        5.  HHI Equity Interests. .................................................................................9

III.  Key Events Leading to Chapter 11 ......................................................................................9

    A.  Funded Debt Incurred from 2014 and 2015 Acquisitions. ....................................9
    B.  Changes in International Trade and Political Policies with Chinese Government. .........................10
    C.  Financial Distress Compounded by Uncertainty from COVID 19 Pandemic. .....10
    D.  Negotiations with Key Stakeholders. ..................................................................10

IV.  The Debtors' Proposed Restructuring: Key Components......................................................10

    A.  The Restructuring Support Agreement and the Plan. ..........................................10
    B.  The Debtors' Proposed Disclosure Statement and Solicitation Process.............12
    C.  Management Incentive Plan .................................................................................12
    D.  The Debtors' First-Day Motions and Certain Related Relief...............................13

        1.  Operational First-Day Pleadings. .............................................................13
        2.  Cash Collateral..........................................................................................13
        3.  Motion To Approve Solicitation Procedures and Confirm the Plan. ........13

    E.  Other Requested First-Day Relief and Retention Applications...........................14

V.  Summary of the Plan ..........................................................................................................14

    A.  Treatment of Unclassified Claims. ......................................................................14

        1.  Administrative Claims. .............................................................................14
        2.  Priority Tax Claims....................................................................................15
        3.  Statutory Fees. ..........................................................................................15

    B.  Classification and Treatment of Claims and Interests. ........................................15

        1.  Classification of Claims and Interests. .....................................................15
        2.  Treatment of Classes of Claims and Interests. .........................................16
        3.  Class 1 — Other Secured Claims...............................................................16
        4.  Class 2 — Other Priority Claims ...............................................................16
        5.  Class 3 — ABL Claims .............................................................................17
        6.  Class 4 — Secured Notes Claims ..............................................................17

| | | | |
|---|---|---|---|
| | **7.** | Class 5 — General Unsecured Claims | 17 |
| | **8.** | Class 6 —Intercompany Claims | 18 |
| | **9.** | Class 7 — Section 510(b) Claims | 18 |
| | **10.** | Class 8 — Intercompany Interests | 18 |
| | **11.** | Class 9 — Existing Equity Interests | 19 |
| **C.** | | Means for Implementation of the Plan. | 19 |
| | **1.** | Corporate and Organizational Existence. | 19 |
| | **2.** | Corporate Action | 19 |
| | **3.** | Organizational Documents of the Reorganized Debtors. | 19 |
| | **4.** | Managers, Directors and Officers of Reorganized Debtors; Corporate Governance. | 20 |
| | **5.** | Sources of Consideration for Plan Distributions. | 20 |
| | **6.** | Exemption from Registration Requirements. | 22 |
| | **7.** | Cancellation of Certain Existing Security Interests. | 23 |
| | **8.** | Management Incentive Plan. | 23 |
| | **9.** | Restructuring Transactions. | 23 |
| | **10.** | Effectuating Documents; Further Transactions. | 24 |
| | **11.** | Vesting of Assets in the Reorganized Debtors | 24 |
| | **12.** | Release of Liens, Claims and Interests. | 24 |
| | **13.** | Cancellation of Stock, Certificates, Instruments and Agreements. | 25 |
| | **14.** | Preservation and Maintenance of Debtors' Causes of Action. | 25 |
| | **15.** | Exemption from Certain Taxes and Fees. | 26 |
| | **16.** | Restructuring Expenses. | 26 |
| | **17.** | Distributions. | 27 |
| | **18.** | Treatment of Executory Contracts and Unexpired Leases. | 27 |
| **D.** | | Conditions Precedent to the Effective Date of the Plan. | 30 |
| | **1.** | Conditions to Effective Date of the Plan. | 30 |
| | **2.** | Waiver of Conditions Precedent to the Effective Date. | 31 |
| | **3.** | Substantial Consummation. | 31 |
| | **4.** | Effect of Non-Occurrence of Conditions to Consummation. | 31 |
| **E.** | | Effects of Confirmation. | 31 |
| | **1.** | General Settlement of Claims. | 31 |
| | **2.** | Binding Effect. | 32 |
| | **3.** | Discharge of the Debtors. | 32 |
| | **4.** | Release of Liens. | 32 |
| | **5.** | Releases by the Debtors. | 32 |
| | **6.** | Releases by Holders of Claims and Interests. | 33 |
| | **7.** | Exculpation | 34 |
| | **8.** | Injunction. | 34 |
| | **9.** | Term of Injunctions or Stays | 34 |
| | **10.** | Recoupment | 35 |
| | **11.** | Reimbursement or Contribution | 35 |
| | **12.** | Protection Against Discriminatory Treatment. | 35 |
| **VI.** | | Confirmation of the Plan | 35 |
| **A.** | | The Confirmation Hearing. | 35 |
| **B.** | | Deadline to Object to Approval of the Disclosure Statement and Confirmation of the Plan. | 35 |
| **C.** | | Requirements for Approval of the Disclosure Statement. | 35 |
| **D.** | | Requirements for Confirmation of the Plan. | 36 |
| | **1.** | Requirements of Section 1129(a) of the Bankruptcy Code. | 36 |
| | **2.** | The Debtor Release, Third-Party Release, Exculpation, and Injunction | |

|  |  | Provisions. | 37 |
|  | 3. | Best Interests of Creditors—Liquidation Analysis. | 38 |
|  | 4. | Feasibility/Financial Projections. | 38 |
|  | 5. | Acceptance by Impaired Classes. | 39 |
|  | 6. | Confirmation Without Acceptance by All Impaired Classes. | 39 |
|  | 7. | Valuation. | 40 |

**VII.** Voting Instructions .......... 41

   **A.**   Overview. .......... 41
   **B.**   Solicitation Procedures. .......... 41

      **1.**   Solicitation Agent. .......... 41
      **2.**   Solicitation Package. .......... 41
      **3.**   Voting Deadline. .......... 41
      **4.**   Distribution of the Solicitation Package and Plan Supplement. .......... 42

   **C.**   Voting Procedures. .......... 42
   **D.**   Voting Tabulation. .......... 43

**VIII.** Risk Factors .......... 43

   **A.**   Risks Related to the Restructuring. .......... 44

      **1.**   The Restructuring May Take Longer Than Anticipated. .......... 44
      **2.**   The Debtors Will Consider All Available Restructuring Alternatives if the Restructuring Transactions are not Implemented, and Such Alternatives May Result in Lower Recoveries for Holders of Claims Against the Debtors. .......... 44
      **3.**   Even if the Restructuring Transactions are Successful, the Debtors Will Continue to Face Risks. .......... 44
      **4.**   Risks Related to Confirmation and Consummation of the Plan. .......... 45

   **B.**   Risks Related to Recoveries Under the Plan. .......... 47

      **1.**   The Debtors May Not Be Able to Achieve Their Projected Financial Results or Meet Their Post-Restructuring Debt Obligations. .......... 47
      **2.**   Estimated Recoveries to Holders of Allowed Claims and Interests Are Not Intended to Represent Potential Market Values. .......... 48
      **3.**   Certain Tax Implications of the Debtors' Bankruptcy and Reorganization May Increase the Tax Liability of the Reorganized Debtors. .......... 48

   **C.**   Risks Related to the New Common Stock. .......... 48

      **1.**   The Consideration Under the Plan Does Not Reflect any Independent Valuation of Claims against or Interests in the Debtors. .......... 48
      **2.**   The Debtors Do Not Intend to Register or to Offer to Grant Registration Rights with respect to the New Common Stock. .......... 48
      **3.**   There Is No Established Market for the New Common Stock. .......... 49
      **4.**   The Terms of the New Shareholders Agreement Are Subject to Change Based on Negotiation and the Approval of the Bankruptcy Court. .......... 49
      **5.**   Holders of the New Common Stock Will Experience Dilution of Their Ownership Interests. .......... 50
      **6.**   Reorganized HHI Is Not Obligated To Pay Dividends on the New Common Stock. .......... 50
      **7.**   A Small Number of Holders Will Own a Significant Percentage of the New Common Stock. .......... 50
      **8.**   The Debtors' Financial Projections Are Subject to Inherent Uncertainty Due to the Numerous Assumptions Upon Which They Are Based. .......... 50

   **D.**   Risk Factors Related to the Business Operations of the Company and Reorganized Debtors. .......... 50

1.      Demand for the Company's Products Is Sensitive to Factors that Impact the End Markets It Serves, the General Economy, and Consumer Spending Levels. ...................50

2.      Some of the Company's Products Are Vulnerable to Declines In Demand Due to Competing Technologies or Materials...............................................................................51

3.      The Company Is Exposed to Price Fluctuations in Operational Costs...........................51

4.      The Loss of One or More of the Company's Strategic Suppliers Could Adversely Affect Its Business...............................................................................................51

5.      The Loss or Shutdown of One or More Production Facilities Could Adversely Affect the Company's Business......................................................................................51

6.      The Company's International Operations Subject It to Risks Arising from International Economic, Political, Legal, and Business Factors. .....................................52

7.      The Company Is Subject to Risks Associated with Environmental, Health and Safety Laws and Regulations, Including Climate Change Regulations. ..........................52

8.      The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases. ..........................................52

9.      The Company's Operations Present Significant Risk of Injury or Death and the Company May Be Subject to Claims Not Covered by or that Exceed Its Insurance.....................................................................................................................52

10.    The Company Could Be Negatively Impacted If It Fails to Maintain Satisfactory Labor Relations.............................................................................................53

11.    COVID-19 or Other Pandemics or Epidemics Could Negatively Impact the Company's Business Operations, Financial Performance and Results of Operations..................................................................................................................53

12.    The Reorganized Debtors May Not Be Able to Generate Sufficient Cash to Service All of Their Indebtedness....................................................................................53

E.      Miscellaneous Risks and Disclaimers. ..........................................................................53

1.      The Financial Information Is Based on the Debtors' Books and Records and, Unless Otherwise Stated, No Audit Was Performed. ......................................................53

2.      No Legal or Tax Advice Is Provided By This Disclosure Statement...............................53

3.      No Admissions Made. ..................................................................................................54

4.      Failure to Identify Litigation Claims or Projected Objections......................................54

5.      Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors.........................................................................................................54

6.      No Representations Outside This Disclosure Statement Are Authorized. ......................54

IX.    Important Securities Laws Disclosures ........................................................................................54

A.      Plan Consideration. .......................................................................................................54

B.      Exemption from Registration Requirements; Issuance and Resale of New Common Stock; Definition of "Underwriter" Under Section 1145(b) of the Bankruptcy Code. ..................54

1.      Exemption from Registration Requirements; Issuance and Resale of New Common Stock. ............................................................................................................54

2.      Definition of "Underwriter" Under Section 1145(b) of the Bankruptcy Code; Implications for Resale of New Common Stock. ...........................................................55

C.      Private Placement Exemptions.......................................................................................56

X.     Certain United States Federal Tax Consequences of the Plan ...................................................58

A.      Introduction....................................................................................................................58

B.      Consequences to the Debtors ........................................................................................59

1.      Tax Attributes ...............................................................................................................59

2.      Consequences of the Implementation of the Plan ........................................................59

3.      Cancellation of Debt .....................................................................................................60

4.      Limitation of Tax Attributes ........................................................................................61

C.      Consequences of the Implementation of the Plan to U.S. Holders of Certain Claims and

| | | Interests ............................................................................................................ | 62 |
| | **1.** | U.S. Holders of Allowed Secured Notes Claims ................................ | 62 |
| | **2.** | U.S. Holders of Allowed Existing Common Equity Interests................ | 64 |
| | **3.** | Character of Gain or Loss ................................................................ | 64 |
| | **4.** | Distributions in Respect of Accrued But Unpaid Interest or OID ......... | 64 |
| | **5.** | Consequences of Owning and Disposing of the New Common Stock ........ | 65 |
| | **6.** | Consequences of Owning and Disposing of the Exit Take Back Debt. ......... | 65 |
| **D.** | | Consequences of the Implementation of the Plan to Non-U.S. Holders of Certain Claims and Interests ........................................................................................ | 67 |
| | **1.** | Gain Recognition on the Exchange of Claims and Interests ................ | 68 |
| | **2.** | Accrued but Unpaid Interest Under the Plan .................................... | 68 |
| | **3.** | Owning and Disposing of New Common Stock. ................................. | 68 |
| | **4.** | Owning and Disposing of the Exit Take Back Debt. ........................... | 70 |
| **E.** | | Information Reporting and Backup Withholding.............................................. | 70 |
| **F.** | | FATCA .............................................................................................................. | 71 |
| **XI.** | | Recommendation............................................................................................................ | 71 |

## **EXHIBITS**

Exhibit A        Plan of Reorganization

Exhibit B        Corporate Structure of the Debtors

Exhibit C        Restructuring Support Agreement

Exhibit D        Financial Projections

Exhibit E        Liquidation Analysis

# I.    Executive Summary

## A.    Purpose of this Disclosure Statement and the Plan.

Northwest Hardwoods, Inc. ("*NWH OpCo*"), a Delaware corporation, and its affiliates, Hardwoods Intermediate Holdings II, Inc. ("*NWH Guarantor*") and Hardwoods Holdings Inc. ("*HHI*"), each Delaware corporations, as debtors and debtors-in-possession, (collectively, the "*Debtors*", and together with their non-Debtor operational affiliates (the "*Non-Debtor Affiliates*"), the "*Company*" or "*NWH*"), submit this Disclosure Statement pursuant to sections 1125 and 1126 of the Bankruptcy Code to Holders of Claims and Interests in connection with the Solicitation of the Plan, including to those Holders of Secured Notes Claims and Existing Common Equity Interests as of the Voting Record Date, which are classified in Classes 4 and 9 under the Plan and are entitled to vote to accept or reject the Plan. A copy of the Plan is attached hereto as <u>Exhibit A</u> and incorporated herein by reference.[3] Each Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code, and the Plan constitutes a separate chapter 11 plan for each of the Debtors, including for purposes of distribution.

**THE DEBTORS BELIEVE THAT THE COMPROMISES AND SETTLEMENTS CONTEMPLATED BY THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND MAXIMIZE RECOVERIES TO HOLDERS OF CLAIMS AND INTERESTS. THE DEBTORS BELIEVE THE PLAN IS THE BEST AVAILABLE ALTERNATIVE FOR IMPLEMENTING A RESTRUCTURING OF THE DEBTORS' BALANCE SHEET. THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO <u>ACCEPT</u> THE PLAN.**

## B.    Overview of the Transactions Contemplated by the Plan.

The Debtors and their non-Debtor subsidiaries will, in accordance with the Restructuring Support Agreement, implement material financial restructuring transactions (the "*Restructuring Transactions*") that will eliminate approximately $269 million of net principal indebtedness from their balance sheet. The Debtors will commence chapter 11 cases (the "*Chapter 11 Cases*") in the United States Bankruptcy Court for the District of Delaware in order to implement the Restructuring Transactions. Critically, the Restructuring Transactions and the Plan will not impair the Company's workforce, vendors or customers, who will continue to be paid in full in the ordinary course of business.

On October 21, 2020, the Debtors, certain Holders of the Secured Notes Claims (the "*Consenting Noteholders*") and certain Holders of the Existing Equity Interests (collectively, the "*Consenting Equityholders*" and, together with the Consenting Noteholders, the "Consenting Stakeholders") entered into the Restructuring Support Agreement, attached hereto as <u>Exhibit C</u> (as may be amended, supplemented, or otherwise modified from time to time in accordance with its terms, and including all annexes, exhibits and schedules thereto, the "*Restructuring Support Agreement*"), that sets forth the principal terms of the Restructuring Transactions and requires the Consenting Stakeholders to support the Plan. The Consenting Stakeholders collectively own more than 95% of the Secured Notes Claims and approximately 82% of the Existing Equity Interests.

The Restructuring Transactions will be implemented through the Plan in a chapter 11 process through a prepackaged restructuring because the Debtors believe a prepackaged plan will maximize value by minimizing both the costs of restructuring and the impact of the restructuring on the Debtors' business. Among other things, the Debtors intend to file motions to avoid the need to file schedules of assets and liabilities or statements of financial affairs, which will provide them with significant cost savings. In addition, a prepackaged restructuring may obviate the need for an unsecured creditors' committee and the expenses associated therewith that would otherwise be paid by the Debtors' Estates. Thus, the Debtors believe that the prepackaged Plan represents the most efficient route to effectuate

---

[3]    This Disclosure Statement incorporates the rules of interpretation located in Article I of the Plan. Any summary provided in this Disclosure Statement of any documents attached to this Disclosure Statement, including the Plan, is qualified in its entirety by reference to the Plan, the exhibits, and other materials referenced in the Plan, the Plan Supplement, and the documents being summarized. In the event of any inconsistencies between the terms of this Disclosure Statement and the Plan, the Plan shall govern.

their balance sheet restructuring and places them, their trade partners, and other stakeholders in an optimal position going forward.

The Debtors will seek joint administration of the Chapter 11 Cases for procedural purposes, administrative purposes and voting and, substantially simultaneously with the commencement of the Chapter 11 Cases, will file the Plan, this Disclosure Statement, a motion seeking to approve the Disclosure Statement and proposed Solicitation process, and motions seeking first-day relief.

As set forth in the Plan, the Restructuring Transactions provide for a comprehensive restructuring of a significant portion of the Claims against and Interests in the Debtors. The restructuring will take place on the Effective Date (as defined below) by (i) distributing to Holders of Secured Notes Claims their *pro rata* shares of a combination of (a) new Exit Take Back Debt in an aggregate principal amount equal to $110 million; and (b) 99.00% of the common stock, limited liability company membership units, or functional equivalent thereof issued by Reorganized HHI to be authorized, issued and outstanding on and after the Effective Date ("***New Common Stock***"), in each case subject to dilution by the Management Incentive Plan; and (ii) distributing to Holders of Existing Common Equity Interests their pro rata shares of 1.00% of the New Common Stock, subject to dilution by the Management Incentive Plan.

The Chapter 11 Cases will be financed by the use of cash collateral. Upon emergence, the Reorganized Debtors will enter into a first lien senior secured asset-based revolving credit facility with a commitment of $100 million (the "***Exit ABL Facility***"), the form of which will be included within the Plan Supplement.

Other than the Holders of the Secured Notes Claims and the Existing Equity Interests (who overwhelmingly support the Plan pursuant to the Restructuring Support Agreement), the Debtors' other creditors (including employees, vendors, and Holders of general unsecured claims) will be paid in full or otherwise receive such treatment to render them unimpaired.

The Plan and Restructuring Transactions, therefore, implement a significant deleveraging with the overwhelming support of the largest creditors that allows the Company to fully pay its employees and vendors and focus on its operational strengths with the support of a strong balance sheet.

As described below, Holders of Secured Notes Claims and Existing Common Equity Interests as of the Voting Record Date, which are classified in Classes 4 and 9 under the Plan, are receiving this Disclosure Statement because they are entitled to vote to accept or reject the Plan. **Prior to voting on the Plan, you are encouraged to read this Disclosure Statement and all documents attached to this Disclosure Statement in their entirety. As reflected in this Disclosure Statement, there are risks, uncertainties, and other important factors that could cause the Debtors' actual performance or achievements to be materially different from those they may project, and the Debtors undertake no obligation to update any such statement. Certain of these risks, uncertainties, and factors are described in <u>Section VIII</u> of this Disclosure Statement, entitled "Risk Factors."**

**C.      Summary of Treatment of Claims and Interests and Description of Recoveries under the Plan.**

The Plan organizes the Debtors' creditor and equity constituencies into groups called "Classes." For each Class, the Plan describes: (1) the underlying Claim or Interest; (2) the recovery available to the Holders of Claims or Interests in that Class under the Plan; (3) whether the Class is Impaired or Unimpaired under the Plan; (4) the form of consideration, if any, that Holders in such Class will receive on account of their respective Claims or Interests; and (5) whether the Holders of Claims or Interests in such Class are entitled to vote to accept or reject the Plan.

The proposed distributions under the Plan are based upon a number of factors, including the Debtors' liquidation analysis, which is set forth in <u>Exhibit E</u> attached hereto, and which was prepared by the Debtors and their proposed financial advisor, Huron Consulting Services LLC ("***Huron***").

The table below provides a summary of the classification, description, treatment, and anticipated recovery of Claims and Interests under the Plan. This information is provided in summary form below for illustrative purposes only and is qualified in its entirety by reference to the provisions of the Plan. Any estimates of Claims or Interests in

this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court. Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan. The recoveries available to Holders of Claims are estimates and actual recoveries may materially differ based on, among other things, whether the amount of Claims actually Allowed exceeds the estimates provided below. In such an instance, the recoveries available to Holders of Allowed Claims could be materially lower when compared to the estimates provided below. To the extent that any inconsistency exists between the summaries contained in this Disclosure Statement and the Plan, the terms of the Plan shall govern.

For a more detailed description of the treatment of Claims and Interests under the Plan and the sources of satisfaction for Claims and Interests, see Section V of this Disclosure Statement, entitled "Summary of the Plan."

| SUMMARY OF ESTIMATED RECOVERIES[4] | | | | | |
|---|---|---|---|---|---|
| Class | Claim/Interest | Plan Treatment | Voting Rights | Projected[5] Amount of Allowed Claims or Interests | Projected[6] Plan Recovery |
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) | $0 | 100% |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) | $9,100,000 | 100% |
| 3 | ABL Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) | $42,290,000[7] | 100% |
| 4 | Secured Notes Claims | Impaired | Entitled to Vote | $378,634,000 | 52% |
| 5 | General Unsecured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) | $25,000,000 | 100% |
| 6 | Intercompany Claims | Unimpaired/Impaired | Not Entitled to Vote (Deemed to Accept or Reject) | $892,000 | N/A |
| 7 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) | N/A | N/A |
| 8 | Intercompany Interests | Unimpaired/Impaired | Not Entitled to Vote (Deemed to Accept or Reject) | N/A | N/A |
| 9 | Existing Equity Interests | Impaired | Entitled to Vote | N/A | $995,000 |

---

[4]   The estimated recoveries presented for Holders of Secured Notes Claims and Existing Equity Interests are estimated recoveries to such Holders solely on account of their Secured Notes Claims and Existing Equity Interest, respectively, and do not reflect consideration received by such Holders for any other Claims or Interests or in any other capacity.

[5]   Unless otherwise indicated, all Claim amounts in this Disclosure Statement and accompanying exhibits are estimates as of the Solicitation Date, and Class 3 and Class 4 reflect outstanding principal amounts only.

[6]   As set forth in Article VI.D.7 herein, the Plan presumes that the value of the New Common Stock  of the Reorganized Debtors would range between $62 million and $137 million. Projected Plan Recoveries set forth herein assume par value with respect to the Exit Take Back Debt issued to Holders of Class 4 Secured Notes Claims, with distributions of the New Common Stock to Holders of Class 4 Secured Notes Claims and Class 9 Existing Equity Interests valued based on the midpoint of the equity value range.

[7]   This includes $4,191,000 of issued but undrawn prepetition letters of credit outstanding.

D.      **Voting on the Plan.**

Certain procedures will be used to collect and tabulate votes on the Plan, as summarized in <u>Section VII</u> of this Disclosure Statement, entitled "Voting Instructions." Readers should carefully read the voting instructions in <u>Section VII</u> herein.

Only Holders of Secured Notes Claims and Existing Common Equity Interests as of the Voting Record Date, which are classified in Classes 4 and 9 under the Plan, are entitled to vote on the Plan (the "***Voting Classes***"). Holders of Claims in Classes 1, 2, 3 and 5 are conclusively presumed to accept the Plan because they are Unimpaired by the Plan. Holders of Interests in Class 7 are Impaired and deemed to reject. Holders of Claims or Interests in Classes 6 and 8 are deemed to reject or accept the Plan because they are (1) Unimpaired under the Plan and presumed to accept the Plan, <u>or</u> (2) Impaired and entitled to no recovery under the Plan and deemed to reject the Plan.

**<u>The Voting Deadline is 5:00 p.m., prevailing Eastern Time, on December 16, 2020.</u>** To be counted as votes to accept or reject the Plan, a Ballot must be **<u>actually received</u>** on or before the Voting Deadline by the Solicitation Agent as follows:

| <u>DELIVERY OF BALLOTS</u> |
|---|
| 1.     Ballots must be actually received by the Solicitation Agent before the Voting Deadline (5:00 p.m. prevailing Eastern Time, on December 16, 2020). |
| 2.     Ballots must be completed following the instructions received with the Ballot, so that such Holder's Ballot (including such Holder's vote) is actually received by the Voting Deadline. |
| If you have any questions on the procedures for voting on the Plan, please contact the Solicitation Agent by emailing nwhballots@primeclerk.com and referencing "NWH" in the subject line, or by calling (877) 930-4312 (Toll Free) or (347) 532-7901 (International), and asking for the solicitation group. |

| **IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE SOLICITATION AGENT. ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE VOTING INSTRUCTIONS WILL NOT BE COUNTED EXCEPT AS DETERMINED BY THE DEBTORS.** |
|---|

E.      **Confirmation and Consummation of the Plan.**

Under section 1128(a) of the Bankruptcy Code, the Bankruptcy Court, after notice, may hold a hearing to confirm a plan of reorganization. If the Debtors file the Chapter 11 Cases, they will file a motion on the Petition Date requesting that the Bankruptcy Court set a date and time as soon as practicable after the Petition Date for a hearing for the Bankruptcy Court to determine whether the Disclosure Statement contains adequate information under section 1125(a) of the Bankruptcy Code, whether the Debtors' prepetition solicitation of acceptances in support of the Plan complied with section 1126(b) of the Bankruptcy Code, and whether the Plan should be confirmed in light of both the affirmative requirements of the Bankruptcy Code and objections, if any, that are timely filed, as permitted by section 105(d)(2)(B)(2)(v) of the Bankruptcy Code (such hearing, the "***Confirmation Hearing***"). The Confirmation Hearing, once set, may be continued from time to time without further notice other than an adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served on those parties who have requested notice under Bankruptcy Rule 2002 and the Entities who have filed an objection to the Plan, if any, without further notice to parties in interest. The Bankruptcy Court, in its discretion and prior to the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing. Subject to section 1127 of the Bankruptcy Code, the Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

Additionally, section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation. The Debtors, in the same motion requesting a date for Confirmation of the Plan, will request that the

Bankruptcy Court set a date and time for parties in interest to file objections to the adequacy of the Disclosure Statement, the Debtors' prepetition Solicitation of acceptances in support of the Plan, and Confirmation of the Plan. All such objections must be filed with the Bankruptcy Court and served on the Debtors and certain other parties in interest in accordance with the applicable order of the Bankruptcy Court so that they are received before the deadline to file such objections.

        1.        **Confirmation Hearing.**

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Disclosure Statement contains adequate information under section 1125(a) of the Bankruptcy Code, whether the Debtors' prepetition solicitation of acceptances in support of the Plan complied with section 1126(b) of the Bankruptcy Code, and whether the Plan should be confirmed in light of both the affirmative requirements of the Bankruptcy Code and objections, if any, that are timely filed, and subject to satisfaction or waiver of each condition precedent in Article IX of the Plan. For a more detailed discussion of the Confirmation Hearing, see <u>Section VI</u> of this Disclosure Statement, entitled "Confirmation of the Plan."

        2.        **Effect of Confirmation and Consummation of the Plan.**

Following Confirmation, and subject to satisfaction or waiver of each condition precedent in Article IX of the Plan, the Plan will be consummated on the Effective Date. Among other things, on the Effective Date, certain release, injunction, exculpation, and discharge provisions set forth in Article VIII of the Plan will become effective. Accordingly, it is important to read the provisions contained in Article VIII of the Plan very carefully so that you understand how Confirmation and Consummation—which effectuates such release, injunction, exculpation, and discharge provisions—will affect you and any Claim or Interest you may hold with respect to the Debtors so that you may cast your vote accordingly. These provisions are described in <u>V.E</u> of this Disclosure Statement.

**F.**        **Additional Plan-Related Documents.**

The Debtors will file certain documents that provide more details about implementation of the Plan in the Plan Supplement, which will be filed with the Bankruptcy Court at least seven (7) calendar days before the deadline for objecting to the Plan and otherwise in accordance with the Restructuring Support Agreement. The Debtors will serve a notice that will inform all parties that the initial Plan Supplement was filed, list the information included therein, and explain how copies of the Plan Supplement may be obtained. The Plan Supplement documents may be supplemented, modified or amended. Eligible Holders of Claims and Interests entitled to vote to accept or reject the Plan shall not be entitled to change their vote based on the contents of the Plan Supplement after the Voting Deadline. The Plan Supplement will include:

- the Exit ABL Credit Agreement;

- the Exit Take Back Debt Agreement;

- the Exit Intercreditor Agreement;

- the New Organizational Documents;

- the New Shareholders Agreement;

- the list of members of the New Board (to the extent known); and

- any other necessary documentation related to the Restructuring Transactions.

> *THE FOREGOING EXECUTIVE SUMMARY IS ONLY A GENERAL OVERVIEW OF THIS DISCLOSURE STATEMENT AND THE MATERIAL TERMS OF, AND TRANSACTIONS PROPOSED BY, THE PLAN AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO, AND SHOULD BE READ IN CONJUNCTION WITH, THE MORE DETAILED DISCUSSIONS APPEARING ELSEWHERE IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS ATTACHED TO THIS DISCLOSURE STATEMENT, INCLUDING THE PLAN.*

## II.    The Debtors' Business Operations and Capital Structure

### A.    Corporate History.

The Company originated in 1967 with a single sawmill producing Alder lumber in Arlington, Washington. The business was sold to Weyerhaeuser Company in 1980, and then its core hardwood assets and operations were acquired by American Industrial Partners in 2011. The Company is currently majority owned by the Sponsor Equityholder, which acquired the business in 2014. Over the past decade, the Company has experienced tremendous growth—both organically and through various corporate acquisitions—to become a top global supplier of hardwood and the world's leading hardwood brand.

### B.    The Company's Business and Operations.

The Company, which conducts its business primarily through NWH OpCo, is the largest United States manufacturer of North American hardwood lumber based on sawmill capacity, with a current estimated annual hardwood lumber capacity of approximately 320 million board feet. Its North America operations include 20 facilities that produce over 20 species of domestic hardwoods. The Company's facilities are strategically located near high production timber baskets and key shipping ports in the Western, Glacial, and Appalachian regions of the United States. The Company also owns and operates three distribution centers/warehouses and operates 13 leased inventory warehouses scattered throughout the country. In addition to its domestic hardwoods lumber business, the Company imports and distributes over 18 species of exotic hardwood lumber, and sells hardwood plywood panel products and engineered wood products.

The majority of the Company's hardwood products are sold for use in the appearance wood markets where they are used in highly visible applications such as kitchen cabinets, hardwood flooring, millwork, molding and furniture. To the extent that lumber from the Company's milled logs is not suitable for appearance wood applications, the Company sells such lumber for industrial applications, such as pallets, railroad ties and cants. The Company's competitive advantages lie in its technologically sophisticated mills, operational analytics, and grading and cutting practices, which collectively allow it to cut logs in optimal patterns that maximize high-value extraction of grade lumber sold in appearance wood markets.

As of November 13, 2020, the date of Solicitation, (the "**Solicitation Date**"), the Company serves more than 2,000 active customers across over 60 countries. Its customers consist principally of manufacturers who use its products for a broad range of end-use applications including mill work, cabinetry and flooring, doors and windows, recreational vehicle paneling and industrial pallets. The Company's customer base also includes distributors and home improvement retailers who supply hardwood products to small manufacturers or retail consumers. Demand for the Company's appearance hardwood products has historically benefited from high demand for North American hardwood in global markets—particularly in China. In recent years, a material portion of the Company's revenue has been derived from sales in China.

The Company's workforce, as of the Solicitation Date, consists of approximately 1,200 skilled employees, who collectively provide manufacturing, sales, purchasing, finance, IT and other services. The Debtors are all operated by the same senior management team and share significant services, such as operating and enterprise resource systems, back office finance, treasury and accounting support, insurance coverage and safety oversight.

C.        **The Debtors' Prepetition Capital Structure.**

As of the Solicitation Date, the Debtors had approximately $421 million in total principal amount outstanding under their funded secured debt obligations and approximately $25 million in in total outstanding general operating and unsecured debt obligations. The following table summarizes the Debtors' prepetition capital structure:

| Type of Debt | Maturity | Principal Outstanding |
|---|---|---|
| **Secured Debt** | | |
| ABL Facility | July 18, 2022 | $42,290,000[8] |
| 2014 Notes | August 1, 2021 | $275,379,000 |
| 2015 Notes | August 1, 2021 | $103,255,000 |
| **Total Secured Debt** | | **$420,924,000** |
| **Unsecured Debt** | | |
| Operating Debt and Similar Unsecured Obligations | - | $25,000,000[9] |
| **Total Debt** | | **$445,924,000** |

1.        **ABL Facility.**

On July 18, 2014, NWH OpCo entered into that certain Asset-Based Revolving Credit Agreement (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**ABL Credit Agreement**"), guaranteed by NWH Guarantor (together with NWH OpCo, the "**NWH Obligors**"), which provides for a revolving credit facility of up to $150.0 million (the "**ABL Facility**"). Bank of America, N.A. currently acts as the administrative and collateral agent for the lenders under the ABL Credit Agreement.

Obligations under the ABL Credit Agreement are guaranteed by NWH Guarantor and are secured by a first priority lien on all existing and after-acquired accounts receivable, bank accounts, inventory, and certain related assets of the NWH Obligors (collectively, the "**ABL Priority Collateral**"), and a second priority lien, subject to permitted liens and other customary exceptions, on all other assets of the NWH Obligors, including equipment, fixtures, certain real property, capital stock of subsidiaries, and intellectual property (collectively, the "**Notes Priority Collateral**"). The ABL Facility has a scheduled maturity date of July 18, 2022, provided that, if the Secured Notes are outstanding, the ABL Facility maturity springs to sixty (60) days prior to the Secured Notes' maturity date. As of the Solicitation Date, there was approximately $42,290,000 in principal amount outstanding under the ABL Facility, including $4,191,000 of issued but undrawn prepetition letters of credit outstanding.

2.        **The Secured Notes.**

On July 18, 2014, NWH OpCo entered into that certain Indenture (as amended, supplemented or otherwise modified, the "**2014 Indenture**"), guaranteed by NWH Guarantor, pursuant to which the 7.500% Senior Secured Notes due 2021 ("**2014 Notes**") were issued in an original principal amount of $300 million. Bank of New York Mellon currently acts as Trustee and Notes Collateral Agent (in such capacities under such Indenture, including its successors and assigns in such capacities, the "**2014 Trustee**"). The 2014 Indenture has a scheduled maturity date of August 1, 2021. As of the Solicitation Date, there was approximately $275,379,000 of notes outstanding under the 2014

---

[8]        This includes $4,191,000 of issued but undrawn prepetition letters of credit outstanding.

[9]        This excludes amounts that will be paid pursuant to the first-day motions described in Article IV.D below or will otherwise be treated as Class 2 Other Priority Claims pursuant to the Plan.

Indenture. Obligations under the 2014 Indenture are guaranteed by NWH Guarantor and are secured by a first priority lien on the Notes Priority Collateral and a second priority lien on the ABL Priority Collateral.

On February 20, 2015, NWH OpCo entered into that certain Indenture (as amended, supplemented or otherwise modified, the "*2015 Indenture*"), guaranteed by NWH Guarantor, pursuant to which the 7.500% Senior Secured Notes due 2021 (the "*2015 Notes*" and, together with the 2014 Notes, the "*Secured Notes*") were issued in an original principal amount of $135 million. Bank of New York Mellon currently acts as Trustee and Notes Collateral Agent (in such capacities under such Indenture, including its successors and assigns in such capacities, the "*2015 Trustee*" and, together with the 2014 Trustee, the "*Indenture Trustee*"). The 2015 Indenture has a scheduled maturity date of August 1, 2021. As of the Solicitation Date, there was approximately $103,255,000 of notes outstanding under the 2015 Indenture. Obligations under the 2015 Indenture are guaranteed by NWH Guarantor and are secured by a first priority lien on the Notes Priority Collateral and a second priority lien on the ABL Priority Collateral.

### 3.    Operating Debt and Similar Unsecured Obligations.

In the ordinary course of business, the Debtors incur general unsecured debt on account of operational costs related to, for example, office and manufacturing facilities, equipment leases, and certain goods and services procured on credit. NWH OpCo is also party to that certain Promissory Note pursuant to which NWH OpCo agreed to pay $2.1 million in principal to Keystone Transportation Solutions, LLC at an interest rate of 10.0% per annum as part of a broader settlement agreement.

### 4.    Intercompany Financing.

The Debtors, in the ordinary course of business, engage in various business transactions among themselves and their Non-Debtor Affiliates (the "*Intercompany Transactions*"), including moving cash within the Company's cash management system between Debtors and Non-Debtor Affiliates. The Company generally tracks Intercompany Transactions as intercompany obligations owing from the recipient entity (the "*Intercompany Claims*"), particularly Intercompany Transactions between operating entities. The Intercompany Transactions may involve, for example, Non-Debtor Affiliates purchasing lumber from the Debtors, such that Intercompany Claims arise that are owed to the Debtors. In the ordinary course, the Company records the Intercompany Transactions on the Debtors' and Non-Debtor Affiliates' respective books, and are eventually settled through cash payments. At any given time, there may be Intercompany Claims owing between the Non-Debtor Affiliates and the Debtors, including outstanding prepetition Intercompany Claims.

The costs and revenues associated with these Intercompany Transactions are accounted for among the legal entities and result in Intercompany Claims that are tracked electronically in their accounting system and can be ascertained, traced and accounted for as needed. This system of Intercompany Transactions is important to the Debtors' ability to manage their cash flow, to support the operations of Non-Debtor Affiliates, to satisfy obligations to third parties, and to preserve the Estate value by conducting business in the ordinary course.

### 5.    HHI Equity Interests.

HHI is a privately held company. As of the Solicitation Date, the Sponsor Equityholder holds approximately 82.0% of outstanding shares in HHI and Forest Field Limited holds approximately 9.4%. The remaining approximately 8.5% is disparately held by former and existing management members of the Company. All other Debtors are all wholly-owned direct or indirect subsidiaries of HHI.

### III.    Key Events Leading to Chapter 11

### A.    Funded Debt Incurred from 2014 and 2015 Acquisitions.

The funded debt in the Debtors' current capital structure is the result of two material acquisitions. First, in connection with the Sponsor Equityholder's acquisition of the Company in July 2014, the Company issued $300 million in 2014 Notes. Second, in connection with the Company's acquisition of ITL Corp. in February 2015, the Company issued an additional $135 million in 2015 Notes.

B.      **Changes in International Trade and Political Policies with Chinese Government.**

Since 2018, the Company's ability to continue servicing its funded debt has been hampered by significant and unanticipated hurdles resulting from increasingly aggressive trade restrictions between the U.S. and China. As described above, a material portion of the Company's sales have recently come from the Chinese market and sales projections over the past several years have been tied to an uptick in Chinese demand.

In recent years, in response to trade practices by certain of its international trading partners, the U.S. has imposed greater general trade restrictions and significant increases on tariffs for certain imported goods, particularly those from China. In September 2018, in retaliation for tariffs imposed by the U.S., China began placing tariffs ranging from 10% to 25% on U.S. wood products, among other goods.

Due to the escalation of these trade tensions, and the resulting decline of North American hardwood lumber sales in China, a surplus of hardwood lumber accumulated in the U.S. market, causing a drop in domestic pricing and in overall sales volumes.  The Company has not been immune to these industry forces and, due to lower demand, has closed certain of its facilities, including those in in Mount Vernon, Washington;  Maury River, Virginia; Garibaldi, Oregon (sawmill only); Coos Bay, Oregon; and Front Royal, Virginia.

C.      **Financial Distress Compounded by Uncertainty from COVID 19 Pandemic.**

The Company's financial distress has been further exacerbated by the COVID-19 pandemic. Stay-at-home orders issued across the U.S. brought the operations of many of the Company's customers to a halt, reducing demand for the Company's products.

D.      **Negotiations with Key Stakeholders.**

In light of the above, the Company has been engaged in a months-long process to effect a balance sheet restructuring through discussions with an *ad hoc* group of Holders of Secured Notes Claims (the "***Ad Hoc Noteholder Group***") represented by, *inter alia*, Willkie Farr & Gallagher and Guggenheim Securities, LLC. Given the constructive negotiations between the Company and the Ad Hoc Noteholder Group, as well as the Company's financial position, the Company elected not to make the approximately $14 million interest payment on the Secured Notes due August 2020, and the Ad Hoc Noteholder Group agreed to forbear from exercising remedies for such non-payment. Accordingly, on September 2, 2020, the Company and the Ad Hoc Noteholder Group entered into that certain Forbearance and Consent Agreement (as amended, modified, or otherwise supplemented from time to time thereafter, the "***Forbearance Agreement***"). Concurrently, the Company entered certain supplemental indentures with respect to the Secured Notes that amended the grace period for the Company to make the interest payment, which allowed the Company to avoid a cross default under the ABL Credit Agreement. These agreements provided the parties additional time to continue negotiating the terms of a consensual restructuring transaction without interrupting the Company's day-to-day business operations.

Since the date of the Forbearance Agreement, the Debtors have worked tirelessly to finalize the terms of a consensual restructuring with members of the Ad Hoc Noteholder Group. As a result of those efforts, on October 21, 2020, the Debtors, the members of the Ad Hoc Noteholder Group, and the Sponsor Equityholder entered into the Restructuring Support Agreement, as described below.

## IV.      The Debtors' Proposed Restructuring: Key Components

A.      **The Restructuring Support Agreement and the Plan.**

The Restructuring Support Agreement contemplates a comprehensive financial restructuring of the Debtors that will result in the deleveraging of the Debtors' balance sheet. The Restructuring Support Agreement contemplates the implementation of the Restructuring Transactions through a chapter 11 process. The key components of the Restructuring Transactions contemplate that, on the date on which a notice of effectiveness is filed with the Bankruptcy Court confirming that (a) all conditions in Article IX.A of the Plan have been satisfied or waived as

provided for in Article IX.B and (b) consummation of the Restructuring Transactions has occurred (the "***Effective Date***"):

- All Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims, and Allowed Other Secured Claims shall be paid in full in Cash or receive such other treatment that renders such Claims Unimpaired;

- Each Holder of an Allowed ABL Claim shall be paid in full in Cash with the proceeds of the Exit ABL Facility or Cash from the Debtors' bank accounts;

- Each Holder of an Allowed Secured Notes Claim shall receive its *pro rata* share of: (a) Exit Take Back Debt in an aggregate principal amount equal to $110 million; and (b) 99.00% of the New Common Stock, subject to dilution;

- All outstanding and undisputed General Unsecured Claims will be Unimpaired by the restructuring unless otherwise agreed to by the Holder of such General Unsecured Claim;

- Holders of Section 510(b) Claims shall not receive or retain any other property or interests under the Plan;

- All Intercompany Claims shall be (i) Unimpaired and Reinstated or (ii) Impaired and canceled and released without any distribution; and

- Each Holder of an Allowed Existing Common Equity Interest shall receive its Pro Rata share of: 1.00% of the New Common Stock, subject to dilution.

The Consenting Stakeholders have agreed pursuant to the Restructuring Support Agreement to support and vote in favor of the Plan. This consensus will save the Debtors material delay, expense, and value degradation that could have resulted from a non-consensual restructuring process.

The Restructuring Support Agreement contains a number of termination events that may be triggered if, among other things, the Debtors pursue a restructuring transaction that is inconsistent with the Plan or otherwise file restructuring documents that are not in form and substance consistent with the terms contemplated by the Restructuring Support Agreement. Importantly, the Debtors maintain a broad "fiduciary out" under the Restructuring Support Agreement and can terminate the Restructuring Support Agreement if the board of directors of NWH OpCo (the "***Board***") or of any other Company Party, in good faith and after consulting with external counsel, determines that proceeding with the Restructuring Transactions and pursuing confirmation and consummation of the Plan would be inconsistent with the Board's fiduciary obligations under applicable law.

The Restructuring Support Agreement contains a number of milestones, including:

- the Plan, Disclosure Statement and Financing Motion (defined below) must be filed on the Petition Date;

- the Interim Financing Order must be entered within five (5) calendar days of the Petition Date;

- No later than seven (7) calendar days prior to the deadline for objecting to the Plan, the Debtors shall file the Plan Supplement;

- the Final Financing Order must be entered within thirty-five (35) calendar days of the Petition Date;

- the Confirmation Order must be entered within forty-five (45) calendar days of the Petition Date; and

- the Plan must be consummated within sixty (60) calendar days of the Petition Date.

Failure to achieve these milestones provides Required Consenting Noteholders the right to terminate the Consenting Noteholders' obligations under the Restructuring Support Agreement.

The Plan includes customary releases and exculpatory and injunctive protection, including consensual third-

party releases in favor of the Released Parties, which includes the Debtors, the Reorganized Debtors, the Consenting Noteholders (in their various capacities), the Indenture Trustee, the Consenting Equityholders, the Debtors' directors and officers, and each of their respective related parties.

Pursuant to the Restructuring Support Agreement and the Plan, Reorganized HHI will issue shares of New Common Stock on the Effective Date to Holders of Allowed Secured Notes Claims and Allowed Existing Common Equity Interests.

The chart below summarizes the Reorganized Debtors' anticipated capital structure upon emergence:

| Debt | Principal Amount |
|---|---|
| Exit ABL Facility | Commitment of $100,000,000 |
| Exit Take Back Debt Facility | $110,000,000 |

Obligations under the Exit Take Back Debt Facility are expected to be secured by first priority liens on all Notes Priority Collateral  and second priority liens on all ABL Priority Collateral. Obligations under the Exit ABL Facility are expected to be secured by first priority liens on the ABL Priority Collateral and second priority liens on the Notes Priority Collateral. The liens securing the Exit Take Back Debt Facility and the Exit ABL Facility will be subject to the Exit Intercreditor Agreement governing the respective rights as among those facilities on common collateral.

Reorganized HHI shall be a private company on the Effective Date. The Reorganized Debtors will enter into new corporate governance documents, including charters, bylaws, operating agreements, or other organization or formation documents, as applicable (the "***New Organizational Documents***"), which shall be in form and substance reasonably acceptable to the Required Consenting Noteholders.

Pursuant to terms and procedures set forth in the New Organizational Documents, the Restructuring Term Sheet, and the New Shareholders Agreement, the identity of each member of the board of directors (or similar governing body) of Reorganized HHI (the "***New Board***"), which shall include the President of Reorganized HHI, shall be disclosed in the Plan Supplement (to the extent known).

**B.      The Debtors' Proposed Disclosure Statement and Solicitation Process.**

Following the execution of the Restructuring Support Agreement, the Debtors commenced solicitation of the Plan on November 13, 2020 by delivering a copy of the Plan and the Disclosure Statement (including Ballots) to Holders of Secured Notes Claims and Existing Common Equity Interests as of the Voting Record Date, which are classified in Classes 4 and 9 under the Plan and are the only Holders entitled to vote to accept or reject the Plan. The Debtors have established December 16, 2020, at 5:00 p.m., prevailing Eastern Time, as the Voting Deadline for the receipt of votes to accept or reject the Plan.

The Debtors will seek Bankruptcy Court approval of the Voting Deadline at the outset of their Chapter 11 Cases. As soon as reasonably practicable after the Voting Deadline, the Solicitation Agent will file the voting report (the "***Voting Report***") with the Bankruptcy Court setting forth the voting results. Based on the execution of the Restructuring Support Agreement by the Consenting Stakeholders, the Debtors believe the Voting Report likely will show that the Holders of Claims entitled to vote on the Plan have overwhelmingly voted to accept the Plan. Accordingly, on the Petition Date, the Debtors intend to file the Plan, this Disclosure Statement, and a motion to approve the solicitation procedures (the "***Solicitation Procedures***") and schedule the Confirmation Hearing to consider approval of this Disclosure Statement and Confirmation of the Plan.

**C.      Management Incentive Plan**

Within sixty (60) days following the Effective Date, the Reorganized Debtors shall enter into the Management Incentive Plan, the terms of which shall include:

- <u>Size of Pool</u>: 10.00% of fully diluted equity as of emergence

- <u>Grants at Emergence</u>: 85% in the form of options and restricted stock units ("***RSUs***") within 60 days post-closing

- <u>RSUs/Options Split</u>: 50% options; 50% RSUs

- <u>Vesting Terms</u>:
  - *Options*
    - (i) 10% on the 6-month anniversary of the grant date (or the Effective Date for emergence grants), and (ii) the remaining 90% in equal quarterly installments thereafter (i.e., 100% will be vested as of the 5th anniversary); full acceleration upon change of control ("***CIC***")

  - *RSUs*
    - 50% subject to time vesting only; vest on the same schedule as described for the options above, including with respect to full acceleration upon CIC
    - 50% subject to performance vesting; vest based on the multiple of per share emergence equity value ("***MoM***") achieved upon the first to occur (with such first occurrence, the "***Performance Measurement Date***") of (i) a CIC, (ii) an initial public offering and (iii) the 6th anniversary of the Effective Date (based on the CIC purchase price per share, the IPO offering price per share or the fair market value per share on the 6th anniversary of the Effective Date, as applicable), as follows: 50% vest at a 2x MoM and 100% vest at a 3x MoM, with linear interpolation for MoM achievement in between the two thresholds; any performance vesting RSUs that have not vested as of the Performance Measurement Date (after taking into account the vesting achieved in connection therewith) will be forfeited.

## D.    The Debtors' First-Day Motions and Certain Related Relief.

### 1.    Operational First-Day Pleadings.

To minimize disruption to the Debtors' operations and effectuate the terms of the Plan, upon the commencement of the Chapter 11 Cases, the Debtors intend to file various first-day motions seeking authority to, among other things, (a) continue using the Company's existing cash management system; (b) pay prepetition claims owed to employees and on account of employee benefit programs and to continue offering employee benefit programs postpetition; (c) pay prepetition claims owed due to maintaining insurance or surety bonds and continue maintaining the Company's insurance and surety bond programs; (d) pay prepetition claims owed to taxing authorities and continue paying taxes and related fees in the ordinary course of business; (e) provide adequate assurance of payment to utility companies; (f) pay trade claims in the ordinary course of business; and (g) continue honoring existing customer programs.

### 2.    Cash Collateral.

The Debtors will also file a motion seeking approval to use cash collateral on hand to fund their Chapter 11 Cases (the "***Financing Motion***").  The Debtors, the ABL Lenders, and the Required Consenting Noteholders have negotiated terms for the consensual use of cash collateral, which include customary terms and conditions related to the adequate protection to be provided.  Among other things, the Debtors will seek authority to use the cash collateral: (a) to pay reasonable and documented transaction and administrative costs, fees and expenses that are incurred in connection with the Chapter 11 Cases and (b) for working capital and general corporate purposes.

### 3.    Motion To Approve Solicitation Procedures and Confirm the Plan.

On the Petition Date, the Debtors intend to file a motion seeking (a) entry of an order scheduling the Confirmation Hearing and approving the form of notices and procedures related thereto; (b) approval of the Disclosure Statement as containing adequate information under section 1125(a) of the Bankruptcy Code; and (c) approval of the Solicitation Procedures.

E.    **Other Requested First-Day Relief and Retention Applications.**

The Debtors also plan to file motions and/or applications seeking certain customary relief, including the entry of orders (a) directing the joint administration of the Debtors' Chapter 11 Cases under a single docket and (b) preserving valuable tax attributes.  In addition, the Debtors will seek orders approving the retention of Gibson, Dunn & Crutcher LLP and Young Conaway Stargatt & Taylor, LLP as proposed co-counsel to the Debtors; Huron as proposed financial advisor; Prime Clerk LLC as proposed Solicitation Agent, and Moss Adams LLP as proposed tax accountant.

### V.    Summary of the Plan

SECTION V OF THIS DISCLOSURE STATEMENT IS INTENDED ONLY TO PROVIDE A SUMMARY OF THE KEY TERMS, STRUCTURE, CLASSIFICATION, TREATMENT, AND IMPLEMENTATION OF THE PLAN, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE ENTIRE PLAN AND EXHIBITS TO THE PLAN. ALTHOUGH THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN, THIS DISCLOSURE STATEMENT DOES NOT PURPORT TO BE A PRECISE OR COMPLETE STATEMENT OF ALL RELATED TERMS AND PROVISIONS, AND SHOULD NOT BE RELIED ON FOR A COMPREHENSIVE DISCUSSION OF THE PLAN. INSTEAD, REFERENCE IS MADE TO THE PLAN AND ALL SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS. THE PLAN ITSELF (INCLUDING ATTACHMENTS) AND THE PLAN SUPPLEMENT WILL CONTROL THE TREATMENT OF HOLDERS OF CLAIMS AND INTERESTS UNDER THE PLAN. TO THE EXTENT THERE ARE ANY INCONSISTENCIES BETWEEN THIS SECTION V AND THE PLAN (INCLUDING ANY ATTACHMENTS TO THE PLAN) AND THE PLAN SUPPLEMENT, THE PLAN OR PLAN SUPPLEMENT, AS APPLICABLE, SHALL GOVERN.

A.    **Treatment of Unclassified Claims.**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Priority Tax Claims, and Professional Fee Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

1.    **Administrative Claims.**

Subject to subparagraph (a) below, in full and complete satisfaction, settlement, discharge and release of and in exchange for each Allowed Administrative Claim (except to the extent that the Holder of such Allowed Administrative Claim agrees in writing to less favorable treatment or the Holder of such Allowed Administrative Claim has been paid in full during the Chapter 11 Cases), the Debtors or Reorganized Debtors, as applicable, at the option of the Debtors or Reorganized Debtors, as applicable, and with the consent of the Required Consenting Noteholders, (i) shall pay to each Holder of an Allowed Administrative Claim Cash in an amount equal to the due and unpaid portion of its Allowed Administrative Claim on the later of (x) the Effective Date, or as soon thereafter as is reasonably practicable and (y) as soon as practicable after such Allowed Administrative Claim becomes due and payable or (ii) shall provide such other treatment as the Holder of such Allowed Administrative Claim may agree to or otherwise as permitted by section 1129(a)(9) of the Bankruptcy Code; *provided*, that Administrative Claims incurred by the Debtors in the ordinary course of business may be paid in the ordinary course of business in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court.

(a)    **Professional Fee Claims.**

Professionals (i) asserting a Professional Fee Claim shall deliver to the Debtors their estimates for purposes of the Debtors computing the Professional Fee Reserve Amount no later than five (5) Business Days prior to the anticipated Effective Date; *provided*, that, for the avoidance of doubt, no such estimate shall be deemed to limit the amount of the fees and expenses that are the subject of a Professional's final request for payment of Professional Claims filed with the Bankruptcy Court; provided, further, that, if a Professional does not provide an estimate, the

Debtors may estimate the unpaid and unbilled fees and expenses of such Professional; and (ii) asserting a Professional Fee Claim for services rendered before the Effective Date, for the avoidance of doubt, excluding any claims for Restructuring Expenses, must file and serve on the Reorganized Debtors and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court an application for final allowance of such Professional Fee Claim no later than the Professional Claims Bar Date; *provided*, that any Professional who is subject to the Ordinary Course Professionals Order (as applicable) may continue to receive such compensation and reimbursement of expenses for services rendered before the Effective Date, without further Bankruptcy Court order, pursuant to the Ordinary Course Professionals Order. Objections to any Professional Fee Claim must be filed and served on the Reorganized Debtors and the applicable Professional within thirty (30) days after the filing of the final fee application with respect to the Professional Fee Claim. Any such objections that are not consensually resolved may be set for hearing on twenty-one (21) days' notice.

(b)        **Professional Fee Escrow Account.**

On the Effective Date, the Debtors or the Reorganized Debtors, as applicable, shall establish the Professional Fee Escrow Account and fund such account with Cash equal to the Professional Fee Reserve Amount. The Professional Fee Escrow Account shall be maintained in trust for the Professionals. Each Holder of an Allowed Professional Fee Claim will be paid by the Reorganized Debtors in Cash from the Professional Fee Escrow Account within five (5) Business Days of entry of the order approving such Allowed Professional Fee Claim. If the Professional Fee Escrow Account is depleted, each Holder of an Allowed Professional Fee Claim will be paid the full amount of such Allowed Professional Fee Claim by the Reorganized Debtors in Cash within five (5) Business Days of entry of the order approving such Allowed Professional Fee Claim. All amounts remaining in the Professional Fee Escrow Account after all Allowed Professional Fee Claims have been paid in full shall revert to Reorganized HHI. If the Professional Fee Escrow Account is insufficient to pay the full amount of all Allowed Professional Fee Claims, remaining unpaid Allowed Professional Fee Claims will be promptly paid by the Reorganized Debtors without any further action or order of the Bankruptcy Court.

2.        **Priority Tax Claims.**

In full and complete satisfaction, settlement, discharge and release of and in exchange for each Allowed Priority Tax Claim (except to the extent that (a) the Holder of such Allowed Priority Tax Claim agree in writing to less favorable treatment or (b) the Holder of such Allowed Priority Tax Claim has been paid in full during the Chapter 11 Cases), on the Effective Date, each Holder of an Allowed Priority Tax Claim will be treated in accordance with section 1129(a)(9)(C) of the Bankruptcy Code.

3.        **Statutory Fees.**

Notwithstanding anything herein to the contrary, on the Effective Date, the Debtors shall pay, in full, in Cash, any fees due and owing to the U.S. Trustee at the time of Confirmation pursuant to 28 U.S.C. § 1930(a)(6). On and after the Effective Date, to the extent the Chapter 11 Cases remains open, and for so long as the Reorganized Debtors remain obligated to pay quarterly fees, the Reorganized Debtors shall file with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee. The Debtors or Reorganized Debtors, as applicable, shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of the Chapter 11 Cases being closed, dismissed or converted to a case under chapter 7 of the Bankruptcy Code.

B.        **Classification and Treatment of Claims and Interests.**

1.        **Classification of Claims and Interests.**

Each Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code, and the Plan constitutes a separate Plan proposed by each Debtor, including for purposes of distribution. Except for the Claims addressed in Article II of the Plan, all Claims and Interests are classified in the Classes set forth below in accordance with section 1122 of the Bankruptcy Code. A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or an Interest

also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The following chart represents the classification of Claims and Interests for each Debtor pursuant to the Plan:

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3 | ABL Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 4 | Secured Notes Claims | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 6 | Intercompany Claims | Unimpaired; Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| 7 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 8 | Intercompany Interests | Unimpaired; Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| 9 | Existing Equity Interests | Impaired | Entitled to Vote[10] |

**2.      Treatment of Classes of Claims and Interests.**

To the extent a Class contains Allowed Claims or Allowed Interests with respect to any Debtor, the classification of Allowed Claims and Allowed Interests is specified below.

**3.      Class 1 — Other Secured Claims**

(a)      *Classification*:  Class 1 consists of all Other Secured Claims against each Debtor.

(b)      *Treatment*:  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, to the extent such claim has not already been paid in full during the Chapter 11 Cases, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each Allowed Other Secured Claim, each Holder thereof shall receive, at the option of the Debtors and with the consent of the Required Consenting Noteholders: (a) payment in full in cash of its Other Secured Claim on the Effective Date (or as soon thereafter as reasonably practicable); (b) the collateral securing its Allowed Other Secured Claim; (c) reinstatement of its Allowed Other Secured Claim under section 1124 of the Bankruptcy Code; (d) such other treatment rendering its Allowed Other Secured Claim unimpaired in accordance with section 1124 of the Bankruptcy Code; or (e) the indubitable equivalent of such claim.

(c)      *Impairment and Voting*: Class 1 is Unimpaired under the Plan. Holders of Allowed Other Secured Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Therefore, Holders of Allowed Other Secured Claims are not entitled to vote to accept or reject the Plan.

**4.      Class 2 — Other Priority Claims**

(a)      *Classification*: Class 2 consists of all Other Priority Claims against each Debtor.

(b)      *Treatment*:  Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, to the extent such claim has not already been paid in full during

---

[10]     Only Holders of Existing Common Equity Interests as of the Voting Record Date are entitled to vote within Class 9.

the Chapter 11 Cases, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each Allowed Other Priority Claim, each Holder thereof shall receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code, in each case, as determined by the Debtors with the consent of the Required Consenting Noteholders.

(c)     *Impairment and Voting*:  Class 2 is Unimpaired under the Plan. Holders of Allowed Other Priority Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Therefore, Holders of Allowed Other Priority Claims are not entitled to vote to accept or reject the Plan.

**5.      Class 3 — ABL Claims**

(a)     *Classification:*  Class 3 consists of all ABL Claims.

(b)     *Treatment:*  On the Effective Date, each Holder of an Allowed ABL Claim shall be paid in full in cash with the proceeds of the Exit ABL Facility.

(c)     *Impairment and Voting:* Class 3 is Unimpaired under the Plan. Holders of Allowed ABL Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Therefore, Holders of Allowed ABL Claims are not entitled to vote to accept or reject the Plan.

**6.      Class 4 — Secured Notes Claims**

(a)     *Classification:*  Class 4 consists of all Secured Notes Claims.

(b)     *Allowance:* The Secured Notes Claims shall be Allowed in an aggregate principal amount of no less than $378,634,000, plus all other unpaid and outstanding obligations including any accrued and unpaid interest thereon (including at any applicable default rate), and all applicable fees, costs, charges, expenses, premiums or other amounts arising under the Indentures and other Loan Documents (as defined therein), in each case, as of the Petition Date.

(c)     *Treatment:*  On or as soon as reasonably practicable following the Effective Date, except to the extent that a Holder of an Allowed Secured Notes Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each Allowed Secured Notes Claim, each Holder thereof (and/or its designee) shall receive its Pro Rata share of and/or interest in (i) 99.00% of the New Common Stock (subject to dilution from the Management Incentive Plan) and (ii) the Exit Take Back Debt.

(d)     *Impairment and Voting:* Class 4 is Impaired under the Plan. Holders of Allowed Secured Notes Claims are entitled to vote to accept or reject the Plan.

**7.      Class 5 — General Unsecured Claims**

(a)     *Classification*:  Class 5 consists of all General Unsecured Claims against each Debtor.

(b)     *Treatment*:  Except to the extent that a Holder of an Allowed General Unsecured Claim has already been paid during the Chapter 11 Cases or such Holder agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for its Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive, at the Debtors' option and with the consent of the Required Consenting Noteholders: (i) if such Allowed General Unsecured Claim is due and payable on or before the Effective Date, payment in full, in Cash, of the unpaid portion of its

Allowed General Unsecured Claim on the Effective Date; (ii) if such Allowed General Unsecured Claim is not due and payable before the Effective Date, payment in the ordinary course of business consistent with past practices; or (iii) other treatment, as may be agreed upon by the Debtors, the Required Consenting Noteholders, and the Holder of such Allowed General Unsecured Claim, such that the Allowed General Unsecured Claim shall be rendered unimpaired pursuant to section 1124(1) of the Bankruptcy Code.

(c)      *Impairment and Voting*: Class 5 is Unimpaired under the Plan. Holders of Allowed General Unsecured Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Allowed General Unsecured Claims are not entitled to vote to accept or reject the Plan.

## 8.      Class 6 —Intercompany Claims

(a)      *Classification*: Class 6 consists of all Intercompany Claims.

(b)      *Treatment*: On the Effective Date, in full and final satisfaction, settlement, discharge and release of, and in exchange for, each Intercompany Claim, at the option of the Reorganized Debtors and with the consent of the Required Consenting Noteholders, each Allowed Intercompany Claim shall be (i) Unimpaired and Reinstated or (ii) Impaired and canceled and released without any distribution.

(c)      *Impairment and Voting:* Holders of Allowed Intercompany Claims in Class 6 are either (i) Unimpaired, and such Holders are conclusively deemed to have accepted the Plan pursuant to section 1126(f), or (ii) Impaired, and such Holders are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Allowed Intercompany Claims are not entitled to vote to accept or reject the Plan.

## 9.      Class 7 — Section 510(b) Claims

(a)      *Classification*: Class 7 consists of Section 510(b) Claims against each Debtor.

(b)      *Treatment*:   Section 510(b) Claims shall be discharged, canceled, released, and extinguished without any distribution to Holders of such Claims. The Debtors believe that no Section 510(b) Claims exist.

(c)      *Impairment and Voting*: Class 7 is Impaired by the Plan, and Holder of Section 510(b) Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Section 510(b) Claims are not entitled to vote to accept or reject the Plan.

## 10.     Class 8 — Intercompany Interests

(a)      *Classification*: Class 8 consists of all Intercompany Interests.

(b)      *Treatment*: On the Effective Date, in full and final satisfaction, settlement, discharge and release of, and in exchange for, each Intercompany Interest, at the option of the Reorganized Debtors, and with the consent of the Required Consenting Noteholders, each Intercompany Interest shall be (i) Unimpaired and Reinstated or (ii) Impaired and canceled and released without any distribution.

(c)      *Impairment and Voting*: Holders of Intercompany Interests in Class 8 are either (i) Unimpaired, and such Holders are conclusively deemed to have accepted the Plan pursuant to section 1126(f), or (ii) Impaired, and such Holders are conclusively deemed to have

rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

11.    **Class 9 — Existing Equity Interests**

(a)    *Classification:*  Class 9 consists of all Existing Equity Interests.

(b)    *Treatment:*  On the Effective Date, each Existing Equity Interest shall be canceled, released, and extinguished, and will be of no further force or effect and Holders of Allowed Existing Common Equity Interests on the Effective Date shall receive their Pro Rata share of the Equity Recovery.

(c)    *Impairment and Voting:*  Class 9 is Impaired under the Plan. Holders of Allowed Existing Common Equity Interests on the Voting Record Date are entitled to vote to accept or reject the Plan.

**C.    Means for Implementation of the Plan.**

**1.    Corporate and Organizational Existence.**

Except as otherwise provided in the Plan or any agreement, instrument or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, each Reorganized Debtor shall continue to exist, pursuant to its organizational documents in effect prior to the Effective Date, except as otherwise set forth herein or in the Plan Supplement, without any prejudice to any right to terminate such existence (whether by merger or otherwise) in accordance with applicable Law after the Effective Date. To the extent such documents are amended on or prior to the Effective Date, such documents are deemed to be amended pursuant to the Plan without any further notice to or action, order or approval of the Bankruptcy Court.

**2.    Corporate Action**

On or before the Effective Date, as applicable, all actions contemplated under the Plan or the Plan Supplement shall be deemed authorized and approved in all respects, including: (1) adoption or assumption, as applicable, of the agreements with existing management; (2) selection of the directors, managers, and officers for the Reorganized Debtors; (3) implementation of the Restructuring Transactions; (4) issuance and distribution of the New Common Stock by the Distribution Agent; (5) adoption of the New Organizational Documents; (6) entry into the Exit Facility Documents; (7) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; (8) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date); and (9) all other acts or actions contemplated or reasonably necessary or appropriate to properly consummate the Restructuring Transactions contemplated by the Plan (whether to occur before, on or after the Effective Date). All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, as applicable, and any corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, managers, or officers of the Debtors or the Reorganized Debtors. On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtors, including the New Shareholders Agreement, the New Organizational Documents, the Exit Facility Documents, and any and all other agreements, documents, securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by Article IV.J of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

**3.    Organizational Documents of the Reorganized Debtors.**

On the Effective Date, the New Organizational Documents shall become effective and be deemed to amend and restate the current organizational documents without the need for any further notice or approvals. To the extent

necessary, the New Organizational Documents will (i) include, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code, a provision prohibiting the issuance of non-voting equity securities, but only to the extent required by section 1123(a)(6) of the Bankruptcy Code, and (ii) to the extent necessary or appropriate, include such provisions as may be needed to effectuate and consummate the Plan and the transactions contemplated herein. After the Effective Date, each Reorganized Debtor may amend and restate its organizational documents, as permitted by applicable Law and pursuant to the terms contained therein.

4.      **Managers, Directors and Officers of Reorganized Debtors; Corporate Governance.**

On the Effective Date, Reorganized HHI shall enter into and deliver the New Shareholders Agreement, in substantially the forms included in the Plan Supplement, to each Holder of New Common Stock and such Holders shall be bound thereby, without the need for execution by any party thereto other than Reorganized HHI.

The number and identity of the initial members of the New Board shall be determined by the Required Consenting Noteholders in consultation with the Debtors or Reorganized Debtors, as applicable, provided that the initial directors of the New Board shall include the President of HHI. Subsequent members of the New Board shall be selected in accordance with the New Organizational Documents, the Restructuring Term Sheet and the New Shareholders Agreement. To the extent not previously disclosed, the Debtors will disclose prior to or at the Confirmation Hearing, the affiliations of each Person proposed to serve on the New Board or as an officer of the Reorganized Debtors, and, to the extent such Person is an insider other than by virtue of being a manager, director or officer, the nature of any compensation for such Person.

5.      **Sources of Consideration for Plan Distributions.**

The Debtors shall fund distributions under the Plan, as applicable, with: (1) the issuance of New Common Stock; (2) the Exit ABL Facility; (3) the Exit Take Back Debt; and (4) the Debtors' Cash on hand. Each distribution and issuance referred to in Article IV of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance. The issuance, distribution, or authorization, as applicable, of certain Securities in connection with the Plan, including the New Common Stock will be exempt from SEC registration, as described more fully in Article IX.B below.

(a)      **Issuance and Distribution of the New Common Stock.**

i.      On the Effective Date, the New Common Stock shall be issued and distributed to the Holders of Secured Notes Claims and Existing Common Equity Interests entitled to receive the New Common Stock pursuant to the Plan in accordance with the Restructuring Support Agreement. The issuance of New Common Stock by the Reorganized Debtors shall be authorized without the need for any further corporate action and without any action by such Holders or other parties in interest. All of the New Common Stock issued under the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.

ii.      Each distribution and issuance of the New Common Stock under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance, as applicable, and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, as applicable, including the New Shareholders Agreement and the New Organizational Documents, which terms and conditions shall bind each Holder receiving such distribution of the New Common Stock. Any such Holder's acceptance of New Common Stock shall be deemed as its agreement to the New Organizational Documents and the New Shareholders Agreement, as the same may be amended or modified from time to time following the Effective Date in accordance with their respective terms. The New Common Stock may not be registered on any exchange as of the Effective Date and may not meet the eligibility requirements of the

Depository Trust Company ("**DTC**"). All New Common Stock issued and distributed under the Plan shall be subject to dilution by the Management Incentive Plan.

(b)　　**Exit ABL Loan Documents.**

　　i.　　On the Effective Date, the applicable Reorganized Debtors shall execute and deliver the Exit ABL Credit Agreement and the other Exit ABL Credit Documents. Confirmation shall be deemed approval of the Exit ABL Facility (including transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the Debtors or Reorganized Debtors in connection therewith). The Reorganized Debtors shall execute and deliver those documents necessary or appropriate to obtain the Exit ABL Facility, including the Exit ABL Credit Documents.

　　ii.　　On the Effective Date, as applicable, all Liens and security interests granted pursuant to, or in connection with the Exit ABL Credit Agreement shall be deemed granted by the Reorganized Debtors pursuant to the Exit ABL Credit Agreement, and all Liens and security interests granted pursuant to, or in connection with the Exit ABL Credit Agreement (including any Liens and security interests granted on the Reorganized Debtors' assets) shall (i) be valid, binding, perfected, enforceable liens and security interests in the property described in the Exit ABL Credit Agreement and the other "Loan Documents" (as defined therein or any similar defined term), with the priorities established in respect thereof under applicable non-bankruptcy Law and the Exit Intercreditor Agreement, and (ii) not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination under any applicable law, the Plan, or the Confirmation Order.

　　iii.　　The Reorganized Debtors shall also execute, deliver, file, record and issue any other related notes, guarantees, deeds of trust, security documents or instruments (including UCC financing statements), amendments to the foregoing, or agreements in connection therewith, in each case, without (A) further notice to or order of the Bankruptcy Court or (B) further act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Entity (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order without the need for any filings or recordings) and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable Law to give notice of such liens and security interests to third parties.

(c)　　**Exit Take Back Debt Documents.**

　　i.　　On the Effective Date, the applicable Reorganized Debtors shall execute and deliver the Exit Take Back Debt Agreement and the other Exit Take Back Debt Documents. Confirmation shall be deemed approval of the Exit Take Back Debt (including transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the Debtors or Reorganized Debtors in connection therewith). The Reorganized Debtors shall execute and deliver those documents necessary or appropriate to obtain the Exit Take Back Debt, including the Exit Take Back Debt Documents.

　　ii.　　On the Effective Date, as applicable, all Liens and security interests granted pursuant to, or in connection with the Exit Take Back Debt Agreement shall be deemed granted by the Reorganized Debtors pursuant to the Exit Take Back Debt Agreement, and all Liens and security interests granted pursuant to, or in connection with the Exit Take Back Debt Agreement (including any Liens and security interests

granted on the Reorganized Debtors' assets) shall (i) be valid, binding, perfected, enforceable liens and security interests in the property described in the Exit Take Back Debt Agreement and the other "Loan Documents" (as defined therein or any similar defined term), with the priorities established in respect thereof under applicable non-bankruptcy Law and the Exit Intercreditor Agreement, and (ii) not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination under any applicable law, the Plan, or the Confirmation Order.

    iii.    The Reorganized Debtors shall also execute, deliver, file, record and issue any other related notes, guarantees, deeds of trust, mortgages, security documents or instruments (including UCC financing statements), amendments to the foregoing, or agreements in connection therewith, in each case, without (A) further notice to or order of the Bankruptcy Court or (B) further act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Entity (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order without the need for any filings or recordings) and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable Law to give notice of such liens and security interests to third parties.

For the avoidance of doubt, on the Effective Date, all Holders of Secured Notes Claims shall be deemed party to the Exit Take Back Debt Agreement and the applicable other Exit Take Back Debt Documents, in each case, without the need for execution by any party thereto other than Reorganized HHI.

    **6.**    **Exemption from Registration Requirements.**

All shares of New Common Stock or other Securities, as applicable, issued and distributed pursuant to the Plan, will be issued and distributed without registration under the Securities Act or any similar federal, state, or local Law in reliance upon (1) section 1145 of the Bankruptcy Code; (2) section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder; or (3) such other exemption as may be available from any applicable registration requirements.

To the extent that the offering, issuance, and distribution of any shares of New Common Stock or other Securities pursuant to the Plan is in reliance upon section 1145 of the Bankruptcy Code, it is exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable U.S. state or local Law requiring registration prior to the offering, issuance, distribution, or sale of Securities. Such shares of New Common Stock or other Securities to be issued under the Plan pursuant to section 1145 of the Bankruptcy Code (a) will not be "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (b) subject to the terms of the New Shareholders Agreement, will be freely tradable and transferable by any initial recipient thereof that (i) is not an "affiliate" of the Debtors as defined in Rule 144(a)(1) under the Securities Act, (ii) has not been such an "affiliate" within 90 days of such transfer, and (iii) is not an entity that is an "underwriter" as defined in subsection (b) of Section 1145 of the Bankruptcy Code.

All shares of New Common Stock or other Securities issued pursuant to the Plan that are not issued in reliance on section 1145 of the Bankruptcy Code will be issued without registration under the Securities Act or any similar federal, state, or local Law in reliance on section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder, or such other exemption as may be available from any applicable registration requirements. All shares of New Common Stock or other Securities issued pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom. The New Common Stock underlying the Management Incentive Plan will be issued pursuant to a registration statement or an available exemption from registration under the Securities Act and other applicable law.

The availability of the exemption under section 1145 of the Bankruptcy Code or any other applicable securities laws shall not be a condition to the occurrence of the Effective Date.

Should the Reorganized Debtors elect, on or after the Effective Date, to reflect all or any portion of the ownership of Reorganized HHI's New Common Stock through the facilities of the DTC, the Reorganized Debtors shall not be required to provide any further evidence other than the Plan or Confirmation Order with respect to the treatment of such applicable portion of Reorganized HHI's New Common Stock, and such Plan or Confirmation Order shall be deemed to be legal and binding obligations of the Reorganized Debtors in all respects.

DTC shall be required to accept and conclusively rely upon the Plan and Confirmation Order in lieu of a legal opinion regarding whether Reorganized HHI's New Common Stock is exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

Notwithstanding anything to the contrary in the Plan, no Entity (including, for the avoidance of doubt, DTC) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether Reorganized HHI's New Common Stock are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

### 7.    Cancellation of Certain Existing Security Interests.

Upon the full payment or other satisfaction of an Allowed Other Secured Claim, or promptly thereafter, the Holder of such Allowed Other Secured Claim shall deliver to the Debtors or Reorganized Debtors (as applicable) any termination statements, instruments of satisfaction or releases of all security interests with respect to its Allowed Other Secured Claim that may reasonably be required in order to terminate any related financing statements, mortgages, mechanic's liens or lis pendens and take any and all other steps reasonably requested by the Debtors, the Reorganized Debtors, the Exit ABL Agent or the Exit Take Back Agent that are necessary to cancel and/or extinguish any Liens or security interests securing such Holder's Other Secured Claim.

### 8.    Management Incentive Plan.

Within sixty (60) days of the Effective Date, the Reorganized Debtors shall enter into the Management Incentive Plan, the terms of which shall be determined and approved by the New Board, provided that such terms shall be consistent with the Restructuring Term Sheet.

### 9.    Restructuring Transactions.

Following Confirmation, the Debtors and/or the Reorganized Debtors, as applicable, shall take any actions as may be necessary or appropriate to effect a restructuring of the Debtors' business or the overall organization or capital structure subject to and consistent with the terms of the Plan and the Restructuring Support Agreement and subject to the consent rights set forth therein in all respects. The actions taken by the Debtors and/or the Reorganized Debtors, as applicable, to effect the Restructuring Transactions may include: (i) the execution, delivery, adoption and/or amendment of appropriate agreements or other documents of restructuring, conversion, disposition, dissolution, liquidation, merger or transfer containing terms that are consistent with the terms of the Plan and the Restructuring Support Agreement and any documents contemplated hereunder or thereunder and that satisfy the applicable requirements of applicable state Law and any other terms to which the applicable parties may agree; (ii) the execution, delivery, adoption and/or amendment of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan, the Restructuring Support Agreement and any documents contemplated hereunder or thereunder and having any other terms for which the applicable parties may agree; (iii) the filing of appropriate certificates or articles of incorporation or formation, reincorporation, merger, conversion, dissolution or other organizational documents, as applicable, pursuant to applicable state law, including certificates of dissolution with respect to certain Debtors; (iv) the execution, delivery, adoption and/or amendment of all filings, disclosures or other documents necessary to obtain any necessary third-party approvals; (v) the execution and delivery of the New Shareholders Agreement and the New Organizational Documents and any certificates or articles of incorporation, bylaws, or such other applicable formation, organizational, governance, or constitutive documents (if any) of each Reorganized Debtor (including all actions to be taken, undertakings to be made, and obligations to be incurred and fees and expenses to be paid by the Debtors and/or the Reorganized Debtors, as applicable), and the issuance, distribution, reservation, or dilution, as applicable, of the New Common Stock, as set forth herein; (vi) the execution and delivery of the Exit Facility Documents (including all actions to be taken, undertakings to be made, and obligations to be incurred and fees and expenses to be paid by the

Debtors and/or the Reorganized Debtors, as applicable); (vii) the adoption of the Management Incentive Plan and the issuance and reservation of equity thereunder to the participants in the Management Incentive Plan on the terms and conditions set by New Board after the Effective Date, and/or (viii) all other actions that the Debtors and/or the Reorganized Debtors, as applicable, determine, with the consent of the Required Consenting Noteholders, to be necessary, desirable or appropriate to implement, effectuate and consummate the Plan or the Restructuring Transactions contemplated hereby, including making filings or recordings that may be required by applicable state Law in connection with the Restructuring Transactions. All matters provided for pursuant to the Plan that would otherwise require approval of the equity holders, managing members, members, managers, directors, or officers of any Debtor (as of or prior to the Effective Date) will be deemed to have been so approved and will be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law, the provisions of the New Organizational Documents, and without any requirement of further action by the equity holders, managing members, members, managers, directors or officers of such Debtors, or the need for any approvals, authorizations, actions or consents of any Person.

The Confirmation Order shall and shall be deemed to, pursuant to both section 1123 and section 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.

**10.     Effectuating Documents; Further Transactions.**

On and after the Effective Date, the Reorganized Debtors and the officers and members of the New Board and any other board of directors or managers of any of the Reorganized Debtors shall be authorized and (as applicable) directed to issue, execute, deliver, file or record such agreements, securities, instruments, releases and other documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan and the Restructuring Transactions, including the Exit Facility Documents, the New Shareholders Agreement, the Management Incentive Plan and any New Organizational Documents in the name of and on behalf of one or more of the Reorganized Debtors, without the need for any approvals, authorization or consents except those expressly required pursuant to the Plan.

**11.     Vesting of Assets in the Reorganized Debtors.**

Except as provided elsewhere in the Plan, or in the Confirmation Order, on or after the Effective Date, all property and assets of the Debtors' Estates (including Causes of Action, but only to the extent such Causes of Action have not been waived or released pursuant to the terms of the Plan, pursuant to an order of the Bankruptcy Court, or otherwise) and any property and assets acquired by the Debtors pursuant to the Plan, will vest in the Reorganized Debtors, free and clear of all Liens or Claims. Except as may be otherwise provided in the Plan, on and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire or dispose of property and compromise or settle any Claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan, the Confirmation Order, the New Organizational Documents or the New Shareholders Agreement.

**12.     Release of Liens, Claims and Interests.**

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, concurrently with the applicable distributions made pursuant to the Plan, all Liens, Claims or Interests in or against the property of the Estates will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Entity. Any Entity holding such Liens, Claims, or Interests will, if necessary, pursuant to section 1142 of the Bankruptcy Code, promptly execute and deliver to the Reorganized Debtors such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Reorganized Debtors and shall incur no liability to any Entity in connection with its execution and delivery of any such instruments.

On the Effective Date, in exchange for the treatment described herein and as set forth in Article III of the Plan, the Secured Notes Claims and the ABL Claims shall be discharged, the Liens on the Collateral (as defined in the Indentures or the ABL Credit Agreement, as applicable) shall be released and the Indentures and the ABL Credit

Agreement shall be cancelled and be of no further force or effect, and the obligations of the Debtors or the Reorganized Debtors thereunder or in any way related thereto shall be discharged and deemed satisfied in full, and the ABL Agent and the Indenture Trustee shall be released from all duties and obligations thereunder; provided, however, that notwithstanding Confirmation or the occurrence of the Effective Date, any credit document or agreement that governs the rights of the Holder of a Claim or Interest and any debt issued thereunder shall continue in effect solely for purposes of (1) allowing Holders of Allowed Claims to receive distributions under the Plan; (2) allowing and preserving the rights of the ABL Agent and the Indenture Trustee to make distributions pursuant to the Plan; (3) preserving the ABL Agent's and the Indenture Trustee's rights to compensation and indemnification as against any money or property distributable to the Holders of ABL Claims or Secured Notes Claims, including permitting the ABL Agent and the Indenture Trustee to maintain, enforce, and exercise their respective charging liens, if any, against such distributions; (4) preserving all rights, including rights of enforcement, of the ABL Agent and the Indenture Trustee against any Person other than a Released Party (including the Debtors), including with respect to indemnification or contribution from the Holders of ABL Claims and Secured Notes Claims, pursuant and subject to the terms of the Indentures and the ABL Credit Agreement, respectively, as in effect on the Effective Date; (5) permitting the ABL Agent and the Indenture Trustee to enforce any obligation (if any) owed to the ABL Agent and the Indenture Trustee, respectively, under the Plan; (6) permitting the ABL Agent and the Indenture Trustee to appear in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court; and (7) permitting the ABL Agent and the Indenture Trustee to perform and seek compensation and reimbursement for any functions that are necessary to effectuate the foregoing; provided, further, however, that (a) the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan, or result in any expense or liability to the Debtors or Reorganized Debtors, as applicable, except as expressly provided for in the Plan and (b) except as otherwise provided in the Plan, the terms and provisions of the Plan shall not modify any existing contract or agreement that would in any way be inconsistent with distributions under the Plan. The ABL Agent and the Trustee shall be discharged and shall have no further obligation or liability except as provided in the Plan and Confirmation Order, and after the performance by the ABL Agent and the Indenture Trustee and their representatives and professionals of any obligations and duties required under or related to the Plan or Confirmation Order, the ABL Agent and the Indenture Trustee shall be relieved of and released from any obligations and duties arising under the Plan, the Confirmation Order, and, respectively, the ABL Credit Agreement and the Indentures, except with respect to such other rights that survive the termination of the Indentures. The fees, expenses, and costs of the ABL Agent and the Indenture Trustee, including fees, expenses, and costs of its professionals incurred after the Effective Date in connection with the ABL Credit Agreement and the Indentures, as applicable, and reasonable and documented costs and expenses associated with effectuating distributions pursuant to the Plan will be paid by the Reorganized Debtors in the ordinary course.

**13.    Cancellation of Stock, Certificates, Instruments and Agreements.**

On the Effective Date, all stock, units, instruments, certificates, agreements and other documents evidencing the Existing Equity Interests will be cancelled, and the obligations of the Debtors thereunder or in any way related thereto will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or any requirement of further action, vote or other approval or authorization by any Person.

**14.    Preservation and Maintenance of Debtors' Causes of Action.**

(a)    **Maintenance of Causes of Action**

In accordance with section 1123(b) of the Bankruptcy Code, except as otherwise provided in Article VIII or elsewhere in the Plan or the Confirmation Order, or in any contract, instrument, release or other agreement entered into in connection with the Plan, on and after the Effective Date, the Reorganized Debtors shall retain any and all rights to commence, pursue, litigate or settle, as appropriate, any and all Causes of Action of the Debtors, whether existing as of the Petition Date or thereafter arising, in any court or other tribunal, including in an adversary proceeding filed in the Chapter 11 Cases, but excluding all Avoidance Actions, which shall be deemed released and waived by the Debtors and Reorganized Debtors as of the Effective Date except for Avoidance Actions brought as counterclaims or defenses to claims asserted against the Debtors. The Reorganized Debtors, as the successors in interest to the Debtors and their Estates, may, in their sole and absolute discretion, and will have the exclusive right to, enforce, sue on, settle, compromise, transfer or assign (or decline to do any of the foregoing) any or all such Causes of Action, without notice to or approval from the Bankruptcy Court. The Reorganized Debtors or their respective successor(s)

may pursue such retained claims, rights or Causes of Action, suits or proceedings as appropriate, in accordance with the best interests of the Reorganized Debtors or their respective successor(s) who hold such rights. Upon the Effective Date, the Reorganized Debtors, as applicable, shall be deemed to have released all Preference Actions held by the Debtors, if any. For the avoidance of doubt, in no instance will any Cause of Action maintained or preserved pursuant to Article IV.O.1 of the Plan include any Cause of Action with respect to, or against, a Released Party.

(b)    <b>Preservation of All Causes of Action Not Expressly Settled or Released</b>

Unless a Cause of Action against a Holder of a Claim or an Equity Interest or other Entity is (A) expressly waived, relinquished, released, compromised or settled in the Plan (including and for the avoidance of doubt, the releases contained in Article VIII of the Plan) or any Final Order (including the Confirmation Order), or (B) subject to the discharge and injunction provisions in Article VIII of the Plan, and the Confirmation Order, in the case of each of clauses (A) and (B), the Debtors and the Reorganized Debtors, as applicable, expressly reserve such Cause of Action for later adjudication and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such Causes of Action upon or after the Confirmation of the Plan or the Effective Date of the Plan based on the Plan or the Confirmation Order. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement or the Disclosure Statement to any Causes of Action against it as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against it. The Debtors and the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan. For the avoidance of doubt, in no instance will any Cause of Action maintained or preserved pursuant to Article IV.O.2 of the Plan include any Cause of Action with respect to, or against, a Released Party.

### 15.    Exemption from Certain Taxes and Fees.

To the maximum extent permitted by section 1146 of the Bankruptcy Code, any post-confirmation (a) issuance, transfer or exchange of any securities, instruments or documents, (b) creation of any Lien, mortgage, deed of trust or other security interest, (c) sale transactions consummated by the Debtors and approved by the Bankruptcy Court, including any transfers effectuated under the Plan, (d) assumption, assignment, or sale by the Debtors of their interests in unexpired leases of nonresidential real property or executory contracts pursuant to section 365(a) of the Bankruptcy Code, (e) grant of collateral under the Exit Take Back Debt Agreement and (f) issuance, renewal, modification or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including the Confirmation Order shall not be subject to any document recording tax, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales tax, use tax or other similar tax or governmental assessment.  Consistent with the foregoing, each recorder of deeds or similar official for any county, city or Governmental Unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax or similar tax.

### 16.    Restructuring Expenses.

The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date shall be paid in full in Cash on the Effective Date (to the extent not previously paid during the course of the Chapter 11 Cases) without the requirement to file a fee application with the Bankruptcy Court and without any requirement for Bankruptcy Court review or approval; *provided*, that, with respect to any such Restructuring Expenses of legal counsel to the Ad Hoc Noteholder Group or the Sponsor Equityholder (subject to the Sponsor Fee Cap), the Debtors and Reorganized Debtors (as applicable) shall have the right to review (subject to applicable attorney-client privilege) and object to any such Restructuring Expenses on reasonableness grounds. All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least five (5) Business Days before the anticipated Effective Date; provided, further, that such estimate shall not be considered an admission or limitation with respect to such Restructuring Expenses. On the Effective Date, final invoices for all Restructuring Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors.

17.    **Distributions.**

Except as otherwise provided in the Plan or the Confirmation Order, all Cash necessary for the Debtors or Reorganized Debtors to make payments required pursuant to the Plan will be paid from the Cash balances of the Debtors or the Reorganized Debtors. Cash payments to be made pursuant to the Plan will be made by the Reorganized Debtors, as applicable, or any designated Affiliates of the Reorganized Debtors on their behalf.

18.    **Treatment of Executory Contracts and Unexpired Leases.**

(a)    **Debtors Assumption of Executory Contracts and Unexpired Leases.**

Except as otherwise provided in the Plan, as of the Effective Date, each Debtor shall be deemed to have assumed each Executory Contract and Unexpired Lease to which it is a party in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, without the need for any further notice to or action, order or approval of the Bankruptcy Court, unless such Executory Contract or Unexpired Lease: (1) was assumed or rejected previously by such Debtor; (2) expired or terminated pursuant to its own terms prior to the Effective Date; (3) is the subject of a motion to reject filed on or before the Effective Date; or (4) identified on the Rejected Executory Contract and Unexpired Lease List (which shall be included in the Plan Supplement) as an Executory Contract or Unexpired Lease designated for rejection. The assumption of Executory Contracts and Unexpired Leases pursuant to the Plan may include the assignment of certain of such contracts to one or more Reorganized Debtors. The Confirmation Order will constitute an order of the Bankruptcy Court approving the above-described assumptions.

Entry of the Confirmation Order by the Bankruptcy Court shall constitute an order approving the rejection of Executory Contracts and Unexpired Leases identified on the Rejected Executory Contract and Unexpired Lease List and assumption or, as applicable, assumption and assignment, of all other Executory Contracts and Unexpired Leases, subject to the exceptions noted above, all pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Notwithstanding anything to the contrary in the Plan, the Debtors or Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Rejected Executory Contract and Unexpired Lease List prior to the Effective Date.

To the maximum extent permitted by law, to the extent that any provision in any Executory Contract or Unexpired Lease assumed, or amended and assumed, and, in either case, potentially assigned, restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption, or amendment and assumption, and, in either case, the potential assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

Except as otherwise provided in the Plan or agreed to by the Debtors and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal and any other interests. Modifications, amendments, supplements and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

If certain, but not all, of a contract counterparty's Executory Contracts and/or Unexpired Leases are assumed pursuant to the Plan, the Confirmation Order shall be a determination that such counterparty's Executory Contracts and/or Unexpired Leases that are being rejected pursuant to the Plan are severable agreements that are not integrated with those Executory Contracts and/or Unexpired Leases that are being assumed pursuant to the Plan. Parties seeking to contest this finding with respect to their Executory Contracts and/or Unexpired Leases must file a timely objection to the Plan on the grounds that their agreements are integrated and not severable, and any such dispute shall be resolved by the Bankruptcy Court at the Confirmation Hearing (to the extent not resolved by the parties prior to the Confirmation Hearing).

(b)    **Claims Based on Rejection of Executory Contracts and Unexpired Leases**

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be filed with the Bankruptcy Court within 30 days after the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (2) the effective date of such rejection, or (3) the Effective Date. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors or the Reorganized Debtors, the Estates, or their property without the need for any objection by the Reorganized Debtors of further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Proof of Claim to the contrary. All Allowed Claims arising from the rejection of an Executory Contract or Unexpired Lease shall be classified as General Unsecured Claims and shall be treated in accordance with Article III.B.5 of the Plan.

(c)    **Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.**

The Reorganized Debtors shall satisfy any monetary defaults under any Executory Contract or Unexpired Lease to be assumed hereunder, to the extent required by section 365(b)(1) of the Bankruptcy Code, upon assumption thereof in the ordinary course of business. If a counterparty to any Executory Contract or Unexpired Lease believes any amounts are due as a result of such Debtor's monetary default thereunder, it shall assert a Cure Claim against the Debtors or Reorganized Debtors, as applicable, in the ordinary course of business, subject to all defenses the Debtors or Reorganized Debtors may have with respect to such Cure Claim. Any Cure Claim shall be deemed fully satisfied, released and discharged upon payment by the Reorganized Debtors of the applicable Cure Claim; *provided*, that nothing in the Plan shall prevent the Reorganized Debtors from paying any Cure Claim despite the failure of the relevant counterparty to assert or file such request for payment of such Cure Claim. The Debtors, with the consent of the Required Consenting Noteholders, or the Reorganized Debtors, as applicable, may settle any Cure Claims without any further notice to or action, order or approval of the Bankruptcy Court.

As set forth in the notice of the Confirmation Hearing, any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan, including an objection regarding the ability of the Reorganized Debtors to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code), must have been filed with the Bankruptcy Court by the deadline set by the Bankruptcy Court for objecting to Confirmation of the Plan, or such other deadline as may have been established by order of the Bankruptcy Court. To the extent any such objection is not determined by the Bankruptcy Court at the Confirmation Hearing, such objection may be heard and determined at a subsequent hearing. Any counterparty to an Executory Contract or Unexpired Lease that did not timely object to the proposed assumption of any Executory Contract or Unexpired Lease by the deadline established by the Bankruptcy Court will be deemed to have consented to such assumption.

In the event of a dispute regarding (1) the amount of any Cure Claim, (2) the ability of the Reorganized Debtors to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or (3) any other matter pertaining to assumption or the payment of Cure Claims required by section 365(b)(1) of the Bankruptcy Code, payment of a Cure Claim, if any, shall occur as soon as reasonably practicable after entry of a Final Order or Final Orders resolving such dispute and approving such assumption. The Debtors (with the consent of the Required Consenting Noteholders), or Reorganized Debtors, as applicable, reserve the right at any time prior to the Effective Date to move to reject any Executory Contract or Unexpired Lease based upon the existence of any unresolved dispute or upon a resolution of such dispute that is unfavorable to the Debtors or Reorganized Debtors.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise, and full payment of any applicable Cure Claims pursuant to the Plan, shall result in the full release and satisfaction of any Claims or defaults, whether monetary or non-monetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the date that the Reorganized Debtors assume such Executory Contract or Unexpired Lease. Any Proofs of Claim filed with respect to an Executory Contract or Unexpired Lease

that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

        (d)      **Assumption of Insurance Policies.**

Notwithstanding anything in the Plan to the contrary, all of the Debtors' insurance policies and any agreements, documents or instruments relating thereto, are treated as and deemed to be Executory Contracts under the Plan. On the Effective Date, pursuant to section 365(a) of the Bankruptcy Code, the Reorganized Debtors shall be deemed to have assumed all insurance policies and any agreements, documents and instruments related thereto, including all D&O Liability Insurance Policies. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' assumption of all such insurance policies, including the D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation shall not discharge, impair or otherwise modify any indemnity obligations presumed or otherwise referenced in the foregoing insurance policies, including the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Reorganized Debtors under the Plan as to which no Proof of Claim need be filed, and shall survive the Effective Date.

After the Effective Date, the Reorganized Debtors shall not terminate or otherwise reduce, modify or restrict in any way, the coverage under any D&O Liability Insurance Policies (including such tail coverage liability insurance) in effect or purchased as of the Petition Date, and all members, managers, directors and officers of the Reorganized Debtors who served in such capacity at any time prior to the Effective Date or any other individuals covered by such D&O Liability Insurance Policies shall be entitled to the full benefits of any such policy for the full term of such policy (and all tail coverage related thereto) regardless of whether such members, managers, directors and/or officers remain in such positions after the Effective Date.

        (e)      **Rejection of MSA and CITIC Agreement.**

Notwithstanding anything herein to the contrary, on the Effective Date, the MSA and the CITIC Agreement shall each be rejected pursuant to section 365(a) of the Bankruptcy Code.  In full and complete satisfaction of any and all Claims, rights or obligations under the MSA and the rejection thereof, the Sponsor Equityholder shall be entitled to the MSA Claim.   In full and complete satisfaction of any and all Claims, rights or obligations under the CITIC Agreement and the rejection thereof, CITIC shall be entitled to the CITIC Claim.  As of the Effective Date, each of the MSA Claim and the CITIC Claim shall be Allowed General Unsecured Claims.

        (f)      **Indemnification.**

All indemnification obligations in place as of the Effective Date (whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational or formation documents, board resolutions, indemnification agreements, employment contracts, service contracts, or otherwise) for the current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, as applicable, shall be assumed and remain in full force and effect after the Effective Date, and shall not be modified, reduced, discharged, impaired, or otherwise affected in any way, including by Confirmation of the Plan, and shall survive unimpaired and unaffected, irrespective of when such obligation arose by the Reorganized Debtors, as applicable.

        (g)      **Employment Obligations and Programs.**

Except as otherwise provided in the Plan, on and after the Effective Date, subject to any Final Order and, without limiting any authority provided to the New Board under the Debtors' respective formation, organizational and constituent documents, the Reorganized Debtors shall adopt, assume, and/or honor in the ordinary course of business any written contracts, agreements, policies, programs, and plans, in accordance with their respective terms, for, among other things, compensation, bonuses, reimbursement, indemnity, health care benefits, disability benefits, deferred compensation benefits, travel benefits, vacation and sick leave benefits, savings, severance benefits, retirement benefits, welfare benefits, relocation programs, life insurance and accidental death and dismemberment insurance, including written contracts, agreements,

policies, programs, and plans, in accordance with their respective terms, for bonuses and other incentives or compensation for the Debtors' current and former employees, directors, officers, and managers, including executive compensation programs and all existing compensation arrangements for the employees of the Debtors, in each case on the current terms of such arrangements as may be modified from time to time in the ordinary course of business. Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

(h)    **Workers' Compensation Benefits.**

Except as otherwise provided in the Plan, as of the Effective Date, the Debtors and the Reorganized Debtors will continue to honor their obligations under: (i) all applicable workers' compensation laws in states in which the Reorganized Debtors operate; and (ii) the Debtors' written contracts, agreements, agreements of indemnity, self-insurer workers' compensation bonds and any other policies, programs, and plans regarding or relating to workers' compensation and workers' compensation insurance; all such contracts and agreements are treated as Executory Contracts under the Plan and on the Effective Date will be assumed by the Reorganized Debtors pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan will not impair or otherwise modify any rights of the Reorganized Debtors under any such contracts, agreements, policies, programs or plans regarding or relating to workers' compensation or workers' compensation insurance.

(i)    **Reservation of Rights.**

Nothing contained in the Plan shall constitute an admission by the Debtors, Reorganized Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that the Debtors or Reorganized Debtors have any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption, the Debtors or Reorganized Debtors, as applicable, shall have forty-five (45) calendar days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease, including by rejecting such contract or lease effective as of the Confirmation Date or such other date the Reorganized Debtors deem appropriate.

(j)    **Nonoccurrence of Effective Date**

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code, unless such deadline(s) have expired.

(k)    **Contracts and Leases Entered Into After the Petition Date**

Contracts and leases entered into after the Petition Date by any Debtor and any Executory Contracts and Unexpired Leases assumed by any Debtor may be performed by the applicable Reorganized Debtor in the ordinary course of business.

D.    **Conditions Precedent to the Effective Date of the Plan.**

1.    **Conditions to Effective Date of the Plan.**

Effectiveness of the Plan is subject to the satisfaction of each of the following conditions precedent:

1.    The Bankruptcy Court shall have entered the Confirmation Order, which shall be in form and substance reasonably acceptable to the Required Consenting Noteholders, and the Confirmation Order shall not be stayed, modified, or vacated, and shall not be subject to any pending appeal, and the appeals period for the Confirmation Order shall have expired; provided that the requirement that the Confirmation Order not be subject to any pending appeal and the appeals period for the Confirmation Order shall have expired may be waived

by any Consenting Noteholder.

2.    The Restructuring Support Agreement shall continue to be in full force and effect.

3.    All actions, documents, and agreements necessary to implement and consummate the Plan shall have been effected and executed and remain in full force and effect.

4.    The Debtors shall have paid or reimbursed all Restructuring Expenses.

5.    Amounts sufficient to pay the Professional Fee Claims of all of the Debtors' Professionals, including those of (a) Gibson, Dunn & Crutcher LLP, as proposed counsel to the Debtors, (b) Young Conaway Stargatt & Taylor, LLP, as proposed co-counsel to the Debtors, and (c) Huron, as financial advisor to the Debtors shall have been placed in the Professional Fee Escrow Account pending approval of the Professional Fee Claims by the Bankruptcy Court.

6.    Each document or agreement constituting the Definitive Documents shall be in form and substance consistent with the Restructuring Support Agreement.

7.    All governmental approvals and consents that are legally required for the consummation of the Restructuring Transactions shall have been obtained.

**2.    Waiver of Conditions Precedent to the Effective Date.**

Other than the condition set forth in Article IX.A.4 of the Plan, the Debtors, with the consent of the Required Consenting Noteholders, may waive any of the conditions to the Effective Date set forth in Article IX.A of the Plan at any time without any notice to any other parties in interest and without any further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than proceeding to confirm and consummate the Plan

**3.    Substantial Consummation.**

"Substantial Consummation" of the Plan, as defined in section 1101(2) of the Bankruptcy Code, with respect to any of the Debtors, shall be deemed to occur on the Effective Date with respect to such Debtor.

**4.    Effect of Non-Occurrence of Conditions to Consummation.**

If the Effective Date does not occur with respect to any of the Debtors, the Plan shall be null and void in all respects with respect to such Debtor, and nothing contained in the Plan or the Disclosure Statement shall: (a) constitute a waiver or release of any Claims by or Claims against or Interests in such Debtors; (b) prejudice in any manner the rights of such Debtors, any Holders of a Claim or Interest, or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking by such Debtors, any Holders, or any other Entity in any respect.

**E.    Effects of Confirmation.**

**1.    General Settlement of Claims.**

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable.  In accordance

with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against, and Interests in, the Debtors and their Estates and Causes of Action against other Entities.

2.        **Binding Effect.**

**ON THE EFFECTIVE DATE, AND EFFECTIVE AS OF THE EFFECTIVE DATE, THE PLAN WILL BIND, AND WILL BE DEEMED BINDING UPON, ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS, AND EACH HOLDER'S RESPECTIVE DESIGNEES, SUCCESSORS AND ASSIGNS, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NOTWITHSTANDING WHETHER OR NOT ANY SUCH HOLDER (A) WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, (B) HAS FILED A PROOF OF CLAIM OR INTEREST IN THE CHAPTER 11 CASES OR (C) FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR AFFIRMATIVELY VOTED TO REJECT THE PLAN.**

3.        **Discharge of the Debtors.**

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors before the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (a) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (c) the Holder of such a Claim or Interest has accepted the Plan. Any default or "event of default" by the Debtors or Affiliates with respect to any Claim or Interest that existed immediately before or on account of the filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

4.        **Release of Liens.**

Except (a) with respect to the Liens securing (1) the Exit Facilities, (2) Other Secured Claims that are Reinstated pursuant to the Plan, and (3) obligations pursuant to Executory Contracts and Unexpired Leases assumed pursuant to the Plan, or (b) as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates and, subject to the consummation of the applicable distributions contemplated in the Plan, shall be fully released and discharged, at the sole cost of and expense of the Reorganized Debtors, and the Holders of such mortgages, deeds of trust, Liens, pledges, or other security interests shall execute such documents as may be reasonably requested by the Debtors or the Reorganized Debtors, as applicable, to reflect or effectuate such releases, and all of the right, title, and interest of any Holders of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtor and its successors and assigns.

5.        **Releases by the Debtors.**

Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtors, the Reorganized Debtors, and their Estates from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that

the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest, or that any Holder of any Claim or Interest could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part:

(a)    the Debtors, the Debtors' restructuring efforts, intercompany transactions, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement;

(b)    any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Entity on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, or the Plan;

(c)    the Chapter 11 Cases, the Disclosure Statement, the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement; or

(d)    any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any (i) post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, or (ii) claims related to any act or omission that is determined in a final order to have constituted actual fraud or willful misconduct.

**6.        Releases by Holders of Claims and Interests.**

As of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part:

(a)    the Debtors, the Debtors' restructuring efforts, intercompany transactions, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement;

(b)    any transaction that is part of the Restructuring Transactions, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Entity on the Plan or the order confirming the Plan in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, or the Plan;

(c)    the Chapter 11 Cases, the Disclosure Statement, the Plan, the filing of the Chapter 11 Cases, the pursuit of confirmation of the Plan, the pursuit of consummation of the Plan, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement; or

(d)    any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any (i) post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the

Plan, or (ii) claims related to any act or omission that is determined in a final order to have constituted actual fraud or willful misconduct. Notwithstanding anything herein to the contrary, nothing herein shall be intended to be a release of (a) the Sponsor Equityholder's (i) Secured Notes Claims or (ii) Claims under the MSA, or (b) Claims arising under the Restructuring Support Agreement, and such Claims in each case are expressly reserved.

7.    **Exculpation**

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or termination of the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan, or any Restructuring Transaction, contract, instrument, release or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission constitutes actual fraud, willful misconduct, or gross negligence. The Exculpated Parties have, and, upon completion of the Plan, shall be deemed to have participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

8.    **Injunction.**

**All Entities that have held, hold, or may hold Causes of Action, claims or interests that have been released pursuant to the Plan, or that have been discharged pursuant to the Plan, or that are subject to exculpation pursuant to the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, or the Released Parties: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Causes of Action, claims or interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Causes of Action, claims or interests; (c) creating, perfecting, or enforcing any lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Causes of Action, claims or interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Causes of Action, claims or interests unless such Entity has timely asserted such setoff right in a document filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a Cause of Action, claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable Law or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Causes of Action, claims or interests released or settled pursuant to the Plan.**

9.    **Term of Injunctions or Stays**

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases (pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court) and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

10.     **Recoupment**

In no event shall any Holder of Claims or Interests be entitled to recoup any Claim or Interest against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

11.     **Reimbursement or Contribution**

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the Effective Date, such Claim shall be forever disallowed notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Effective Date (a) such Claim has been adjudicated as noncontingent, or (b) the relevant Holder of a Claim has filed a noncontingent Proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer contingent.

12.     **Protection Against Discriminatory Treatment.**

In accordance with section 525 of the Bankruptcy Code, and consistent with paragraph 2 of Article VI of the United States Constitution, no Governmental Unit shall discriminate against any Reorganized Debtor, or any Entity with which a Reorganized Debtor has been or is associated, or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because such Reorganized Debtor was a Debtor under chapter 11, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before such Debtor was granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

## VI.     Confirmation of the Plan

**A.     The Confirmation Hearing.**

At the Confirmation Hearing, the Bankruptcy Court will determine whether to approve the Disclosure Statement and whether the Plan should be confirmed in light of both the affirmative requirements of the Bankruptcy Code and objections, if any, that are timely filed. **The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or the filing of a notice of such adjournment served in accordance with the order approving the Solicitation Procedures.**

**B.     Deadline to Object to Approval of the Disclosure Statement and Confirmation of the Plan.**

Upon commencement of the Chapter 11 Cases and scheduling of the Confirmation Hearing, the Debtors will provide notice of the Confirmation Hearing, and, if approved by the Bankruptcy Court, the notice will specify a deadline for filing and serving objections to the Disclosure Statement and Confirmation of the Plan. Unless objections to the Disclosure Statement or Confirmation of the Plan are timely served and filed, they may not be considered by the Bankruptcy Court.

**C.     Requirements for Approval of the Disclosure Statement.**

Pursuant to sections 1125(g) and 1126(b) of the Bankruptcy Code, prepetition solicitation of votes to accept or reject a chapter 11 plan must comply with applicable federal or state securities laws and regulations (including the registration and disclosure requirements thereof) or, if such laws and regulations do not apply, provide "adequate information" under section 1125 of the Bankruptcy Code. At the Confirmation Hearing, the Debtors will seek a determination from the Bankruptcy Court that the Disclosure Statement satisfies sections 1125(g) and 1126(b) of the Bankruptcy Code.

**D.**     **Requirements for Confirmation of the Plan.**

**1.**     **Requirements of Section 1129(a) of the Bankruptcy Code.**

Among the requirements for confirmation are the following: (a) the plan is accepted by all impaired classes of claims and interests or, if the plan is rejected by an impaired class, at least one impaired class of claims or interests has voted to accept the plan and a determination that the plan "does not discriminate unfairly" and is "fair and equitable" as to holders of claims in all rejecting impaired classes; (b) the plan is feasible; and (c) the plan is in the "best interests" of holders of Impaired Claims and Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code. The Debtors believe that the Plan satisfies or will satisfy all of the necessary requirements of chapter 11 of the Bankruptcy Code. Specifically, in addition to other applicable requirements, the Debtors believe that the Plan satisfies or will satisfy the applicable Confirmation requirements of section 1129 of the Bankruptcy Code set forth below.

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors, as the Plan proponents, have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, will be disclosed to the Bankruptcy Court, and any such payment: (a) made before Confirmation will be reasonable or (b) will be subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after Confirmation.

- Either each Holder of an Impaired Claim against or Interest in the Debtors will accept the Plan, or each non-accepting Holder will receive or retain under the Plan on account of such Claim or Interest property of a value, as of the Effective Date, that is not less than the amount that the Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code.

- Except to the extent that the Holder of a particular Claim agrees to a different treatment of its Claim, the Plan provides that, to the extent an Allowed Administrative Claim has not already been paid in full or otherwise satisfied during the Chapter 11 Cases, Allowed Administrative Claims and Other Priority Claims will be paid in full on the Effective Date, or as soon thereafter as is reasonably practicable.

- At least one Class of Impaired Claims will have accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class.

- Confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successors thereto under the Plan.

- All fees of the type described in 28 U.S.C. § 1930, including the fees of the U.S. Trustee, will be paid as of the Effective Date.

Section 1126(c) of the Bankruptcy Code provides that a class of claims has accepted a plan of reorganization if such plan has been accepted by creditors that hold at least two-thirds in amount and more than one-half in number of the Allowed claims of such class. Section 1126(d) of the Bankruptcy Code provides that a class of interests has accepted a plan of reorganization if such plan has been accepted by holders of such interests that hold at least two-thirds in amount of the Allowed interests of such class.

2.        **The Debtor Release, Third-Party Release, Exculpation, and Injunction Provisions.**

Article VIII.D of the Plan provides for releases of certain claims and Causes of Action the Debtors may hold against the Released Parties (the "***Debtor Release***"). The "***Released Parties***" means, collectively, and in each case in its capacity as such: (a) the Debtors and the Reorganized Debtors; (b) the Consenting Noteholders; (c) the Indenture Trustee; (d) the Consenting Equityholders; (e) with respect to each of the foregoing entities, each such Entity's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), subsidiaries, direct and indirect equity holders, and funds; and (f) with respect to each of the foregoing Entities in clauses (a) through (e), each of their respective current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors (with respect to clause (e), each solely in their capacity as such); *provided, however*, that any Holder of a Claim or Interest in a voting Class that objects to the Plan and votes to reject the Plan (and thereby opts out of the releases) shall not be a "Released Party."

Article VIII.E of the Plan provides for releases of certain claims and Causes of Action that Holders of Claims may hold against the Released Parties in exchange for the good and valuable consideration provided by each of the Released Parties (the "***Third-Party Releases***"). The Holders of Claims who are releasing certain claims and Causes of Action under the Third-Party Releases (the "***Releasing Parties***") include collectively, and in each case in its capacity as such: (a) the Debtors and the Reorganized Debtors; (b) the Consenting Noteholders; (c) the Indenture Trustee, (d) the Consenting Equityholders; (e) with respect to each of the foregoing entities in clauses (a) through (d), each such Entity's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), subsidiaries, direct and indirect equity holders, and funds; (f) with respect to each of the foregoing Entities in clauses (a) through (e), each of their respective current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors (with respect to clause (e), each solely in their capacity as such); and (g) all Holders of Claims and Interests not described in the foregoing clauses (a) through (f); *provided, however*, that any Holder of a Claim or Interest that (1) votes to reject the Plan if such Holder was entitled to vote and (2) objects to the releases in the Plan, shall not be a "Releasing Party" for purposes of the Plan.

**ALL HOLDERS OF (A) CLAIMS AND INTERESTS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN THAT VOTE TO REJECT THE PLAN OR DO NOT VOTE TO ACCEPT OR REJECT THE PLAN BUT DO NOT AFFIRMATIVELY ELECT TO OPT OUT OF BEING A RELEASING PARTY AND (B) CLAIMS OR INTERESTS THAT ARE DEEMED TO REJECT THE PLAN AND DO NOT AFFIRMATIVELY ELECT TO OPT OUT OF BEING A RELEASING PARTY ARE RELEASING PARTIES UNDER THE PLAN.**

Article VIII.F of the Plan provides for the exculpation of each Exculpated Party for certain acts or omissions taken in connection with the Chapter 11 Cases. The released and exculpated claims are limited to those claims or Causes of Action that may have arisen in connection with, related to, or arising out of the Chapter 11 Cases, the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan, or other related Restructuring Transactions or documents created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan. The "***Exculpated Parties***" means, collectively, and in each case in its capacity as such: (a) the Debtors and the Reorganized Debtors, (b) with respect to each of the foregoing entities, each such Entity's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), subsidiaries, direct and indirect equity holders, and advisors and (c) with respect to each of the foregoing Entities in clauses (a) and (b), each of their respective current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors.

Article VIII.G of the Plan permanently enjoins Entities who have held, hold, or may hold Claims, Interests, or Liens that have been discharged or released pursuant to the Plan or are subject to exculpation pursuant to the Plan from asserting such Claims, Interests, or Liens against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, and the Released Parties.

Under applicable law, a release provided by a debtor is appropriate where: (a) there is an identity of interest between the debtor and the third party, such that a suit against the released non-debtor party is, at core, a suit against the debtor or will deplete assets of the estate; (b) there is a substantial contribution by the non-debtor of assets to the reorganization; (c) the injunction is essential to the reorganization; (d) there is overwhelming creditor support for the injunction; and (e) the chapter 11 plan will pay all or substantially all of the claims affected by the injunction. *In re Indianapolis Downs, LLC*, 486 B.R. 286, 303 (Bankr. D. Del. 2013). Importantly, these factors are "neither exclusive nor are they a list of conjunctive requirements," but "[i]nstead, they are helpful in weighing the equities of the particular case after a fact-specific review." *Id*. Further, a chapter 11 plan may provide for a release of third-party claims against non-debtors, such as the Third-Party Releases, where such releases are consensual. *Id*. at 304–06. In addition, exculpation is appropriate where it applies to estate fiduciaries. *Id*. at 306. Finally, an injunction is appropriate where it is necessary to the reorganization and fair pursuant to section 105(a) of the Bankruptcy Code. *In re W.R. Grace & Co.*, 475 B.R. 34, 107 (D. Del. 2012). In addition, approval of the releases, exculpations, and injunctions for each of the Released Parties and each Exculpated Party as part of Confirmation of the Plan will be limited to the extent such releases, exculpations, and injunctions are permitted by applicable law.

The Debtors believe that the releases, exculpations, and injunctions set forth in the Plan are appropriate because, among other things, the releases are narrowly tailored to the Debtors' restructuring proceedings, and each of the Released Parties has contributed value to the Debtors and aided in the reorganization process, which facilitated the Debtors' ability to propose and pursue Confirmation. The Debtors believe that each of the Released Parties has played an integral role in formulating the Plan and has expended significant time and resources analyzing and negotiating the issues presented by the Debtors' prepetition capital structure. The Debtors further believe that such releases, exculpations, and injunctions are a necessary part of the Plan. In addition, the Debtors believe the Third-Party Releases are entirely consensual under the established case law in the United States Bankruptcy Court for the District of Delaware. *See In re Indianapolis Downs, LLC*, 486 B.R. at 304–06. The Debtors will be prepared to meet their burden to establish the basis for the releases, exculpations, and injunctions for each of the Released Parties and each Exculpated Party as part of Confirmation of the Plan.

### 3. Best Interests of Creditors—Liquidation Analysis.

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each class, that each holder of a claim or an interest in such class either (a) has accepted the plan, or (b) will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtors liquidated under chapter 7 of the Bankruptcy Code.

To demonstrate compliance with the "best interests" test, the Debtors, with the assistance of their advisors, prepared the Liquidation Analysis, attached hereto as Exhibit E, showing that the value of the distributions provided to Holders of Allowed Claims and Interests under the Plan would be the same or greater than under a hypothetical chapter 7 liquidation. Accordingly, the Debtors believe that the Plan is in the best interests of creditors.

### 4. Feasibility/Financial Projections.

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a chapter 11 plan of reorganization is not likely to be followed by the liquidation of the reorganized debtor or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in the chapter 11 plan). For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the Plan. As part of this analysis, the Debtors, and Huron have prepared certain Financial Projections, which projections and the assumptions upon which they are based are attached hereto as Exhibit D. Based on these Financial Projections, the Debtors believe the deleveraging contemplated by the Plan meets the financial feasibility requirement. Moreover, the Debtors believe that sufficient funds will exist to make all payments required by the Plan. Accordingly, the Debtors believe that the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.

5.      **Acceptance by Impaired Classes.**

The Bankruptcy Code requires that, except as described in the following section, each impaired class of claims or interests must accept a plan in order for it to be confirmed. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to the class is not required. A class is "impaired" unless the plan: (a) leaves unaltered the legal, equitable, and contractual rights to which the claim or the interest entitles the holder of the claim or interest; (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest; or (c) provides that, on the consummation date, the holder of such claim receives Cash equal to the Allowed amount of that claim or, with respect to any equity interest, the holder of such interest receives value equal to the greater of (i) any fixed liquidation preference to which the holder of such equity interest is entitled, (ii) the fixed redemption price to which such holder is entitled, or (iii) the value of the interest.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of Allowed claims in that class, counting only those claims that actually voted to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number of creditors actually voting cast their ballots in favor of acceptance. For a class of impaired interests to accept a plan, section 1126(d) of the Bankruptcy Code requires acceptance by interest holders that hold at least two-thirds in amount of the Allowed interests of such class, counting only those interests that actually voted to accept or reject the plan. Thus, a class of interests will have voted to accept the plan only if two-thirds in amount actually voting cast their ballots in favor of acceptance.

6.      **Confirmation Without Acceptance by All Impaired Classes.**

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted the plan, *provided* that the plan has been accepted by at least one impaired class of claims. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cramdown," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

If any Impaired Class of Claims or Interests rejects the Plan, including Classes of Claims or Interests deemed to reject the Plan, the Debtors will request Confirmation of the Plan, as it may be modified from time to time, utilizing the "cramdown" provision under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims to render such Class of Claims Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules or to withdraw the Plan as to such Debtor.

The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the requirements for cramdown and the Debtors will be prepared to meet their burden to establish that the Plan can be confirmed pursuant to section 1129(b) of the Bankruptcy Code as part of Confirmation of the Plan.

(a)      **No Unfair Discrimination.**

The "unfair discrimination" test applies with respect to classes of claims or interests that are of equal priority but are receiving different treatment under a proposed plan. The test does not require that the treatment be the same or equivalent, but that the treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. Under certain circumstances, a proposed plan may treat two classes of unsecured creditors differently without unfairly discriminating against either class.

With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. Accordingly, the Debtors believe that the Plan meets the standard to demonstrate that the Plan does not unfairly discriminate and the Debtors will be prepared to meet their burden to establish that there is no unfair discrimination as part of Confirmation of the Plan.

        (b)        **Fair and Equitable Test.**

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class. As to each non-accepting class and as set forth below, the test sets different standards depending on the type of claims or interests in such class. The Debtors believe that the Plan satisfies the "fair and equitable" requirement, notwithstanding the fact that certain Classes are deemed to reject the Plan. There is no Class receiving more than a 100% recovery and no junior Class is receiving a distribution under the Plan until all senior Classes have received a 100% recovery or agreed to receive a different treatment under the Plan.

        (i)        **Secured Claims.**

The condition that a plan be "fair and equitable" to a non-accepting class of secured claims includes the requirements that: (A) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; and (B) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a value, as of the effective date, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the claimant's liens.

        (ii)        **Unsecured Claims.**

The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirement that either: (A) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date, equal to the allowed amount of such claim; or (B) the holder of any claim or any interest that is junior to the claims of such class will not receive or retain any property under the plan on account of such junior claim or junior interest, subject to certain exceptions.

        (iii)        **Interests.**

The condition that a plan be "fair and equitable" to a non-accepting class of interests, includes the requirements that either: (A) the plan provides that each holder of an interest in that class receives or retains under the plan on account of that interest property of a value, as of the effective date, equal to the greater of: (1) the allowed amount of any fixed liquidation preference to which such holder is entitled; (2) any fixed redemption price to which such holder is entitled; or (3) the value of such interest; or (B) the holder of any interest that is junior to the interests of such class will not receive or retain any property under the plan on account of such junior interest.

        **7.**        **Valuation.**

Over the course of many months of negotiations that resulted in the Restructuring Support Agreement, the Debtors and the Ad Hoc Noteholder Group considered a range of total enterprise values. Based on publicly available information and information provided during the months-long negotiations to reach agreement regarding the Restructuring Transactions, the Debtors determined that there was no viable scenario under which value would be available for holders of Interests, and that, absent the commitments set forth in the Restructuring Support Agreement and as incorporated into the Plan, only *de minimis* value, if any, may be available to distribute to holders of General Unsecured Claims, each of whom would as a result realize substantial (or in the case of Holders of Existing Equity Interests, total) impairment on such Claims.

As part of the negotiations regarding the Restructuring Support Agreement and the Restructuring Transactions contemplated thereby, the Debtors and the Ad Hoc Noteholder Group considered a range of total

enterprise values between $175 million and $250 million. It is projected that the Reorganized Debtors will emerge with $113 million of net debt. Accordingly, based on the range of total enterprise values considered between the Debtors and the Ad Hoc Noteholder Group, this implies that the imputed net equity value of the Reorganized Debtors would range between $62 million and $137 million.

The valuation information described herein does not constitute a recommendation to any Holder of a Claim against or Interest in the Debtors as to whether to vote to accept or reject the Plan. The estimated reorganized value also does not constitute an opinion as to the fairness from a financial point of view of the consideration to be received under the Plan or of the terms and provisions of the Plan or of any transaction offered pursuant to the Plan or otherwise described herein. Instead, this valuation information is presented solely in furtherance of providing "adequate information" under section 1125 of the Bankruptcy Code to enable Holders of Claims and Interests entitled to vote whether to accept or reject the Plan to make an informed judgment regarding the Plan, and should not be relied upon for any other purpose. This valuation information should be considered in conjunction with the information provided as a whole hereunder, including the risk factors described in Article VIII herein and the Financial Projections set forth in Exhibit D attached hereto.

## VII.    Voting Instructions

### A.    Overview.

Holders of Claims and Interests in a Class entitled to vote should carefully read the below voting instructions.

### B.    Solicitation Procedures.

#### 1.    Solicitation Agent.

The Debtors have proposed to retain Prime Clerk LLC to act, among other things, as the Solicitation Agent in connection with the solicitation of votes to accept or reject the Plan. The Solicitation Agent will process and tabulate Ballots for each Class entitled to vote to accept or reject the Plan and will file the Voting Report as soon as practicable after the Voting Deadline.

#### 2.    Solicitation Package.

The following materials constitute the solicitation package (the "*Solicitation Package*") distributed to Holders of Claims in the Voting Classes:

- the appropriate Ballot and applicable voting instructions, together with a pre-addressed, postage pre-paid return envelope; and

- this Disclosure Statement and all exhibits hereto, including the Plan and all exhibits thereto (which may be distributed in paper or USB-flash drive format).

#### 3.    Voting Deadline.

The period during which Ballots with respect to the Plan will be accepted by the Debtors will terminate at **5:00 p.m. prevailing Eastern Time on December 16, 2020**, unless the Debtors extend the date until which Ballots will be accepted. Except to the extent that the Debtors so determine or as permitted by the Bankruptcy Court, Ballots that are received after the Voting Deadline will not be counted or otherwise used by the Debtors in connection with the Debtors' request for Confirmation of the Plan (or any permitted modification thereof).

The Debtors reserve the right, at any time or from time to time, to extend the period of time (on a daily basis, if necessary) during which Ballots will be accepted for any reason, including determining whether or not the requisite number of acceptances have been received, by making a public announcement of such extension no later than the first Business Day next succeeding the previously announced Voting Deadline. The Debtors will give notice of any such

extension in a manner deemed reasonable by the Debtors in their discretion. There can be no assurance that the Debtors will exercise their right to extend the Voting Deadline.

4.        **Distribution of the Solicitation Package and Plan Supplement.**

On November 13, 2020, which is more than 28 days before the Voting Deadline, the Debtors caused the Solicitation Agent to distribute the Solicitation Package to Holders of Claims and Interests entitled to vote (or their brokers, dealers, commercial banks, trust companies, or other agent nominees) by electronic mail and overnight mail.

The Solicitation Package may also be obtained from the Solicitation Agent by: (a) calling (877) 930-4312 (Toll Free) or (347) 532-7901 (International) and asking for the Solicitation Group; (b) emailing nwhballots@primeclerk.com and referencing "NWH" in the subject line; or (c) writing to the following address: NWH Ballot Processing, c/o Prime Clerk, LLC, One Grand Central Place, 60 East 42nd Street, Suite 1440, New York, NY 10165. When the Debtors file the Chapter 11 Cases, you may also obtain copies of any pleadings filed with the Bankruptcy Court for free by visiting the Debtors' restructuring website, cases.primeclerk.com/nwh, or for a fee at https://ecf.deb.uscourts.gov/.

The Debtors will file the Plan Supplement in accordance with the terms of the Plan on or about December 16, 2020 (or such other date as the Bankruptcy Court may direct). As the Plan Supplement is updated or otherwise modified, such modified or updated documents will be made available on the Debtors' restructuring website. The Debtors will not serve paper or electronic copies of the Plan Supplement; however, parties may obtain a copy of the Plan Supplement at no cost from the Solicitation Agent by: (a) calling the Solicitation Agent at one of the telephone numbers set forth above; (b) visiting the Debtors' restructuring website cases.primeclerk.com/nwh; or (c) emailing the Solicitation Agent at the email address set forth above.

C.        **Voting Procedures.**

November 11, 2020 (the "***Voting Record Date***"), is the date that was used for determining which Holders of Claims are entitled to vote to accept or reject the Plan and receive the Solicitation Package in accordance with the solicitation procedures. Except as otherwise set forth herein, the Voting Record Date and all of the Debtors' solicitation and voting procedures shall apply to all of the Debtors' creditors and other parties in interest.

In order for the Holder of a Claim in a Voting Class to have such Holder's Ballot counted as a vote to accept or reject the Plan, such Holder's Ballot must be properly completed, executed, and delivered by following the instructions received with the Ballot, so that such Holder's Ballot including their vote is **actually received** by the Solicitation Agent before the Voting Deadline.

IF A BALLOT IS RECEIVED AFTER THE VOTING DEADLINE, IT WILL NOT BE COUNTED UNLESS THE DEBTORS DETERMINE OTHERWISE.

ANY BALLOT THAT IS PROPERLY EXECUTED BY THE HOLDER OF A CLAIM BUT THAT DOES NOT CLEARLY INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN OR ANY BALLOT THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.

EACH HOLDER OF A CLAIM OR INTEREST IN A VOTING CLASS MUST VOTE ALL OF ITS CLAIMS  OR INTERESTS WITHIN THE VOTING CLASS EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT SUCH VOTES. BY SIGNING AND RETURNING A BALLOT, EACH HOLDER OF A CLAIM WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTORS THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM HAVE BEEN CAST OR, IF ANY OTHER BALLOTS HAVE BEEN CAST WITH RESPECT TO SUCH CLASS OF CLAIMS, ONLY THE LAST PROPERLY EXECUTED BALLOT CAST PRIOR TO THE VOTING DEADLINE WILL BE COUNTED AND ANY OTHER PREVIOUSLY CAST BALLOT SHALL BE DEEMED REVOKED.

IT IS IMPORTANT THAT THE HOLDER OF A CLAIM OR INTEREST IN THE VOTING CLASSES FOLLOWS THE SPECIFIC INSTRUCTIONS PROVIDED ON SUCH HOLDER'S BALLOT.

**D.        Voting Tabulation.**

A Ballot does not constitute, and shall not be deemed to be, a Proof of Claim or an assertion or admission of a Claim. Only Holders of Claims in the Voting Classes (or their nominees) shall be entitled to vote with regard to such Claims.

Unless the Debtors decide otherwise, Ballots received after the Voting Deadline may not be counted. A Ballot will be deemed delivered only when the Solicitation Agent actually receives the executed Ballot as instructed in the applicable voting instructions. No Ballot should be sent to the Debtors, the Debtors' agents (other than the Solicitation Agent), or the Debtors' financial or legal advisors.

The Bankruptcy Code may require the Debtors to disseminate additional solicitation materials if the Debtors make material changes to the terms of the Plan or if the Debtors waive a material condition to Confirmation. In that event, Solicitation will be extended to the extent directed by the Bankruptcy Court.

To the extent there are multiple Claims within the same Voting Class, the Debtors may, in their discretion, and to the extent possible, aggregate the Claims of any particular Holder within a Voting Class for the purpose of counting votes.

In the event a designation of lack of good faith is requested by a party in interest under section 1126(e) of the Bankruptcy Code, the Bankruptcy Court will determine whether any vote to accept and/or reject the Plan cast with respect to that Claim will be counted for purposes of determining whether the Plan has been accepted and/or rejected.

The following Ballots will not be counted in determining the acceptance or rejection of the Plan: (a) any Ballot that is illegible or contains insufficient information to permit the identification of the Holder of the Claim; (b) any Ballot that is not actually received by the Solicitation Agent by the Voting Deadline (unless the Debtors determine otherwise or as permitted by the Court); (c) any unsigned Ballot; (d) any Ballot that partially rejects and partially accepts the Plan; (e) any Ballot not marked to accept or reject the Plan or marked to both accept and reject the Plan; (f) any Ballot superseded by a later, timely submitted valid Ballot; (g) any improperly submitted Ballot, or any form of ballot other than the official form of Ballot sent by the Solicitation Agent (unless the Debtors determine otherwise or as permitted by the Court); and (h) any Ballot cast by a Person or entity that does not hold a Claim in a Class that is entitled to vote on the Plan.

As soon as practicable after the Voting Deadline, the Solicitation Agent will file the Voting Report with the Bankruptcy Court. The Voting Report shall, among other things, delineate every Ballot that does not conform to the voting instructions or that contains any form of irregularity (each an "***Irregular Ballot***"), including those Ballots that are late or (in whole or in material part) illegible, unidentifiable, lacking signatures, lacking necessary information, or damaged. The Solicitation Agent will attempt to reconcile the amount of any Claim reported on a Ballot with the Debtors' or nominee's records, as applicable, but in the event such amount cannot be timely reconciled without undue effort on the part of the Solicitation Agent, the amount shown in the Debtors' or nominee's records, as applicable, shall govern. The Voting Report also shall indicate the Debtors' intentions with regard to such Irregular Ballots. Neither the Debtors nor any other Person or Entity will be under any duty to provide notification of defects or irregularities with respect to delivered Ballots other than as provided in the Voting Report, nor will any of them incur any liability for failure to provide such notification.

## VIII.        Risk Factors

**BEFORE TAKING ANY ACTION WITH RESPECT TO THE PLAN, HOLDERS OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTORS WHO ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, THE PLAN, AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH,**

REFERRED TO, OR INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT, INCLUDING OTHER DOCUMENTS FILED WITH THE BANKRUPTCY COURT IN THE CHAPTER 11 CASES. EACH OF THE RISK FACTORS DISCUSSED IN THIS DISCLOSURE STATEMENT MAY APPLY EQUALLY TO THE DEBTORS AND THE REORGANIZED DEBTORS, AS APPLICABLE AND AS CONTEXT REQUIRES.

THIS SECTION PROVIDES INFORMATION REGARDING POTENTIAL RISKS IN CONNECTION WITH THE PLAN. THE FACTORS BELOW SHOULD NOT BE REGARDED AS THE ONLY RISKS ASSOCIATED WITH THE PLAN OR ITS IMPLEMENTATION. THE RISK FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESS OR THE RESTRUCTURING AND CONSUMMATION OF THE PLAN. NEW FACTORS, RISKS AND UNCERTAINTIES EMERGE FROM TIME TO TIME AND IT IS NOT POSSIBLE TO PREDICT ALL SUCH FACTORS, RISKS AND UNCERTAINTIES.

A.      **Risks Related to the Restructuring.**

    1.      **The Restructuring May Take Longer Than Anticipated.**

Although the Plan is designed to minimize the length of the Chapter 11 Cases, it is impossible to predict with certainty the amount of time that one or more of the Debtors may spend in bankruptcy, how long it may take to confirm the Plan, or whether the Plan will be confirmed. Any material delay in the confirmation of the Plan, the Chapter 11 Cases, or the threat of rejection of the Plan by the Bankruptcy Court, would add substantial expense and uncertainty to the process. Further, prolonged bankruptcy proceedings may divert Debtors' resources, including the attention of the Debtors' management, away from business operations.

The uncertainty surrounding a prolonged restructuring may have other adverse effects on the Company. For example, it could adversely affect:

- the Company's ability to raise additional capital;
- the Company's liquidity;
- how the Company's business is viewed by potential investors, lenders, and credit ratings agencies;
- the Company's enterprise value; and
- the Company's relationships with customers and vendors.

Even if confirmed on a timely basis, bankruptcy cases to confirm the Plan could have an adverse effect on the Company's business.

    2.      **The Debtors Will Consider All Available Restructuring Alternatives if the Restructuring Transactions are not Implemented, and Such Alternatives May Result in Lower Recoveries for Holders of Claims Against the Debtors.**

Subject to the terms of the Restructuring Support Agreement, if the Restructuring Transactions are not consummated, the Debtors thereafter will consider all available restructuring alternatives, including filing an alternative chapter 11 plan, converting to a chapter 7 plan, commencing section 363 sales of the Debtors' assets, dismissing the Chapter 11 Cases, and any other transaction that would maximize the value of the Debtors' estates. The terms of any alternative restructuring proposal may be less favorable to Holders of Claims against the Debtors than the terms of the Plan as described in this Disclosure Statement.

    3.      **Even if the Restructuring Transactions are Successful, the Debtors Will Continue to Face Risks.**

The Restructuring Transactions are generally designed to reduce the Debtors' leverage, improve the Debtors' liquidity, and provide the Debtors' greater flexibility to generate long-term growth. Even if the Restructuring Transactions are implemented, the Company will continue to face a number of risks, including certain risks that are beyond the Company's control, such as changes in economic conditions, changes in the Company's industry, and

changes in demand for the Company's services. As a result of these risks, there is no guarantee that the Restructuring Transactions will achieve the Debtors' stated goals.

    **4.**    **Risks Related to Confirmation and Consummation of the Plan.**

    (a)    **The Restructuring Support Agreement May Be Terminated**.

The Restructuring Support Agreement contains certain provisions that allow the Restructuring Support Agreement to be terminated if various conditions are satisfied. Termination of the Restructuring Support Agreement could result in protracted Chapter 11 Cases, which could significantly and detrimentally impact the Debtors' relationships with, among others, employees and customers. As more fully set forth in Section 11 of the Restructuring Support Agreement, the Restructuring Support Agreement may be terminated upon the occurrence of certain events, including, among others (i) a determination that proceeding with the proposed Plan would be inconsistent with the Board's fiduciary obligations; (ii) the Bankruptcy Court grants relief that is inconsistent in any material respect with any Definitive Document in a manner that directly and adversely impacts the treatment of the Secured Notes Claims without the prior written consent of the Required Consenting Noteholders; (iii) entry of the Interim Financing Order or the Final Financing Order in a form that is not reasonably acceptable to the Requisite Consenting Noteholders; (iv) the occurrence of any Event of Default under the Interim Financing Order or the Final Financing Order; or (v) any milestone set forth in the Restructuring Term Sheet has not been satisfied after two (2) Business Days written notice of such failure to satisfy, unless extended in accordance with the terms of the Restructuring Support Agreement.

    (b)    **Conditions Precedent to Confirmation May Not Occur.**

As more fully set forth in Article IX of the Plan, the occurrence of the Effective Date is subject to a number of conditions precedent. If each condition precedent to Consummation is not met or waived, the Effective Date will not take place, and if the Effective Date does not occur, the Plan shall not be consummated and shall be null and void in all respects. In the event that the Plan is not consummated, the Debtors may seek Confirmation of a new plan. Pursuit of a new plan may require consents or concessions from various parties in interest. The Debtors can provide no assurances that such consents or concessions would be obtained. If the Debtors do not secure sufficient liquidity to continue their operations or if the new plan is not confirmed, however, the Debtors may be forced to liquidate their assets.

    (c)    **Parties in Interest, including the United States Trustee, May Object to the Plan's Classification of Claims and Interests.**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion if any party in interest objects to the Plan's classification of Claims and Interests.

    (d)    **The Debtors May Not Be Able to Satisfy Vote Requirements.**

The Debtors can make no assurances that they will receive the requisite votes for acceptance to confirm the Plan. Even if all Voting Classes vote in favor of the Plan, the Bankruptcy Court could decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met. Pursuant to section 1126(c) of the Bankruptcy Code, section 1129(a)(7)(A)(i) of the Bankruptcy Code will be satisfied with respect to Classes 4 and 9 if Holders of at least two-thirds in amount and more than one-half in number of the Allowed Claims or Interests in the Class that votes on the Plan cast votes to accept the Plan. There is no guarantee that the Debtors will receive the necessary acceptances from Holders of Claims or Interests in the Voting Classes. If the Voting Classes vote to reject the Plan, the Debtors may elect to amend the Plan, file an alternative chapter 11 plan, convert to a chapter 7 plan, commence section 363 sales of the Debtors' assets, dismiss the Chapter 11 Cases, or pursue any other transaction that would maximize the value of the Debtors' estates. If the Plan is not confirmed, it is unclear what distributions Holders

of Claims or Interests ultimately would receive with respect to their Claims or Interests in a subsequent plan of reorganization.

(e)    **The Debtors May Not Be Able to Secure Confirmation.**

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the bankruptcy court that: (i) the plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (ii) the plan is not likely to be followed by a liquidation or a need for further financial reorganization unless liquidation or reorganization is contemplated by the plan; and (iii) the value of distributions to non-accepting holders of claims within a particular class under the plan will not be less than the value of distributions such holders would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A dissenting Holder of an Allowed Claim or Interest or the United States Trustee might challenge either the adequacy of this Disclosure Statement or whether the voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement and the voting results are appropriate, the Bankruptcy Court can decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation have not been met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes.

If the Plan is not confirmed, it is unclear what distributions, if any, Holders of Allowed Claims and Interests will receive with respect to their Allowed Claims and Interests, as applicable.

Subject to the limitations contained in the Plan, the Debtors reserve the right to modify the Plan and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan. Any modifications could result in a less favorable treatment of any Class than the treatment currently provided in the Plan, such as a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan.

(f)    **Parties in Interest, including the United States Trustee, May Object to Provisions Contained in the Plan.**

There is a risk that certain parties could oppose and object to either the entirety of the Plan or specific provisions of the Plan. There can be no guarantee that a party in interest will not file an objection to the Plan or that the Bankruptcy Court will not sustain such an objection.

(g)    **Releases, Injunction, and Exculpation Provisions May Not Be Approved.**

Confirmation is also subject to the Bankruptcy Court's approval of the settlement, release, injunction, and related provisions described in Article VIII of the Plan. Certain parties in interest, including the United States Trustee, may assert that the Debtors cannot demonstrate that they meet the standards for approval of releases, exculpations, and injunctions established by the United States Court of Appeals for the Third Circuit. If the releases and exculpations are not approved, certain parties may not be considered Releasing Parties, Released Parties, or Exculpated Parties, and certain Released Parties or Exculpated Parties may withdraw their support for the Plan.

(h)    **The Debtors May Not Be Able to Pursue Nonconsensual Confirmation Over Certain Impaired Non-Accepting Classes.**

Generally, a bankruptcy court may confirm a plan under the Bankruptcy Code's "cramdown" provisions over the objection of an impaired non-accepting class of claims or interests if at least one impaired class of claims has accepted the plan (with acceptance being determined without including the vote of any "insider" in that accepting class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the rejecting impaired classes.

46

As to Classes 4 and 9, while the Debtors believe they have secured Plan support from (i) the Holders of Claims well in excess of the requisite two-thirds in amount and more than one-half in number of the Allowed Class 4 pursuant to the Restructuring Support Agreement, the amount required for an accepting Class of Claims pursuant to section 1126(c) of the Bankruptcy Code and (ii) the Holders of Interests well in excess of the requisite two-thirds in amount of the Allowed Class 9 pursuant to the Restructuring Support Agreement, the amount required for an accepting Class of Interests pursuant to section 1126(d) of the Bankruptcy Code, there is no guarantee that those Holders will vote those Claims in favor of the Plan. There can be no assurances that the Debtors will confirm a chapter 11 plan and emerge as a reorganized company in that event, and it is unclear what distributions, if any, Holders of Allowed Claims and Interests will receive with respect to their Allowed Claims and Interests in that instance. In addition, the pursuit of an alternative restructuring proposal may result in, among other things, increased expenses relating to Professional Fee Claims.

Finally, to the extent that the Voting Classes vote to reject the Plan, the Debtors may not be able to seek to "cramdown" such Voting Classes under section 1129(b) of the Bankruptcy Code because there is no other impaired Class of Claims entitled to vote under the Plan.

(i) **The Amount or Classification of a Claim or Interest is Subject to the Debtors' Right to Object and Other Potential Changes.**

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim or Interest under the Plan. Any Holder of a Claim or Interest that is subject to an objection or dispute may not receive its expected share of the estimated distributions described in this Disclosure Statement. Further, there can be no assurance that the estimated amount of Claims in certain Classes will not be significantly more than projected, which in turn, could cause the value of distributions to a Holder of a Claim to be reduced substantially. Therefore, the actual amount of Allowed Claims may vary materially from the estimates set forth in this Disclosure Statement.

(j) **The Effective Date May Not Occur.**

There can be no assurance as to the timing of the Effective Date or as to whether the Effective Date will, in fact, occur. If the conditions precedent to the Effective Date set forth in the Plan have not occurred or have not been waived, then the Confirmation Order may be vacated, in which event no distributions would be made under the Plan, the Debtors and all Holders of Claims or Interests would be restored to the status quo as of the day immediately preceding the Confirmation Date, and the Debtors' obligations with respect to Claims and Interests would remain unchanged.

**B.    Risks Related to Recoveries Under the Plan.**

**1.    The Debtors May Not Be Able to Achieve Their Projected Financial Results or Meet Their Post-Restructuring Debt Obligations.**

Certain of the information contained herein is, by nature, forward-looking, and contains estimates and assumptions, which might ultimately prove to be incorrect, and projections, which may be materially different from actual future experiences. Many of the assumptions underlying the projections are subject to significant uncertainties that are beyond the control of the Debtors or Reorganized Debtors, including the timing, confirmation, and consummation of the Plan, the Reorganized Debtors' future revenues, inflation, and other unanticipated market and economic conditions. There are uncertainties associated with any projections and estimates, and they should not be considered assurances or guarantees of the amount of funds or the amount of Claims in the various Classes that might be Allowed. Some assumptions may not materialize, and unanticipated events and circumstances may affect the actual results.

The Financial Projections represent the best estimate of the Debtors' management and financial advisor of the future financial performance of the Debtors or the Reorganized Debtors, as applicable, based on currently known facts and assumptions about future operations of the Debtors or the Reorganized Debtors, as applicable, as well as the U.S. and world economy in general and the relevant industries in which the Company operates. The Financial

Projections are inherently subject to substantial and numerous uncertainties and to a wide variety of significant business, economic, and competitive risks, including risks related to or deriving from the COVID-19 pandemic and its consequences, and the assumptions underlying the projections may be inaccurate in material respects. In addition, unanticipated events and circumstances occurring after the approval of this Disclosure Statement by the Bankruptcy Court including any natural disasters, terrorist attacks, or health epidemics and/or pandemics may affect the actual financial results achieved. There is no guarantee that the Financial Projections will be realized, and actual financial results may differ significantly from the Financial Projections.

To the extent the Reorganized Debtors do not meet their projected financial results or achieve projected revenues and cash flows, the Reorganized Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date, may be unable to service their debt obligations as they come due, or may not be able to meet their operational needs, all of which may negatively affect the value of the New Common Stock.

### 2. Estimated Recoveries to Holders of Allowed Claims and Interests Are Not Intended to Represent Potential Market Values.

There can be no assurance that the estimated Allowed amount of Claims in certain Classes will not be significantly more than projected, which in turn, could cause the value of distributions to be reduced substantially. The Debtors' estimated recoveries to Holders of Allowed Claims and Allowed Interests are not intended to represent the market value of the Debtors' Securities. The estimated recoveries are based on numerous assumptions (the realization of many of which will be beyond the control of the Debtors), including: (a) the successful reorganization of the Debtors; (b) an assumed date for the occurrence of the Effective Date; (c) the Debtors' ability to achieve the operating and financial results included in the Financial Projections; (d) the Debtors' ability to maintain adequate liquidity to fund operations; (e) the assumption that capital and equity markets remain consistent with current conditions; and (f) the Debtors' ability to maintain and develop critical client relationships. Accordingly, the estimated recoveries do not necessarily reflect, and should not be construed as reflecting, values that may be attained for the Debtors' Securities in the public or private markets.

### 3. Certain Tax Implications of the Debtors' Bankruptcy and Reorganization May Increase the Tax Liability of the Reorganized Debtors.

Holders of Allowed Claims and Interests should carefully review Section X of this Disclosure Statement, entitled "Certain United States Federal Income Tax Consequences of the Plan," to determine how the U.S. federal income tax implications of the Plan and the Chapter 11 Cases may adversely affect the Debtors.

## C. Risks Related to the New Common Stock.

The following are some of the risks that apply to Holders of Claims against the Debtors who become Holders of the New Common Stock pursuant to the Plan. There are additional risk factors related to ownership of the New Common Stock that Holders of Claims against the Debtors should consider before deciding to vote to accept or reject the Plan.

### 1. The Consideration Under the Plan Does Not Reflect any Independent Valuation of Claims against or Interests in the Debtors.

The Debtors have not obtained or requested an opinion from any bank or other firm as to the fairness of the consideration under the Plan.

### 2. The Debtors Do Not Intend to Register or to Offer to Grant Registration Rights with respect to the New Common Stock.

The Debtors do not intend to register the New Common Stock under the Securities Act or grant registration rights with respect to the New Common Stock. As a result, the New Common Stock may be transferred or resold only in transactions exempt from the securities registration requirements of federal and applicable state laws.

For the avoidance of doubt, shares of New Common Stock, or other Securities, as applicable, issued and distributed pursuant to the Plan will not be issued in reliance upon the exemption from registration set forth in section 1145 of the Bankruptcy Code, and will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance on section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder, or such other exemption as may be available from any applicable registration requirements. These Securities will be subject to resale restrictions and may be resold, exchanged, assigned or otherwise transferred only pursuant to registration, or an applicable exemption from registration, under the Securities Act and other applicable law.

To the extent that any New Common Stock issued under the Plan in satisfaction of Claims is covered by section 1145 of the Bankruptcy Code, they may be resold by the Holders thereof without registration under the Securities Act unless the Holder is an "underwriter," as defined in section 1145(b) of the Bankruptcy Code with respect to such Securities; *provided*, *however*, shares of such Securities will not be freely tradable if, at the time of transfer, the Holder is either an "affiliate" of Reorganized HHI as defined in Rule 144(a)(1) under the Securities Act or has been such an "affiliate" within 90 days of such transfer. Such affiliate Holders would only be permitted to sell such Securities without registration if they are able to comply with an applicable exemption from registration, including Rule 144 under the Securities Act. Resales by Persons who receive New Common Stock pursuant to the Plan that are deemed to be "underwriters" would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or applicable law. Such Persons would only be permitted to sell such Securities without registration if they are able to comply with an applicable exemption from registration, including Rule 144 under the Securities Act.

In addition, the information which the Debtors are required to provide in order to issue the New Common Stock may be less than the Debtors would be required to provide if the New Common Stock were registered under the Securities Act. Among other things, the Debtors may not be required to provide:  (a) separate financial information for any subsidiary; (b) selected historical consolidated financial data of the Debtors; (c) selected quarterly financial data of the Debtors; (d) certain information about the Debtors' disclosure controls and procedures and their internal controls over financial reporting; and (e) certain information regarding the Debtors' executive compensation policies and practices and historical compensation information for their executive officers. This lack of information could impair your ability to evaluate your ownership and the marketability of the New Common Stock.

3.       **There Is No Established Market for the New Common Stock.**

The New Common Stock and will be a new issuance of Securities, and there is no established trading market for those Securities. The Debtors are under no obligation, and do not intend, to apply for the New Common Stock to be listed on any securities exchange or to arrange for quotation on any automated dealer quotation system. As a result, there can be no assurance as to the liquidity of any trading market for the New Common Stock or if any trading market will develop. Further, the New Common Stock will be subject to transfer restrictions, if any, in the New Shareholders Agreement. Accordingly, Holders of the New Common Stock may be required to bear the financial risk of ownership indefinitely. If a trading market were to develop, Holders of the New Common Stock may experience difficulty in reselling the New Common Stock and may not be able to sell the New Common Stock at a particular time or at favorable prices. If a trading market were to develop, any such future trading prices of the New Common Stock may be volatile and will depend on many factors, including: (a) the Reorganized Debtors' operating performance and financial condition; (b) the interest of securities dealers in making a market for them; and (c) the market for similar Securities. Accordingly, Holders of the New Common Stock may bear certain risks associated with holding securities for an indefinite period of time.

4.       **The Terms of the New Shareholders Agreement Are Subject to Change Based on Negotiation and the Approval of the Bankruptcy Court.**

The terms of the New Shareholders Agreement are subject to change based on negotiations between the Debtors and the Consenting Stakeholders. Holders of Claims or Interests that are not the Consenting Stakeholders will not participate in these negotiations and the results of such negotiations may affect the rights of shareholders in Reorganized HHI following the Effective Date.

5.        **Holders of the New Common Stock Will Experience Dilution of Their Ownership Interests.**

Shares of New Common Stock issued by the Reorganized Debtors on the Effective Date, including those received by Holders of Secured Notes Claims and Existing Common Equity Interests under the Plan on account of such Claims and Interests, are subject to dilution by the New Common Stock or other options and equity awards, if any, issued pursuant to the Management Incentive Plan. The Reorganized Debtors may also grant options, warrants, or other convertible securities in the future, the exercise or conversation of which will dilute the percentage ownership of other Holders of the New Common Stock.

6.        **Reorganized HHI Is Not Obligated To Pay Dividends on the New Common Stock.**

Reorganized HHI may not pay any dividends on the New Common Stock and the terms of the Exit Facility Documents governing the Reorganized Debtors' indebtedness, including the Exit Take Back Debt Agreement may restrict the ability of Reorganized HHI to pay any such dividends. In such circumstances, the success of an investment in the Reorganized Debtors will depend entirely upon any future appreciation in the value of the New Common Stock. There is, however, no guarantee that the New Common Stock will appreciate in or maintain its value.

7.        **A Small Number of Holders Will Own a Significant Percentage of the New Common Stock.**

Consummation of the Plan will result in a small number of Holders owning a significant percentage of the outstanding New Common Stock. Accordingly, these Holders may, among other things, have significant influence over the business and affairs of Reorganized HHI and may have the power to elect directors or managers and approve or disapprove of proposed mergers and other material corporate transactions pursuant to the New Shareholders Agreement.

8.        **The Debtors' Financial Projections Are Subject to Inherent Uncertainty Due to the Numerous Assumptions Upon Which They Are Based.**

The Debtors' Financial Projections are based on numerous assumptions as of the date that such Financial Projections were prepared, including: timely Confirmation and Consummation pursuant to the terms of the Plan; the anticipated future performance of the Debtors; industry performance; general business and economic conditions; and other matters, many of which are beyond the control of the Debtors and some or all of which may not materialize. In addition, unanticipated events and circumstances occurring subsequent to the date of this Disclosure Statement or subsequent to the date that the Disclosure Statement is approved by the Bankruptcy Court may affect the actual financial results of the Debtors' operations or financial conditions. These variations may be material and may adversely affect the ability of the Debtors to make payments with respect to indebtedness following Consummation. Because the actual results achieved throughout the periods covered by the projections may vary from the projected results, the projections should not be relied upon and do not purport to provide an assurance of the actual results that will occur. Except with respect to the projections and except as otherwise specifically and expressly stated, the Disclosure Statement does not reflect any events that may occur subsequent to the date of the Disclosure Statement. Such events may have a material impact on the information contained in the Disclosure Statement. The Debtors do not intend to update the projections and therefore the projections will not reflect the impact of any subsequent events not already accounted for in the assumptions underlying the projections.

D.        **Risk Factors Related to the Business Operations of the Company and Reorganized Debtors.**

The risks associated with the Company's business and industry include, but are not limited to, the following:

1.        **Demand for the Company's Products Is Sensitive to Factors that Impact the End Markets It Serves, the General Economy, and Consumer Spending Levels.**

The Company's hardwood lumber is used to remodel existing, and to build and install new, kitchen and bathroom cabinets, flooring and molding and is used in millwork and furniture, as well as diverse commercial, industrial, and other applications. As a result, its sales are substantially dependent on the residential repair and remodel market and the new residential construction market in the United States as well as exports to Asia and Europe for

similar applications. The strength of these markets depends on the level of residential renovation projects and new housing starts, as well as commercial construction and renovation activities, which are a function of many factors that are beyond the Company's control. Some of these factors include general economic conditions, the level of unemployment, interest rates, housing prices, availability of mortgage financing and other credit and related levels of consumer confidence. The residential repair and remodel and new residential construction markets have experienced periodic downturns in demand and, in the United States, were significantly impacted by the recent recessionary economic conditions. Industrial applications include pallets, rail road ties, trailer flooring and crane mats. These markets have also experienced significant negative impacts from the recent recessionary conditions. Any relapse of these recessionary conditions or any prolonged downturn in residential remodeling, new home construction levels, commercial construction activity, or industrial markets could have a material adverse effect on the Company's operating results, liquidity, and financial condition.

2.      **Some of the Company's Products Are Vulnerable to Declines In Demand Due to Competing Technologies or Materials.**

Some of the Company's products may compete with alternative products in certain market segments. For example, plastic, wood/plastic or composite materials may be used by manufacturers as alternatives to products such as appearance lumber, veneer, and plywood. Changes in prices for oil, chemicals and wood-based fiber can change the competitive position of the Company's products relative to available alternatives and could increase substitution of those products for the Company's. As the use of these alternatives grows, demand for the Company's products may decline.

3.      **The Company Is Exposed to Price Fluctuations in Operational Costs.**

The Company's profitability may be affected by fluctuations in various operational costs such as raw materials (principally timber, lumber, and panels), energy sources, and transportation. In each case, these costs fluctuate as a result of a number of factors including product availability, changes in domestic and international supply and demand, labor costs, market speculation, environmental restrictions, government regulation and trade policies, duties and weather conditions. For example, certain of the Company's products are derived from hard-to-find species of hardwood, the availability of which could be affected by factors beyond the Company's control such as forest fires, insect infestation, tree diseases, or prolonged drought. Government regulations relating to forest management practices also affect the ability of the Company's suppliers to harvest or export timber, which in turn may affect costs passed on to the Company. Such fluctuations in operational expenses may adversely impact the Company's future earnings.

4.      **The Loss of One or More of the Company's Strategic Suppliers Could Adversely Affect Its Business.**

The Company relies on the continued availability of various species of softwoods and hardwoods. Accordingly, the Company's business may be impacted if the harvesting of any species terminates or diminishes, or if the Company is no longer able to procure timber that meets the Company's price, quality, quantity, and delivery requirements. Although the Company relies on multiple suppliers for its products and believes its relationships with existing suppliers are strong, an adverse change in those relationships could delay the Company's ability to meet the demands of its customers, cause increases in its costs of goods sold, and have a significant adverse impact on its results of operations.

5.      **The Loss or Shutdown of One or More Production Facilities Could Adversely Affect the Company's Business.**

The Company's sawmills, concentration yards, and remanufacturing and distribution facilities are critical to its business. The Company could experience a shutdown or loss of one or more facilities as a result of fires, industrial accidents, floods, hurricanes, tornadoes, earthquakes, pandemics, or other catastrophic disasters. Prolonged power failures, breakdown or failure of equipment, noncompliance with material environmental requirements or permits, or other operational problems could also cause significant disruptions at, or shutdowns of, one or more facilities. If any facilities are shut down, they may experience prolonged startup periods, regardless of the reason for the shutdown. The loss of any facilities or any prolonged disruption in operations at any facilities could cause significant lost production or adversely affect the distribution of the Company's products. Although the Company has production

capacity at multiple locations and warehouses strategically located across the Unites States that provide it with flexibility in the production and distribution of products, the loss or shutdown of one or more facilities could negatively impact the Company's business for a particular period while the Company adjusts its other production or distribution facilities to accommodate the loss or shutdown.

6.      **The Company's International Operations Subject It to Risks Arising from International Economic, Political, Legal, and Business Factors.**

The Company's international operations are subject to all applicable import, customs, export and economic sanctions laws and regulations of the U.S. and other countries. Violations of these laws or regulations could result in significant sanctions, including fines, compliance requirements and criminal penalties which could materially adversely affect the Company's business, financial condition, and results of operations.

The Company's reliance on non-U.S. sales and foreign suppliers also exposes its business to a number of risks, including tariffs, exchange rate fluctuations, foreign trade restrictions, political instability, and other factors beyond the Company's control. This exposure has the potential to disrupt the Company's ability to continue exporting its products outside of the United States and its suppliers' ability to ship products cost-effectively or at all. Any one of these factors may have a material adverse effect on the Company's ability to maintain or increase net sales or profit margins.

7.      **The Company Is Subject to Risks Associated with Environmental, Health and Safety Laws and Regulations, Including Climate Change Regulations.**

The Company is subject to increasingly stringent federal, state, and local environmental laws and regulations, including those related to air emissions, climate change, water use, wastewater discharges, harvesting and other silvicultural activities, forestry operations and endangered species habitat protection, and hazardous materials and waste management. Some of these environmental laws hold owners or operators of facilities or properties liable for their own and for previous owners' or operators' releases of hazardous substances. Other environmental laws and regulations require the obtainment of and compliance with environmental permits. The nature of the Company's operations and its long history of industrial activities at certain current, former, and acquired facilities, could potentially result in material environmental liabilities. The potential impacts of environmental laws and regulations are often uncertain, particularly as regards future new or revised environmental laws and regulations, and may have a material adverse effect on the Company's financial condition, results of operations, or cash flows.

8.      **The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases.**

In the future, the Reorganized Debtors may become a party to litigation. In general, litigation can be expensive and time consuming to bring or defend against. Such litigation could result in settlements or damages that could significantly affect the Reorganized Debtors' financial results. It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan. It is not possible to predict the potential litigation that the Reorganized Debtors may become party to, nor the final resolution of such litigation. The impact of any such litigation on the Reorganized Debtors' business and financial stability, however, could be material.

9.      **The Company's Operations Present Significant Risk of Injury or Death and the Company May Be Subject to Claims Not Covered by or that Exceed Its Insurance.**

Lumber manufacturing is completed in a safety-sensitive environment. As a result, there exists a risk of injury or death to the Company's employees or other visitors at its sawmills or other locations notwithstanding the safety precautions the Company takes. The Company's operations are subject to regulation by federal, state and local agencies responsible for employee health and safety. While the Company has policies in place to minimize such risks, it may nevertheless be unable to avoid material liabilities for any employee death or injury that may occur in the future. These types of incidents may not be covered by or may exceed the Company's insurance coverage and may have a material adverse effect on the Company's results of operations and financial condition.

10.     **The Company Could Be Negatively Impacted If It Fails to Maintain Satisfactory Labor Relations.**

Depending on the state of the U.S. economy, it may be difficult to acquire and retain the skilled labor necessary to successfully operate the Company's facilities. Labor disruptions or shortages could prevent the Company from meeting customer demands or result in increased costs, thereby reducing sales and profitability.

The Company is party to a collective bargaining agreement with respect to approximately 120 employees at its Longview, Washington facility. The collective bargaining agreement expires on July 31, 2022. In addition, the Company relies substantially on expert foresters to access timber tracts, manage supplier relationships and price and procure logs. Although foresters have an average employment tenure with the Company of approximately 13 years, they are at-will employees and do not operate under employment contracts. An effective forester has significant knowledge of and experience with log procurement strategies in the region in which he or she operates and, consequently, the available supply of individuals with the requisite knowledge and experience is relatively limited in relation to the demand for such individuals. The Company's business operations may be adversely affected as a result of labor disputes or difficulties with the unionized workforce or the loss of one or more expert foresters

11.     **COVID-19 or Other Pandemics or Epidemics Could Negatively Impact the Company's Business Operations, Financial Performance and Results of Operations.**

The business and financial results of the Company have been and may continue to be negatively impacted by the recent outbreak of COVID-19 and could be similarly negatively impacted by other pandemics or epidemics in the future. The severity, magnitude and duration of the current COVID-19 pandemic is uncertain, rapidly changing and hard to predict, and could negatively impact the Company's business in numerous ways, including but not limited to: general operational disruptions; work-related travel restrictions; workforce shortages; temporary or permanent facility closures; disruptions, uncertainties, delays, or modifications to the Company's strategic plans and initiatives; and increased pricing volatility for both costs and sales.

12.     **The Reorganized Debtors May Not Be Able to Generate Sufficient Cash to Service All of Their Indebtedness.**

The Reorganized Debtors' ability to make scheduled payments on, or refinance their debt obligations, depends on the Reorganized Debtors' financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Reorganized Debtors' control. The Reorganized Debtors may be unable to maintain a level of cash flow from operating activities sufficient to permit the Reorganized Debtors to pay the principal, premium (if any), and interest and/or fees on their indebtedness, including, without limitation, anticipated borrowings under the Exit Facilities upon emergence.

E.     **Miscellaneous Risks and Disclaimers.**

1.     **The Financial Information Is Based on the Debtors' Books and Records and, Unless Otherwise Stated, No Audit Was Performed.**

In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation. Although the Debtors have used their reasonable business judgment to assure the accuracy of the financial information provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects their financial condition, the Debtors are unable to warrant or represent that the financial information contained in this Disclosure Statement (or any information in any of the exhibits to the Disclosure Statement) is without inaccuracies.

2.     **No Legal or Tax Advice Is Provided By This Disclosure Statement.**

This Disclosure Statement is not legal advice to any Person or Entity. The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each reader should consult its own legal counsel

and accountant with regard to any legal, tax, and other matters concerning its Claim. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote to accept or reject the Plan or whether to object to Confirmation.

### 3.    No Admissions Made.

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Reorganized Debtors, Holders of Allowed Claims or Interests, or any other parties in interest.

### 4.    Failure to Identify Litigation Claims or Projected Objections.

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim is, or is not, identified in this Disclosure Statement. The Debtors may seek to investigate, file, and prosecute Claims and may object to Claims after Confirmation and Consummation of the Plan, irrespective of whether this Disclosure Statement identifies such Claims or objections to Claims.

### 5.    Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors.

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement and the exhibits to the Disclosure Statement, they have not independently verified the information contained in this Disclosure Statement or the information in the exhibits to the Disclosure Statement.

### 6.    No Representations Outside This Disclosure Statement Are Authorized.

No representations concerning or relating to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure voting Holders' acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by voting Holders in arriving at their decision. Voting Holders should promptly report unauthorized representations or inducements to counsel to the Debtors and the Office of the United States Trustee for the District of Delaware.

## IX.    Important Securities Laws Disclosures

### A.    Plan Consideration.

In accordance with the Plan and the Restructuring Support Agreement, the Debtors and/or Reorganized Debtors, as applicable, will distribute (x) the Exit Take Back Debt to Holders of Secured Notes Claims and (y) shares of New Common Stock to Holders of Secured Notes Claims and Existing Common Equity Interests. The Debtors believe that the New Common Stock may constitute "securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and all applicable state Blue Sky Laws.

### B.    Exemption from Registration Requirements; Issuance and Resale of New Common Stock; Definition of "Underwriter" Under Section 1145(b) of the Bankruptcy Code.

### 1.    Exemption from Registration Requirements; Issuance and Resale of New Common Stock.

Section 1145 of the Bankruptcy Code provides that the registration requirements of section 5 of the Securities Act (and any applicable state Blue Sky Laws) shall not apply to the offer or sale of stock, options, warrants, or other Securities by a debtor if: (a) the offer or sale occurs under a plan of reorganization; (b) the recipients of the Securities hold a claim against, an interest in, or claim for administrative expense against, the debtor; and (c) the Securities are

issued in exchange for a claim against or interest in a debtor or are issued principally in such exchange and partly for cash and property.

Any Securities issued in reliance of section 1145 may be resold without registration under the Securities Act or other federal securities laws, unless the Holder is an "underwriter" (as discussed in <u>Section IX.B.2</u> below) with respect to such Securities, as that term is defined in section 1145(b) of the Bankruptcy Code, or an affiliate of the Reorganized Debtors (or has been such an "affiliate" within 90 days of such transfer). In addition, such Securities generally may be able to be resold without registration under applicable state Blue Sky Laws by a Holder that is not an underwriter or an affiliate of the Reorganized Debtors pursuant to various exemptions provided by the respective Blue Sky Laws of those states. However, the availability of such exemptions cannot be known unless individual state Blue Sky Laws are examined.

Recipients of the New Common Stock to be issued pursuant to the Plan or the Restructuring Support Agreement are advised to consult with their own legal advisors as to the availability and applicability of section 1145 of the Bankruptcy Code to such New Common Stock, and any other potential exemption from registration under the Securities Act or applicable state Blue Sky Laws in any given instance and as to any applicable requirements or conditions to such availability.

Notwithstanding anything to the contrary in the Plan, no Entity (including, for the avoidance of doubt, DTC) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the New Common Stock are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

The Debtors do not have any contract, arrangement, or understanding relating to, and will not, directly or indirectly, pay any commission or other remuneration to any broker, dealer, salesperson, agent, or any other Person for soliciting votes to accept or reject the Plan. In addition, no broker, dealer, salesperson, agent, or any other Person, is engaged or authorized to express any statement, opinion, recommendation, or judgment with respect to the relative merits and risks of the Plan. Thus, no Person will receive any commission or other remuneration, directly or indirectly, for soliciting votes to accept or reject the Plan or in connection with the offer of any Securities that may be the deemed to occur in connection with voting on the Plan.

In addition to the foregoing, all transfers of New Common Stock will be subject to the transfer provisions and other applicable provisions set forth in the New Shareholders Agreement.

2.      **Definition of "Underwriter" Under Section 1145(b) of the Bankruptcy Code; Implications for Resale of New Common Stock.**

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions of an entity that is not an issuer": (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any Security received or to be received in exchange for such claim or interest; (b) offers to sell Securities offered or sold under a plan for the holders of such Securities; (c) offers to buy Securities offered or sold under a plan from the holders of such Securities, if such offer to buy is (i) with a view to distribution of such Securities and (ii) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of Securities under the plan; or (d) is an issuer of the Securities within the meaning of section 2(a)(11) of the Securities Act. In addition, a Person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer," for purposes of whether a Person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of Securities. The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover "controlling persons" of the issuer of the securities. "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting Securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor

under a plan of reorganization may be deemed to be a "controlling person" of such debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. In addition, the legislative history of section 1145 of the Bankruptcy Code may suggest that a creditor who owns ten percent or more of a class of voting Securities of a reorganized debtor may be presumed to be a "controlling person" and, therefore, an underwriter.

Whether any particular Person would be deemed to be an "underwriter" (including whether such Person is a "controlling person") with respect to the New Common Stock to be issued in respect of Claims or Interests as contemplated by the Plan would depend upon various facts and circumstances applicable to that Person. Accordingly, the Debtors express no view as to whether any Person would be deemed an "underwriter" with respect to the New Common Stock to be issued in respect of Claims or Interests as contemplated by the Plan and, in turn, whether any Person may freely resell such New Common Stock. The Debtors recommend that potential recipients of such New Common Stock consult their own counsel concerning their ability to freely trade such Securities without registration under the federal and applicable state Blue Sky Laws.

Under certain circumstances, Holders of New Common Stock to be issued in respect of Claims or Interests as contemplated by the Plan who are deemed to be "underwriters" may be entitled to resell their New Common Stock pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act. Generally, Rule 144 of the Securities Act would permit the public sale of Securities received by such Person after a specified holding period if current information regarding the issuer is publicly available and certain other conditions are met, and, if such seller is an affiliate of the issuer, if volume limitations and manner of sale requirements are met.

## C.    Private Placement Exemptions.

Section 4(a)(2) of the Securities Act provides that the issuance of Securities by an issuer in transactions not involving any public offering are exempt from registration under the Securities Act. Regulation D is a non-exclusive safe harbor from registration promulgated by the SEC under section 4(a)(2) of the Securities Act.

To the extent any of the Securities issued pursuant to the Plan or the Restructuring Supporting Agreement do not qualify for exemption from registration in reliance on section 1145 of the Bankruptcy Code, the Debtors believe such Securities will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance on Section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder. These Securities will be subject to resale restrictions and may be resold, exchanged, assigned or otherwise transferred only pursuant to registration, or an applicable exemption from registration, under the Securities Act and other applicable law, as described below.

Unlike the Securities issued pursuant to section 1145(a) of the Bankruptcy Code, if any, all Securities, including shares of New Common Stock, issued pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder will be considered "restricted securities" and may not be offered, sold, exchanged, assigned or otherwise transferred unless they are registered under the Securities Act, or an exemption from registration under the Securities Act is available.

All Persons who receive such Securities will be required to agree that they will not offer, sell or otherwise transfer any such shares except in accordance with an exemption from registration, including under Rule 144 under the Securities Act, if and when available.

Rule 144 provides an exemption for the public resale of "restricted securities" if certain conditions are met. These conditions vary depending on whether the holder of the restricted Securities is an affiliate of the issuer. An affiliate is defined as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the issuer."

A non-affiliate of an issuer that is not subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act and who has not been an affiliate of the issuer during the 90 days preceding such sale may resell restricted securities after a one-year holding period whether or not there is current public information regarding the issuer.

An affiliate of an issuer that is not subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act may resell restricted Securities after the one-year holding period if at the time of the sale certain current public information regarding the issuer is available. The affiliate must also comply with the volume, manner of sale and notice requirements of Rule 144. First, the rule limits the number of restricted Securities (plus any unrestricted Securities) sold for the account of an affiliate (and related persons) in any three-month period to the greater of 1% of the outstanding Securities of the same class being sold, or, if the class is listed on a stock exchange, the greater of 1% of the average weekly reported volume of trading in such restricted Securities during the four weeks preceding the filing of a notice of proposed sale on Form 144. Second, the manner of sale requirement provides that the restricted Securities must be sold in a broker's transaction, which generally means they must be sold through a broker and handled as a routine trading transaction. The broker must receive no more than the usual commission and cannot solicit orders for the sale of the restricted Securities except in certain situations. Third, if the sale exceeds 5,000 restricted Securities or has an aggregate sale price greater than $50,000, an affiliate must file with the SEC three copies of a notice of proposed sale on Form 144. The sale must occur within three months of filing the notice unless an amended notice is filed.

It is not currently contemplated that Reorganized HHI will become subject to the reporting requirements of Section 13 or 15(b) of the Exchange Act.

The Debtors believe that the Rule 144 exemption will not be available with respect to any such shares (whether held by non-affiliates or affiliates) until at least one year after the Effective Date. Accordingly, Holders of such shares will be required to hold such shares for at least one year and, thereafter, to sell them only in accordance with the applicable requirements of Rule 144, pursuant to the an effective registration statement or pursuant to another available exemption from the registration requirements of applicable securities laws.

****

*Legend*. To the extent certificated or issued by way of direct registration on the records of the issuer's transfer agent, certificates evidencing the New Common Stock held by Holders of 10% or more of the outstanding New Common Stock will bear a legend substantially in the form below:

> THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON [DATE OF ISSUANCE], HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "*ACT*"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE EXEMPTION FROM REGISTRATION THEREUNDER.

The Debtors and Reorganized Debtors, as applicable, reserve the right to reasonably require certification, legal opinions or other evidence of compliance with Rule 144 as a condition to the removal of such legend or to any resale of the 4(a)(2) Securities. The Debtors and Reorganized Debtors, as applicable, also reserve the right to stop the transfer of any 4(a)(2) Securities if such transfer is not in compliance with Rule 144, pursuant to an effective registration statement or pursuant to another available exemption from the registration requirements of applicable securities laws. All Persons who receive 4(a)(2) Securities will be required to acknowledge and agree that (a) they will not offer, sell or otherwise transfer any 4(a)(2) Securities except in accordance with an exemption from registration, including under Rule 144 under the Securities Act, if and when available, or pursuant to an effective registration statement, and (b) the 4(a)(2) Securities will be subject to the other restrictions described above.

In any case, recipients of Securities issued under the Plan are advised to consult with their own legal advisers as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability.

**BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER OR AN AFFILIATE AND THE HIGHLY FACT-SPECIFIC NATURE OF THE AVAILABILITY OF EXEMPTIONS FROM REGISTRATION UNDER THE**

SECURITIES ACT, INCLUDING THE EXEMPTIONS AVAILABLE UNDER SECTION 1145 OF THE BANKRUPTCY CODE AND RULE 144 UNDER THE SECURITIES ACT, NONE OF THE DEBTORS OR THE REORGANIZED DEBTORS MAKE ANY REPRESENTATION CONCERNING THE ABILITY OF ANY PERSON TO DISPOSE OF THE SECURITIES TO BE DISTRIBUTED UNDER THE PLAN. ACCORDINGLY, THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF THE SECURITIES TO BE ISSUED UNDER THE PLAN CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES AND THE CIRCUMSTANCES UNDER WHICH THEY MAY RESELL SUCH SECURITIES.

Notwithstanding anything contained herein to the contrary, each recipient of the New Common Stock issued pursuant to the Plan will be deemed to be a party to the New Shareholders Agreement, and such New Common Stock will be subject to the New Shareholders Agreement.

## X.      Certain United States Federal Tax Consequences of the Plan

### A.      Introduction.

The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Plan to the Debtors, the Reorganized Debtors, and certain holders of Claims or Interests. The following summary does not address the U.S. federal income tax consequences to holders who are Unimpaired, entitled to payment in full in Cash under the Plan, or deemed to reject the Plan.

This discussion is based on the Internal Revenue Code of 1986, as amended (the "*Tax Code*"), U.S. Treasury Regulations (the "*Treasury Regulations*"), judicial authorities, and published positions of the Internal Revenue Service ("*IRS*"), all as in effect on the date hereof and all of which are subject to change or differing interpretations (possibly with retroactive effect). The U.S. federal income tax consequences of the contemplated transactions are complex and subject to significant uncertainties. The Debtors have not requested an opinion of counsel or a ruling from the IRS with respect to any of the tax aspects of the contemplated transactions. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein, in which case the tax consequences to the Debtors, Reorganized Debtors, and Holders of Claims or Interests may differ materially from the tax consequences described below.

This discussion does not address foreign, state, local, gift, or estate tax consequences of the Plan, nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or to Holders that are subject to special tax rules (such as Persons who are related to the Debtors within the meaning of the Tax Code, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, real estate investment trusts, tax exempt organizations, controlled foreign corporations, passive foreign investment companies, pass-through entities, beneficial owners of pass-through entities, trusts, governmental authorities or agencies, dealers and traders in securities, S corporations, Persons who hold Claims or Interests, or who will hold consideration received under the Plans as part of a straddle, hedge, conversion transaction, or other integrated investment, Persons using a mark-to-market method of accounting, Persons required to accelerate the recognition of any item of gross income with respect to the Claims or Interests as a result of such income being recognized on an applicable financial statement, and U.S. Holders (as defined below) whose "functional currency" is not the U.S. dollar, and Persons subject to the alternative minimum tax or the "Medicare" tax on net investment income).

This discussion assumes that all Claims and Interests are held as "capital assets" (generally, property held for investment) within the meaning of section 1221 of the Tax Code (unless otherwise indicated) and that the various debt and other arrangements to which the Debtors are parties will be respected for U.S. federal income tax purposes in accordance with their form.

THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON INDIVIDUAL CIRCUMSTANCES. ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO

CONSULT THEIR OWN TAX ADVISORS FOR THE U.S. FEDERAL, STATE, LOCAL, FOREIGN, AND OTHER TAX CONSEQUENCES OF THE PLAN.

**B.      Consequences to the Debtors**

For U.S. federal income tax purposes, the Debtors are members of an affiliated group of corporations which files a single consolidated U.S. federal income tax return of which HHI is the common parent (the "*NWH Group*").

**1.      Tax Attributes**

The Debtors estimate that, as of December 31, 2019, the NWH Group had consolidated net operating loss ("*NOL*") carryforwards for U.S. federal income tax purposes of approximately $18.4 million and estimated carryforwards of disallowed business interest expense of approximately $62.8 million, taking into account the impact of the Coronavirus Aid, Relief, and Economic Security Act, as may be amended or modified (the "*CARES Act*"). Up to and after the Petition Date, the Debtors may have generated additional net tax losses, which losses would increase the Debtors' NOLs.  The amount of any such NOLs and other tax attributes, including any deductions allowed for tax purposes in respect of payments of Claims under the Plan ("*Tax Attributes*"), remains subject to audit and potential adjustment by the IRS.

In addition, certain trading activity and certain other actions prior to the Effective Date relating to direct and indirect ownership of equity and securities of the Debtors could result in an "ownership change" of the Debtors independent of the Plan, which could adversely affect the ability to fully utilize the Debtors' Tax Attributes.  In an attempt to minimize the likelihood of such an ownership change occurring, the Debtors obtained a protective trading order at the inception of the Chapter 11 Cases.

The CARES Act, which was enacted on March 27, 2020, implements certain amendments to the Tax Code (some of which are retroactive in effect) that, among other things, relax previously applicable limitations on the use of NOLs and business interest expense deductions.  Such changes in law could impact both the amount and makeup of Tax Attributes of the Debtors.   In general, under the CARES Act all NOLs (regardless of the taxable year in which the NOL arose) carried over to taxable years beginning before January 1, 2021 may offset up to 100% of taxable income for such year. Prior to enactment of the CARES Act, NOL carryforwards arising in taxable years beginning before 2018 were able to be carried forward to, and offset 100% of taxable income arising in, future years, until such NOLs expire, which is generally 20 years after the year incurred, and NOL carryforwards arising in taxable years beginning after 2017 were able to be carried forward to, and offset only 80% of taxable income arising in, future taxable years, and such NOLs do not expire.

As discussed below, in connection with the Plan, it is anticipated that the Debtors' Tax Attributes (other than any carryforward of disallowed business interest) will be substantially reduced and likely eliminated as a result of the implementation of the Plan as Recapitalization (as defined below).  As part of that Tax Attribute reduction, it is possible that the tax basis in assets retained by Reorganized HHI would be reduced below the fair market value of such assets.  In contrast, in the event of an Asset Transfer (as defined below), the Debtors expect that the acquiring entities would obtain a tax basis in the acquired assets equal to their fair market value; in such a scenario, however, the acquirers would not acquire or succeed to any of Debtors' NOL carryforwards or other Tax Attributes.

**2.      Consequences of the Implementation of the Plan**

The U.S. federal income tax consequences to the Debtors of the implementation of the Plan depend in significant part on whether the Debtors consummate either (a) a Recapitalization or (b) an Asset Transfer.

(a)      Recapitalization

The Plan may be implemented through an exchange of (i) the Allowed Secured Notes Claims for 99.00% of the New Common Stock and the Exit Take Back Debt and (ii) the Allowed Existing Common Equity Interests for 1.00% of the New Common Stock (the "*Recapitalization*"). The Debtors are not expected to recognize gain or loss as

a result of a Recapitalization, regardless of whether such exchange qualifies as a "reorganization" within the meaning of the Tax Code.

(b)    Asset Transfer

Alternatively, the Plan may be implemented through a transfer of some or all of the Debtors' assets to a newly formed group of corporations (the "**Acquisition Companies**" and such transfer, the "**Asset Transfer**") of which a newly formed Reorganized HHI would be the common parent. The consideration for the acquisition of the Debtors' assets in the Asset Transfer would be the New Common Stock, the Exit Take Back Debt, and the indirect assumption of all of remaining obligations of the NWH Group not otherwise discharged under the Plan.

The Debtors expect that, for U.S. federal income tax purposes, the Asset Transfer would be treated as – and the discussion herein assumes treatment as – a taxable asset acquisition, such that the Acquisition Companies would obtain a new cost basis in the assets acquired (or deemed acquired) based on the fair market value of such assets acquired on the Effective Date. In such a transaction, the Acquisition Companies would not succeed to any Tax Attributes of the Debtors. The NWH Group generally would recognize gain or loss upon the transfer in an amount equal to the difference, if any, between (i) the sum of (x) the fair market value of the New Common Stock, (y) the issue price of the Exit Take Back Debt, and (z) the amount of any other liabilities directly or indirectly assumed by the Acquisition Companies and (ii) the tax basis in the assets transferred.

The Debtors have not yet determined whether such a taxable sale would result in material tax liabilities. In addition, the fair market value and tax basis of the Debtors' assets may vary from current estimates, which could result in tax consequences different from those expected, and in any event, the amount of gain or loss and any resulting tax liability will remain subject to audit and adjustment by the IRS or other applicable taxing authorities.

Although the Debtors expect the Asset Transfer would be treated as a taxable asset acquisition, there is no assurance that the IRS would not take a contrary position. If the Asset Transfer was treated as a "reorganization" rather than as a taxable sale for U.S. federal income tax purposes, the Acquisition Companies would carry over the Tax Attributes of the NWH Group (including tax basis in assets), subject to the attribute reduction attributable to the substantial cancellation of debt income realized and other applicable limitations (as discussed below).

**3.    Cancellation of Debt**

In general (and subject to certain exceptions), the Tax Code provides that the discharge of debt in exchange for less consideration than the adjusted issue price of the discharged debt results in taxable cancellation of debt income ("**CODI**") to the debtor. Generally, CODI may be excluded from income if the debtor is in a chapter 11 bankruptcy case or to the extent the debtor is insolvent, although specified tax attributes of the debtor must be reduced to the extent of CODI so excluded.

A debtor in a bankruptcy case must reduce certain of its tax attributes – such as NOL carryforwards and current year NOLs, capital loss carryforwards, certain tax credits, and tax basis in assets – by the amount of any CODI realized pursuant to a confirmed chapter 11 plan. Although not free from doubt, it is expected that carryovers of disallowed interest expense would not be a tax attribute subject to such reduction. In applying this attribute reduction rule to the tax basis in assets, the tax law limits the reduction in tax basis to the amount by which the tax basis exceeds the debtor's post-emergence liabilities (often referred to as the "**liability floor**").

Alternatively, a debtor can elect to reduce the basis of depreciable property prior to any reduction in its NOL carryforwards or other tax attributes. Where the debtor joins in the filing of a consolidated U.S. federal income tax return, applicable Treasury Regulations require, in certain circumstances, that the tax attributes of the consolidated subsidiaries of the debtor and other members of the group must also be reduced. Any reduction in tax attributes in respect of CODI generally does not occur until after the determination of the debtor's net income or loss for the taxable year in which the CODI is realized.

The Debtors expect to realize a substantial amount of CODI as a result of the implementation of the Plan. The amount of such CODI and resulting reduction in Tax Attributes will depend primarily on the sum of the fair

market value of the New Common Stock and the issue price (as determined for tax purposes) of the Exit Take Back Debt distributed to holders of Allowed Secured Notes Claims. Accordingly, the Tax Attributes (other than any carryforward of disallowed business interest) are expected to be substantially reduced or eliminated as a result of a the implementation of the Plan, and the aggregate tax basis in any assets retained by the Debtors' may be reduced to the maximum extent permitted by the liability floor.

Any reduction in Tax Attributes attributable to CODI realized in a Recapitalization or Asset Transfer does not occur until the end of the taxable year in which the Plan becomes effective. As a result, the Debtors do not expect the attribute reduction to affect the U.S. federal income tax treatment to Debtors of an Asset Transfer, including the computation of gain or loss on the transfer.

### 4.      Limitation of Tax Attributes

Any NOL carryforwards, disallowed interest expense carryforwards and certain other tax attributes of a corporation (collectively, "***Pre-Change Losses***") may be subject to an annual limitation if the corporation undergoes an "ownership change" within the meaning of section 382 of the Tax Code. These limitations apply in addition to, and not in lieu of, the attribute reduction that may result from the CODI arising in connection with the Plan.

The Debtors expect that the issuance of the New Common Stock in a Recapitalization will constitute an "ownership change" of HHI and its subsidiaries. This "ownership change" would be expected to occur as of the Effective Date of the Plan.

#### (a)      **General Annual Limitation**

In general, the amount of the annual limitation to which a corporation (or consolidated group) that undergoes an ownership change will be subject is equal to the product of (A) the fair market value of the stock of the corporation (or common parent of the consolidated group) immediately *before* the ownership change (with certain adjustments) multiplied by (B) the "long-term tax-exempt rate" in effect for the month in which the ownership change occurs.

For a corporation (or consolidated group) in bankruptcy that undergoes an ownership change pursuant to a confirmed chapter 11 plan, subject to a special exception described below, the fair market value of the stock of the corporation is generally determined immediately *after* (rather than before) the ownership change after giving effect to the discharge of creditors' claims, subject to certain adjustments; in no event, however, can the stock value for this purpose exceed the pre-change gross value of the corporation's assets.

Under certain circumstances, the annual limitation may apply to certain unrealized built-in losses. Additionally, under certain circumstances the annual limitation may be adjusted for certain net unrealized built-in gains. Any portion of the annual limitation that is not used in a given year may be carried forward, thereby adding to the annual limitation for the subsequent taxable year.

#### (b)      **Special Bankruptcy Exception**

An exception to the foregoing annual limitation rules generally applies when shareholders and "qualified creditors" of a debtor corporation in chapter 11 receive, in respect of their equity interests or claims (as applicable), at least fifty percent (50%) of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan. Under this exception, a debtor's Pre-Change Losses are not subject to the annual limitation.

However, if this exception applies, the debtor's Pre-Change Losses generally will be reduced by the amount of any interest deductions claimed during the three taxable years preceding the taxable year that includes the effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the plan of reorganization, in respect of all debt converted into stock in the reorganization. Also, if the reorganized debtor thereafter undergoes another "ownership change" within two years, the annual limitation with respect to such later ownership change could be zero, effectively precluding any future use of such Debtor's Pre-Change Losses.

A debtor that qualifies for this exception may, if it so desires, elect not to have the exception apply and instead remain subject to the annual limitation determining, for purposes of such calculation, the fair market value of the stock of the corporation immediately after the ownership change as described above.

**C.    Consequences of the Implementation of the Plan to U.S. Holders of Certain Claims and Interests**

As used herein, the term "***U.S. Holder***" means a beneficial owner of an Allowed Secured Notes Claim, Allowed Existing Equity Interest, or Exit Take Back Debt that is for U.S. federal income tax purposes:

- an individual who is a citizen or resident of the United States;
- a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof or the District of Columbia;
- an estate the income of which is subject to U.S. federal income taxation regardless of its source; or
- a trust, if a court within the United States is able to exercise primary jurisdiction over its administration and one or more U.S. persons have authority to control all of its substantial decisions, or if the trust has a valid election in effect under applicable Treasury Regulations to be treated as a U.S. person.

If a partnership or other entity taxable as a partnership (or other pass-through entity) for U.S. federal income tax purposes holds a Claim or Interest, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partnership (or other pass-through entity).  Partnerships (or other pass-through entities) and partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders of Claims or Interests are urged to consult their tax advisors regarding the tax consequences of the Plan.

**1.    U.S. Holders of Allowed Secured Notes Claims**

Pursuant to the Plan, U.S. Holders of Allowed Secured Notes Claims will receive 99.00% of the New Common Stock and the Exit Take Back Debt in complete and final satisfaction of their Claims.  The U.S. federal income tax consequences of this exchange to U.S. holders of Allowed Secured Notes Claims will depend in part on whether the Debtors implement the Plan through a Recapitalization or an Asset Transfer (each as described above) and on whether the Secured Notes and the Exit Take Back Debt, respectively, constitute "securities" for U.S. federal income tax purposes.

(a)    **Treatment of a Debt Instrument as a "Security"**

The term "security" is not defined in the Tax Code or in the Treasury Regulations issued thereunder and has not been clearly defined by judicial decisions.  The determination of whether a particular debt obligation constitutes a "security" depends on an overall evaluation of the nature of the debt, including whether the holder of such debt obligation is subject to a material level of entrepreneurial risk and whether a continuing proprietary interest is intended or not.

One of the most significant factors considered in determining whether a particular debt obligation is a security is its original term.  In general, debt obligations issued with a weighted average maturity at issuance five (5) years or less do not constitute securities, whereas debt obligations with a weighted average maturity at issuance of ten (10) years or more constitute securities.  Additionally, the IRS has ruled that new debt obligations with a term of less than five years issued in exchange for and bearing the same terms (other than interest rate) as securities should also be classified as securities for this purpose, since the new debt represents a continuation of the holder's investment in the corporation in substantially the same form.

The 2014 Notes had a seven (7) year maturity at issuance[11] and the 2015 Notes had a six (6) year maturity at

---

[11]    The 2014 Notes were issued on July 18, 2014, with a maturity date of August 1, 2021.

issuance.[12] The Exit Take Back Debt is expected to have a five (5) year maturity. The following discussion assumes that only the Notes qualify as "securities" for U.S. federal income tax purposes, but the applicable treatment with respect to the Exit Take Back Debt is unclear. Holders of Allowed Secured Notes Claims are urged to consult their own tax advisors regarding the appropriate status for U.S. federal income tax purposes of the Notes and the Exit Take Back Debt.

If the Debtors implement the Plan through a Recapitalization, the exchange of Allowed Secured Notes Claims for New Common Stock and Exit Take Back Debt is expected to be a "reorganization" for U.S. federal income tax purposes, with the consequences to U.S. Holders of such Claims described below in "Reorganization Treatment." If the Plan is implemented through an Asset Transfer (or the Plan implemented through a Recapitalization but the Notes are not "securities"), the exchange is expected to be taxable to U.S. Holders and its U.S. federal income tax consequences to such Holders should be as described below in "Taxable Exchange."

(b)      **Reorganization Treatment**

If the exchange by a U.S. Holder of Allowed Secured Notes Claims for New Common Stock and Exit Take Back Debt is a "reorganization" within the meaning of the Tax Code, the holder generally will recognize gain (but not loss) equal to the lesser of (1) the difference, if any, between (i) the issue price of the Exit Take Back Debt and the fair market value of the New Common Stock received (except to the extent received in respect of accrued but unpaid interest or OID) and (ii) the U.S. Holder's adjusted tax basis in its Allowed Secured Notes Claims exchanged therefor (other than any tax basis attributable to accrued but unpaid interest or OID), and (2) the issue price of the Exit Take Back Debt received in exchange for Allowed Secured Notes Claims (except to the extent received in respect of accrued but unpaid interest or OID). *See* Section X.C.3 —"Character of Gain or Loss," below. In addition, a U.S. Holder will have ordinary interest income to the extent of any consideration received in respect of accrued but unpaid interest or OID on the Notes. *See* Section X.C.4 — "Distributions in Respect of Accrued But Unpaid Interest or OID," below.

In an exchange that qualifies as a "reorganization," a U.S. Holder's aggregate tax basis in the New Common stock received in exchange for its Allowed Secured Notes Claims will equal such U.S. Holder's aggregate adjusted tax basis in the Allowed Secured Notes Claims exchanged therefor, increased by any gain and interest income recognized in the exchange. A U.S. Holder's holding period in the New Common Stock received in exchange for its Allowed Secured Notes Claims will include its holding period in the Allowed Secured Notes Claims exchanged therefor, except to the extent of any New Common Stock received in respect of accrued but unpaid interest or OID on the Notes.

(c)      **Taxable Exchange Treatment**

In the case of a taxable exchange, a U.S. Holder of an Allowed Secured Notes Claim generally should recognize gain or loss in an amount equal to the difference, if any, between (i) the issue price of the Exit Take Back Debt and the fair market value of the New Common Stock received (except to the extent received in respect of accrued but unpaid interest or OID) and (ii) the U.S. Holder's adjusted tax basis in its Allowed Secured Notes Claims exchanged therefor (other than any tax basis attributable to accrued but unpaid interest or OID). *See* Section X.C.3 —"Character of Gain or Loss," below. In addition, a U.S. Holder will have ordinary interest income to the extent of any consideration received in respect of accrued but unpaid interest or OID on the Notes. *See* Section X.C.4 — "Distributions in Respect of Accrued But Unpaid Interest or OID," below.

In the case of a taxable exchange, a U.S. Holder's tax basis in the New Common Stock received will equal the fair market value of such New Common Stock and its tax basis in the Exit Take Back Debt received will be equal to its issue price. The U.S. Holder's holding period in the New Common Stock and Exit Take Back Debt generally will begin on the day following the Effective Date.

---

[12]     The 2014 Notes were issued on February 20, 2015, with a maturity date of August 1, 2021.

2.        **U.S. Holders of Allowed Existing Common Equity Interests**

Pursuant to the Plan, U.S. Holders of Allowed Existing Common Equity Interests will receive 1.00% of the New Common Stock in exchange for their Interests. The Debtors expect that this exchange will be a "reorganization" for U.S. federal income tax purposes. Accordingly, a U.S. Holder should recognize neither gain nor loss on this exchange and its aggregate tax basis in the New Common Stock received should equal such holder's aggregate adjusted tax basis in the Allowed Existing Common Equity Interests exchanged therefor.

If the exchange of Allowed Existing Common Equity Interests is not a "reorganization" for U.S. federal income tax purposes, then the Debtors expect its tax consequences to U.S. Holders of Allowed Existing Common Equity Interests to be similar to the ones described in <u>Section X.C.1.c</u> — "Taxable Exchange Treatment," above. Holders of Allowed Existing Common Equity Interests are urged to consult their own tax advisors regarding the tax consequences of the exchange of these Interests for the New Common Stock.

3.        **Character of Gain or Loss**

Where gain or loss is recognized by a U.S. Holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, whether the Claim or Interest held constitutes a capital asset in the hands of the holder and how long it has been held, whether the Allowed Secured Notes Claim was acquired at a market discount, and whether and to what extent the holder previously claimed a bad debt deduction.

In addition, a U.S. Holder that purchased its Claims from a prior holder at a "market discount" (relative to the principal amount of the Claims at the time of acquisition) may be subject to the market discount rules of the Tax Code. In general, a debt instrument is considered to have been acquired with "market discount" if its holder's adjusted tax basis in the debt instrument is less than (i) its stated redemption price at maturity (which generally would be equal to the stated principal amount if all stated interest was required to be paid in Cash at least annually) or (ii) in the case of a debt instrument issued with OID, its adjusted issue price, in each case, by at least a *de minimis* amount.

Under the market discount rules, any gain recognized on the exchange of Claims (other than in respect of a Claim for accrued but unpaid interest) generally will be treated as ordinary income to the extent of the market discount accrued (on a straight line basis or, at the election of the holder, on a constant yield basis) during the holder's period of ownership, unless the holder elected to include the market discount in income as it accrued. If a holder of a Claim did not elect to include market discount in income as it accrued and thus, under the market discount rules, was required to defer all or a portion of any deductions for interest on debt incurred or maintained to purchase or carry its Claim, such deferred amounts would become deductible at the time of the exchange but, if the exchange qualifies for reorganization treatment, only up to the amount of gain that the holder recognizes in the exchange.

In the event of a "reorganization," the Tax Code indicates that, under Treasury Regulations to be issued, any accrued market discount in respect of the Claims in excess of the gain recognized in the exchange should not be currently includible in income. However, such accrued market discount that is not included in income should carry over to any non-recognition property received in exchange therefor (*i.e.,* to the relevant New Common Stock). Any gain recognized by a U.S. holder upon a subsequent disposition of such property would be treated as ordinary income to the extent of any accrued market discount carried over not previously included in income. To date, specific Treasury Regulations implementing this rule have not been issued.

4.        **Distributions in Respect of Accrued But Unpaid Interest or OID**

In general, to the extent that any consideration received pursuant to the Plan by a U.S. holder of a Allowed Secured Notes Claim is received in satisfaction of accrued interest during the holder's holding period, such amount will be taxable to the U.S. holder as interest income (if not previously included in the U.S. holder's gross income).

Conversely, a U.S. holder generally recognizes a deductible loss to the extent any accrued interest or accrued OID was previously included in its gross income and is not paid in full. However, the IRS has privately ruled that a holder of a "security" of a corporate issuer, in an otherwise tax-free exchange, could not claim a current loss with

respect to any accrued but unpaid OID. Accordingly, it is unclear whether, in similar circumstances or by analogy, any U.S. holder of an Allowed Secured Notes Claim would be required to recognize a capital loss, rather than an ordinary loss, with respect to previously included OID with respect to such Claim that is not paid in full.

The Plan provides that consideration received in respect of an Allowed Secured Notes Claim is allocable first to the principal amount of the Allowed Secured Notes Claim (as determined for U.S. federal income tax purposes) and then, to the extent of any excess, to the remainder of the Allowed Secured Notes Claim, including Claim for accrued but unpaid interest (in contrast, for example, to a pro rata allocation of a portion of the exchange consideration received between principal and interest, or an allocation first to accrued but unpaid interest). *See* Section VI.F of the Plan. There is no assurance that the IRS will respect such allocation for U.S. federal income tax purposes.

**HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISOR REGARDING THE ALLOCATION OF CONSIDERATION RECEIVED UNDER THE PLAN, AS WELL AS THE DEDUCTIBILITY OF ACCRUED BUT UNPAID INTEREST (INCLUDING OID) AND THE CHARACTER OF ANY LOSS CLAIMED WITH RESPECT TO ACCRUED BUT UNPAID INTEREST (INCLUDING OID) PREVIOUSLY INCLUDED IN GROSS INCOME FOR U.S. FEDERAL INCOME TAX PURPOSES.**

 **5.**  **Consequences of Owning and Disposing of the New Common Stock**

  (a)  **Distributions**

Any distributions made on New Common Stock will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of Reorganized HHI as determined under U.S. federal income tax principles. To the extent a U.S. Holder receives distributions that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the U.S. Holder's basis in its New Common Stock. Any such distributions in excess of the U.S. Holder's basis in its New Common Stock generally will be treated as capital gain from the sale or exchange thereof. Under current law, dividends received by non-corporate U.S. Holders on the New Common Stock may be subject to U.S. federal income tax at lower rates than other types of ordinary income if certain conditions are met.

  (b)  **Sale, Exchange, or Other Taxable Disposition**

Subject to the discussion above regarding "market discount," U.S. Holders generally will recognize capital gain or loss upon the sale, exchange, redemption, repurchase, or other taxable disposition of the New Common Stock, in an amount equal to the difference between the amount realized on such disposition and the U.S. Holder's adjusted tax basis in such New Common Stock.

Such capital gain or loss will be long-term capital gain or loss if, at the time of the sale, exchange, redemption, or other taxable disposition, the U.S. Holder has a holding period in the New Common Stock of more than one year. Capital gains of non-corporate U.S. Holders derived in respect of capital assets held for more than one year generally are eligible for reduced rates of taxation. The deductibility of capital loss is subject to significant limitations.

Such capital gain will generally be long-term capital gain if, at the time of the sale, exchange, redemption, repurchase, or other taxable disposition, the U.S. Holder held the New Common Stock for more than one year.

 **6.**  **Consequences of Owning and Disposing of the Exit Take Back Debt.**

  (a)  **Issue Price.**

The "issue price" of the Exit Take Back Debt will depend, in part, on whether the Exit Take Back Debt is traded on an "established securities market" for U.S. federal income tax purposes ("***publicly traded***"). A debt instrument is generally treated as publicly traded if, at any time during the 31-day period ending 15 days after its date of issuance, there is a readily available sales price for an executed purchase or sale of the debt instrument, or if there is one or more "firm quotes" or "indicative quotes" for such debt instrument. Debt issues not in excess of $100 million are not treated as publicly traded for U.S. federal income tax purposes.

The issue price of a debt instrument that is publicly traded is its fair market value on the issue date. The issue price of a debt instrument that is not publicly traded generally depends on whether it is issued in exchange for publicly traded property. If a debt instrument that is not publicly traded is issued in exchange for property (including, e.g., another debt instrument) that is publicly traded, then the issue price of this debt instrument is the fair market value of the property for which it is issued on the issue date. The issue price of a debt instrument that is neither publicly traded nor issued for publicly traded property would be its stated principal amount (provided that the interest rate on the debt instrument exceeds the applicable federal rate published by the IRS).

Because Holders of Allowed Secured Notes Claims are receiving both the Exit Take Back Debt and the New Common Stock in exchange for their Claims, the "investment unit" rules may apply to the determination of the issue price of the Exit Take Back Debt. In general, if all of the components of an investment unit are publicly traded (as defined above), then the issue price of the investment unit, as a whole, is the sum of the fair market values of each of the unit's components. This issue price is then allocated among the components of the investment unit in proportion to their fair market value. If some, but not all, of the components of an investment unit are publicly traded, then the application of the investment unit rules is unclear.

In general, Holders of Claims must follow the issuer's determination of issue price with respect to each debt instrument issued under the Plan, unless such Holder specifically discloses its disagreement with such determination on its own tax return.

(b)     **Accrual and Amortization of OID**

The Exit Take Back Debt will be treated as issued with OID for U.S. federal income tax purposes if its "stated redemption price at maturity" exceeds its "issue price" by an amount equal to or more than a statutorily defined *de minimis* amount (generally, 0.25 percent multiplied by the product of the stated redemption price at maturity and the number of complete years to maturity). The "stated redemption price at maturity" of Exit Take Back Debt is the total of all payments to be made under the Exit Take Back Debt other than payments of "qualified stated interest."

If the Exit Take Back Debt is treated as having been issued with OID, a U.S. Holder generally will be required to include any OID in gross income as it accrues over the term of the Exit Take Back Debt using the "constant yield method" without regard to such Holder's regular method of accounting for U.S. federal income tax purposes, and in advance of the receipt of Cash payments attributable to that income.

The amount of OID includible in income for a taxable year by a U.S. holder generally will equal the sum of the "daily portions" of the total OID on the Exit Take Back Debt for each day during the taxable year (or portion thereof) on which such U.S. holder held the Exit Take Back Debt. Generally, the daily portion of the OID is determined by allocating to each day during an accrual period a ratable portion of the OID on such Exit Take Back Debt that is allocable to the accrual period in which such day is included. The amount of OID allocable to each accrual period generally will be an amount equal to the excess of (i) product of (x) "adjusted issue price" of such Exit Take Back Debt at the beginning of such accrual period and (y) its "yield to maturity" over (ii) the aggregate amount of any qualified stated interest payments allocable to the accrual period. The "adjusted issue price" of such Exit Take Back Debt at the beginning of any accrual period will equal the issue price, increased by the total OID accrued for each prior accrual period, less any Cash payments made on such Exit Take Back Debt on or before the first day of the accrual period (other than payments of qualified stated interest). The "yield to maturity" of the Exit Take Back Debt will be computed on the basis of a constant annual interest rate and compounded at the end of each accrual period.

The rules regarding the determination of issue price and OID are complex, and the OID rules described above may not apply in all cases. Accordingly, Holders are urged to consult their own tax advisors regarding the determination of the issue price of the Exit Take Back Debt and the application of the OID rules.

(c)     **Acquisition and Bond Premium**

The amount of OID includible in a U.S. holder's gross income with respect to the Exit Take Back Debt will be reduced if the debt is acquired (or deemed to be acquired) at an "acquisition premium" or with "bond premium." A U.S. holder may have an "acquisition premium" or "bond premium" only if an exchange qualifies as a

"reorganization" for U.S. federal income tax purposes.  Otherwise, a U.S. Holder's initial tax basis in the Exit Take Back Debt will equal the issue price of such holder's portion of such debt.

A debt instrument is acquired at an "acquisition premium" if the Holder's tax basis in the debt is greater than the adjusted issue price of the debt at the time of the acquisition, but is less than or equal to the stated redemption price at maturity of the debt.  If a U.S. Holder has acquisition premium, the amount of any OID includible in its gross income in any taxable year with respect to the portion of the Exit Take Back Debt to which such acquisition premium relates will be reduced by an allocable portion of the acquisition premium (generally determined by multiplying the annual OID accrual with respect to such portion of the Exit Take Back Debt by a fraction, the numerator of which is the amount of the acquisition premium, and the denominator of which is the total OID).

If a U.S. Holder has a tax basis in any portion of the Exit Take Back Debt received that exceeds the stated redemption price at maturity of such debt, that portion of the Exit Take Back Debt will be treated as having "bond premium" and the U.S. Holder will not include any OID attributable to such portion of the Exit Take Back Debt in income.  A U.S. Holder may elect to amortize any bond premium over the period from its acquisition of such portion of the Exit Take Back Debt to the maturity date of such portion of the Exit Take Back Debt, in which case the U.S. Holder should have an ordinary deduction (and a corresponding reduction in tax basis in such portion of the Exit Take Back Debt for purposes of computing gain or loss) in the amount of such bond premium upon the sale or other disposition of such portion of the Exit Take Back Debt, including the repayment of principal.  If such an election to amortize bond premium is not made, a U.S. Holder will receive a tax benefit from the premium only in computing such holder's gain or loss upon the sale or other taxable disposition of the Exit Take Back Debt, including the repayment of principal.

An election to amortize bond premium will apply to amortizable bond premium on all notes and other bonds the interest on which is includible in the U.S. holder's gross income and that are held at, or acquired after, the beginning of the U.S. holder's taxable year as to which the election is made.  The election may be revoked only with the consent of the IRS.

(d)    **Sale, Taxable Exchange, or Other Taxable Disposition of Exit Take Back Debt.**

Subject to the discussion above with respect to the potential carryover of accrued market discount to the Exit Take Back Debt (*see* Section X.C.3 — "Character of Gain or Loss," above), U.S. holders generally will recognize capital gain or loss upon the sale, redemption or other taxable disposition of the Exit Take Back Debt in an amount equal to the difference between (i) the sum of the Cash plus the fair market value of any property received from such disposition (other than amounts attributable to accrued but unpaid stated interest, which will be taxable as ordinary income for U.S. federal income tax purposes to the extent not previously so taxed) and (ii) the U.S. holder's adjusted tax basis in the Exit Take Back Debt, which will be reduced by any amortizable bond premium that such U.S. holder previously deducted with respect to the Exit Take Back Debt or used to offset qualified stated interest on the Exit Take Back Debt (*see* Section X.C.6(c) — "Acquisition and Bond Premium," above).  Any capital gain or loss generally should be long-term if the U.S. holder's holding period for the Exit Take Back Debt is more than one year at the time of disposition.  A reduced tax rate on long-term capital gain may apply to non-corporate U.S. holders.  The deductibility of capital loss is subject to significant limitations.

**D.    Consequences of the Implementation of the Plan to Non-U.S. Holders of Certain Claims and Interests**

As used herein, the term "***Non-U.S. Holder***" means a beneficial owner of an Allowed Secured Notes Claim, Allowed Existing Equity Interest, or Exit Take Back Debt that is not a U.S. Holder for U.S. federal income tax purposes.  The following discussion includes only certain U.S. federal income tax consequences of the Plan to Non-U.S. Holders.  This discussion does not include any non-U.S. tax considerations.

**EACH NON-U.S. HOLDER SHOULD CONSULT ITS OWN TAX ADVISOR REGARDING THE U.S. FEDERAL, STATE, LOCAL, FOREIGN, AND OTHER TAX CONSEQUENCES OF THE CONSUMMATION OF THE PLAN AND THE OWNERSHIP AND DISPOSITION OF THE NEW COMMON STOCK AND EXIT TAKE BACK DEBT TO SUCH NON-U.S. HOLDER , AS APPLICABLE.**

1.      **Gain Recognition on the Exchange of Claims and Interests**

Whether a Non-U.S. Holder realizes gain or loss pursuant to the transactions undertaken as part of the Plan and the amount of such gain or loss is determined in the same manner as set forth above in connection with U.S. Holders.

Any gain recognized by a Non-U.S. Holder on the exchange of its Claim or Interest generally will not be subject to U.S. federal income taxation unless (a) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Restructuring Transactions occur and certain other conditions are met or (b) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange.

If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange if such gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business in the United States ("**ECI**") in the same manner as a U.S. Holder.  In order to claim an exemption from withholding tax, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates).  In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

2.      **Accrued but Unpaid Interest Under the Plan**

Payments made to a Non-U.S. Holder under the Plan that are attributable to accrued but unpaid interest generally will not be subject to U.S. federal income or withholding tax, provided that (i) such Non-U.S. Holder is not a bank, (ii) such Non-U.S. Holder does not actually or constructively own 10 percent or more of the total combined voting power of all classes of the stock of the Debtors, (iii) the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E) establishing that the Non-U.S. Holder is not a U.S. person, and (iv) such interest is not ECI to such Non-U.S. Holder.

If such interest is ECI to a Non-U.S. Holder who provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, then such Non-U.S. Holder generally will not be subject to withholding tax, but will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise).  Additionally, a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued but unpaid interest at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).

A Non-U.S. Holder that does not qualify for exemption from withholding tax with respect to accrued but unpaid interest that is not ECI generally will be subject to withholding of U.S. federal income tax at a 30 percent rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on payments that are attributable to accrued but unpaid interest. For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

3.      **Owning and Disposing of New Common Stock.**

(a)      **Dividends on New Common Stock.**

Any distributions made with respect to New Common Stock (other than certain distributions of stock of Reorganized HHI) will constitute dividends for U.S. federal income tax purposes to the extent described in Section X.C.5(a) — "Distributions," above.

Except as described below, dividends paid with respect to New Common Stock held by a Non-U.S. Holder that are not ECI (or, if an income tax treaty applies, are not attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) will be subject to U.S. federal withholding tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).

A Non-U.S. Holder generally will be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from withholding under a tax treaty by filing IRS Form W-8BEN or W-8BEN-E, as applicable (or such successor form as the IRS designates), upon which the Non-U.S. Holder certifies, under penalties of perjury, its status as a non-U.S. person and its entitlement to the lower treaty rate or exemption from tax with respect to such payments.

Dividends paid with respect to New Common Stock held by a Non-U.S. Holder that are ECI to this Non-U.S. Holder (and, if an income tax treaty applies, are attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) generally will be subject to U.S. federal income tax in the same manner as a U.S. Holder. Additionally, a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the dividends at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).

(b)     **Sale or Other Taxable Disposition of New Common Stock**

A Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain realized on the sale or other taxable disposition (including a cash redemption) of New Common Stock unless (i) such Non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of disposition or who is subject to special rules applicable to former citizens and residents of the United States, (ii) such gain is effectively connected with such Non-U.S. Holder's conduct of a U.S. trade or business (and, if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States), or (iii) the issuer of such New Common Stock is or has been during a specified testing period a "U.S. real property holding corporation" (a "*USRPHC*") under the FIRPTA rules (as defined and discussed below).

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of disposition of New Common Stock.

If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. Holder. Additionally, a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to earnings and profits effectively connected with a U.S. trade or business that are attributable to such gains at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty). The FIRPTA rules are discussed below.

(c)     **FIRPTA**  Under the Foreign Investment in Real Property Tax Act ("*FIRPTA*"), gain on the disposition of certain investments in U.S. real property is subject to U.S. federal income tax in the hands of Non-U.S. Holders and treated as ECI that is subject to U.S. federal net income tax even if a Non-U.S. Holder is not otherwise engaged in a U.S. trade or business.

With respect to New Common Stock, rules with respect to USRPHCs may apply. In general, a corporation is a USRPHC if the fair market value of the corporation's U.S. real property interests ("*USRPIs*") equals or exceeds 50 percent of the aggregate fair market value of its worldwide real property interests and its other assets used or held for use in a trade or business (applying certain look-through rules to evaluate the assets of subsidiaries) at any time

within the shorter of the 5-year period ending on the effective time of the applicable disposition or the period of time the Non-U.S. Holder held an interest in such corporation.

Taxable gain from the disposition of an interest in a USRPHC (generally equal to the difference between the amount realized and such Non-U.S. Holder's adjusted tax basis in such interest) will constitute ECI.  Further, the buyer of the New Common Stock may be required to withhold a tax equal to 15 percent of the amount realized on the sale.  The amount of any such withholding would be allowed as a credit against the Non-U.S. Holder's U.S. federal income tax liability and may entitle the Non-U.S. Holder to a refund, provided that the Non-U.S. Holder properly and timely files a tax return with the IRS.  The Debtors do not anticipate that Reorganized HHI will be a USRPHC, although no guarantees can be made in that regard.

Under the FIRPTA rules, if the stock of a USRPHC is regularly traded on an established securities market, a person that holds 5 percent or less of such stock (after taking into account certain attribution rules) will not be subject to substantive FIRPTA taxation or FIRPTA withholding upon a disposition of its shares, and FIRPTA withholding upon dispositions will generally be inapplicable other than in the case of certain distributions and redemptions by the issuer.  Whether and when the New Common Stock will be considered regularly traded on an established securities market will depend, in part, on whether a market develops in such equity, and cannot currently be determined.

The FIRPTA rules will also not apply if, at the time of a disposition, the corporation does not directly or indirectly hold any USRPIs and it had directly or indirectly disposed of all of the USRPIs it directly or indirectly owned in one or more fully taxable transactions.

      **4.**      **Owning and Disposing of the Exit Take Back Debt.**

      (a)      **Payments of Interest on the Exit Take Back Debt**

Interest paid on the Exit Take Back Debt to a Non-U.S. Holder is subject to the rules described in <u>Section X.D.2</u> — "Accrued but Unpaid Interest," above.

      (b)      **Sale or Other Taxable Disposition of the Exit Take Back Debt.**

Gain or loss recognized by a Non-U.S. Holder from the sale or other taxable disposition of the Exit Take Back Debt is subject to the rules described in <u>Section X.D.3(b)</u> — "Sale or Other Taxable Disposition of New Common Stock," above (other than with respect to FIRPTA).

**NON-U.S. HOLDERS SHOULD CONSULT THEIR TAX ADVISORS REGARDING THE TAX CONSEQUENCES TO SUCH HOLDERS OF OWNING THE NEW COMMON STOCK AND EXIT TAKE BACK DEBT.**

**E.**      **Information Reporting and Backup Withholding**

All distributions to holders of Allowed Secured Notes Claims and Allowed Existing Equity Interests under the Plan are subject to any applicable tax withholding, including employment tax withholding.  Under U.S. federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable withholding rate.  Backup withholding generally applies if the holder (a) fails to furnish its social security number or other taxpayer identification number, (b) furnishes an incorrect taxpayer identification number, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the tax identification number provided is its correct number and that it is not subject to backup withholding.

Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax.  Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.  Holders of Allowed Claims are urged to consult their tax

advisors regarding the Treasury Regulations governing backup withholding and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations.

In addition, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.  Holders are urged to consult their tax advisors regarding these Treasury Regulations and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations and require disclosure on the holder's tax returns.

## F.      FATCA

The Foreign Account Tax Compliance Act ("*FATCA*") requires foreign financial institutions and certain other foreign entities to report certain information with respect to their U.S. account holders and investors or else be subject to withholding at a rate of 30 percent on the receipt of "withholdable payments."  For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income, and, subject to the paragraph immediately below, also include gross proceeds from the sale of any property of a type which can produce U.S. source interest, including any OID or dividends.  FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding.

FATCA withholding rules were previously scheduled to take effect on January 1, 2019, that would have applied to payments of gross proceeds from the sale or other disposition of property of a type that can produce U.S. source interest (including any OID) or dividends. However, such withholding has effectively been suspended under proposed Treasury Regulations that may be relied on until final regulations become effective. Nonetheless, there can be no assurance that a similar rule will not go into effect in the future. Each Non-U.S. Holder should consult its own tax advisor regarding the possible impact of FATCA withholding rules on such Non-U.S. Holder.

> **THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM OR INTEREST IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED UNDER THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, FOREIGN, OR OTHER TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## XI.      Recommendation

In the opinion of the Debtors and the Consenting Stakeholders, the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for a larger distribution to Holders of Allowed Claims and Interests than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code. In addition, any alternative other than Confirmation could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of Allowed Claims than proposed under the Plan. Accordingly, the Debtors recommend that Holders of Claims entitled to vote to accept or reject the Plan support Confirmation and vote to accept the Plan.

Hardwoods Holdings, Inc.,
on behalf of itself and each of the other Debtors

By: /s/ *Christopher Hannon*
     Name: Christopher Hannon
     Title: Chief Financial Officer

Prepared By:

Dated:  November 13, 2020
       Wilmington, Delaware

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

Sean M. Beach (No. 4070)
Jacob D. Morton (No. 6684)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:    (302) 571-6600
Facsimile:     (302) 571-1253
Email:        sbeach@ycst.com
             jmorton@ycst.com

- and -

**GIBSON, DUNN & CRUTCHER LLP**

David M. Feldman (*pro hac vice* pending)
Matthew K. Kelsey (*pro hac vice* pending)
J. Eric Wise (*pro hac vice* pending)
Alan Moskowitz (*pro hac vice* pending)
200 Park Avenue
New York, New York 10166
Telephone:    (212) 351-4000
Facsimile:     (212) 351-4035
Email:        DFeldman@gibsondunn.com
             MKelsey@gibsondunn.com
             EWise@gibsondunn.com
             AMoskowitz@gibsondunn.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**Exhibit A**

**Plan of Reorganization**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| NORTHWEST HARDWOODS, INC., *et al.*,[1] | ) | Case No. 20-[____] (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

## JOINT PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION
## OF NORTHWEST HARDWOODS, INC., AND ITS DEBTOR AFFILIATES

---

**THIS CHAPTER 11 PLAN WAS PREPARED AND IS BEING SOLICITED FOR ACCEPTANCE OR REJECTION IN ACCORDANCE WITH SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE AND ANY APPLICABLE NON-BANKRUPTCY LAW. THIS CHAPTER 11 PLAN WILL BE SUBMITTED TO THE BANKRUPTCY COURT FOR APPROVAL FOLLOWING SOLICITATION AND THE DEBTORS' FILING FOR CHAPTER 11 BANKRUPTCY**

---

**GIBSON, DUNN & CRUTCHER LLP**
David M. Feldman (*pro hac vice* pending)
J. Eric Wise (*pro hac vice* pending)
Matthew K. Kelsey (*pro hac vice* pending)
Alan Moskowitz (*pro hac vice* pending)
200 Park Avenue
New York, NY 10166
T: (212) 351-4000
F: (212) 351-4035

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Sean M. Beach (No. 4070)
Jacob D. Morton (No. 6684)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
T: (302) 571-6600
F: (302) 571-1253

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

Dated:  November 13, 2020

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Northwest Hardwoods, Inc. (5401), Hardwoods Intermediate Holdings II, Inc. (7760), and Hardwoods Holdings, Inc. (3443).  The location of the Debtors' service address in these chapter 11 cases is: 1313 Broadway, Suite 300, Tacoma, WA 98402.

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................................................1

**ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES**.................................................................**1**
    A.    *Defined Terms* ................................................................................................1
    B.    *Rules of Interpretation* ..................................................................................12
    C.    *Computation of Time* ....................................................................................12
    D.    *Governing Law*..............................................................................................12
    E.    *Reference to Monetary Figures*....................................................................13
    F.    *Reference to the Debtors or the Reorganized Debtors*.................................13
    G.    *Controlling Document*...................................................................................13
    H.    *Consent Rights* ..............................................................................................13

**ARTICLE II. ADMINISTRATIVE CLAIMS AND PRIORITY CLAIMS** ...........................**13**
    A.    *Administrative Claims* ..................................................................................13
    B.    *Professional Fee Claims* ...............................................................................13
    C.    *Priority Tax Claims* ......................................................................................14
    D.    *Statutory Fees* ...............................................................................................14

**ARTICLE III. CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS**..........**14**
    A.    *Classification of Claims and Interests* .........................................................14
    B.    *Treatment of Classes of Claims and Interests* .............................................15
    C.    *Special Provision Governing Unimpaired Claims* .......................................18
    D.    *Voting Classes; Presumed Acceptance by Non-Voting Classes* ...................19
    E.    *Elimination of Vacant Classes* .....................................................................19
    F.    *Subordinated Claims and Interests* ..............................................................19
    G.    *Intercompany Interests* .................................................................................19
    H.    *Controversy Concerning Impairment* ...........................................................20
    I.    *Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code* ...........20

**ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN** ..................................**20**
    A.    *Corporate and Organizational Existence* .....................................................20
    B.    *Corporate Action* ..........................................................................................20
    C.    *Organizational Documents of the Reorganized Debtors*...............................20
    D.    *Managers, Directors and Officers of Reorganized Debtors; Corporate Governance* ...................21
    E.    *Exit ABL Loan Documents* ...........................................................................21
    F.    *Exit Take Back Debt Documents* ..................................................................21
    G.    *Exemption from Registration Requirements*..................................................22
    H.    *Cancellation of Certain Existing Security Interests* .....................................23
    I.    *Management Incentive Plan*...........................................................................23
    J.    *Restructuring Transactions* ...........................................................................23
    K.    *Effectuating Documents; Further Transactions* ............................................24
    L.    *Vesting of Assets in the Reorganized Debtors* ..............................................24
    M.    *Release of Liens, Claims and Interests*.........................................................24
    N.    *Cancellation of Notes, Stock, Certificates, Instruments and Agreements* ...25
    O.    *Preservation and Maintenance of Debtors' Causes of Action* ......................25
    P.    *Exemption from Certain Taxes and Fees* ......................................................26
    Q.    *Restructuring Expenses* .................................................................................26
    R.    *Distributions* .................................................................................................27

**ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES** ....................**27**
    A.    *Debtors Assumption of Executory Contracts and Unexpired Leases*............27

B.      *Claims Based on Rejection of Executory Contracts and Unexpired Leases* ................................28
C.      *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases* ................................28
D.      *Assumption of Insurance Policies* ................................................................29
E.      *Rejection of MSA and CITIC Agreement* ................................................29
F.      *Indemnification* ................................................................29
G.      *Employment Obligations and Programs* ................................................30
H.      *Workers' Compensation Benefits* ................................................30
I.      *Reservation of Rights* ................................................................30
J.      *Nonoccurrence of Effective Date* ................................................30
K.      *Contracts and Leases Entered Into After the Petition Date* ................................30

**ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS** ................................................**31**
A.      *Distribution Record Date* ................................................................31
B.      *Dates of Distribution* ................................................................31
C.      *Distribution Agent* ................................................................31
D.      *Cash Distributions* ................................................................31
E.      *Rounding of Payments* ................................................................31
F.      *Allocation Between Principal and Interest* ................................................32
G.      *General Distribution Procedures* ................................................32
H.      *Address for Delivery of Distributions* ................................................32
I.      *Unclaimed Distributions* ................................................................32
J.      *Withholding Taxes* ................................................................32
K.      *No Postpetition Interest on Claims* ................................................33
L.      *Setoffs* ................................................................33
M.      *Surrender of Cancelled Instruments or Securities* ................................................33

**ARTICLE VII. PROCEDURES FOR RESOLVING DISPUTED CLAIMS AND INTERESTS** ....................**33**
A.      *Disputed Claims Process* ................................................................33
B.      *Claims Administration Responsibilities* ................................................33
C.      *Estimation of Claims and Interests* ................................................34
D.      *Amendments to Claims; Adjustment to Claims Register* ................................34
E.      *No Distributions Pending Allowance* ................................................34
F.      *Distributions After Allowance* ................................................................34
G.      *No Interest* ................................................................35
H.      *Single Satisfaction of Claims* ................................................35
I.      *Tax Treatment of Claim Distribution Amounts* ................................................35

**ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS** ..................**35**
A.      *Compromise and Settlement of Claims, Interests, and Controversies* ................................35
B.      *Discharge of Claims and Termination of Interests* ................................................35
C.      *Release of Liens* ................................................................36
D.      *Releases by the Debtors* ................................................................36
E.      *Releases by Holders of Claims and Interests of the Debtors* ................................37
F.      *Exculpation* ................................................................37
G.      *Injunction* ................................................................38
H.      *Protection Against Discriminatory Treatment* ................................................38
I.      *Recoupment* ................................................................38
J.      *Reimbursement or Contribution* ................................................38
K.      *Term of Injunctions or Stays* ................................................39
L.      *Document Retention* ................................................................39

**ARTICLE IX. CONDITIONS PRECEDENT TO THE EFFECTIVE DATE** ................................**39**
A.      *Conditions Precedent to the Effective Date.* ................................................39
B.      *Waiver of Conditions Precedent* ................................................39
C.      *Substantial Consummation* ................................................................40
D.      *Effect of Non-Occurrence of Conditions to Consummation* ................................40

**ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN** ...............................40

    A.    *Modification of Plan* .........................................................................................................40

    B.    *Effect of Confirmation on Modifications* ...........................................................................40

    C.    *Revocation or Withdrawal of Plan* ...................................................................................40

**ARTICLE XI. RETENTION OF JURISDICTION** ...............................................................................41

**ARTICLE XII. MISCELLANEOUS PROVISIONS** .............................................................................42

    A.    *Immediate Binding Effect* ..................................................................................................42

    B.    *Additional Documents* .......................................................................................................42

    C.    *Reservation of Rights* ........................................................................................................43

    D.    *Successors and Assigns* ......................................................................................................43

    E.    *Service of Documents* .........................................................................................................43

    F.    *Entire Agreement* ...............................................................................................................44

    G.    *Exhibit and Plan Supplement* ...........................................................................................44

    H.    *Non-Severability* ...............................................................................................................44

    I.    *Votes Solicited in Good Faith* ...........................................................................................45

    J.    *Waiver or Estoppel* ............................................................................................................45

    K.    *No Strict Construction* .......................................................................................................45

    L.    *Closing of Chapter 11 Cases* .............................................................................................45

**INTRODUCTION**

Northwest Hardwoods, Inc., and its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases (each a "Debtor" and, collectively, the "Debtors") propose this joint prepackaged plan of reorganization (the "Plan") for, among other things, the resolution of the outstanding Claims against and Interests in the Debtors pursuant to chapter 11 of the Bankruptcy Code. Capitalized terms used in the Plan and not otherwise defined shall have the meanings set forth in Article I.A of the Plan. Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor for the resolution of outstanding Claims and Interests pursuant to the Bankruptcy Code. Each Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code. The classifications of Claims and Interests set forth in Article III of the Plan shall be deemed to apply separately with respect to each Plan proposed by each Debtor, as applicable. The Plan does not contemplate substantive consolidation of any of the Debtors. Reference is made to the Disclosure Statement for a discussion of the Debtors' history, business, properties and operations, projections, risk factors, a summary and analysis of this Plan, and certain related matters.

ALL HOLDERS OF CLAIMS AND INTERESTS ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY, PARTICULARLY HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN.

**ARTICLE I.**
**DEFINED TERMS, RULES OF INTERPRETATION,**
**COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES**

A.    *Defined Terms*

1.    "*2014 Notes*" means the 7.500% Senior Secured Notes due 2021 issued and outstanding under the 2014 Indenture.

2.    "*2014 Indenture*" means that certain Indenture, dated as of July 18, 2014 (as amended, modified, or supplemented from time to time) by and between Hardwoods Acquisition, Inc. and The Bank of New York Mellon, as trustee and notes collateral agent.

3.    "*2015 Notes*" means the 7.500% Senior Secured Notes due 2021 issued and outstanding under the 2015 Indenture.

4.    "*2015 Indenture*" means that certain Indenture, dated as of February 20, 2015 (as amended, modified, or supplemented from time to time) by and between NWH Escrow Corporation and The Bank of New York Mellon, as trustee and notes collateral agent.

5.    "*ABL Agent*" means Bank of America, N.A., acting through such of its affiliates or branches as it may designate, in its capacity as administrative agent under the ABL Credit Agreement.

6.    "*ABL Claims*" means any Claim on account of the Obligations under the ABL Credit Agreement.

7.    "*ABL Credit Agreement*" means that certain Asset-Based Revolving Credit Agreement, dated as of July 18, 2014, and as amended, restated, amended and restated, supplemented or otherwise modified from time to time, by and among Northwest Hardwoods, Inc., as borrower, Hardwoods Intermediate Holdings II, Inc., the ABL Agent, and certain lenders party thereto.

8.    "*Ad Hoc Noteholder Group*" means the *ad hoc* group of certain Consenting Noteholders.

9.    "*Ad Hoc Noteholder Group Professionals*" means, collectively, Willkie, Guggenheim, and one local counsel retained in connection with the Chapter 11 Cases, as applicable, to represent the Ad Hoc Noteholder Group.

10.    "*Administrative Claim*" means a Claim for costs and expenses of administration of each of the Estates under sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including (a) actual, necessary

costs and expenses, incurred on or after the Petition Date until and including the Effective Date, of preserving the Estates and operating the Debtors' businesses, (b) Allowed Professional Fee Claims in the Chapter 11 Cases, (c) all Allowed requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code, and (d) all fees and charges assessed against the Estates under chapter 123 of title 28, United States Code, 28 U.S.C. §§ 1911-1930.

11.     "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code.

12.     "*Allowed*" means, with respect to any Claim or Interest, such Claim or Interest or any portion thereof that a Debtor or a Reorganized Debtor has assented to the validity of, or that has been (a) allowed by a Final Order of the Bankruptcy Court, (b) allowed pursuant to the terms of the Plan, (c) allowed by agreement between the Holder of such Claim or Interest, on one hand, and the applicable Debtor, with the reasonable consent of the Required Consenting Noteholders, or Reorganized Debtor, as applicable, on the other hand or (d) allowed by a Final Order of a court in which such Claim or Interest could have been determined, resolved or adjudicated if the Chapter 11 Cases had not been commenced; *provided*, that notwithstanding the foregoing, the Reorganized Debtors shall retain all claims and defenses with respect to Allowed Claims that are Reinstated or otherwise Unimpaired pursuant to the Plan.

13.     "*Avoidance Actions*" means any and all avoidance, recovery, subordination, or other Claims, actions, or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including actions or remedies under sections 502, 510, 542, 544, 545, 547 through and including 553, and 724(a) of the Bankruptcy Code or under similar or related state or federal statutes and common law, including fraudulent transfer laws.

14.     "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

15.     "*Bankruptcy Court*" means the United States Bankruptcy Court for the District of Delaware or such other court having jurisdiction over the Chapter 11 Cases, including, to the extent of a withdrawal of the reference under 28 U.S.C. § 157, the United States District Court for the District of Delaware.

16.     "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Chapter 11 Cases and the general, local, and chambers rules of the Bankruptcy Court, as now in effect or hereafter amended.

17.     "*Business Day*" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York.

18.     "*Cash*" or "*$*" means the legal tender of the United States of America or the equivalent thereof, including bank deposits, checks, and cash equivalents, as applicable.

19.     "*Causes of Action*" means any claims, interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, Liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise. Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state or foreign Law fraudulent transfer or similar claim.

20.     "*CITIC*" means CCIP III Advisory Ltd., a Cayman Islands exempt company.

21.        "*CITIC Agreement*" means that certain Director Services and Fee Agreement, dated as of September 4, 2014, by and between CITIC and Northwest Hardwoods, Inc.

22.        "*CITIC Claim*" means the Claim of CITIC under the CITIC Agreement, which shall be $25,000 payable in Cash and shall be an Allowed General Unsecured Claim.

23.        "*Chapter 11 Cases*" means the procedurally consolidated cases filed or to be filed (as applicable) for the Debtors in the Bankruptcy Court under chapter 11 of the Bankruptcy Code.

24.        "*Claim*" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors, whether or not assessed or Allowed.

25.        "*Claims Register*" means the official register of Claims against the Debtors maintained by the Solicitation Agent.

26.        "*Class*" means a category of Holders of Claims or Interests under section 1122(a) of the Bankruptcy Code.

27.        "*Confirmation*" means entry of the Confirmation Order by the Bankruptcy Court on the docket of the Chapter 11 Cases.

28.        "*Confirmation Date*" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

29.        "*Confirmation Hearing*" means the combined hearing to consider approval of the Disclosure Statement and confirmation of the Plan under section 1128 of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time.

30.        "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan under section 1129 of the Bankruptcy Code and approving the Disclosure Statement and the Solicitation Materials.

31.        "*Consenting Noteholders*" means the Holders of Notes Claims that are signatories to the Restructuring Support Agreement and remain parties thereto as of the Effective Date, but excluding, for the avoidance of doubt, the Sponsor Equityholder.

32.        "*Consenting Equityholder*" means those Equityholders that are signatories to the Restructuring Support Agreement and remain parties thereto as of the Effective Date, including the Sponsor Equityholder.

33.        "*Consenting Stakeholders*" means, collectively, the Consenting Noteholders and the Consenting Equityholders.

34.        "*Consummation*" means the occurrence of the Effective Date.

35.        "*Control*," "*Controlled*," or "*Controlling*," means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.

36.        "*Cure*" means the payment of Cash, or the distribution of other property or other action (as the parties may agree or the Bankruptcy Court may order), as necessary to cure defaults under an Executory Contract or Unexpired Lease of the Debtors that the Debtors seek to assume under section 365(a) of the Bankruptcy Code.

37.        "*Cure Claim*" means a Claim (unless waived or modified by the applicable counterparty) based upon a Debtor's defaults under an Executory Contract or an Unexpired Lease assumed by such Debtor under section 365 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

38.    *"D&O Liability Insurance Policies"* means all insurance policies (including any "tail policy") of any of the Debtors that cover current or former directors', managers', and officers' liability.

39.    *"Definitive Documents"* means those documents governing the Restructuring Transactions including the following:  (a) the Plan; (b) the Confirmation Order; (c) the Disclosure Statement and Solicitation Materials; (d) the Exit ABL Credit Documents; (e) the Exit Take Back Debt Documents; (f) the Exit Intercreditor Agreement; (g) the New Shareholders Agreement; (h) the Governance Documents; (i) the Interim Financing Order and the Final Financing Order, and to the extent applicable in each instance or in both instances, any related documents; (j) the Plan Supplement; and (k) the "first day" pleadings and all other orders sought pursuant thereto.

40.    *"Disclosure Statement"* means the *Disclosure Statement for the Joint Prepackaged Chapter 11 Plan of Reorganization of Northwest Hardwoods, Inc. and Its Debtor Affiliates*, dated as of November 13, 2020, that was prepared and distributed in accordance with sections 1125 and 1126 of the Bankruptcy Code, Bankruptcy Rules 3016 and 3018 and applicable non-bankruptcy law, as may be amended, supplemented or modified from time to time, and all exhibits, schedules, supplements, modifications, and amendments thereto.

41.    *"Disputed"* means, with respect to a Claim or Interest, or any portion thereof, (a) any Claim or Interest, which is disputed under this Plan or as to which the Debtor has interposed and not withdrawn an objection or request for estimation that has not been determined by a Final Order; (b) any Claim or Interest, proof of which was required to be Filed by order of the Bankruptcy Court but as to which a Proof of Claim or Proof of Interest was not timely or properly Filed; (c) any Claim or Interest that is listed in the Schedules, if any are Filed, as unliquidated, contingent or disputed, and as to which no request for payment or Proof of Claim or Proof of Interest has been Filed; or (d) any Claim or Interest that is otherwise disputed by the Debtor in accordance with applicable law or contract, which dispute has not been withdrawn, resolved or overruled by a Final Order *provided*, *however*, that in no event shall a Claim that is deemed Allowed pursuant to this Plan be a Disputed Claim.

42.    *"Distribution Agent"* means, as applicable, the Reorganized Debtors or any Entity the Reorganized Debtors select to make or to facilitate distributions in accordance with the Plan.

43.    *"Distribution Record Date"* means the date for determining which Holders of Allowed Claims and Interests are eligible to receive distributions pursuant to the Plan, which date shall be the Effective Date.

44.    *"Effective Date"* means the date that is the first Business Day after the Confirmation Date on which all conditions precedent to the occurrence of the Effective Date set forth in Article IX.A of the Plan have been satisfied or waived in accordance with Article IX.B of the Plan.

45.    *"Entity"* has the meaning set forth in section 101(15) of the Bankruptcy Code.

46.    *"Equity Recovery"* means 1% of the New Common Stock (on a fully diluted basis and set at the equity value as of the Effective Date) (subject to dilution from the Management Incentive Plan).

47.    *"Estate"* means the estate of any Debtor created under sections 301 and 541 of the Bankruptcy Code upon the commencement of the applicable Debtor's Chapter 11 Case.

48.    *"Exchange Act"* means the Securities Exchange Act of 1934, as amended.

49.    *"Exculpated Party"* means, collectively, and in each case in its capacity as such:  (a) the Debtors and the Reorganized Debtors, (b) with respect to each of the foregoing entities, each such Entity's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), subsidiaries, direct and indirect equity holders, and advisors and (c) with respect to each of the foregoing Entities in clauses (a) and (b), each of their respective current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors.

50.     "*Executory Contract*" means a contract or lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

51.     "*Exhibit*" means an exhibit annexed to either the Plan or the Plan Supplement or as an exhibit or appendix to the Disclosure Statement (as such exhibits may be amended, supplemented, amended and restated, or otherwise modified from time to time).

52.     "*Existing Common Equity Interests*" means all existing common stock in HHI as reflected in the HHI stock ledger.

53.     "*Existing Equity Interests*" means all existing Interests in HHI.

54.     "*Exit ABL Agent*" means the administrative agent under the Exit ABL Credit Agreement.

55.     "*Exit ABL Credit Agreement*" means that certain credit agreement (as amended, restated, supplemented, or otherwise modified in accordance with its terms) governing the Exit ABL Facility, by and among Reorganized HHI, the guarantors named therein, the Exit ABL Agent and the lenders party thereto.

56.     "*Exit ABL Credit Documents*" means the Exit ABL Credit Agreement and any related notes, guaranties, collateral agreements, certificates, documents and instruments related to or executed in connection with the Exit ABL Credit Agreement.

57.     "*Exit ABL Facility*" means the asset-based facility with a commitment of $100 million, under and evidenced by the Exit ABL Credit Agreement.

58.     "*Exit Facility Documents*" means, collectively, the Exit ABL Credit Documents and the Exit Take Back Debt Documents.

59.     "*Exit Facilities*" means, collectively, the Exit ABL Facility and the Exit Take Back Debt.

60.     "*Exit Intercreditor Agreement*" means that certain intercreditor agreement governing the relative priorities between the collateral grants under the Exit ABL Credit Agreement and Exit Take Back Debt Agreement.

61.     "*Exit Take Back Agent*" means the administrative agent under the Exit Take Back Facility Agreement.

62.     "*Exit Take Back Debt Agreement*" means that certain agreement (as amended, restated, supplemented, or otherwise modified in accordance with its terms) governing the Exit Take Back Debt.

63.     "*Exit Take Back Debt Documents*" means the Exit Take Back Debt Agreement and any related notes, guaranties, collateral agreements, certificates, documents and instruments related to or executed in connection with the Exit Take Back Debt Agreement.

64.     "*Exit Take Back Debt*" means the senior secured debt of $110 million, under and evidenced by the Exit Take Back Debt Agreement.

65.     "*Final Decree*" means the decree contemplated under Bankruptcy Rule 3022.

66.     "*Final Financing Order*" means the order of the Bankruptcy Court approving the use of cash collateral on a final basis.

67.     "*Final Order*" means an order or judgment of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the clerk of the Bankruptcy Court (or such other court) on the docket in the Chapter 11 Cases (or the docket of such other court), which has not been modified, amended, reversed, vacated or stayed and as to which (x) the time to appeal, petition for certiorari, or move for a new trial, stay, reargument or rehearing has expired and as

to which no appeal, petition for certiorari or motion for new trial, stay, reargument or rehearing shall then be pending or as to which any right to appeal, petition for certiorari, new trial, reargue, or rehear shall have been waived in writing in form and substance satisfactory to the Debtors or the Reorganized Debtors, as applicable, or (y) if an appeal, writ of certiorari, new trial, stay, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, stay, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, stay, reargument or rehearing shall have expired, as a result of which such order shall have become final in accordance with Rule 8002 of the Federal Rules of Bankruptcy Procedure; *provided* that no order shall fail to be a Final Order solely due to the possibility that a motion pursuant to section 502(j) of the Bankruptcy Code, Rules 59 or 60 of the Federal Rules of Civil Procedure, or Rule 9024 of the Bankruptcy Rules may be filed with respect to such order.

68.    "*General Unsecured Claim*" means any Claim (including the MSA Claim and the CITIC Claim), against any Debtor, that is not an Administrative Claim, Priority Tax Claim, Other Priority Claim, Other Secured Claim, ABL Claim, Secured Notes Claim, Intercompany Claim or Section 510(b) Claim.

69.    "*Governance Documents*" means the organizational and governance documents for Reorganized HHI and its subsidiaries and affiliates, including without limitation, certificates of incorporation, certificates of formation or certificates of limited partnership (or equivalent organizational documents), bylaws, or limited liability company agreements (or equivalent governing documents), as applicable.

70.    "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

71.    "*Guggenheim*" means Guggenheim Securities, LLC, as financial advisor and investment banker to the Consenting Noteholders.

72.    "*HHI*" means Hardwoods Holdings, Inc., a corporation incorporated under the Laws of Delaware.

73.    "*Holder*" means any Entity that is the legal and/or beneficial owner of a Claim or Interest as of the applicable date of determination. For the avoidance of doubt, if a Claim is subject to an unsettled trade as of the Voting Record Date, the Holder shall be deemed to be the Entity that is the legal and/or beneficial owner of such claim after such trade has settled.

74.    "*Impaired*" means, with respect to any Class of Claims or Interests, a Claim or an Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

75.    "*Indentures*" means collectively the 2014 Indenture and the 2015 Indenture.

76.    "*Indenture Trustee*" means The Bank of New York Mellon, acting through such of its affiliates or branches as it may designate, in its capacity as trustee and notes collateral agent under the Indentures, or any successor trustee or notes collateral agent as permitted by the terms set forth in the Indentures.

77.    "*Intercompany Claim*" means any Claim held by a Debtor against another Debtor.

78.    "*Intercompany Interest*" means an Interest held by a Debtor in another Debtor.

79.    "*Intercreditor Agreement*" means that certain intercreditor agreement dated, July 18, 2014, and as amended, restated, amended and restated, supplemented or otherwise modified from time to time, by and among Northwest Hardwoods, Inc., Hardwoods Intermediate Holdings II, Inc., certain subsidiary guarantors, the ABL Agent and The Bank of New York Mellon in its capacity as collateral agent under the Indenture.

80.    "*Interest*" means any common stock, limited liability company interest, equity security (as defined in section 101(16) of the Bankruptcy Code), equity, ownership, profit interests, unit, or share in a Debtor, including all issued, unissued, authorized, or outstanding shares of capital stock of the Debtors and any other rights, options,

warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable or exchangeable securities or other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor.

81.     "*Interim Financing Order*" means the order of the Bankruptcy Court approving the use of cash collateral on an interim basis.

82.     "*Internal Revenue Code*" means the Internal Revenue Code of 1986, as amended.

83.     "*Law*" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

84.     "*Lien*" means a "lien" as defined in section 101(37) of the Bankruptcy Code, and, with respect to any asset, includes any mortgage, lien, pledge, charge, security interest or other encumbrance of any kind or any other type of preferential arrangement that has the practical effect of creating a security interest, in respect of such asset.

85.     "*Management Incentive Plan*" means the incentive program for the officer and other management of the Reorganized Debtors, the terms of which shall be determined and approved by the New Board, provided that such terms shall be consistent with the Restructuring Term Sheet.

86.     "*MSA*" means that certain Management Services and Fee Agreement, dated as of July 18, 2014, by and between the Sponsor Equityholder and Northwest Hardwoods, Inc.

87.     "*MSA Claim*" means the Claim of the Sponsor Equityholder under the MSA, which shall be $900,000 payable in Cash and shall be an Allowed General Unsecured Claim.

88.     "*New Board*" means the initial board of directors (or similar governing body) of Reorganized HHI as selected in accordance with the New Organizational Documents, the Restructuring Term Sheet and the New Shareholders Agreement, the identities of which will be disclosed in the Plan Supplement or to the Bankruptcy Court (to the extent known) at or prior to the Confirmation Hearing in satisfaction of section 1129(a)(5) of the Bankruptcy Code.

89.     "*New Common Stock*" means the common stock, limited liability company membership units, or functional equivalent thereof of Reorganized HHI to be issued on the Effective Date.

90.     "*New Organizational Documents*" means the form of certificate or articles of incorporation (or functional equivalent), bylaws, or such other applicable formation documents (if any) of the Reorganized Debtors, each of which shall be included in the Plan Supplement.

91.     "*New Shareholders Agreement*" means the shareholders agreement (as amended, restated, supplemented or otherwise modified in accordance with its terms), including all annexes, exhibits, and schedules thereto, that will govern certain matters related to the governance of Reorganized HHI and the New Common Stock, which agreement shall become effective on the Effective Date.

92.     "*Obligations*" means those obligations outstanding under the Indentures, the ABL Credit Agreement, the Interim Financing Order or the Final Financing Order, as applicable.

93.     "*Ordinary Course Professionals Order*" means an order of the Bankruptcy Court, if any, approving a motion to employ ordinary course professionals in the Chapter 11 Cases.

94.     "*Other Priority Claim*" means a Claim entitled to priority under section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Claim.

95.     "*Other Secured Claim*" means any Secured Claim against any Debtor other than an ABL Claim or Secured Notes Claim, other than a Secured Tax Claim.

96.     "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

97.     "*Petition Date*" means the date on which each of the Debtors commenced the Chapter 11 Cases.

98.     "*Plan*" means, collectively, this joint prepackaged chapter 11 plan of reorganization, the Exhibits, all annexes, supplements and schedules hereto, and any document to be executed, delivered, assumed or performed in connection with the occurrence of the Effective Date, including the documents to be included in the Plan Supplement, in each case as may be amended, modified or supplemented from time to time.

99.     "*Plan Supplement*" means one or more supplements to the Plan containing certain agreements, lists, documents or forms of documents and/or schedules or exhibits relating to the implementation of the Plan, which may include certain agreements, lists, documents or forms of documents and/or schedules or exhibits necessary to comply with Bankruptcy Code sections 1123(a)(7) and 1129(a)(5), each of which may be updated or further supplemented by the Debtors (subject to Section I.H. hereof) at any time up to and including the Effective Date.

100.    "*Preference Actions*" means any and all avoidance, recovery or other actions or remedies that may be brought by and on behalf of the Debtors or their Estates under section 547 of the Bankruptcy Code.

101.    "*Prepack Scheduling Order*" means an order of the Bankruptcy Court scheduling a combined hearing with respect to approval of the Disclosure Statement and confirmation of this Plan.

102.    "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

103.    "*Pro Rata*" means, at any time, the proportion that the face amount of a Claim or Equity Interest in a particular Class bears to the aggregate face amount of all Claims or Interests in that Class, unless the Plan provides otherwise.

104.    "*Professional*" means: (a) any Entity employed in the Chapter 11 Cases pursuant to section 327, 328, 363 or 1103 of the Bankruptcy Code and (b) any Entity seeking compensation or reimbursement of expenses in connection with the Chapter 11 Cases pursuant to section 503(b)(4) of the Bankruptcy Code.

105.    "*Professional Claims Bar Date*" means forty-five (45) days after the Effective Date.

106.    "*Professional Fee Claims*" means a Claim under sections 328, 330(a), 331, 363, 503 or 1103 of the Bankruptcy Code for compensation for services rendered or reimbursement of costs, expenses or other charges incurred by Professionals after the Petition Date and prior to the Effective Date; *provided*, that Professional Fee Claims shall not include Restructuring Expenses.

107.    "*Professional Fee Escrow Account*" means an interest-bearing account funded by the Debtors with Cash on or before the Effective Date pursuant to Article II of the Plan, in an amount equal to the Professional Fee Escrow Amount.

108.    "*Professional Fee Reserve Amount*" means the aggregate amount of Professional Fee Claims and other unpaid fees and expenses Professionals estimate they have incurred or will incur in rendering services to the Debtors prior to and as of the Effective Date, which estimates Professionals shall deliver to the Debtors as set forth in Article II.B of the Plan.

109.    "*Proof of Claim*" means a proof of Claim filed against any of the Debtors in the Chapter 11 Cases.

110.    "*Proof of Interest*" means a proof of Interest filed against any of the Debtors in the Chapter 11 Cases.

8

111.    "*Reinstate,*" "*Reinstated,*" or "*Reinstatement*" means, with respect to any Claim: (a) leaving unaltered the legal, equitable and contractual rights to which a Claim entitles the Holder of such Claim in accordance with section 1124 of the Bankruptcy Code or (b) notwithstanding any contractual provision or applicable Law that entitles the Holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default: (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) of the Bankruptcy Code expressly does not require to be cured; (ii) reinstating the maturity of such Claim as such maturity existed before such default; (iii) compensating the Holder of such Claim for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; (iv) if such Claim arises from any failure to perform a non-monetary obligation, other than a default arising from failure to operate a non-residential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensating the Holder of such Claim (other than any Debtor or an insider of any Debtor) for any actual pecuniary loss incurred by the Holder of such Claim as a result of such failure; and (v) not otherwise altering the legal, equitable or contractual rights to which such Claim entitles the Holder of such Claim.

112.    "*Rejected Executory Contract and Unexpired Lease List*" means, in the event that the Debtors determine to reject any Executory Contract or Unexpired Lease, the list (as may be amended from time to time prior to the Effective Date pursuant to Article V and XI of the Plan) of Executory Contracts and Unexpired Leases that will be rejected by the Debtors pursuant to Article V of the Plan, which shall be included in the Plan Supplement.

113.    "*Released Party*" means, collectively, and in each case in its capacity as such:  (a) the Debtors and the Reorganized Debtors; (b) the Consenting Noteholders; (c) the Indenture Trustee; (d) the Consenting Equityholders; (e) with respect to each of the foregoing entities, each such Entity's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), subsidiaries, direct and indirect equity holders, and funds; and (f) with respect to each of the foregoing Entities in clauses (a) through (e), each of their respective current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors (with respect to clause (e), each solely in their capacity as such); *provided*, *however*, that any Holder of a Claim or Interest in a voting Class that objects to the Plan and votes to reject the Plan (and thereby opts out of the releases) shall not be a "Released Party."

114.    "*Releasing Parties*" means, collectively, and in each case in its capacity as such:  (a) the Debtors and the Reorganized Debtors; (b) the Consenting Noteholders; (c) the Indenture Trustee, (d) the Consenting Equityholders; (e) with respect to each of the foregoing entities in clauses (a) through (d), each such Entity's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), subsidiaries, direct and indirect equity holders, and funds; (f) with respect to each of the foregoing Entities in clauses (a) through (e), each of their respective current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors (with respect to clause (e), each solely in their capacity as such); and (g) all Holders of Claims and Interests not described in the foregoing clauses (a) through (f); *provided*, *however*, that any Holder of a Claim or Interest that (1) votes to reject the Plan if such Holder was entitled to vote and (2) objects to the releases in the Plan, shall not be a "Releasing Party" for purposes of the Plan.

115.    "*Reorganized HHI*" means HHI, as reorganized pursuant to and under the Restructuring Transactions or any successor thereto.

116.    "*Reorganized Debtor*" means a Debtor, or any successor or assign thereto, by merger, consolidation, reorganization, or otherwise, in the form of a corporation, limited liability company, partnership, or other form, as the case may be, on and after the Effective Date, including Reorganized HHI.

117.    "*Required Consenting Equityholders Consent Right*" means the Required Consenting Equityholders' right to consent to or approve any of the Definitive Documents (or any amendments, modifications, or supplements to the Definitive Documents) and shall apply solely to the extent any Definitive Document adversely (a) modifies the release, exculpation, injunction, or indemnification provisions related to the Consenting Equityholders as identified in the Restructuring Term Sheet or the Restructuring Support Agreement and implemented pursuant to the Plan or the Out-of-Court Restructuring (as applicable), (b) affects, in a material manner, the rights or obligations

of the Consenting Equityholders pursuant to or identified in the Restructuring Support Agreement and implemented pursuant to the Plan, (c) modifies the form of recovery of the Equityholders pursuant to the Restructuring Term Sheet or Plan, or (d) affects the MSA Payment (as defined in the Restructuring Term Sheet); *provided* that any ruling by a Court of competent jurisdiction (including the Bankruptcy Court permitting a holder of Company Claims or Interests other than a Consenting Stakeholder to opt out of releases in the Plan shall not give rise to any consent right.

118. "*Required Consenting Equityholders*" means, as of the relevant date, Consenting Equityholders holding more than 50% of the aggregate Existing Equity Interests.

119. "*Required Consenting Noteholders*" means, as of the relevant date, Consenting Noteholders holding more than 50% of the aggregate outstanding principal amount of Notes that are held by Consenting Noteholders.

120. "*Required Consenting Stakeholders*" means the Required Consenting Noteholders and the Required Consenting Equityholders.

121. "*Restructuring*" means a transaction, negotiated in good faith and at arms' length between the parties to the RSA, that will effectuate a financial restructuring of the Debtors' capital structure and financial obligations, on the terms and conditions set forth in the RSA, the Restructuring Term Sheet and this Plan.

122. "*Restructuring Expenses*" means (i) all out-of-pocket third-party reasonable and documented fees and expenses of the Ad Hoc Noteholder Group Professionals, in each case that are due and owing after receipt of applicable invoices (including, without limitation, and for the avoidance of doubt, any such fees, expenses and other amounts which the Debtors agreed to pay pursuant to those certain engagement letters entered into, prior to the Petition Date, by and among the Debtors and such Ad Hoc Noteholder Group Professionals), (ii) all out-of-pocket third-party reasonable and documented fees and expenses of the Sponsor Equityholder Professionals up to the Sponsor Fee Cap, in each case that are due and owing after receipt of applicable invoices, and (iii) the reasonable and documented fees and expenses of the Indenture Trustee and the reasonable fees and expenses of its professionals, limited to one primary counsel and one local counsel, and only to the extent such fees and expenses are due and payable pursuant to the Indentures.

123. "*Restructuring Support Agreement*" means that certain Restructuring Support Agreement, dated as of October 21, 2020, by and among the Debtors, the Consenting Equityholders, and the Consenting Noteholders, including all exhibits and attachments thereto, and as amended, restated, and supplemented from time to time in accordance with its terms.

124. "*Restructuring Term Sheet*" means the term sheet attached as <u>Exhibit B</u> to the Restructuring Support Agreement (as may be amended, supplemented, or otherwise modified from time to time in accordance with the terms of the Restructuring Support Agreement).

125. "*Restructuring Transactions*" means the restructuring transactions for the Debtors, in accordance with, and subject to the terms and conditions set forth in, the Restructuring Support Agreement, the Plan and the Plan Supplement.

126. "*Rules*" means Rule 501(a)(1), (2), (3), and (7) of the Securities Act.

127. "*SEC*" means the Securities and Exchange Commission.

128. "*Section 510(b) Claim*" means a Claim subordinated pursuant to Section 510(b) of the Bankruptcy Code.

129. "*Secured Notes*" means collectively, the 2014 Notes and the 2015 Notes.

130. "*Secured Notes Claim*" means any Claim on account of the Obligations under the Indentures.

131.    "*Secured Tax Claim*" means any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

132.    "*Secured*" means, when referring to a Claim:  (a) secured by a valid, perfected, and enforceable Lien on collateral in which the applicable Estate has an interest to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code; (b) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code; or (c) Allowed pursuant to the Plan as a Secured Claim.

133.    "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, or any similar federal, state, or local law, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

134.    "*Security*" has the meaning set forth in section 2(a)(1) of the Securities Act.

135.    "*Solicitation*" means the Debtors' formal request for acceptances of the Plan, consistent with sections 1125 and 1126 of the Bankruptcy Code, rules 3017 and 3018 of the Bankruptcy Rules and applicable non-bankruptcy law.

136.    "*Solicitation Agent*" means Prime Clerk LLC, the notice, claims, and solicitation agent retained by the Debtors for the Chapter 11 Cases.

137.    "*Solicitation Materials*" means all materials, including the Plan, the Disclosure Statement, any letters of transmittal and ballots or other documents required to solicit votes to accept or reject the Plan.

138.    "*Sponsor Equityholder*" means Littlejohn & Co., LLC.

139.    "*Sponsor Equityholder Professionals*" means (a) Wachtell, Lipton, Rosen & Katz, as counsel to the Sponsor Equityholder and (b) one local counsel retained in connection with the Chapter 11 Cases.

140.    "*Sponsor Fee Cap*" means $200,000.

141.    "*Transfer*" means to sell, resell, reallocate, use, pledge, assign, transfer, hypothecate, participate, donate or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales or other transactions).

142.    "*UCC*" means the Uniform Commercial Code as the same may from time to time be in effect in the State of Delaware or the Uniform Commercial Code as in effect in any other state to the extent it may be applicable to any security interests in property of the Debtors.

143.    "*U.S.*" means the United States of America.

144.    "*U.S. Trustee*" means the Office of the United States Trustee for the District of Delaware.

145.    "*Unclaimed Distribution*" means any distribution under the Plan or as otherwise authorized by the Bankruptcy Court on account of an Allowed Claim to a Holder that, within six (6) months from when the distribution was first made, has not: (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to Reorganized HHI of an intent to accept a particular distribution; (c) responded to Reorganized HHI's request for information necessary to facilitate a particular distribution; (d) taken delivery of such distribution or where such distribution was returned for lack of a current address or otherwise; or (e) taken any other action necessary to facilitate such distribution.

146.    "*Unexpired Lease*" means a lease of nonresidential real property to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

147.    "*Unimpaired*" means any Claim or Equity Interest that is not designated as Impaired.

148.     "*Unimpaired Claim*" means Administrative Claims, Priority Tax Claims, Other Secured Claims, Other Priority Claims, and General Unsecured Claims.

149.     "*Voting Classes*" means collectively, Class 4 and Class 9.

150.     "*Voting Record Date*" means the date for determining which Holders are entitled to receive the Disclosure Statement and vote to accept or reject the Plan, as applicable, which date is November 11, 2020 for all Holders of Claims or Interests in the Voting Classes.

151.     "*Willkie*" means Willkie Farr & Gallagher LLP, counsel to the Consenting Noteholders.

B.     *Rules of Interpretation*

For purposes of the Plan, except as otherwise provided in this Plan:  (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) unless otherwise specified, any reference in the Plan to an existing document, schedule, or exhibit, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (c) unless otherwise specified, all references in the Plan to "Articles" and "Sections" are references to Articles and Sections, respectively, hereof or hereto; (d) the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to any particular portion of the Plan; (e) any effectuating provisions may be interpreted by the Debtors (subject to the terms of the Restructuring Support Agreement) or the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; (f) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (g) unless otherwise specified in the Plan, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (h) any term used in capitalized form in the Plan that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (i) references to docket numbers of documents filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (j) references to "Proofs of Claim," "Holders of Claims," "Disputed Claims," and the like shall include "Proofs of Interest," "Holders of Interests," "Disputed Interests," and the like as applicable; (k) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; (l) the terms "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; and (m) except as otherwise provided in the Plan, any reference to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter.

C.     *Computation of Time*

Unless otherwise specifically stated in the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed in the Plan.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

D.     *Governing Law*

Unless a rule of law or procedure is supplied by federal Law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing Law of such agreement shall control); *provided*, *however*, that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, shall be governed by the laws of the state of incorporation or formation of the relevant Debtor or Reorganized Debtor, as applicable.

E.      *Reference to Monetary Figures*

All references in the Plan to monetary figures refer to currency of the United States of America, unless otherwise expressly provided herein.

F.      *Reference to the Debtors or the Reorganized Debtors*

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or to the Reorganized Debtors mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

G.      *Controlling Document*

In the event of an inconsistency between the Plan, the Restructuring Support Agreement, and the Disclosure Statement, the terms of the Plan shall control in all respects. In the event of an inconsistency between the Plan and any document included in the Plan Supplement, the terms of the relevant provision in the Plan Supplement shall control. In the event of any inconsistency between the Plan and the Confirmation Order, the Confirmation Order shall control.

H.      *Consent Rights*

Notwithstanding anything herein to the contrary, any and all consent rights of the parties to the Restructuring Support Agreement set forth in the Restructuring Support Agreement with respect to the form and substance of this Plan, all exhibits to the Plan, the Plan Supplements, and the Definitive Documents, including any amendments, restatements, supplements, or other modifications to such agreements and documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in Article I.A hereof) and be fully enforceable as if stated in full herein.

## ARTICLE II.
## ADMINISTRATIVE CLAIMS AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims set forth in Article III of the Plan.

A.      *Administrative Claims*

Subject to subparagraph (i) below, in full and complete satisfaction, settlement, discharge and release of and in exchange for each Allowed Administrative Claim (except to the extent that (a) the Holder of such Allowed Administrative Claim agrees in writing to less favorable treatment or (b) the Holder of such Allowed Administrative Claim has been paid in full during the Chapter 11 Cases), the Debtors or Reorganized Debtors, as applicable, at the option of the Debtors or Reorganized Debtors, as applicable, and with the consent of the Required Consenting Noteholders, (i) shall pay to each Holder of an Allowed Administrative Claim Cash in an amount equal to the due and unpaid portion of its Allowed Administrative Claim on the later of (x) the Effective Date, or as soon thereafter as is reasonably practicable and (y) as soon as practicable after such Allowed Administrative Claim becomes due and payable, or (ii) shall provide such other treatment as the Holder of such Allowed Administrative Claim may agree to or otherwise as permitted by section 1129(a)(9) of the Bankruptcy Code; *provided*, that Administrative Claims incurred by the Debtors in the ordinary course of business may be paid in the ordinary course of business in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court.

B.      *Professional Fee Claims*

1.      Professional Fee Claims

Professionals (a) asserting a Professional Fee Claim shall deliver to the Debtors their estimates for purposes of the Debtors computing the Professional Fee Reserve Amount no later than five (5) Business Days prior to the

anticipated Effective Date; *provided*, that, for the avoidance of doubt, no such estimate shall be deemed to limit the amount of the fees and expenses that are the subject of a Professional's final request for payment of Professional Claims filed with the Bankruptcy Court; *provided*, *further*, that, if a Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional; and (b) asserting a Professional Fee Claim for services rendered before the Effective Date, for the avoidance of doubt, excluding any claims for Restructuring Expenses, must file and serve on the Reorganized Debtors and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court an application for final allowance of such Professional Fee Claim no later than the Professional Claims Bar Date; *provided*, that any Professional who is subject to the Ordinary Course Professionals Order (as applicable) may continue to receive such compensation and reimbursement of expenses for services rendered before the Effective Date, without further Bankruptcy Court order, pursuant to the Ordinary Course Professionals Order. Objections to any Professional Fee Claim must be filed and served on the Reorganized Debtors and the applicable Professional within thirty (30) days after the filing of the final fee application with respect to the Professional Fee Claim. Any such objections that are not consensually resolved may be set for hearing on twenty-one (21) days' notice.

2.      Professional Fee Escrow Amount

On the Effective Date, the Debtors or the Reorganized Debtors, as applicable, shall establish the Professional Fee Escrow Account and fund such account with Cash equal to the Professional Fee Reserve Amount. The Professional Fee Escrow Account shall be maintained in trust for the Professionals. Each Holder of an Allowed Professional Fee Claim will be paid by the Reorganized Debtors in Cash from the Professional Fee Escrow Account within five (5) Business Days of entry of the order approving such Allowed Professional Fee Claim. If the Professional Fee Escrow Account is depleted, each Holder of an Allowed Professional Fee Claim will be paid the full amount of such Allowed Professional Fee Claim by the Reorganized Debtors in Cash within five (5) Business Days of entry of the order approving such Allowed Professional Fee Claim. All amounts remaining in the Professional Fee Escrow Account after all Allowed Professional Fee Claims have been paid in full shall revert to Reorganized HHI. If the Professional Fee Escrow Account is insufficient to pay the full amount of all Allowed Professional Fee Claims, remaining unpaid Allowed Professional Fee Claims will be promptly paid by the Reorganized Debtors without any further action or order of the Bankruptcy Court.

C.      *Priority Tax Claims*

In full and complete satisfaction, settlement, discharge and release of and in exchange for each Allowed Priority Tax Claim (except to the extent that (a) the Holder of such Allowed Priority Tax Claim agree in writing to less favorable treatment or (b) the Holder of such Allowed Priority Tax Claim has been paid in full during the Chapter 11 Cases), on the Effective Date, each Holder of an Allowed Priority Tax Claim will be treated in accordance with section 1129(a)(9)(C) of the Bankruptcy Code.

D.      *Statutory Fees*

Notwithstanding anything herein to the contrary, on the Effective Date, the Debtors shall pay, in full, in Cash, any fees due and owing to the U.S. Trustee at the time of Confirmation pursuant to 28 U.S.C. § 1930(a)(6). On and after the Effective Date, to the extent the Chapter 11 Cases remains open, and for so long as the Reorganized Debtors remain obligated to pay quarterly fees, the Reorganized Debtors shall file with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee. The Debtors or Reorganized Debtors, as applicable, shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of the Chapter 11 Cases being closed, dismissed or converted to a case under chapter 7 of the Bankruptcy Code.

## ARTICLE III.
## CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS

A.      *Classification of Claims and Interests*

This Plan constitutes a separate Plan proposed by each Debtor within the meaning of section 1121 of the Bankruptcy Code.  Except for the Claims addressed in Article II of this Plan, all Claims and Interests are classified in

the Classes set forth below in accordance with section 1122 of the Bankruptcy Code. A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

This Plan groups the Debtors together solely for the purpose of describing treatment under the Plan, Confirmation of the Plan, and making distributions in accordance with the Plan in respect of Claims against and Interests in the Debtors under the Plan. Such groupings shall not affect any Debtor's status as a separate legal Entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal Entities, or cause the transfer of any assets, and, except as otherwise provided by or permitted under the Plan, all Debtors shall continue to exist as separate legal Entities after the Effective Date.

The following chart represents the classification of Claims and Interests for each Debtor pursuant to the Plan:

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 3 | ABL Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 4 | Secured Notes Claims | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 6 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| 7 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 8 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| 9 | Existing Equity Interests | Impaired | Entitled to Vote |

Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the Debtors or the Reorganized Debtors, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

B.      *Treatment of Classes of Claims and Interests*

To the extent a Class contains Allowed Claims or Allowed Interests with respect to any Debtor, the classification of Allowed Claims and Allowed Interests is specified below.

1.      Class 1 — Other Secured Claims

    (a)    *Classification*:  Class 1 consists of all Other Secured Claims against each Debtor.

    (b)    *Treatment*:  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, to the extent such claim has not already been paid in full during the Chapter 11 Cases, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each Allowed Other Secured Claim, each Holder thereof shall receive, at the option of the Debtors and with the consent of the Required Consenting Noteholders: (a) payment in full in cash of its Other Secured Claim on the  Effective Date (or as soon thereafter as reasonably practicable); (b) the collateral securing its Allowed Other Secured Claim; (c) reinstatement of its Allowed Other Secured Claim under section 1124 of the Bankruptcy Code; (d) such other treatment rendering its Allowed Other Secured Claim unimpaired in accordance with section 1124 of the Bankruptcy Code; or (e) the indubitable equivalent of such claim.

    (c)    *Voting*:  Class 1 is Unimpaired under the Plan.  Holders of Allowed Other Secured Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Allowed Other Secured Claims are not entitled to vote to accept or reject the Plan.

2.      Class 2 — Other Priority Claims

    (a)    *Classification*:  Class 2 consists of all Other Priority Claims against each Debtor.

    (b)    *Treatment*:  Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, to the extent such claim has not already been paid in full during the Chapter 11 Cases, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each Allowed Other Priority Claim, each Holder thereof shall receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code, in each case, as determined by the Debtors with the consent of the Required Consenting Noteholders.

    (c)    *Voting*:  Class 2 is Unimpaired under the Plan.  Holders of Allowed Other Priority Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Allowed Other Priority Claims are not entitled to vote to accept or reject the Plan.

3.      Class 3 —ABL Claims

    (a)    *Classification*:  Class 3 consists of all ABL Claims.

    (b)    *Treatment*:  On the Effective Date, each Holder of an Allowed ABL Claim shall be paid in full in cash with the proceeds of the Exit ABL Facility.

    (c)    *Voting*:  Class 3 is Unimpaired under the Plan.  Holders of Allowed ABL Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Allowed ABL Claims are not entitled to vote to accept or reject the Plan.

4.      Class 4 —Secured Notes Claims

    (a)    *Allowance*:  The Secured Notes Claims shall be Allowed in an aggregate principal amount of no less than $378,634,000, plus all other unpaid and outstanding obligations including any accrued and unpaid interest thereon (including at any applicable default rate), and all

applicable fees, costs, charges, expenses, premiums or other amounts arising under the Indentures and other Loan Documents (as defined therein), in each case, as of the Petition Date.

(b)    *Classification*: Class 4 consists of all Secured Notes Claims.

(c)    *Treatment*: On or as soon as reasonably practicable following the Effective Date, except to the extent that a Holder of an Allowed Secured Notes Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each Allowed Secured Notes Claim, each Holder thereof (and/or its designee) shall receive its *Pro Rata* share of and/or interest in (i) 99% of the New Common Stock (subject to dilution from the Management Incentive Plan) and (ii) the Exit Take Back Debt.

(d)    *Voting*: Class 4 is Impaired under the Plan. Holders of Allowed Secured Notes Claims are entitled to vote to accept or reject the Plan.

5.    Class 5 — General Unsecured Claims

(a)    *Classification*: Class 5 consists of all General Unsecured Claims against each Debtor.

(b)    *Treatment*: Except to the extent that a Holder of an Allowed General Unsecured Claim has already been paid during the Chapter 11 Cases or such Holder agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for its Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive, at the Debtors' option and with the consent of the Required Consenting Noteholders: (i) if such Allowed General Unsecured Claim is due and payable on or before the Effective Date, payment in full, in Cash, of the unpaid portion of its Allowed General Unsecured Claim on the Effective Date; (ii) if such Allowed General Unsecured Claim is not due and payable before the Effective Date, payment in the ordinary course of business consistent with past practices; or (iii) other treatment, as may be agreed upon by the Debtors, the Required Consenting Noteholders and the Holder of such Allowed General Unsecured Claim, such that the Allowed General Unsecured Claim shall be rendered unimpaired pursuant to section 1124(1) of the Bankruptcy Code.

(c)    *Voting*: Class 5 is Unimpaired under the Plan. Holders of Allowed General Unsecured Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Allowed General Unsecured Claims are not entitled to vote to accept or reject the Plan.

6.    Class 6 — Intercompany Claims

(a)    *Classification*: Class 6 consists of all Intercompany Claims.

(b)    *Treatment*: On the Effective Date, in full and final satisfaction, settlement, discharge and release of, and in exchange for, each Intercompany Claim, at the option of the Reorganized Debtors and with the consent of the Required Consenting Noteholders, each Allowed Intercompany Claim shall be (i) Unimpaired and Reinstated or (ii) Impaired and canceled and released without any distribution.

(c)    *Voting*: Holders of Allowed Intercompany Claims in Class 6 are either (i) Unimpaired, and such Holders are conclusively deemed to have accepted the Plan pursuant to section 1126(f), or (ii) Impaired, and such Holders are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Allowed Intercompany Claims are not entitled to vote to accept or reject the Plan.

7.      Class 7 — Section 510(b) Claims

    (a)    *Classification*:  Class 7 consists of Section 510(b) Claims against each Debtor.

    (b)    *Treatment*:  Section 510(b) Claims shall be discharged, canceled, released, and extinguished without any distribution to Holders of such Claims.  The Debtors believe that no Section 510(b) Claims exist.

    (c)    *Voting*:  Class 7 is Impaired by the Plan, and Holder of Section 510(b) Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Section 510(b) Claims are not entitled to vote to accept or reject the Plan.

8.      Class 8 — Intercompany Interests

    (a)    *Classification*:  Class 8 consists of all Intercompany Interests.

    (b)    *Treatment*:  On the Effective Date, in full and final satisfaction, settlement, discharge and release of, and in exchange for, each Intercompany Interest, at the option of the Reorganized Debtors and with the consent of the Required Consenting Noteholders, each Intercompany Interest shall be (i) Unimpaired and Reinstated or (ii) Impaired and canceled and released without any distribution.

    (c)    *Voting*:  Holders of Intercompany Interests in Class 8 are either (i) Unimpaired, and such Holders are conclusively deemed to have accepted the Plan pursuant to section 1126(f), or (ii) Impaired, and such Holders are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

9.      Class 9 —Existing Equity Interests

    (a)    *Classification*:  Class 9 consists of all Existing Equity Interests.

    (b)    *Treatment*:  On the Effective Date, each Existing Equity Interest shall be canceled, released, and extinguished, and will be of no further force or effect and Holders of Allowed Existing Common Equity Interests on the Effective Date shall receive their Pro Rata share of the Equity Recovery.

    (c)    *Voting*:  Class 9 is Impaired under the Plan.  Holders of Allowed Existing Common Equity Interests on the Voting Record Date are entitled to vote to accept or reject the Plan.

C.    *Special Provision Governing Unimpaired Claims*

The Debtors, the Reorganized Debtors and any other Entity shall retain all defenses, counterclaims, rights to setoff and rights to recoupment, if any, as to Unimpaired Claims other than the CITIC Claim and the MSA Claim. Holders of Unimpaired Claims shall not be required to file a Proof of Claim with the Court and shall retain all their rights under applicable non-bankruptcy Law to pursue their Unimpaired Claims in any forum with jurisdiction over the parties. Notwithstanding anything to the contrary in the Plan, each Holder of an Unimpaired Claim shall be entitled to enforce its rights in respect of such Unimpaired Claim against the Debtors or the Reorganized Debtors, as applicable, until such Unimpaired Claim has been either (a) paid in full (i) on terms agreed to between the Holder of such Unimpaired Claim and the Debtors or the Reorganized Debtors, as applicable, or (ii) in accordance with the terms and conditions of the applicable documentation or laws giving rise to such Unimpaired Claim or (b) otherwise satisfied or disposed of as determined by a court of competent jurisdiction. If the Debtors or the Reorganized Debtors dispute any Unimpaired Claim, such dispute shall be determined, resolved or adjudicated pursuant to applicable non-bankruptcy law.

D.      *Voting Classes; Presumed Acceptance by Non-Voting Classes*

      1.      <u>Presumed Acceptance of Plan</u>: Classes 1, 2, 3, 5, 6 (if so treated) and 8 (if so treated) are Unimpaired by the Plan and are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

      2.      <u>Presumed Rejection of Plan</u>: Classes 6 (if so treated), 7, and 8 (if so treated) are Impaired by the Plan and are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

      3.      <u>Voting Classes</u>: Each Holder of an Allowed Claim or Interest in the Voting Classes as of the applicable Voting Record Date is entitled to vote to accept or reject the Plan.

      4.      <u>Acceptance by Impaired Classes of Claims</u>: Pursuant to section 1126(c) of the Bankruptcy Code and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims has accepted the Plan if the Holders of at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims in such Class actually voting have voted to accept the Plan.

      5.      <u>Plan Cannot be Confirmed as to Some or All Debtors</u>: If the Plan cannot be confirmed as to any Debtor, with the consent of the Required Consenting Noteholders and without prejudice to and subject to the respective parties' rights under the Restructuring Support Agreement, then the Debtors (a) may revoke the Plan as to such Debtor or (b) may revoke the Plan as to any Debtor (and any such Debtor's Chapter 11 Case may be converted, continued or dismissed) and confirm the Plan as to the remaining Debtors to the extent required without the need for re-solicitation as to any Holder of a Claim against and/or Equity Interest in a Debtor for which the Plan is not so revoked.

E.      *Elimination of Vacant Classes*

      Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

F.      *Subordinated Claims and Interests*

      The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors or Reorganized Debtors, as applicable, reserve the right to re-classify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

G.      *Intercompany Interests*

      To the extent Reinstated under the Plan, distributions on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests, but for the purposes of administrative convenience and in exchange for the Debtors' and Reorganized Debtors' agreement under the Plan to provide management services to certain other Debtors and Reorganized Debtors, to use certain funds and assets as set forth in the Plan to make certain distributions and satisfy certain obligations of certain other Debtors and Reorganized Debtors to the Holders of certain Allowed Claims.  For the avoidance of doubt, any Interest in non-Debtor subsidiaries owned by a Debtor shall continue to be owned by the applicable Reorganized Debtor.

H.      *Controversy Concerning Impairment*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

I.      *Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code*

The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors reserve the right to modify the Plan in accordance with Article X hereof to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules or to withdraw the Plan as to such Debtor.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.      *Corporate and Organizational Existence*

Except as otherwise provided in the Plan or any agreement, instrument or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, each Reorganized Debtor shall continue to exist, pursuant to its organizational documents in effect prior to the Effective Date, except as otherwise set forth herein or in the Plan Supplement, without any prejudice to any right to terminate such existence (whether by merger or otherwise) in accordance with applicable Law after the Effective Date. To the extent such documents are amended on or prior to the Effective Date, such documents are deemed to be amended pursuant to the Plan without any further notice to or action, order or approval of the Bankruptcy Court.

B.      *Corporate Action*

On or before the Effective Date, as applicable, all actions contemplated under the Plan or the Plan Supplement shall be deemed authorized and approved in all respects, including:  (1) adoption or assumption, as applicable, of the agreements with existing management; (2) selection of the directors, managers, and officers for the Reorganized Debtors; (3) implementation of the Restructuring Transactions; (4) issuance and distribution of the New Common Stock by the Distribution Agent; (5) adoption of the New Organizational Documents; (6) entry into the Exit Facility Documents; (7) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; (8) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date); and (9) all other acts or actions contemplated or reasonably necessary or appropriate to properly consummate the Restructuring Transactions contemplated by the Plan (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, as applicable, and any corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, managers, or officers of the Debtors or the Reorganized Debtors, as applicable. On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtors, including the New Shareholders Agreement, the New Organizational Documents, the Exit Facility Documents, and any and all other agreements, documents, securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by Article IV.J of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law**.**

C.      *Organizational Documents of the Reorganized Debtors*

On the Effective Date, the New Organizational Documents shall become effective and be deemed to amend and restate the current organizational documents without the need for any further notice or approvals. To the extent

necessary, the New Organizational Documents will (i) include, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code, a provision prohibiting the issuance of non-voting equity securities, but only to the extent required by section 1123(a)(6) of the Bankruptcy Code, and (ii) to the extent necessary or appropriate, include such provisions as may be needed to effectuate and consummate the Plan and the transactions contemplated herein. After the Effective Date, each Reorganized Debtor may amend and restate its organizational documents, as permitted by applicable Law and pursuant to the terms contained therein.

D.      *Managers, Directors and Officers of Reorganized Debtors; Corporate Governance*

On the Effective Date, Reorganized HHI shall enter into and deliver the New Shareholders Agreement, in substantially the forms included in the Plan Supplement, to each Holder of New Common Stock and such Holders shall be bound thereby, without the need for execution by any party thereto other than Reorganized HHI.

The number and identity of the initial members of the New Board shall be determined by the Required Consenting Noteholders in consultation with the Debtors or Reorganized Debtors, as applicable, provided that the initial directors of the New Board shall include the President of HHI. Subsequent members of the New Board shall be selected in accordance with the New Organizational Documents, the Restructuring Term Sheet and the New Shareholders Agreement.

E.      *Exit ABL Loan Documents*

1.      On the Effective Date, the applicable Reorganized Debtors shall execute and deliver the Exit ABL Credit Agreement and the other Exit ABL Credit Documents. Confirmation shall be deemed approval of the Exit ABL Facility (including transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the Debtors or Reorganized Debtors in connection therewith). The Reorganized Debtors shall execute and deliver those documents necessary or appropriate to obtain the Exit ABL Facility, including the Exit ABL Credit Documents.

2.      On the Effective Date, as applicable, all Liens and security interests granted pursuant to, or in connection with the Exit ABL Credit Agreement shall be deemed granted by the Reorganized Debtors pursuant to the Exit ABL Credit Agreement, and all Liens and security interests granted pursuant to, or in connection with the Exit ABL Credit Agreement (including any Liens and security interests granted on the Reorganized Debtors' assets) shall (i) be valid, binding, perfected, enforceable liens and security interests in the property described in the Exit ABL Credit Agreement and the other "Loan Documents" (as defined therein or any similar defined term), with the priorities established in respect thereof under applicable non-bankruptcy Law and the Exit Intercreditor Agreement, and (ii) not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination under any applicable law, the Plan, or the Confirmation Order.

3.      The Reorganized Debtors shall also execute, deliver, file, record and issue any other related notes, guarantees, deeds of trust, security documents or instruments (including UCC financing statements), amendments to the foregoing, or agreements in connection therewith, in each case, without (A) further notice to or order of the Bankruptcy Court or (B) further act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Entity (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order without the need for any filings or recordings) and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable Law to give notice of such liens and security interests to third parties.

F.      *Exit Take Back Debt Documents*

1.      On the Effective Date, the applicable Reorganized Debtors shall execute and deliver the Exit Take Back Debt Agreement and the other Exit Take Back Debt Documents. Confirmation shall be deemed approval of the Exit Take Back Debt (including transactions contemplated thereby, and all actions

to be taken, undertakings to be made, and obligations to be incurred and fees paid by the Debtors or Reorganized Debtors in connection therewith). The Reorganized Debtors shall execute and deliver those documents necessary or appropriate to obtain the Exit Take Back Debt, including the Exit Take Back Debt Documents.

2. On the Effective Date, as applicable, all Liens and security interests granted pursuant to, or in connection with the Exit Take Back Debt Agreement shall be deemed granted by the Reorganized Debtors pursuant to the Exit Take Back Debt Agreement, and all Liens and security interests granted pursuant to, or in connection with the Exit Take Back Debt Agreement (including any Liens and security interests granted on the Reorganized Debtors' assets) shall (i) be valid, binding, perfected, enforceable liens and security interests in the property described in the Exit Take Back Debt Agreement and the other "Loan Documents" (as defined therein or any similar defined term), with the priorities established in respect thereof under applicable non-bankruptcy Law and the Exit Intercreditor Agreement, and (ii) not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination under any applicable law, the Plan, or the Confirmation Order.

3. The Reorganized Debtors shall also execute, deliver, file, record and issue any other related notes, guarantees, deeds of trust, mortgages, security documents or instruments (including UCC financing statements), amendments to the foregoing, or agreements in connection therewith, in each case, without (A) further notice to or order of the Bankruptcy Court or (B) further act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Entity (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order without the need for any filings or recordings) and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable Law to give notice of such liens and security interests to third parties.

For the avoidance of doubt, on the Effective Date, all Holders of Secured Notes Claims shall be deemed party to the Exit Take Back Debt Agreement and the applicable other Exit Take Back Debt Documents, in each case, without the need for execution by any party thereto other than Reorganized HHI.

G. *Exemption from Registration Requirements*

All shares of New Common Stock or other Securities, as applicable, issued and distributed pursuant to the Plan, will be issued and distributed without registration under the Securities Act or any similar federal, state, or local Law in reliance upon (1) section 1145 of the Bankruptcy Code; (2) section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder; or (3) such other exemption as may be available from any applicable registration requirements.

To the extent that the offering, issuance, and distribution of any shares of New Common Stock or other Securities pursuant to the Plan is in reliance upon section 1145 of the Bankruptcy Code, it is exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable U.S. state or local Law requiring registration prior to the offering, issuance, distribution, or sale of Securities. Such shares of New Common Stock or other Securities to be issued under the Plan pursuant to section 1145 of the Bankruptcy Code (a) will not be "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (b) subject to the terms of the New Shareholders Agreement, will be freely tradable and transferable by any initial recipient thereof that (i) is not an "affiliate" of the Debtors as defined in Rule 144(a)(1) under the Securities Act, (ii) has not been such an "affiliate" within 90 days of such transfer, and (iii) is not an entity that is an "underwriter" as defined in subsection (b) of Section 1145 of the Bankruptcy Code.

All shares of New Common Stock or other Securities pursuant to the Plan that are not issued in reliance on section 1145 of the Bankruptcy Code will be issued without registration under the Securities Act or any similar federal, state, or local Law in reliance on section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder, or such other exemption as may be available from any applicable registration requirements. All shares of New Common Stock or other Securities issued pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder will be considered "restricted securities" and may not be transferred

except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom. The New Common Stock underlying the Management Incentive Plan will be issued pursuant to a registration statement or an available exemption from registration under the Securities Act and other applicable law.

The availability of the exemption under section 1145 of the Bankruptcy Code or any other applicable securities laws shall not be a condition to the occurrence of the Effective Date.

Should the Reorganized Debtors elect, on or after the Effective Date, to reflect all or any portion of the ownership of Reorganized HHI's New Common Stock through the facilities of the Depositary Trust Company ("**_DTC_**"), the Reorganized Debtors shall not be required to provide any further evidence other than the Plan or Confirmation Order with respect to the treatment of such applicable portion of Reorganized HHI's New Common Stock, and such Plan or Confirmation Order shall be deemed to be legal and binding obligations of the Reorganized Debtors in all respects.

DTC shall be required to accept and conclusively rely upon the Plan and Confirmation Order in lieu of a legal opinion regarding whether Reorganized HHI's New Common Stock is exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

Notwithstanding anything to the contrary in the Plan, no Entity (including, for the avoidance of doubt, DTC) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether Reorganized HHI's New Common Stock are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

H.    *Cancellation of Certain Existing Security Interests*

Upon the full payment or other satisfaction of an Allowed Other Secured Claim, or promptly thereafter, the Holder of such Allowed Other Secured Claim shall deliver to the Debtors or Reorganized Debtors (as applicable) any termination statements, instruments of satisfaction or releases of all security interests with respect to its Allowed Other Secured Claim that may reasonably be required in order to terminate any related financing statements, mortgages, mechanic's liens or lis pendens and take any and all other steps reasonably requested by the Debtors, the Reorganized Debtors, the Exit ABL Agent or the Exit Take Back Agent that are necessary to cancel and/or extinguish any Liens or security interests securing such Holder's Other Secured Claim.

I.    *Management Incentive Plan*

Within sixty (60) days of the Effective Date, the Reorganized Debtors shall enter into the Management Incentive Plan, the terms of which shall be determined and approved by the New Board, provided that such terms shall be consistent with the Restructuring Term Sheet.

J.    *Restructuring Transactions*

Following Confirmation, the Debtors and/or the Reorganized Debtors, as applicable, shall take any actions as may be necessary or appropriate to effect a restructuring of the Debtors' business or the overall organization or capital structure subject to and consistent with the terms of the Plan and the Restructuring Support Agreement and subject to the consent rights set forth therein in all respects. The actions taken by the Debtors and/or the Reorganized Debtors, as applicable, to effect the Restructuring Transactions may include: (i) the execution, delivery, adoption and/or amendment of appropriate agreements or other documents of restructuring, conversion, disposition, dissolution, liquidation, merger or transfer containing terms that are consistent with the terms of the Plan and the Restructuring Support Agreement and any documents contemplated hereunder or thereunder and that satisfy the applicable requirements of applicable state Law and any other terms to which the applicable parties may agree; (ii) the execution, delivery, adoption and/or amendment of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan, the Restructuring Support Agreement and any documents contemplated hereunder or thereunder and having any other terms for which the applicable parties may agree; (iii) the filing of appropriate certificates or articles of incorporation or formation, reincorporation, merger, conversion, dissolution or other organizational documents, as applicable, pursuant to

applicable state law, including certificates of dissolution with respect to certain Debtors; (iv) the execution, delivery, adoption and/or amendment of all filings, disclosures or other documents necessary to obtain any necessary third-party approvals; (v) the execution and delivery of the New Shareholders Agreement and the New Organizational Documents and any certificates or articles of incorporation, bylaws, or such other applicable formation, organizational, governance, or constitutive documents (if any) of each Reorganized Debtor (including all actions to be taken, undertakings to be made, and obligations to be incurred and fees and expenses to be paid by the Debtors and/or the Reorganized Debtors, as applicable), and the issuance, distribution, reservation, or dilution, as applicable, of the New Common Stock, as set forth herein; (vi) the execution and delivery of the Exit Facility Documents (including all actions to be taken, undertakings to be made, and obligations to be incurred and fees and expenses to be paid by the Debtors and/or the Reorganized Debtors, as applicable); (vii) the adoption of the Management Incentive Plan and the issuance and reservation of equity thereunder to the participants in the Management Incentive Plan on the terms and conditions set by New Board after the Effective Date, and/or (viii) all other actions that the Debtors and/or the Reorganized Debtors, as applicable, determine, with the consent of the Required Consenting Noteholders, to be necessary, desirable or appropriate to implement, effectuate and consummate the Plan or the Restructuring Transactions contemplated hereby, including making filings or recordings that may be required by applicable state Law in connection with the Restructuring Transactions. All matters provided for pursuant to the Plan that would otherwise require approval of the equity holders, managing members, members, managers, directors, or officers of any Debtor (as of or prior to the Effective Date) will be deemed to have been so approved and will be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law, the provisions of the New Organizational Documents, and without any requirement of further action by the equity holders, managing members, members, managers, directors or officers of such Debtors, or the need for any approvals, authorizations, actions or consents of any Person.

The Confirmation Order shall and shall be deemed to, pursuant to both section 1123 and section 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.

K.    *Effectuating Documents; Further Transactions*

On and after the Effective Date, the Reorganized Debtors and the officers and members of the New Board and any other board of directors or managers of any of the Reorganized Debtors shall be authorized and (as applicable) directed to issue, execute, deliver, file or record such agreements, securities, instruments, releases and other documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan and the Restructuring Transactions, including the Exit Facility Documents, the New Shareholders Agreement, the Management Incentive Plan and any New Organizational Documents in the name of and on behalf of one or more of the Reorganized Debtors, without the need for any approvals, authorization or consents except those expressly required pursuant to the Plan.

L.    *Vesting of Assets in the Reorganized Debtors*

Except as provided elsewhere in the Plan, or in the Confirmation Order, on or after the Effective Date, all property and assets of the Debtors' Estates (including Causes of Action, but only to the extent such Causes of Action have not been waived or released pursuant to the terms of the Plan, pursuant to an order of the Bankruptcy Court, or otherwise) and any property and assets acquired by the Debtors pursuant to the Plan, will vest in the Reorganized Debtors, free and clear of all Liens or Claims. Except as may be otherwise provided in the Plan, on and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire or dispose of property and compromise or settle any Claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan, the Confirmation Order, the New Organizational Documents or the New Shareholders Agreement.

M.    *Release of Liens, Claims and Interests*

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, concurrently with the applicable distributions made pursuant to the Plan, all Liens, Claims or Interests in or against the property of the Estates will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act

24

or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Entity. Any Entity holding such Liens, Claims, or Interests will, if necessary, pursuant to section 1142 of the Bankruptcy Code, promptly execute and deliver to the Reorganized Debtors such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Reorganized Debtors and shall incur no liability to any Entity in connection with its execution and delivery of any such instruments.

On the Effective Date, in exchange for the treatment described herein and as set forth in Article III the Secured Notes Claims and the ABL Claims shall be discharged, the Liens on the Collateral (as defined in the Indentures or the ABL Credit Agreement, as applicable) shall be released and the Indentures and the ABL Credit Agreement shall be cancelled and be of no further force or effect, and the obligations of the Debtors or the Reorganized Debtors thereunder or in any way related thereto shall be discharged and deemed satisfied in full, and the ABL Agent and the Indenture Trustee shall be released from all duties and obligations thereunder; *provided, however*, that notwithstanding Confirmation or the occurrence of the Effective Date, any credit document or agreement that governs the rights of the Holder of a Claim or Interest and any debt issued thereunder shall continue in effect solely for purposes of (1) allowing Holders of Allowed Claims to receive distributions under the Plan; (2) allowing and preserving the rights of the ABL Agent and the Indenture Trustee to make distributions pursuant to the Plan; (3) preserving the ABL Agent's and the Indenture Trustee's rights to compensation and indemnification as against any money or property distributable to the Holders of ABL Claims or Secured Notes Claims, including permitting the ABL Agent and the Indenture Trustee to maintain, enforce, and exercise their respective charging liens, if any, against such distributions; (4) preserving all rights, including rights of enforcement, of the ABL Agent and the Indenture Trustee against any Person other than a Released Party (including the Debtors), including with respect to indemnification or contribution from the Holders of ABL Claims and Secured Notes Claims, pursuant and subject to the terms of the Indentures and the ABL Credit Agreement, respectively, as in effect on the Effective Date; (5) permitting the ABL Agent and the Indenture Trustee to enforce any obligation (if any) owed to the ABL Agent and the Indenture Trustee, respectively, under the Plan; (6) permitting the ABL Agent and the Indenture Trustee to appear in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court; and (7) permitting the ABL Agent and the Indenture Trustee to perform and seek compensation and reimbursement for any functions that are necessary to effectuate the foregoing; *provided, further*, however, that (a) the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan, or result in any expense or liability to the Debtors or Reorganized Debtors, as applicable, except as expressly provided for in the Plan and (b) except as otherwise provided in the Plan, the terms and provisions of the Plan shall not modify any existing contract or agreement that would in any way be inconsistent with distributions under the Plan.  The ABL Agent and the Trustee shall be discharged and shall have no further obligation or liability except as provided in the Plan and Confirmation Order, and after the performance by the ABL Agent and the Indenture Trustee and their representatives and professionals of any obligations and duties required under or related to the Plan or Confirmation Order, the ABL Agent and the Indenture Trustee shall be relieved of and released from any obligations and duties arising under the Plan, the Confirmation Order, and, respectively, the ABL Credit Agreement and the Indentures, except with respect to such other rights that survive the termination of the Indentures. The fees, expenses, and costs of the ABL Agent and the Indenture Trustee, including fees, expenses, and costs of its professionals incurred after the Effective Date in connection with the ABL Credit Agreement and the Indentures, as applicable, and reasonable and documented costs and expenses associated with effectuating distributions pursuant to the Plan will be paid by the Reorganized Debtors in the ordinary course.

N.      *Cancellation of Notes, Stock, Certificates, Instruments and Agreements*

On the Effective Date, all stock, units, instruments, certificates, agreements and other documents evidencing the Existing Equity Interests will be cancelled, and the obligations of the Debtors thereunder or in any way related thereto will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or any requirement of further action, vote or other approval or authorization by any Person.

O.      *Preservation and Maintenance of Debtors' Causes of Action*

1.      Maintenance of Causes of Action

In accordance with section 1123(b) of the Bankruptcy Code, except as otherwise provided in Article VIII or elsewhere in the Plan or the Confirmation Order, or in any contract, instrument, release or other agreement entered

into in connection with the Plan, on and after the Effective Date, the Reorganized Debtors shall retain any and all rights to commence, pursue, litigate or settle, as appropriate, any and all Causes of Action of the Debtors, whether existing as of the Petition Date or thereafter arising, in any court or other tribunal, including in an adversary proceeding filed in the Chapter 11 Cases, but excluding all Avoidance Actions, which shall be deemed released and waived by the Debtors and Reorganized Debtors as of the Effective Date except for Avoidance Actions brought as counterclaims or defenses to claims asserted against the Debtors. The Reorganized Debtors, as the successors in interest to the Debtors and their Estates, may, in their sole and absolute discretion, and will have the exclusive right to, enforce, sue on, settle, compromise, transfer or assign (or decline to do any of the foregoing) any or all such Causes of Action, without notice to or approval from the Bankruptcy Court. The Reorganized Debtors or their respective successor(s) may pursue such retained claims, rights or Causes of Action, suits or proceedings as appropriate, in accordance with the best interests of the Reorganized Debtors or their respective successor(s) who hold such rights. Upon the Effective Date, the Reorganized Debtors, as applicable, shall be deemed to have released all Preference Actions held by the Debtors, if any. For the avoidance of doubt, in no instance will any Cause of Action maintained or preserved pursuant to this Article IV.O.1 include any Cause of Action with respect to, or against, a Released Party

2.    Preservation of All Causes of Action Not Expressly Settled or Released

Unless a Cause of Action against a Holder of a Claim or an Equity Interest or other Entity is (A) expressly waived, relinquished, released, compromised or settled in the Plan (including and for the avoidance of doubt, the releases contained in Article VIII of the Plan) or any Final Order (including the Confirmation Order), or (B) subject to the discharge and injunction provisions in Article VIII of the Plan, and the Confirmation Order, in the case of each of clauses (A) and (B), the Debtors and the Reorganized Debtors, as applicable, expressly reserve such Cause of Action for later adjudication and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such Causes of Action upon or after the Confirmation of the Plan or the Effective Date of the Plan based on the Plan or the Confirmation Order. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement or the Disclosure Statement to any Causes of Action against it as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against it. The Debtors and the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan. For the avoidance of doubt, in no instance will any Cause of Action maintained or preserved pursuant to this Article IV.O.2 include any Cause of Action with respect to, or against, a Released Party.

P.    *Exemption from Certain Taxes and Fees*

To the maximum extent permitted by section 1146 of the Bankruptcy Code, any post-confirmation (a) issuance, transfer or exchange of any securities, instruments or documents, (b) creation of any Lien, mortgage, deed of trust or other security interest, (c) sale transactions consummated by the Debtors and approved by the Bankruptcy Court, including any transfers effectuated under the Plan, (d) assumption, assignment, or sale by the Debtors of their interests in unexpired leases of nonresidential real property or executory contracts pursuant to section 365(a) of the Bankruptcy Code, (e) grant of collateral under the Exit Take Back Debt Agreement and (f) issuance, renewal, modification or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including the Confirmation Order shall not be subject to any document recording tax, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales tax, use tax or other similar tax or governmental assessment. Consistent with the foregoing, each recorder of deeds or similar official for any county, city or Governmental Unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax or similar tax.

Q.    *Restructuring Expenses*

The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date shall be paid in full in Cash on the Effective Date (to the extent not previously paid during the course of the Chapter 11 Cases) without the requirement to file a fee application with the Bankruptcy Court and without any requirement

for Bankruptcy Court review or approval; *provided*, that, with respect to any such Restructuring Expenses of legal counsel to the Ad Hoc Noteholder Group or the Sponsor Equityholder (subject to the Sponsor Fee Cap), the Debtors and Reorganized Debtors (as applicable) shall have the right to review (subject to applicable attorney-client privilege) and object to any such Restructuring Expenses on reasonableness grounds. All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least five (5) Business Days before the anticipated Effective Date; *provided*, *further*, that such estimate shall not be considered an admission or limitation with respect to such Restructuring Expenses. On the Effective Date, final invoices for all Restructuring Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors.

R.      *Distributions*

Except as otherwise provided in the Plan or the Confirmation Order, all Cash necessary for the Debtors or Reorganized Debtors to make payments required pursuant to the Plan will be paid from the Cash balances of the Debtors or the Reorganized Debtors. Cash payments to be made pursuant to the Plan will be made by the Reorganized Debtors, as applicable, or any designated Affiliates of the Reorganized Debtors on their behalf.

**ARTICLE V.**
**TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

A.      *Debtors Assumption of Executory Contracts and Unexpired Leases*

Except as otherwise provided in the Plan, as of the Effective Date, each Debtor shall be deemed to have assumed each Executory Contract and Unexpired Lease to which it is a party in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, without the need for any further notice to or action, order or approval of the Bankruptcy Court, unless such Executory Contract or Unexpired Lease: (1) was assumed or rejected previously by such Debtor; (2) expired or terminated pursuant to its own terms prior to the Effective Date; (3) is the subject of a motion to reject filed on or before the Effective Date; or (4) identified on the Rejected Executory Contract and Unexpired Lease List (which shall be included in the Plan Supplement) as an Executory Contract or Unexpired Lease designated for rejection. The assumption of Executory Contracts and Unexpired Leases hereunder may include the assignment of certain of such contracts to one or more Reorganized Debtors. The Confirmation Order will constitute an order of the Bankruptcy Court approving the above described assumptions.

Entry of the Confirmation Order by the Bankruptcy Court shall constitute an order approving the rejection of Executory Contracts and Unexpired Leases identified on the Rejected Executory Contract and Unexpired Lease List and assumption or, as applicable, assumption and assignment, of all other Executory Contracts and Unexpired Leases, subject to the exceptions noted above, all pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Notwithstanding anything to the contrary in the Plan, the Debtors or Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Rejected Executory Contract and Unexpired Lease List prior to the Effective Date.

To the maximum extent permitted by law, to the extent that any provision in any Executory Contract or Unexpired Lease assumed, or amended and assumed, and, in either case, potentially assigned, restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption, or amendment and assumption, and, in either case, the potential assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

Except as otherwise provided herein or agreed to by the Debtors and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal and any other interests. Modifications, amendments, supplements and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the

Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

If certain, but not all, of a contract counterparty's Executory Contracts and/or Unexpired Leases are assumed pursuant to the Plan, the Confirmation Order shall be a determination that such counterparty's Executory Contracts and/or Unexpired Leases that are being rejected pursuant to the Plan are severable agreements that are not integrated with those Executory Contracts and/or Unexpired Leases that are being assumed pursuant to the Plan. Parties seeking to contest this finding with respect to their Executory Contracts and/or Unexpired Leases must file a timely objection to the Plan on the grounds that their agreements are integrated and not severable, and any such dispute shall be resolved by the Bankruptcy Court at the Confirmation Hearing (to the extent not resolved by the parties prior to the Confirmation Hearing).

B.      *Claims Based on Rejection of Executory Contracts and Unexpired Leases*

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court within 30 days after the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (2) the effective date of such rejection, or (3) the Effective Date. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors or the Reorganized Debtors, the Estates, or their property without the need for any objection by the Reorganized Debtors of further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Proof of Claim to the contrary. All Allowed Claims arising from the rejection of an Executory Contract or Unexpired Lease shall be classified as General Unsecured Claims and shall be treated in accordance with <u>Article III.B.5</u> of the Plan.

C.      *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*

The Reorganized Debtors shall satisfy any monetary defaults under any Executory Contract or Unexpired Lease to be assumed hereunder, to the extent required by section 365(b)(1) of the Bankruptcy Code, upon assumption thereof in the ordinary course of business. If a counterparty to any Executory Contract or Unexpired Lease believes any amounts are due as a result of such Debtor's monetary default thereunder, it shall assert a Cure Claim against the Debtors or Reorganized Debtors, as applicable, in the ordinary course of business, subject to all defenses the Debtors or Reorganized Debtors may have with respect to such Cure Claim. Any Cure Claim shall be deemed fully satisfied, released and discharged upon payment by the Reorganized Debtors of the applicable Cure Claim; *provided*, that nothing herein shall prevent the Reorganized Debtors from paying any Cure Claim despite the failure of the relevant counterparty to assert or file such request for payment of such Cure Claim. The Debtors, with the consent of the Required Consenting Noteholders, or the Reorganized Debtors, as applicable, may settle any Cure Claims without any further notice to or action, order or approval of the Bankruptcy Court.

As set forth in the notice of the Confirmation Hearing, any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan, including an objection regarding the ability of the Reorganized Debtors to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code), must have been filed with the Bankruptcy Court by the deadline set by the Bankruptcy Court for objecting to Confirmation of the Plan, or such other deadline as may have been established by order of the Bankruptcy Court. To the extent any such objection is not determined by the Bankruptcy Court at the Confirmation Hearing, such objection may be heard and determined at a subsequent hearing. Any counterparty to an Executory Contract or Unexpired Lease that did not timely object to the proposed assumption of any Executory Contract or Unexpired Lease by the deadline established by the Bankruptcy Court will be deemed to have consented to such assumption.

In the event of a dispute regarding (1) the amount of any Cure Claim, (2) the ability of the Reorganized Debtors to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or (3) any other matter pertaining to assumption or the payment of Cure Claims required by section 365(b)(1) of the Bankruptcy Code, payment of a Cure

Claim, if any, shall occur as soon as reasonably practicable after entry of a Final Order or Final Orders resolving such dispute and approving such assumption. The Debtors (with the consent of the Required Consenting Noteholders), or Reorganized Debtors, as applicable, reserve the right at any time prior to the Effective Date to move to reject any Executory Contract or Unexpired Lease based upon the existence of any unresolved dispute or upon a resolution of such dispute that is unfavorable to the Debtors or Reorganized Debtors.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise, and full payment of any applicable Cure Claims pursuant to the Plan, shall result in the full release and satisfaction of any Claims or defaults, whether monetary or non-monetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the date that the Reorganized Debtors assume such Executory Contract or Unexpired Lease. Any Proofs of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

D.    *Assumption of Insurance Policies*

Notwithstanding anything in the Plan to the contrary, all of the Debtors' insurance policies and any agreements, documents or instruments relating thereto, are treated as and deemed to be Executory Contracts under the Plan. On the Effective Date, pursuant to section 365(a) of the Bankruptcy Code, the Reorganized Debtors shall be deemed to have assumed all insurance policies and any agreements, documents and instruments related thereto, including all D&O Liability Insurance Policies. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' assumption of all such insurance policies, including the D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation shall not discharge, impair or otherwise modify any indemnity obligations presumed or otherwise referenced in the foregoing insurance policies, including the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Reorganized Debtors under the Plan as to which no Proof of Claim need be filed, and shall survive the Effective Date.

After the Effective Date, the Reorganized Debtors shall not terminate or otherwise reduce, modify or restrict in any way, the coverage under any D&O Liability Insurance Policy (including such tail coverage liability insurance) in effect or purchased as of the Petition Date, and all members, managers, directors and officers of the Reorganized Debtors who served in such capacity at any time prior to the Effective Date or any other individuals covered by such D&O Liability Insurance Policy shall be entitled to the full benefits of any such policy for the full term of such policy (and all tail coverage related thereto) regardless of whether such members, managers, directors and/or officers remain in such positions after the Effective Date.

E.    *Rejection of MSA and CITIC Agreement*

Notwithstanding anything herein to the contrary, on the Effective Date, the MSA and the CITIC Agreement shall each be rejected pursuant to section 365(a) of the Bankruptcy Code.  In full and complete satisfaction of any and all Claims, rights or obligations under the MSA and the rejection thereof, the Sponsor Equityholder shall be entitled to the MSA Claim.   In full and complete satisfaction of any and all Claims, rights or obligations under the CITIC Agreement and the rejection thereof, CITIC shall be entitled to the CITIC Claim.  As of the Effective Date, each of the MSA Claim and the CITIC Claim shall be Allowed General Unsecured Claims. For the avoidance of doubt and notwithstanding anything herein to the contrary, the Allowed General Unsecured Claims in respect of the MSA Claim and the CITIC Claim shall be paid in Cash on the Effective Date.

F.    *Indemnification*

All indemnification obligations in place as of the Effective Date (whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational or formation documents, board resolutions, indemnification agreements, employment contracts, service contracts, or otherwise) for the current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, as applicable, shall be assumed and remain in full force and effect after the Effective Date, and shall not be modified, reduced, discharged, impaired, or otherwise affected in any way, including by Confirmation of the

Plan, and shall survive unimpaired and unaffected, irrespective of when such obligation arose by the Reorganized Debtors, as applicable.

G.    *Employment Obligations and Programs*

Except as otherwise provided in the Plan, on and after the Effective Date, subject to any Final Order and, without limiting any authority provided to the New Board under the Debtors' respective formation, organizational and constituent documents, the Reorganized Debtors shall adopt, assume, and/or honor in the ordinary course of business any written contracts, agreements, policies, programs, and plans, in accordance with their respective terms, for, among other things, compensation, bonuses, reimbursement, indemnity, health care benefits, disability benefits, deferred compensation benefits, travel benefits, vacation and sick leave benefits, savings, severance benefits, retirement benefits, welfare benefits, relocation programs, life insurance and accidental death and dismemberment insurance, including written contracts, agreements, policies, programs, and plans, in accordance with their respective terms, for bonuses and other incentives or compensation for the Debtors' current and former employees, directors, officers, and managers, including executive compensation programs and all existing compensation arrangements for the employees of the Debtors, in each case on the current terms of such arrangements as may be modified from time to time in the ordinary course of business.

H.    *Workers' Compensation Benefits*

Except as otherwise provided in the Plan, as of the Effective Date, the Debtors and the Reorganized Debtors will continue to honor their obligations under: (i) all applicable workers' compensation laws in states in which the Reorganized Debtors operate; and (ii) the Debtors' written contracts, agreements, agreements of indemnity, self-insurer workers' compensation bonds and any other policies, programs, and plans regarding or relating to workers' compensation and workers' compensation insurance; all such contracts and agreements are treated as Executory Contracts under the Plan and on the Effective Date will be assumed by the Reorganized Debtors pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan will not impair or otherwise modify any rights of the Reorganized Debtors under any such contracts, agreements, policies, programs or plans regarding or relating to workers' compensation or workers' compensation insurance.

I.    *Reservation of Rights*

Nothing contained in the Plan shall constitute an admission by the Debtors, Reorganized Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that the Debtors or Reorganized Debtors have any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption, the Debtors or Reorganized Debtors, as applicable, shall have forty-five (45) calendar days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease, including by rejecting such contract or lease effective as of the Confirmation Date or such other date the Reorganized Debtors deem appropriate.

J.    *Nonoccurrence of Effective Date*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code, unless such deadline(s) have expired.

K.    *Contracts and Leases Entered Into After the Petition Date*

Contracts and leases entered into after the Petition Date by any Debtor and any Executory Contracts and Unexpired Leases assumed by any Debtor may be performed by the applicable Reorganized Debtor in the ordinary course of business.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.    *Distribution Record Date*

Distributions hereunder to the Holders of Allowed Claims and Interests shall be made to the Holders of such Claims and Interests as of the Distribution Record Date. Any transfers of Claims or Interests after the Distribution Record Date shall not be recognized for purposes of the Plan unless otherwise provided herein.

B.    *Dates of Distribution*

Except as otherwise provided in the Plan, on the Effective Date or, if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes an Allowed Claim, or, in either case, as soon as reasonably practicable thereafter, each Holder of an Allowed Claim or Interest shall receive the distributions that the Plan provides for Allowed Claims and Interest in the applicable Class and in the manner provided herein. In the event that any payment or act under the Plan is required to be made or performed on a date that is not on a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. Except as otherwise provided in the Plan, Holders of Claims and Interests shall not be entitled to interest, dividends or accruals on the distributions provided for therein, regardless of whether distributions are delivered on or at any time after the Effective Date.

C.    *Distribution Agent*

Except as otherwise provided in the Plan, all distributions under the Plan, including the distribution of the New Common Stock, shall be made by the Distribution Agent or by such other Entity designated by the Reorganized Debtors as a Distribution Agent on the Effective Date. The Distribution Agent shall not be required to give any bond or surety or other security for the performance of the duties as Distribution Agent unless otherwise ordered by the Bankruptcy Court.

The Distribution Agent shall be empowered to (a) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Plan, (b) make all distributions contemplated hereby, (c) empower professionals to represent it with respect to its responsibilities and (d) exercise such other powers as are necessary and proper to implement the provisions hereof. If the Distribution Agent is an entity other than the Reorganized Debtors, such entity shall be paid its reasonable fees and expenses, including the reasonable fees and expenses of its attorneys or other professionals.

D.    *Cash Distributions*

Distributions of Cash may be made either by check drawn on a domestic bank or electronic transfer from a domestic bank, at the option of the Reorganized Debtors.

E.    *Rounding of Payments*

Whenever payment of a fraction of a dollar would otherwise be called for, the actual payment may reflect a rounding down of such fraction to the nearest whole dollar or zero if the amount is less than one dollar.

No fractional membership units or shares shall be issued or distributed under the Plan. Each Person entitled to receive New Common Stock shall receive the total number of whole units or shares of New Common Stock to which such Person is entitled. Whenever any distribution to a particular Person would otherwise call for the distribution of a fraction of a unit or share of New Common Stock, the actual distribution of units or shares of such New Common Stock shall be rounded down to the nearest whole number.

To the extent Cash, shares, stock or units that are to be distributed under the Plan remain undistributed as a result of the rounding down of such fraction to the nearest whole dollar or whole number of notes, shares, stock or units, such Cash, shares, stock or units shall be treated as an Unclaimed Distribution under the Plan

31

F.      *Allocation Between Principal and Interest*

Distributions to any Holder of an Allowed Claim shall be allocated first to the principal amount of any such Allowed Claim, and then, to the extent the consideration exceeds such amount, to the remainder of such Claim comprising interest accrued through the Effective Date, if any (but solely to the extent that interest is an allowable portion of such Allowed Claim).

G.      *General Distribution Procedures*

The Distribution Agent shall make all distributions of Cash or other property required under the Plan, unless the Plan specifically provides otherwise. All Cash and other property held by the Reorganized Debtors for distribution under the Plan shall not be subject to any claim by any Person, except as provided under the Plan.

H.      *Address for Delivery of Distributions*

Distributions to Holders of Allowed Claims and Interests, to the extent provided for under the Plan, shall be made (1) at the address set forth on any Proofs of Claim filed by such Holders (to the extent such Proofs of Claim are filed in the Chapter 11 Cases), (2) at the address set forth in any written notices of address change delivered to the Debtors, (3) at the address in the Debtors' books and records or (4) in accordance with the Indentures in the case of distributions to Holders of Secured Notes Claims.

I.      *Unclaimed Distributions*

If the distribution to any Holder becomes an Unclaimed Distribution, no further distribution shall be made to such Holder, and the Reorganized Debtors shall have no obligation to make any further distribution to such Holder.

Such Unclaimed Distribution and such Holder's rights to the distribution or any subsequent distribution shall be deemed forfeit under the Plan. Notwithstanding any federal or state escheat, abandoned or unclaimed property laws to the contrary, such Unclaimed Distribution and any subsequent distributions on account of such Holder's Allowed Claim or Interest shall be deemed disallowed, discharged and forever barred as unclaimed property under section 347(b) of the Bankruptcy Code and shall revert to and vest in the Reorganized Debtors free of any restrictions thereon. Holders that fail to claim such Unclaimed Distribution shall have no claim whatsoever on account of such Unclaimed Distribution, or any subsequent distributions, against the Debtors or the Reorganized Debtors or against any Holder of an Allowed Claim or Interest to whom distributions are made by the Reorganized Debtors.

J.      *Withholding Taxes*

Pursuant to section 346(f) of the Bankruptcy Code, the Reorganized Debtors shall, to the extent applicable, comply with all withholding and reporting requirements imposed by federal, state or local taxing authorities and shall be entitled to deduct any federal, state or local withholding taxes from any distributions made with respect to Allowed Claims or Interests, as appropriate. From and as of the Effective Date, the Reorganized Debtors shall comply with all reporting obligations imposed on them by any Governmental Unit in accordance with applicable Law with respect to such withholding taxes. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate. The Reorganized Debtors may require that a Holder entitled to receive a distribution pursuant to the Plan provide such Holder's taxpayer identification number and such other information and certification as may be necessary for the Reorganized Debtors to comply with applicable tax reporting and withholding laws. Notwithstanding the foregoing, each Holder that is to receive a distribution hereunder shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding and other tax obligations, on account of such distribution.

*K.*     *No Postpetition Interest on Claims*

Unless otherwise specifically provided for in an order of the Court, the Plan or the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims or Interests, and no Holder of a Claim or Equity Interest shall be entitled to interest, dividends or other accruals accruing on or after the Petition Date on any such Claim or Equity Interest.

*L.*     *Setoffs*

Except as otherwise expressly provided for herein, the Reorganized Debtors may, to the extent permitted under applicable law, setoff against any Allowed Claim and any distributions to be made pursuant to the Plan on account of such Allowed Claim, the claims, rights and Causes of Action of any nature that the Reorganized Debtors may hold against the Holder of such Allowed Claim that are not otherwise waived, released or compromised in accordance with the Plan; *provided*, that neither such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtors of any such claims, rights and Causes of Action that the Reorganized Debtors possesses against such Holder; *provided, further,* that no such setoff shall be permitted against any (1) CITIC Claim, (2) MSA Claim, (3) Allowed Secured Notes Claim or (4) any distributions to be made pursuant to the Plan on account of any such Allowed Secured Notes Claim.

*M.*     *Surrender of Cancelled Instruments or Securities*

Except as otherwise provided herein, as a condition precedent to receiving any distribution on account of its Allowed Claim or Interest, each Holder of an Allowed Claim or Interest in the Voting Classes based upon an instrument or other security shall be deemed to have surrendered such instrument, security or other documentation underlying such Claim and all such surrendered instruments, securities and other documentation shall be deemed cancelled pursuant to Article IV.O of the Plan.

# ARTICLE VII.
## PROCEDURES FOR RESOLVING DISPUTED CLAIMS AND INTERESTS

*A.*     *Disputed Claims Process*

Holders of Claims generally are not required to file a Proof of Claim with the Bankruptcy Court and shall be subject to the Bankruptcy Court process only to the extent provided in the Plan. On and after the Effective Date, except as otherwise provided in the Plan, all Allowed Claims shall be paid pursuant to the Plan in the ordinary course of business of the Reorganized Debtors and shall survive the Effective Date as if the Chapter 11 Cases had not been commenced. Other than Claims arising from the rejection of an Executory Contract or Unexpired Lease, if the Debtors or the Reorganized Debtors dispute any Claim, such dispute shall be determined, resolved, or adjudicated, as the case may be, in a manner as if the Chapter 11 Cases had not been commenced and shall survive the Effective Date as if the Chapter 11 Cases had not been commenced.

With respect to Claims arising from the rejection of an Executory Contract or Unexpired Lease, any Proof of Claim filed shall—without the need for notice to or action, order, or approval of the Bankruptcy Court—be deemed Disputed unless the Debtors or the Reorganized Debtors, as applicable, determine otherwise, or until such time as such Disputed Claim is deemed Allowed by a Final Order or as otherwise set forth in this Article VII of the Plan. All Proofs of Claim required to be filed by the Plan that are filed after the date that they are required to be filed pursuant to the Plan shall be disallowed and forever barred, estopped and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any further notice to or action, order or approval of the Bankruptcy Court.

*B.*     *Claims Administration Responsibilities*

Except as otherwise specifically provided in the Plan, after the Effective Date, the Reorganized Debtors shall have the sole authority to: (1) file, withdraw, or litigate to judgment, objections to Claims; (2) settle or compromise any Disputed Claim without any further notice to or action, order or approval by the Bankruptcy Court; and (3)

administer and adjust the Claims Register to reflect any such settlements, compromises or withdrawals without any further notice to or action, order or approval by the Bankruptcy Court, *provided, however,* that the Reorganized Debtors shall not have the authority to object to the MSA Claim or the CITIC Claim, each of which shall be Allowed General Unsecured Claims. For the avoidance of doubt, except as otherwise provided in the Plan, from and after the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor or its assignor had immediately prior to the Effective Date with respect to any Disputed Claim, including the Causes of Action retained pursuant to Article V.M of the Plan.

C.      *Estimation of Claims and Interests*

        Before or after the Effective Date, the Debtors, with the reasonable consent of the Required Consenting Noteholders, or the Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the appeal relating to such objection. Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any Disputed Claim or contingent or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has filed a motion requesting the right to seek reconsideration on or before twenty-one (21) days after the date on which such Claim is estimated. All of the aforementioned Claims and objection, estimation and resolution procedures are cumulative and not exclusive of each other. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

D.      *Amendments to Claims; Adjustment to Claims Register*

        On or after the Effective Date, except as provided in the Plan or the Confirmation Order, a Claim may not be filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors, and any such new or amended Claim filed without such prior authorization shall be deemed disallowed in full and expunged without any further action, order or approval of the Bankruptcy Court. Any duplicate Claim or any Claim that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register by the Reorganized Debtors without the Reorganized Debtors having to file an application, motion, complaint, objection or any other legal proceeding seeking to object to such Claim and without any further notice to or action, order or approval of the Bankruptcy Court.

E.      *No Distributions Pending Allowance*

        Notwithstanding any other provision hereof, if any portion of a Claim is a Disputed Claim, no payment or distribution provided hereunder shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

F.      *Distributions After Allowance*

        To the extent that a Disputed Claim or Interest ultimately becomes an Allowed Claim or Interest, distributions (if any) shall be made to the Holder of such Allowed Claim or Interest in accordance with the provisions of the Plan.  As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim or Interest becomes a Final Order, the Distribution Agent shall provide to the Holder of such Claim or Interest the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim or Interest.

G.    *No Interest*

Interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

H.    *Single Satisfaction of Claims*

Holders of Allowed Claims may assert such Claims against each Debtor obligated with respect to such Claims, and such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against each obligated Debtor based upon the full Allowed amount of such Claims. Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan on account of any Allowed Claim exceed 100 percent of the underlying Allowed Claim plus applicable interest, if any.

I.    *Tax Treatment of Claim Distribution Amounts*

Property deposited into any Claim distribution accounts described elsewhere in the Plan (but for the avoidance of doubt, not including the Professional Fee Escrow) will be subject to "disputed ownership fund" treatment under section 1.468B-9 of the United States Treasury Regulations. All corresponding elections with respect to such accounts shall be made, and such treatment shall be applied to the extent possible for state, local, and non-U.S. tax purposes. Under such treatment, a separate federal income tax return shall be filed with the IRS with respect to such accounts, any taxes (including with respect to interest, if any, or appreciation in property between the Effective Date and date of distribution) imposed on such accounts shall be paid out of the assets of such accounts (and reductions shall be made to amounts disbursed from such accounts to account for the need to pay such taxes).

## ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.    *Compromise and Settlement of Claims, Interests, and Controversies*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against, and Interests in, the Debtors and their Estates and Causes of Action against other Entities.

B.    *Discharge of Claims and Termination of Interests*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims, (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors) Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors before the Effective Date and that arise from a termination of employment, any contingent or

non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan. Any default or "event of default" by the Debtors or Affiliates with respect to any Claim or Interest that existed immediately before or on account of the filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

C.    *Release of Liens*

**Except (a) with respect to the Liens securing (1) the Exit Facilities, (2) Other Secured Claims that are Reinstated pursuant to the Plan, and (3) obligations pursuant to Executory Contracts and Unexpired Leases assumed pursuant to the Plan, or (b) as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates and, subject to the consummation of the applicable distributions contemplated in the Plan, shall be fully released and discharged, at the sole cost of and expense of the Reorganized Debtors, and the Holders of such mortgages, deeds of trust, Liens, pledges, or other security interests shall execute such documents as may be reasonably requested by the Debtors or the Reorganized Debtors, as applicable, to reflect or effectuate such releases, and all of the right, title, and interest of any Holders of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtor and its successors and assigns.**

D.    *Releases by the Debtors*

**Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtors, the Reorganized Debtors, and their Estates from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest, or that any Holder of any Claim or Interest could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part:**

**(a)    the Debtors, the Debtors' restructuring efforts, intercompany transactions, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement;**

**(b)    any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Entity on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, or the Plan;**

**(c)    the Chapter 11 Cases, the Disclosure Statement, the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement; or**

**(d)    any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.**

**Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any (i) post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to**

implement the Plan, or (ii) claims related to any act or omission that is determined in a final order to have constituted actual fraud or willful misconduct.

E.    *Releases by Holders of Claims and Interests of the Debtors*

As of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part:

(a)    the Debtors, the Debtors' restructuring efforts, intercompany transactions, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement;

(b)    any transaction that is part of the Restructuring Transactions, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Entity on the Plan or the order confirming the Plan in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, or the Plan;

(c)    the Chapter 11 Cases, the Disclosure Statement, the Plan, the filing of the Chapter 11 Cases, the pursuit of confirmation of the Plan, the pursuit of consummation of the Plan, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement; or

(d)    any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any (i) post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, or (ii) claims related to any act or omission that is determined in a final order to have constituted actual fraud or willful misconduct.  Notwithstanding anything herein to the contrary, nothing herein shall be intended to be a release of (a) the Sponsor Equityholder's (i) Secured Notes Claims, or (ii) Claims under the MSA, or (b) Claims arising under the Restructuring Support Agreement, and such Claims in each case are hereby expressly reserved.

F.    *Exculpation*

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or termination of the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan, or any Restructuring Transaction, contract, instrument, release or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission constitutes actual fraud, willful misconduct, or gross negligence.  The Exculpated Parties have, and, upon completion of the Plan, shall be deemed to have participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable

**law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.**

G.      *Injunction*

**All Entities that have held, hold, or may hold Causes of Action, claims or interests that have been released pursuant to the Plan, or that have been discharged pursuant to the Plan, or that are subject to exculpation pursuant to the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, or the Released Parties:  (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Causes of Action, claims or interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Causes of Action, claims or interests; (c) creating, perfecting, or enforcing any lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Causes of Action, claims or interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Causes of Action, claims or interests unless such Entity has timely asserted such setoff right in a document filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a Cause of Action, claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable Law or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Causes of Action, claims or interests released or settled pursuant to the Plan.**

H.      *Protection Against Discriminatory Treatment*

In accordance with section 525 of the Bankruptcy Code, and consistent with paragraph 2 of Article VI of the United States Constitution, no Governmental Unit shall discriminate against any Reorganized Debtor, or any Entity with which a Reorganized Debtor has been or is associated, or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because such Reorganized Debtor was a Debtor under chapter 11, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before such Debtor was granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

I.      *Recoupment*

In no event shall any Holder of Claims or Interests be entitled to recoup any Claim or Interest against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

J.      *Reimbursement or Contribution*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the Effective Date, such Claim shall be forever disallowed notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Effective Date (a) such Claim has been adjudicated as noncontingent, or (b) the relevant Holder of a Claim has filed

a noncontingent Proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer contingent.

K.      *Term of Injunctions or Stays*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases (pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court) and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

L.      *Document Retention*

On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors.

## ARTICLE IX.
## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

A.      *Conditions Precedent to the Effective Date.*

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to Article IX.B of the Plan:

1.      the Bankruptcy Court shall have entered the Confirmation Order, which shall be in form and substance reasonably acceptable to the Required Consenting Noteholders, and the Confirmation Order shall not be stayed, modified, or vacated, and shall not be subject to any pending appeal, and the appeals period for the Confirmation Order shall have expired; *provided* that the requirement that the Confirmation Order not be subject to any pending appeal and the appeals period for the Confirmation Order shall have expired may be waived by any Consenting Noteholder.

2.      the Restructuring Support Agreement shall continue to be in full force and effect;

3.      All actions, documents, and agreements necessary to implement and consummate the Plan shall have been effected and executed and remain in full force and effect;

4.      the Debtors shall have paid or reimbursed all Restructuring Expenses;

5.      amounts sufficient to pay the Professional Fee Claims of all of the Debtors' Professionals, including those of (a) Gibson, Dunn & Crutcher LLP, as proposed counsel to the Debtors, (b) Young Conaway Stargatt & Taylor, LLP, as proposed co-counsel to the Debtors, and (c) Huron Consulting Group, as financial advisor to the Debtors shall have been placed in the Professional Fee Escrow Account pending approval of the Professional Fee Claims by the Bankruptcy Court;

6.      each document or agreement constituting the Definitive Documents shall be in form and substance consistent with the Restructuring Support Agreement.

7.      all governmental approvals and consents that are legally required for the consummation of the Restructuring Transactions shall have been obtained.

B.      *Waiver of Conditions Precedent*

Other than the condition set forth in Article IX.A.4. of the Plan, the Debtors, with the consent of the Required Consenting Noteholders, may waive any of the conditions to the Effective Date set forth in Article IX.A of the Plan

at any time without any notice to any other parties in interest and without any further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than proceeding to confirm and consummate the Plan.

C.    *Substantial Consummation*

"Substantial Consummation" of the Plan, as defined in section 1101(2) of the Bankruptcy Code, with respect to any of the Debtors, shall be deemed to occur on the Effective Date with respect to such Debtor.

D.    *Effect of Non-Occurrence of Conditions to Consummation*

If the Effective Date does not occur with respect to any of the Debtors, the Plan shall be null and void in all respects with respect to such Debtor, and nothing contained in the Plan or the Disclosure Statement shall: (a) constitute a waiver or release of any Claims by or Claims against or Interests in such Debtors; (b) prejudice in any manner the rights of such Debtors, any Holders of a Claim or Interest, or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking by such Debtors, any Holders, or any other Entity in any respect.

### ARTICLE X.
### MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.    *Modification of Plan*

The Debtors, with the consent of the Required Consenting Noteholders, subject to the Required Consenting Equityholders Consent Right, reserve the right to modify the Plan prior to Confirmation and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Debtors, with the consent of the Required Consenting Noteholders, expressly reserve their rights to alter, amend, or modify materially the Plan, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan. A Holder of a Claim or Interest that has accepted the Plan shall be deemed to have accepted the Plan, as amended, supplemented, amended and restated, or otherwise modified, if the proposed amendment, supplement, amendment and restatement, or other modification does not materially and adversely change the treatment of the Claim or Equity Interest of such Holder, or release any claims or liabilities reserved by such Holder under the Plan. Prior to the Effective Date, the Debtors may make appropriate technical adjustments to the Plan without further order or approval of the Bankruptcy Court; *provided*, that such technical adjustments or modifications shall be satisfactory to the Required Consenting Noteholders and subject to the Required Consenting Equityholders Consent Right. Notwithstanding anything to the contrary contained herein, the Debtors or the Reorganized Debtors, as applicable, shall not amend or modify the Plan other than in a manner that is not inconsistent with the Restructuring Support Agreement.

B.    *Effect of Confirmation on Modifications*

Entry of the Confirmation Order shall constitute approval of all modifications to the Plan occurring after the solicitation thereof pursuant to section 1127(a) of the Bankruptcy Code and a finding that such modifications to the Plan do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.    *Revocation or Withdrawal of Plan*

The Debtors, with the prior written consent of the Required Consenting Noteholders to the extent the Restructuring Support Agreement remains in full force and effect, reserve the right to revoke or withdraw the Plan before the Confirmation Date and to file subsequent chapter 11 plans, but without prejudice to the respective parties' rights under the Restructuring Support Agreement. If the Debtors revoke or withdraw the Plan, or if the Confirmation Date or the Effective Date does not occur, then: (a) the Plan will be null and void in all respects; (b) any settlement

or compromise embodied in the Plan, assumption of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant hereto will be null and void in all respects; and (c) nothing contained in the Plan shall (1) constitute a waiver or release of any Claims, Interests, or Causes of Action, (2) prejudice in any manner the rights of any Debtor or any other Entity, or (3) constitute an admission, acknowledgement, offer, or undertaking of any sort by any Debtor or any other Entity.

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.      allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Claim or Interest and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.      resolve any matters related to Executory Contracts or Unexpired Leases, including:  (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure Claims arising therefrom, including pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

4.      ensure that distributions to Holders of Allowed Claims and Interests (as applicable) are accomplished pursuant to the provisions of the Plan and adjudicate any and all disputes arising from or relating to distributions under the Plan;

5.      adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.      enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of (a) contracts, instruments, releases, indentures, and other agreements or documents approved by Final Order in the Chapter 11 Cases and (b) the Plan, the Confirmation Order, and contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan;

7.      enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

8.      grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

9.      adjudicate, decide, or resolve any and all matters related to the Restructuring Transactions;

10.     adjudicate, decide, or resolve any and all matters related to enforcement of the Restructuring Support Agreement;

11.     issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

12.     resolve any cases, controversies, suits, disputes, Causes of Action, or any other matters that may arise in connection with the Consummation, interpretation, or enforcement of the Plan, the Disclosure Statement, the Confirmation Order, or the Restructuring Transactions, or any Entity's obligations incurred in connection with the foregoing, including disputes arising under agreements, documents, or instruments executed in connection with the Plan, the Disclosure Statement, the Confirmation Order, or the Restructuring Transactions;

13.     hear, determine, and resolve any cases, matters, controversies, suits, disputes, or Causes of Action in connection with or in any way related to the Chapter 11 Cases, including:  (a) with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or an Interest for amounts not timely repaid pursuant to Article VI.J.1 of the Plan; (b) with respect to the releases, injunctions, and other provisions contained in Article VIII of the Plan, including entry of such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions; (c) that may arise in connection with the Consummation, interpretation, implementation, or enforcement of the Plan, the Confirmation Order, and, subject to any applicable forum selection clauses, contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan; or (d) related to section 1141 of the Bankruptcy Code;

14.     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

15.     consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

16.     hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

17.     enter an order or Final Decree concluding or closing the Chapter 11 Cases;

18.     enforce all orders previously entered by the Bankruptcy Court; and

19.     hear any other matter not inconsistent with the Bankruptcy Code.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter, including the matters set forth in Article XI of the Plan, the provisions of this Article XI shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A.     *Immediate Binding Effect*

Subject to Article IX.A hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and Definitive Documents (including any such Definitive Documents included in the Plan Supplement) shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtors to Executory Contracts and Unexpired Leases with the Debtors.

B.     *Additional Documents*

On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and the Restructuring Support Agreement.  The Debtors or the Reorganized Debtors, as applicable, and all Holders of Claims and Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to

time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.      *Reservation of Rights*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court has entered the Confirmation Order and the Effective Date shall have occurred.  None of the filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

D.      *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

E.      *Service of Documents*

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided in the Plan, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

**If to the Debtors or Reorganized Debtors:**

Northwest Hardwoods, Inc.
1313 Broadway, Suite 300
Tacoma, WA 98402
Attention:  Nathan Jeppson
Email:  legal.notices@nwhardwoods.com

With copies to:

Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, New York, 10166
Facsimile:  (212) 351-4035
Attention:  David M. Feldman, J. Eric Wise, Matthew K. Kelsey and Alan Moskowitz
Email:  DFeldman@gibsondunn.com
        EWise@gibsondunn.com
        MKelsey@gibsondunn.com
        AMoskowitz@gibsondunn.com

        -and-

Young Conaway Stargatt & Taylor, LLP
Rodney Square
1000 North King Street
Wilmington, DE 19801
Facsimile: (302) 571-1253
Attention:    Sean M. Beach, Jacob D. Morton
Email:    sbeach@ycst.com
            jmorton@ycst.com

**If to the Consenting Noteholders:**

To each Consenting Lender at the addresses or e-mail addresses set forth below the Consenting Noteholder's signature page to the Restructuring Support Agreement (or to the signature page to a Joinder or Transfer Agreement in the case of any Consenting Noteholders that become a party thereto after the Restructuring Support Agreement effective date).

With copies to:

Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY 10019
Attention:  Jeffrey D. Pawlitz, Weston T. Eguchi, and Agustina G. Berro
Email:      jpawlitz@willkie.com
            weguchi@willkie.com
            aberro@willkie.com

**If to the Consenting Equityholders:**

To each Consenting Equityholder at the addresses or e-mail addresses set forth below the Consenting Equityholder's signature page to the Restructuring Support Agreement.

After the Effective Date, the Reorganized Debtors shall have the authority to send a notice to Entities that continue to receive documents pursuant to Bankruptcy Rule 2002 requiring such Entity to file a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Reorganized Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have filed such renewed requests.

F.    *Entire Agreement*

Except as otherwise indicated, and without limiting the effectiveness of the Restructuring Support Agreement, the Plan (including, for the avoidance of doubt, the Plan Supplement) supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

G.    *Exhibit and Plan Supplement*

All exhibits and documents included in the Plan and Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are filed, copies of such exhibits and documents shall be made available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website cases.primeclerk.com/nwh or the Bankruptcy Court's website at https://ecf.deb.uscourts.gov/.  Unless otherwise ordered by the Bankruptcy Court, to the extent any exhibit or document in the Plan Supplement is inconsistent with the terms of any part of the Plan that does not constitute the Plan Supplement, such exhibit or document in the Plan Supplement shall control.  The documents in the Plan Supplement are an integral part of the Plan and shall be deemed approved by the Bankruptcy Court pursuant to the Confirmation Order.

H.    *Non-Severability*

Except as set forth in Article VIII of the Plan, the provisions of the Plan, including its release, injunction, exculpation and compromise provisions, are mutually dependent and non-severable.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan is:  (a) valid and enforceable pursuant to its terms; (b) integral to the Plan; and (c) non-severable and mutually dependent.

I.        *Votes Solicited in Good Faith*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors, the Consenting Stakeholders, and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, no such parties, individuals, or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

J.        *Waiver or Estoppel*

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, the Restructuring Support Agreement, or papers filed with the Bankruptcy Court prior to the Confirmation Date.

K.        *No Strict Construction*

The Plan is the product of extensive discussions and negotiations between and among, *inter alia*, the Debtors, the Consenting Stakeholders and their respective professionals. Each of the foregoing was represented by counsel of its choice who either (a) participated in the formulation and documentation of, or (b) was afforded the opportunity to review and provide comments on, the Plan, the Plan Supplement, the Disclosure Statement, and the agreements and documents contemplated therein or related thereto. Accordingly, unless explicitly indicated otherwise, the general rule of contract construction known as "*contra proferentem*" or other rule of strict construction shall not apply to the construction or interpretation of any provision of the Plan, the Plan Supplement, the Disclosure Statement, and the documents contemplated thereunder and related thereto.

L.        *Closing of Chapter 11 Cases*

On and after the Effective Date, the Debtors or Reorganized Debtors shall be permitted to close the Chapter 11 Cases of HHI and Hardwoods Intermediate Holdings II, Inc., and all contested matters relating to any of the Debtors, including objections to Claims, shall be administered and heard in the Chapter 11 Case of Northwest Hardwoods, Inc., irrespective of whether such Claim(s) were Filed against any other Debtor.

When substantial consummation of the Plan is achieved, the Reorganized Debtors shall seek authority to close the Chapter 11 Case of Northwest Hardwoods, Inc. in accordance with the Bankruptcy Code and the Bankruptcy Rules.

Dated:  November 13, 2020

Respectfully submitted,

By:      */s/ Christopher Hannon*
Name:    Christopher Hannon
Title:     Chief Financial Officer, Northwest Hardwoods, Inc.

**Exhibit B**

**Corporate Structure of the Debtors**





**Exhibit C**

**Restructuring Support Agreement**

HARDWOODS HOLDINGS INC., *ET AL.*,

RESTRUCTURING SUPPORT AGREEMENT

**October 21, 2020**

**THIS RESTRUCTURING SUPPORT AGREEMENT AND THE DOCUMENTS ATTACHED HERETO COLLECTIVELY DESCRIBE A PROPOSED RESTRUCTURING OF THE COMPANY PARTIES THAT WILL BE EFFECTUATED EITHER THROUGH FILING CHAPTER 11 CASES IN THE BANKRUPTCY COURT OR PURSUANT TO AN OUT-OF-COURT RESTRUCTURING.**

**THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER OR A SOLICITATION WITH RESPECT TO ANY SECURITIES OF THE COMPANY PARTIES IN ANY JURISDICTION WHERE IT IS UNLAWFUL TO DO SO OR A SOLICITATION OF VOTES WITH RESPECT TO A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION SHALL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE, AS APPLICABLE. NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, BINDING ON ANY OF THE PARTIES HERETO.**

**THIS RESTRUCTURING SUPPORT AGREEMENT IS THE PRODUCT OF SETTLEMENT DISCUSSIONS AMONG THE PARTIES THERETO. ACCORDINGLY, THIS RESTRUCTURING SUPPORT AGREEMENT IS PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER APPLICABLE STATUTES OR DOCTRINES PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL SETTLEMENT DISCUSSIONS.**

**THIS RESTRUCTURING SUPPORT AGREEMENT DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, REPRESENTATIONS, WARRANTIES, AND OTHER PROVISIONS WITH RESPECT TO THE TRANSACTIONS DESCRIBED HEREIN, WHICH TRANSACTIONS WILL BE SUBJECT TO THE COMPLETION OF DEFINITIVE DOCUMENTS INCORPORATING THE TERMS SET FORTH HEREIN AND THE CLOSING OF ANY TRANSACTION SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTS AND THE APPROVAL RIGHTS OF THE PARTIES SET FORTH HEREIN AND IN SUCH DEFINITIVE DOCUMENTS.**

This RESTRUCTURING SUPPORT AGREEMENT (including all exhibits, annexes, and schedules hereto in accordance with Section 13.02, this "**Agreement**") is made and entered into as of October 21, 2020 (the "**Execution Date**"), by and among the following parties (each of the following described in sub-clauses (i) through (iii) of this preamble, collectively, the "**Parties**"):[1]

    i.    Hardwoods Holdings, Inc., a company incorporated under the Laws of Delaware ("**Holdings**"), and each of its Affiliates listed on **Exhibit A** to this Agreement that have executed and delivered counterpart signature pages to this Agreement to counsel to the Consenting Stakeholders (the Entities in this clause (i), each a "**Company Party**," and collectively, the "**Company Parties**");

    ii.    the undersigned holders of, or investment advisors, sub-advisors, or managers of discretionary accounts that hold, the Notes that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement to counsel to the Company Parties (the Entities in this clause (ii), collectively, but excluding Consenting Equityholders who hold Notes (as defined below), the "**Consenting Noteholders**"); and

    iii.    Littlejohn & Co. LLC (collectively with its affiliates, the "**Sponsor Equityholder**") and the other undersigned holders of Holdings Equity Interests that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement to counsel to the Company Parties (the "**Other Equityholders**" and together with the Sponsor Equityholder, the "**Consenting Equityholders**" and, together with the Consenting Noteholders, the "**Consenting Stakeholders**").

### *RECITALS*

**WHEREAS**, the Company Parties and the Consenting Stakeholders have in good faith and at arms' length negotiated or been apprised of certain restructuring and recapitalization transactions with respect to the Company Parties' capital structure on the terms set forth in this Agreement and as specified in the term sheet attached as **Exhibit B** hereto (the "**Restructuring Term Sheet**" and, such transactions as described in this Agreement and the Restructuring Term Sheet, the "**Restructuring Transactions**");

**WHEREAS**, the Company Parties intend to implement the Restructuring Transactions in accordance with the terms set forth in this Agreement by either (i) a transaction other than through cases commenced pursuant to chapter 11 of the Bankruptcy Code (the "**Out-of-Court Restructuring**") or (ii) commencing voluntary cases under chapter 11 of the Bankruptcy Code in the Bankruptcy Court (an "**In-Court Restructuring**," and the cases commenced, the "**Chapter**

---

[1]    Capitalized terms used but not defined in the preamble and recitals to this Agreement have the meanings ascribed to them in Section 1.

**11 Cases**"), in either case, in accordance with the terms and conditions set forth herein and in the Restructuring Term Sheet;

**WHEREAS**, the Parties have agreed to take certain actions in support of the Restructuring Transactions on the terms and conditions set forth in this Agreement and the Restructuring Term Sheet;

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

*AGREEMENT*

**Section 1.**     *Definitions and Interpretation.*

1.01.     Definitions.  The following terms shall have the following definitions:

"**2014 Notes**" means the 7.500% Senior Secured Notes due 2021 issued under the 2014 Indenture.

"**2014 Indenture**" means that certain Indenture, dated as of July 18, 2014 (as amended, modified, or supplemented from time to time) by and between Hardwoods Acquisition, Inc. and The Bank of New York Mellon, as trustee and notes collateral agent.

"**2015 Notes**" means the 7.500% Senior Secured Notes due 2021 issued under the 2015 Indenture.

"**2015 Indenture**" means that certain Indenture, dated as of February 20, 2015 (as amended, modified, or supplemented from time to time) by and between NWH Escrow Corporation and The Bank of New York Mellon, as trustee and notes collateral agent.

"**Affiliate**" shall have the meaning set forth in section 101(2) of the Bankruptcy Code.

"**Agreement**" has the meaning set forth in the preamble to this Agreement and, for the avoidance of doubt, includes all the exhibits, annexes, and schedules hereto in accordance with Section 13.02 (including the Restructuring Term Sheet).

"**Agreement Effective Date**" means the date on which the conditions set forth in Section 2 have been satisfied or waived by the appropriate Party or Parties in accordance with this Agreement.

"**Agreement Effective Period**" means, with respect to a Party, the period from the Agreement Effective Date to the Termination Date applicable to that Party.

"**Alternative Transaction**" means any inquiry, proposal, offer, bid, term sheet, discussion, or agreement with respect to a sale, disposition, new-money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt investment, equity investment, liquidation, tender offer, asset sale, share issuance, recapitalization, plan of

reorganization, share exchange, business combination, joint venture or similar transaction involving any one or more Company Parties or the debt, equity, or other interests in any one or more Company Parties that is an alternative to one or more of the Restructuring Transactions or which would prevent or otherwise frustrate or impede in any material respect one or more of the Restructuring Transactions, or is otherwise inconsistent in any material respect with the Definitive Documents.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

"**Bankruptcy Court**" means the United States Bankruptcy Court in which the Chapter 11 Cases are commenced or another United States Bankruptcy Court with jurisdiction over the Chapter 11 Cases.

"**Business Day**" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York.

"**Causes of Action**" means any action, Claim, cause of action, controversy, demand, right, action, lien, indemnity, Interest, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, whether known, unknown, contingent or noncontingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, in contract or in tort, in law or in equity, or pursuant to any other theory of law.

"**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

"**Claim**" has the meaning ascribed to it in section 101(5) of the Bankruptcy Code.

"**Company**" means Holdings and all of its Affiliates, excluding, for the avoidance of doubt, the Sponsor Equityholder and any of its affiliates.

"**Company Claims/Interests**" means any Claim against, or Equity Interest in, a Company Party, including the Secured Notes Claims, and the Equity Interests.

"**Company Parties**" has the meaning set forth in the recitals to this Agreement.

"**Confidentiality Agreement**" means an executed confidentiality agreement, including with respect to the issuance of a "cleansing letter" or other public disclosure of material non-public information agreement, in connection with any proposed Restructuring Transactions.

"**Confirmation Order**" means the confirmation order with respect to the Plan.

"**Consenting Equityholders**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Noteholders**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Noteholders Fees and Expenses**" has the meaning set forth in Section 13.20.

"**Consenting Stakeholders**" has the meaning set forth in the preamble to this Agreement.

"**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.  "Controlling" and "Controlled" have meaning correlative thereto.

"**Debtors**" means the Company Parties that commence the Chapter 11 Cases.

"**Definitive Documents**" means the documents listed in Section 3.01.

"**Disclosure Statement**" means the related disclosure statement with respect to the Plan.

"**Disclosure Statement Order**" means the order of the Bankruptcy Court approving the Disclosure Statement and the Solicitation Materials pursuant to Section 1125 of the Bankruptcy Code and modification of the automatic stay to permit the Consenting Stakeholders to provide any notices, including notices of termination, with respect to this Agreement in accordance with the terms hereof or thereof, which, for the avoidance of doubt, may be combined with the Confirmation Order, if applicable.

"**Effective Date**" means the date on which all conditions to consummation of the Plan or the Out-of-Court Restructuring (as applicable), have been satisfied in full or waived, in accordance with the terms of the Plan or the Out-of-Court Restructuring (as applicable), and the Plan or Out-of-Court Restructuring (as applicable) becomes effective.

"**Entity**" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

"**Equity Interests**" means, collectively, the shares (or any class thereof), common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests of any Company Party, and options, warrants, rights, or other securities or agreements to acquire or subscribe for, or which are convertible into the shares (or any class thereof) of, common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any Company Party (in each case whether or not arising under or in connection with any employment agreement).

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended.

"**Exchange Documents**" means any agreements, notices, instruments or other documents setting forth the terms and conditions, including releases, transaction steps and mechanics, of an Out-of-Court Restructuring.

"**Execution Date**" has the meaning set forth in the preamble to this Agreement.

"**Exit Intercreditor Agreement**" means an intercreditor agreement by and among the agent under the Exit Take-Back Debt Facility and the agent under the Exit ABL Facility.

"**Final Order**" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or a new trial, reargument or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice.

"**Financing Order**" means any order entered in the Chapter 11 Cases authorizing debtor in possession financing or the use of cash collateral (whether interim or final).

"**First Day Pleadings**" means the first-day pleadings that the Company Parties determine are necessary or desirable to file.

"**Gibson Dunn**" means Gibson, Dunn & Crutcher LLP, counsel to the Company Parties.

"**Governance Documents**" means the organizational and governance documents for Reorganized Holdings and its subsidiaries and affiliates, including without limitation, certificates of incorporation, certificates of formation or certificates of limited partnership (or equivalent organizational documents), bylaws, limited liability company agreements (or equivalent governing documents), as applicable.

"**Guggenheim**" means Guggenheim Securities, LLC, investment banker and financial advisor to certain of the Consenting Noteholders.

"**Holdings**" has the meaning set forth in the preamble to this Agreement.

"**In-Court Restructuring**" has the meaning set forth in the preamble to this Agreement.

"**Indentures**" means the 2014 Indenture and the 2015 Indenture.

"**Indenture Documents**" means, collectively, the Indentures and all other agreements, documents, and instruments related thereto, including any notes, guarantee agreements, forbearance agreements, pledge and collateral agreements, intercreditor agreements, subordination agreements, and other security documents.

"**Indenture Trustee**" means The Bank of New York Mellon, acting through such of its affiliates or branches as it may designate, in its capacity as trustee and notes collateral agent under the Indentures, or any successor trustee or notes collateral agent as permitted by the terms set forth in the Indentures.

"**Interest**" means, collectively, the shares (or any class thereof), common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests of any Company Party, and options, warrants, rights, or other securities or agreements to acquire or subscribe for, or which are convertible into the shares (or any class thereof) of, common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests

of any Company Party (in each case whether or not arising under or in connection with any employment agreement).

"**Joinder**" means a joinder to this Agreement substantially in the form attached hereto as **Exhibit C**.

"**Law**" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

"**Milestones**" means the milestones set forth in the Restructuring Term Sheet.

"**New Common Stock**" means the new common stock of Reorganized Holdings, to be issued in accordance with the terms set forth in the Restructuring Term Sheet and this Agreement.

"**New Shareholders Agreement**" means the shareholders agreement, including all annexes, exhibits, and schedules thereto, that will govern certain matters related to the governance of Reorganized Holdings and the New Common Stock.

"**Notes**" means the 2014 Notes and the 2015 Notes.

"**Obligations**" means those obligations outstanding under the Indentures.

"**Out-of-Court Restructuring**" has the meaning set forth in the preamble of this Agreement.

"**Parties**" has the meaning set forth in the preamble to this Agreement.

"**Permitted Transferee**" means each transferee of any Company Claims/Interests who meets the requirements of Section 8.01.

"**Person**" has the meaning set forth in section 101(41) of the Bankruptcy Code.

"**Petition Date**" means the first date any of the Company Parties commences a Chapter 11 Case.

"**Plan**" means the joint chapter 11 plan filed by the Debtors under chapter 11 of the Bankruptcy Code, including all annexes, exhibits, schedules, and supplements thereto, in each case as may be amended, modified, or supplemented from time to time in accordance with this Agreement.

"**Plan Effective Date**" means the occurrence of the Effective Date of the Plan according to its terms.

"**Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan that will be filed by the Debtors with the Bankruptcy Court.

"**Qualified Marketmaker**" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Company Claims/Interests (or enter with customers into long and short positions in Company Claims/Interests), in its capacity as a dealer or market maker in Company Claims/Interests and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

"**Related Party**" means, each of, and in each case in its capacity as such, current and former directors, managers, officers, equityholders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed or advised accounts, funds or other entities, investment advisors, sub-advisors, and/or managers, predecessors, participants, successors, assigns, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals and advisors.

"**Released Claim**" means, with respect to any Releasing Party, any Claim, Cause of Action, or any other debt, obligation, right, suit, damage, judgment, action, remedy, or liability that is released by such Releasing Party pursuant to this Agreement.

"**Reorganized Holdings**" means Holdings, as reorganized pursuant to and under the Restructuring Transactions, or any successor thereto.

"**Required Consenting Equityholders**" means, as of the relevant date, Consenting Equityholders holding more than 50% of the aggregate Holdings Equity Interests.

"**Required Consenting Equityholders Consent Right**" means the Required Consenting Equityholders' right to consent or approve any of the Definitive Documents (or any amendments, modifications, or supplements to the Definitive Documents) and shall apply solely to the extent any Definitive Document adversely (a) modifies the release, exculpation, injunction, or indemnification provisions related to the Consenting Equityholders as identified in the Restructuring Term Sheet or this Agreement and implemented pursuant to the Plan or the Out-of-Court Restructuring (as applicable), (b) affects, in a material manner, the rights or obligations of the Consenting Equityholders pursuant to or identified in this Agreement and implemented pursuant to the Plan or the Out-of-Court Restructuring (as applicable), (c) modifies the form of recovery of the Equityholders pursuant to the Restructuring Term Sheet or Plan, or (d) affects the MSA Payment (as defined in the Restructuring Term Sheet); *provided* that any ruling by a Court of competent jurisdiction permitting a holder of Company Claims or Interests other than a Consenting Stakeholder to opt out of releases in the Plan shall not give rise to any consent right.

"**Required Consenting Noteholders**" means, as of the relevant date, Consenting Noteholders holding more than 50% of the aggregate outstanding principal amount of Notes that are held by Consenting Noteholders.

"**Required Consenting Stakeholders**" means the Required Consenting Noteholders and the Required Consenting Equityholders.

"**Restructuring Term Sheet**" has the meaning set forth in the recitals to this Agreement.

"**Restructuring Transactions**" has the meaning set forth in the recitals to this Agreement.

"**Rules**" means Rule 501(a)(1), (2), (3), and (7) of the Securities Act.

"**SEC**" means the Securities and Exchange Commission.

"**Secured Notes Claims**" means any Claim on account of the Obligations under the Indentures.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Solicitation Materials**" means all solicitation materials in respect of the In -Court Restructuring, including the Plan, the Disclosure Statement, any letters of transmittal and ballots or other documents required to solicit votes to accept or reject the Plan.

"**Termination Date**" means the date on which termination of this Agreement as to a Party is effective in accordance with Sections 11.01, 11.02, 11.03, 11.04, or 11.05.

"**Transfer**" means to sell, resell, reallocate, use, pledge, assign, transfer, hypothecate, participate, donate or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales or other transactions).

"**Transfer Agreement**" means an executed form of the transfer agreement providing, among other things, that a transferee is bound by the terms of this Agreement and substantially in the form attached hereto as **Exhibit D**.

"**Willkie**" means Willkie Farr & Gallagher LLP, counsel to certain of the Consenting Noteholders.

"**WLRK**" means Wachtell, Lipton, Rosen & Katz, counsel to the Sponsor Equityholder.

1.02.    Interpretation.  For purposes of this Agreement:

(a)    in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

(b)    capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(c)    unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

(d)    unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, supplemented, or otherwise modified from time to time; *provided* that any capitalized

terms herein which are defined with reference to another agreement, are defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the date hereof;

(e)     unless otherwise specified, all references herein to "Sections" are references to Sections of this Agreement;

(f)     the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety rather than to any particular portion of this Agreement;

(g)     captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

(h)     references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws;

(i)     the use of "include" or "including" is without limitation, whether stated or not; and

(j)     the phrase "counsel to the Consenting Stakeholders" refers in this Agreement to each counsel specified in Section 13.10 other than counsel to the Company Parties.

**Section 2.**    *Effectiveness of this Agreement.*    This Agreement shall become effective and binding upon each of the Parties at 12:00 a.m., prevailing Eastern Time, on the Agreement Effective Date, which is the date on which all of the following conditions have been satisfied or waived in accordance with this Agreement:

(a)     each of the Company Parties shall have executed and delivered counterpart signature pages of this Agreement to counsel to each of the Parties;

(b)     holders of at least 66.67% of the aggregate outstanding principal amount of the Notes shall have executed and delivered counterpart signature pages of this Agreement;

(c)     the Company shall have paid all reasonable and documented fees and expenses of Willkie, Guggenheim and WLRK in accordance with their applicable fee and engagement letters for which an invoice has been received by the Company on or before the date that is two (2) Business Days prior to the Execution Date; and

(d)     counsel to the Company Parties shall have given notice to counsel to the Consenting Stakeholders in the manner set forth in Section 13.10 hereof (by email or otherwise) that the other conditions to the Agreement Effective Date set forth in this Section 2(a) have occurred.

**Section 3.**    *Definitive Documents.*

3.01.    The Definitive Documents, each of which shall be consistent with the terms of this Agreement and the Restructuring Term Sheet and in form and substance acceptable to the Company Parties and reasonably acceptable to the Required Consenting Noteholders, governing the Restructuring

Transactions shall include the following:  (a) the Exchange Documents with respect to the Out-of-Court Restructuring; (b) the Plan; (c) the Confirmation Order; (d) the Disclosure Statement and Solicitation Materials; (e) the Disclosure Statement Order; (f) the credit agreement or indenture and other agreements, instruments and documents in respect of the Exit Take-Back Debt Facility; (g) the Exit Intercreditor Agreement; (h) the credit agreement or indenture and other agreements, instruments and documents in respect of the Exit ABL Facility; (i) the New Shareholders Agreement; (j) the Governance Documents ((a) through (j) collectively, the "**Select Definitive Documents**"); (k) the Financing Order, and to the extent applicable, any related documentation; (l) the Plan Supplement; and (m) the First Day Pleadings and all orders sought pursuant thereto, *provided, however*, that the Select Definitive Documents shall be in form and substance acceptable to the Required Consenting Noteholders.

3.02.    The Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date remain subject to negotiation and completion.  Upon completion, the Definitive Documents and every other document, deed, agreement, filing, notification, letter or instrument related to the Restructuring Transactions shall contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement, as they may be modified, amended, or supplemented in accordance with Section 12.  Further, the Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date shall otherwise be in form and substance acceptable to the Company Parties and the Required Consenting Noteholders, and solely to the extent of the Required Consenting Equityholders Consent Right, the Required Consenting Equityholders.

**Section 4.**    *Commitments of the Consenting Stakeholders.*

4.01.    <u>General Commitments, Forbearances, and Waivers</u>.

(a)    During the Agreement Effective Period, each Consenting Stakeholder agrees, in respect of all of its Company Claims/Interests, to:

(i)    support the Restructuring Transactions and vote and exercise any powers or rights available to it (including in any board, shareholders', or creditors' meeting or in any process requiring voting or approval to which they are legally entitled to participate) in each case in favor of any matter requiring approval to the extent necessary to implement the Restructuring Transactions;

(ii)    use commercially reasonable efforts to consummate the Restructuring Transactions (including pursuant to the Exchange Documents in the event of an Out-of-Court Restructuring), and to cooperate with and assist the Company Parties in obtaining additional support for the Restructuring Transactions from the Company Parties' other stakeholders;

(iii)    solely with respect to the Consenting Noteholders, use commercially reasonable efforts to oppose any party or person from taking any actions contemplated in Section 4.02(b);

(iv)    forbear from exercising remedies on account of its Collateral (as defined in the Indenture Documents) other than as contemplated by this Agreement or as otherwise permitted by the Financing Order and the Definitive Documents;

(v)    give any notice, order, instruction, or direction to the Indenture Trustee necessary to give effect to the Restructuring Transactions; and

(vi)    negotiate in good faith and execute and implement the Definitive Documents that are consistent with this Agreement to which it is required to be a party.

(b)    During the Agreement Effective Period, each Consenting Stakeholder agrees, in respect of all of its Company Claims/Interests, that it shall not directly or indirectly:

(i)    object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions, including (a) commencing or supporting any action to appoint a trustee, conservator, receiver, or examiner for the Company, or to dismiss the Chapter 11 Cases, or to convert the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or (b) commencing or supporting any action or proceeding to shorten or terminate the period during which on the Company may propose and/or seek confirmation of any chapter 11 plan;

(ii)    propose, file, support, or vote for any Alternative Transaction;

(iii)    file any motion, pleading, or other document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement or the Plan;

(iv)    initiate, or have initiated on its behalf, any litigation or proceeding of any kind with respect to the Chapter 11 Cases, this Agreement, or the other Restructuring Transactions contemplated herein against the Company Parties or the other Parties other than to enforce this Agreement or any Definitive Document or as otherwise permitted under this Agreement;

(v)    exercise, or direct any other person to exercise, any right or remedy for the enforcement, collection, or recovery of any of Claims against or Interests in the Company Parties;

(vi)    object to, delay, impede, or take any other action to interfere with any key employee retention, pre-paid retention programs, and/or other retention and incentive programs that otherwise complies with the terms of this Agreement; or

(vii)    object to, delay, impede, or take any other action to interfere with the Company Parties' ownership and possession of their assets, wherever located, or interfere with the automatic stay arising under section 362 of the Bankruptcy Code.

4.02.    <u>Commitments with Respect to Chapter 11 Cases</u>.

(a)    During the Agreement Effective Period, each Consenting Stakeholder that is entitled to vote to accept or reject the Plan pursuant to its terms agrees that it shall, subject to receipt by such Consenting Stakeholder, whether before or after the commencement of the Chapter 11 Cases, of the Solicitation Materials:

(i)    vote each of its Company Claims/Interests to accept the Plan by delivering its duly executed and completed ballot accepting the Plan on a timely basis following the

commencement of the solicitation of the Plan and its actual receipt of the Solicitation Materials and the ballot;

        (ii)     to the extent it is permitted to elect whether to opt out of the releases set forth in the Plan, elect not to opt out of the releases set forth in the Plan by timely delivering its duly executed and completed ballot(s) indicating such election; and

        (iii)     not change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended, or revoked) any vote or election referred to in clauses (i) and (ii) above.

        (b)     During the Agreement Effective Period, each Consenting Stakeholder, in respect of each of its Company Claims/Interests, will support, and will not directly or indirectly object to, delay, impede, or take any other action to interfere with any motion or other pleading or document filed by a Company Party in the Bankruptcy Court that is consistent with this Agreement.

**Section 5.**     ***Additional Provisions Regarding the Consenting Stakeholders' Commitments.*** Notwithstanding anything contained in this Agreement, nothing in this Agreement shall: (a) affect the ability of any Consenting Stakeholder to consult with any other Consenting Stakeholder, the Company Parties, or any other party in interest in the Out-of-Court Restructuring or the Chapter 11 Cases (including any official committee and the United States Trustee); (b) impair or waive the rights of any Consenting Stakeholder to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; or (c) prevent any Consenting Stakeholder from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

**Section 6.**     ***Commitments of the Company Parties.***

  6.01.  <u>Affirmative Commitments</u>.

        (a)     During the Agreement Effective Period, the Company Parties agree to:

        (i)     support and take all steps reasonably necessary and desirable to consummate the Restructuring Transactions in accordance with this Agreement, including by timely complying with the Milestones;

        (ii)     to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions contemplated herein, take all steps reasonably necessary and desirable to address any such impediment;

        (iii)     use commercially reasonable efforts to obtain any and all required regulatory and/or third-party approvals for the Restructuring Transactions;

        (iv)     negotiate in good faith and use commercially reasonable efforts to execute and deliver the Definitive Documents and any other required agreements to effectuate and consummate the Restructuring Transactions as contemplated by this Agreement;

        (v)     use commercially reasonable efforts to seek additional support for the Restructuring Transactions from their other material stakeholders to the extent reasonably prudent;

(vi)     (A) provide Willkie a reasonable opportunity (which shall be no less than two (2) calendar days) to review draft copies of all material pleadings, motions, and proposed orders (including the First Day Pleadings and "second day" pleadings) and any other material documents the Debtors intend to file in the Chapter 11 Cases, (B) provide WLRK a reasonable opportunity (which shall be no less than two (2) calendar days) to review draft copies of all First Day Pleadings, as well as draft copies of any other filings to the extent the Sponsor Equityholder is materially affected by such filing, and (C) consult with Willkie regarding the form and substance of any document referred to in the immediately preceding clause (A) before filing such document in the Chapter 11 Cases, except, in each case, in the case of exigent circumstances where doing so is not practicable and the relevant parties' rights and/or interests are not adversely affected thereby.

(vii)     If the Debtors know of a material breach by any Debtor of any of the obligations, representations, warranties, or covenants of the Debtors set forth in this Agreement, furnish prompt written notice (and in any event within two (2) Business Days of obtaining actual knowledge) to Willkie and use commercially reasonable efforts to take all remedial action reasonably necessary as soon as reasonably practicable to cure such breach by any such Debtor; and

(viii)     Operate their businesses in the ordinary course in a manner consistent with past practice in all material respects (other than any changes in operations (a) resulting from the filing of the Chapter 11 Cases or (b) imposed by the Bankruptcy Court.

(b)     The Debtors represent and warrant to the Consenting Noteholders that there are no pending agreements (oral or written) with respect to any Alternative Transaction.  The Debtors represent and warrant to the Consenting Noteholders that, during the term of this Agreement, any of the Debtors shall not (i) solicit any proposal or expression of interest (written or oral) regarding an Alternative Transaction or (ii) maintain or continue discussions or negotiations with respect to any Alternative Transaction, updated proposal or expression of interest (written or oral) regarding an Alternative Transaction. The Debtors shall promptly (and in any case within two (2) Business Days) notify Willkie and Guggenheim of the receipt of any such proposal or expression of interest relating to an Alternative Transaction, with such notice to include the material terms thereof and, if applicable, a copy of such proposal, expression or interest, or Alternative Transaction, including the identity of the Person or Entity or group of Persons or Entities involved.

(c)     The Debtors represent and warrant to the Consenting Noteholders that there have been no amendments, supplements, or other changes to any employee benefit, deferred compensation, incentive, retention, bonus, or other compensatory arrangements, policies, programs, practices, plans, or agreements, including for the avoidance of doubt with respect to any director compensation or benefits, since prior to October 1, 2020.

6.02.   Negative Commitments. During the Agreement Effective Period, each of the Company Parties shall not directly or indirectly:

(a)     object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(b)      take any action that is inconsistent in any material respect with, or is intended to frustrate or impede approval, implementation and consummation of the Restructuring Transactions described in, this Agreement;

(c)      modify the Plan, in whole or in part, in a manner that is not consistent with this Agreement in all material respects;

(d)      seek, solicit, encourage, or negotiate or engage in, any discussions or other communications relating to, or enter into any agreements or arrangements relating to, any Alternative Transaction;

(e)      other than in the ordinary course of business of the Company Parties and subject to the consent of the Required Consenting Noteholders, enter into, amend, supplement, or otherwise modify any employee benefit, deferred compensation, incentive, retention, bonus, or other compensatory arrangements, policies, programs, practices, plans, or agreements, including offer letters, employment agreements, consulting agreements, severance arrangements, or change in control arrangements with or for the benefit of any of its directors, executive officers, or other members of the senior leadership team, or increase the base salary, target bonus opportunity, or other benefits payable by the Company Parties to any of its directors, executive officers, or other members of the senior leadership team; or

(f)      file any motion, pleading, or Definitive Documents with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement or the Plan.

**Section 7.      *Additional Provisions Regarding Company Parties' Commitments.***

7.01.    Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require a Company Party or the board of directors, board of managers, or similar governing body of a Company Party, after consulting with counsel, to take any action or to refrain from taking any action with respect to the Restructuring Transactions to the extent taking or failing to take such action would be inconsistent with applicable Law or its fiduciary obligations under applicable Law, and any such action or inaction pursuant to this Section 7.01 shall not be deemed to constitute a breach of this Agreement.  The Debtors shall give prompt written notice to Willkie of any determination made in accordance with this Section 7.01.  This Section 7.01 shall not impede any Party's right to terminate this Agreement pursuant to Section 11.02(b) hereof.  Notwithstanding anything to the contrary herein, each Consenting Noteholder reserves its rights to challenge any action taken in the exercise of such fiduciary duties.

7.02.    Notwithstanding anything to the contrary in this Agreement (but subject to Sections 6.02(d) and 7.01), each Company Party and their respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the right to enter into or continue discussions or negotiations with holders of Claims against or Equity Interests in a Company Party (including any Consenting Stakeholder), any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee), or any other Entity regarding the Restructuring Transactions.

7.03.    Nothing in this Agreement shall: (a) impair or waive the rights of any Company Party to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; or (b) prevent any Company Party from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

**Section 8.** *Transfer of Interests and Securities.*

8.01.    During the Agreement Effective Period, no Consenting Stakeholder shall Transfer any ownership (including any beneficial ownership as defined in the Rule 13d-3 under the Securities Exchange Act of 1934, as amended) in any Company Claims/Interests to any affiliated or unaffiliated party, including any party in which it may hold a direct or indirect beneficial interest, unless:

(a)    in the case of any Company Claims/Interests, the authorized transferee is one of (i) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (ii) a non-U.S. person located outside the United States in an offshore transaction (as such terms are used in Regulation S under the Securities Act), (iii) an institutional accredited investor (as defined in the Rules), or (iv) a Consenting Stakeholder; and

(b)    either (i) the transferee executes and delivers to Gibson Dunn and Willkie, at or before the time of the proposed Transfer, a Transfer Agreement or (ii) the transferee is a Consenting Stakeholder and the transferee provides notice of such Transfer (including the amount and type of Company Claim/Interest Transferred) to counsel to the Company Parties and Willkie at or before the time of the proposed Transfer.

8.02.    Upon compliance with the requirements of Section 8.01, the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of the rights and obligations in respect of such transferred Company Claims/Interests.  Any Transfer in violation of Section 8.01 shall be void *ab initio*.

8.03.    This Agreement shall in no way be construed to preclude the Consenting Stakeholders from acquiring additional Company Claims/Interests; *provided*, *however*, that (a) such additional Company Claims/Interests shall automatically and immediately upon acquisition by a Consenting Stakeholder be deemed subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given to counsel to the Company Parties or counsel to the Consenting Stakeholders) and (b) such Consenting Stakeholder must provide notice of such acquisition (including the amount and type of Company Claim/Interest acquired) to counsel to the Company Parties and Willkie within five (5) Business Days of such acquisition.

8.04.    This Section 8 shall not impose any obligation on any Company Party to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Consenting Stakeholder to Transfer any of its Company Claims/Interests.  Notwithstanding anything to the contrary herein, to the extent a Company Party and another Party have entered into a Confidentiality Agreement, the terms of such Confidentiality Agreement shall continue to apply and remain in full force and effect according to its terms, and this Agreement does not supersede any rights or obligations otherwise arising under such Confidentiality Agreements.

8.05.    Notwithstanding Section 8.01, a Qualified Marketmaker that acquires any Company Claims/Interests with the purpose and intent of acting as a Qualified Marketmaker for such Company

Claims/Interests shall not be required to execute and deliver a Transfer Agreement in respect of such Company Claims/Interests if (a) such Qualified Marketmaker subsequently transfers such Company Claims/Interests (by purchase, sale assignment, participation, or otherwise) within five (5) Business Days of its acquisition to a transferee that is an entity that is not an affiliate, affiliated fund, or affiliated entity with a common investment advisor; (b) the transferee otherwise is a Permitted Transferee under Section 8.01; and (c) the Transfer otherwise is a Permitted Transfer under Section 8.01.  To the extent that a Consenting Stakeholder is acting in its capacity as a Qualified Marketmaker, it may Transfer (by purchase, sale, assignment, participation, or otherwise) any right, title or interests in Company Claims/Interests that the Qualified Marketmaker acquires from a holder of the Company Claims/Interests who is not a Consenting Stakeholder without the requirement that the transferee be a Permitted Transferee.

8.06.    Notwithstanding anything to the contrary in this Section 8, the restrictions on Transfer set forth in this Section 8 shall not apply to the grant of any liens or encumbrances on any claims and interests in favor of a bank or broker-dealer holding custody of such claims and interests in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such claims and interests.

**Section 9.**      *Representations and Warranties of Consenting Stakeholders.*  Each Consenting Stakeholder severally, and not jointly, represents and warrants (as applicable) that, as of the date such Consenting Stakeholder executes and delivers this Agreement and as of the Effective Date:

(a)      it is the beneficial or record owner of the face amount of the Company Claims or is the nominee, investment manager, or advisor for beneficial holders of the Company Claims reflected in, and, having made reasonable inquiry, is not the beneficial or record owner of any Company Claims other than those reflected in, such Consenting Noteholder's signature page to this Agreement or a Transfer Agreement, as applicable (as may be updated pursuant to Section 8);

(b)      it has the full power and authority to act on behalf of, vote and consent to matters concerning, such Company Claims/Interests;

(c)      such Company Claims are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition, transfer, or encumbrances of any kind, that would adversely affect in any way such Consenting Noteholder's ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed;

(d)      it has the full power to vote, approve changes to, and transfer all of its Company Claims/Interests referable to it as contemplated by this Agreement subject to applicable Law;

(e)      solely with respect to holders of Company Claims/Interests, (i) it is either (A) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (B) not a U.S. person and is located outside the United States (as such terms are used in Regulation S of the Securities Act), or (C) an institutional accredited investor (as defined in the Rules), and (ii) any securities acquired by the Consenting Stakeholder in connection with the Restructuring Transactions will have been acquired for investment and not with a view to distribution or resale in violation of the Securities Act;

**Section 10.**   *Mutual Representations, Warranties, and Covenants*.   Each of the Parties represents, warrants, and covenants to each other Party, as of the date such Party executed and delivers this Agreement, on the Plan Effective Date:

(a)   it is validly existing and in good standing under the Laws of the state of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(b)   except as expressly provided in this Agreement, the Plan, and the Bankruptcy Code, no consent or approval is required by any other person or entity in order for it to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement;

(c)   the entry into and performance by it of, and the transactions contemplated by, this Agreement do not, and will not, conflict in any material respect with any Law or regulation applicable to it or with any of its articles of association, memorandum of association or other constitutional documents;

(d)   except as expressly provided in this Agreement, it has (or will have, at the relevant time) all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement; and

(e)   except as expressly provided by this Agreement, it is not party to any restructuring or similar agreements or arrangements with the other Parties to this Agreement that have not been disclosed to all Parties to this Agreement.

(f)   Each Consenting Noteholder severally (but not jointly) represents that, as of the date hereof, it beneficially holds or advises or manages for a beneficial holder, the principal amount of 2014 Notes and/or 2015 Notes set forth on Schedule 1 hereto, and to that extent it advises or acts as a manager for any beneficial holder, it has all the necessary power and authority to enter into this Agreement and perform its obligations hereunder.   The Company agrees that any information regarding the amount of notes disclosed on Schedule 1 shall be strictly confidential, and shall not be disclosed to any person without the prior written consent of such Consenting Noteholder.

**Section 11.**   *Termination Events*.

11.01.   Consenting Noteholder Termination Events.   This Agreement may be terminated as to all Parties by the Required Consenting Noteholders, by the delivery to the Company and all Parties of a written notice in accordance with Section 13.10 hereof upon the occurrence of the following events:

(a)   any Debtor withdraws the Plan or files any plan of reorganization (or disclosure statement related thereto) in the Chapter 11 Cases other than the Plan and Disclosure Statement without the prior written consent of the Required Consenting Noteholders;

(b)    after filing of the Plan with the Bankruptcy Court, (i) any material amendment or modification to any Definitive Document is made by the Debtors or (ii) any pleading that seeks Bankruptcy Court approval to amend or modify any Definitive Document is filed by the Debtors, and such amendment, modification or filing is inconsistent in any material respect with any Definitive Document, which amendment, modification or filing is not in form and substance (A) satisfactory to the Required Consenting Noteholders, in the case of any Select Definitive Document or (B) reasonably satisfactory to the Required Consenting Noteholders in the case of any other Definitive Document;

(c)    the Bankruptcy Court grants relief that is inconsistent in any material respect with any Definitive Document in a manner that directly and adversely impacts the treatment of the Secured Notes Claims without the prior written consent of the Required Consenting Noteholders;

(d)    the breach in any material respect by a Company Party of any of the representations, warranties, or covenants of the Company Parties set forth in this Agreement that (i) is adverse to the Consenting Noteholders seeking termination pursuant to this provision and (ii) remains uncured (to the extent curable) for ten (10) Business Days after such terminating Consenting Noteholders transmit a written notice in accordance with Section 13.10 hereof of such breach;

(e)    any Milestone has not been satisfied after two (2) Business Days written notice of such failure to satisfy, unless extended in accordance with the terms of this Agreement;

(f)    entry of the Financing Order in a form that is not reasonably acceptable to the Requisite Consenting Noteholders;

(g)    the occurrence of any Event of Default under the Financing Order or, if applicable, any debtor-in-possession credit agreement that has not been cured (if susceptible to cure) or waived in accordance with the terms of the Financing Order or, if applicable, the debtor-in-possession credit agreement;

(h)    entry of a final order that grants relief terminating, annulling, or materially modifying the automatic stay (as set forth in section 362 of the Bankruptcy Code) with regard to any material asset that, to the extent such relief has a material adverse effect on the consummation of the Restructuring, other than with the prior written consent of the Requisite Consenting Noteholders;

(i)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for thirty (30) days after such terminating Consenting Noteholders transmit a written notice in accordance with Section 13.10 hereof detailing any such issuance; *provided*, that this termination right may not be exercised by any Party that sought or requested such ruling or order in contravention of any obligation set out in this Agreement;

(j)    the Bankruptcy Court enters an order denying confirmation of the Plan;

(k)    any Debtor challenges the principal amount, priority, and/or validity of the Secured Notes Claims or the liens securing the Secured Notes Claims;

(l)      the Bankruptcy Court enters an order in the Chapter 11 Cases terminating any of the Debtors' exclusive right to file a plan or plans of reorganization pursuant to Section 1121 of the Bankruptcy Code;

(m)      the commencement of an involuntary case against any of the Debtors or the filing of an involuntary petition seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, reorganization or other relief in respect of the any of the Debtors or its debts, or of a substantial part of its assets, under any federal, state or foreign bankruptcy, insolvency, administrative receivership or similar law now or hereafter in effect (provided that such involuntary proceeding is not dismissed (or converted with the prior consent of the Required Consenting Noteholders) within a period of thirty (30) days after the filing thereof) or if any court grants the relief sought in such involuntary proceeding;

(n)      without the prior consent of the Required Consenting Noteholders, any of the Debtors (A) voluntarily commences any case or files any petition seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, reorganization or other relief under any federal, state or foreign bankruptcy, insolvency, administrative receivership or similar law now or hereafter in effect except consistent with this Agreement, (B) consents to the institution of, or fails to contest in a timely and appropriate manner, any involuntary proceeding or petition described above, (C) files an answer admitting the material allegations of a petition filed against it in any such proceeding, or (D) makes a general assignment or arrangement for the benefit of creditors;

(o)      any Debtor sells or files any motion or application seeking authority to sell a material portion of the Debtors' assets as a whole, without the prior written consent of the Required Consenting Noteholders; or

(p)      the occurrence of a termination event described in Section 11.02(b), (c) and (d);

(q)      the delivery by the Company of written notice to Willkie pursuant to Section 7.01 hereof; or

(r)      the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order (without the prior written consent of the Required Consenting Noteholders), (i) converting one or more of the Chapter 11 Cases of a Company Party to a case under chapter 7 of the Bankruptcy Code, (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases of a Company Party, or (iii) rejecting this Agreement.

11.02.  Company Party Termination Events.  Any Company Party may terminate this Agreement as to all Parties upon prior written notice to all Parties in accordance with Section 13.10 hereof upon the occurrence of any of the following events:

(a)      the breach in any material respect by one or more of the Consenting Noteholders holding Secured Notes Claims in an aggregate amount such that non-breaching Consenting Noteholders collectively own (or have voting control of) less than 66.67% of the aggregate outstanding principal amount of the Secured Notes Claims, of any provision set forth in this

Agreement that remains uncured for a period of ten (10) days after the receipt by the Consenting Noteholders of notice of such breach;

(b)    the board of directors, board of managers, or such similar governing body of any Company Party determines, after consulting with counsel, (i) that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable Law or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Transaction;

(c)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for thirty (30) days after such terminating Company Party transmits a written notice in accordance with Section 13.10 hereof detailing any such issuance; *provided*, that this termination right shall not apply to or be exercised by any Company Party that sought or requested such ruling or order in contravention of any obligation or restriction set out in this Agreement; or

(d)    the Bankruptcy Court enters an order denying confirmation of the Plan.

11.03.  <u>Consenting Equityholders Termination Events</u>.  This Agreement may be terminated by the Required Consenting Equityholders, solely as to the Consenting Equityholders, by the delivery to the Company and Willkie of a written notice in accordance with Section 13.10 hereof upon the occurrence of the following events:

(a)    the breach in any material respect by a Company Party or one or more of the Consenting Noteholders in an aggregate amount such that non-breaching Consenting Noteholders collectively own (or have voting control of) less than 66.67% of the aggregate outstanding principal amount of the Secured Notes Claims, of any provision set forth in this Agreement that remains uncured for a period of ten (10) Business Days after the receipt by the Consenting Stakeholders of notice of such breach;

(b)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for thirty (30) days after such terminating Consenting Equityholder transmit a written notice in accordance with Section 13.10 hereof detailing any such issuance; *provided*, that this termination right may not be exercised by any Party that sought or requested such ruling or order in contravention of any obligation set out in this Agreement; or

(c)    any Definitive Document adversely (i) modifies the release, exculpation, injunction, indemnification, or insurance provisions related to the Consenting Equityholders as identified in the Restructuring Term Sheet or this Agreement, including the Releases, or implemented pursuant to the Plan, (ii) affects, in a material manner, the rights or obligations of the Consenting Equityholders or their Affiliates pursuant to or identified in this Agreement or the Restructuring Term Sheet or implemented pursuant to the Plan, or (iii) affects the MSA Payment (as defined in the Restructuring Term Sheet); *provided* that, any ruling by a court of competent jurisdiction permitting a holder of Company Claims/Interests other than a Consenting Stakeholder to opt out of releases in the Plan shall not give rise to any termination right.

11.04.  <u>Mutual Termination</u>.  This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among all of the following:  (a) the Required Consenting Stakeholders; and (b) each Company Party.

11.05.  <u>Automatic Termination</u>.  This Agreement shall terminate automatically without any further required action or notice immediately after the occurrence of the Effective Date.

11.06.  <u>Effect of Termination</u>.  Upon the occurrence of a Termination Date as to a Party, this Agreement shall be of no further force and effect as to such Party and each Party subject to such termination shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, including with respect to any and all Claims or causes of action.  Upon the occurrence of a Termination Date prior to the Effective Date with respect to an Out-of-Court Restructuring or an In-Court Restructuring, as applicable, any and all consents or ballots tendered by the Parties subject to such termination before a Termination Date shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring Transactions and this Agreement or otherwise; *provided*, *however*, any Consenting Stakeholder withdrawing or changing its vote pursuant to this Section 11.06 shall promptly provide written notice of such withdrawal or change to each other Party to this Agreement and, if such withdrawal or change occurs on or after the Petition Date, file notice of such withdrawal or change with the Bankruptcy Court.  Nothing in this Agreement shall be construed as prohibiting a Company Party or any of the Consenting Stakeholders from contesting whether any such termination is in accordance with its terms or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date.  Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict (a) any right of any Company Party or the ability of any Company Party to protect and reserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Consenting Stakeholder, and (b) any right of any Consenting Stakeholder, or the ability of any Consenting Stakeholder, to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Company Party or Consenting Stakeholder.  No purported termination of this Agreement shall be effective under this Section 11.06 or otherwise if the Party seeking to terminate this Agreement is in material breach of this Agreement, except a termination pursuant to Section 11.02(b) or Section 11.02(d).  Nothing in this Section 11.06 shall restrict any Company Party's right to terminate this Agreement in accordance with Section 11.02(b).

**Section 12.**    *Amendments and Waivers.*

(a)    This Agreement may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner except in accordance with this Section 12.

(b)    Subject to Section 12(c) hereof, this Agreement may be modified, amended, or supplemented, or a condition or requirement of this Agreement may be waived only with the prior written consent of (i) each Company Party; (ii) the Required Consenting Noteholders and

(iii) solely to the extent of the Required Consenting Equityholders Consent Right, the Required Consenting Equityholders.

(c)    In addition to Section 12(b) above, any modification, amendment, supplement, waiver, or change described in this Section 12(c) also requires the prior written consent specified in this Section 12(c).

(i)    Any modification, amendment, supplement, waiver, or change with respect to the following provisions of this Agreement requires the prior written consent of each Consenting Noteholder:  (A) the definition of "Consenting Noteholders" herein; (B) the definition of "Required Consenting Noteholders" herein; (C) Section 3 of this Agreement; and (D) this Section 12(c).

(ii)    Any modification, amendment, supplement, waiver, or change with respect to the following provisions of this Agreement requires the prior written consent of each Consenting Equityholder:  (A) the definition of "Company" herein; (B) the definition of "Consenting Equityholders" herein; (C) the definition of "Required Consenting Equityholders" herein; (D) the definition of "Required Consenting Equityholders Consent Right" herein; and (E) this Section 12(c).

(iii)    Any modification, amendment, supplement, waiver, or change with respect to the following provisions of this Agreement requires the prior written consent of each Consenting Stakeholder:  (A) the definition of "Consenting Stakeholders" herein; (B) the definition of "Required Consenting Stakeholders" herein; and (C) this Section 12(c).

(iv)    Any proposed modification, amendment, waiver, or supplement that has a material, disproportionate, and adverse effect on any of the Company Claims/Interests held by a Consenting Stakeholder requires the prior written consent of each such affected Consenting Stakeholder.

(d)    A Party shall be deemed to have given the written consent required by this Section 12 if counsel to such Party conveys such consent in writing (including electronic mail) to counsel to the Party receiving such consent.

(e)    Any proposed modification, amendment, waiver or supplement that does not comply with this Section 12 shall be ineffective and void *ab initio*.

(f)    The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy under this Agreement shall operate as a waiver of any such right, power or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise of such right, power or remedy or the exercise of any other right, power or remedy.  All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

**Section 13.**    *Miscellaneous.*

13.01.    Acknowledgement.    Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.    Any such offer or solicitation will be made only in compliance with all applicable securities Laws, provisions of the Bankruptcy Code, and/or other applicable Law.

13.02.    Exhibits Incorporated by Reference; Conflicts.    Each of the exhibits, annexes, signatures pages, and schedules attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include such exhibits, annexes, and schedules. In the event of any inconsistency between this Agreement (without reference to the exhibits, annexes, and schedules hereto) and the exhibits, annexes, and schedules hereto, this Agreement (without reference to the exhibits, annexes, and schedules thereto) shall govern.

13.03.    Further Assurances.    Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, or as may be required by order of the Bankruptcy Court, from time to time, to effectuate the Restructuring Transactions, as applicable.

13.04.    Complete Agreement.    Except as otherwise explicitly provided herein, this Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, among the Parties with respect thereto, other than any Confidentiality Agreement.

13.05.    GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM.    THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF.    Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in the Bankruptcy Court, and solely in connection with claims arising under this Agreement: (a) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court; (b) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; and (c) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party hereto.

13.06.    TRIAL BY JURY WAIVER.    EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

13.07.    Execution of Agreement.    This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.  Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

13.08.  <u>Rules of Construction</u>.  This Agreement is the product of negotiations among the Company Parties and the Consenting Stakeholders, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.  The Company Parties and the Consenting Stakeholders were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.

13.09.  <u>Successors and Assigns; Third Parties</u>.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable.  There are no third party beneficiaries under this Agreement, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other person or entity.

13.10.  <u>Notices</u>.  All notices hereunder shall be deemed given if in writing and delivered, by electronic mail, courier, or registered or certified mail (return receipt requested), to the following addresses (or at such other addresses as shall be specified by like notice):

      (a)     if to a Company Party, to:

> Hardwoods Holdings, Inc.
> 1313 Broadway, Suite 300
> Tacoma, WA 98402
> Attention:  Nathan Jeppson, President
> E-mail address:  legal.notices@nwhardwoods.com
>
> with copies to:
>
> Gibson, Dunn & Crutcher LLP
> 200 Park Avenue
> New York, New York 10166
> Attention:  David M. Feldman, Matthew K. Kelsey, and Alan Moskowitz
> E-mail address:  DFeldman@gibsondunn.com; MKelsey@gibsondunn.com; and AMoskowitz@gibsondunn.com

      (b)     if to a Consenting Noteholder, to each Consenting Noteholder at the addresses or e-mail addresses set forth below the Consenting Noteholder's signature page to this Agreement (or to the signature page to a Joinder or Transfer Agreement in the case of any Consenting Noteholder that becomes a party hereto after the Agreement Effective Date):

with a copy to (which shall not constitute notice):

> Willkie Farr & Gallagher LLP
> 787 Seventh Avenue
> New York, NY 10019
> Attention:  Jeffrey D. Pawlitz, Weston T. Eguchi, and Agustina G. Berro
> E-mail address:  jpawlitz@willkie.com; weguchi@willkie.com; and aberro@willkie.com

(c)      if to the Sponsor Equityholder, at the addresses or e-mail addresses set forth below the Sponsor Equityholder's signature page to this Agreement:

with a copy to (which shall not constitute notice):

> Littlejohn & Co., LLC
> 8 Sound Shore Drive, Suite 303
> Greenwich, Connecticut 06830,
> Attn:   Edmund J. Feeley, Managing Director
> E-mail address:  efeeley@littlejohnllc.com

> - and -

> Wachtell, Lipton, Rosen & Katz LLP
> 51 West 52nd Street
> New York, NY 10019
> Phone: 212-403-1202
> Attn:   Scott K. Charles and David E. White Jr.
> E-mail address:  SKCharles@wlrk.com and DEWhite@wlrk.com

Any notice given by delivery, mail, or courier shall be effective when received.

13.11.  <u>Independent Due Diligence and Decision Making</u>.  Each Consenting Stakeholder hereby confirms that its decision to execute this Agreement has been based upon its independent investigation of the operations, businesses, financial and other conditions, and prospects of the Company Parties, and without reliance on any statement of any other Party or Entity (or such other Party's or Entity's financial or legal advisors).

13.12.  <u>Enforceability of Agreement</u>.  Each of the Parties, to the extent enforceable, waives any right to assert that the exercise of termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code, and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required.

13.13.  <u>Waiver</u>.  If the Restructuring Transactions are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights.  Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms or the payment of damages to which a Party may be entitled under this Agreement.

13.14.  <u>Specific Performance</u>.  It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

13.15. <u>Several, Not Joint, Claims</u>.  Except where otherwise specified, the agreements, representations, warranties, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

13.16. <u>Severability and Construction</u>.  If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

13.17. <u>Remedies Cumulative</u>.  All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at Law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

13.18. <u>Capacities of Consenting Stakeholders</u>.  Each Consenting Stakeholder has entered into this agreement on account of all Company Claims/Interests that it holds (directly or through discretionary accounts that it manages or advises) and, except where otherwise specified in this Agreement, shall take or refrain from taking all actions that it is obligated to take or refrain from taking under this Agreement with respect to all such Company Claims/Interests.

13.19. <u>Email Consents</u>.  Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, pursuant to Section 3.02, Section 12, or otherwise, including a written approval by the Company Parties or the Required Consenting Stakeholders, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel to the Parties submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

13.20. <u>Fees and Expenses.</u>  The Company Parties shall promptly pay in cash all reasonable and documented fees and expenses of (a) (i) Willkie, as counsel to the Consenting Noteholders, and (ii) Guggenheim, as financial advisor and investment banker to the Consenting Noteholders, and (b) any consultants or other professionals retained by either the Consenting Noteholders represented by Willkie in connection with the Company Parties or the Restructuring Transactions with the consent of the Company Parties, in each case, in accordance with the engagement letters of such consultant or professional signed by the Company Parties, in each case, without further order of, or application to, the Bankruptcy Court but such consultant or professionals (collectively, the "**Consenting Noteholder Fees and Expenses**").  The Company Parties shall promptly pay in cash all reasonable and documented fees and expenses of WLRK, as counsel to the Sponsor Equityholder (i) on the Agreement Effective Date, and (ii) on an ongoing basis and as of the Effective Date in accordance with the Restructuring Term Sheet, in each case, subject to the Sponsor Fee Cap (as defined in the Restructuring Term Sheet).

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement on the day and year first above written.

*[Signature Pages Follow]*

**Company Parties Signature Page to
the Restructuring Support Agreement**

**NORTHWEST HARDWOODS, INC.,**

By: _Chris Hannon_

Name:  Chris Hannon

Title:   CFO & VP of Finance

**HARDWOODS INTERMEDIATE
HOLDINGS II, INC.,**

By: _Nathan Jeppson_

Name: Nathan Jeppson

Title:  President

**HARDWOODS HOLDINGS, INC.,**

By: _Nathan Jeppson_

Name: Nathan Jeppson

Title:  President

[*Consenting Stakeholder Signature Pages Redacted*]

**STRICTLY CONFIDENTIAL / PROFESSIONAL EYES ONLY**

*Subject to Section 10(f) of the Restructuring Support Agreement*

Schedule 1

| Consenting Noteholder | Principal Amount of 2014 Notes Held ($) | Principal Amount of 2015 Notes Held ($) |
|---|---|---|
|  |  |  |

# **EXHIBIT A**

## **Company Parties**

HARDWOODS HOLDINGS, INC.

HARDWOODS INTERMEDIATE HOLDINGS II, INC.

NORTHWEST HARDWOODS, INC.

**<u>EXHIBIT B</u>**

**Restructuring Term Sheet**

# HARDWOODS HOLDINGS, INC.

## RESTRUCTURING TERM SHEET

This term sheet (the "**Term Sheet**") summarizes certain terms and conditions (and does not purport to summarize all of the terms and conditions) of the proposed financial restructuring of the existing indebtedness and interests of Hardwoods Holdings, Inc., a Delaware corporation ("**Holdings**"), and certain of its affiliates identified herein (each a "**Company Party**" or "**Debtor**", and collectively, the "**Company Parties**" or "**Debtors**"), which will be consummated at the mutual determination of the Company Parties and the Required Consenting Noteholders (as defined herein) and subject to the terms of the Restructuring Support Agreement (as defined below), pursuant to either (a) an out-of-court transaction (the "**Out-of-Court Restructuring**") or (b) the commencement of voluntary cases (the "**Chapter 11 Cases**") under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") to pursue a prepackaged chapter 11 plan of reorganization (the "**Plan**," and such financial restructuring process, the "**In-Court Restructuring**"; and, together with the Out-of-Court Restructuring, the "**Restructuring**"). This is the Restructuring Term Sheet referred to in, and appended to, the Restructuring Support Agreement dated as of October 21, 2020, by and among the Company Parties and the other parties signatory thereto (as amended, supplemented, or otherwise modified from time to time, the "**Restructuring Support Agreement**"). Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Restructuring Support Agreement.

This Term Sheet is presented for discussion purposes only, does not constitute a commitment to provide, accept, or consent to any financing or otherwise create any implied or express legally binding or enforceable obligation on any party (or any affiliates of a party), at law or in equity, to negotiate or enter into definitive documentation related to the Restructuring or to negotiate in good faith or otherwise.

**THIS TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER TO SELL OR BUY, OR THE SOLICITATION OF AN OFFER TO SELL OR BUY ANY SECURITIES OR A SOLICITATION OR ACCEPTANCE OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE (AS DEFINED BELOW), IT BEING UNDERSTOOD THAT ANY SUCH OFFER OR SOLICITATION WILL BE MADE ONLY IN COMPLIANCE WITH APPLICABLE LAW.**

Without limiting the generality of the foregoing, this Term Sheet and the undertakings contemplated herein are subject in all respects to the negotiation, execution and delivery of definitive documentation in form and substance consistent with this Term Sheet and otherwise reasonably acceptable to the Company Parties and the Consenting Stakeholders as well as the satisfactory completion of due diligence (including, without limitation, with respect to the tax implications of the Restructuring).

This Term Sheet is provided as part of a settlement proposal in furtherance of settlement discussions and is entitled to protection from any use or disclosure to any party or person pursuant to Federal Rule of Evidence 408 and any applicable statutes, doctrines or rules protecting the use or disclosure of confidential information and information exchanged in the context of settlement discussions.

| Overview | |
|---|---|
| **Debtors to Commence Chapter 11 Cases (if applicable)** | Hardwoods Holdings, Inc.; Hardwoods Intermediate Holdings II, Inc.; and Northwest Hardwoods, Inc. |
| **Filing Date and Venue (if applicable)** | No later than November 23, 2020 (the "**Petition Date**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"). |
| **Claims and Interests to Be Restructured** | ABL Facility Claims:  consisting of $42,246,000 (including $4,191,000 of outstanding Letters of Credit) in principal amount (as of October 15, 2020), plus unpaid interest, fees, and other expenses arising and payable under that certain asset-based revolving credit and letter of credit facilities, dated as of July 18, 2014 (as amended, supplemented or otherwise modified prior to the effectiveness of this Agreement, the "**Existing ABL Facility**"), among Northwest Holdings, Inc., as borrower, the other guarantors party thereto, Bank of America, N.A., as administrative agent, such other agents party thereto from time to time, and the lenders party thereto from time to time (the "**ABL Lenders**," and such Claims arising thereunder, the ("**ABL Facility Claims**"). <br><br> Secured Notes Claims:  consisting of $378,634,000 in principal amount, plus unpaid interest, fees, and other expenses arising and payable under that certain (i) that certain Indenture, dated as of July 18, 2014 (as amended, supplemented or otherwise modified prior to the effectiveness of this Agreement, the "**2014 Indenture**"), among Northwest Hardwoods, Inc., Hardwoods Intermediate Holdings II, Inc., the other Guarantors party thereto, and the Bank of New York Mellon, as Trustee and Notes Collateral Agent (in such capacities under such Indenture, including its successors and assigns in such capacities, the "**Notes Trustee**"), pursuant to which the Issuer's 7.500% Senior Secured Notes due 2021 ("**2014 Notes**") are outstanding and (ii) that certain Indenture, dated as of February 20, 2015 (as amended, supplemented or otherwise modified prior to the effectiveness of this Agreement, the "**2015 Indenture**", and together with the 2014 Indenture, the "**Indentures**", and each an "**Indenture**"), among the Northwest Hardwoods, Inc., Hardwoods Intermediate Holdings II, Inc., the other Guarantors party thereto, and Secured Notes Trustee, pursuant to which the Issuer's 7.500% Senior Secured Notes due 2021 ("**2015 Notes**" and together with the 2014 Notes, the "**Notes**"), and the noteholders party thereto from time to time (the "**Noteholders**," and the Claims thereunder, the "**Secured Notes Claims**"). <br><br> General Unsecured Claims:  consisting of any prepetition Claim against one or more of the Company Parties that is not an ABL Facility Claim, Secured Notes Claim, an Intercompany Claim, or a Claim that is secured, subordinated, or entitled to priority under the Bankruptcy Code (the "**General Unsecured Claims**"), including, for the avoidance of doubt, the MSA Claim and the DSA Claim (each as defined herein). <br><br> Existing Equity Interests: consisting of any Interests in Holdings (the "**Existing Equity Interests**"). |

| | |
|---|---|
| **Debt and Securities to Be Issued on the Effective Date** | Exit ABL Facility:  An up to $100 million first lien senior secured asset-based revolving credit facility, the terms of which shall be consistent with the term sheet included in the commitment letter attached hereto as **Exhibit 1** (the "**Exit ABL Facility**"). |
| | Exit Take-Back Term Loan Facility:  A senior secured term loan facility in an aggregate principal amount of up to $110 million the terms of which shall be consistent with **Exhibit 2** hereto (the "**Exit Take-Back Term Loan Facility**"). |
| | Priority: The Exit ABL Facility and the Exit Take-Back Debt Facility will be subject to a customary cross-over intercreditor agreement pursuant to which the Exit ABL Facility will have a first lien on all ABL priority collateral and a second lien on all other assets of the Debtors, and the Exit Take-Back Debt Facility will have a second lien on ABL priority collateral and a first lien on all other assets of the Company Parties. |
| | New Common Stock:  Hardwoods Holding, Inc., as reorganized pursuant to the Restructuring, or a new corporation or limited liability company that may be incorporated or formed to directly or indirectly acquire all of the assets and/or stock of the reorganized Company Parties ("**Reorganized Holdings**") shall issue equity (the "**New Common Stock**") on the Effective Date on the terms set forth herein. |
| **Overview of the Restructuring** | The Restructuring will be implemented in accordance with the Restructuring Support Agreement and this Term Sheet. In order to implement the Out-of-Court Restructuring, holders of 100% of the outstanding Secured Notes Claims shall have consented to the consummation of the Out-of-Court Restructuring by the Exchange Commencement Date (as defined below) unless such requirement is waived by the written consent of the Debtors and the Required Consenting Noteholders.  To effectuate the Restructuring, certain parties, including: (i) the Company Parties; (ii) certain Noteholders (but excluding the Sponsor Equityholder)  (each, a "**Consenting Noteholder**," and collectively, the "**Consenting Noteholders**"); and (iii) certain holders of Existing Equity Interests in Holdings (each, a "**Consenting Equityholder**," and collectively, the "**Consenting Equityholders**," and the Consenting Noteholders together with the Consenting Equityholders, the "**Consenting Stakeholders**"), will enter into the Restructuring Support Agreement. |
| | As set forth in further detail herein and in the Restructuring Support Agreement, on the Effective Date of the Restructuring: |
| | (a) Each Noteholder shall receive its pro rata share of and interest in: |
| |     (i)    99.00% of the New Common Stock, subject to dilution solely from the New MIP; and |
| |     (ii)    Exit Take-Back Term Loan Facility ((i) and (ii) collectively, the "**Noteholder Recovery**"). |
| | (b) Each holder of an Existing Equity Interest shall receive its pro rata share of 1.00% of the New Common Stock, subject to dilution solely from the New MIP (the "**Equityholder Recovery**"). |

| **Treatment of Claims and Interests of the Debtors Under Out-of-Court Restructuring** | |
|---|---|
| **Out-of-Court Restructuring Recovery** | In the event that the Company Parties and the Required Consenting Noteholders determine to consummate the Out-of-Court Restructuring, then on the Effective Date: <br><br> • <u>Secured Notes Claims</u>. Each Consenting Noteholder will receive its pro rata share of the Noteholder Recovery. <br> • <u>Existing Equity Interests</u>. Each holder of an Existing Equity Interest will receive its pro rata share of the Equityholder Recovery. |
| **Treatment of Claims and Interests Pursuant to the Plan (If Applicable)** | |
| **Administrative, Priority Tax, and Other Priority Claims** | Except to the extent that a holder of an Allowed Administrative Claim, Allowed Priority Tax Claim or Allowed Other Priority Claim, respectively, agrees to less favorable treatment, to the extent such Allowed claim has not already been paid in full during the Chapter 11 Cases, in full and final satisfaction, settlement, release, and discharge of, such Allowed claim, on or as soon as reasonably practicable after the later to occur of (i) the Effective Date and (ii) the date such claim becomes Allowed (or as otherwise set forth in the Plan), each holder of an Allowed Administrative Claim, Allowed Priority Tax Claim and Allowed Other Priority Claim will either be satisfied in full, in cash, or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. <br><br> "**Administrative Claim**" means a claim for costs and expenses of administration of each of the Debtors' respective estates (the "**Estates**") under sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) allowed professional fee claims in the Chapter 11 Cases; (c) all allowed requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code; and (d) all fees and charges assessed against the Estates under chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1911-1930. <br><br> "**Priority Tax Claim**" means any claim of a governmental unit of the kind specified in section 507(a)(8) of the Bankruptcy Code. <br><br> "**Other Priority Claim**" means any claim, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code. |
| **Other Secured Claims** | In full and final satisfaction, compromise, settlement, release, and discharge of its Claim (unless the applicable holder agrees to less favorable treatment) each holder of an Allowed Other Secured Claim shall receive, in full and final satisfaction of such claims, either (a) payment in full in cash, (b) delivery of the collateral securing any such claim and payment of any interest required under section 506(b) of the Bankruptcy Code, (c) reinstatement of such claim under section 1124 of the Bankruptcy Code, (d) other treatment rendering such claim unimpaired or (e) the indubitable |

|  | equivalent of such claim. |
|---|---|
|  | "**Other Secured Claim**" means any secured claim against any Debtor, other than an ABL Claim or Secured Notes Claim, including any secured tax Claim. |
| **ABL Facility Claims** | On or as soon as reasonably practicable following the Effective Date, each holder of an Allowed ABL Facility Claim shall be paid in full in cash with the proceeds of the Exit ABL Facility. |
| **Secured Notes Claims** | **Allowance**.  The Secured Notes Claims shall be allowed in an aggregate amount equal to approximately \$401,667,568.<br><br>**Treatment**.  On or as soon as reasonably practicable following the Effective Date, each holder of an Allowed Secured Notes Claim will receive, in full and final satisfaction of such Allowed Secured Notes Claims, its pro rata share of the Noteholder Recovery. |
| **General Unsecured Claims** | Except to the extent that a holder of an Allowed General Unsecured Claim has already been paid during the Chapter 11 Cases or such holder agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for its allowed General Unsecured Claim, each holder of an allowed General Unsecured Claim shall receive, at the Debtors' option and with the consent of the Required Consenting Noteholders:  (i) if such allowed General Unsecured Claim is due and payable on or before the Effective Date, payment in full, in cash, of the unpaid portion of its allowed General Unsecured Claim on the Effective Date; (ii) if such allowed General Unsecured Claim is not due and payable before the Effective Date, payment in the ordinary course of business consistent with past practices; or (iii) other treatment, as may be agreed upon by the Debtors, the Required Consenting Noteholders, and the holder of such allowed General Unsecured Claim, such that the allowed General Unsecured Claim shall be rendered unimpaired pursuant to section 1124(1) of the Bankruptcy Code; provided, however, that the MSA Payment and the DSA Payment shall each be paid in cash in full on the Effective Date.<br><br>Holders of Allowed General Unsecured Claims will not be required to file any proof of claim in the Chapter 11 Cases. |
| **Intercompany Claims** | Unless otherwise provided for under the Plan, on the Effective Date, intercompany claims shall be reinstated, compromised, cancelled, set off, settled, canceled and released, contributed or distributed, or otherwise addressed at the election of the Company Parties. |
| **Section 510(b) Claims** | Section 510(b) Claims shall be discharged, cancelled, released, and extinguished without any distribution to holders of such claims. |
| **Intercompany Interests** | Intercompany Interests shall receive no recovery or distribution and be preserved or reinstated on the Effective Date solely to the extent necessary to maintain the Debtors' corporate structure. |
| **Existing Equity Interests** | On or as soon as reasonably practicable following Effective Date, each holder of an Allowed Existing Equity Interest will receive, in full and final satisfaction of such Allowed Existing Equity Interest, its pro rata share of the Equityholder Recovery. |

| | |
|---|---|
| **Voting Rights** | The Noteholders and holders of Existing Equity Interests will be the only holders of claims or interests entitled to vote to accept or reject the Plan. All other holders of claims or interests will be deemed to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code. |
| **Implementation and Material Provisions** | |
| **Use of Cash Collateral and Adequate Protection** | Prior to the filing of the Chapter 11 Cases, the Company Parties, the ABL Lenders, and the Required Consenting Noteholders shall negotiate terms for the consensual use of cash collateral. |
| **Exit ABL Facility** | On the Effective Date, the reorganized Company Parties (collectively, the "**Reorganized Company**") will enter into the Exit ABL Facility, the terms of which shall be consistent with the term sheet included in the commitment letter attached hereto as **Exhibit 1**. |
| **Exit Take-Back Term Loan Facility** | On the Effective Date, the Reorganized Company shall enter into the Exit Take-Back Term Loan Facility, the terms of which shall be consistent with **Exhibit 2** hereto. |
| **Issuance of New Securities; Execution of the Plan Restructuring Documents** | On the Effective Date, the Reorganized Company shall enter into all agreements and other documents required pursuant to the Restructuring and shall issue the New Common Stock and all other securities, notes, certificates, and other instruments required to be issued pursuant to the Restructuring, including pursuant to Section 1145 of the Bankruptcy Code, to the extent applicable, or another available exemption from the registration requirements of the Securities Act of 1933, as amended. |
| **Cancellation of Notes, Instruments, Certificates, and Other Documents** | On the Effective Date, except to the extent otherwise provided in the Plan, all notes, instruments, certificates, and other documents evidencing Claims or Interests, including credit agreements and indentures, shall be canceled and the obligations of the Debtors thereunder or in any way related thereto shall be deemed satisfied in full and discharged. |
| **Definitive Documents** | Any documents contemplated by this Term Sheet, including any Definitive Documents, that remain the subject of negotiation as of the Agreement Effective Date shall be subject to the rights and obligations set forth in Section 3 of the Restructuring Support Agreement. Failure to reference such rights and obligations as it relates to any document referenced in this Term Sheet shall not impair such rights and obligations. |
| **Milestones** | The following shall be Milestones under the Restructuring Support Agreement and that certain Forbearance and Consent Agreement, dated as of September 2, 2020 (as amended from time to time): (a) No later than November 5, 2020, the Company Parties shall deliver to the Consenting Noteholders a copy of an executed commitment letter that provides, on a fully committed basis, for the Exit ABL Facility; and (b) No later than consummation of the Out-of-Court Restructuring or the In-Court Restructuring, the Company Parties shall have executed definitive documents in respect of the Exit ABL Facility. |

The following milestones shall be applicable to an In-Court Restructuring only:

(c) No later than November 13, 2020, the Company Parties shall commence solicitation in respect of the Plan and Disclosure Statement;

(d) No later than November 23, 2020, the Company Parties shall commence the Chapter 11 Cases (the "**Petition Date**");

(e) On the Petition Date, the Company Parties shall file the Plan, the Disclosure Statement and the motion seeking approval of the Financing Order;

(f) No later than five (5) calendar days following the Petition Date, the Court shall have entered the Financing Order on an interim basis;

(g) No later than seven (7) calendar days prior to the deadline for objecting to the Plan, the Company Parties shall file a plan supplement containing the credit agreement or indenture in respect of the Exit Take-Back Facility, the credit agreement or indenture in respect of the Exit Take-Back Facility, the Exit Intercreditor Agreement, the Governance Documents and the New Shareholders Agreement;

(h) No later than thirty-five (35) calendar days following the Petition Date, the Court shall have entered the Financing Order on a final basis;

(i) No later than forty-five (45) calendar days following the Petition Date, the Court shall have held a confirmation hearing in respect of confirmation of the Plan and approval of the Disclosure Statement, and entered an order confirming the Plan (and approving the Disclosure Statement and the solicitation process) (the "**Confirmation Order**"); and

(j) No later than sixty (60) calendar days following the Petition Date, the Effective Date shall have occurred and the In-Court Restructuring shall have been consummated.

The following milestones shall be applicable to an Out-of-Court Restructuring only:

(a) No later than November 23, 2020, the Company Parties shall have commenced the exchange offer to all Noteholders under the Indenture pursuant to the Exchange Documents (the "**Exchange Commencement Date**"); and

(b) No later than thirty (30) calendar days following the Exchange Commencement Date, the Out-of-Court Restructuring shall have been consummated.

For the avoidance of doubt, at any point subsequent to the execution of the Restructuring Support Agreement, the Company Parties and the Required Consenting Noteholders may mutually determine to terminate any efforts to consummate the In-Court Restructuring and instead seek to consummate the Out-of-Court Restructuring, at which point the Company Parties shall commence the Out-of-Court Restructuring as soon as reasonably practicable thereafter (subject to and in accordance with the Milestones).

| | |
|---|---|
| | The following conditions precedent to the effectiveness of the Out-of-Court Restructuring or the Plan, as applicable, shall be satisfied or waived by the prior written consent of the Debtors and the Required Consenting Noteholders, and the Effective Date shall occur on the date upon which the last of such conditions are so satisfied and/or waived: |
| | • The following conditions are the "Out-of-Court Restructuring Conditions": |
| | o Holders of 100% of the outstanding Secured Notes Claims shall have consented to the consummation of the Out-of-Court Restructuring; and |
| | o All actions, documents, and agreements necessary to implement and consummate the Out-of-Court Restructuring shall have been effected and executed and remain in full force and effect. |
| | • To the extent the Chapter 11 Cases are commenced: |
| **Conditions Precedent to the Effective Date** | o The Bankruptcy Court shall have entered the Disclosure Statement Order, and such Disclosure Statement Order shall not have been reversed, stayed, modified, or vacated and shall not be subject to any pending appeal, and the appeals period for the Disclosure Statement order shall have expired; |
| | o The Bankruptcy Court shall have entered the Confirmation Order, and such Confirmation Order shall not be stayed, modified, or vacated and shall not be subject to any pending appeal, and the appeals period for the Confirmation Order shall have expired; and |
| | o All actions, documents, and agreements necessary to implement and consummate the Plan shall have been effected and executed and remain in full force and effect. |
| | • Under either the Out-of-Court Restructuring or the Chapter 11 Cases: |
| | o The Restructuring Support Agreement shall continue to be in full force and effect; |
| | o The Company Parties shall have paid or reimbursed all reasonable and documented fees and out-of-pocket expenses of the Ad Hoc Group Professionals (as defined below) (as applicable) and, to the extent set forth herein and in the Restructuring Support Agreement, the Sponsor Equityholder Professional (as defined below) in connection with the Restructuring; |
| | o All of the Company Parties' Professional Fee Claims[1] shall have been paid in full or, in the event of the Chapter 11 Cases, |

---

[1] "**Professional Fee Claims**" means a Claim under sections 328, 330(a), 331, 363, 503 or 1103 of the Bankruptcy Code for compensation for services rendered or reimbursement of costs, expenses or other charges incurred by professionals after the Petition Date and prior to the Effective Date.

|  | amounts sufficient to pay such Professional Fee Claims after the Effective Date shall have been placed in the Professional Fee Escrow Account[2] pending approval of the Professional Fee Claims by the Bankruptcy Court; |
|--|--|
|  | o  Each document or agreement constituting the Definitive Documents shall be in form and substance consistent with the Restructuring Support Agreement and this Term Sheet; and |
|  | o  All governmental approvals and consents that are legally required for the consummation of the Restructuring shall have been obtained. |
|  | • Such other conditions precedent to the Effective Date, as are customary and otherwise reasonably requested by the Required Consenting Noteholders and acceptable to the Company Parties. |

| **Miscellaneous Provisions** |
|--|

| **Management Incentive Plan** | Within 60 days of occurrence of the Effective Date, the Company Parties shall enter into an incentive program for the officers and other management of the Reorganized NWH Entities (the "**New MIP**") the terms of which shall be determined and approved by the New Board (as defined below), provided that such terms shall be consistent with **Exhibit 3** hereto. |
|--|--|
| **Employment Obligations and Programs** | The Company Parties' written contracts, agreements, policies, programs and plans for, among other things, compensation, bonuses, reimbursement, indemnity, health care benefits, disability benefits, deferred compensation benefits, travel benefits, vacation and sick leave benefits, savings, severance benefits, retirement benefits, welfare benefits, relocation programs, life insurance and accidental death and dismemberment insurance, including written contracts, agreements, policies, programs and plans for bonuses and other incentives or compensation for the Company Parties' current and former employees, directors, officers, and managers, including executive compensation programs and all existing compensation arrangements for the employees of the Company Parties, in each case on the current terms of such arrangements as may be modified from time to time in the ordinary course of business (the "**Employee Obligation Programs**"), shall continue in full force and effect; *provided* that the obligations arising under the currently existing Key Employee Incentive Plan shall be calculated based on a Total Enterprise Value (as defined in each respective KEIP) equal to $175 million and paid the later of (i) January 15, 2021 and the (ii) the Effective Date of the Restructuring. |
|  | If the In-Court Restructuring is pursued, the Required Consenting Noteholders consent to and shall support the approval and assumption of the Company Parties' Employee Obligation Programs. |

---

[2] "**Professional Fee Escrow Account**" means an interest-bearing account funded by the Debtors with cash on or before the Effective Date, in an amount equal to the Professional Fee Reserve Amount. "**Professional Fee Reserve Amount**" means the aggregate amount of Professional Fee Claims and other unpaid fees and expenses Professionals estimate they have incurred or will incur in rendering services to the Debtors prior to and as of the Effective Date, which estimates Professionals shall deliver to the Debtors as set forth in the Plan.

| | |
|---|---|
| **Management Services and Fee Agreement and Director Services and Fee Agreement** | On the Effective Date, (i) in full and final satisfaction of all claims (collectively, the "**MSA Claim**") arising under that certain Management Services and Fee Agreement, dated as of July 18, 2014 (the "**MSA**"), the Company Parties shall make a $900,000 cash payment to the Sponsor Equityholder and (ii) in full and final satisfaction of all claims (collectively, the "**DSA Claim**") arising under that certain Director Services and Fee Agreement, dated as of September 4, 2014 (the "**DSA**"), the Company Parties shall make a $25,000 cash payment to CCIP III Advisory LTD ("**CITIC**") on account of the DSA Claim (the "**DSA Payment**"). |
| | For the avoidance of doubt, the MSA Payment or the DSA Payment shall be adjusted as appropriate in the event any payments are made prior to the Effective Date in respect of the MSA Payment or the DSA Payment (other than legal fees and expense reimbursements), and the MSA and the DSA shall terminate on the Effective Date. |
| **Board of Directors and Corporate Governance** | The number and identity of initial board of directors for Holdings (the "**New Board**") shall be determined by the Required Consenting Noteholders in consultation with the Company Parties. The President of Holdings shall serve on the New Board. |
| | Holders of New Common Stock shall be (or be deemed) parties to a shareholder agreement in form and substance reasonably acceptable to the Required Consenting Noteholders, subject to the consent rights set forth in the Restructuring Support Agreement. |
| **Tax Issues** | The terms of the Restructuring, including whether the Restructuring is structured as a taxable transaction (in whole or in part), shall be structured to preserve or otherwise maximize favorable tax attributes (including tax basis) of the Company Parties to the extent practicable and commercially reasonable as determined by the Company Parties, and the Required Consenting Noteholders, in consultation with the Sponsor Equityholder. |
| **Executory Contracts and Unexpired Leases** | Assumption and/or rejection of any executory contract or unexpired lease (other than those governing Employee Obligations and Programs as set forth below) shall be at the discretion of the Company Parties and subject to the reasonable consent of the Required Consenting Noteholders. |
| **Discharge, Release, Injunction, and Exculpation** | Certain matters with respect to release, discharge, injunction, and exculpation provisions in connection with the Restructuring are attached hereto as **Annex 2**. |
| **Avoidance Actions** | On the Effective Date, the Company Parties shall waive any Causes of Action arising under sections 544, 545, 547, 548, 549, and 550 of the Bankruptcy Code or any other state or federal law. |

| | |
|---|---|
| **Survival of Indemnification Obligations and D&O Insurance** | Any obligations of the Debtors (pursuant to corporate charters, bylaws, certificates of incorporation, limited liability company agreements, or other organizational documents, board resolutions, indemnification agreements, employment contracts or otherwise) to indemnify current and former officers, directors, managers, agents, employees, attorneys, accountants, investment bankers, and other professionals of the Company Parties, as applicable, with respect to all present and future actions, suits, and proceedings against the Debtors or such directors, officers, agents, employees, managers, attorneys, accountants, investment bankers, and other professionals of the Debtors, based upon any act or omission for or on behalf of the Debtors, will not be discharged or impaired by confirmation of the Plan. All such obligations will be deemed and treated as executory contracts to be assumed by the Debtors. <br><br> After the Effective Date, the Reorganized Debtors will not terminate or otherwise reduce the coverage under any directors' and officers' insurance policies (including any "tail policy") in effect or purchased as of the Petition Date, and all members, managers, directors, and officers of the Reorganized Debtors who served in such capacity at any time prior to the Effective Date or any other individuals covered by such insurance policies, will be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such members, managers, directors, officers, or other individuals remain in such positions after the Effective Date.[3] |
| **Retention of Jurisdiction** | The Plan will provide for the retention of jurisdiction by the Bankruptcy Court for usual and customary matters. |
| **Fees and Expenses of the Consenting Noteholders and Sponsor Equityholder** | The Company Parties shall pay or reimburse all reasonable and documented fees and out-of-pocket expenses of the Consenting Noteholders in connection with the Restructuring on an ongoing basis and as of the Effective Date, including the reasonable and documented fees and expenses of (a) (i) Willkie, Farr & Gallagher LLP, as counsel to the Consenting Noteholders, and (ii) Guggenheim Securities, LLC, as investment banker and financial advisor to the Consenting Noteholders; and (b) one local counsel retained in connection with the Chapter 11 Cases, as applicable (collectively, the "**Ad Hoc Group Professionals**"). <br><br> The Company Parties shall pay or reimburse all reasonable and documented legal fees and out-of-pocket expenses of the Sponsor Equityholder in connection with the Restructuring on an ongoing basis and as of the Effective Date, including the reasonable and documented fees and expenses of (a) Wachtell, Lipton, Rosen & Katz, as counsel to the Sponsor Equityholder and (b) one local counsel retained in connection with the Chapter 11 Cases, as applicable (the "**Sponsor Equityholder Professionals**"); provided, that such obligations shall not exceed $200,000 if the Chapter 11 Cases are commenced, or $150,000 if the Out-Of-Court Restructuring is consummated (the "**Sponsor Fee Cap**"). |

---

[3]     For the avoidance of doubt, and notwithstanding anything herein or in the Restructuring Support Agreement to the contrary, the Company is authorized to purchase insurance policies in the ordinary course of business, including, without limitation, a "tail" policy with respect to their directors' and officers' insurance policies.

| | |
|---|---|
| **Consent and Consultation Rights** | The consent and consultation rights over the Definitive Documents are as set forth in the Restructuring Support Agreement.  To the extent there is any inconsistency between the Restructuring Support Agreement and this Term Sheet, the Restructuring Support Agreement shall govern. |

## **Annex 1**

**Discharge, Release, Injunction, and Exculpation Provisions**

**CHAPTER 11 CASES RELEASES**

The release, discharge, injunction, and exculpation provisions applicable to the Restructuring shall be set forth only in the Plan, substantially as set forth below:

| | |
|---|---|
| **Discharge of Claims and Termination of Interests** | Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims, (including any Debtor Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors) Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors before the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (1) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan.  Any default or "event of default" by the Debtors or Affiliates with respect to any Claim or Interest that existed immediately before or on account of the filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring. |
| **Released Parties** | Collectively, and in each case in its capacity as such:  (a) the Debtors and the Reorganized Debtors;  (b) the Consenting Noteholders; (c) the Indenture Trustee; (d) the Consenting Equityholders; (e) with respect to each of the foregoing entities, each such Entity's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), subsidiaries, direct and indirect equity holders, and funds; and (f) with respect to each of the foregoing Entities in clauses (a) through (e), each of their respective current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors (with respect to clause (e), each solely in their capacity as such); *provided*, *however*, that any Holder of a Claim or |

| | |
|---|---|
| | Interest in a voting Class that objects to the Plan and votes to reject the Plan (and thereby opts out of the releases) shall not be a "Released Party." |
| **Releasing Parties** | Collectively, and in each case in its capacity as such:  (a) the Debtors and the Reorganized Debtors;  (b) the Consenting Noteholders; (c) the Indenture Trustee, (d) the Consenting Equityholders; (e) with respect to each of the foregoing entities in clauses (a) through (d), each such Entity's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), subsidiaries, direct and indirect equity holders, and funds; (f) with respect to each of the foregoing Entities in clauses (a) through (e), each of their respective current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors (with respect to clause (e), each solely in their capacity as such); and (g) all Holders of Claims and Interests not described in the foregoing clauses (a) through (f); *provided*, *however*, that any Holder of a Claim or Interest that (1) votes to reject the Plan and (2) objects to the releases in the Plan, shall not be a "Releasing Party" for purposes of the Plan. |
| **Releases by the Debtors** | Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtors, the Reorganized Debtors, and their Estates from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest, or that any Holder of any Claim or Interest could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part: |

(a)  the Debtors, the Debtors' restructuring efforts, intercompany transactions, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement;

(b)  any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, or the Plan;

(c)  the Chapter 11 Cases, the Disclosure Statement, the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement; or

(d)  any other act or omission, transaction, agreement, event, or other

| | |
|---|---|
| | occurrence taking place on or before the Effective Date. |
| | Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any (i) post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, or (ii) claims related to any act or omission that is determined in a final order to have constituted actual fraud or willful misconduct. |
| **Releases by Holders of Claims and Interests of the Debtors** | As of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part: |
| | (a) the Debtors, the Debtors' restructuring efforts, intercompany transactions, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement; |
| | (b) any transaction that is part of the Restructuring, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the order confirming the Plan in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, or the Plan; |
| | (c) the Chapter 11 Cases, the Disclosure Statement, the Plan, the filing of the Chapter 11 Cases, the pursuit of confirmation of the Plan, the pursuit of consummation of the Plan, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement; or |
| | (d) any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. |
| | Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any (i) post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, or (ii) claims related to any act or omission that is determined in a final order to have constituted actual fraud or willful misconduct.  Notwithstanding anything herein to the contrary, nothing herein shall be intended to be a release of the Sponsor Equityholder's (a) Secured Notes Claims, (b) Claims under that certain Management Services and Fee Agreement, dated as of July 18, 2014, by and between the Sponsor Equityholder and Northwest Hardwoods, Inc., and such claims are hereby expressly reserved, or (c) Claims arising under the Restructuring Support Agreement. |

| | |
|---|---|
| **Exculpated Parties** | Collectively, and in each case in its capacity as such: (a) the Debtors and the Reorganized Debtors, (b) with respect to each of the foregoing entities, each such Entity's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), subsidiaries, direct and indirect equity holders, and advisors and (c) with respect to each of the foregoing Entities in clauses (a) and (b), each of their respective current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors. |
| **Exculpation** | Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or termination of the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan, or any Restructuring Transaction, contract, instrument, release or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a final order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and, upon completion of the Plan, shall be deemed to have participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. |
| **Injunctions** | Except as otherwise expressly provided in the Plan or the Confirmation Order, all Entities that have held, hold, or may hold claims or interests that have been released pursuant to the Plan, shall be discharged pursuant to the Plan, or are subject to exculpation pursuant to the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, or the Released Parties: (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (ii) enforcing, attaching, collecting, or recovering by any manner or means any |

| | judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (iii) creating, perfecting, or enforcing any lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests unless such Entity has timely asserted such setoff right in a document filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan. |
|---|---|

## Exhibit 1

## Exit ABL Facility Commitment Letter



Brett German                                                                                    Wholesale Credit
Senior Vice President                                                          Bank of America Business Capital
Asset-Based Portfolio Specialist            121 SW Morrison Street, Suite 1700 Portland OR 97204
                                                                                                    T 503.795.6440
                                                                                            brett.german@bofa.com

November 5, 2020

Northwest Hardwoods, Inc.
1313 Broadway, Suite 300
Tacoma, WA 98402

   Re:  Commitment for Senior Credit Facility

Ladies and Gentlemen:

Bank of America, N.A. ("<u>Bank</u>") is pleased to commit to be the administrative agent ("<u>Agent</u>") for a $100,000,000 Senior Credit Facility ("<u>Senior Credit Facility</u>") in connection with the exit ("<u>Exit</u>") of Northwest Hardwoods, Inc. ("NWH" or the "<u>Borrower</u>") from restructuring, including if required through a chapter 11 bankruptcy case (the "<u>Chapter 11 Case</u>") to be filed in the United States Bankruptcy Court for the District of Delaware ("<u>Bankruptcy Court</u>") to, and to lend up to $60,000,000 of the Senior Credit Facility, with the remaining $40,000,000 to be provided by Wells Fargo Bank, N.A. pursuant to the commitment letter attached as Exhibit A hereto, in each case, on the terms of this letter, including the Summary of Terms attached hereto (collectively, "<u>Commitment Letter</u>") and subject to confirmation and effectiveness of the Plan.  Bank is also pleased to advise you of its willingness to form a syndicate of financial institutions ("<u>Lenders</u>") for the Senior Credit Facility.

Bank will act as sole and exclusive Agent, lead arranger and book manager for the Senior Credit Facility. No additional agents, co-agents or arrangers will be appointed and no other titles will be awarded without Bank's prior written approval.  You agree that, effective upon your acceptance of this Commitment Letter and continuing through the earlier of (a) January 31, 2021 and (b) 20 days following the Exit, you shall not solicit any other bank, investment bank, financial institution, person or entity to provide, structure, arrange or syndicate the Senior Credit Facility or any other senior financing similar to the Senior Credit Facility.

The undertakings of Bank herein are subject to satisfaction of the following conditions, in a manner acceptable to Bank:  (a) all Information (defined below) when taken as a whole, is and will be complete and correct in all material respects and does not and will not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained therein, in the light of the circumstances under which such statements are made, not misleading; (b) the financial projections that have been or will be made available to the Bank by Borrower, or any of Borrower's respective representatives in connection with the transactions contemplated hereby have been and will be prepared in good faith based upon assumptions believed by you to be reasonable at the time of preparation (it being understood that projections by their nature are inherently uncertain and no assurances are being given that the results reflected in the financial projections will be achieved); (c) (i) the terms and conditions of any restructuring, recapitalization, debt modification or reorganization transaction and/or document effecting such a transaction shall be consistent with the Restructuring Support Agreement (as defined in the attached

Summary of Terms) or otherwise reasonably satisfactory to the Agent and Lenders, and (ii) any order entered in the Chapter 11 Case shall be reasonably satisfactory to the Agent and Lenders to the extent such order affects the rights or obligations of the Agent and the Lenders, including entry of any order contemplated in the Restructuring Support Agreement; (d) the accuracy and completeness of all representations that you and your affiliates make to Bank and your compliance with the terms of this Commitment Letter and the fee letter of even date between you and Bank ("Fee Letter"); (e) prior to and during the syndication of the Senior Credit Facility, there shall be no competing offering, placement or arrangement of any debt securities or bank financing by or on behalf of Holdings or any of its subsidiaries; and (f) other than with respect to or as a result of the Chapter 11 Case, no change, occurrence or development shall have occurred or become known to Bank since June 30, 2020, that could reasonably be expected to have a material adverse effect on the business, assets, properties, liabilities (actual or contingent), operations, or condition (financial or otherwise) of Holdings and subsidiaries, taken as a whole (a "Material Adverse Effect"); provided that the non-payment of interest on the Borrower's outstanding notes on August 3, 2020 shall not be deemed to constitute a Material Adverse Effect.

The commitment set forth hereunder with respect to the Senior Credit Facility may be terminated by the Bank if (i) any information submitted to the Bank by or on behalf of Holdings, or any of its subsidiaries or affiliates is inaccurate, incomplete or misleading in any material respect; (ii) any change shall occur since the commencement of the  Chapter 11 Case, or any additional information shall be disclosed to or discovered by the Bank (including, without limitation, information contained in any review or report required to be provided to them in connection herewith), that the Bank determines has had or could reasonably be expected to have a Material Adverse Effect; or (iii) any condition set forth in the attached Term Sheet or Annex I is not satisfied or any covenant or agreement in this Commitment Letter or the Fee Letter is not complied with.

Bank intends to commence syndication efforts promptly upon your acceptance of this Commitment Letter and the Fee Letter.  You agree to actively assist Bank in achieving a syndication of the Senior Credit Facility that is satisfactory to it.  Such assistance shall include (a) your providing and causing your advisors to provide to Bank and the other Lenders, upon request, all information reasonably deemed necessary by Bank to complete syndication; (b) your using best efforts to ensure that the syndication efforts benefit materially from your existing banking relationships; and (c) otherwise assisting Bank in its syndication efforts, including by making your senior management and advisors available from time to time to attend and make presentations regarding the business and prospects of Holdings and its subsidiaries at one or more meetings of prospective Lenders.  Notwithstanding, Bank shall not syndicate more than $40,000,000 of its commitment hereunder in connection with a syndication occurring on or about the closing date of the Senior Credit Facility.

It is understood and agreed that Bank will manage and control all aspects of the syndication, including decisions as to the selection of prospective Lenders and any titles offered to proposed Lenders, when commitments will be accepted and the final allocations of the commitments among the Lenders; provided that with respect to a syndication occurring on or about the closing date of the Senior Credit Facility, Borrower shall have a right to consent to proposed Lenders (other than Wells Fargo Bank, N.A.), which consent shall not be unreasonably withheld or delayed.  It is understood that no Lender participating in the Senior Credit Facility will receive compensation from you in order to obtain its commitment, except on the terms provided herein.  It is also understood and agreed that the amount and distribution of fees among the Lenders will be at the sole discretion of Bank.

You hereby represent, warrant and covenant that (a) all information, other than Projections (as defined below), which has been or is hereafter made available to Bank or the Lenders by you or any of your representatives (or on your or their behalf) in connection with the transactions contemplated hereby (collectively, "Information") is and will be complete and correct in all material respects and does not and

will not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained therein not misleading; and (b) all financial projections concerning Holdings and its subsidiaries that have been or are hereafter made available to Bank or the Lenders by you or any of your representatives ("<u>Projections</u>") have been and will be prepared in good faith based upon assumptions believed by you to be reasonable at the time of preparation (it being understood that projections by their nature are inherently uncertain and no assurances are being given that the results reflected in the financial projections will be achieved). You agree to furnish Bank with such Information and Projections as it may reasonably request and to supplement the Information and Projections from time to time until the closing date for the Senior Credit Facility, so that the representations, warranties and covenants in the preceding sentence are correct on the closing date.  In issuing this commitment and in arranging and syndicating the Senior Credit Facility, Bank is and will be relying on, without independent verification, the Information and Projections.

By executing this Commitment Letter, you agree to reimburse Bank from time to time on demand for all reasonable out-of-pocket fees and expenses (including without limitation (a) the reasonable fees, disbursements and other charges of counsel, including any special or local counsel, and (b) due diligence expenses) incurred in connection with the Senior Credit Facility, the syndication thereof, the preparation of the definitive documentation therefor and the other transactions contemplated hereby.

You agree to indemnify and hold harmless Bank, each Lender, and each of their affiliates, officers, directors, employees, agents, advisors and other representatives (each, an "<u>Indemnified Party</u>") from and against (and will reimburse each Indemnified Party as the same are incurred for) any and all claims, damages, losses, liabilities and expenses (including, without limitation, the reasonable fees, disbursements and other charges of counsel) that may be incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or by reason of (including, without limitation, in connection with any investigation, litigation or proceeding or preparation of a defense in connection therewith) (a) any matters contemplated by this Commitment Letter or any related transaction or (b) the Senior Credit Facility and any other financings or any use made or proposed to be made with the proceeds thereof, except to the extent such claim, damage, loss, liability or expense (x) is found in a final, nonappealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence, willful misconduct, or material breach of this Commitment Letter, or (y) arise out of any claim, litigation, investigation or proceeding brought by such Indemnified Party (or any of its Related Parties, as such term is defined in the Existing Credit Agreement) against another Indemnified Party (or any of its Related Parties) (other than any claim, litigation, investigation or proceeding brought by or against any Agent, the Lead Arranger, any Issuing Bank or the Swingline Lender, acting in each of their respective capacities as such) that does not involve any act or omission of Borrower, any Guarantor or any of their subsidiaries. Furthermore, Borrower shall not be liable for any settlement of any proceeding referred to in this paragraph effected without Borrower's written consent (such consent not to be unreasonably withheld or delayed) (unless the Borrower shall have declined to assume the defense of such proceeding), but if settled with such consent, or if there is a final judgment against an Indemnified Party in any such proceeding, Borrower agrees to indemnify and hold harmless the applicable Indemnified Party in the manner set forth above.  The Borrower shall not, without the prior written consent of any Indemnified Party (such consent not to be unreasonably withheld), effect any settlement of any pending or threatened proceeding in respect of which such Indemnified Party is or could have been a party and indemnity could have been sought hereunder by such Indemnified Party unless such settlement (i) includes an unconditional release (in form and substance satisfactory to such Indemnified Party) of such Indemnified Party (and its Related Parties) from all liability or claims that are the subject matter of such proceeding and (ii) does not include a statement as to or an admission of fault, culpability or a failure to act by or on behalf of any Indemnified Party (or its Related Parties).  In the case of an investigation, litigation or proceeding to which the indemnity in this paragraph applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by you, your equity holders or creditors, a third party or an Indemnified Party, whether or not an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby are

consummated.  You also agree that no Indemnified Party shall have any liability (whether direct or indirect, in contract or tort, or otherwise) to you or your affiliates or to your or their respective equity holders or creditors arising out of, related to or in connection with any aspect of the transactions contemplated hereby, except to the extent of direct, as opposed to special, indirect, consequential or punitive, damages determined in a final, nonappealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct.  It is further agreed that Bank shall only have liability to you (as opposed to any other person), and that Bank shall be liable solely in respect of its own commitment to the Senior Credit Facility on a several, and not joint, basis with any other Lender, and that such liability shall only arise to the extent damages have been caused by a breach of Bank's obligations hereunder to negotiate definitive documentation for the Senior Credit Facility in good faith on the terms set forth herein, as determined in a final, nonappealable judgment by a court of competent jurisdiction. Notwithstanding any other provision of this Commitment Letter, no Indemnified Party shall be liable for any damages arising from the use by others of information or other materials obtained through electronic telecommunications or other information transmission systems, unless such information or other materials was obtained due to such Indemnified Party's gross negligence, willful misconduct or breach of this Commitment Letter or other confidentiality agreement.

This Commitment Letter and the Fee Letter are confidential and, except for disclosure on a confidential basis to your accountants, attorneys and other professional advisors retained by you in connection with the Senior Credit Facility or as otherwise required by law, may not be disclosed in whole or in part to any person or entity without Bank's prior written consent (which may be evidenced by a writing from Bank's attorneys); provided, however, that you may disclose this Commitment Letter (but not the Fee Letter), after your acceptance of same, (a) in filings with the Securities and Exchange Commission and other applicable regulatory authorities and stock exchanges, (b) in filings with the Bankruptcy Court in connection with the Chapter 11 Case, including confirmation of a plan of reorganization and related matters, and (c) subject to confidentiality agreements similar to those contained in this Commitment Letter, to the Term Lenders and their accountants, attorneys, financial advisors and other professional advisors retained by them in connection with the Term Loan Facility.

You acknowledge that Bank and its affiliates may be providing financing or other services to parties whose interests may conflict with yours.  Bank agrees that it will not furnish confidential information obtained from you to any of its other customers and that it will treat confidential information relating to you and your affiliates with the same degree of care as it treats its own confidential information.  Bank further advises you that it will not make available to you confidential information that Bank or its affiliates have obtained or may obtain from any other customer.  In connection with the services and transactions contemplated hereby, you agree that Bank is permitted to access, use and share, with any of its affiliates, agents, advisors or representatives, any information concerning you or any of your affiliates that is or may come into the possession of Bank or its affiliates.

In connection with all aspects of each transaction contemplated by this letter, you acknowledge and agree, and acknowledge your affiliates' understanding, that (a) the Senior Credit Facility and any related arranging or other services described in this letter constitute an arm's-length commercial transaction between you and your affiliates, on the one hand, and Bank on the other hand, and you are capable of evaluating and understanding, and do understand and accept, the terms, risks and conditions of the transactions contemplated by this Commitment Letter; (b) in connection with the process leading to such transaction, Bank is and has been acting solely as a principal and is not the financial advisor, agent or fiduciary for you or any of your affiliates, stockholders, creditors or employees or any other party; (c) Bank has not assumed and will not assume an advisory, agency or fiduciary responsibility in your or your affiliates' favor with respect to any of the transactions contemplated hereby or the process leading thereto (irrespective of whether Bank has advised or is currently advising you or your affiliates on other matters) and Bank has no obligation to you or your affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth in this letter; (d) Bank and its affiliates may be engaged in a broad range of

-4-

transactions that involve interests that differ from yours and your affiliates, and Bank has no obligation to disclose any of such interests by virtue of any advisory, agency or fiduciary relationship; and (e) Bank has not provided any legal, accounting, regulatory or tax advice with respect to any of the transactions contemplated hereby and you have consulted your own legal, accounting, regulatory and tax advisors to the extent you have deemed appropriate.  You hereby waive and release, to the fullest extent permitted by law, any claims that you may have against Bank with respect to any breach or alleged breach of agency or fiduciary duty.

The provisions of the five preceding paragraphs shall remain in full force and effect regardless of whether any definitive documentation for the Senior Credit Facility shall be executed and delivered, and notwithstanding the termination of this Commitment Letter or any undertaking hereunder.

This Commitment Letter and the Fee Letter may be executed in counterparts which, taken together, shall constitute an original.  Delivery of an executed counterpart of this Commitment Letter or the Fee Letter by facsimile or electronic mail shall be effective as delivery of a manually executed counterpart thereof.

This Commitment Letter and the Fee Letter shall be governed by the laws of the State of New York (and, to the extent applicable, the Bankruptcy Code).  Each of you and Bank hereby irrevocably waives any and all right to trial by jury in any action, proceeding or counterclaim (whether based on contract, tort or otherwise) arising out of or relating to this Commitment Letter, the Fee Letter, the transactions contemplated thereby, or the actions of Bank in the negotiation, performance or enforcement thereof.  Bank may terminate any of its undertakings hereunder if you fail to perform your obligations under this Commitment Letter or the Fee Letter on a timely basis.

Bank hereby notifies you that pursuant to the requirements of the USA Patriot Act, Title III of Pub. L. 107-56 (signed into law October 26, 2001) ("Act"), Bank is required to obtain, verify and record information that identifies a Borrower, which information includes a Borrower's legal name, address, tax ID number and other information that will allow Bank to identify a Borrower in accordance with the Act.  Bank will also require information regarding each personal guarantor, if any, and may require information regarding a Borrower's management and owners, such as legal name, address, social security number and date of birth.

This Commitment Letter and the Fee Letter embody the entire agreement and understanding among Bank, you and your affiliates with respect to the Senior Credit Facility, and supersede all prior agreements and understandings relating thereto.  However, please note that the terms of the undertakings of Bank hereunder are not limited to those set forth in this Commitment Letter.  Those matters that are not covered or made clear are subject to mutual agreement of the parties.  No party has been authorized by Bank to make any oral or written statements that are inconsistent with this Commitment Letter and the Fee Letter.  This Commitment Letter is not assignable by any Borrower without Bank's prior written consent and is intended to be solely for the benefit of the parties hereto and the Indemnified Parties.

This offer will expire at 5:00 p.m. (Pacific time) on November 6, 2020, unless you execute this letter and the Fee Letter and return them to Bank prior to that time.  If this letter and the Fee Letter are executed and delivered by such date, this undertaking and commitment will thereafter expire on January 31, 2021, unless definitive documentation for the Senior Credit Facility is executed and delivered by that date.

THIS WRITTEN AGREEMENT AND THE FEE LETTER REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.  THERE ARE NO UNWRITTEN AGREEMENTS BETWEEN THE PARTIES.

[Remainder of page intentionally left blank]

We look forward to working with you in the coming weeks on this important financing.

**BANK:**

**BANK OF AMERICA, N.A.**

By:_____

Name:__Brett German_____

Title:___Sr. Vice President_____


Accepted and Agreed to as of

_____, 2020:

**BORROWER:**


By_____

   Title:

We look forward to working with you in the coming weeks on this important financing.

**BANK:**

**BANK OF AMERICA, N.A.**

By:_____
Name:_____
Title:_____

Accepted and Agreed to as of
_____ November 5 , 2020:

**BORROWER:**

By_____
   Title: PRESIDENT, CEO

## SUMMARY OF TERMS

| | |
|---|---|
| BORROWER: | Northwest Hardwoods, Inc. or any successor thereto on consummation of a plan of reorganization in the Chapter 11 Case ("NWH" or "Borrower"). |

GUARANTORS:    Hardwoods Intermediate Holdings II, Inc. or any successor thereto on consummation of a plan of reorganization in the Chapter 11 Case ("Holdings") and any domestic subsidiaries of Holdings.

AGENT:    Bank of America, N.A. ("Agent").

LEAD ARRANGER AND
BOOK MANAGER:    Bank of America, N.A.

LENDERS:    Bank, and a group of lenders acceptable to Agent (to include Wells Fargo Bank, N.A.).

CREDIT
FACILITY:    A senior credit facility ("Senior Credit Facility") consisting of a revolving credit facility of up to $100,000,000, including a $25,000,000 sub-limit for letters of credit (letters of credit will be 100% reserved against borrowing availability under the Senior Credit Facility) and a $20,000,000 sub-limit for swingline loans.

DOCUMENTATION
PRINCIPLES:    The documentation for the Senior Credit Facility will include a credit agreement, guaranties, security agreements, the Intercreditor Agreement (as defined below), and other customary loan documents with terms and conditions customary for an asset based credit facility (collectively, the "Definitive Loan Documents"), and will contain representations and warranties, covenants, events of default and other provisions which shall be in substantially similar form as corresponding provisions of the Asset-Based Revolving Credit Agreement dated as of July 18, 2014 by and among Borrower, various lenders party thereto and Bank of America, N.A. as agent for such lenders (as amended, the "Existing Credit Agreement") and the "Loan Documents" (as defined thereunder), as applicable, except to the extent necessary to reflect (a) the terms and conditions described herein, (b) changes in law or accounting standards since the date of the Existing Credit Agreement, (c) the Agent's current documentation standards for credit facilities similar to the Senior Credit Facility (including (i) methods of determining and calculating interest rates and related matters, and (ii) interest rate definitions and terms and conditions related to the phase out and replacement of LIBOR), (d) terms and conditions set forth in the Term Loan Facility documentation, and (e) such other changes as are mutually agreeable to Borrower and the Agent (collectively, the "Documentation Principles"). All capitalized terms used but not defined in this Term Sheet shall have the definition given thereto in the Existing Credit Agreement subject to the Documentation Principles.

ACCORDION:    The Senior Credit Facility will include an accordion feature permitting Borrower to request an increase in the Revolving Facility Commitments by an additional amount of up to $50,000,000; provided that any such request shall be in a minimum amount of $5,000,000 and in increments of $5,000,000 in excess thereof.  Such increases may be effected from time to time after the closing date subject to customary terms and conditions and provided that (a) no Default or Event of Default exists at the time of any such increase and (b) Borrower may make a maximum of two (2) such requests.  Borrower may offer the increase to (i) its existing Lenders, and each existing Lender will have the right, but not the obligation, to commit to all or a portion of the proposed increase, and (ii) if necessary to obtain the requested additional commitments, third party financial institutions reasonably acceptable to the Agent and Borrower.

TERM LOAN
FACILITY:    In connection with that certain term loan facility to be incurred by Borrower on the closing date in an aggregate amount not to exceed $110,000,000 (the "Term Loan Facility") provided by the lender or lenders pursuant thereto (collectively, the "Term Loan Lenders"), the Agent, the Term Loan Lenders (or agent for such Term Loan Lenders), Borrower and Guarantors shall enter into an Intercreditor Agreement on terms consistent with the terms hereof (including under the heading "Security" below) and the Documentation Principles and otherwise reasonably satisfactory to the Agent and the Term Loan Lenders (the "Intercreditor Agreement").

PURPOSE:    On the closing date, proceeds of the Senior Credit Facility will be used, together with cash on hand of Borrower and its subsidiaries to satisfy the claims against Borrower and its subsidiaries pursuant to the Plan, including payment in full in cash of obligations under the Existing Credit Agreement and, on and following the closing date, the Senior Credit Facility will be used to issue standby or commercial letters of credit, and to finance ongoing working capital needs and general corporate purposes.

LOAN
AVAILABILITY:    Subject to the Documentation Principles, advances under the Senior Credit Facility will be limited to (a) 85% of eligible accounts receivable (excluding accounts receivable owed by account debtors located outside of the United States and Canada), plus (b) the lesser of (x) 80% of eligible accounts receivable owed by account debtors located outside of the United States and Canada, (y) $10,000,000 and (z) 10% of the Borrowing Base (after giving effect to this clause (b)), plus (c) the lesser of (x) 70% of eligible inventory, (y) 85% of the appraised net orderly liquidation value of eligible inventory, plus (d) the lesser of (x) 100% of the qualified cash of Borrower and (y) an amount equal to 10% of the aggregate Revolving Facility Commitments; minus (e) such reserves as Agent may establish in its Permitted Discretion and subject to the Documentation Principles.

Standards of eligibility will be consistent with the Existing Credit Agreement subject to the Documentation Principles with the definition of "Eligible Foreign Account" to be expanded to include account debtors located in Vietnam.

SECURITY:    All obligations under the Senior Credit Facility will be secured by:

(a)   first priority perfected liens on and security interests in all of Borrower's and each Guarantor's existing and future (i) inventory and accounts receivable, (ii) cash, (iii) deposit accounts, securities accounts, commodity accounts and investment accounts, (iv) to the extent relating to any of the foregoing, all documents, general intangibles, instruments, chattel paper, books and records, and supporting obligations, and (v) proceeds of all of the foregoing (including without limitation insurance proceeds relating to any of the foregoing and business interruption insurance) (collectively, the "ABL Priority Collateral"), subject to permitted liens or as otherwise acceptable to the Agent. All deposit and investment accounts maintained at financial institutions other than the Agent (subject to certain customary exceptions to be agreed upon) shall be subject to account control agreements in favor of the Lender; and

(b)   second priority perfected liens on and security interests in all of Borrower's and each Guarantor's other existing and future personal property assets, including, without limitation, equipment, general intangibles, goods, trademarks, patents, copyrights, intercompany obligations, stock, securities and notes, and, to the extent not relating to the ABL Priority Collateral, all documents, contracts, instruments, chattel paper, books and records, supporting obligations, and any other asset or property securing the obligations under the Term Loan Facility, in each case, all proceeds thereof (the "Term Priority Collateral" and collectively with the ABL Priority Collateral, the "Collateral"), subject to permitted liens or as otherwise acceptable to the Lender.

MATURITY:    The Senior Credit Facility will mature on the earlier of (i) 5 years after the closing date and (ii) 91 days prior to the state maturity of the Term Loan Facility.

INTEREST RATES:    The Senior Credit Facility will initially bear interest at a rate equal to LIBOR plus 2.125% or Base Rate plus 1.05%.

LIBOR and Base Rate will be defined in accordance with Bank's standard practices, and LIBOR and any successor rate will be subject to a floor of 0.25% per annum.  LIBOR loans will be subject to customary provisions, including replacement of LIBOR, applicable reserve requirements, limits on the number of outstanding LIBOR loans, and minimum dollar amounts of each LIBOR loan.

All interest and per annum fees will be calculated on the basis of actual number of days elapsed in a year of 360 days.  If an event of default exists, upon the

election of Agent, all loans and other obligations will bear interest at a rate 200 basis points in excess of the otherwise applicable rate.

PERFORMANCE
PRICING:                The LIBOR and Base Rate margins will be subject to performance pricing adjustments, commencing 3 months after the closing date, based upon the pricing matrix attached hereto as Schedule 1.

UNUSED LINE
FEE:                    An unused line fee equal to 0.375% per annum; provided that if on the last day of any fiscal quarter (starting with the first full fiscal quarter after the closing date) the daily average undrawn portion of the Revolving Facility Commitments during the preceding quarter was greater than 33.3% of the aggregate Revolving Facility Commitments, such rate shall be 0.25% per annum for such fiscal quarter.

LETTER OF CREDIT
FEES:                   Borrower will pay (a) a letter of credit fee monthly in arrears on all letters of credit equal to the applicable LIBOR margin; (b) a 0.125% fronting fee to Bank, on the face amount of all outstanding letters of credit, payable monthly in arrears; and (c) Bank's customary fees and charges in connection with all amendments, extensions, draws and other actions with respect to letters of credit.

OTHER FEES:             Borrower will pay certain other fees in connection with the Senior Credit Facility as set forth in the Fee Letter.

EXPENSES:               Borrower will pay (a) all reasonable out-of-pocket costs and expenses (including fees and expenses of counsel) of Bank associated with the Senior Credit Facility, including costs and expenses of (i) Bank's due diligence, including field examinations, appraisals and environmental audits, and (ii) syndicating and administering the Senior Credit Facility, and preparing and enforcing all documents relating thereto; plus (b) Bank's charges, fees and expenses with respect to examinations of any Borrower's or Guarantor's books and records or any other financial or collateral matters as the Agent deems appropriate, including field audits and inventory appraisals, each up to one (1) time (or, two (2) times if such second audit and/or appraisal is commenced during an Audit Trigger Period) per twelve-month period; provided, however, that if an examination and/or appraisal is initiated during an Event of Default, all charges, costs and expenses therefor shall be reimbursed by the Loan Parties without regard to such limits.

"Audit Trigger Period" shall mean any period during which Excess Availability has been less than the greater of (i) $15,000,000 and (ii) 20% of the lesser of (x) the aggregate Revolving Facility Commitments at such time and (y) the Borrowing Base at such time, for five (5) consecutive Business Days, with such period commencing on the first such date that such trigger is met for the five

preceding Business Days and ending three months after the first date thereafter that such trigger is not met.

Borrower will remain obligated for all such amounts set forth above whether or not the Senior Credit Facility is consummated.

TERMS AND
CONDITIONS:                The Definitive Loan Documents will contain representations and warranties, covenants, events of default, and other provisions acceptable to Bank and consistent with Documentation Principles, including the following:

1.  Financial covenants shall be limited to a minimum fixed charge coverage ratio of 1.00:1.00 to be defined consistent with the Documentation Principles and tested during a Financial Covenant Trigger Period.

    "Financial Covenant Trigger Period" shall mean a period commencing on any date when Excess Availability is less than the greater of (i) 10% of the lesser of (x) the aggregate Revolving Facility Commitments at such time and (y) the Borrowing Base at such time and (ii) $8,000,000 and continuing until the date on which Excess Availability has exceeded the greater of (i) 10% of the lesser of (x) the aggregate Revolving Facility Commitments at such time and (y) the Borrowing Base at such time and (ii) $8,000,000 for 30 consecutive days.

2.  Borrower's agreement to provide Bank and Lenders periodic financial and collateral reporting consistent with Documentation Principles, including annual audited financial statements, quarterly internally prepared financial statements, annual financial projections, and monthly Borrowing Base certificates (to be delivered weekly during a Weekly Reporting Period), receivables agings and inventory reports.

    "Weekly Reporting Period" shall mean any period (i) during the continuance of a Specified Event of Default or (ii) during which Excess Availability is less than the greater of (a) 12.5% of the lesser of (x) the aggregate Revolving Facility Commitments at such time and (y) the Borrowing Base at such time and (b) $12,000,000 for five (5) consecutive Business Days (until the date on which, in the case of clause (i), such Specified Event of Default is cured or waived or no longer continuing, or in the case of clause (ii), Excess Availability exceeds the greater of (a) 12.5% of the lesser of (x) the aggregate Revolving Facility Commitment at such time and (y) the Borrowing Base at such time and (b) $12,000,000 for at least 30 consecutive days.

3.  Borrower's agreement to maintain insurance with insurance carriers, against risks, in amounts and with endorsements acceptable to Bank.

4.  Restrictions on, among other things, distributions and dividends, acquisitions and investments, indebtedness, liens, and affiliate transactions

subject to baskets and exclusions consistent with Documentation Principles; provided, further, that the definition of "Payment Conditions" shall be as follows:

"Payment Conditions" shall mean the satisfaction of the following conditions (except as indicated): (a) no Default or Event of Default exists or would arise as a result of the making of the subject Specified Payment, (b) immediately after giving effect to such Specified Payment, Holdings and its Subsidiaries shall, on a consolidated basis, have a Fixed Charge Coverage Ratio of not less than 1.00:1.00 as calculated on a Pro Forma Basis for the Test Period then most recently ended; provided, however, that (x) the condition set forth in clause (b) shall not be applicable in the case of a Specified Payment described in clause (b), (d) or (e) if Excess Availability (on the date of such Specified Payment and for the 30 consecutive day period immediately preceding such Specified Payment, in each case calculated on a Pro Forma Basis to include the Borrowing of any Loans or issuances of Letters of Credit in connection with the proposed Specified Payment) is in excess of the greater of (i) $17,000,000 and (ii) 20% of the lesser of (x) the Revolving Facility Commitments at such time and (y) the Borrowing Base at such time and  (y) the condition set forth in clause (b) shall not be applicable in the case of a Specified Payment described in clause (a) or (c) if Excess Availability (on the date of such Specified Payment and for the 30 consecutive day period immediately preceding such Specified Payment, in each case calculated on a Pro Forma Basis to include the Borrowing of any Loans or issuances of Letters of Credit in connection with the proposed Specified Payment) is in excess of the greater of (i) $15,000,000 and (ii) 17.5% of the lesser of (x) the Revolving Facility Commitments at such time and (y) the Borrowing Base at such time, (c) immediately after giving effect to such Specified Payment, Excess Availability (on the date of such proposed Specified Payment and for the 30 consecutive day period immediately preceding such Specified Payment, in each case calculated on a Pro Forma Basis to include the Borrowing of any Loans or issuances of Letters of Credit in connection with the proposed Specified Payment), shall not be less than (A) the greater of (i) $10,000,000 and (ii) 15% of the lesser of (x) the Revolving Facility Commitments at such time and (y) the Borrowing Base at such time, in the case of a Specified Payment described in clause (b), (d) or (e) of the definition thereof or (B) the greater of (i) $10,000,000 and (ii) 12.5% of the lesser of (x) the Revolving Facility Commitments at such time and (y) the Borrowing Base at such time, in the case of a Specified Payment described in clause (a) or (c) of the definition thereof, and (d) the Administrative Agent shall have received an officer's certificate executed by a Responsible Officer of the Lead Borrower certifying as to compliance with preceding clauses (a) through (c) and demonstrating (in reasonable detail) the calculations required by preceding clauses (b) and (c).

5.  Borrower's agreement to cause all proceeds of accounts receivable to be forwarded to deposit account subject to the exclusive control of Agent which may be exercised by Agent during a Cash Dominion Trigger Period.

"<u>Cash Dominion Period</u>" shall mean the period commencing upon either (i) the occurrence of a Specified Event of Default, or (ii) the occurrence of five (5) consecutive Business Days on which Excess Availability is less than the greater of (a) 10% of the lesser of (x) the aggregate Revolving Facility Commitments then existing and (y) the Borrowing Base then existing and (b) $8,000,000 (in each case, until Excess Availability exceeds the greater of (a) 10% of the lesser of (x) the aggregate Revolving Facility Commitments then existing and (y) the aggregate Borrowing Base and (b) $8,000,000 for 30 consecutive days, and no Specified Event of Default continues to exist).

CONDITIONS
PRECEDENT:          The extension of the Senior Credit Facility is subject to fulfillment of a number of conditions to Bank's satisfaction, including without limitation the conditions set forth on Annex I hereto.

OTHER:              This term sheet is intended as an outline only of certain of the material terms of the Senior Credit Facility and does not purport to summarize all of the conditions, covenants, representations, warranties and other provisions that will be contained in Definitive Loan Documents for the Senior Credit Facility.

## **SCHEDULE 1**

## **PRICING MATRIX**

| Average Excess Availability (as a percentage of the Revolving Facility Commitments) | Base Rate Revolving Loans | LIBOR Revolving Loans |
|---|---|---|
| | | |
| > 50% | 0.55% | 1.625% |
| ≤ 50% and >25% | 0.80% | 1.875% |
| ≤ 25% | 1.05% | 2.125% |

ANNEX I

CONDITIONS TO CLOSING

The commitment of the Bank under the Commitment Letter with respect to the Senior Credit Facility, the consummation of the transactions thereunder and the funding of the Senior Credit Facility are subject to the conditions set forth in the Commitment Letter and satisfaction of each of the conditions precedent set forth below.

1.  Exit from Restructuring.

(i)     In the event that the restructuring is effected pursuant to a Chapter 11 Case, the an order authorizing Borrower to be bound by the commitment letter (the "Authorization Order"), in form and substance reasonably satisfactory to Bank, shall have been entered by the Bankruptcy Court and shall not have been vacated, stayed, reversed, modified or amended in any respect except with the prior written consent of Bank (x) in its sole discretion with respect to any such vacatur, stay, or reversal, and (y) in the case of any such amendment or modification, if in the sole judgment of Bank, such modification or amendment is adverse to the rights or interests of any or all of the Agent and the Lenders.

(ii)    In the event that the restructuring is effected pursuant to a Chapter 11 Case, (A) unless waived by Bank, in its sole discretion, Bank shall be satisfied, in its sole discretion, with the terms and conditions of the plan of reorganization of Borrower and Guarantors (such plan of reorganization, together with all exhibits, supplements, annexes, schedules and any other attachments thereto, and including the terms described in this paragraph, the "Plan"); provided that terms and conditions of a Plan consistent with the Restructuring Support Agreement shall be deemed satisfactory to Bank, (B) the Plan and related disclosure statement and other solicitation materials, the Confirmation Order (as defined below) and all documents to be executed and/or delivered in connection with implementation of the Plan shall be on terms and conditions substantially the same as the Restructuring Term Sheet attached as Exhibit B to the Restructuring Support Agreement dated October 21, 2020 among NWH, certain of its affiliates and the Forbearing Noteholders a party thereto (as amended as of the date of this Commitment Letter, the "Restructuring Support Agreement").

(iii)   Insofar as the same could adversely affect the Agent or Lenders, no amendment, modification, supplement or waiver shall have been made to any or all of the Restructuring Support Agreement, and in the case of a Chapter 11 Case, the Plan, the related disclosure statement and other solicitation materials, the Confirmation Order and all documents to be executed and/or delivered in connection with the implementation of the Plan, in each case, without the prior written consent of Bank that is materially adverse to the rights or interests of any or all of the Agent and the Lenders (for the avoidance of doubt, the extension of any milestones thereunder other than any milestones relating to execution of definitive documents in respect of the Senior Credit Facility or entry of the Financing Order (as defined therein; the parties to the Commitment Letter acknowledge and agree that, as of the date of the Commitment Letter, no such party has agreed to the form or substance of any Financing Order) shall be deemed acceptable to the Agent and the Lenders so long as (a) such extension is not for more than 14 days (or longer as approved by Agent and Lenders, which approval will not be unreasonably withheld or delayed) from the original date of the corresponding milestone in the Restructuring Support Agreement, (b) at the time of such extension there is no event of default under the Financing Order, (c) the

extension of the milestone with respect to these conditions to closing is not deemed to be an extension of the corresponding (or any other) milestone for purposes of the Financing Order and (d) such extension shall not be deemed under any circumstances to be an extension of the expiration date of the Commitment Letter)

(iv)    In the event that the restructuring is effected pursuant to a Chapter 11 Case, the Bankruptcy Court shall have entered an order, in form and substance satisfactory to Bank (the "Confirmation Order"), confirming the Plan and approving the Plan-related solicitation procedures and (x) the time to appeal the Confirmation Order or to seek review, rehearing or certiorari with respect to the Confirmation Order shall have expired, unless waived by each Commitment Party, in their sole discretion, (y) with respect to the Confirmation Order, unless otherwise waived by each Commitment Party in their sole discretion, no appeal or petition for review, rehearing or certiorari with respect to the Confirmation Order may be pending, and (z) the Confirmation Order shall be in full force and effect, and shall not have been stayed, vacated, reversed or modified by the Bankruptcy Court or by any other court having jurisdiction to issue any such stay, unless waived by Bank, in their sole discretion, (D) the Plan shall have become effective in accordance with its terms, and all conditions precedent to the effectiveness of the Plan shall have been satisfied or waived (with the prior written consent of Bank if in the sole judgment of Bank, any such waiver is materially adverse to the rights or interests of any or all of the Agent and the Lenders), and (E) all of the transactions contemplated by the Plan and the Confirmation Order to occur on the effective date of the Plan shall have been consummated on or before the closing date.

2.    Concurrent Transactions: Bank shall be satisfied in its reasonable judgment that (a) concurrently with consummation of, as applicable, the Plan and/or the transactions contemplated in the Restructuring Support Agreement, all pre-existing indebtedness of Holdings and its subsidiaries shall have been satisfied, discharged or otherwise treated as specified in the Plan (in the case of a Chapter 11 Case) or in the Restructuring Support Agreement, including, without limitation, in each case, the repayment in full in cash of the obligations under the Existing Credit Facility with the proceeds of the Senior Credit Facility and Borrower's cash on hand, (b) there will not exist (after giving pro forma effect for confirmation of the Plan, in the case of a Chapter 11 Case) any default or event of default under any of the Loan Documents, or under any other material indebtedness of Holdings and its subsidiaries from and after the effective date of the Plan, and (c) the new equity issued by Holdings shall be entirely in the form of common equity (the "New Common Equity") and shall be distributed in accordance with the Plan (in the case of a Chaper 11 Case) and/or in accordance with the Restructuring Support Agreement.

3.    Definitive Loan Documents.  The execution and delivery, in form and substance acceptable to Bank and its counsel, of agreements, documents, instruments, financing statements, consents, landlord waivers, documents indicating compliance with all applicable federal and state environmental laws and regulations, evidences of corporate authority, opinions of counsel, and such other documents to confirm and effectuate the Senior Credit Facility and Agent's first priority liens, as may be reasonably required by Bank and its counsel.

4.    Material Adverse Effect.  No Material Adverse Effect.

5.    Projections.  Receipt by Bank, in form and substance satisfactory to it, of (a) financial projections of Borrower, evidencing Borrower's ability to comply with the financial covenants set forth in the

loan documentation, and (b) interim financial statements for Borrower as of a date not more than 30 days prior to the closing date.

6. <u>Capital/Debt Structure</u>.  Bank's satisfaction with Borrower's capital structure and indebtedness (provided that the capital structuring and indebtedness consistent with the Restructuring Support Agreement shall be deemed satisfactory to Bank), including Bank's receipt of satisfactory evidence that Borrower is adequately capitalized, that the fair saleable value of Borrower's assets will exceed its liabilities at closing, and that Borrower will have sufficient working capital to pay its debts as they become due.

7. <u>Insurance</u>.  Receipt by Bank of certificates of insurance with respect to Borrower's property and liability insurance, together with a loss payable endorsement naming Bank as loss payee, all in form and substance satisfactory to Bank.

8. <u>Approvals</u>.  Satisfactory evidence that Borrower have received all governmental and third party consents and approvals as may be appropriate in connection with the Senior Credit Facility and the transactions contemplated thereby.

9. <u>Environmental</u>.  Bank's satisfaction with all environmental aspects relating to Borrower.

10. <u>Due Diligence</u>.  Bank's satisfactory completion of its due diligence, including without limitation a final, pre-closing collateral and field examination conducted by Bank and/or a third party.

11. <u>Term Loan Facility</u>.  Bank's receipt and satisfactory review of the final executed loan documents with respect to the Term Loan Facility and Intercreditor Agreement and confirmation received by Bank that all conditions to the funding of the Term Loan Facility have been satisfied and the Term Loan Facility will be funded on the closing date.

12. <u>Excess Availability</u>.  After giving effect to advances made on the closing date and the transactions contemplated under the Plan, (i) the sum of Borrower's unrestricted cash (which is subject to no liens other than the liens in favor of Bank) plus Excess Availability under the Senior Credit Facility shall be greater than $25,000,000 and (ii) Excess Availability under the Senior Credit Facility shall be greater than $20,000,000.

13. <u>Litigation</u>.  Other than the Chapter 11 Case, there shall be no pending or threatened (in writing) litigation or other proceedings (private or governmental) with respect to Holdings or its subsidiaries that could reasonably be expected to result in a Material Adverse Effect.

14. <u>Know Your Customer</u>.  Borrower and each of the Guarantors shall have provided the documentation and other information to the Agent and Lenders that is required by regulatory authorities under applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the Patriot Act.

EXHIBIT A

Wells Fargo Bank, N.A. Commitment Letter

(see attached)

WELLS FARGO BANK, N.A.

November 5, 2020

**<u>CONFIDENTIAL</u>**

Bank of America, N.A.
Attention: Brett German
121 SW Morrison Street
Floor 17
Portland, Oregon 97204

      Re:    <u>Northwest Hardwoods, Inc. Exit Facility</u>

Ladies and Gentlemen:

      Reference is hereby made to the $100,000,000 senior credit facility ("<u>Senior Credit Facility</u>") as set forth in that certain Commitment Letter from Bank of America, N.A. to Northwest Hardwoods, Inc. ("<u>NWH</u>") dated as of even date herewith and the Summary of Terms attached thereto (collectively, the "<u>Commitment Letter</u>"), in connection with the exit of NWH from restructuring, including if required through a chapter 11 bankruptcy case to be filed in the United States Bankruptcy Court for the District of Delaware.

      This letter confirms (i) our commitment to provide $40,000,000 of the commitments under the Senior Credit Facility, subject to the terms and conditions set forth in the Commitment Letter and (ii) NWH's agreement to pay to Wells Fargo Bank, N.A. a closing fee upon the closing of the Senior Credit Facility in an amount equal to $100,000.

      We acknowledge that we have, independently and without reliance upon the Bank of America, N.A. or any of its subsidiaries or affiliates, or any other bank or institution, and based on documents and information as we have deemed appropriate, made our independent credit analysis and decision to enter into this letter agreement.

      We acknowledge that Bank of America, N.A. reserves the right to manage the syndication process.

                Very truly yours,

                WELLS FARGO BANK, N.A.

                By: _____
                Name: Stacy Gottlieb
                Title: Senior Vice President

**Exhibit 2**

**Exit Take-Back Term Loan Facility Term Sheet**

| | |
|---|---|
| **Exit Take Back Term Loan Facility** | A senior secured term loan facility in an aggregate principal amount of $110 million (the "**Exit Take Back Term Loan Facility**"), pursuant to which term loans or notes shall be deemed advanced to the Borrower thereunder (whether issued as term loans or notes, the "**Term Loans**") in exchange for a portion of the claims arising from the Notes.[1] Once repaid, the Term Loans may not be reborrowed. |
| **Borrower** | Northwest Hardwoods, Inc. (as reorganized under the Plan or recapitalized pursuant to the Out-of-Court Restructuring), or a newly formed entity that acquires substantially all of the assets of such entity in connection with confirmation and consummation of the Plan (as defined in the Restructuring Support Agreement) (in either case, collectively, the "**Borrower**" or the "**Company**"). |
| **Guarantors** | All obligations of the Borrower under the Exit Take Back Term Loan Facility will be unconditionally guaranteed on a joint and several basis by: (a) Hardwoods Holdings, Inc. and Hardwoods Intermediate Holdings II, Inc. (as reorganized under the Plan or recapitalized pursuant to the Out-of-Court Restructuring), and (b) each of the Borrower's direct and indirect domestic subsidiaries now owned or hereafter acquired or formed direct and indirect domestic subsidiaries (collectively, the "**Guarantors**"). The Borrower and the Guarantors are each referred to herein as a "**Loan Party**". |
| **Administrative Agent; Administrative Agent Fee** | A financial institution acceptable to the Required Lenders (as defined below) (in such capacity, the "**Agent**"). The Agent shall be paid an annual agency fee to be agreed by the Agent and the Required Lenders. |
| **Lenders** | The Term Loans shall be distributed to all Noteholders on a pro rata basis pursuant to the terms of the Plan or the agreement pursuant to which the Out-of-Court Restructuring is effectuated, as applicable. Each of the lenders (or noteholders, if applicable) under the Exit Take Back Term Loan Facility, a "**Lender**". |
| **Maturity Date** | All obligations under the Exit Term Loan Documents (as defined below) will be due and payable in full in cash on the earliest of: (i) the date that is five years after the Closing Date and (ii) the date of acceleration of the Exit Term Loans pursuant to the terms of the Exit Term Loan Agreement. |
| **Interest** | Interest on the Exit Term Loans shall be payable in cash at the end of each quarter in arrears, unless the PIK Toggle (defined below) is in effect. At all times prior to the occurrence of an Event of Default, interest on the outstanding principal amount of the Exit Term Loans shall accrue at a rate equal to 7.50% *per annum*; *provided* that, upon the election of the Borrower, |

---

[1] Capitalized terms used but not defined herein shall have the meanings as defined in the Restructuring Support Agreement.

| | |
|---|---|
| | (the "**PIK Toggle**"), interest on the outstanding principal amount of the Exit Term Loans shall be paid in kind at a rate *per annum* equal to 9.5%. |
| | Interest shall be calculated on the basis of the actual number of days elapsed in a 360 day year. |
| **Default Interest** | During the continuance of an Event of Default, the Exit Term Loans and any overdue amounts (including overdue interest and fees) will bear interest at an additional 2.00% *per annum*. Default interest shall be payable in cash on demand. |
| **Collateral** | All obligations of the Loan Parties to the Lenders and the Administrative Agent, including, without limitation, all principal, accrued interest, costs, fees and expenses and other amounts under the Exit Take Back Term Loan Facility (collectively, the "**Exit Term Loan Obligations**"), shall be secured by first priority liens on all Notes Priority Collateral (as defined in the existing intercreditor agreement, dated as of July 18, 2014 with any changes or modifications as may reasonably be required to cure any errors or omissions or to adapt to changes in market ("**Existing Intercreditor Agreement**") and second priority liens on all ABL Priority Collateral (as defined in the Existing Intercreditor Agreement), provided that in accordance with a customary intercreditor agreement to be entered into among such parties in form and substance satisfactory to the Required Lenders and the requisite lenders under the Exit ABL Facility (the "**Exit Intercreditor Agreement**"), as between the Exit Term Loan Obligations and the obligations in respect of the Exit ABL Facility, the agent and the lenders under the Exit ABL Facility shall possess senior payment and other senior priority rights in respect of the ABL Priority Collateral and the Lenders and the Administrative Agent shall have junior payment and other junior priority rights in respect of the ABL Priority Collateral. |
| | The property securing the Exit Take Back Loan Obligations is collectively referred to as the "**Exit Collateral**" and shall include substantially all assets of the Loan Parties, including without limitation, pledges of equity interests, subject to customary exceptions to be agreed upon. |
| | For the avoidance of doubt, the Exit Collateral shall include, among other things, all property that secured the Notes Obligations (as defined in the Existing Intercreditor Agreement). |
| **Reporting Covenants, Affirmative Covenants and Negative Covenants** | The Exit Term Loan Documents (as defined below) will contain reporting requirements, affirmative covenants and negative covenants customarily found in loan agreements for facilities of this type and other reporting requirements, affirmative covenants and negative covenants satisfactory to the Required Lenders including, without limitation: |
| | (i) the delivery of reporting information customarily found in loan agreements for facilities of this type, and |
| | (ii) limitations on indebtedness (to include baskets for (i) a priority ABL, cash flow revolver or other revolving working capital facility (including the Exit ABL Facility) up to $100 million in principal amount), liens, asset sales, restricted payments, investments, repayments of indebtedness and affiliate transactions. |

| | |
|---|---|
| **Financial Covenants** | None. |
| **Optional Prepayments** | The Borrower may make optional prepayments of the Term Loans. |
| **Mandatory Prepayments** | To be agreed, usual and customary for facilities similar to the Exit Take Back Term Loan Facility and in form and substance acceptable to the Required Lenders, but in any event to include prepayments with (i) 50% of Excess Cash Flow (to be defined) commencing with the fiscal year ending December 31, 2021, with stepdowns to be agreed based on a leverage test to be determined, (ii) net cash proceeds of asset sales and casualty/insurance events subject to a twelve (12) month reinvestment option for sales and of casualty/insurance proceeds for major assets and (iii) the proceeds of all non-permitted issuances of indebtedness. |
| **Call Premium** | Optional prepayments and mandatory prepayments with the proceeds of non-permitted indebtedness[2] or any acceleration of the Term Loans, in each case prior to the date that is 30 months following the Closing Date, shall be subject to payment of a customary make-whole amount ("**Call Protection**"), in each case plus any accrued but unpaid interest. |
| **Exit Loan Documents** | The Exit Take Back Term Loan Facility will be documented by a Senior Secured Credit Agreement (the "**Exit Term Loan Agreement**") and other guarantee, security and loan documentation (together with the Exit Loan Agreement, collectively, the "**Exit Term Loan Documents**") reflecting the terms and provisions set forth in this Term Sheet and otherwise in form and substance satisfactory to the Agent and the Required Lenders. |
| **Conditions Precedent to the Closing** | The closing date (the "**Closing Date**") under the Exit Take Back Term Loan Facility shall be subject to customary conditions to closing for facilities of this type, which shall be satisfactory to the Required Lenders, including without limitation: |
| | (i) execution and delivery of the Exit Term Loan Agreement and any other Exit Loan Document being executed and delivered on the Closing Date; |
| | (ii) receipt of certain reporting in form and substance acceptable to the Required Lenders; |
| | (iii) the concurrent effectiveness of the Exit ABL Facility in an amount, containing such terms, and pursuant to such documentation (including the Exit Intercreditor Agreement) as contemplated by the Plan or Out-of-Court Restructuring Agreement, as applicable; |
| | (iv) the payment of all fees and expenses of the Ad Hoc Group Professionals; |
| | (v) if the Out-of-Court Restructuring is consummated, consummation of the Out-of-Court Restructuring under the Out-of-Court Restructuring Agreement; |
| | (vi) if the Out-of-Court Restructuring is not consummated, (a) entry of the Confirmation Order, and (b) the effectiveness of the Plan; |

---

[2]    For the avoidance of doubt, prepayments with Excess Cash Flow shall not be subject to any Call Protection.

| | |
|---|---|
| | (viii) all conditions precedent to the issuance of the New Common Stock shall have been satisfied or waived; and |
| | (ix) the Restructuring Support Agreement shall not have been terminated as to all parties signatory thereto. |
| **Events of Default** | The Exit Term Loan Documents will contain events of default customarily found in loan agreements for facilities of this type and other events of default agreed upon by the Borrower and the Required Lenders (collectively, the "**Events of Default**"). |
| **Required Lenders** | Lenders holding at least 50.1% of the outstanding unused commitments and Exit Term Loans under the Exit Take Back Term Loan Facility. |
| **Miscellaneous** | The Exit Loan Documents will include (i) standard yield protection provisions (including, without limitation, provisions relating to compliance with risk-based capital guidelines, increased costs and payments free and clear of withholding taxes (subject to customary qualifications)) and (ii) waivers of consequential damages and jury trial, to be agreed upon by the Borrower and the Required Lenders. |
| **Governing Law and Submission to Exclusive Jurisdiction** | State of New York. |

## Exhibit 3

## New MIP Summary

| Pool Size | 10.0% of the Company's fully-diluted equity as of the emergence (treating the MIP as fully allocated and outstanding) will be reserved for purposes of making awards under the New MIP (the "**Pool**"). |
| --- | --- |
| Emergence Grants | 85% of the Pool will be granted in the form of options and RSUs (allocated 50% options and 50% RSUs, as set forth below) within 60 days after the Effective Date.<br><br>If the required allocation for non-employee directors materially increases from the allocation expected as of the date hereof, the New Board will discuss in good faith with the President whether or not increases to the Pool are necessary or appropriate. |
| Form of Consideration | • 50% options.<br><br>• 50% RSUs.<br><br>• All options will have a 10-year term and an exercise price = 1x FMV as of the grant date (which will be the per share emergence value for the emergence grants). |
| Vesting | • Options: Subject to time vesting only; vest (i) 10% on the 6-month anniversary of the grant date (or the Effective Date for emergence grants), and (ii) the remaining 90% in equal quarterly installments thereafter (i.e., 100% will be vested as of the 5th anniversary); full acceleration upon CIC.<br><br>• RSUs:<br><br>   o 50% subject to time vesting only; vest on the same schedule as described for the options above, including with respect to full acceleration upon CIC.<br><br>   o 50% subject to performance vesting; vest based on the multiple of per share emergence equity value ("**MoM**") achieved upon the first to occur (with such first occurrence, the "**Performance Measurement Date**") of (i) a CIC, (ii) an IPO and (iii) the 6th anniversary of the Effective Date (based on the CIC purchase price per share, the IPO offering price per share or the fair market value per share on the 6th anniversary of the Effective Date, as applicable), as follows: 50% vest at a 2x MoM and 100% vest at a 3x MoM, with linear interpolation for MoM achievement in between the two thresholds; any performance vesting RSUs that have not vested as of the Performance Measurement Date (after taking into account the vesting achieved in connection therewith) will be forfeited.<br><br>• Vesting of all emergence grants will commence as of the Effective Date.<br><br>• CIC will be triggered if, among other things, any person (or persons |

|  | acting as a group), other than a member of the Ad Hoc Group or any "affiliate" (to be defined in definitive documents) thereof, acquires more than 50% of the voting power of the Company in one or a series of related transactions. |
|  | • If Company securities are not publicly-traded, net exercise/settlement will be provided for exercises and/or settlement occurring during the participant's employment or following a termination of the participant's employment by the Company without Cause, by the participant for Good Reason or due to the participant's death or Disability (each, as defined below, and each, a "**Qualifying Termination**"). |
| **Good Leaver Protections** | • Upon a participant's Qualifying Termination, such participant (or his or her estate, if applicable) will be entitled to have all of his or her vested options remain outstanding for 2 years post-termination.<br><br>• Additionally, if a participant's employment is terminated by the Company without Cause or the participant resigns for Good Reason, in either case, within 6 months before the Performance Measurement Date, the participant will, subject to execution of a customary general release of claims in favor of the Company and its affiliates (which will not impose any additional restrictive covenants), be treated as if he or she had remained employed through the Performance Measurement Date for vesting purposes. |
| **Other** | • The New Board will work together with the President in good faith to finalize the definitive agreements. Definitive agreements will address, among other things, (i) measurement of performance vesting, (ii) detailed CIC definition; (iii) definitions of Cause, Good Reason and Disability, and (iv) for the President only, customary FMV dispute rights.<br><br>• Cannot impose restrictive covenants more onerous than those currently in effect, or require forfeiture of existing entitlements, as a condition of the New MIP grants.<br><br>• The New MIP will contain other customary terms and conditions as determined by the New Board in consultation with the President. |

## EXHIBIT C

### Form of Joinder

The undersigned ("**Joinder Party**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of _____ (the "**Agreement**"),[1] by and among Hardwoods Holdings, Inc. and its Affiliates and subsidiaries bound thereto and the Consenting Stakeholders and agrees to be bound by the terms and conditions thereof to the extent the other Parties are thereby bound, and shall be deemed a "Consenting Stakeholder" under the terms of the Agreement.

The Joinder Party specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date hereof and any further date specified in the Agreement.

Date Executed:

_____

Name:
Title:

Address:

E-mail address(es):

| *Aggregate Amounts Beneficially Owned or Managed on Account of:* | |
|---|---|
| 2014 Notes | |
| 2015 Notes | |

---

[1]    Capitalized terms not used but not otherwise defined herein shall have the meanings ascribed to such terms in the Agreement.

## <u>EXHIBIT D</u>

**Provision for Transfer Agreement**

The undersigned ("**<u>Transferee</u>**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of _____ (the "**<u>Agreement</u>**"),[1] by and among Hardwoods Holdings, Inc. and its Affiliates and subsidiaries bound thereto and the Consenting Stakeholders, including the transferor to the Transferee of any 2014 Notes or 2015 Notes (each such transferor, a "**<u>Transferor</u>**"), and agrees to be bound by the terms and conditions thereof to the extent the Transferor was thereby bound, and shall be deemed a "Consenting Stakeholder" under the terms of the Agreement.

The Transferee specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date of the Transfer, including the agreement to be bound by the vote of the Transferor if such vote was cast before the effectiveness of the Transfer discussed herein.

Date Executed:

_____
Name:
Title:

Address:

E-mail address(es):

| *Aggregate Amounts Beneficially Owned or Managed on Account of:* | |
|---|---|
| 2014 Notes | |
| 2015 Notes | |

---

[1]    Capitalized terms not used but not otherwise defined herein shall have the meanings ascribed to such terms in the Agreement.

**Exhibit D**

**Financial Projections**

Exhibit D

Financial Projections[1]

## A.    Overview

The Debtors believe that the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code, as confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successor under the Plan. In connection with the development of a plan of reorganization and for the purposes of determining whether such plan would satisfy the feasibility standard, the Debtors analyzed their ability to satisfy their financial obligations while maintaining sufficient liquidity and capital resources. The Debtors prepared consolidated financial projections including their non-Debtor subsidiaries (the "**Financial Projections**") for the balance of the 2020 calendar year and for calendar years 2021 through 2024 and reflects estimates for its new capital structure and financing terms. The Debtors assume they will emerge from Chapter 11 in late December 2020 or early January 2021. As such, the Financial Projections reflect the estimated post-emergence period from January 1, 2021 through December 31, 2024 (the "**Projection Period**").

The Debtors do not, as a matter of course, publish their business plans or strategies, projections or anticipated financial position. Accordingly, the Debtors do not anticipate that they will, and disclaim any obligation to, furnish updated business plans or projections to Holders of Claims or Interests or other parties in interest after the Confirmation Date, or to include such information in documents required to be filed with the SEC (if any) or otherwise make such information public, unless required to do so by the SEC or other regulatory body pursuant to the provisions of the Plan.

In connection with the planning and development of the Plan, the Financial Projections were prepared by the Debtors and their advisors to present the anticipated impact of the Plan. The Financial Projections assume that the Plan will be implemented in accordance with the stated terms. The Financial Projections are based on forecasts of key economic variables and may be significantly impacted by, among other factors, changes in the political environment of the countries where the Debtors operate, regulatory changes and/or a variety of other factors, including those factors listed in the Plan and the Disclosure Statement. Accordingly, the estimates and assumptions underlying the Financial Projections are inherently uncertain and are subject to significant business, economic and other uncertainties. Therefore, such Financial Projections, estimates and assumptions are not necessarily indicative of current values or future performance, which may be significantly less or more favorable than set forth herein.

THE FINANCIAL PROJECTIONS HAVE BEEN PREPARED BY THE DEBTORS' MANAGEMENT AND HAVE BEEN REVIEWED BY HURON, THE DEBTORS' FINANCIAL ADVISOR. THE DEBTORS DID NOT PREPARE SUCH FINANCIAL PROJECTIONS TO COMPLY WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS OR THE RULES AND REGULATIONS OF THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION. EXCEPT FOR PURPOSES OF THE DISCLOSURE STATEMENT, THE DEBTORS DO NOT PUBLISH FINANCIAL PROJECTIONS OF THEIR ANTICIPATED FINANCIAL POSITION OR RESULTS OF OPERATIONS. MOREOVER, THE FINANCIAL PROJECTIONS CONTAIN CERTAIN STATEMENTS THAT ARE "FORWARD LOOKING STATEMENTS' WITHIN THE MEANING OF THE PRIVATE SECURITIES

---

[1]    Capitalized terms used but not defined herein have the meanings ascribed to such terms in the *Joint Prepackaged Chapter 11 Plan of Reorganization of Northwest Hardwoods, Inc. and Its Debtor Affiliates* (the "Plan") and the accompanying *Disclosure Statement for the Joint Prepackaged Chapter 11 Plan of Reorganization of Northwest Hardwoods, Inc. and Its Debtor Affiliates* (the "Disclosure Statement"), to which these Financial Projections are attached.

LITIGATION REFORM ACT OF 1995. THESE STATEMENTS ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS, AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS, INCLUDING THE IMPLEMENTATION OF THE PLAN, THE CONTINUING AVAILABILITY OF SUFFICIENT BORROWING CAPACITY OR OTHER FINANCING TO FUND OPERATIONS, ACHIEVING OPERATING EFFICIENCIES, EXISTING AND FUTURE GOVERNMENTAL REGULATIONS AND ACTIONS OF GOVERNMENTAL BODIES, OTHER RISK FACTORS, AND OTHER MARKET AND COMPETITIVE CONDITIONS. HOLDERS OF CLAIMS AND INTERESTS ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE. ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE ANY SUCH FINANCIAL STATEMENTS.

THE FINANCIAL PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY THE DEBTORS, MAY NOT BE REALIZED AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, INDUSTRY, REGULATORY, LEGAL, MARKET, AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE REORGANIZED DEBTORS' CONTROL. THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE OR ARE MADE AS TO THE ACCURACY OF THE FINANCIAL PROJECTIONS OR TO THE REORGANIZED DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL BE INCORRECT. MOREOVER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE DEBTORS PREPARED THESE FINANCIAL PROJECTIONS MAY BE DIFFERENT FROM THOSE ASSUMED, OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR DISCLOSURE STATEMENT, THE DEBTORS AND REORGANIZED DEBTORS, AS APPLICABLE, DO NOT INTEND AND UNDERTAKE NO OBLIGATION TO UPDATE OR OTHERWISE REVISE THE FINANCIAL PROJECTIONS TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE THE DISCLOSURE STATEMENT IS INITIALLY DISTRIBUTED TO HOLDERS OF CLAIMS OR INTERESTS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS. THEREFORE, THE FINANCIAL PROJECTIONS MAY NOT BE RELIED UPON AS A GUARANTY OR ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR. IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, HOLDERS OF CLAIMS OR INTERESTS MUST MAKE THEIR OWN DETERMINATIONS AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE FINANCIAL PROJECTIONS AND SHOULD CONSULT WITH THEIR OWN ADVISORS.

THE DEBTORS' INDEPENDENT ACCOUNTANTS HAVE NEITHER EXAMINED NOR COMPILED THE ACCOMPANYING FINANCIAL PROJECTIONS AND ACCORDINGLY DO NOT EXPRESS AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT TO THE FINANCIAL PROJECTIONS, DO NOT ASSUME RESPONSIBILITY FOR THE FINANCIAL PROJECTIONS AND DISCLAIM ANY ASSOCIATION WITH THE PROJECTIONS. FURTHERMORE, THESE FINANCIAL PROJECTIONS DO NOT REFLECT FRESH-START ACCOUNTING ADJUSTMENTS.

## B.    Key Assumptions to the Projections

The Financial Projections disclosed herein, to the best of the Debtors' knowledge and belief, represent the Debtors' expected financial position, results of operations, and cash flows for the projection period. The

assumptions and notes to the Financial Projections disclosed herein are those that the Debtors believe are significant to the Financial Projections. Notwithstanding, if events and circumstances do not occur as expected, there will be differences between the projected and actual results. These differences may be material to the Financial Projections described herein. The Financial Projections should be read in conjunction with the assumptions, qualifications, and explanations set forth in the Disclosure Statement, and the Plan in their entirety.

The Financial Projections consider the Debtors' contemplated operating initiatives and existing conditions in the hardwoods industry. In addition, the Financial Projections are predicated on the assumption that the Debtors successfully reorganize and can emerge from the restructuring process with a viable capital structure and adequate liquidity on the Effective Date.

## C.    Assumptions with Respect to the Projected Consolidated Statement of Operations

*Net Sales:* Projected sales are primarily comprised of an aggregation of domestic and international sales for manufactured lumber and other similar hardwood products. Management projected its lumber net sales by using volume and price per unit assumptions or historical run-rate assumptions for non-lumber products, adjusted for management's expectations of future market demand. Increases or decreases in specific products' markets were often the primary driver of changes to volume assumptions over the Projection Period, and relied principally on the assumption of market recovery with respect to the COVID-19 pandemic or changes in international trade and political policies with the Chinese government.

*Cost of Sales*: Projected cost of sales are the aggregation of variable (direct) cost of sales and fixed/other (indirect) cost of sales for hardwood lumber products. Variable costs consist primarily of material, labor, and overhead attributable to a specific product type and production-related depreciation and amortization. Fixed/other costs consist primarily of manufacturing plant overhead not attributable to specific customer programs. Management projected its gross profit for non-lumber products primarily using historical run-rate assumptions adjusted for management's expectations of future market demand.

*Selling, General & Administrative ("SG&A") Expense*: Projected SG&A expense includes the aggregation of general management, marketing and sales, finance, human resources, information systems, research and development, bank charges, and office-related depreciation and amortization. SG&A expense was primarily projected based on the anticipated monthly run-rates experienced during the first quarter of 2020, which eliminated the non-recurring financial impact of short-term actions the Debtors took to mitigate risks from the COVID-19 pandemic. Certain other SG&A expenses were projected by using the most recently available monthly financial reporting period for expenses generally not impacted by the COVID-19 pandemic. Annual growth rates were applied in each annual period to reflect estimated cost of living adjustments or inflation assumptions.

*Interest Expense*: Interest expense reflects financing terms for the Debtors' anticipated capital structure (see Secured Debt description below for details on post-emergence capitalization).

*Income Tax Expense*: The Debtors assume they will emerge with zero tax assets or net operating loss carryforwards.  As the Debtors generate income, they accrue for any tax assets / liabilities on a monthly basis at an effective corporate tax rate of 26%, and to the extent the Debtors generate losses, these tax assets would be available to offset future tax liabilities, once applicable.  If the Debtors emerge in January 2021, some of their tax attributes, including NOL carryforwards, may be available for the 2021 calendar tax year.

*Depreciation & Amortization*: Depreciation and amortization expenses are primarily related to the depreciation of tangible fixed assets in accordance with their useful lives and amortization of intangible assets acquired.

*Non-Recurring Items:* Estimated expenses that historically have related to a combination of multiple non-recurring expenses, including but not limited to, one-time professional fees, board of director or management fees, litigation-related charges, and severance or other restructuring costs.

*Management EBITDA*: Earnings before interest expense, taxes, depreciation, and amortization excluding non-recurring items.

## D.    Assumptions to Key Projected Balance Sheet Items

*Cash and cash equivalents*: Cash and cash equivalents include deposits and investments in highly liquid financial instruments with original maturities of three months or less. The Financial Projections assume the Debtors operate with a minimum cash on hand balance of $4.5 million through the Projection Period.

*Accounts receivable, net*: Accounts receivable are recorded at amounts billed to customers less an allowance for uncollectible accounts. The allowance for uncollectible accounts is based on historical run-rates. The Company generally requires no collateral from its customers. Projected receivables assume days sales outstanding remains consistent with historic levels after emerging from bankruptcy.

*Inventories, net*: All inventories are stated at the lower of cost or market. Cost is determined using the moving average cost method. Projected inventories assume inventory turns per year for the manufacturing operations return to levels experienced prior to certain initiatives undertaken in 2020 to preserve liquidity. Management believes projected inventory balances based on inventory turns per year over the Projection Period are achievable.

*Prepaid and Other Current Assets:* Includes deposits, advances, and prepaid insurance expense. Projections generally match historical levels and seasonality, adjusted for the Debtors' anticipated sales growth.

*Property, Plant & Equipment, Net*: Property, plant and equipment are recorded at cost. This balance is increased each year for additional capital expenditures and decreased for depreciation using the straight-line method over the assets' estimated useful life.

*Intangibles and Goodwill:* Consists of goodwill, customer relationships and tradenames. Customer relationships are amortized throughout the Projection Period.

*Other Long Term Assets:* Consist of various other long term assets such as idle plant, property and equipment, long term timber fees paid and other long term timber deposits, deferred tax assets, deferred financing fees and notes receivable.

*Accounts payable*: Accounts payable balances assume days payable outstanding return to normal historic levels experienced prior to the bankruptcy.

*Accrued liabilities*: Accrued liabilities include customer deposits, accrued employee compensation and benefits, accruals for taxes, rebates, warranties and/or discounts, and interest on secured debt.

*Other Liabilities:* Other Liabilities include accruals related to reforestation, deferred tax liabilities, and all other long-term liabilities.

*Secured Debt*: Reflects post-reorganization secured debt based upon the proposed Plan:

- ▪ *$110 million Exit Take Back Debt*: The $110 million Exit Take Back Debt has an assumed cash interest rate of 7.50% or a payment-in-kind ("PIK") interest rate of 9.50%. The Financial Projections assume interest will be paid in cash during the Projection Period.

- ▪ *$100 million commitment Exit ABL Facility*: The $100 million Exit ABL Facility has a range of borrowing rates based on the facility's usage and a range of unused line fees based on the facility's usage. The Debtors anticipate using the Exit ABL Facility to fund the working capital needs of the business throughout the Projection Period.

*Stockholders' Equity*: Includes existing paid in capital and retained earnings[2]. Shareholders' equity changes each year by the amount of net income.

### E.    Assumptions to Key Projected Consolidated Statement of Cash Flows

*Operating Cash Flow:*  Operating cash flow is projected starting with net income and adjusted for certain non-cash items included in income as well as for working capital changes including other assets and liabilities.

*Investing Cash Flow:* Capital expenditures to support annual net sales and maintain the Debtors' facilities are the only meaningful investing cash flows.

*Financing Cash Flow:* Financing cash flows include any cash provided by equity sources or distributed to equity sources in the Projection Period plus borrowings from or repayment of the $100 million Exit ABL Facility resulting from projected operating and investing cash flows.

---

[2]    The Stockholders' Equity balance does not reflect anticipated changes resulting from fresh start accounting.

**UNAUDITED PROJECTED CONSOLIDATED STATEMENTS OF OPERATIONS ($ in millions)**

|  | 2021P | | 2022P | | 2023P | | 2024P |
|---|---|---|---|---|---|---|---|
| **Net Sales** | $ | **476.3** | $ | **545.9** | $ | **604.1** | $ | **650.3** |
| Cost of Goods Sold | | 426.4 | | 486.1 | | 536.8 | | 576.7 |
| **Gross Profit** | $ | **49.9** | $ | **59.8** | $ | **67.3** | $ | **73.6** |
| | | | | | | | | |
| Selling, General & Administrative Expense | | 34.6 | | 35.9 | | 37.2 | | 38.7 |
| **Management EBITDA** | $ | **15.3** | $ | **23.9** | $ | **30.1** | $ | **34.9** |
| | | | | | | | | |
| Depreciation & Amortization | | 20.4 | | 10.1 | | 8.5 | | 6.8 |
| Non-Recurring Items | | 3.1 | | 3.1 | | 3.2 | | 3.2 |
| Interest Expense | | 9.4 | | 9.7 | | 9.7 | | 9.6 |
| Income Tax Expense | | (0.9) | | 2.9 | | 3.9 | | 4.8 |
| **Net Income** | $ | **(16.7)** | $ | **(1.9)** | $ | **4.8** | $ | **10.4** |

**UNAUDITED PROJECTED BALANCE SHEET ($ in millions)**

| | 2021P | 2022P | 2023P | 2024P |
|---|---|---|---|---|
| **ASSETS** | | | | |
| Cash | 4.5 | 4.5 | 4.5 | 4.5 |
| Accounts Receivable, Net | 32.8 | 35.9 | 37.8 | 42.9 |
| Inventory | 134.7 | 139.7 | 144.1 | 150.8 |
| Prepaids and Other Current Assets | 4.1 | 4.7 | 5.3 | 6.1 |
| **Total Current Assets** | **$ 176.0** | **$ 184.7** | **$ 191.7** | **$ 204.3** |
| | | | | |
| Property Plant & Equipment, Net | 62.6 | 58.4 | 55.4 | 53.1 |
| Intangibles & Goodwill | 86.0 | 85.9 | 85.9 | 85.9 |
| Other Long-Term Assets | 13.7 | 12.8 | 12.8 | 12.8 |
| **Total Assets** | **$ 338.3** | **$ 341.7** | **$ 345.7** | **$ 356.0** |
| | | | | |
| **LIABILITIES AND EQUITY** | | | | |
| Accounts Payable | 19.6 | 21.6 | 22.9 | 25.6 |
| Accrued Liabilities | 14.6 | 15.2 | 15.8 | 16.7 |
| **Total Current Liabilities** | **$ 34.2** | **$ 36.8** | **$ 38.7** | **$ 42.2** |
| | | | | |
| Exit Take Back Debt | 110.0 | 110.0 | 110.0 | 110.0 |
| Exit ABL Facility | 50.9 | 53.6 | 50.8 | 47.2 |
| **Total Secured Debt** | **$ 160.9** | **$ 163.6** | **$ 160.8** | **$ 157.2** |
| | | | | |
| Other Liabilities | 23.0 | 23.0 | 23.0 | 23.0 |
| **Total Other Liabilities** | **$ 23.0** | **$ 23.0** | **$ 23.0** | **$ 23.0** |
| | | | | |
| **Total Liabilities** | **$ 218.0** | **$ 223.3** | **$ 222.5** | **$ 222.4** |
| | | | | |
| **Total Stockholders' Equity** | **$ 120.3** | **$ 118.4** | **$ 123.2** | **$ 133.7** |
| | | | | |
| **Total Liabilities and Stockholders' Equity** | **$ 338.3** | **$ 341.7** | **$ 345.7** | **$ 356.0** |

**UNAUDITED PROJECTED CONSOLIDATED STATEMENT OF CASH FLOWS ($ in millions)**

|  | | 2021P | | 2022P | | 2023P | | 2024P |
|---|---|---|---|---|---|---|---|---|
| **Net Income** | | **(16.7)** | | **(1.9)** | | **4.8** | | **10.4** |
| | | | | | | | | |
| **Cash flows from Operating Activities:** | | | | | | | | |
| Depreciation & Amortization | | 20.5 | | 10.2 | | 8.6 | | 6.9 |
| Other Non-Cash Reconciling Items | | (0.9) | | 0.9 | | 0.0 | | 0.0 |
| Accounts Receivable | | (2.3) | | (3.1) | | (1.9) | | (5.1) |
| Inventory | | (35.1) | | (5.0) | | (4.5) | | (6.7) |
| Prepaid and Other Current Assets | | (0.6) | | (0.6) | | (0.6) | | (0.8) |
| Accounts Payable | | (3.5) | | 2.0 | | 1.4 | | 2.6 |
| Accrued and Other Current Liabilities | | 0.5 | | 0.6 | | 0.6 | | 0.9 |
| **Net cash provided by operating activities** | $ | **(38.1)** | $ | **3.2** | $ | **8.4** | $ | **8.2** |
| | | | | | | | | |
| **Cash flows from Investing Activities** | | | | | | | | |
| Capital Expenditures | | (6.1) | | (5.8) | | (5.5) | | (4.5) |
| **Cash flows from Investing Activities** | $ | **(6.1)** | $ | **(5.8)** | $ | **(5.5)** | $ | **(4.5)** |
| | | | | | | | | |
| **Cash flow from Financing Activities:** | | | | | | | | |
| Net Change in Revolving Credit Facility | | 30.0 | | 2.6 | | (2.9) | | (3.7) |
| **Net cash used in Financing Activities** | $ | **30.0** | $ | **2.6** | $ | **(2.9)** | $ | **(3.7)** |
| | | | | | | | | |
| **Net Increase / (Decrease) in Cash** | $ | **(14.2)** | $ | **(0.0)** | $ | **0.0** | $ | **0.0** |
| | | | | | | | | |
| *Cash and Cash Equivalent, beginning of period* | | *18.7* | | *4.5* | | *4.5* | | *4.5* |
| *Net Increase / (Decrease) in cash and cash equivalent* | | *(14.2)* | | *(0.0)* | | *0.0* | | *0.0* |
| *Ending Cash Balance* | | *4.5* | | *4.5* | | *4.5* | | *4.5* |

**Exhibit E**

**Liquidation Analysis**

**Liquidation Analysis[1]**

A.    *Overview*

Under the "best interests" of creditors test set forth in section 1129(a)(7) of the Bankruptcy Code, the Bankruptcy Court may only confirm the Plan if each holder of an impaired Claim or Interest either (1) accepts the Plan or (2) receives or retains under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code. Accordingly, to demonstrate that the Plan satisfies the "best interests" of creditors test, the Debtors have prepared the following hypothetical liquidation analysis (the "**Liquidation Analysis**") based upon certain estimates and assumptions discussed below.

The Liquidation Analysis estimates potential cash distributions to Holders of Allowed Claims in a hypothetical Chapter 7 liquidation of the Debtors' assets. Asset values discussed in the Liquidation Analysis may differ materially from values referred to in the Plan and Disclosure Statement. The Debtors prepared the Liquidation Analysis with the assistance of their advisors.

The Debtors believe that each Holder of a Claim or Interest in each impaired class under the Plan will receive at least as much under the Plan than they would receive in a Chapter 7 liquidation of the Debtors' assets, taking into consideration: (i) the likely discounts that would be realized on the value of the assets in a Chapter 7 liquidation, (ii) the incremental costs that would be incurred in connection with a Chapter 7 bankruptcy, and (iii) the fees payable to a Chapter 7 trustee and newly appointed estate professionals.

B.    *Approach and Purpose of Liquidation Analysis*

The determination of the costs of, and proceeds from, the hypothetical liquidation of the Debtors' assets in Chapter 7 is an uncertain process involving significant estimates and assumptions that, although considered reasonable by the Debtors, are inherently subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Debtors, their management, and their advisors. The Liquidation Analysis is also based on the Debtors' best judgment of how numerous decisions in the liquidation process would be resolved. Inevitably, some assumptions in the Liquidation Analysis would not materialize in an actual Chapter 7 liquidation, and unanticipated events and circumstances could materially affect the ultimate results in an actual Chapter 7 liquidation. In addition, the Debtors' management cannot judge with any degree of certainty the recovery that may result from asset sales in a Chapter 7 liquidation. The Liquidation Analysis was prepared for the sole purpose of generating a reasonable, good faith estimate of the proceeds that would be generated if the Debtors were

---

[1]    Capitalized terms used but not defined herein have the meanings ascribed to such terms in the *Joint Prepackaged Chapter 11 Plan of Reorganization of Northwest Hardwoods, Inc. and Its Debtor Affiliates* (the "Plan") and the accompanying *Disclosure Statement for the Joint Prepackaged Chapter 11 Plan of Reorganization of Northwest Hardwoods, Inc. and Its Debtor Affiliates* (the "Disclosure Statement"), to which this Liquidation Analysis is attached.

liquidated in accordance with Chapter 7 of the Bankruptcy Code. The Liquidation Analysis is not intended, and should not be used, for any other purpose.

The underlying financial information in the Liquidation Analysis was not compiled or examined by any independent accountants in accordance with the standards promulgated by the American Institute of Certified Public Accountants. No independent appraisals were conducted in preparing the Liquidation Analysis. **NEITHER THE DEBTORS NOR THEIR ADVISORS MAKE ANY REPRESENTATIONS OR WARRANTIES THAT THE ACTUAL RESULTS WOULD OR WOULD NOT APPROXIMATE THE ESTIMATES AND ASSUMPTIONS REPRESENTED IN THE LIQUIDATION ANALYSIS. ACTUAL RESULTS COULD VARY MATERIALLY.**

In preparing the Liquidation Analysis, the Debtors estimated Allowed Claims based upon the Debtors' latest financial projections and review of liabilities in the Debtors' books and records. The Liquidation Analysis includes estimates for Claims that could be asserted and Allowed in a Chapter 7 liquidation, including wind-down costs and trustee and professional fees required to facilitate disposition of certain assets in a value-maximizing manner. The Debtors' estimate of Allowed Claims set forth in the Liquidation Analysis should not be relied upon for any other purpose, including determining the value of any distribution to be made on account of Allowed Claims under the Plan. **NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS IS INTENDED TO BE, OR CONSTITUTES, A CONCESSION, ADMISSION, OR ALLOWANCE OF ANY CLAIM BY THE DEBTORS. THE ACTUAL AMOUNT OR PRIORITY OF ALLOWED CLAIMS IN THE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH AND USED IN THE LIQUIDATION ANALYSIS. THE DEBTORS RESERVE ALL RIGHTS TO SUPPLEMENT, MODIFY, OR AMEND THE LIQUIDATION ANALYSIS SET FORTH HEREIN**.

*C.    Global Assumptions*

The Liquidation Analysis should be read in conjunction with the following global notes and assumptions:

1.    <u>Petition Date and Appointment of Chapter 7 Trustee</u>

The Liquidation Analysis assumes the Debtors commence Chapter 7 liquidation cases on or about November 23, 2020 (the "**Chapter 7 Petition Date**"). On or shortly after the Chapter 7 Petition Date, it is assumed that the Bankruptcy Court would appoint one Chapter 7 trustee (the "**Trustee**") to oversee the liquidation of the Debtors' Estates. Should multiple Trustees be appointed to administer the Estates, lower recoveries and higher administrative costs could result and distributions to creditors could be delayed. The bases of the Liquidation Analysis are the Debtors' projected cash balance as of the Chapter 7 Petition Date, their non-cash asset book values as of the most recently available month-end close, or October 31, 2020, and the net costs to wind down the Estates. The Liquidation Analysis reflects the wind down and liquidation of substantially all of the Debtors' remaining assets and the distribution of available proceeds to Holders of Allowed Claims during the period after the Chapter 7 Petition Date. The Liquidation Analysis

does not include the impact of foreign liquidation proceedings for the Debtors' non-domestic subsidiaries, which could result in lower recoveries.

2.     <u>Chapter 7 Process</u>

On or shortly after the Chapter 7 Petition Date, it is assumed that the Trustee would commence the liquidation of the Debtors' Estates, during which time all of the Debtors' assets would be sold or surrendered to the respective lien holders, and the cash proceeds, net of liquidation-related costs, would then be distributed to creditors in accordance with the priority scheme under section 726 of the Bankruptcy Code. Under section 704 of the Bankruptcy Code, a Trustee must, among other duties, collect and convert property of the Estates as expeditiously as is compatible with the best interests of parties in interest, which could result in potentially distressed recoveries.

The liquidation of the Debtors' assets is assumed to be completed over a three to six month period. To maximize value of the Debtors' Estates, the Trustee is assumed to maintain the staff required to support the sale and transition of assets over the foregoing period, including the processing and management of documentation requirements to maximize recovery of proceeds from asset sales. Non-essential employees are assumed to be terminated immediately with only the minimum staff required to conduct the liquidation remaining. An expedited process is expected to result in materially less recovery to the Debtors' Estates.

3.     <u>Claims Estimates</u>

In preparing the Liquidation Analysis, the Debtors have preliminarily estimated an amount of Allowed Claims based upon a review of the Debtors' consolidated balance sheet as of October 31, 2020, subject to adjustment for estimates of additional accrued expenses arising between October 31, 2020 and the Chapter 7 Petition Date. In certain cases, proceeds from asset sales are shown net of amounts for estimated Chapter 7 administrative obligations incurred after the Chapter 7 Petition Date, such as broker's fees, commissions and other expenses required to liquidate certain assets. No order or finding has been entered or made by the Bankruptcy Court estimating or otherwise fixing the amount of Claims at the projected amounts of Allowed Claims set forth in the Liquidation Analysis. The estimate of the amount of Allowed Claims set forth in the Liquidation Analysis should not be relied upon for any other purpose, including, without limitation, any determination of the value of any distribution to be made on account of Allowed Claims under the Plan. The actual amount of Allowed Claims could be materially different from the amount of Claims estimated in the Liquidation Analysis.

4.     <u>Avoidance Actions</u>

No recovery or related litigation costs attributable to any potential avoidance actions under the Bankruptcy Code, including potential preference or fraudulent transfer actions, are assumed within the Liquidation Analysis.

5.     <u>Litigation</u>

The Liquidation Analysis does not consider any recovery or claims that may arise from the outcome of current or potential actions by or against the Debtors.

6.        <u>Additional Claims in a Liquidation</u>

A Chapter 7 liquidation itself may trigger certain obligations and priority payments that otherwise would not be due in the ordinary course of business or would otherwise not exist under a chapter 11 plan. The liquidation could prompt certain other events to occur, including the rejection of executory contracts and unexpired leases, defaults under agreements with suppliers, and acceleration of severance obligations. Such events, if triggered, would likely subject the Debtors' Estates to additional claims.

D.    *Conclusion*

The Debtors have determined that confirmation of the Plan will provide holders of Claims and Interests with recoveries that are not less than what they would otherwise receive in connection with a hypothetical liquidation of the Debtors under Chapter 7 of the Bankruptcy Code.

[*Remainder of page left intentionally blank*]

## Liquidation Analysis ($ in millions)

| | Net Book Value as of 10/31/2020 | Estimated Proceeds | | | |
| --- | --- | --- | --- | --- | --- |
| | | Low Range | | High Range | |
| Cash [1] | 28.7 | 97% $ | 27.8 | 98% $ | 28.1 |
| Accounts Receivable | 31.7 | 64% | 20.2 | 77% | 24.3 |
| Inventory, net [2] | 103.1 | 47% | 48.1 | 56% | 57.3 |
| Prepaids and Other Current Assets | 6.2 | 0% | - | 10% | 0.6 |
| Income Tax Receivable | 4.1 | 75% | 3.0 | 95% | 3.9 |
| Property, Plant & Equipment, net | 69.5 | 42% | 29.4 | 76% | 53.1 |
| Goodwill and Other Intangibles | 97.6 | 0% | - | 5% | 4.4 |
| Idle Assets | 11.5 | 31% | 3.6 | 36% | 4.1 |
| Other | 4.9 | 10% | 0.5 | 11% | 0.6 |
| Total Book Assets | $   357.3 | | | | |
| **Estimated Liquidation Proceeds before Expenses** | | **$** | **132.7** | **$** | **176.3** |
| | | | | | |
| Less Expenses:  Wind down costs, not reflected in net recoveries above | | | (8.3) | | (4.4) |
| Trustee fees | | | (3.1) | | (4.4) |
| Professional fees | | | (8.0) | | (5.0) |
| **Net Liquidation Proceeds Available for Claims** | | **$** | **113.3** | **$** | **162.5** |
| | | | | | |
| Net Liquidation Proceeds Subject to a Secured Lien | | $ | 99.1 | $ | 135.1 |
| Net Liquidation Proceeds Not Subject to a Secured Lien | | | 14.2 | | 27.4 |
| Total | | $ | 113.3 | $ | 162.5 |

| | Estimated Claim Amount | Estimated Recovery | | | |
| --- | --- | --- | --- | --- | --- |
| | | Low Range | | High Range | |
| ABL Claims | $   42.2 | $   42.2 | 100% | $   42.2 | 100% |
| Secured Notes Claims | $   401.7 | $   56.8 | 14% | $   92.9 | 23% |
| 503(b)(9) Claims | $   8.3 | $   8.3 | 100% | $   8.3 | 100% |
| Other Priority Claims | $   9.1 | $   5.9 | 65% | $   9.1 | 100% |
| Priority Tax Claims | $   24.4 | $   - | 0% | $   10.0 | 41% |
| General Unsecured Claims [3] | $   25.0 | $   - | 0% | $   - | 0% |
| plus: Rejection Damage Claims | Unknown | $   - | 0% | - | 0% |
| Existing Equity Interests | Not Quantified | $   - | 0% | $   - | 0% |

Notes:
(1) Net book value of cash represents the projected cash balance as of the Chapter 7 Petition Date.
(2) The Debtors recently obtained an inventory appraisal from Hilco Valuation Services, which provided an estimated net orderly liquidation recovery percentage on raw materials, work-in-process and finished goods inventory assets. For purposes of the Liquidation Analysis, the Debtors assumed low recoveries of 10% less than the recovery rates provided by Hilco for each of the respective inventory assets and high recoveries equal to the recovery rates provided by Hilco for each of the respective inventory assets. For purposes of the Liquidation Analysis, the Debtors assume there is no recovery on inventory considered ineligible for borrowing purposes under the Debtors' ABL Credit Agreement.
(3) The estimated claim amount for General Unsecured Claims does not include incremental estimates for deficiency claims as a result of less than 100% recovery to the Secured Notes Claims, Other Priority Claims or Priority Tax Claims.

*[Remainder of page left intentionally blank]*

## Plan and Chapter 7 Recoveries

| | Estimated Recovery - Liquidation Analysis | | | | Estimated Recovery - Debtors' Plan[1] | | | |
|---|---|---|---|---|---|---|---|---|
| | Low Range | | High Range | | Low Range | | High Range | |
| ABL Claims | $ 42.2 | 100% $ | 42.2 | 100% | $ 42.2 | 100% $ | 42.2 | 100% |
| Secured Notes Claims | $ 56.8 | 14% $ | 92.9 | 23% | $ 171.4 | 43% $ | 245.6 | 61% |
| 503(b)(9) Claims | $ 8.3 | 100% $ | 8.3 | 100% | $ 8.3 | 100% $ | 8.3 | 100% |
| Other Priority Claims | $ 5.9 | 65% $ | 9.1 | 100% | $ 9.1 | 100% $ | 9.1 | 100% |
| Priority Tax Claims | - | 0% $ | 10.0 | 41% | $ 24.4 | 100% $ | 24.4 | 100% |
| General Unsecured Claims | - | 0% | - | 0% | $ 25.0 | 100% $ | 25.0 | 100% |
| plus: Rejection Damage Claims | - | 0% | - | 0% | - | n/a | - | n/a |
| Existing Equity Interests | - | 0% | - | 0% | $ 0.4 | n/a $ | 1.4 | n/a |

Notes:
(1) Estimated recoveries from the Debtors Plan assumes only Class 4 and Class 9 claims are impaired. The recovery for Class 4 includes $110 million of Exit Take Back Debt, plus the equity value received per the Debtors' Plan before any dilution, using an estimated total enterprise value range of $175 - $250 million. The recovery for Class 9 includes the equity value received before any dilution using the same estimated total enterprise value range.

*[Remainder of page left intentionally blank]*

**Liquidation Analysis Notes**

A.    *Liquidation Proceeds*

**Cash.**  This amount represents the Debtors' worldwide cash estimate as of the Chapter 7 Petition Date.  Approximately $3.0 million of the Debtors' cash is held in foreign bank accounts. The Debtors assume they will need to pay taxes or penalties on repatriated foreign cash, resulting in estimated recoveries on consolidated cash of 97-98%.

**Tangible and Intangible Assets.**  This amount represents the proceeds from liquidation of tangible and intangible assets based on estimates derived from the October 31, 2020 consolidated balance sheet of the Debtors and their subsidiaries.  The book values presented are intended to be proxies for actual balances on the Chapter 7 Petition Date.

1.    Customer Accounts and Other Receivables, net ("AR").   The Debtors' AR is primarily amounts owed to the Debtors by their customers for the sale of hardwood lumber, pallets, cants and ties, logs, panels, and other hardwood lumber related products, net of allowances for doubtful accounts.  The estimated recoveries on such assets are assumed to be within the range of 64-77% of book value, based on quoted advance rates for such assets (+/- 10%), with discounts applied if the AR is with counterparties in foreign locations.  If the Debtors were to commence a liquidation under Chapter 7, they would need to terminate several of their customer supply agreements and would be unable to honor warranty and rebate programs. The Liquidation Analysis does not include potential counterclaims of customers and resulting set-offs through nonpayment of customer receivables, which could result in substantially lower AR recoveries than what is illustrated herein.

2.    Inventory, net.   This category represents the Debtors' raw materials, works-in-process, semi-finished and finished goods on-hand, net of reserves of obsolete or slow-moving items.   The estimated recoveries on such assets are based on a September 22, 2020 appraisal report prepared by Hilco Valuation Services ("Hilco") for orderly liquidation values. The appraised values were net of certain estimated expenses required to liquidate the assets, such as payroll, occupancy, and other operating expenses for sites where the inventory is located during the liquidation period and the costs and fees of a liquidator. Hilco provided a single estimated recovery rate on each of the Debtors' raw materials, works-in-process, and finished goods inventory assets. For purposes of the Liquidation Analysis, the Debtors assume low recoveries are 10% less than the recovery rates provided by Hilco for each of the respective inventory asset types and high recoveries are equal to the recovery rates provided by Hilco for each of the respective inventory asset types, which after excluding inventory considered ineligible for borrowing purposes under the Debtors' ABL Credit Agreement, results in an estimated recovery range of 47 – 56%.

3.    Prepaid Expenses and Other Current Assets.   Includes prepaid expenses (such as rent and insurance) and other current assets. Prepaid insurance represents unamortized payments for the Debtors' insurance policy payments.  The Debtors

estimate 100% of the book value is used to pay for actual costs incurred. To the extent that the Debtors' prepaid insurance balances are insufficient to cover actual incurred costs, the insurance carriers would likely assert claims against the Debtors. No estimate for such claims has been included in the Liquidation Analysis. Prepaid rents, other prepaid expenses, deposits, and advances are expected to be substantially consumed during wind-down activities or set-off by counterclaims of lessors or other contract counterparties. Therefore, the Liquidation Analysis assumes the Debtors would recover 0 – 10% of these assets in a liquidation.

4.   <u>Income Tax Receivable.</u> Includes an income tax receivable with a net book value $4.1 million. The Liquidation Analysis assumes the Debtors would recover 75-95% of this asset based due to uncertainties related to the tax authority's acceptance of the submitted claim and timing of payment.

5.   <u>Property, Plant & Equipment, net.</u>  Includes the Debtors' ownership interests in its real property for 31 properties as well as leasehold improvements in its rented facilities, machinery and equipment used in its manufacturing locations, and office fixtures and furniture. The real and personal property has not been independently appraised for purposes of the Liquidation Analysis. In certain cases, the market value of real property may be materially greater or lower than the net book value. The Debtors utilized prior appraisal and tax assessed values to determine a range of recovery values for its real property and then applied an estimated discount rate and broker's fee using information currently available related to certain of the Debtors' properties that are currently being marketed for sale. Machinery and equipment recoveries are based on the Debtors' current understanding of market conditions for these assets. Total liquidation recoveries for property, plant & equipment are estimated at 42% to 76% of net book value for purposes of the Liquidation Analysis.

6.   <u>Goodwill and Other Intangibles.</u>  The Debtors' intangibles assets primarily consist of tradenames, customer relationships and goodwill.  The Debtors do not assume its tradenames and customer relationships would generate significant recoverable value in a liquidation. The Liquidation Analysis assumes no recovery for goodwill recorded on the Debtors' books as it does not represent a separable asset that can be monetized in a liquidation. In the aggregate, the Debtors estimate 0 to 5% of its goodwill and other intangibles net book value would be monetized in a liquidation.

7.   <u>Idle Assets.</u> Includes the Debtors' ownership interests in 4 idle real estate properties as well as leasehold improvements in its idle rented facilities, and the machinery and equipment and office fixtures and furniture in these locations. The real and personal property has not been independently appraised for purposes of the Liquidation Analysis. In certain cases, the market value of real property may be materially greater or lower than the net book value. The Debtors utilized prior appraisal and tax assessed values to determine a range of recovery values for its idle real property and then applied an estimated discount rate and broker's fee using information currently available for these properties that are currently being marketed for sale.  Idle machinery and equipment recoveries are based on the

Debtors' current understanding of market conditions for these assets and are similarly discounted because they are currently idle. Liquidation recoveries for Idle Assets are estimated at 31% to 36% of net book value for purposes of the Liquidation Analysis.

8. <u>Other Assets.</u> Includes long-term timber rights, other long-term deposits, deferred financing fees, and a note receivable from an individual. The Debtors estimate 10-11% of its other asset net book value is recoverable in a liquidation, primarily from receipt of amounts owed under the note receivable.

B. *Liquidation Adjustments*

**Wind-Down Costs.** Wind-down costs include utilities, insurance and building occupancy costs that would be incurred as the Trustee monetizes assets during the liquidation period. These costs are assumed to be incremental to the costs subtracted from inventory value to arrive at the recently appraised values of those assets for locations without inventory held for sale in a liquidation. The Liquidation Analysis also assumes costs (estimated at 5%) to retain a small group of the Debtors' current personnel during the liquidation period to assist the Trustee in safely and responsibly mothballing facilities, mobilizing and monetizing assets, preparing and closing the Debtors' books and records to facilitate final tax returns and audits with regulatory agencies, and other tasks necessary to liquidate the Debtors' Estates in the most efficient manner. The Debtors estimate wind-down costs in a range of $4.4 million for a three month liquidation, which is applied to the higher asset recovery range, and $8.3 million for a six month liquidation, which is applied to the lower asset recovery range.

**Trustee Fees.** Trustee fees are projected to be 3% of the liquidation proceeds, not including cash, in accordance with section 326 of the Bankruptcy Code.

**Professional Fees.** The Debtors estimate a Trustee would require legal, tax and other professional services to carry out liquidation of the Debtors' Estates. The Debtors assume that fees for such professionals would be approximately 3-6% of gross proceeds depending on the estimated recovery assumed.

C. *Claims*

**ABL Claims.** Represents the estimated principal and interest amount outstanding as of November 23, 2020 under the Debtors' ABL Credit Agreement, including letters of credit.

**Secured Notes Claims.** Includes unpaid principal and accrued and unpaid interest as of November 23, 2020 under the Debtors' 2014 Notes and 2015 Notes.

**503(b)(9) Administrative Priority Claims.** The Debtors estimate that $8.3 million of their open trade payables for prepetition goods qualify for 503(b)(9) administrative priority status.

**Other Priority Claims.** Includes accrued payroll and employee related expenses, up to the statutory priority claim limit.

**Priority Tax Claims.** Includes various accruals for tax liabilities.

**General Unsecured Claims.**  Includes (1) open trade payables for prepetition goods and services, rebates, warranties, and other trade-related accruals that are not otherwise included as a Priority Claim due to 503(b)(9) treatment,  (2) unpaid principal and estimated accrued prepetition interest on the Promissory Note pursuant to which the Debtors agreed to pay $2.1 million in principal to Keystone Transportation Solutions, LLC, and (3) other recorded prepetition unsecured liabilities not otherwise entitled to higher priority.  The Liquidation Analysis does not include estimates for rejection damage claims that may be filed in connection with the Debtors' numerous customer programs and supply agreements, facility and equipment leases, and other executory contracts.