## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| NORTHWEST HARDWOODS, INC., *et al.*,[1] | ) | Case No. 20-13005 (CSS) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |
|  | ) | **Re: Docket No. 15** |

### NOTICE OF FILING OF SUPPLEMENT TO THE JOINT PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION OF NORTHWEST HARDWOODS, INC., AND ITS DEBTOR AFFILIATES

Northwest Hardwoods, Inc. and its affiliated debtors and debtors-in-possession (each, a "Debtor," and collectively, the "Debtors") respectfully submit this plan supplement (the "Plan Supplement") in support of, and in accordance with, the *Joint Prepackaged Chapter 11 Plan of Reorganization of Northwest Hardwoods, Inc., and Its Debtor Affiliates* [Docket No. 15] (as may be amended, supplemented, or modified from time to time, the "Plan").[2] The documents contained in this Plan Supplement are integral to, part of, and incorporated by reference into the Plan. These documents have not yet been approved by the Bankruptcy Court. If the Plan is confirmed by the Bankruptcy Court, the documents contained in this Plan Supplement will be approved by the Bankruptcy Court pursuant to the Confirmation Order.

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Northwest Hardwoods, Inc. (5401), Hardwoods Intermediate Holdings II, Inc. (7760), and Hardwoods Holdings, Inc. (3443). The location of the Debtors' service address in these chapter 11 cases is: 1313 Broadway, Suite 300, Tacoma, WA 98402.

[2]  Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan.

# CONTENTS

This Plan Supplement contains the following documents, each as may be amended, modified, or supplemented from time to time in accordance with the Plan and the Restructuring Support Agreement:

| Exhibit | Plan Supplement Document |
|---------|--------------------------|
| A | Exit ABL Credit Agreement |
| B | Exit Take Back Debt Agreement |
| C | Exit Intercreditor Agreement |
| D | Reorganized HHI Limited Liability Company Agreement Term Sheet[3] |
| E | Rejected Executory Contract and Unexpired Lease List |
| F | Identities of the Members of the New Board |

Certain documents, or portions thereof, contained in this Plan Supplement remain subject to continuing negotiations among the Debtors, the Required Consenting Stakeholders, the Exit ABL Agent and the lenders party to the ABL Credit Agreement (the "Lenders") and/or other interested parties with respect thereto and to the agreement and approval of the applicable parties. Subject to the terms and conditions of the Plan and the Restructuring Support Agreement, the Debtors reserve all rights to amend, revise, or supplement this Plan Supplement, and any of the documents and designations contained herein, at any time before the Effective Date of the Plan, or any such other date as may be provided for by the Plan or by order of the Bankruptcy Court. Each of the documents contained in the Plan Supplement or its amendments are subject to certain

---

[3] On or prior to the Effective Date, either (i) HHI will be converted into a Delaware limited liability company, or (ii) a newly formed Delaware limited liability company will be inserted above HHI. References to "Reorganized HHI" in this Plan Supplement are to the limited liability company referred to in either clause (i) or (ii). Accordingly, the Reorganized HHI Limited Liability Company Agreement will replace the New Shareholders Agreement and serve as the New Organizational Document for Reorganized HHI.

consent and approval rights to the extent provided in the Plan or the Restructuring Support Agreement.

*[Remainder of Page Intentionally Blank]*

Dated:  December 16, 2020
        Wilmington, Delaware

*/s/ Jacob D. Morton*

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Sean M. Beach (No. 4070)
Jacob D. Morton (No. 6684)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Tel:    (302) 571-6600
Fax:    (302) 571-1253
Email:  sbeach@ycst.com
        jmorton@ycst.com

GIBSON, DUNN & CRUTCHER LLP
David M. Feldman  (admitted *pro hac vice*)
J. Eric Wise  (admitted *pro hac vice*)
Matthew K. Kelsey  (admitted *pro hac vice*)
Alan Moskowitz  (admitted *pro hac vice*)
200 Park Avenue
New York, New York 10166
Tel:    (212) 351-4000
Fax:    (212) 351-4035
Email:  dfeldman@gibsondunn.com
        ewise@gibsondunn.com
        mkelsey@gibsondunn.com
        amoskowitz@gibsondunn.com

*Counsel to the Debtors and Debtors in Possession*

## EXHIBIT A

### Exit ABL Credit Agreement

This **Exhibit A** contains the Exit ABL Credit Agreement.  Certain documents, or portions thereof, contained in this **Exhibit A** remain subject to continuing negotiations among the Debtors, the Required Consenting Stakeholders, the Exit ABL Agent and Lenders and/or other interested parties with respect thereto and to the agreement and approval of the applicable parties.  Subject to the terms and conditions of the Plan and the Restructuring Support Agreement, the Debtors reserve all rights to amend, revise, or supplement this **Exhibit A**, and any of the documents and designations contained herein, at any time before the Effective Date of the Plan, or any such other date as may be provided for by the Plan or by order of the Bankruptcy Court.  Each of the documents contained in this **Exhibit A** are subject to certain consent and approval rights to the extent provided in the Plan or the Restructuring Support Agreement.

ASSET-BASED REVOLVING CREDIT AGREEMENT

Dated as of [_____ ___, 20__]

among

NORTHWEST HARDWOODS, INC.,
as Borrower,

The Subsidiaries from time to time party hereto,
as Subsidiary Borrowers

HARDWOODS INTERMEDIATE HOLDINGS II, INC.,
as Holdings,

THE LENDERS PARTY HERETO,

BANK OF AMERICA, NA.,
as Administrative Agent and Collateral Agent,

and

BANK OF AMERICA, N.A.,
as Sole Lead Arranger and as Sole Bookrunner

## TABLE OF CONTENTS
(continued)

**Page**

ARTICLE I       DEFINITIONS..................................................................................... 3

Section 1.01    Defined Terms ................................................................. 3
Section 1.02    Terms Generally............................................................... 57
Section 1.03    Accounting Terms............................................................ 57
Section 1.04    Rounding........................................................................... 58
Section 1.05    Timing of Payment or Performance................................ 58
Section 1.06    References to Laws .......................................................... 58
Section 1.07    Pro Forma......................................................................... 58

ARTICLE II      THE CREDITS .................................................................................. 58

Section 2.01    Commitments.................................................................... 59
Section 2.02    Loans and Borrowings ..................................................... 59
Section 2.03    Requests for Borrowings.................................................. 59
Section 2.04    Swingline Loans ............................................................... 60
Section 2.05    Letters of Credit ............................................................... 62
Section 2.06    Funding of Borrowings .................................................... 68
Section 2.07    Interest Elections.............................................................. 69
Section 2.08    Termination and Reduction of Commitments................... 70
Section 2.09    Repayment of Loans; Evidence of Debt ......................... 70
Section 2.10    Repayment of Revolving Facility Loans ......................... 71
Section 2.11    Prepayment of Loans ....................................................... 72
Section 2.12    Fees .................................................................................. 73
Section 2.13    Interest.............................................................................. 74
Section 2.14    (i) Alternate Rate of Interest ........................................... 75
Section 2.15    Increased Costs ................................................................ 78
Section 2.16    Break Funding Payments ................................................. 79
Section 2.17    Taxes ................................................................................ 80
Section 2.18    Payments Generally; Pro Rata Treatment; Sharing of Set-offs ........ 82
Section 2.19    Mitigation Obligations; Replacement of Lenders............. 84
Section 2.20    Illegality ........................................................................... 86
Section 2.21    Defaulting Lenders........................................................... 86
Section 2.22    Incremental Extensions of Credit..................................... 89
Section 2.23    Extensions of Commitments ............................................ 91
Section 2.24    Overadvances ................................................................... 93
Section 2.25    Protective Advances......................................................... 94

ARTICLE III     REPRESENTATIONS AND WARRANTIES............................................ 95

Section 3.01    Organization; Powers....................................................... 95
Section 3.02    Authorization ................................................................... 95
Section 3.03    Enforceability................................................................... 96
Section 3.04    Governmental Approvals; Consents ................................ 96
Section 3.05    Financial Statements ........................................................ 96
Section 3.06    No Material Adverse Effect .............................................. 96

138633067_7

4850-7280-1748.5

# TABLE OF CONTENTS
(continued)

**Page**

| | | |
|---|---|---|
| Section 3.07 | Title to Properties | 97 |
| Section 3.08 | Subsidiaries | 97 |
| Section 3.09 | Litigation; Compliance with Laws | 97 |
| Section 3.10 | Investment Company Act | 97 |
| Section 3.11 | [Reserved] | 98 |
| Section 3.12 | Federal Reserve Regulations | 98 |
| Section 3.13 | Taxes | 98 |
| Section 3.14 | No Material Misstatements | 98 |
| Section 3.15 | Employee Benefit Plans | 99 |
| Section 3.16 | Environmental Matters | 99 |
| Section 3.17 | Security Documents | 100 |
| Section 3.18 | Solvency | 101 |
| Section 3.19 | Labor Matters | 101 |
| Section 3.20 | Use of Proceeds | 101 |
| Section 3.21 | Anti-Terrorism Laws | 101 |
| Section 3.22 | Borrowing Base Certificate | 102 |
| Section 3.23 | Intellectual Property; Licenses, Etc | 102 |
| Section 3.24 | Senior Indebtedness; Subordination | 102 |
| Section 3.25 | No Default | 102 |
| Section 3.26 | Chapter 11 Plan | 102 |
| ARTICLE IV | CONDITIONS OF LENDING | 103 |
| Section 4.01 | All Credit Events After the Closing Date | 103 |
| Section 4.02 | Closing Date | 104 |
| ARTICLE V | AFFIRMATIVE COVENANTS | 108 |
| Section 5.01 | Existence; Businesses and Properties | 108 |
| Section 5.02 | Insurance | 108 |
| Section 5.03 | Taxes | 109 |
| Section 5.04 | Financial Statements, Reports, etc | 109 |
| Section 5.05 | Litigation and Other Notices | 111 |
| Section 5.06 | Compliance with Laws | 112 |
| Section 5.07 | Maintaining Records; Inspections and Appraisals | 112 |
| Section 5.08 | Compliance with Environmental Laws | 113 |
| Section 5.09 | Further Assurances | 113 |
| Section 5.10 | Conference Calls | 116 |
| Section 5.11 | [Reserved] | 116 |
| Section 5.12 | Use of Proceeds | 116 |
| Section 5.13 | Collateral Monitoring and Reporting | 116 |
| Section 5.14 | Designation of Subsidiaries | 120 |
| Section 5.15 | Post-Closing Covenant | 120 |
| ARTICLE VI | NEGATIVE COVENANTS | 121 |

-ii-

# TABLE OF CONTENTS
(continued)

Page

Section 6.01    Indebtedness ................................................................ 121
Section 6.02    Liens .......................................................................... 124
Section 6.03    [Reserved] .................................................................. 129
Section 6.04    Investments, Loans and Advances ................................ 129
Section 6.05    Mergers, Consolidations and Dispositions ..................... 131
Section 6.06    Dividends and Distributions ......................................... 134
Section 6.07    Transactions with Affiliates .......................................... 136
Section 6.08    Business of Holdings ................................................... 138
Section 6.09    Limitation on Prepayments of Certain Debt; Modifications of Indebtedness and Certain Other Agreements; Restrictions on Subsidiary Distributions; Negative Pledges ....................... 139
Section 6.10    Financial Covenant ..................................................... 142
Section 6.11    Swap Agreements ....................................................... 142
Section 6.12    Changes in Fiscal Year ................................................ 142
Section 6.13    Change in Lines of Business ........................................ 142

ARTICLE VII    EVENTS OF DEFAULT ................................................. 142

Section 7.01    Events of Default ......................................................... 142
Section 7.02    Holdings' Right to Cure ............................................... 146
Section 7.03    Post-Default Allocation of Payments ............................ 147

ARTICLE VIII    THE ADMINISTRATIVE AGENT ................................... 148

Section 8.01    Appointment ............................................................... 148
Section 8.02    Delegation of Duties ................................................... 149
Section 8.03    Exculpatory Provisions ................................................ 149
Section 8.04    Reliance by Administrative Agent ................................. 150
Section 8.05    Notice of Default ........................................................ 150
Section 8.06    Non-Reliance on Administrative Agent and Other Lenders ........... 150
Section 8.07    Indemnification .......................................................... 151
Section 8.08    Agent in Its Individual Capacity .................................. 151
Section 8.09    Successor Administrative Agent ................................... 152
Section 8.10    Lead Arranger ............................................................ 152
Section 8.11    Withholding Tax ......................................................... 152
Section 8.12    Secured Bank Product Providers .................................. 153

ARTICLE IX    MISCELLANEOUS ....................................................... 153

Section 9.01    Notices ...................................................................... 153
Section 9.02    Survival of Agreement ................................................ 154
Section 9.03    Binding Effect ............................................................ 155
Section 9.04    Successors and Assigns ............................................... 155
Section 9.05    Expenses; Indemnity ................................................... 159
Section 9.06    Right of Set-off .......................................................... 161
Section 9.07    Applicable Law ........................................................... 162

138633067_7

4850-7280-1748.5

# TABLE OF CONTENTS
(continued)

**Page**

Section 9.08 Waivers; Amendment; Intercreditor Agreements ........................... 162
Section 9.09 Interest Rate Limitation ................................................ 166
Section 9.10 Entire Agreement ...................................................... 166
Section 9.11 WAIVER OF JURY TRIAL ............................................... 166
Section 9.12 Severability ........................................................... 167
Section 9.13 Counterparts .......................................................... 167
Section 9.14 Headings .............................................................. 167
Section 9.15 Jurisdiction; Consent to Service of Process ................................ 167
Section 9.16 Confidentiality ......................................................... 168
Section 9.17 Release of Liens and Guarantees ......................................... 169
Section 9.18 USA PATRIOT Act ..................................................... 170
Section 9.19 Marshalling; Payments Set Aside ......................................... 170
Section 9.20 Obligations Several; Independent Nature of Lenders' Rights ......... 170
Section 9.21 Electronic Execution of Assignments ...................................... 170
Section 9.22 Acknowledgements ..................................................... 170
Section 9.23 Lender Action .......................................................... 171
Section 9.24 Material Non-Public Information .......................................... 171
Section 9.25 Authorization to Distribute Certain Materials to "Public-Side"
Lenders .............................................................. 173

ARTICLE X    THE BORROWERS' REPRESENTATIVE; NATURE OF
BORROWERS' OBLIGATIONS ............................................. 173

Section 10.01 Appointment; Nature of Relationship ..................................... 173
Section 10.02 Powers ............................................................... 174
Section 10.03 Employment of Agents ................................................. 174
Section 10.04 Notices ............................................................... 174
Section 10.05 Execution of Loan Documents; Borrowing Base Certificate .......... 174
Section 10.06 [Reserved] ............................................................ 174
Section 10.07 Joint and Several Liability .............................................. 174

138633067_7

4850-7280-1748.5

Exhibits and Schedules

Exhibit A          Form of Assignment and Acceptance
Exhibit B          Form of Administrative Questionnaire
Exhibit C-1        Form of Borrowing Request
Exhibit C-2        Form of Swingline Borrowing Request
Exhibit D          Form of Interest Election Request
Exhibit E          Form of Collateral Agreement
Exhibit F          Form of Solvency Certificate
Exhibit G          Form of Subordination Provisions
Exhibit H          Form of Prepayment Notice
Exhibit I          Form of Compliance Certificate
Exhibit J          Form of Increased Facility Activation Notice
Exhibit K          Form of New Lender Supplement
Exhibit L-1        Form of U.S. Tax Compliance Certificate (Foreign Lenders that are not
                   Partnerships for U.S. Federal Income Tax Purposes)
Exhibit L-2        Form of U.S. Tax Compliance Certificate (Foreign Participants that are
                   not Partnerships for U.S. Federal Income Tax Purposes)
Exhibit L-3        Form of U.S. Tax Compliance Certificate (Foreign Participants that are
                   Partnerships for U.S. Federal Income Tax Purposes)
Exhibit L-4        Form of U.S. Tax Compliance Certificate (Foreign Lenders that are
                   Partnerships for U.S. Federal Income Tax Purposes)
Exhibit M          Form of Revolving Note
Exhibit N          Form of ABL Intercreditor Agreement
Exhibit O          Form of Borrowing Base Certificate
Exhibit P          Form of Global Intercompany Note
Exhibit Q          Form of Joinder Agreement
Exhibit R          Form of Bank Product Designation
Exhibit S          Title Endorsements

Schedule 2.01      Commitments
Schedule 3.08(a)   Subsidiaries
Schedule 3.08(b)   Equity Interests
Schedule 5.13(j)   Deposit Accounts
Schedule 5.15      Post-Closing Matters
Schedule 6.01      Indebtedness
Schedule 6.02      Liens
Schedule 6.04      Investments
Schedule 6.07      Transactions with Affiliates

138633067_7

4850-7280-1748.5

## ASSET-BASED REVOLVING CREDIT AGREEMENT

ASSET-BASED REVOLVING CREDIT AGREEMENT dated as of [_____, 20\_\_] (this "Agreement"), among NORTHWEST HARDWOODS, INC., a Delaware corporation (the "Lead Borrower"), each of the Subsidiary Borrowers from time to time party hereto, HARDWOODS INTERMEDIATE HOLDINGS II, INC., a Delaware corporation and direct parent of the Borrower ("Holdings"), the LENDERS party hereto from time to time, BANK OF AMERICA, N.A. ("Bank of America"), as administrative agent (in such capacity, the "Administrative Agent") and Collateral Agent.

### RECITALS

WHEREAS, on November 23, 2020 (the "Petition Date"), the Lead Borrower and certain of its affiliates commenced the Chapter 11 Cases (as defined below) by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code (as amended, the "Bankruptcy Code") with the Bankruptcy Court (as defined below). The Lead Borrower continues to operate its businesses and manage its properties as a debtor and debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

WHEREAS, prior to the Petition Date, certain lenders provided financing to Lead Borrower, the other loan parties signatory thereto, Bank of America, N.A. as administrative agent and co-collateral agent and Wells Fargo Bank, N.A., as syndication agent and co-collateral agent (as amended, restated, supplemented or modified from time to time) (the "Existing Credit Agreement").

WHEREAS, the Borrowers have requested that the Lenders extend credit in the form of Revolving Facility Loans and Letters of Credit at any time on or after the Closing Date and from time to time prior to the Maturity Date, in an aggregate principal amount at any time outstanding not in excess of $100.0 million (as such amount may be increased from time to time in accordance with Section 2.22).

### AGREEMENT

NOW, THEREFORE, the Lenders are willing to extend such credit to the Borrowers, the Swingline Lender is willing to make Swingline Loans to the Borrowers and each Issuing Bank is willing to issue Letters of Credit for the account of the Borrowers on the terms and subject to the conditions set forth herein. Accordingly, the parties hereto agree as follows:

### ARTICLE I

### Definitions

SECTION 1.01    Defined Terms. As used in this Agreement, the following terms shall have the meanings specified below:

"ABL Intercreditor Agreement" shall mean the ABL Intercreditor Agreement, in substantially the form of Exhibit N dated as of the Closing Date, among the Administrative Agent, the Senior Secured Term Loan Agent, the Loan Parties, the other grantors from time to

1

time party thereto, and each Additional Pari Passu Obligations Agent (as defined therein) party thereto from time to time.

"ABL Priority Collateral" shall have the meaning assigned to such term in the ABL Intercreditor Agreement.

"ABR" shall mean for any day, a rate per annum equal to the greater of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus 0.5% or (c) the Adjusted Eurodollar Rate (to the extent ascertainable) that would be calculated as of such day (or, if such day is not a Business Day, as of the next preceding Business Day) in respect of a one month Interest Period plus one percent.  For purposes hereof, "Prime Rate" shall mean the prime commercial lending rate published by the Wall Street Journal as the "prime rate" (the Prime Rate not being intended to be the lowest rate of interest charged by the Administrative Agent in connection with extensions of credit to debtors).  Any change in the ABR due to a change in the Prime Rate, the Federal Funds Effective Rate or such Adjusted Eurodollar Rate shall be effective as of the opening of business on the effective day of such change in the Prime Rate, the Federal Funds Effective Rate or such Adjusted Eurodollar Rate, respectively.

"ABR Borrowing" shall mean a Borrowing comprised of ABR Loans.

"ABR Loan" shall mean any Revolving Facility Loan bearing interest at a rate determined by reference to the ABR in accordance with the provisions of Article II.

"Account Debtor" shall mean a Person who is obligated under an Account, Chattel Paper or General Intangible (each as defined in the UCC).

"Accounts" shall mean all "accounts," as such term is defined in the Uniform Commercial Code as in effect in the State of New York, now owned or hereafter acquired by the Lead Borrower or any Restricted Subsidiary.

"Adjusted Eurodollar Rate" shall mean, as to any Eurodollar Borrowing for any Interest Period, an interest rate per annum (rounded upwards, if necessary, to the next 1/100 of 1%) equal to (a) the Eurodollar Rate for such Interest Period divided by (b) one minus the Eurodollar Reserve Percentage.

"Adjustment Date" shall have the meaning assigned to such term in the definition of Applicable Pricing Grid.

"Administrative Agent" shall have the meaning assigned to such term in the preamble of this Agreement.

"Administrative Agent Fees" shall have the meaning assigned to such term in Section 2.12(c).

"Administrative Questionnaire" shall mean an Administrative Questionnaire in the form of Exhibit B or any other form approved by the Administrative Agent.

"Affected Lender" shall have the meaning assigned to such term in Section 2.20.

2

"Affiliate" shall mean, when used with respect to a specified person, another person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the person specified; provided, however, no Agent or Lender shall be deemed to be an Affiliate of the Lead Borrower and its Subsidiaries with respect to transactions evidenced by any Loan Document..

"Affiliated Lender" shall mean Holdings, any Subsidiary of Holdings and each of their respective Affiliates.

"Agents" shall mean, individually and collectively as the context may require, the Administrative Agent, the Syndication Agent and the Collateral Agent.

"Agreement" shall have the meaning assigned to such term in the preamble of this Agreement.

"Anti-Terrorism Laws" shall mean (i) the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act ("USA PATRIOT Act") of 2001 (Title III of Pub. L. 107-56), and (ii) the Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) and any enabling legislation or executive order relating thereto.

"Applicable Margin" shall mean 2.125% per annum, in the case of Eurodollar Loans, and 1.05% per annum, in the case of ABR Loans; provided, that on and after the date occurring three months from the Closing Date, the Applicable Margins with respect to Revolving Facility Loans and Swingline Loans will be determined pursuant to the Applicable Pricing Grid.

"Applicable Pricing Grid" shall mean the table set forth below:

| Average Excess Availability (percentage of Commitments) | Applicable Margin for ABR Loans | Applicable Margin for Eurodollar Loans |
|---|---|---|
| Greater than 50% | 0.55% | 1.625% |
| Less than or equal to 50% but greater than 25% | 0.80% | 1.875% |
| Less than or equal to 25% | 1.05% | 2.125% |

For the purposes of the Applicable Pricing Grid, changes in the Applicable Margin resulting from changes in the Average Excess Availability shall become effective on the first day of each of January, April, July and October (each, an "Adjustment Date") and shall remain in effect until the next change to be effected pursuant to this paragraph. If any Borrowing Base Certificate (including during any Weekly Reporting Period) shall not have been delivered within the time period specified in Section 5.13, then, until the date that is one Business Day

after the date on which such monthly Borrowing Base Certificate is delivered, the highest rate set forth in each column of the Applicable Pricing Grid shall apply.

"ASC" shall mean the FASB Accounting Standards Codification.

"Assignment and Acceptance" shall mean an assignment and acceptance entered into by a Lender and an assignee, and accepted by the Administrative Agent and the Lead Borrower (if the Lead Borrower's consent is required by this Agreement), in the form of Exhibit A or such other form as shall be approved by the Lead Borrower and the Administrative Agent.

"Audit Trigger Period" shall mean any period during which Excess Availability has been less than the greater of (i) $15.0 million and (ii) 20% of the lesser of (x) the aggregate Revolving Facility Commitments at such time and (y) the Borrowing Base at such time, for five (5) consecutive Business Days, with such period commencing on the first such date that such trigger is met for the five preceding Business Days and ending three months after the first date thereafter that such trigger is not met.

"Auto-Renewal Letter of Credit" shall have the meaning assigned to such term in Section 2.05(c).

"Availability" shall mean, at any time, the lesser of (i) the aggregate Revolving Facility Commitments at such time and (ii) the Borrowing Base at such time

"Availability Period" shall mean the period from and including the Closing Date to but excluding the earlier of the Maturity Date and the date of termination of the Commitments.

"Availability Reserve" shall mean, the sum (without duplication) of (a) the Inventory Reserve with respect to the inventory of the Loan Parties; (b) the Rent and Charges Reserve; (c) the L/C Reserve; (d) the Bank Product Reserve; (e) the aggregate amount of liabilities secured by Liens upon the ABL Priority Collateral that are senior to Administrative Agent's Liens (but imposition of any such reserve shall not waive an Event of Default arising therefrom); and (f) such additional reserves (including, without limitation, dilution reserves), in such amounts and with respect to such matters, as the Administrative Agent in its Permitted Discretion may establish.

"Available Unused Commitment" shall mean, with respect to a Lender at any time, an amount equal to the amount by which (a) the Revolving Facility Commitment of such Lender at such time exceeds (b) the Credit Exposure of such Lender at such time.

"Average Excess Availability" shall mean, at any Adjustment Date, the average daily Excess Availability for the fiscal quarter immediately preceding such Adjustment Date.

"Bank of America" shall mean Bank of America, N.A. and its successors.

"Bank Product" shall mean any of the following products, services or facilities extended to any Loan Party or Subsidiary (or any other Affiliate thereof requested by the Lead Borrower and approved by the Administrative Agent) by a Lender or any of its Affiliates: (a)

138633067

4850-7280-1748.5

Cash Management Services; (b) products under Hedging Agreements; and (c) commercial credit card and merchant card services.

"Bank Product Designation" shall have the meaning assigned to such term in the definition of Designated Bank Products.

"Bank Product Reserve" shall mean the aggregate amount of reserves, as established by the Administrative Agent from time to time in its Permitted Discretion, to reflect the reasonably anticipated liabilities in respect of the then outstanding Secured Bank Product Obligations of the Loan Parties and their Subsidiaries (or any other Affiliate thereof requested by the Lead Borrower and approved by the Administrative Agent), which shall at all times include the full Pari Passu Bank Product Amount with regard to Designated Bank Product Obligations.

"Bankruptcy Code" shall mean Title 11 of the United States Code or any similar federal or state law for the relief of debtors.

"Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware.

"Bankruptcy Event" shall mean, with respect to any person, such person (i) is insolvent, or is generally unable to pay its debts as they become due, or admits in writing its inability to pay its debts as they become due, or makes a general assignment for the benefit of its creditors or (ii) becomes the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, administrator, custodian, assignee for the benefit of creditors or similar person charged with the reorganization or liquidation of its business appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any such proceeding or appointment; provided that a Bankruptcy Event shall not result solely by virtue of any ownership interest, or the acquisition of any ownership interest, in such person by a Governmental Authority or instrumentality thereof so long as such ownership interest does not result in or provide such person with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such person (or such Governmental Authority or instrumentality) to reject, repudiate, disavow or disaffirm any contracts or agreements made by such person.

"Board" shall mean the Board of Governors of the Federal Reserve System of the United States of America, or any successor thereto.

"Borrowers" shall mean (i) the Lead Borrower and (ii) any Subsidiary Borrower.

"Borrowing" shall mean (a) Revolving Facility Loans of a single Type under a single Facility and made, converted or continued on a single date and, in the case of Eurodollar Loans, as to which a single Interest Period is in effect, (b) a Swingline Loan or (c) a Protective Advance.

"Borrowing Base" shall mean, on any date of determination, an amount equal to the sum of (1) 85% of the Value of Eligible Accounts of the Loan Parties; plus (2) 80% of the Value of Eligible Foreign Accounts of the Loan Parties up to the greater of (x) $10 million and (y) such amounts that constitutes 10% of the Borrowing Base (after giving effect to this clause

5

(2)), plus (3) the lesser of (a) 70% of the Value of Eligible Inventory of the Loan Parties; and (b) 85% of the NOLV Percentage of the Value of Eligible Inventory of the Loan Parties; plus (4) the lesser of (a) 100% of the Qualified Cash and (b) 10% of the Revolving Facility Commitments of all Lenders, minus (5) the Availability Reserve.

"Borrowing Base Certificate" shall mean a certificate, substantially in the form attached as Exhibit O or otherwise in form and substance satisfactory to the Administrative Agent, by which the Lead Borrower certifies calculation of any Borrowing Base.

"Borrowing Base Collateral Account" means that certain DACA Deposit Account maintained at the Administrative Agent and designated as the Borrowing Base Collateral Account, which deposit account shall be under the exclusive dominion and control of the Administrative Agent, into which deposit account funds will be deposited for inclusion in the calculation of the Borrowing Base.

"Borrowing Minimum" shall mean $1.0 million.

"Borrowing Multiple" shall mean $100,000.

"Borrowing Request" shall mean a request by the Lead Borrower in accordance with the terms of Section 2.03 and, if written, substantially in the form of Exhibit C-1.

"Business Day" shall mean any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law or other governmental action to remain closed; provided that when used in connection with a Eurodollar Loan, the term "Business Day" shall also exclude any day on which banks are not open for dealings in deposits in Dollars in the London interbank market.

"Canadian Dollars" shall mean the lawful currency of Canada.

"Capital Expenditures" shall mean for any period, with respect to any Person, the aggregate of all expenditures by such Person for the acquisition or leasing (pursuant to a capital lease) of fixed or capital assets or additions to equipment (including replacements, capitalized repairs and improvements during such period) which are required to be capitalized under GAAP on a consolidated balance sheet of such Person.

"Capital Lease Obligations" of any person shall mean the obligations of such person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such person under GAAP and, for purposes hereof, the amount of such obligations at any time shall be the capitalized amount thereof at such time determined in accordance with GAAP.

"Captive Insurance Subsidiary" shall mean any Restricted Subsidiary that is subject to regulation as an insurance company (or any Subsidiary thereof).

"Captive Mill Indebtedness" shall mean Indebtedness of a lumber mill with which Holdings, any Borrower or any Restricted Subsidiary is doing business so long as (i) such

6

Indebtedness is incurred by the lumber mill to finance Capital Expenditures, (ii) none of Holdings, any Borrowers or any Restricted Subsidiaries are obligated (directly or indirectly) for the payment or performance of such Indebtedness, (iii) the lumber mill is characterized as a "captive mill" on the audited financial statements delivered pursuant to Section 5.04(a), and (iv) such Indebtedness is required to be reflected as an Indebtedness of Holdings or its Subsidiaries on such audited financial statements.

"Cash Dominion Period" shall mean the period commencing upon either (i) the occurrence of a Specified Event of Default, or (ii) the occurrence of five (5) consecutive Business Days on which Excess Availability is less than the greater of (a) 10% of the lesser of (x) the aggregate Revolving Facility Commitments then existing and (y) the Borrowing Base then existing and (b) $8.0 million (in each case, until Excess Availability exceeds the greater of (a) 10% of the lesser of (x) the aggregate Revolving Facility Commitments then existing and (y) the aggregate Borrowing Base and (b) $8.0 million for 30 consecutive days, and no Specified Event of Default continues to exist).

"Cash Management Services" shall mean any services provided from time to time by any Lender or any of its Affiliates to any Loan Party or Subsidiary in connection with operating, collections, payroll, trust, or other depository or disbursement accounts, including automated clearinghouse, e-payable, electronic funds transfer, wire transfer, controlled disbursement, depository, information reporting, lockbox and stop payment services.

"CFC" shall mean a "controlled foreign corporation" within the meaning of Section 957 of the Code.

"Change in Control" shall mean:

(a)       any Person or "group" (within the meaning of Rule 13d-3 and 13d-5 under the Exchange Act) other than the Permitted Investors shall have (x) acquired beneficial ownership, directly or indirectly, of at least 50% of the aggregate ordinary voting power represented by the issued and outstanding Equity Interests of Lead Borrower,

(b)       except in connection with a transaction pursuant to which a Subsidiary Borrower shall cease to be a Subsidiary Borrower in accordance with this Agreement, Holdings shall for any reason fail to own, directly or indirectly, 100% of the issued and outstanding Equity Interests of the Lead Borrower and each Subsidiary Borrower, or

(c)       any "Change of Control" (or any comparable term) in the Senior Secured Term Loan Agreement or in any Permitted Refinancing Indebtedness in respect of Senior Secured Term Loan;

provided that none of the Chapter 11 Restructuring Transactions shall constitute, or be deemed to constitute, a Change in Control.

"Change in Law" shall mean (a) the adoption of any law, rule or regulation after the Closing Date, (b) any change in law, rule or regulation or in the interpretation or application thereof by any Governmental Authority after the Closing Date or (c) compliance by any Lender or Issuing Bank (or, for purposes of Section 2.15(b), by any Lending Office of such Lender or by

such Lender's or Issuing Bank's holding company, if any) with any written request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the Closing Date.

"Chapter 11 Cases" means the procedurally consolidated Chapter 11 cases captioned *In re Northwest Hardwoods, Inc., et al.*, Case No. 20-13005 in the Bankruptcy Court.

"Chapter 11 Confirmation Order" means the Order Confirming the Joint Prepackaged Chapter 11 Plan of Reorganization of Northwest Hardwoods, Inc., and Its Debtor Affiliates entered by the Bankruptcy Court in the Chapter 11 Cases on [____].

"Chapter 11 Effective Date" means the date designated as the "Effective Date" under the Chapter 11 Plan after all of the conditions precedent to the effectiveness of the Chapter 11 Plan shall have been satisfied or waived in accordance with the Chapter 11 Plan.

"Chapter 11 Plan" means that certain Joint Prepackaged Chapter 11 Plan of Reorganization of Northwest Hardwoods, Inc., and Its Debtor Affiliates filed by the Borrower and its affiliates in the Chapter 11 Cases and confirmed by the Bankruptcy Court in the Chapter 11 Confirmation Order.

"Chapter 11 Restructuring Transactions" has the meaning assigned to such term in Section 1.09."Charges" shall have the meaning assigned to such term in Section 9.09.

"Closing Date" shall mean [_____ ___, 20__].

"Collateral Agent" shall mean Bank of America, N.A.

"Code" shall mean the Internal Revenue Code of 1986, as amended.

"Collateral" shall mean all of the "Collateral" as defined in any Security Document and all other property of whatever kind and nature subject or purported to be subject from time to time to a Lien under any Security Document, but shall, in any event, exclude all Excluded Property.

"Collateral Access Agreement" shall mean an agreement, in form and substance satisfactory to the Administrative Agent, by which (a) for any Collateral located on premises leased by a Loan Party, the lessor waives or subordinates any Lien it may have on the Collateral, and agrees to permit the Administrative Agent to enter upon the premises and remove the Collateral or to use the premises to store or dispose of the Collateral; (b) for any Collateral held by a warehouseman, processor, shipper, customs broker or freight forwarder, such Person waives or subordinates any Lien it may have on the Collateral, agrees to hold any Documents (as defined in the UCC) in its possession relating to the Collateral as agent for the Administrative Agent, and agrees to deliver the Collateral to the Administrative Agent upon request; (c) for any Collateral held by a repairman, mechanic or bailee, such Person acknowledges the Administrative Agent's Lien, waives or subordinates any Lien it may have on the Collateral, and agrees to deliver the Collateral to the Administrative Agent upon request; and (d) for any Collateral subject to a licensor's intellectual property rights, the licensor grants to the Administrative Agent the right, vis-à-vis such licensor, to enforce the Administrative Agent's

8

Liens with respect to the Collateral, including the right to dispose of it with the benefit of the intellectual property, whether or not a default exists under any applicable license; it being understood that any "Landlord Waiver" in form and substance reasonably satisfactory to the Administrative Agent and any "Bailee Letter" in form and substance reasonably satisfactory to the Administrative Agent, in any case obtained by or on behalf of any Loan Party, shall be satisfactory to the Administrative Agent as a Collateral Access Agreement.

"Collateral Agreement" shall mean the Guarantee and Collateral Agreement substantially in the form of Exhibit E, among Holdings, the Lead Borrower, each Subsidiary Loan Party and the Administrative Agent.

"Collateral and Guarantee Requirement" shall mean the requirement that, subject in all respects to Section 5.09(g):

(a)    on the Closing Date, the Administrative Agent shall have received from Holdings, the Lead Borrower and each Subsidiary Loan Party, a counterpart of the Collateral Agreement duly executed and delivered on behalf of such person,

(b)    on the Closing Date, subject to the ABL Intercreditor Agreement, the Notes Collateral Agent, for the benefit of Notes Claimholders (as defined in the ABL Intercreditor Agreement) on a first-priority basis and the Secured Parties on second priority basis, shall have received (I) a pledge of all the issued and outstanding Equity Interests (to the extent such Equity Interests constitute Collateral) of (A) the Lead Borrower and (B) each Restricted Subsidiary owned on the Closing Date directly by or on behalf of Holdings, the Lead Borrower or any Subsidiary Loan Party; (II) all certificates (if any) representing such Equity Interests, together with stock powers or other instruments of transfer with respect thereto endorsed in blank; and (III) an original Global Intercompany Note,

(c)    on the Closing Date, and at all times thereafter, or as otherwise provided in the Collateral Agreement, all Indebtedness having, in the case of each instance of Indebtedness, an aggregate principal amount in excess of $2.0 million (other than (i) intercompany current liabilities incurred in the ordinary course of business in connection with the cash management operations of Holdings and its Subsidiaries or (ii) to the extent that a pledge of such promissory note or instrument would violate applicable law) that is owing to any Loan Party and evidenced by a promissory note or an instrument and constitutes Collateral shall have been pledged pursuant to the Collateral Agreement (including the Global Intercompany Note), and subject to the ABL Intercreditor Agreement, the Administrative Agent (or, with respect to any Non-ABL Priority Collateral, the Notes Collateral Agent acting as bailee of the Administrative Agent pursuant to the ABL Intercreditor Agreement) shall have received all such promissory notes or instruments, together with note powers or other instruments of transfer with respect thereto endorsed in blank,

(d)    [Reserved],

(e)     on the Closing Date, and at all times thereafter, or as otherwise provided in the Collateral Agreement, the Administrative Agent, for the benefit of the Secured Parties, shall have been granted, subject to the ABL Intercreditor Agreement, security interests in the personal property Collateral of Holdings, the Lead Borrower and any Subsidiary Loan Party in accordance with the Collateral Agreement,

(f)     in the case of any person that becomes (i) a Subsidiary Borrower after the Closing Date, within the time period required by Section 5.09(d), the Administrative Agent shall have received (A) a Joinder Agreement, duly executed and delivered on behalf of such Person, (B) a supplement to the Collateral Agreement, in the form specified therein, duly executed and delivered on behalf of such Person and (C) supplements to the other Loan Documents, if applicable or (ii) a Guarantor after the Closing Date, within the time period required by Section 5.09(d), the Administrative Agent shall have received (A) a supplement to the Collateral Agreement, in the form specified therein, duly executed and delivered on behalf of such Person and (B) supplements to the other Security Documents, if applicable,

(g)     after the Closing Date and subject in all respects to Section 5.09(g), (A) all outstanding Equity Interests of any person that becomes a Subsidiary Loan Party after the Closing Date, (B) all Equity Interests of the Lead Borrower issued after the Closing Date and (C) all other Equity Interests of any Subsidiary that are acquired by a Loan Party after the Closing Date and constitute Collateral shall have been pledged on a second priority basis pursuant to the Collateral Agreement and subject to the ABL Intercreditor Agreement, and the Administrative Agent (or, with respect to any Non-ABL Priority Collateral, the Notes Collateral Agent acting as bailee of the Administrative Agent pursuant to the ABL Intercreditor Agreement) shall, within the time period required by Section 5.09(d) and Section 5.09(e), as applicable, have received all certificates or other instruments (if any) representing such Equity Interests, together with stock powers or other instruments of transfer with respect thereto endorsed in blank,

(h)     except as contemplated by any Security Document or otherwise agreed by the Administrative Agent, all documents and instruments, including Uniform Commercial Code financing statements and filings with the United States Copyright Office and the United States Patent and Trademark Office, and all other actions required by law or reasonably requested by the Administrative Agent to be filed, registered or recorded to create the Liens intended to be created by the Security Documents (in each case, including any supplements thereto) and perfect such Liens to the extent required by, and with the priority required by, the Security Documents, and in each case subject to the ABL Intercreditor Agreement, shall have been filed, registered or recorded or delivered to the Administrative Agent for filing, registration or the recording concurrently with, or promptly following, the execution and delivery of each such Security Document and at all times thereafter,

(i)     on the Closing Date (or such later date as the Administrative Agent shall agree), the Administrative Agent shall have received insurance certificates from the Borrowers' insurance broker(s) or other evidence reasonably satisfactory to it that all

10

insurance required to be maintained pursuant to <u>Section 5.02</u> is in full force and effect and such certificates shall comply with the requirements set forth in <u>Section 5.02</u>, and

(j)      the Loan Parties shall, within 120 days following the Closing Date (or such longer period as the Administrative Agent shall agree), use commercially reasonable efforts to obtain, in forms reasonably satisfactory to the Administrative Agent, such landlord lien waivers, estoppels or Collateral Access Agreements with respect to the leased properties as Administrative Agent shall reasonably request.

"<u>Commitments</u>" shall mean (a) with respect to any Lender, such Lender's Revolving Facility Commitment and (b) with respect to any Swingline Lender, its Swingline Commitment.

"<u>Commodity Exchange Act</u>" shall mean the Commodity Exchange Act (7 U.S.C. § 1 *et seq*.), as amended from time to time, and any successor statute.

"<u>Compliance Certificate</u>" shall mean a certificate duly executed by a Responsible Officer substantially in the form of <u>Exhibit I</u>.

"<u>Consolidated Cash Interest Expense</u>" shall mean, with respect to any Person for any period, the total interest expense actually paid in cash (including that attributable to Capital Lease Obligations) of such Person and its consolidated Subsidiaries for such period with respect to all outstanding Indebtedness of such Person and its consolidated Subsidiaries (including, without limitation, all commissions, discounts and other fees and charges paid in cash by such Person and its Subsidiaries with respect to letters of credit and bankers' acceptance financing which are classified as interest in accordance with GAAP).

"<u>Consolidated Net Income</u>" shall mean, for any period, the Net Income of Holdings and its Restricted Subsidiaries, determined on a consolidated basis in accordance with GAAP; excluding, without duplication:

(a)      the Net Income of any person (other than a Restricted Subsidiary) in which the Lead Borrower has an ownership interest, except to the extent any such income has actually been received by the Lead Borrower or any of its Restricted Subsidiaries in the form of cash dividends or distributions or other payments (including any ordinary course dividend, distribution or other payment and any dividend, distribution or other payment that is converted into cash),

(b)      any net gain attributable to the write-up of any asset,

(c)      (i) any net loss attributable to the write-down or write-off of any asset (other than Accounts or inventory), or (ii) any increase in amortization or depreciation or any non-cash charge or loss resulting from any amortization, write-up, write-down or write-off of assets upon the application of recapitalization accounting or purchase accounting (including tangible and intangible assets, goodwill, deferred financing costs and inventory (including any adjustment reflected in the "cost of goods sold" or similar line item of the financial statements)) in connection with the Transactions, Permitted

11

Business Acquisitions or any acquisition, merger, consolidation or similar transaction not prohibited hereunder,

(d)     any net after-tax income or loss from discontinued operations (which shall not, unless the Lead Borrower otherwise elects, include assets then held for sale) and any net after-tax gain or loss on disposal of such discontinued operations,

(e)     any net after-tax income or loss (less all fees and expenses or charged relating thereto) attributable to the early extinguishment of Indebtedness,

(f)     the cumulative effect of a change in accounting principles during such period,

(g)     any non-cash impairment charges resulting from the application of ASC 350 and ASC 360 and the amortization of intangibles arising pursuant to ASC 805, and

(h)     the effect of mark-to-market accounting for derivatives contracts under ASC 820.

"Consolidated Senior Secured Net Debt" shall mean as of any date of determination, Consolidated Total Debt that is secured by a Lien on any assets or property of Holdings or any Restricted Subsidiary (other than any (x) such Indebtedness for which the Liens on any assets of the Holdings or any Restricted Subsidiary securing such Indebtedness are expressly subordinated or junior to the Liens securing the Obligations and (y) Captive Mill Indebtedness).

"Consolidated Senior Secured Net Leverage Ratio" shall mean, as of any date of determination, the ratio of (a) Consolidated Senior Secured Net Debt as of the last day of the Test Period most recently ended on or prior to the date of determination to (b) EBITDA for such Test Period.

"Consolidated Total Assets" shall mean, for any date of determination, all amounts that, in conformity with GAAP, are set forth opposite the caption "total assets" (or any like caption) on the most recent consolidated balance sheet of Holdings delivered (or required to have been delivered) pursuant to clause (e)(i) or (ii) of Section 4.02 or clause (a), (b) or (i) of Section 5.04.

"Consolidated Total Debt" shall mean, as of any date of determination, (a) the aggregate principal amount of indebtedness of Holdings and the Restricted Subsidiaries outstanding on such date, determined on a consolidated basis in accordance with GAAP (but excluding the effects of any discounting of indebtedness resulting from the application of purchase accounting in connection with the Transactions, any Permitted Business Acquisition or Investments similar to those made for Permitted Business Acquisitions), consisting of Indebtedness for borrowed money, Unpaid Drawings, Capital Lease Obligations and debt obligations evidenced by promissory notes or similar instruments minus (b) the amount of unrestricted cash and cash equivalents (other than Liens in favor of the Administrative Agent or a Lender) of Holdings and its Restricted Subsidiaries (determined in accordance with GAAP). It is understood that to the extent Holdings or any Restricted Subsidiary incurs any Indebtedness

12

and receives the proceeds of such Indebtedness, for purposes of determining any incurrence test under this Agreement and whether Holdings is in compliance on a Pro Forma Basis with any such test, the proceeds of such incurrence shall not be considered cash or cash equivalents for purposes of any "netting" pursuant to clause (b) of this definition.

"Contractual Obligation" shall mean, as applied to any person, any provision of any security issued by that person or of any indenture, mortgage, deed of trust, contract, written undertaking, agreement or other instrument to which that person is a party or by which it or any of its properties is bound or to which it or any of its properties is subject.

"Control" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a person, whether through the ownership of voting securities, by contract or otherwise, and "Controlling" and "Controlled" shall have meanings correlative thereto.

"Control Investment Affiliate" shall mean as to any Person, any other Person that (a) directly or indirectly is in Control of, is Controlled by, or is under common Control with, such Person and (b) is organized by such Person primarily for the purpose of making equity or debt investments in one or more companies.

"Credit Exposure" shall mean, at any time, the sum of (a) the aggregate principal amount of the Revolving Facility Loans outstanding at such time, (b) the Swingline Exposure at such time, (c) the L/C Exposure at such time and (d) the Protective Advances at such time. The Credit Exposure of any Lender at any time shall be the sum of (x) the aggregate principal amount of such Lender's Revolving Facility Loans outstanding at such time and (y) such Lender's (i) L/C Exposure at such time *plus* (ii) except for purposes of calculating the Revolving Credit Commitment Fee, Swingline Exposure at such time plus (iii) Protective Advance Exposure at such time.

"Cure Expiration Date" shall have the meaning assigned to such term in Section 7.02(a).

"Cure Period" shall have the meaning assigned to such term in Section 7.02(b).

"Cure Right" shall have the meaning assigned to such term in Section 7.02(a).

"DACA Deposit Account" shall mean a Deposit Account subject to a Deposit Account Control Agreement.

"Default" shall mean any event or condition that upon notice, lapse of time or both would constitute an Event of Default.

"Defaulting Lender" shall mean any Lender that (a) has failed, within two Business Days of the date required to be funded or paid, to (i) fund any portion of its Loans, (ii) fund any portion of its participations in Letters of Credit or Swingline Loans or Protective Advances or (iii) pay over to any Loan Party or Lender Party any other amount, in each case, required to be funded or paid by it hereunder, (b) has notified the Lead Borrower or any Lender Party in writing, or has made a public statement to the effect, that it does not intend or expect to

13

comply with any of its funding obligations under this Agreement, (c) has failed, within three Business Days after request by the Lead Borrower or a Lender Party, acting in good faith, to provide a certification in writing from an authorized officer of such Lender that it will comply with its obligations to fund prospective Loans and participations in then outstanding Letters of Credit, Swingline Loans or Protective Advances under this Agreement; provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon such person's receipt of such certification in form and substance satisfactory to it and the Administrative Agent, or (d) has become (or its direct or indirect parent company has become) the subject of a Bankruptcy Event.

"Deposit Account" shall have the meaning assigned to such term in the UCC.

"Deposit Account Control Agreements" shall mean the deposit account control agreements in form and substance satisfactory to the Administrative Agent executed by each lockbox servicer and financial institution maintaining a lockbox and/or Deposit Account (other than an Excluded Account) for a Loan Party, in favor of the Administrative Agent and meeting the requirements set forth in Section 5.13(e).

"Designated Bank Product Obligations" shall mean Secured Bank Product Obligations in respect of Designated Bank Products.

"Designated Bank Products" shall mean Bank Products designated by the Lead Borrower as a "Designated Bank Product" pursuant to the definition of "Secured Bank Product Obligations" by written notice to the Administrative Agent substantially in the form of Exhibit R or such other form reasonably acceptable to the Administrative Agent (such form, the "Bank Product Designation"), which shall in any event include Bank Products provided by Bank of America or any of its Affiliates to any Loan Party or Subsidiary without the need to provide any Bank Product Designation.

"Designated Non-Cash Consideration" shall mean the fair market value (as determined by the Lead Borrower in good faith) of non-cash consideration received by the Lead Borrower or a Restricted Subsidiary in connection with a Disposition pursuant to Section 6.05(g) and the last paragraph of Section 6.05 that is designated as Designated Non-Cash Consideration pursuant to a certificate of a Responsible Officer of the Lead Borrower, setting forth the basis of such valuation (which amount will be reduced by the fair market value of the portion of the non-cash consideration converted to cash or cash equivalents).

"Disposition" shall mean any sale, transfer, lease or other disposition of assets, including any sale and leaseback transaction, any sale or issuance of Equity Interests in a Subsidiary or a Division of a Dividing Person.  "Dispose" shall have a correlative meaning.

"Disqualified Institutions" shall mean (a) any bank, financial institution, institutional lender or other investor identified in writing to the Administrative Agent and the Lenders prior to the Closing Date, (b) any person that competes with or which is affiliated with a person that competes with the business of Holdings, the Lead Borrower or any Subsidiary of the Lead Borrower identified in writing to the Administrative Agent and the Lenders prior to the Closing Date and (c) in the case of each of clauses (a) and (b), any of their Affiliates (which, for

14

the avoidance of doubt, shall not include any bona fide debt investment funds that are Affiliates of the persons referenced in clause (b) above) that are identified in writing to the Administrative Agent prior to the Closing Date.

"Disqualified Person" shall have the meaning assigned to such term in Section 9.04(f).

"Dividing Person" shall have the meaning assigned to such term in the defined term "Division".

"Division" means the division of the assets, liabilities and/or obligations of a Person (the "Dividing Person") among two or more Persons (whether pursuant to a "plan of division" or similar arrangement, and including a statutory division of any Delaware limited liability company into two or more Delaware limited liability companies pursuant to Section 18-217 of the Delaware Limited Liability Company Act), which may or may not include the Dividing Person and pursuant to which the Dividing Person may or may not survive, including

"Dollar Equivalent" shall mean, at any time, (a) with respect to any amount denominated in Dollars, such amount, and (b) with respect to any amount denominated in Canadian Dollars, the equivalent amount thereof in Dollars as determined by the Administrative Agent, as the case may be, at such time on the basis of the Spot Rate for the purchase of Dollars with such currency.

"Dollars" or "$" shall mean lawful money of the United States of America.

"Domestic Subsidiary" shall mean any Subsidiary that is not a Foreign Subsidiary.

"Dominion Account" shall have the meaning assigned to such term in Section 5.13(e).

"EBITDA" shall mean, with respect to Holdings and its Restricted Subsidiaries on a consolidated basis for any period, (a) Consolidated Net Income for such period, less (b) (in each case to the extent included in the calculation of Consolidated Net Income for such period, but without duplication):

(i)    any net extraordinary, non-recurring or unusual gains or income (less all fees and expenses relating thereto),

(ii)    any net gain (less all fees and expenses relating thereto) arising from the sale, exchange or other disposition of assets outside of the ordinary course of business (as determined in good faith by Holdings),

(iii)    any non-cash gains (but excluding any such gains (x) in respect of which cash or other assets were received in a prior period or will be received in a future period or (y) which represent the reversal of any accrual of, or cash reserve for, anticipated cash charges in any prior period) described in clause (c)(vi) below,

15

(iv)    the amount added back to EBITDA pursuant to clause (c)(xi) below to the extent the relevant fees, costs and expenses were not reimbursed within the time period required by such clause (which amount shall be deducted in the next succeeding fiscal quarter following the expiration of the applicable time period),

(v)    any net unrealized gains resulting from currency gains related to currency re-measurements of Indebtedness (including any net gain resulting from Swap Agreements for currency exchange risk) and any other unrealized foreign currency transaction gains,

(vi)    the amount added back to EBITDA pursuant to clause (c)(ix) or (xi) below to the extent the relevant expenses or business interruption insurance proceeds were not received within the time period required by such clause (which amount shall be deducted in the next succeeding fiscal quarter following expiration of the applicable time period),

(vii)    the amount of any net gain associated with any Subsidiary that is attributable to non-controlling interests or minority interests of third parties, and

(viii)    any net gains with respect to Dispositions permitted by Section 6.05, Investments permitted under Section 6.04, any offering or issuance of Equity Interests or any issuance or incurrence of Indebtedness (including in connection with any exchange or refinancing, replacement, renewal or extension thereof) or early extinguishment of Indebtedness, hedging agreements or other derivative instruments, in each case whether or not consummated;

plus (c) (in the cases of clauses (i) through (xxiii) below (other than clause (ix)(B) below), to the extent deducted in the calculation of Consolidated Net Income for the period for which EBITDA is being determined), but without duplication):

(i)    any provision for Taxes based on income, profits or capital of Holdings and the Restricted Subsidiaries for such period, including state, foreign and franchise and similar taxes, and Tax Distributions made during such period,

(ii)    total interest expense of Holdings and the Restricted Subsidiaries for such period,

(iii)    (x) depreciation and amortization, (y) amortization of inventory write-up, deferred revenue adjustment or other non-cash adjustments required under business combination accounting, amortization of intangibles (including goodwill and the cost of non-competition agreements) and organization costs, including non-cash charges associated with impairment analysis, and (z) amortization of Capital Lease Obligations,

(iv)    net extraordinary, non-recurring or unusual losses or expenses, including severance expenses and costs of legal settlement, fines, judgments or orders; provided, that any decreased or reduced income as a result of COVID-19 shall not be deemed an extraordinary, non-recurring or unusual loss or expense for purposes of this clause (iv) to the extent such decreased or reduced income is disclosed to Administrative Agent in

16

writing prior to the Closing Date and does not exceed the aggregate amount of [$_____];

(v)      any net loss arising from the sale, exchange or other disposition of assets outside of the ordinary course of business (as determined in good faith by Holdings),

(vi)      (x) any write-offs, write-downs and other non-cash losses, charges, reserves and expenses (excluding (A) non-cash losses, charges and expenses relating to write-offs, write-downs or reserves with respect to Accounts or inventory and (B) any such non-cash item to the extent it represents an accrual of, or reserve for, such expenditures in any future period, but including non-cash rent expense, non-cash expense from any employee benefit or stock option plan and purchase accounting adjustments with respect to revaluing assets and liabilities and subsequent non-cash impairment charges) and (y) adjustments for "LIFO" reserves,

(vii)      the amount of any expense or deduction associated with any Subsidiary that is attributable to non-controlling interests or minority interests of third parties,

(viii)      cash restructuring costs attributable to the Transactions incurred prior to the Closing Date or within 90 days thereafter and not exceeding the aggregate amount of [$_____] and all other fees, costs and expenses associated with the Transactions, including, management bonuses payable in connection with the Transactions,

(ix)      (A) to the extent actually covered by insurance expenses with respect to liability or casualty events or business interruption and (B) the proceeds of business interruption insurance in an amount not to exceed the earnings for the applicable period that such proceeds are intended to replace; provided that Holdings in good faith expects that it, the Lead Borrower or a Restricted Subsidiary shall receive such expense or proceeds, as applicable, within the next four fiscal quarters,

(x)      accruals, payments, fees, costs, charges and expenses, including write-offs and write-downs, with respect to any transaction (or amendments or modifications to any such transaction) not prohibited by this Agreement, including, without limitation, Dispositions permitted by Section 6.05, Investments permitted under Section 6.04, any offering or issuance of Equity Interests or any issuance or incurrence of Indebtedness (including in connection with any exchange or refinancing, replacement, renewal or extension thereof) or early extinguishment of Indebtedness, hedging agreements or other derivative instruments, in each case whether or not consummated,

(xi)      fees, costs and expenses incurred during such period that are covered by indemnification provisions in any agreement in connection with any Investment or Permitted Business Acquisition (or similar transactions consummated prior to the Closing Date), in each case whether or not consummated; provided that Holdings in good faith expects that it, the Lead Borrower or a Restricted Subsidiary shall receive such fees, costs and expenses covered by indemnification provisions, within the next four fiscal quarters,

(xii)    any Specified Equity Contribution received pursuant to <u>Section 7.02</u> in respect of such period,

(xiii)    [reserved],

(xiv)    (x) costs (including restructuring costs related to acquisitions after the Closing Date), charges, accruals, reserves or expenses attributable to the undertaking and/or implementation of cost savings initiatives, operating expense reductions and other restructuring and integration and transition charges (including, without limitation, inventory optimization programs, facilities' opening and pre-opening costs and other business optimization expenses, including software development costs, transaction costs and costs related to the closure or consolidation of facilities, contract termination payments (including future lease payments), facilities and curtailments, marketing costs related to re-branding efforts, consulting fees, signing costs, retention or completion bonuses, relocation expenses, severance payments, modifications to pension and post-retirement employee benefit plans and systems design) and (y) on-going expenses associated with closed facilities; <u>provided</u>, that the aggregate amount of business optimization expenses, other restructuring charges or reserves added back pursuant to this <u>clause (xiv)</u> shall not exceed 20% of EBITDA in any Test Period (calculated after giving effect to the addbacks permitted under (A) this <u>clause (xiv)</u>, (B) <u>clause (xv)</u> below and (C) the pro forma adjustments under the last paragraph of the definition of "Pro Forma Basis"), when taken together with (A) the amount of addbacks permitted under clause (xv) below and (B) pro forma adjustments under the last paragraph of the definition of "Pro Forma Basis",

(xv)    "<u>run rate</u>" cost savings, operating expense reductions and synergies related to the Transactions that are reasonably identifiable and factually supportable (it is understood and agreed that "run rate" means the full recurring benefit for a period that is associated with any action taken, committed to be taken or expected to be taken, net of the amount of actual benefits realized during such period from such actions) and projected by the Lead Borrower in good faith to result from actions that have been taken or with respect to which substantial steps have been taken or are expected to be taken (in the good faith determination of the Lead Borrower) within 18 months after the Closing Date, net the amount of actual benefits realized during such period from such actions; <u>provided</u>, that the aggregate amount of "run rate" cost savings, operating expense reductions and synergies related to the Transactions added back pursuant to this <u>clause (xv)</u> shall not exceed 20% of EBITDA in any Test Period (calculated after giving effect to the addbacks permitted under (A) this <u>clause (xv)</u>, (B) clause (xiv) above and (C) the pro forma adjustments under the last paragraph of the definition of "Pro Forma Basis"), when taken together with (A) the amount of addbacks permitted under clause (xiv) above and (B) pro forma adjustments under the last paragraph of the definition of "Pro Forma Basis",

(xvi)    (A) any deductions, charges or expenses (including compensation charges and expenses) incurred pursuant to any management equity plan or stock option plan or any other management or employee benefit plan or agreement, pension plan, any stock subscription or shareholder agreement or any distributor equity plan or agreement or in

18

connection with grants of stock appreciation or similar rights or other rights to directors, officers and/or employees of a Parent Entity, Holdings, the Lead Borrower or any of its Restricted Subsidiaries and (B) any payments, charges, costs, expenses, accruals or reserves in connection with the rollover, acceleration or payout of Equity Interests held by management or the issuance of any stock options,

(xvii)   the amount of management, consulting, monitoring, transaction and advisory fees and related expenses paid to one or more Permitted Investors (or any accruals related to such fees and related expenses) during such period,

(xviii)  letter of credit fees,

(xix)    any net unrealized losses resulting from currency losses related to currency re-measurements of Indebtedness (including any net loss resulting from Swap Agreements for currency exchange risk) and any other unrealized foreign currency transaction losses,

(xx)     earn-out obligations incurred in connection with any Permitted Business Acquisition or other Investments permitted under this Agreement and paid during the applicable period and any similar acquisitions or other investments completed prior to the Closing Date,

(xxi)    cash actually received (or any netting arrangement resulting in reduced cash expenditures) during such period and not included in Consolidated Net Income in any period to the extent that the non-cash gain relating to the relevant cash receipt or netting arrangement was deducted in the calculation of EBITDA pursuant to clause (b)(iv) or clause (b)(vi) above for any previous period and not added back,

(xxii)   any net losses from disposed, abandoned or discontinued operations or product lines determined in conformity with GAAP, and

(xxiii)  non-cash losses attributable to adjustments to indemnification rights.

Notwithstanding the foregoing, EBITDA with respect to Holdings and its Restricted Subsidiaries for the fiscal quarters ending on or about December 31, 2019, March 31, 2020, June 30, 2020, and September 30, 2020, shall be deemed to be $[_____], $[_____], $[_____] and $[_____], respectively.

"Effective Yield" shall mean, with respect to any Indebtedness and as of any date of determination, the applicable interest rate of such Indebtedness, taking into account interest rate floors, original issue discount and upfront fees with respect to such Indebtedness (with original issue discount and upfront fees being equated to interest rate based on a four-year life to maturity or lesser remaining average life to maturity) and any amendment made to the interest rate with respect to such Indebtedness prior to such date of determination, but excluding arrangement, commitment, structuring, underwriting or similar fees paid to the arrangers (or equivalent) of such Indebtedness or their Affiliates (in each case in their capacities as such) and any amendment or similar fees paid with respect to such Indebtedness to the arrangers (or equivalent) of such amendment or their Affiliates (in each case in their capacities as such).

19

"Eligible Account" shall mean an Account owing to a Loan Party that arises in the ordinary course of business of such Loan Party from the sale of goods or rendition of services and is payable in Dollars or Canadian Dollars and that is deemed by the Administrative Agent in its Permitted Discretion to be an Eligible Account; it being understood that none of the exclusions to "Eligible Account" in clauses (a) through (q) below are intended to be duplicative. Without limiting the foregoing, no Account shall be an Eligible Account if:

(a)     it is unpaid for more than sixty (60) days after the original due date, or more than ninety (90) days after the original invoice date;

(b)     fifty percent (50%) or more of the Dollar Equivalent all Accounts owing to such Loan Party by the Account Debtor are not Eligible Accounts under the foregoing clause (a);

(c)     when aggregated with other Accounts owing to such Loan Party by the Account Debtor, it exceeds 20% of the aggregate Eligible Accounts (or such higher percentage as the Administrative Agent may establish for the Account Debtor from time to time) of each Loan Party;

(d)     [reserved];

(e)     it does not conform in any material respect with a covenant or representation herein;

(f)     is reasonably determined to be subject to an offset, counterclaim, dispute, deduction, discount, recoupment, reserve, defense, chargeback, credit or allowance (but ineligibility shall be limited to the amount thereof);

(g)     an insolvency proceeding has been commenced by or against the Account Debtor; or the Account Debtor has failed, has suspended or ceased doing business, is liquidating, dissolving or winding up its affairs, is not Solvent, or is an Embargoed Person; or such Loan Party is not able to bring suit or enforce remedies against the Account Debtor through judicial process (unless such Account is guaranteed or supported by a guarantor or support provider reasonably acceptable to the Administrative Agent, on such terms as are reasonably acceptable to the Administrative Agent);

(h)     the Account Debtor is organized or has its principal offices outside the United States and Canada, unless the Accounts related to such Account Debtor are backed by a letter of credit;

(i)     it is owing by a Governmental Authority, unless the Account Debtor is the United States or any department, agency or instrumentality thereof and the Account has been assigned to the Administrative Agent in compliance with the Assignment of Claims Act;

(j)     it is not subject to a duly perfected, first priority Lien in favor of the Administrative Agent, or is subject to any other Lien except a Lien permitted under Section 6.02;

20

4850-7280-1748.5

(k)      the goods giving rise to it have not been delivered to and accepted by the Account Debtor, the services giving rise to it have not been accepted by the Account Debtor, or it otherwise does not represent a final sale (unless (x) the terms for such account are FOB Shipping Point or (y) the terms for such account require the goods to be made available for pick-up by the Account Debtor, as the case may be, in accordance with applicable arrangements with the relevant Account Debtor, in which case such Account will not be considered ineligible solely due to it not having been delivered to and accepted by the Account Debtor);

(l)      it is evidenced by Chattel Paper or an Instrument (each as defined in the UCC) of any kind, or has been reduced to judgment;

(m)      its payment has been extended beyond the periods specified in clause (a) above, the Account Debtor has made a partial payment, or it arises from a sale on a cash-on-delivery basis;

(n)      it arises from a sale to an Affiliate, from a sale on a bill-and-hold, guaranteed sale, sale-or-return, sale-on-approval, consignment, or other repurchase or return basis, or from a sale to a Person for personal, family or household purposes;

(o)      the agreements evidencing such Accounts are not governed by the laws of any state of the United States or the District of Columbia;

(p)      it represents a progress billing or retainage, or relates to services for which a performance, surety or completion bond or similar assurance has been issued; or

(q)      it includes a billing for interest, fees or late charges, but ineligibility shall be limited to the extent thereof.

In calculating delinquent portions of Accounts under clauses (a) and (b) above, credit balances more than ninety (90) days old will be excluded.

"Eligible Assignee" shall mean (i) any Lender, any Affiliate of any Lender and any Related Fund (any two or more Related Funds being treated as a single Eligible Assignee for all purposes hereof) and (ii) any commercial bank, insurance company, investment or mutual fund or other entity that is an "accredited investor" (as defined in Regulation D under the Securities Act) and which extends credit or buys loans. For the avoidance of doubt, "Eligible Assignee" shall exclude any Affiliated Lender.

"Eligible Foreign Account" shall mean an Account (i) with an Account Debtor, and that originates in (x) countries other than Jordan, Lebanon, Lithuania, Pakistan and Russia or (y) any country reasonably determined by the Administrative Agent in its Permitted Discretion, and (ii) meets the requirements of the definition of "Eligible Account" other than clause (h) thereof.

"Eligible In-Transit Inventory" shall mean inventory owned by a Loan Party that would meet all of the criteria of "Eligible Inventory" if it were not in transit from any location to a location of such Loan Party within the United States. Without limiting the foregoing, no

21

inventory shall be Eligible In-Transit Inventory unless (a) except as otherwise agreed by the Administrative Agent, if such inventory is subject to a negotiable document of title, such documents of title show the applicable Loan Party as consignee and the Administrative Agent has control over the documents of title, to the extent applicable, which evidence ownership of the subject inventory (such as by the delivery of a customs broker agreement); (b) such inventory is insured in accordance with the provisions of this Agreement and the other Loan Documents, including, without limitation, marine cargo insurance; (c) such inventory has been identified to the applicable sales contract and title has passed to the applicable Loan Party; (d) such inventory is not sold by a vendor that has a right to reclaim, divert shipment of, repossess, stop delivery, claim any reservation of title or otherwise assert Lien rights against the inventory; (e) such inventory is subject to customary purchase orders and other sale documentation consistent with such Loan Party's ordinary course of dealing; and (f) such inventory is shipped by a common carrier that is not affiliated with the vendor and has not been acquired from an Embargoed Person. The aggregate Value of all Eligible In-Transit Inventory shall not exceed the greater of $2.5 million and 2.5% of the Borrowing Base at any time. The Administrative Agent, in its Permitted Discretion, shall have the ability to establish reserves for landing costs if such Eligible In-Transit Inventory is coming from a foreign jurisdiction.

"Eligible Inventory" shall mean Eligible In-Transit Inventory and inventory owned by a Loan Party that the Administrative Agent, in its Permitted Discretion deems to be Eligible Inventory. Without limiting the foregoing, no inventory shall be Eligible Inventory unless it:

(a)     is not packaging or shipping materials, labels, samples, display items, bags, replacement parts or manufacturing supplies;

(b)     is not held on consignment, nor subject to any deposit or down payment;

(c)     is in new and saleable condition and is not damaged, defective, shopworn or otherwise unfit for sale;

(d)     is not slow-moving, obsolete or unmerchantable, and does not constitute returned or repossessed goods;

(e)     meets all standards imposed by any Governmental Authority in all material respects and has not been acquired from an Embargoed Person;

(f)     conforms in all material respects with the covenants and representations herein;

(g)     is subject to the Administrative Agent's duly perfected, first priority Lien, and no other Lien except a Lien permitted under Section 6.02;

(h)     is located within the continental United States and is not consigned to any Person;

(i)     is not in transit (other than (x) in transit between facilities of the Loan Parties, and (y) Eligible In-Transit Inventory);

138633067

4850-7280-1748.5

(j)       is not subject to any (i) warehouse receipt unless the warehouseman has delivered a Collateral Access Agreement or with respect to which an appropriate Rent and Charges Reserve has been established or (ii) negotiable Document (as defined in the UCC) unless the Administrative Agent has control over such Documents;

(k)       is not subject to any license or other arrangement that restricts such Borrower's or Agent's right to dispose of such inventory, unless the Administrative Agent has received an appropriate Collateral Access Agreement;

(l)       is not located on leased premises or in the possession of a warehouseman, repairman, mechanic, shipper, freight forwarder or other Person, unless the lessor or such Person has delivered a Collateral Access Agreement or with respect to which an appropriate Rent and Charges Reserve has been established or in the possession of a processor;

(m)       is located at premises containing at least $100,000 of Eligible Inventory; and

(n)       is reflected in the details of a current perpetual inventory report or is otherwise acceptable to the Administrative Agent.

"Embargoed Person" shall mean any party that (i) is publicly identified on the most current list of "Specially Designated Nationals and Blocked Persons" published by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") or (ii) is currently subject to any U.S. sanctions administered by OFAC.

"Employee Benefit Plan" shall mean any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) established or maintained by any Loan Party or, with respect to any such plan that is subject to Title IV of ERISA or Section 412 of the Code, any ERISA Affiliate.

"Environment" shall mean ambient and indoor air, surface water and groundwater (including potable water, navigable water and wetlands), the land surface or subsurface strata, natural resources such as wetlands, flora and fauna or as otherwise defined in any Environmental Law.

"Environmental Laws" shall mean all applicable laws (including common law), rules, regulations, codes, ordinances, orders, decrees or judgments, promulgated or entered into by or with any Governmental Authority, relating in any way to pollution or the protection of the Environment, preservation or reclamation of natural resources, the generation, management, Release or threatened Release of, or actual or alleged exposure to, any Hazardous Materials or to occupational health and safety (to the extent relating to the Environment or Hazardous Materials).

"Equity Interests" of any person shall mean any and all shares, interests, participations or other equivalents of or interests in (however designated) equity of such person, including any preferred stock, any limited or general partnership interest and any limited liability

23

company membership interest and any and all warrants, rights or options to purchase or other rights to acquire any of the foregoing.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974.

"ERISA Affiliate" shall mean any trade or business (whether or not incorporated) that, together with any Loan Party, is treated as a single employer under Section 414(b) or (c), (m) or (o) of the Code.

"ERISA Event" shall mean (a) any Reportable Event; (b) the existence with respect to any Loan Party or any Employee Benefit Plan of a non-exempt Prohibited Transaction; (c) the failure by any Plan to satisfy the minimum funding standards (within the meaning of Section 412 of the Code or Section 302 of ERISA), applicable to such Plan, whether or not waived; (d) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan, the failure to make by its due date a required installment under Section 430(j) of the Code with respect to any Plan or the failure to make any required contribution to a Multiemployer Plan; (e) the receipt by any Loan Party or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or to appoint a trustee to administer any Plan under Section 4042 of ERISA; (f) the receipt by any Loan Party or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from any Loan Party or any ERISA Affiliate of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, Insolvent, in Reorganization, or terminated (within the meaning of Section 4041A of ERISA); (g) the failure by any Loan Party or any ERISA Affiliate to pay when due (after expiration of any applicable grace period) any installment payment with respect to withdrawal liability under Section 4201 of ERISA; (h) a determination that any Plan is, or is reasonably expected to be, in "at risk" status (within the meaning of Section 430 of the Code or Section 303 of ERISA); (i) any Lien in favor of the PBGC or a Plan shall arise on the assets of any Loan Party or ERISA Affiliate; (j) any Plan shall terminate for purposes of Title IV of ERISA; or (k) the withdrawal of any Loan Party or any ERISA Affiliate from a Plan subject to Section 4063 of ERISA during a plan year in which such entity was a "substantial employer" as defined in Section 4001(a)(2) of ERISA or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA.

"Eurodollar Borrowing" shall mean a Borrowing comprised of Eurodollar Loans.

"Eurodollar Loan" shall mean any Revolving Facility Loan bearing interest at a rate determined by reference to the Adjusted Eurodollar Rate in accordance with the provisions of Article II.

"Eurodollar Rate" shall mean for any Interest Period as to any Eurodollar Loan, (i) the rate per annum determined by the Administrative Agent to be the offered rate which appears on the page of the Reuters Screen which displays the London interbank offered rate administered by ICE Benchmark Administration Limited (or such other commercially available source providing such quotations as designated by Administrative Agent from time to time) (such page currently being the LIBOR01 page) (the "LIBO Rate") for deposits (for delivery on the first day of such Interest Period) with a term equivalent to such Interest Period in Dollars,

determined as of approximately 11:00 a.m. (London, England time), two Business Days prior to the commencement of such Interest Period, (ii) in the event the rate referenced in the preceding clause (i) does not appear on such page or service or if such page or service shall cease to be available, the rate determined by the Administrative Agent to be the offered rate on such other page or other service which displays the LIBO Rate for deposits (for delivery on the first day of such Interest Period) with a term equivalent to such Interest Period in Dollars, determined as of approximately 11:00 a.m. (London, England time) two Business Days prior to the commencement of such Interest Period or (iii) in the event the rates referenced in the preceding clauses (i) and (ii) are not available, the rate per annum determined by the Administrative Agent to be the average offered quotation rate by major banks in the London interbank market to Bank of America for deposits (for delivery on the first day of the relevant period) in Dollars of amounts in same day funds comparable to the principal amount of the Eurodollar Loan for which the Eurodollar Rate is then being determined with maturities comparable to such Interest Period as of approximately 11:00 a.m. (London, England time) two Business Days prior to the commencement of such Interest Period; provided that if LIBO Rates are quoted under either of the preceding clauses (i) or (ii), but there is no such quotation for the Interest Period elected, the LIBO Rate shall be equal to the Interpolated Rate; and provided, further, that if any such rate determined pursuant to the preceding clauses (i), (ii) or (iii) is below 0.25%, the Eurodollar Rate will be deemed to be 0.25%.

"Eurodollar Replacement Rate" shall have the meaning assigned to such term in Section 2.14(i).

"Eurodollar Reserve Percentage" shall mean, for any day during any Interest Period, the reserve percentage in effect on such day, whether or not applicable to any Lender, under regulations issued from time to time by the Federal Reserve Board for determining the maximum reserve requirement (including any emergency, special, supplemental or other marginal reserve requirement) with respect to eurocurrency funding (currently referred to as "Eurocurrency liabilities" in Regulation D). The Adjusted Eurodollar Rate for each outstanding Eurodollar Loan shall be adjusted automatically as of the effective date of any change in the Eurodollar Reserve Percentage.

"Eurodollar Successor Rate" shall have the meaning assigned to such term Section 2.14(i).

"Eurodollar Successor Rate Conforming Changes" means, with respect to any proposed Eurodollar Successor Rate, any conforming changes to the definition of ABR or Interest Period, the timing and frequency of determining rates and making payments of interest and other technical, administrative or operational matters (including, for the avoidance of doubt, the definition of Business Day, timing of borrowing requests or prepayment, conversion or continuation notices, and length of look-back periods) as may be appropriate, in Administrative Agent's discretion, to reflect the adoption and implementation of such Eurodollar Successor Rate and to permit the administration thereof by Administrative Agent in a manner substantially consistent with market practice (or, if Administrative Agent determines that adoption of any portion of such market practice is not administratively feasible or that no market practice for the administration of such Eurodollar Successor Rate exists, in such other manner of administration

as Administrative Agent determines is reasonably necessary in connection with the administration of this Agreement and any other Loan Document).

"Event of Default" shall have the meaning assigned to such term in Section 7.01.

"Excess Availability" shall mean, on any date of determination, an amount equal to (a) the Availability at such time minus (b) the aggregate credit extensions (including Loans and Letters of Credit (including issued and undrawn Letters of Credit)) outstanding hereunder at such time.

"Exchange Act" shall mean the Securities Exchange Act of 1934.

"Excluded Account" shall mean (i) any deposit account, securities account, commodities account or other account of any Loan Party (and all cash, cash equivalents and other securities or investments held therein) exclusively used for all or any of the following purposes: payroll, employee wages and benefits, withholding taxes or compliance with legal requirements, to the extent such legal requirements prohibit the granting of a Lien thereon, (ii) cash accounts of any Loan Party with an average daily balance in any month which does not exceed more than $100,000 at any time for any single account or $ 1.0 million for all such accounts in the aggregate and (iii) accounts designated by the Lead Borrower to solely contain identifiable proceeds of assets of Holdings or any Subsidiary constituting Non-ABL Priority Collateral.

"Excluded Property" shall have the meaning assigned to such term in Section 5.09(g).

"Excluded Subsidiary" shall mean (a) any Restricted Subsidiary that is prohibited by Contractual Obligation existing on the Closing Date or at the time (but not in contemplation) of acquisition thereof after the Closing Date, law or regulation from providing a Guarantee of the Obligations or that would require a governmental (including regulatory) consent, approval, license or authorization in order to provide such Guarantee, (b) any not-for profit Restricted Subsidiary, Captive Insurance Subsidiary or Special Purpose Subsidiary, (c) any Restricted Subsidiary that is not a Wholly-Owned Subsidiary, and (d) any Restricted Subsidiary to the extent that the burden or cost of obtaining a Guarantee of the Obligations from such Subsidiary outweighs the benefit afforded thereby, as reasonably determined by the Administrative Agent and the Lead Borrower.

"Excluded Swap Obligation" shall mean, with respect to any Loan Party, any Swap Obligation if, and to the extent that, all or a portion of the Guarantee of such Loan Party of, or the grant by such Loan Party of a security interest to secure, such Swap Obligation (or any Guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Loan Party's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder (determined after giving effect to any "keepwell, support or other agreement" for the benefit of such Loan Party and any and all guarantees of such Loan Party's Swap Obligations by other Loan Parties) at the time the Guarantee of such Loan Party or the grant of such security

26

interest becomes effective with respect to such Swap Obligation. If a Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such Guarantee or security interest is or becomes illegal.

"Excluded Taxes" shall mean, with respect to the Administrative Agent, any Lender, the Swingline Lender, any Issuing Bank or any other recipient of any payment to be made by or on account of any obligation of any Loan Party hereunder or under any other Loan Document, (a) any Taxes on such recipient's net income or profits (or franchise Taxes in lieu of a Tax on net income or profits) imposed by a jurisdiction as a result of such recipient being organized or having its principal office or, in the case of any Lender, its applicable lending office located in, such jurisdiction or as a result of any other present or former connection between such recipient and such jurisdiction (other than any connection arising from such recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to, and/or enforced, any Loan Document, or sold or assigned an interest in any Loan or Loan Document), (b) any branch profits Taxes imposed pursuant to Section 884(a) of the Code, or any similar Taxes, imposed by any jurisdiction described in (a), (c) in the case of a Foreign Lender (other than any Foreign Lender becoming a party hereto pursuant to a request by the Lead Borrower under Section 2.19), any U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Foreign Lender pursuant to a law in effect at the time on which (x) such Foreign Lender becomes a party hereto or (y) such Foreign Lender designates a new lending office, except in each case to the extent that such Foreign Lender (or its assignor, if any) was entitled, immediately prior to the time of designation of a new lending office (or assignment), to receive additional amounts from a Loan Party with respect to such U.S. federal withholding Taxes pursuant to Section 2.17, (d) any withholding Taxes attributable to a Lender's failure to comply with Section 2.17(e) and (e) any U.S. federal withholding Taxes imposed pursuant to FATCA.

"Existing Credit Agreement" shall have the meaning assigned thereto in the Recitals.

"Existing Debt" shall mean the Indebtedness outstanding under the Existing Credit Agreement.

"Extended Revolving Facility Commitment" shall have the meaning assigned to such term in Section 2.23(a)(i).

"Extended Revolving Facility Loans" shall have the meaning assigned to such term in Section 2.23(a)(i).

"Extension" shall have the meaning assigned to such term in Section 2.23(a). "Extension Offer" shall have the meaning assigned to such term in Section 2.23(a).

"Facility" shall mean the respective facility and commitments utilized in making Loans and credit extensions hereunder, it being understood that as of the date of this Agreement there is one Facility.

138633067

4850-7280-1748.5

"FATCA" shall mean Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantially comparable and not materially more onerous to comply with), any current or future Treasury regulations or other official administrative interpretations thereof, any agreements entered into pursuant to current Section 1471(b)(1) of the Code (or any amended or successor version described above) and any intergovernmental agreements (and related legislation or official administrative guidance) implementing the foregoing.

"FCPA" shall mean the United States Foreign Corrupt Practices Act of 1977, as amended.

"Federal Funds Effective Rate" shall mean, for any day the rate per annum (expressed, as a decimal, rounded upwards, if necessary, to the next higher 1/100 of one percent) equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided, (i) if such day is not a Business Day, the Federal Funds Effective Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (ii) if no such rate is so published on such next succeeding Business Day, the Federal Funds Effective Rate for such day shall be the average rate charged to the Administrative Agent, in its capacity as a Lender, on such day on such transactions as determined by the Administrative Agent.

"Fee Letter" shall mean the Fee Letter dated November 5, 2020 by and between Lead Borrower and Bank of America, N.A.

"Fees" shall mean the Revolving Credit Commitment Fees, the L/C Participation Fees, the Issuing Bank Fees, the Upfront Fees and the Administrative Agent Fees.

"Final Revolving Maturity Date" shall mean, as at any date, the latest to occur of (a) the Maturity Date, (b) the latest maturity date in respect of any outstanding Extended Revolving Facility Commitments and (c) the latest maturity date in respect of any Increased Revolving Facility Commitments.

"Financial Covenant" shall mean the financial covenant set forth in Section 6.10.

"Financial Covenant Event of Default" shall have the meaning assigned to such term in Section 7.01(d).

"Financial Covenant Trigger Period" shall mean a period commencing on any date when Excess Availability is less than the greater of (i) 10% of the lesser of (x) the aggregate Commitments at such time and (y) the Borrowing Base at such time and (ii) $8 million and continuing until the date on which Excess Availability has exceeded the greater of (i) 10% of the lesser of (x) the aggregate Commitments at such time and (y) the Borrowing Base at such time and (ii) $8 million for 30 consecutive days.

28

"Financial Officer" of any person shall mean the chief financial officer, director of finance, principal accounting officer, treasurer, assistant treasurer or controller of such person or, in any case, any other person with substantially equivalent duties.

"Financial Plan" shall have the meaning assigned to such term in Section 5.04(e).

"Fixed Charge Coverage Ratio" shall mean, for any period for Holdings and its Restricted Subsidiaries, the ratio of (a) (i) EBITDA for such period minus (ii) Capital Expenditures actually paid in cash for such period (except to the extent financed with long-term Indebtedness or equity, excluding capital expenditures financed with Revolving Facility Loans) net of sales proceeds of equipment, including fleet inventory minus (iii) income Taxes paid in cash during such period, over (b) Fixed Charges.

"Fixed Charges" shall mean, for any period, the sum, without duplication, of (a) Consolidated Cash Interest Expense for such period, plus (b) scheduled principal payments on Indebtedness made during such period.

"Flood Insurance Laws" shall mean, collectively, (i) the National Flood Insurance Reform Act of 1994 (which comprehensively revised the National Flood Insurance Act of 1968 and the Flood Disaster Protection Act of 1973) as now or hereafter in effect or any successor statute thereto, (ii) the Flood Insurance Reform Act of 2004 as now or hereafter in effect or any successor statute thereto and, (iii) the Biggert-Waters Flood Insurance Reform Act of 2012 as now or hereafter in effect or any successor statute thereto.

"Foreign Benefit Arrangement" shall mean any employee benefit arrangement mandated by non-U.S. law that is maintained or contributed to by any Loan Party or any ERISA Affiliate.

"Foreign Lender" shall mean any Lender that is not a "United States person" as defined in Section 7701(a)(30) of the Code.

"Foreign Plan" shall mean each employee benefit plan (within the meaning of Section 3(3) of ERISA, whether or not subject to ERISA) that is not subject to U.S. law and is maintained or contributed to by any Loan Party.

"Foreign Plan Event" shall mean, with respect to any Foreign Benefit Arrangement or Foreign Plan, (a) the failure to make or, if applicable, accrue in accordance with normal accounting practices, any employer or employee contributions required by applicable law or by the terms of such Foreign Benefit Arrangement or Foreign Plan; (b) the failure to register or loss of good standing with applicable regulatory authorities of any such Foreign Benefit Arrangement or Foreign Plan required to be registered; or (c) the failure of any Foreign Benefit Arrangement or Foreign Plan to comply with any provisions of applicable law and regulations or with the terms of such Foreign Benefit Arrangement or Foreign Plan.

"Foreign Subsidiary" shall mean any Subsidiary that is organized under the laws of any jurisdiction other than the United States of America, any state thereof or the District of Columbia.

"FSHCO" shall mean any Domestic Subsidiary with no material assets other than equity interests of one or more Foreign Subsidiaries that are CFCs.

"Funding Accounts" shall mean the deposit account(s) of the Borrowers to which the Administrative Agent or the Swingline Lender is authorized by the Borrowers (or by the Lead Borrower on their behalf) to transfer the proceeds of any Borrowings requested or authorized pursuant to this Agreement.

"GAAP" shall mean generally accepted accounting principles in effect from time to time in the United States.

"Global Intercompany Note" shall mean an intercompany note in the form of Exhibit P attached hereto evidencing intercompany loans among Holdings, Lead Borrower and the Restricted Subsidiaries.

"Governmental Authority" shall mean any federal, state, local, county, provincial, foreign or other court or governmental agency, authority, instrumentality or regulatory or legislative body or any entity or officer exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to any government or any court, in each case whether associated with a state of the United States, the United States, or a foreign entity or government.

"Guarantee" of or by any person (the "guarantor") shall mean (a) any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation (whether arising by virtue of partnership arrangements, by agreement to keep well, to purchase assets, goods, securities or services, to take-or-pay or otherwise) or to purchase (or to advance or supply funds for the purchase of) any security for the payment of such Indebtedness or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation, (iv) entered into for the purpose of assuring in any other manner the holders of such Indebtedness or other obligation of the payment thereof or to protect such holders against loss in respect thereof (in whole or in part) or (v) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or other obligation, or (b) any Lien on any assets of the guarantor securing any Indebtedness of any other person, whether or not such Indebtedness or other obligation is assumed by the guarantor; provided, however, that the term "Guarantee" shall not include endorsements for collection or deposit, in either case in the ordinary course of business, or customary and reasonable indemnity obligations in effect on the Closing Date or entered into in connection with any acquisition or disposition of assets permitted under this Agreement. The amount of any Guarantee for purposes of clause (b) shall be deemed to be equal to the lesser of (i) the aggregate unpaid amount of such Indebtedness and (ii) the fair market value of the property encumbered thereby as determined by such person in good faith.

138633067

4850-7280-1748.5

"Guarantors" shall mean Holdings and the Subsidiary Loan Parties and any Parent Entity, in lieu of Holdings and any Subsidiary of Holdings that has executed and delivered an assumption agreement in substantially the form of Annex 1 to the Collateral Agreement and become a "Guarantor" and "Grantor" thereunder.

"Hazardous Materials" shall mean all pollutants, contaminants, wastes, chemicals, materials, substances and constituents of any nature which are subject to regulation by any Environmental Law, including, without limitation, explosive or radioactive substances or petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls or radon gas.

"Hedging Agreement" shall mean an agreement relating to any swap, cap, floor, collar, option, forward (excluding contracts for the acquisition of raw materials in the ordinary course of business), cross right or obligation, or combination thereof or similar transaction, with respect to interest rate, foreign exchange, currency, commodity, credit or equity risk.

"Holdings" shall have the meaning assigned to such term in the preamble of this Agreement, or any successor entity that shall merge with or into Holdings.

"Immaterial Subsidiary" shall mean, at any time, any Restricted Subsidiary of the Lead Borrower (i) having total assets (as determined in accordance with GAAP) in an amount of less than 2.50% of Consolidated Total Assets and (ii) contributing less than 2.50% to EBITDA for the most recently ended Test Period; provided, however, that the total assets (as so determined) and EBITDA contribution (as so determined) of all Immaterial Subsidiaries shall not exceed 5.00% of Consolidated Total Assets or 5.00% of EBITDA, as the case may be, for such Test Period.

"Increased Facility Activation Notice" shall mean a notice substantially in the form of Exhibit J.

"Increased Facility Closing Date" shall mean any Business Day designated as such in an Increased Facility Activation Notice.

"Increased Revolving Facility Commitments" shall have the meaning assigned to such term in Section 2.22(a).

"Increased Revolving Facility Loans" shall have the meaning assigned to such term in Section 2.22(a).

"Indebtedness" of any person shall mean, without duplication, (a) all obligations of such person for borrowed money, (b) all obligations of such person evidenced by bonds, debentures, notes or similar instruments to the extent the same would appear as a liability on a balance sheet prepared in accordance with GAAP, (c) all obligations of such person under conditional sale or other title retention agreements relating to property or assets purchased by such person, (d) all payments of such person issued or assumed as the deferred purchase price of property (other than (i) current intercompany liabilities incurred in the ordinary course of business and maturing within 365 days after the incurrence thereof and (ii) earnout obligations), to the extent that the same would be required to be shown as a long term liability on a balance

31

sheet prepared in accordance with GAAP, (e) all Guarantees by such person of Indebtedness of others, (f) all Capital Lease Obligations of such person, (g) all payments that such person would have to make in the event of an early termination, on the date Indebtedness of such person is being determined, in respect of outstanding Swap Agreements net of payments such person would receive in the event of early termination on such date of determination, (h) unreimbursed payment obligations of such person as an account party in respect of letters of credit and (i) unreimbursed payment obligations of such person of such person in respect of bankers' acceptances. The Indebtedness of any person shall include the Indebtedness of any partnership in which such person is a general partner, other than to the extent that the instrument or agreement evidencing such Indebtedness expressly limits the liability of such person in respect thereof. The Indebtedness of the Lead Borrower and the Restricted Subsidiaries shall exclude (i) accrued expenses and accounts and trade payables, (ii) liabilities under vendor agreements to the extent such indebtedness may be satisfied through non-cash means such as purchase volume earnings credits and (iii) reserves for deferred income taxes.

"Indemnified Taxes" shall mean all Taxes other than Excluded Taxes and Other Taxes. "Indemnitee" shall have the meaning assigned to such term in Section 9.05(b).

"Information" shall have the meaning assigned to such term in Section 3.14(a).

"Insolvent" with respect to any Multiemployer Plan, shall mean that such plan is insolvent within the meaning of Section 4245 of ERISA.

"Interest Election Request" shall mean a request by the Lead Borrower to convert or continue a Borrowing in accordance with Section 2.07.

"Interest Payment Date" shall mean, (a) with respect to any Eurodollar Loan, the first day of the Interest Period applicable to the Borrowing of which such Loan is a part and, in the case of a Eurodollar Borrowing with an Interest Period of more than three months' duration, each day that would have been an Interest Payment Date had successive Interest Periods of three months' duration been applicable to such Borrowing and, in addition, the date of any refinancing or conversion of such Borrowing with or to a Borrowing of a different Type, (b) with respect to any ABR Loan, the first day of April, July, October and January of each year while such ABR Loan is outstanding and (c) with respect to any Protective Advance or Overadvance Loan, the day that such Loan is required to be repaid in accordance with the terms hereof and the Maturity Date.

"Interest Period" shall mean, as to any Eurodollar Borrowing, the period commencing on the date of such Borrowing or on the last day of the immediately preceding Interest Period applicable to such Borrowing, as applicable, and ending on the numerically corresponding day (or, if there is no numerically corresponding day, on the last day) in the calendar month that is one, three or six months thereafter (or 12 months or a period of shorter than one month, if agreed by all relevant Lenders), as the Lead Borrower may elect, or the date any Eurodollar Borrowing is converted to an ABR Borrowing in accordance with Section 2.07 or repaid or prepaid in accordance with Section 2.09, Section 2.10 or Section 2.11; provided, that if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would

32

fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day. Interest shall accrue from and including the first day of an Interest Period to but excluding the last day of such Interest Period.

"Interpolated Rate" shall mean, in relation to the LIBO Rate, the rate which results from interpolating on a linear basis between:

        (a)      the applicable LIBO Rate for the longest period (for which that LIBO Rate is available) which is less than the Interest Period of that Loan; and

        (b)      the applicable LIBO Rate for the shortest period (for which that LIBO Rate is available) which exceeds the Interest Period of that Loan,

each as of approximately 11:00 a.m. (London, England time) two Business Days prior to the commencement of such Interest Period of that Loan.

"inventory" shall mean any "inventory," as such term is defined in the Uniform Commercial Code as in effect in the State of New York, now owned or hereafter acquired by Holdings, the Lead Borrower or any Restricted Subsidiary, wherever located.

"Inventory Reserve" shall mean reserves established by the Administrative Agent in its Permitted Discretion, to reflect factors that may negatively impact the Value of inventory, including change in salability, obsolescence, seasonality, theft, shrinkage, imbalance, change in composition or mix, markdowns, vendor chargebacks and loggers' and stumpage liens.

"Investment" shall have the meaning assigned to such term in Section 6.04.

"IP Rights" shall have the meaning assigned to such term in Section 3.23.

"IRS" shall mean the United States Internal Revenue Service.

"ISDA Definitions" means the 2006 ISDA Definitions (or successor definitional booklet for interest rate derivatives) published by the International Swaps and Derivatives Association, Inc. or any successor thereto, as amended or supplemented from time to time.

"Issuing Bank" shall mean Bank of America, acting through any of its Affiliates or branches, and each other Issuing Bank designated pursuant to Section 2.05(k), in each case in its capacity as an issuer of Letters of Credit hereunder, and its successors in such capacity as provided in Section 2.05(i). An Issuing Bank may, in its discretion, arrange for one or more Letters of Credit to be issued by Affiliates of such Issuing Bank, in which case the term "Issuing Bank" shall include any such Affiliate with respect to Letters of Credit issued by such Affiliate.

"Issuing Bank Fees" shall have the meaning assigned to such term in Section 2.12(b).

"Joinder Agreement" shall mean the joinder agreement to this Agreement substantially in the form of Exhibit Q, executed by a Responsible Officer of a Subsidiary that becomes a Subsidiary Borrower following the Closing Date.

33

"Joint Venture" shall mean a joint venture or similar arrangement, whether in corporate, partnership or other legal form which is not a Subsidiary but in which the Lead Borrower or any Subsidiary owns or controls any Equity Interests.

"L/C Disbursement" shall mean a payment or disbursement made by an Issuing Bank pursuant to a Letter of Credit.

"L/C Exposure" shall mean at any time the sum of (a) the aggregate undrawn amount of all Letters of Credit outstanding at such time and (b) the aggregate principal amount of all L/C Disbursements that have not yet been reimbursed at such time. The L/C Exposure of any Lender at any time shall mean its Revolving Facility Percentage of the aggregate L/C Exposure at such time.

"L/C Obligations" shall mean the sum (without duplication) of (a) all amounts owing by the Borrowers for any drawings under Letters of Credit; (b) the stated amount of all outstanding Letters of Credit issued for the account of the Borrowers; and (c) all fees and other amounts owing with respect to Letters of Credit issued for the account of the Borrowers.

"L/C Participation Fee" shall have the meaning assigned such term in Section 2.12(b).

"L/C Reserve" shall mean the aggregate of all L/C Obligations, other than (a) those that have been cash collateralized pursuant to Section 2.05(j); and (b) if no Default or Event of Default exists, amounts specified in clause (c) of the definition of L/C Obligations.

"Lead Arranger" shall mean Bank of America, N.A.

"Lead Borrower" shall have the meaning assigned thereto in the Recitals.

"Lender" shall mean each financial institution listed on Schedule 2.01 (other than any such person that has ceased to be a party hereto pursuant to an Assignment and Acceptance in accordance with Section 9.04), as well as any person that becomes a "Lender" hereunder in accordance with Section 9.04.

"Lender Counterparty" shall mean any counterparty to a document evidencing any Bank Product that (i) was an Agent, Lead Arranger, Lender or an Affiliate of any thereof on the Closing Date, or (ii) at the time the Bank Product was entered into, was an Agent, a Lead Arranger, a Lender, or an Affiliate of any thereof, including each such Affiliate that enters into a joinder agreement with the Administrative Agent, which in the case of clauses (i) and (ii), is designated in writing by the Lead Borrower as a Lender Counterparty (which may be done in the relevant documentation for such Bank Product).

"Lender Party" shall mean the Administrative Agent, each Issuing Bank, the Swingline Lender or any other Lender.

"Lending Office" shall mean, as to any Lender, the applicable branch, office or Affiliate of such Lender designated by such Lender to make Loans.

138633067

4850-7280-1748.5

"Letter of Credit" shall mean any letter of credit issued pursuant to Section 2.05.

"LIBO Rate" shall have the meaning assigned to such term in the definition of Eurodollar Rate.

"Lien" shall mean, with respect to any asset, (a) any mortgage, deed of trust, lien, hypothecation, pledge, encumbrance in the nature of security, charge or security interest in or on such asset and (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset. For purposes of this Agreement and the other Loan Documents, nonexclusive licenses granted to any person to use intellectual property owned or developed by Holdings, the Lead Borrower or any Restricted Subsidiary shall not constitute a Lien on such intellectual property.

"Loan Documents" shall mean this Agreement, the Security Documents, any Note issued under Section 2.09(e), the ABL Intercreditor Agreement and any other intercreditor agreement entered into by the Administrative Agent as contemplated by this Agreement and any amendments (including any amendment affecting the Increased Revolving Facility Commitments) and waivers to or of any of the foregoing.

"Loan Parties" shall mean the Borrowers and the Guarantors.

"Loans" shall mean the Revolving Facility Loans, the Swingline Loans, any Overadvance Loans, any Protective Advances and Increased Revolving Facility Loans.

"Local Time" shall mean central standard time.

"Management Group" shall mean the group consisting of the current and former directors, officers, employees and other management personnel of any Parent Entity, Holdings, the Lead Borrower and the Restricted Subsidiaries and, in each case, family members thereof and related trusts for the benefit of any of the foregoing.

"Margin Stock" shall have the meaning assigned to such term in Regulation U.

"Material Adverse Effect" shall mean any event, development or circumstance that has a material adverse effect on (a) the business, property, operations or condition (financial or otherwise) of Holdings and its Restricted Subsidiaries taken as a whole or (b) the validity or enforceability of this Agreement or any of the other Loan Documents or the rights or remedies of the Administrative Agent or the Lenders hereunder or thereunder.

"Material Indebtedness" shall mean Indebtedness (other than the Obligations) of any one or more of Holdings and the Restricted Subsidiaries in an aggregate principal amount exceeding $12.5 million.

"Maturity Date" shall mean the earlier of (a) December [__], 2025 and (b) the date that is ninety one (91) days prior to the maturity date of the Senior Secured Term Loan.

"Maximum Rate" shall have the meaning assigned to such term in Section 9.09.

"Minimum Extension Condition" shall have the meaning assigned to such term in Section 2.23(b).

"Moody's" shall mean Moody's Investors Service, Inc.

"Multiemployer Plan" shall mean a multiemployer plan as defined in Section 4001(a)(3) of ERISA to which any Loan Party or any ERISA Affiliate (other than one considered an ERISA Affiliate only pursuant to subsection (m) or (o) of Code Section 414) is making or accruing an obligation to make contributions, or has within any of the preceding six plan years made or accrued an obligation to make contributions.

"Net Income" shall mean, with respect to any person, the net income (loss) of such person, determined in accordance with GAAP and before any reduction in respect of preferred stock dividends.

"New Lender" shall have the meaning assigned to such term in Section 2.22(b).

"New Lender Supplement" shall have the meaning assigned to such term in Section 2.22(b).

"NOLV Percentage" shall mean the net orderly liquidation value by category of inventory, expressed as a percentage of the Value of inventory expected to be realized at an orderly, negotiated sale held within a reasonable period of time, net of all liquidation expenses, as determined from the most recent appraisal of the Loan Parties' inventory performed by an appraiser and on terms reasonably satisfactory to the Administrative Agent.

"Non-ABL Priority Collateral" shall have the meaning assigned to the term "Notes Col-lateral" in the ABL Intercreditor Agreement.

"Non-Consenting Lender" shall have the meaning assigned to such term in Section 2.19(c).

"Non-Defaulting Lender" shall mean, at any time, each Lender that is not a Defaulting Lender at such time.

"Nonpublic Information" shall mean information which has not been disseminated in a manner making it available to investors generally, within the meaning of Regulation FD.

"Note" shall have the meaning assigned to such term in Section 2.09(e).

"Obligations" shall mean (a) all obligations of every nature of each Loan Party from time to time owed under any Loan Document, whether for principal, interest, fees, expenses, indemnification or otherwise and (b) obligations in respect of Secured Bank Product Obligations (including in each of clauses (a) and (b) interest, fees and other amounts which, but for the filing of a petition in bankruptcy with respect to such Loan Party, would have accrued on any such Obligation, whether or not a claim is allowed against such Loan Party for such interest, fees and other amounts in the related bankruptcy proceeding). For the avoidance of doubt,

36

Increased Revolving Facility Commitment incurred pursuant to <u>Section 2.22</u> shall constitute Obligations; <u>provided</u> that the "Obligations" of each Loan Party shall exclude any Excluded Swap Obligations of such Loan Party.

"<u>OFAC</u>" shall have the meaning assigned to such term in the definition of the term "Embargoed Person."

"<u>Other Taxes</u>" shall mean any present or future stamp or documentary Taxes or any other excise or property Taxes arising from any payment made under any Loan Document, or from the execution, delivery or enforcement of, or otherwise with respect to, any Loan Document.

"<u>Overadvance</u>" shall have the meaning assigned to such term in <u>Section 2.24</u>.

"<u>Overadvance Loan</u>" shall mean a Loan made to a Borrower when an Overadvance exists or is caused by the funding thereof.

"<u>Parent Entity</u>" shall mean any of (i) Holdings and (ii) any person of which Holdings is a Subsidiary.

"<u>Pari Passu Bank Product Amount</u>" shall have the meaning assigned to such term in the definition of the term "Secured Bank Product Obligations."

"<u>Participant</u>" shall have the meaning assigned to such term in <u>Section 9.04(c)(i)</u>.

"<u>Participant Register</u>" shall have the meaning assigned to such term in <u>Section 9.04(c)(i)</u>.

"<u>Payment Conditions</u>" shall mean the satisfaction of the following conditions (except as indicated): (a) no Default or Event of Default exists or would arise as a result of the making of the subject Specified Payment, (b) immediately after giving effect to such Specified Payment, Holdings and its Subsidiaries shall, on a consolidated basis, have a Fixed Charge Coverage Ratio of not less than 1.00:1.00 as calculated on a Pro Forma Basis for the Test Period then most recently ended; provided, however, that (x) the condition set forth in clause (b) shall not be applicable in the case of a Specified Payment described in clause (b), (d) or (e) if Excess Availability (on the date of such Specified Payment and for the 30 consecutive day period immediately preceding such Specified Payment, in each case calculated on a Pro Forma Basis to include the Borrowing of any Loans or issuances of Letters of Credit in connection with the proposed Specified Payment) is in excess of the greater of (i) $17,000,000 and (ii) 20% of the lesser of (x) the Revolving Facility Commitments at such time and (y) the Borrowing Base at such time and (y) the condition set forth in clause (b) shall not be applicable in the case of a Specified Payment described in clause (a) or (c) if Excess Availability (on the date of such Specified Payment and for the 30 consecutive day period immediately preceding such Specified Payment, in each case calculated on a Pro Forma Basis to include the Borrowing of any Loans or issuances of Letters of Credit in connection with the proposed Specified Payment) is in excess of the greater of (i) $15,000,000 and (ii) 17.5% of the lesser of (x) the Revolving Facility Commitments at such time and (y) the Borrowing Base at such time, (c) immediately after giving effect to such Specified Payment, Excess Availability (on the date of such proposed Specified

Payment and for the 30 consecutive day period immediately preceding such Specified Payment, in each case calculated on a Pro Forma Basis to include the Borrowing of any Loans or issuances of Letters of Credit in connection with the proposed Specified Payment), shall not be less than (A) the greater of (i) $10,000,000 and (ii) 15% of the lesser of (x) the Revolving Facility Commitments at such time and (y) the Borrowing Base at such time, in the case of a Specified Payment described in clause (b), (d) or (e) of the definition thereof or (B) the greater of (i) $10,000,000 and (ii) 12.5% of the lesser of (x) the Revolving Facility Commitments at such time and (y) the Borrowing Base at such time, in the case of a Specified Payment described in clause (a) or (c) of the definition thereof, and (d) the Administrative Agent shall have received an officer's certificate executed by a Responsible Officer of the Lead Borrower certifying as to compliance with preceding clauses (a) through (c) and demonstrating (in reasonable detail) the calculations required by preceding clauses (b) and (c).

"Payment Item" shall mean each check, draft or other item of payment payable to a Loan Party, including those constituting proceeds of any Collateral.

"PBGC" shall mean the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"Perfection Certificate" shall have the meaning assigned to such term in the Collateral Agreement.

"Permitted Business Acquisition" shall mean any acquisition by the Lead Borrower or any Restricted Subsidiary of all or substantially all of the assets of, or a majority of the outstanding Equity Interests (other than directors' qualifying shares and similar de minimis holdings required by applicable law) in, a person or division, business unit or line of business of a person that is in the same, or a related, business to that of the Lead Borrower and its Subsidiaries; provided that (i) on the date of consummation of such acquisition, both immediately prior to and after giving effect to such acquisition, no Event of Default under Sections 7.01(b), (c), (h) and (i) shall have occurred and be continuing or would result therefrom, (ii) immediately after giving effect to such acquisition, the Lead Borrower and its Restricted Subsidiaries shall be in compliance with Section 6.13, (iii) the Loan Parties and any acquired entities shall have complied with the provisions of Section 5.09 within the time periods provided therein (to the extent compliance is required prior to consummation of such acquisition), (iv) if (with respect to any acquisition of a person or any Equity Interests in a person) the acquired person shall not become a Subsidiary Loan Party or (with respect to any acquisition of assets) the assets shall be acquired by a Subsidiary that is not a Subsidiary Loan Party, the aggregate amount of consideration paid in respect of the portion of such acquisition attributable to any such person that does not become a Subsidiary Loan Party or any such assets that are acquired by a person that is not a Subsidiary Loan Party shall not exceed the greater of $12.5 million or [•]% of Consolidated Total Assets and (v) the Payment Conditions are satisfied.

"Permitted Discretion" shall mean a determination made in good faith and in the exercise of reasonable (from the perspective of a secured asset-based lender) business judgment.

"Permitted Investments" shall mean:

(a)    direct obligations of the United States of America or any member of the Europe-an Union or any agency thereof or obligations guaranteed by the United States of America or any member of the European Union or any agency thereof, in each case with maturities not exceeding two years;

(b)    time deposit accounts, certificates of deposit, eurodollar deposits, overnight bank deposits and money market deposits maturing within one year of the date of acquisition thereof issued by a bank or trust company that is organized under the laws of the United States of America, any state thereof or any foreign country recognized by the United States of America having capital, surplus and undivided profits in excess of $100 million;

(c)    repurchase obligations with a term of not more than 180 days for underlying securities of the types described in clause (a) above entered into with a bank meeting the qualifications described in clause (b) above;

(d)    commercial paper, maturing not more than one year after the date of acquisition, issued by a person organized and in existence under the laws of the United States of America or any foreign country recognized by the United States of America with a rating at the time as of which any investment therein is made of P-2 (or higher) according to Moody's, or A-1 (or higher) according to S&P or carrying an equivalent rating by a nationally-recognized rating agency if either Moody's or S&P cease publishing ratings of commercial paper issuers generally;

(e)    securities with maturities of two years or less from the date of acquisition issued or fully guaranteed by any State, commonwealth or territory of the United States of America, or by any political subdivision or taxing authority thereof, and rated at least A by S&P or A by Moody's;

(f)    securities with maturities of one year or less from the date of acquisition backed by standby letters of credit issued by any Lender or any commercial bank satisfying the requirements of clause (b) of this definition;

(g)    shares of mutual funds whose investment guidelines restrict 95% of such funds' investments to those satisfying the provisions of clauses (a) through (f) above and (h) and (i) below;

(h)    money market funds that (i) comply with the criteria set forth in Rule 2a-7 under the Investment Company Act of 1940, (ii) are rated AAA by S&P and Aaa by Moody's and (iii) have portfolio assets of at least $5 billion; and

(i)    other short-term investments utilized by Foreign Subsidiaries of the Lead Borrower in accordance with normal investment practices for cash management in investments of a type analogous to the foregoing.

"Permitted Investors" shall mean (a) each of [_____], [_____], and [_____] and each of their Control Investment Affiliates  and (b) the members of the Management Group.

138633067

4850-7280-1748.5

"Permitted Refinancing Indebtedness" shall mean any Indebtedness issued in exchange for, or the net proceeds of which are used to extend, refinance, renew, replace, defease or refund (collectively, to "Refinance"), the Indebtedness being Refinanced (or previous refinancings thereof constituting Permitted Refinancing Indebtedness) and, in the case of any revolving Indebtedness, the permanent reduction of commitments thereunder; provided that (a) the principal amount (or accreted value, if applicable) of such Permitted Refinancing Indebtedness does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness so Refinanced (plus unpaid accrued interest and premium thereon, any committed or undrawn amounts and underwriting discounts, fees, commissions and expenses, associated with such Permitted Refinancing Indebtedness), except as otherwise permitted under Section 6.01, (b) other than with respect to Indebtedness permitted pursuant to Section 6.01(h) and (q), such Permitted Refinancing Indebtedness has a final maturity date equal to or later than the date that is 91 days after the final maturity date of, and has a Weighted Average Life to Maturity no less than 91 days greater than the Weighted Average Life to Maturity of, the Indebtedness being Refinanced (unless such Permitted Refinancing Indebtedness is secured on a *pari passu* basis with the Indebtedness being Refinanced, in which case such maturity and Weighted Average Life to Maturity shall be no shorter than the Maturity Date of the Indebtedness being Refinanced), (c) if the Indebtedness being Refinanced is by its terms subordinated in right of payment to the Obligations under this Agreement, such Permitted Refinancing Indebtedness shall be subordinated in right of payment to such Obligations on terms not materially less favorable to the Lenders as those contained in the documentation governing the Indebtedness being Refinanced, taken as a whole, in the good faith determination of the Lead Borrower and the Administrative Agent, (d) no Permitted Refinancing Indebtedness shall have obligors or contingent obligors that were not obligors or contingent obligors (or that would not have been required to become obligors or contingent obligors) in respect of the Indebtedness being Refinanced except to the extent otherwise permitted under Section 6.01 or Section 6.04 and (e) if the Indebtedness being Refinanced is (or would have been required to be) secured by the Collateral, such Permitted Refinancing Indebtedness may only be secured by such Collateral on terms no more favorable, taken as a whole, than those contained in the documentation governing the Indebtedness being Refinanced, taken as a whole, in each case in the good faith determination of the Lead Borrower and the Administrative Agent.

"Person" or "person" shall mean any natural person, corporation, business trust, joint venture, association, company, partnership, limited liability company, individual or family trust, or other organization (whether or not a legal entity), or any government or any agency or political subdivision thereof.

"Petition Date" shall have the meaning assigned thereto in the Recitals.

"Plan" shall mean any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, and in respect of which any Loan Party or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4062 or Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"Platform" shall have the meaning assigned to such term in Section 9.24(a).

"Pledged Collateral" shall mean, collectively, "Pledged Stock" and "Pledged Notes" as defined in the Collateral Agreement, respectively.

"Pre-Adjustment Successor Rate" shall have the meaning assigned to such term in Section 2.14(i).

"Prime Rate" shall have the meaning assigned to such term in the definition of the term "ABR."

"Pro Forma Basis" shall mean, as to any financial calculation or compliance with any covenant or test hereunder, performing such calculation or compliance with such covenant or test, as applicable, for any event described below that occurs subsequent to the commencement of any period of four consecutive quarters (the "Reference Period") for which the financial effect of such event is being calculated (or compliance being tested), and giving effect to the event for which such calculation (or compliance test) is being made, such calculation (or compliance test) will give pro forma effect to such event as if such event, and all other events described below that occurred subsequent to the commencement of the Reference Period (whether or not a ratio was required to be calculated in respect thereof), occurred on the first day of the Reference Period or in the case of Consolidated Total Assets, after giving effect thereto (it being understood and agreed that (x) unless otherwise specified, such Reference Period shall be deemed to be the most recently ended Test Period and such pro forma adjustments shall be excluded to the extent already accounted for in the calculation of EBITDA for such period and (y) if any person that became a Restricted Subsidiary or was merged, amalgamated or consolidated with or into the Lead Borrower or any Restricted Subsidiary shall have experienced any event requiring adjustment pursuant to this definition, then such calculation shall give pro forma effect thereto for such period as if such event occurred at the beginning of such period): (i) in making any determination of EBITDA pro forma effect shall be given to any disposition by the Lead Borrower or a Restricted Subsidiary of a person or asset, distribution facility or line of business, to any acquisition by the Lead Borrower or any Restricted Subsidiary, any discontinued operation or any operational change and any Subsidiary Redesignation or any Unrestricted Subsidiary Designation, in each case that occurred during the Reference Period (or, in the case of determinations made with respect to any action the taking of which hereunder is subject to compliance on a Pro Forma Basis, as specified in the definition of "Payment Conditions" or otherwise with any other test, as applicable, (any such action, a "Restricted Action") occurring during the Reference Period or thereafter and through and including the date of such determination) and (ii) in making any determination on a Pro Forma Basis, (x) all Indebtedness (including Indebtedness incurred or assumed and for which the financial effect is being calculated, whether incurred under this Agreement or otherwise, but excluding normal fluctuations in revolving Indebtedness incurred for working capital purposes) incurred or permanently repaid, returned, redeemed or extinguished during the Reference Period (or, in the case of determinations made with respect to any Restricted Action, occurring during the Reference Period or thereafter and through and including the date of such determination) shall be deemed to have been incurred or repaid, returned, redeemed or extinguished at the beginning of such period, (y) interest expense of such person attributable to (A) interest on any Indebtedness, for which pro forma effect is being given as provided in the preceding clause (x), bearing a floating interest rate shall be computed on a pro forma basis utilizing the rate which is or would be in effect with respect to such Indebtedness as at the relevant date of determination as if such

138633067

4850-7280-1748.5

rate had been actually in effect during the period for which pro forma effect is being given taking into account any interest hedging arrangements applicable to such Indebtedness, (B) any Capital Lease Obligation shall be deemed to accrue at an interest rate reasonably determined by a Responsible Officer of the Lead Borrower to be the rate of interest implicit in such Capital Lease Obligation in accordance with GAAP and (C) interest on any Indebtedness that may optionally be determined at an interest rate based upon a factor of a prime or similar rate, a eurocurrency interbank offered rate, or other rate, shall be determined to have been based upon the rate actually chosen, or if none, then based upon such optional rate chosen as the Lead Borrower or Restricted Subsidiary may designate, and (z) adjustments shall be made to Consolidated Total Assets for all Dispositions for proceeds exceeding $2.0 million and any Permitted Business Acquisitions occurring after the end of the most recent Reference Period (including any such transactions in relation to which Consolidated Total Assets is being calculated or to be completed concurrently therewith).

Pro forma calculations or determinations made pursuant to the definition of the term "Pro Forma Basis" shall be determined in good faith by a Responsible Officer of the Lead Borrower and, for any fiscal period ending on or prior to the first anniversary of any Restricted Action, may include adjustments (estimated by the Lead Borrower in good faith) to reflect (x) operating expense reductions and other operating improvements or synergies reasonably expected to result from such Restricted Action and such adjustments may reflect additional operating expense reductions and other additional operating improvements and synergies for which substantially all of the steps necessary for the realization thereof have been taken or are reasonably anticipated by the Lead Borrower to be taken in the 18-month period following the relevant Restricted Action and, are estimated on a good faith basis by the Lead Borrower and (y) the amount of "run rate" cost savings, operating expense reductions and other operating improvements or synergies related to such Restricted Action that are reasonably identifiable and factually sup-portable and projected by the Lead Borrower in good faith to result from actions that have been taken or with respect to which substantial steps have been taken or are expected to be taken (in the good faith determination of the Lead Borrower) within 18 months following the relevant Restricted Action, net the amount of actual benefits realized during such period from such actions; provided, however that the aggregate amount of any such adjustments pursuant to clauses (x) and (y) above shall not exceed 20% of EBITDA, for any Test Period (calculated after giving effect to such addbacks and the addbacks specified in clauses (c)(xiv) and (c)(xv) of the definition of EBITDA), taken together with EBITDA addbacks pursuant to clauses (c)(xiv) and (c)(xv) of the definition of "EBITDA" in such period. The Lead Borrower shall deliver to the Administrative Agent a certificate of a Responsible Officer of the Lead Borrower setting forth such demonstrable or additional operating expense reductions and other operating improvements or synergies and information and calculations supporting them in reasonable detail.

"Prohibited Transaction" shall have the meaning assigned to such term in Section 406 of ERISA and/or Section 4975(c) of the Code.

"Projections" shall mean the Lead Borrower's forecasted (a) balance sheets, (b) profit and loss statements, and (c) cash flow statements, all prepared on a basis consistent with Lead Borrower's historical financial statements, together with appropriate supporting details and a statement of underlying assumptions.

138633067

4850-7280-1748.5

"Protective Advance" shall have the meaning assigned to such term in Section 2.25(a).

"Protective Advance Exposure" shall mean, at any time, the sum of the aggregate principal amount of all outstanding Protective Advances at such time. The Protective Advance Exposure of any Lender at any time shall be its Revolving Facility Percentage of the total Protective Advance Exposure at such time.

"Qualified Capital Stock" shall mean any Equity Interest of any person that does not by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable or exercisable) or upon the happening of any event (a) provide for scheduled payments of dividends in cash (other than at the option of the issuer) prior to the date that is, at the time of issuance of such Equity Interest, 91 days after the Final Revolving Maturity Date, (b) become mandatorily redeemable at the option of the holder thereof (other than for Qualified Capital Stock or pursuant to customary provisions relating to redemption upon a change of control, sale of assets or initial public offering) pursuant to a sinking fund obligation or otherwise prior to the date that is, at the time of issuance of such Equity Interest, 91 days after the Final Revolving Maturity Date or (c) become convertible or exchangeable at the option of the holder thereof for Indebtedness (other than Indebtedness that Holdings, the Lead Borrower or any Restricted Subsidiary would be permitted to incur under Section 6.01(o) on the date of conversion) or Equity Interests that are not Qualified Capital Stock; provided, that if any such Equity Interest is issued pursuant to a plan for the benefit of the employees, directors, officers, managers or consultants of any Parent Entity, the Lead Borrower or its Subsidiaries or by any such plan to such persons, such Equity Interest shall not be regarded as an Equity Interest not constituting Qualified Capital Stock solely because it may be required to be repurchased by any Parent Entity, the Lead Borrower or its Subsidiaries in order to satisfy applicable regulatory obligations or upon termination of services to any Parent Entity, the Lead Borrower or its Subsidiaries; provided, further, that any Equity Interest held by any future, present or former employee, director, officer, managers or consultants of any Parent Entity, the Lead Borrower or any of its Subsidiaries shall be deemed Qualified Capital Stock, regardless of whether such stock is redeemable or subject to repurchase pursuant to any management equity subscription agreement, stock option agreement, stock ownership plan, put agreement, stockholder agreement or similar agreement that may be in effect from time to time if, in the case of Equity Interests of the Lead Borrower or any of its Subsidiaries, the terms of such Equity Interests provide that the Lead Borrower or such Subsidiary may not repurchase or redeem any such Equity Interests pursuant to such provisions unless such repurchase or redemption complies with the terms of this Agreement (or is consented to by the Required Lenders).

"Qualified Cash" means the amount of cash held in or credited to the Borrowing Base Collateral Account.

"Qualified Equity Contribution" shall mean property or assets (including cash) contributed to the capital of the Lead Borrower, or the proceeds received by the Lead Borrower from the sale (other than to a Restricted Subsidiary) of Qualified Capital Stock of the Lead Borrower or Equity Interests of any Parent Entity.

43

"Reference Period" shall have the meaning assigned to such term in the definition of the term "Pro Forma Basis."

"Refinance" shall mean the extension, refinancing, renewal, replacement, defeaseance or refunding of any Indebtedness and "Refinanced" and "Refinancing" shall have a meaning correlative thereto.

"Register" shall have the meaning assigned to such term in Section 9.04(b)(iv).

"Regulation FD" shall mean Regulation FD as promulgated by the SEC under the Securi-ties Act and the Exchange Act.

"Regulation U" shall mean Regulation U of the Board.

"Regulation X" shall mean Regulation X of the Board.

"Related Adjustment" shall mean, in determining any Eurodollar Successor Rate, the first relevant available alternative set forth in the order below that can be determined by Administrative Agent applicable to such Eurodollar Successor Rate: (a) the spread adjustment, or method for calculating or determining such spread adjustment, that has been selected or recommended by the Federal Reserve Board and/or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Federal Reserve Board and/or the Federal Reserve Bank of New York for the relevant Pre-Adjustment Successor Rate (taking into account the interest period, interest payment date or payment period for interest calculated and/or tenor thereto) and which adjustment or method (i) is published on an information service as selected by the Administrative Agent from time to time in its discretion or (ii) solely with respect to Term SOFR, if not currently published, which was previously so recommended for Term SOFR and published on an information service acceptable to Administrative Agent; or (b) the spread adjustment that would apply (or has previously been applied) to the fallback rate for a derivative transaction referencing the ISDA Definitions (taking into account the interest period, interest payment date or payment period for interest calculated and/or tenor thereto).

"Related Fund" shall mean, with respect to any Lender, any person (other than a natural person) that is engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its activities and is administered, advised or managed by (i) such Lender, (ii) an Affiliate of such Lender or (iii) an entity or an Affiliate of an entity that administers, advises or manages such Lender.

"Related Parties" shall mean, with respect to any specified person, such person's Affiliates and the respective directors, trustees, officers, employees, agents, advisors and controlling persons of such person and such person's Affiliates.

"Release" shall mean, with respect to Hazardous Materials, any spilling, leaking, seeping, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, disposing, depositing, or emanating in, into, onto or through the Environment.

"Removal Effective Date" shall have the meaning assigned to such term in Section 8.09.

"Rent and Charges Reserve" shall mean the aggregate of (a) all past due rent and other past due amounts owing by any Loan Party to any landlord, warehouseman, processor, repairman, mechanic, shipper, freight forwarder, broker or other Person who possesses any Collateral or could assert a Lien on any such Collateral; plus (b) a reserve at least equal to three (3) months' rent and other charges that could reasonably be expected to be payable to any such Person who possesses any Collateral or could reasonably be expected to assert a Lien thereon under applicable law, unless, in any such case, such Person has executed a Collateral Access Agreement (it being understood that (x) such Collateral Access Agreement shall not be required to be delivered until such date following the Closing Date specified in clause (j) of the definition of "Collateral and Guarantee Requirement" and (y) a Rent and Charges Reserve shall not be implemented until after such date); provided, however, in no event shall the Rent and Charges Reserve with respect to any location exceed the amount of Eligible Inventory at such location.

"Reorganization" shall mean, with respect to any Multiemployer Plan, that such plan is in "reorganization" within the meaning of Section 4241 of ERISA.

"Reportable Event" shall mean any reportable event as defined in Section 4043(c) of ERISA or the regulations issued thereunder with respect to a Plan (other than a Plan maintained by an ERISA Affiliate that is considered an ERISA Affiliate only pursuant to subsection (m) or (o) of Section 414 of the Code), other than those events as to which the 30-day notice period referred to in Section 4043(c) of ERISA has been waived.

"Required Lenders" shall mean, at any time, at least two (2) unaffiliated Lenders having (a) Credit Exposure and (b) Available Unused Commitments, that, taken together, represent more than 50% of the sum of the aggregate (i) Credit Exposure and (ii) Available Unused Commitments at such time. The Credit Exposure and Available Unused Commitments of any Defaulting Lender shall be disregarded in determining Required Lenders at any time.

"Responsible Officer" of any person shall mean any executive officer or Financial Officer of such person and any other officer or similar official thereof responsible for the administration of the obligations of such person in respect of this Agreement.

"Restricted Action" shall have the meaning assigned to such term in the definition of the term "Pro Forma Basis."

"Restricted Debt Payment" shall have the meaning assigned to such term in Section 6.09(b).

"Restricted Payment" shall have the meaning assigned to such term in Section 6.06.

"Restricted Subsidiary" shall mean each Subsidiary of the Lead Borrower that is not an Unrestricted Subsidiary. The Subsidiary Borrowers shall at all times constitute Restricted Subsidiaries.

"Revolving Credit Commitment Fee" shall have the meaning assigned to such term in Section 2.12(a).

"Revolving Facility" shall mean the Revolving Facility Commitments and the extensions of credit made hereunder by the Lenders.

"Revolving Facility Borrowing" shall mean a Borrowing comprised of Revolving Facility Loans.

"Revolving Facility Commitment" shall mean, with respect to each Lender, the commitment of such Lender (i) to make Revolving Facility Loans pursuant to Sections 2.01 and 2.24 and (ii) to acquire participations in Letters of Credit, Swingline Loans and Protective Advances hereunder, expressed as an amount representing the maximum aggregate permitted amount of such Lender's Credit Exposure hereunder, as such commitment may be (a) reduced from time to time pursuant to Section 2.08, (b) increased from time to time pursuant to Section 2.22 and (c) reduced or increased from time to time pursuant to assignments by or to such Lender under Section 9.04. The initial amount of each Lender's Revolving Facility Commitment is set forth on Schedule Section 2.01, or in the Assignment and Acceptance pursuant to which such Lender shall have assumed its Revolving Facility Commitment, as applicable. The aggregate amount of the Revolving Facility Commitments of all Lenders on the Closing Date is $100.0 million.

"Revolving Facility Loan" shall mean a Loan (including any Overadvance Loan) made by a Lender pursuant to Sections 2.01 and 2.24.

"Revolving Facility Percentage" shall mean, with respect to any Lender, the percentage of the total Revolving Facility Commitments represented by such Lender's Revolving Facility Commitment. If the Revolving Facility Commitments have terminated or expired, the Revolving Facility Percentages shall be determined based upon the Revolving Facility Commitments most recently in effect, giving effect to any assignments pursuant to Section 9.04.

"S&P" shall mean Standard & Poor's Financial Services LLC.

"SEC" shall mean the Securities and Exchange Commission or any successor thereto.

"Secured Bank Product Amount" shall have the meaning assigned to such term in the definition of "Secured Bank Product Obligations."

"Secured Bank Product Obligations" shall mean Indebtedness, obligations and other liabilities with respect to Bank Products owing by a Borrower or Affiliate of a Borrower to a Lender Counterparty; provided, that Secured Bank Product Obligations of a Loan Party shall not include its Excluded Swap Obligations. In addition, the Lender Counterparty providing such Bank Product and a Borrower or the relevant Affiliate of such Borrower must have previously provided written notice to the Administrative Agent of (i) the existence of such Bank Product, (ii) the maximum dollar amount up to which such obligations arising thereunder (the "Secured Bank Product Amount"), (iii) whether such Bank Product is a Designated Bank Product, and if so, the amount that shall be included in the Bank Product Reserve (the "Pari Passu Bank Product Amount"); provided that, if such Lender Counterparty's and such Borrower's intent is to secure the entirety of the obligations under such Bank Product, but the amount of such obligations is not determinable at the time such Bank Product is entered into or at the Closing Date, as applicable,

46

then such Lender Counterparty and the Lead Borrower (or its relevant Affiliate) may notify the Administrative Agent of the current exposure under such Bank Product and thereafter provide monthly updates of the exposure amounts thereunder and thus, the amount that shall be included in the Bank Product Reserve, subject to the proviso at the end of this definition), (iv) the methodology to be used by such parties in determining the Secured Bank Product Obligations owing from time to time and if the Administrative Agent has received no such notice with respect to any such Bank Product, then the Administrative Agent shall be permitted to assume that no such Secured Bank Product Obligations are outstanding in connection with making distributions under Section 7.03 and (v) its agreement to be bound by Section 8.12; provided, however, that no such notice from the Lead Borrower shall be required with respect to any Bank Products provided by Bank of America or its Affiliates with respect to any Bank Products provided as of the Closing Date. The Secured Bank Product Amount or Pari Passu Bank Product Amount may be changed from time to time by the Administrative Agent with respect to Bank Products provided by Bank of America or its Affiliates in its Permitted Discretion, and otherwise upon written notice to the Administrative Agent by the Lender Counterparty providing the related Bank Product and the Lead Borrower; provided that no additional Pari Passu Bank Product Amount may be voluntarily established by the Loan Parties at any time that a Default or Event of Default exists, or if a reserve in such amount would cause an Overadvance; provided further that the Pari Passu Bank Product Amount may be increased by the Administrative Agent in its Permitted Discretion or upon written notice to the Administrative Agent by the Lender Counterparty providing the relevant Bank Product any time that a Default or Event of Default exists so long as such increase will not cause an Overadvance.

"Secured Parties" shall mean the "Secured Parties" as defined in the Collateral Agreement.

"Securities Accounts" shall mean all "securities accounts" as such term is defined in the UCC.

"Securities Account Control Agreement" shall mean an effective securities account control agreement in form and substance satisfactory to the Administrative Agent.

"Securities Act" shall mean the Securities Act of 1933.

"Security Documents" shall mean the Collateral Agreement and each of the security agreements, mortgages, pledge agreements and other instruments and documents executed and delivered pursuant to any of the foregoing or pursuant to Section 5.09.

"Senior Secured Term Loan" shall mean the term loan facility provided under the Senior Secured Term Loan Documents in the aggregate amount of $110.0 million.

"Senior Secured Term Loan Agent" means [_____], in its capacity as administrative agent for the lenders under the Senior Secured Term Loan Documents, and its successors and assigns.

"Senior Secured Term Loan Agreement" means that certain Term Loan Agreement dated as of even date herewith by and between the Borrower, Holdings, Senior Secured Term Loan Agent and various lenders party thereto, as the same may be amended,

restated, amended and restated or supplemented or refinanced from time to time in accordance with this Agreement and the ABL Intercreditor Agreement.

"Senior Secured Term Loan Documents" shall mean the Senior Secured Term Loan Agreement and the other documents referred to therein (including the related guarantees, the related collateral documents, the notes and the notes purchase agreement).

"Settlement Date" shall have the meaning assigned to such term in Section 2.04(c).

"Settlement Report" shall mean a report delivered by the Administrative Agent to the Lenders summarizing the Swingline Loans of the Borrowers outstanding as of a given settlement date, allocated to the Lenders on a pro rata basis in accordance with their Commitments.

"SOFR" means, with respect to any Business Day, the secured overnight financing rate published for such day by the Federal Reserve Bank of New York, as the administrator of the benchmark (or a successor administrator) on the Federal Reserve Bank of New York's website (or any successor source) at approximately 8:00 a.m. (New York City time) on the immediately succeeding Business Day and, in each case, that has been selected or recommended by the Federal Reserve Board and/or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Federal Reserve Board and/or the Federal Reserve Bank of New York.

"Solvent" shall mean, with respect to any person as of any date of determination, that, as of such date (a) the value of the assets of such person (both at fair value and present fair saleable value) is greater than the total amount of liabilities (including contingent and unliquidated liabilities) of such person, (b) such person is able to pay all liabilities of such person as such liabilities mature. In computing the amount of contingent or unliquidated liabilities at any time, such liabilities shall be computed at the amount that, in light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability, (c) has capital that is not unreasonably small for its business and is sufficient to carry on its business and transactions and all business and transactions in which it is about to engage; (d) is not "insolvent" within the meaning of Section 101(32) of the Bankruptcy Code; and (e) has not incurred (by way of assumption or otherwise) any obligations or liabilities (contingent or otherwise) under any Loan Documents, or made any conveyance in connection therewith, with actual intent to hinder, delay or defraud either present or future creditors of such Person or any of its Affiliates.

"Special Purpose Subsidiary" shall mean a Restricted Subsidiary that (a) is engaged solely in (x) the business of acquiring, selling, collecting, financing or refinancing receivables (including any thereof constituting or evidenced by chattel paper, instruments or general intangibles), accounts (as defined in the Uniform Commercial Code as in effect in any jurisdiction from time to time) and other accounts, all proceeds thereof and all rights (contractual and other), collateral and other assets relating thereto and (y) any business or activities incidental or related to such business, in each case permitted by this Agreement and (b) is designated as a "Special Purpose Subsidiary" by the Lead Borrower.

"Specified Equity Contribution" shall have the meaning assigned to such term in Section 7.02(a).

"Specified Event of Default" shall mean the occurrence of and continuance of any Event of Default under (i) Section 7.01(a), to the extent related to the inaccuracy of any Borrowing Base Certificate delivered under this Agreement that resulted in its material overstatement, (ii) any of Sections 7.01(b), (c), (h), or (i), (iii) Section 7.01(d) to the extent related to (x) the failure to deliver a Borrowing Base Certificate pursuant to Section 5.13(a), (y) the failure to comply with Section 5.13(e) or (z) a Financial Covenant Event of Default, or (iv) Section 7.01(f) to the extent relating to any payment default under the Senior Secured Term Loan Documents or any Permitted Refinancing Indebtedness in respect of the Senior Secured Term Loan.

"Specified Indebtedness" shall have the meaning assigned to such term in Section 6.09(b).

"Specified Payment" shall mean (a) any Permitted Business Acquisition, (b) Restricted Payments made pursuant to Section 6.06(e), (c) Investments made pursuant to Section 6.04(q), (d) Indebtedness incurred pursuant to Section 6.01(o) and (e) payments in respect of Specified Indebted-ness made pursuant to Section 6.09(b).

"Specified Representations" shall mean the representations and warranties of the Borrowers and the Guarantors set forth in Section 3.01(a) and (b), Section 3.02(a) and (b)(i)(A)(y) (related solely to the entering into, borrowing under, guaranteeing under, performance of, and granting of security interests in the Collateral pursuant to, the Loan Documents), Section 3.03 (related solely to the entering into, borrowing under, guaranteeing under, performance of, and granting of security interests in the Collateral pursuant to, the Loan Documents), Section 3. 10, Section 3.12, Section 3.17 (limited to the Security Documents required to be delivered on the Closing Date), Section 3.18, and Section 3.21.

"Spot Rate" shall mean the exchange rate, as determined by the Administrative Agent, that is applicable to conversion of one currency into another currency, which is (a) the exchange rate reported by Bloomberg (or other commercially available source designated by the Administrative Agent) as of the end of the preceding business day in the financial market for the first currency; or (b) if such report is unavailable for any reason, the spot rate for the purchase of the first currency with the second currency as in effect during the preceding business day in the Administrative Agent's principal foreign exchange trading office for the first currency.

"Subordinated Indebtedness" shall mean any Indebtedness of the Lead Borrower or any Restricted Subsidiary that is expressly subordinated in right of payment to the Obligations.

"Subsidiary" shall mean, with respect to any person (herein referred to as the "parent"), any corporation, partnership, association or other business entity of which securities or other ownership interests representing more than 50% of the ordinary voting power or more than 50% of the partnership interests are, at the time any determination is being made, directly or indirectly, owned, Controlled or held by the parent.

49

"Subsidiary Borrower" shall mean collectively, each Subsidiary of Holdings that owns or acquires any assets included in the Borrowing Base and that either (i) is a party to this Agreement on the Closing Date or (ii) becomes a party to this Agreement following the Closing Date by executing a Joinder Agreement pursuant to Section 5.9(d), in each case, until such time as such Subsidiary is released from its obligations under the Loan Documents in accordance with this Agreement .

"Subsidiary Loan Party" shall mean each Restricted Subsidiary that is a Wholly-Owned Subsidiary of the Lead Borrower, other than (a) any Foreign Subsidiary of the Lead Borrower, (b) any Excluded Subsidiary. Any entity that is a Subsidiary Borrower or a guarantor of the Senior Secured Term Loan shall be a Subsidiary Loan Party hereunder.

"Subsidiary Redesignation" shall have the meaning assigned to such term in Section 5.14.

"Supermajority Required Lenders" shall mean, at any time, at least two (2) unaffiliated Lenders having (a) Credit Exposure and (b) Available Unused Commitments, that, taken together, represent more than 66% of the sum of the aggregate (i) Credit Exposure and (ii) Available Unused Commitments at such time. The Credit Exposure and Available Unused Commitments of any Defaulting Lender shall be disregarded in determining Supermajority Required Lenders at any time.

"Surviving Borrower" shall have the meaning provided in the preamble to this Agreement.

"Swap Agreement" shall mean any agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; provided that no phantom stock or other employee benefit plan providing for payments only on account of services provided by current or former directors, officers, employees, members of management or consultants of Holdings, the Lead Borrower or any of its Subsidiaries shall be a Swap Agreement.

"Swap Obligations" shall mean with respect to any Loan Party any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act.

"Swingline Borrowing" shall mean a Borrowing comprised of Swingline Loans.

"Swingline Borrowing Request" shall mean a request by the Lead Borrower substantially in the form of Exhibit C-2.

"Swingline Commitment" shall mean, with respect to each Swingline Lender, the commitment of such Swingline Lender to make Swingline Loans pursuant to Section 2.04. The aggregate amount of the Swingline Commitments on the Closing Date is $20 million.

50

"Swingline Exposure" shall mean at any time the aggregate principal amount of all out-standing Swingline Loans at such time. The Swingline Exposure of any Lender at any time shall mean its Revolving Facility Percentage of the aggregate Swingline Exposure at such time.

"Swingline Lender" shall mean Bank of America, acting through any of its Affiliates or branches, in its capacity as a lender of Swingline Loans.

"Swingline Loans" shall mean the swingline loans made to a Borrower pursuant to Section 2.04.

"Syndication Agent" shall have the meaning assigned to such term in the preamble of this Agreement.

"Tax Distributions" shall have the meaning assigned to such term in Section 6.06(i).

"Tax Group" shall have the meaning assigned to such term in Section 6.06(i).

"Taxes" shall mean all present or future taxes, levies, imposts, duties, assessments, deductions, charges, fees or withholdings imposed by any Governmental Authority and any interest, additions to tax and penalties applicable thereto.

"Termination Date" shall mean the date on which the Commitments have been terminated and the principal of and interest on each Loan, Fees and all other expenses or amounts payable under any Loan Document (other than obligations for taxes, costs, indemnifications, reimbursements damages and other contingent liabilities in respect of which no claim or demand for payment has been made or, in the case of indemnifications, no notice been given (or reasonably satisfactory arrangements have otherwise been made)) shall have been paid in full and all Letters of Credit have been canceled or have expired (or have been cash collateralized in a manner consistent with the requirements of Section 2.05, back-stopped with a letter of credit having terms and conditions reasonably satisfactory to the applicable Issuing Banks or otherwise supported in a manner reasonably satisfactory to the applicable Issuing Banks), and all amounts drawn thereunder have been reimbursed in full.

"Term SOFR" means, the forward-looking term rate for any period that is approximately (as determined by Administrative Agent) as long as any of the Interest Period options set forth in the definition of "Interest Period" and that is based on SOFR and that has been selected or recommended by the Federal Reserve Board and/or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Federal Reserve Board and/or the Federal Reserve Bank of New York, in each case as published on an information service as selected by Administrative Agent from time to time in its discretion.

"Test Period" shall mean, on any date of determination, the period of four consecutive fiscal quarters (taken as one accounting period) of Holdings then most recently ended for which financial statements have been delivered pursuant to Section 5.04(a) or Section 5.04(b), as applicable.

"Title Policy" shall have the meaning assigned to such term in the definition of Collateral and Guarantee Requirement.

"Transaction Costs" shall mean fees and expenses payable or otherwise borne by Holdings, any other Parent Entity, the Lead Borrower and its Subsidiaries in connection with the Transactions.

"Transactions" shall mean, collectively, (a) the transactions to occur in connection with the Loan Documents, including the execution and delivery of the Loan Documents and the initial borrowings hereunder, (b) the entering into of the Senior Secured Term Loan Documents and the incurrence of the Senior Secured Term Loan, (c) the repayment of the Existing Debt, (d) the Chapter 11 Restructuring Transactions, (e) [Reserved] and (f) the payment of the Transaction Costs.

"Type," when used in respect of any Loan or Borrowing, shall refer to the Rate by reference to which interest on such Loan or on the Loans comprising such Borrowing is determined. For purposes hereof, the term "Rate" shall include the Adjusted Eurodollar Rate and the ABR.

"Uniform Commercial Code" or "UCC": the Uniform Commercial Code (or any similar or equivalent legislation) as in effect from time to time in any applicable jurisdiction.

"Uniform Customs" shall have the meaning assigned to such term in Section 9.07.

"Unpaid Drawings" shall have the meaning assigned to such term in Section 2.05(e).

"Unrestricted Subsidiary" shall mean any Subsidiary of the Lead Borrower that is acquired or created after the Closing Date and designated by the Lead Borrower as an Unrestricted Subsidiary hereunder by written notice to the Administrative Agent pursuant to Section 5.14; provided, however, that no Subsidiary Borrower shall be designated as an Unrestricted Subsidiary.

"Unrestricted Subsidiary Designation" shall have the meaning assigned to such term in Section 5.14.

"Unused Line Fee Rate" shall mean a rate equal to 0.375% per annum; provided that if on the last day of any fiscal quarter (starting with the first full fiscal quarter after the Closing Date) the daily average undrawn portion of the Commitments during the preceding quarter was greater than 33.3% of the aggregate Commitments, such rate shall be 0.25% per annum for such fiscal quarter.

"Upfront Fees" shall have the meaning assigned to such term in Section 2.12(d).

"U.S. Lender" shall mean any Lender that is a "United States person" as defined in Section 7701(a)(30) of the Code.

138633067

4850-7280-1748.5

"U.S. Tax Compliance Certificate" shall have the meaning assigned to such term in Section 2.17(e).

"USA PATRIOT Act" shall have the meaning assigned to such term in the definition of the term "Anti-Terrorism Laws."

"Value" shall mean, without duplication of any item enumerated in the definition of "Eligible Inventory" or "Eligible Account" (a) for inventory, its value in Dollars determined on the basis of the lower of cost or market, calculated on a first-in, first-out basis, and excluding any portion of cost attributable to (1) intercompany profit among the Lead Borrower, the other Loan Parties and their Affiliates and (2) representing the lower of cost or market adjustments or reserves and (b) for an Account, its Dollar Equivalent face amount, net of any returns, rebates, discounts (calculated on the shortest terms), credits, allowances or Taxes (including sales, excise or other Taxes) that have been or could be claimed by the Account Debtor or any other Person.

"Weekly Reporting Period" shall mean any period (i) during the continuance of a Specified Event of Default or (ii) during which Excess Availability is less than the greater of (a) 12.5% of the lesser of (x) the aggregate Revolving Facility Commitments at such time and (y) the Borrowing Base at such time and (b) $12.0 million for five (5) consecutive Business Days (until the date on which, in the case of clause (i), such Specified Event of Default is cured or waived or no longer continuing, or in the case of clause (ii), Excess Availability exceeds the greater of (a) 12.5% of the lesser of (x) the aggregate Revolving Facility Commitment at such time and (y) the Borrowing Base at such time and (b) $12.0 million for at least 30 consecutive days.

"Weighted Average Life to Maturity" shall mean, when applied to any Indebtedness at any date, the number of years obtained by dividing: (a) the sum of the product obtained by multiplying (i) the amount of each then remaining installment, sinking fund, serial maturity or other scheduled payments of principal, including a payment at final maturity, in respect thereof, by (ii) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment; by (b) the outstanding principal amount of such Indebtedness.

"Wholly-Owned Subsidiary" of any person shall mean a Subsidiary of such person, all of the outstanding Equity Interests of which (other than directors' qualifying shares or nominee or other similar shares (including shares issued to foreign nationals) required pursuant to applicable law) are owned by such person or another Wholly-Owned Subsidiary of such person.

"Withdrawal Liability" shall mean liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

SECTION 1.02        Terms Generally.

(a)        The definitions set forth or referred to in Section 1.01 shall apply equally to both the singular and plural forms of the terms defined. The words "herein," "hereto," "hereof" and "hereunder" and words of similar import when used in any Loan Document shall

53

refer to such Loan Document as a whole and not to any particular provision thereof. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." All references herein to Articles, Sections, Exhibits and Schedules shall be deemed references to Articles and Sections of, and Exhibits and Schedules to, the Loan Documents in which the reference appears unless the context shall otherwise require.

(b)    Except as otherwise expressly provided herein, any reference in this Agreement to any Loan Document or the Chapter 11 Plan or other document, agreement, order or instrument (including any bylaws, limited partnership agreement, limited liability company agreement, articles of incorporation, certificate of limited partnership or certificate of formation, as the case may be) shall mean such Loan Document, Chapter 11 Plan, document, agreement, order or instrument as amended, restated, amended and restated, supplemented, otherwise modified, replaced, renewed, extended or refinanced from time to time and any reference in this Agreement to any person shall include a reference to such person's permitted assigns and successors-in-interest.

SECTION 1.03    <u>Accounting Terms</u>.

(a)    Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; <u>provided</u> that, if the Lead Borrower notifies the Administrative Agent that the Lead Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the Closing Date in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Lead Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith; <u>provided</u> <u>further</u> that if an amendment is requested by the Lead Borrower or the Required Lenders, then the Lead Borrower and the Administrative Agent shall negotiate in good faith to enter into an amendment of such affected provisions (without the payment of any amendment or similar fees to the Lenders) to preserve the original intent thereof in light of such change in GAAP or the application thereof subject to the approval of the Required Lenders (not to be unreasonably withheld, conditioned or delayed); <u>provided</u> <u>further</u> that all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made without giving effect to (i) any election under Accounting Standards Codification 825-10-25 (previously referred to as Statement of Financial Accounting Standards 159) (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value any Indebtedness or other liabilities of the Lead Borrower or any Subsidiary at "fair value," as defined therein and (ii) any treatment of Indebtedness in respect of convertible debt instruments under Accounting Standards Codification 470-20 (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value any such Indebtedness in a reduced or bifurcated manner as described therein, and such Indebtedness shall at all times be valued at the full stated principal amount thereof.

(b)        Notwithstanding anything to the contrary contained in paragraph (a) above or the definition of "Capital Lease Obligations," in the event of an accounting change requiring all leases to be capitalized, only those leases (assuming for purposes hereof that they were in existence on the date hereof) that would constitute Capital Lease Obligations on the date hereof shall be considered Capital Lease Obligations and all calculations and deliverables under this Agreement or any other Loan Document shall be made in accordance therewith (provided that all financial statements delivered to the Administrative Agent in accordance with the terms of this Agreement after the date of such accounting change shall contain a schedule showing the adjustments necessary to reconcile such financial statements with GAAP as in effect immediately prior to such accounting change).

(c)        Further notwithstanding anything to the contrary contained in paragraph (a) above, all terms of an accounting or financial nature construed in accordance with GAAP shall take be based on "fresh start accounting" taking into account the "Restructuring Transactions" made in accordance with (and as defined in) the Chapter 11 Plan and the Confirmation Order.

SECTION 1.04        Rounding.  Except as otherwise expressly provided herein, any financial ratios required to be maintained by the Lead Borrower pursuant to this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding up if there is no nearest number).

SECTION 1.05        Timing of Payment or Performance.  When the payment of any obligation or the performance of any action, covenant, duty or obligation is stated to be due or performance required on a day which is not a Business Day (other than as described in the definitions of "ABR," "Federal Funds Effective Rate" or "Interest Period"), the date of such payment or performance shall extend to the immediately succeeding Business Day and such extension of time shall be reflected in computing interest or fees, as the case may be.

SECTION 1.06        References to Laws.  Unless otherwise expressly provided herein, references to any law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such law.

SECTION 1.07        Pro Forma.  Notwithstanding anything to the contrary contained herein, financial ratios and tests pursuant to this Agreement shall be calculated in the manner prescribed by the definition of "Pro Forma Basis."

SECTION 1.08        Divisions.  For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests at such time.

SECTION 1.09        Chapter 11 Restructuring Transactions.  Notwithstanding anything to the contrary in this Agreement or any other Loan Document, neither this Agreement nor any other Loan Document shall prohibit the consummation by the Borrower or its Subsidiaries of the "Restructuring Transactions" made in accordance with (and as defined in) the Chapter 11 Plan and the Confirmation Order, each as in effect on the Closing Date, including (a) the conversion of Hardwoods Holdings, Inc., a Delaware corporation, to Hardwoods Holdings, LLC, a Delaware limited liability company ("Reorganized HHI"), and (b) the cancellation of the existing Equity Interests of Reorganized HHI and the issuance of new Equity Interests of Reorganized HHI and Senior Secured Term Loans as distributions for certain existing Indebtedness of the Lead Borrower and (c) the other corporate, restructuring or other transactions expressly described in the Chapter 11 Plan or the Confirmation Order, each as in effect on the Closing Date, that are necessary or appropriate to implement or effectuate the Chapter 11 Plan (collectively, the "Chapter 11 Restructuring Transactions"), and the consummation of the Chapter 11 Restructuring Transactions shall not constitute or result in (x) a breach of any representation or warranty under this Agreement or any other Loan Document, (y) a breach of any covenant set forth in this Agreement or any other Loan Document, other than Section 6.10, or (z) a Default or Event of Default under this Agreement or any other Loan Document other than a Default or Event of Default arising from a breach of Section 6.10.

ARTICLE II

The Credits

SECTION 2.01        Commitments.  Subject to the terms and conditions set forth herein, each Lender agrees to make Revolving Facility Loans to the Borrowers from time to time during the Availability Period; provided that, other than as set forth in Section 2.24, such Lenders shall have no obligation to the Borrowers whatsoever to honor any request for a Revolving Facility Loan if the amount of the proposed Revolving Facility Loan exceeds the Excess Availability on the proposed funding date for such Revolving Facility Loans. Within the foregoing limits and subject to the terms and conditions set forth herein, the Borrowers may borrow, prepay and reborrow Revolving Facility Loans. In accordance with Section 10.07, all Borrowers shall be jointly and severally liable as borrowers for all Revolving Facility Loans regardless of which Borrower received the proceeds thereof.

SECTION 2.02        Loans and Borrowings.

(a)        Each Revolving Facility Loan shall be made as part of a Borrowing consisting of Revolving Facility Loans under the same Facility and of the same Type made by the Lenders ratably in accordance with their respective Revolving Facility Commitments; provided, however, that Revolving Facility Loans shall be made by the Lenders ratably in accordance with their respective Revolving Facility Percentages on the date such Revolving Facility Loans are made hereunder. The failure of any Lender to make any Revolving Facility Loan required to be made by it shall not relieve any other Lender of its obligations hereunder.

(b)        Subject to Section 2.14, each Borrowing (other than a Swingline Borrowing) shall be comprised entirely of ABR Loans or Eurodollar Loans as the Lead Borrower may request in accordance herewith. Each Swingline Borrowing or Protective Advance shall be

56

an ABR Borrowing. Each Lender at its option may make any ABR Loan or Eurodollar Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan.

(c)     At the commencement of each Interest Period for any Eurodollar Borrowing, such Borrowing shall be in an aggregate amount that is an integral multiple of the Borrowing Multiple and not less than the Borrowing Minimum. At the time that each ABR Borrowing is made, there shall be no Borrowing Multiple or Borrowing Minimum requirement; it being understood that an ABR Borrowing may be in an aggregate amount that is equal to the entire unused balance of the Revolving Facility Commitments or that is required to finance the reimbursement of an L/C Disbursement as contemplated by Section 2.05(e). Each Swingline Borrowing shall be in an amount that is an integral multiple of the Borrowing Multiple and not less than the Borrowing Minimum. Borrowings of more than one Type may be outstanding at the same time; provided that, without the consent of the Administrative Agent, there shall not at any time be more than a total of 10 Eurodollar Borrowings outstanding.

(d)     Notwithstanding any other provision of this Agreement, the Lead Borrower shall not be entitled to request, or to elect to convert or continue, any Borrowing if the Interest Period requested with respect thereto would end after the Maturity Date.

SECTION 2.03     Requests for Borrowings.  To request a Revolving Facility Borrowing, the Lead Borrower shall notify the Administrative Agent of such request by written notice (a) in the case of a Eurodollar Borrowing, not later than 2:00 p.m., Local Time, three Business Days before the date of the proposed Borrowing or (b) in the case of an ABR Borrowing, not later than 2:00 p.m., Local Time, on the date of the proposed Borrowing. Each such written Borrowing Request shall be irrevocable and shall be confirmed promptly by hand delivery, fax or other electronic transmission (including ".pdf" or ".tif") to the Administrative Agent of a written Borrowing Request in a form approved by the Administrative Agent and signed by the Lead Borrower. Each such written Borrowing Request shall specify the following information in compliance with Section 2.02:

(i)     the aggregate amount of the requested Borrowing;

(ii)     the date of such Borrowing, which shall be a Business Day;

(iii)     whether such Borrowing is to be an ABR Borrowing or a Eurodollar Borrowing;

(iv)     in the case of a Eurodollar Borrowing, the initial Interest Period to be applicable thereto, which shall be a period contemplated by the definition of the term "Interest Period"; and

(v)     the location and number of the Funding Account(s) to which funds are to be disbursed.

If no election as to the Type of Borrowing is specified, then the requested Borrowing shall be an ABR Borrowing. If no Interest Period is specified with respect to any requested Eurodollar Borrowing, then the Lead Borrower shall be deemed to have selected a Eurodollar Borrowing with an Interest Period of three month's duration. Promptly following

57

receipt of a Borrowing Request in accordance with this <u>Section 2.03</u>, the Administrative Agent shall advise each Lender of the details thereof and of the amount of such Lender's Loan to be made as part of the requested Borrowing.

SECTION 2.04    <u>Swingline Loans</u>.

(a)    Subject to the terms and conditions set forth herein, the Swingline Lender agrees to make Swingline Loans to the Lead Borrower from time to time during the Availability Period, in an aggregate principal amount at any time outstanding that will not result in (i) the aggregate principal amount of outstanding Swingline Loans exceeding the Swingline Commitment or (ii) the Credit Exposure exceeding the Availability at such time; <u>provided</u> that the Swingline Lender shall not be required to make a Swingline Loan to refinance an outstanding Swingline Borrowing. Within the foregoing limits and subject to the terms and conditions set forth herein, the Lead Borrower may borrow, prepay and reborrow Swingline Loans.

(b)    To request a Swingline Borrowing, the Lead Borrower shall notify the Administrative Agent and the Swingline Lender of such request by telephone (confirmed by a Swingline Borrowing Request by fax or other electronic transmission (including ".pdf" or ".tif")), not later than 2:00 p.m., Local Time, on the day of a proposed Swingline Borrowing. Each such notice and Swingline Borrowing Request shall be irrevocable and shall specify (i) the requested date (which shall be a Business Day), (ii) the amount of the requested Swingline Borrowing and (iii) the location and number of the Funding Account(s) to which funds are to be disbursed. The Swingline Lender shall consult with the Administrative Agent as to whether the making of the Swingline Loan is in accordance with the terms of this Agreement prior to the Swingline Lender funding such Swingline Loan. The Swingline Lender shall make each Swingline Loan in accordance with <u>Section 2.04(a)</u> on the proposed date thereof by wire transfer of immediately available funds by 3:00 p.m., Local Time, to the applicable Funding Account (or, in the case of a Swingline Borrowing made to finance the reimbursement of an L/C Disbursement as provided in <u>Section 2.05(e)</u>, by remittance to the applicable Issuing Bank).

(c)    Settlement of Swingline Loans among the Lenders and the Swingline Lender shall take place on a date determined from time to time by Swingline Lender (but at least weekly) by notifying the applicable Lenders of such requested settlement by electronic transmission, telephone or e-mail no later than 2:00 p.m., Local Time, on the date of such requested Settlement (the "<u>Settlement Date</u>"). On each settlement date, settlement shall be made with each Lender in accordance with the Settlement Report delivered by the Swingline Lender to the Lenders. Between settlement dates, the Administrative Agent may in its discretion apply payments on Revolver Facility Loans to Swingline Loans regardless of any designation by the Lead Borrower or any provision herein to the contrary. Each Lender (other than the Swingline Lender) shall transfer the amount of such Lender's Revolving Facility Percentage of the out-standing principal amount of the applicable Swingline Loan with respect to which settlement is requested to the Swingline Lender, to such account of the Swingline Lender as the Swingline Lender may designate, not later than 3:00 p.m., Local Time, on such Settlement Date. Each Lender hereby absolutely and unconditionally agrees, upon receipt of notice or Settlement Report as provided above, to pay to the Administrative Agent, for the account of the Swingline Lender, such Lender's Revolving Facility Percentage of such Swingline Loan or Loans. Each Lender acknowledges and agrees that its respective obligation to make settlements with the

58

Administrative Agent and acquire participations in Swingline Loans pursuant to this paragraph is absolute and unconditional and shall not be affected by any circumstance whatsoever, including the occurrence and continuance of a Default or Event of Default or reduction or termination of the Commitments, and that each such payment shall be made without any offset, abatement, withholding or reduction whatsoever. Each Lender shall comply with its obligation under this paragraph by wire transfer of immediately available funds, in the same manner as provided in Section 2.06 with respect to Loans made by such Lender (and Section 2.06 shall apply, *mutatis mutandis*, to the payment obligations of the Lenders), and the Administrative Agent shall promptly pay to the Swingline Lender the amounts so received by it from the Lenders. The Administrative Agent shall notify the Lead Borrower of any participations in any Swingline Loan acquired pursuant to this paragraph (c), and thereafter payments in respect of such Swingline Loan shall be made to the Administrative Agent and not to the Swingline Lender. Any amounts received by the Swingline Lender from the Lead Borrower (or other person on behalf of the Lead Borrower) in respect of a Swingline Loan after receipt by the Swingline Lender of the proceeds of a sale of participations therein shall be promptly remitted to the Administrative Agent; any such amounts received by the Administrative Agent shall be promptly remitted by the Administrative Agent to the Lenders that shall have made their payments pursuant to this paragraph and to the Swingline Lender, as their interests may appear; provided that any such payment so remitted shall be repaid to the Swingline Lender or to the Administrative Agent, as applicable, if and to the extent such payment is required to be refunded to the Lead Borrower (or such other person) for any reason. The purchase of participations in a Swingline Loan pursuant to this paragraph shall not relieve the Lead Borrower of any default in the payment thereof.

(d)    If the maturity date shall have occurred in respect of any tranche of Revolving Facility Commitments at a time when another tranche or tranches of Revolving Facility Commitments with a later maturity date is or are in effect, then on the earliest occurring maturity date all then outstanding Swingline Loans shall be repaid in full on such date (and there shall be no adjustment to the participations in such Swingline Loans as a result of the occurrence of such maturity date); provided that if on the occurrence of such earliest maturity date (after giving effect to any repayments of Revolving Facility Loans and any reallocation of Letter of Credit participations as contemplated in Section 2.05(b)(ii)), there shall exist sufficient unutilized Extended Revolving Facility Commitments so that the respective outstanding Swingline Loans could be incurred pursuant to the Extended Revolving Facility Commitments which will remain in effect after the occurrence of such maturity date, then there shall be an automatic adjustment on such date of the participations in such Swingline Loans and the same shall be deemed to have been incurred solely pursuant to the relevant Extended Revolving Facility Commitments, and such Swingline Loans shall not be so required to be repaid in full on such earliest maturity date.

SECTION 2.05    Letters of Credit.

(a)    General. Subject to the terms and conditions set forth herein, the Lead Borrower may request the issuance of Letters of Credit for its own account, or for the account of any Restricted Subsidiary, in Dollars in accordance with Section 2.05(b), at any time and from time to time during the Availability Period and prior to the date that is 30 days prior to the Maturity Date (or such later date as the relevant Issuing Bank may agree). If requested by the applicable Issuing Bank, the Lead Borrower shall also submit a letter of credit application on such Issuing Bank's standard form in connection with any request for a Letter of Credit. In the

event of any inconsistency between the terms and conditions of this Agreement and the terms and conditions of any form of letter of credit application or other agreement submitted by the Lead Borrower to, or entered into by the Lead Borrower with, an Issuing Bank relating to any Letter of Credit, the terms and conditions of this Agreement shall control. For the avoidance of doubt, no letter of credit application, reimbursement agreement or similar agreement shall contain any representations or warranties, covenants or events of default not set forth in the Loan Documents and any such representation or warranty, covenant or event of default shall be subject to the same qualifiers, exceptions and exclusions as those set forth in the Loan Documents, other than representations or warranties relating to the execution, delivery or enforceability of such letter of credit application and other provisions reasonably acceptable to the Lead Borrower and not inconsistent with the provisions of this Agreement.

(b)     Notice of Issuance, Amendment, Renewal, Extension: Certain Conditions.

(A)     To request the issuance of a Letter of Credit (or the amendment, renewal (other than an automatic renewal in accordance with paragraph (c) of this Section 2.05) or extension of an outstanding Letter of Credit), the Lead Borrower shall either (x) provide telephonic notice promptly followed by written notice or (y) hand deliver or telecopy (or transmit by electronic communication, if arrangements for doing so have been approved by the applicable Issuing Bank) to the applicable Issuing Bank and the Administrative Agent three Business Days in advance of the requested date of issuance, amendment, renewal or extension a notice requesting the issuance of a Letter of Credit, or identifying the Letter of Credit to be amended, renewed or extended, and specifying the date of issuance, amendment, renewal or extension (which shall be a Business Day), the date on which such Letter of Credit is to expire (which shall comply with paragraph (c) of this Section 2.05), the amount of such Letter of Credit, the name and address of the beneficiary thereof and such other information as shall be reasonably necessary to issue, amend, renew or extend such Letter of Credit. Upon satisfaction or waiver (in accordance with Section 9.08) of the applicable conditions set forth in Section 4.01 (and in the case of any Letters of Credit to be issued on the Closing Date, Section 4.02), the relevant Issuing Bank shall issue or extend the requested Letter of Credit in accordance with such Issuing Bank's standard operating procedures. A Letter of Credit shall be issued, amended, renewed or extended only if (and upon issuance, amendment, renewal or extension of each Letter of Credit, the Lead Borrower shall be deemed to represent and warrant that), after giving effect to such issuance, amendment, renewal or extension (A) the L/C Exposure shall not exceed $25.0 million (as such amount may be adjusted in accordance with the last sentence of clause (ii) below) and (B) the Credit Exposure shall not exceed the Availability at such time.

(B)     If the maturity date in respect of any tranche of Revolving Facility Commitments occurs prior to the expiration of any Letter of Credit, then (A) if one or more other tranches of Revolving Facility Commitments in respect of which the maturity date shall not have occurred are then in effect, (x) the outstanding Revolving Facility Loans shall be repaid pursuant to Section 2. 10 on such maturity date to the extent and in an amount sufficient to permit the reallocation of the L/C Exposure relating to the outstanding Letters of Credit contemplated by clause (y) below and (y) such Letters of Credit shall automatically be deemed to have been issued (including for purposes of the

60

obligations of the Lenders to purchase participations therein and to make payments in respect thereof pursuant to <u>Section 2.05(d)</u>) under (and ratably participated in by Lenders pursuant to) the Revolving Facility Commitments in respect of such non-terminating tranches up to an aggregate amount not to exceed the aggregate principal amount of the Revolving Facility Commitments in respect of such non-terminating tranches at such time (it being understood that (1) the participations therein of Lenders under the maturing tranche shall be correspondingly released and (2) no partial face amount of any Letter of Credit may be so reallocated) and (B) to the extent not reallocated pursuant to the immediately preceding <u>clause (A)</u>, but without limiting the obligations with respect thereto, the Borrowers shall cash collateralize or backstop any such Letter of Credit in a manner reasonably satisfactory to the Administrative Agent and the applicable Issuing Bank. If, for any reason, such cash collateral or backstop is not provided or the reallocation does not occur, the Lenders under the maturing tranche shall continue to be responsible for their participating interests in the Letters of Credit; <u>provided</u> that, notwithstanding anything to the contrary contained herein, upon any subsequent repayment of the Revolving Facility Loans, the reallocation set forth in <u>clause (A)</u> shall automatically and concurrently occur to the extent of such repayment (it being understood that no partial face amount of any Letter of Credit may be so reallocated). Except to the extent of reallocations of participations pursuant to <u>clause (A)</u> of the second preceding sentence, the occurrence of a maturity date with respect to a given tranche of Revolving Facility Commitments shall have no effect upon (and shall not diminish) the percentage participations of the Lenders in any Letter of Credit issued before such maturity date. Commencing with the maturity date of any tranche of Revolving Facility Commitments, the sublimit for Letters of Credit under any tranche of Revolving Facility Commitments that has not so then matured shall be as agreed with such Lenders; <u>provided</u> that in no event shall such sublimit be less than the sum of (x) the L/C Exposure of the Lenders under such extended tranche immediately prior to such maturity date and (y) the face amount of the Letters of Credit reallocated to such tranche of Revolving Facility Commitments pursuant to <u>clause (A)</u> of the second preceding sentence above (assuming Revolving Facility Loans are repaid in accordance with <u>clause (A)(x)</u>).

(c)      <u>Expiration Date</u>. Each Letter of Credit shall expire at or prior to the close of business on the earlier of (i) the date that is 12 months after the date of the issuance of such Letter of Credit (or, in the case of any renewal or extension thereof, 12 months after such renewal or extension) or such longer period to which the relevant Issuing Bank may agree and (ii) the date that is five Business Days prior to the Maturity Date; <u>provided</u> that any Letter of Credit with a one-year tenor may provide for the automatic renewal thereof for additional 12-month periods (which, in no event, shall extend beyond the date referred to in <u>clause (ii)</u> of this <u>paragraph (c)</u> (each, an "<u>Auto-Renewal Letter of Credit</u>") unless such Letter of Credit is cash collateralized or backstopped pursuant to arrangements satisfactory to the applicable Issuing Bank and the Administrative Agent); <u>provided</u>, <u>further</u>, that any such Auto-Renewal Letter of Credit shall permit such Issuing Bank to prevent any such renewal at least once in each twelve-month period (commencing with the date of issuance of such Letter of Credit) by giving prior notice to the beneficiary thereof not later than a day in each such twelve-month period to be agreed upon at the time such Letter of Credit is issued. Once an Auto-Renewal Letter of Credit has been issued, the Lenders shall be deemed to have authorized (but may not require) the

applicable Issuing Bank to permit the renewal of such Letter of Credit at any time to an expiry date not later than the expiration of such Letter of Credit.

(d)     <u>Participations</u>. By the issuance of a Letter of Credit (or an amendment to a Letter of Credit increasing the amount thereof) and without any further action on the part of the applicable Issuing Bank or the Lenders, such Issuing Bank hereby grants to each Lender, and each Lender hereby acquires from such Issuing Bank, a participation in such Letter of Credit equal to such Lender's Revolving Facility Percentage of the aggregate amount available to be drawn under such Letter of Credit. In consideration and in furtherance of the foregoing, each Lender hereby absolutely and unconditionally agrees to pay to the Administrative Agent, for the account of the applicable Issuing Bank, such Lender's Revolving Facility Percentage of each L/C Disbursement made by such Issuing Bank and not reimbursed by the Borrowers on the date due as provided in <u>paragraph (e)</u> of this <u>Section 2.05</u>, or of any reimbursement payment required to be refunded to the Borrowers for any reason. Each Lender acknowledges and agrees that its obligation to acquire participations pursuant to this paragraph in respect of Letters of Credit is absolute and unconditional and shall not be affected by any circumstance whatsoever, including any amendment, renewal or extension of any Letter of Credit or the occurrence and continuance of a Default or Event of Default or reduction or termination of the Commitments, and that each such payment shall be made without any offset, abatement, withholding or reduction whatsoever.

(e)     <u>Reimbursement</u>. If the applicable Issuing Bank shall make any L/C Disbursement in respect of a Letter of Credit, the Borrowers shall reimburse such L/C Disbursement in the currency of such Letter of Credit by paying to the Administrative Agent an amount equal to such L/C Disbursement not later than 3:00 p.m., Local Time, on the first Business Day following the Business Day that the Lead Borrower receives notice under <u>paragraph (g)</u> of this <u>Section 2.05</u> of such L/C Disbursement (with respect to each such amount so paid under a Letter of Credit until reimbursed, an "<u>Unpaid Drawing</u>"); <u>provided</u> that the Lead Borrower may, subject to the conditions to borrowing set forth herein, request in accordance with <u>Section 2.03</u> or <u>2.04</u> that such payment be financed with an ABR Borrowing or a Swingline Borrowing, as applicable, in an equivalent amount and, to the extent so financed, the Borrowers' obligation to make such payment shall be discharged and replaced by the resulting ABR Borrowing or Swingline Borrowing. If the Borrowers fail to reimburse any L/C Disbursement when due, then the Administrative Agent shall promptly notify the applicable Issuing Bank and each other Lender of the applicable L/C Disbursement, the payment then due from the Borrowers in respect thereof and, in the case of a Lender, such Lender's Revolving Facility Percentage thereof. Promptly following receipt of such notice, each Lender shall pay to the Administrative Agent its Revolving Facility Percentage of the payment then due from the Borrowers in respect of such L/C Disbursement in the same manner as provided in <u>Section 2.06</u> with respect to Revolving Facility Loans made by such Lender (and <u>Section 2.06</u> shall apply, *mutatis mutandis*, to the payment obligations of the Lenders), and the Administrative Agent shall promptly pay to the applicable Issuing Bank the amounts so received by it from the Lenders. Promptly following receipt by the Administrative Agent of any payment from the Borrowers pursuant to this paragraph, the Administrative Agent shall distribute such payment to the applicable Issuing Bank or, to the extent that Lenders have made payments pursuant to this paragraph to reimburse such Issuing Bank, then to such Lenders and such Issuing Bank as their interests may appear. Any payment made by a Lender pursuant to this paragraph to reimburse an Issuing Bank for any L/C Disbursement (other than the funding of an ABR Loan or a Swingline Borrowing as

62

contemplated above) shall not constitute a Revolving Facility Loan and shall not relieve the Borrowers of their obligation to reimburse such L/C Disbursement in accordance with this Section 2.05(e).

(f)     Obligations Absolute. The obligation of the Borrowers' to reimburse L/C Disbursements as provided in paragraph (e) of this Section 2.05 shall be absolute, unconditional and irrevocable, and shall be performed strictly in accordance with the terms of this Agreement under any and all circumstances whatsoever and irrespective of (i) any lack of validity or enforceability of any Letter of Credit or this Agreement, or any term or provision therein, (ii) any draft or other document presented under a Letter of Credit proving to be forged, fraudulent or invalid in any respect or any statement therein being untrue or inaccurate in any respect, (iii) any payment by the applicable Issuing Bank under a Letter of Credit against presentation of a draft or other document that does not comply with the terms of such Letter of Credit or (iv) any other event or circumstance whatsoever, whether or not similar to any of the foregoing, that might, but for the provisions of this Section 2.05, constitute a legal or equitable discharge of, or provide a right of setoff against, the Borrowers' obligations hereunder. Neither the Administrative Agent, the Lenders nor any Issuing Bank, nor any of their Related Parties, shall have any liability or responsibility by reason of or in connection with the issuance or transfer of any Letter of Credit or any payment or failure to make any payment thereunder (irrespective of any of the circumstances referred to in the preceding sentence), or any error, omission, interruption, loss or delay in transmission or delivery of any draft, notice or other communication under or relating to any Letter of Credit (including any document required to make a drawing thereunder), any error in interpretation of technical terms or any consequence arising from causes beyond the control of such Issuing Bank, or any of the circumstances referred to in clauses (i), (ii) or (iii) of the first sentence of this Section 2.05(f); provided that the foregoing shall not be construed to excuse the applicable Issuing Bank from liability to the Borrowers to the extent of any direct damages (as opposed to consequential damages, claims in respect of which are hereby waived by the Borrowers to the extent permitted by applicable law) suffered by the Borrowers caused by (i) such Issuing Bank's failure to exercise care when determining whether drafts and other documents presented under a Letter of Credit comply with the terms thereof or (ii) such Issuing Bank's refusal to issue a Letter of Credit in accordance with the terms of this Agreement. The parties hereto expressly agree that, in the absence of gross negligence, willful misconduct or bad faith on the part of the applicable Issuing Bank, such Issuing Bank shall be deemed to have exercised care in each such determination and each refusal to issue a Letter of Credit. In furtherance of the foregoing and without limiting the generality thereof, the parties agree that, with respect to documents presented which appear on their face to be in substantial compliance with the terms of a Letter of Credit, the applicable Issuing Bank may, in its sole discretion, either accept and make payment upon such documents without responsibility for further investigation, regardless of any notice or information to the contrary, or refuse to accept and make payment upon such documents if such documents are not in strict compliance with the terms of such Letter of Credit.

(g)     Disbursement Procedures. The applicable Issuing Bank shall, promptly following its receipt thereof, examine all documents purporting to represent a demand for payment under a Letter of Credit. Such Issuing Bank shall promptly notify the Administrative Agent and the Lead Borrower by telephone (confirmed by fax) of such demand for payment and whether such Issuing Bank has made or will make a L/C Disbursement thereunder; provided that

any failure to give or delay in giving such notice shall not relieve the Borrowers of their obligation to reimburse such Issuing Bank or the Lenders from the amount of any such L/C Disbursement (it being understood that the failure of the Borrowers to reimburse any Issuing Bank in respect of any L/C Disbursement shall only result in a Default or Event of Default following receipt of the notice contemplated in this Section 2.05(g) and after the time period prescribed in Section 2.05(c) has elapsed).

(h)    Interim Interest. If an Issuing Bank shall make any L/C Disbursement, then, unless the Borrowers shall reimburse such L/C Disbursement in full on the date such L/C Disbursement is made, the unpaid amount thereof shall bear interest, for each day from and including the date such L/C Disbursement is made to but excluding the date that the Borrowers reimburse such L/C Disbursement, at the rate per annum then applicable to ABR Loans; provided that if such L/C Disbursement is not reimbursed by the Borrowers when due pursuant to paragraph (e) of this Section 2.05, then Section 2.13(c) shall apply. Interest accrued pursuant to this paragraph shall be for the account of the applicable Issuing Bank, except that interest accrued on and after the date of payment by any Lender pursuant to paragraph (e) of this Section 2.05 to reimburse such Issuing Bank shall be for the account of such Lender to the extent of such payment.

(i)    Replacement of an Issuing Bank. An Issuing Bank may be replaced at any time by written agreement among the Lead Borrower, the Administrative Agent, the replaced Issuing Bank and the successor Issuing Bank. The Administrative Agent shall notify the Lenders of any such replacement of an Issuing Bank. At the time any such replacement shall become effective, the Borrowers shall pay all unpaid fees accrued for the account of the replaced Issuing Bank pursuant to Section 2.12. From and after the effective date of any such replacement, (i) the successor Issuing Bank shall have all the rights and obligations of the replaced Issuing Bank under this Agreement with respect to Letters of Credit to be issued thereafter and (ii) references herein to the term "Issuing Bank" shall be deemed to refer to such successor or to any previous Issuing Bank, or to such successor and all previous Issuing Banks, as the context shall require. After the replacement of an Issuing Bank hereunder, the replaced Issuing Bank shall remain a party hereto and shall continue to have all the rights and obligations of such Issuing Bank under this Agreement with respect to Letters of Credit issued by it prior to such replacement but shall not be required to issue additional Letters of Credit.

(j)    Cash Collateralization. If any Event of Default shall occur and be continuing (i) in the case of an Event of Default described in Section 7.01(h) or Section 7.01(i)(i), (ii), (iii) or (iv) on the Business Day such Event of Default occurs, or (ii) in the case of any other Event of Default, on the third Business Day following the date on which the Lead Borrower receives notice from the Administrative Agent (or, if the maturity of the Revolving Facility Loans has been accelerated, the Lenders with L/C Exposure representing greater than 50% of the total L/C Exposure) demanding the deposit of cash collateral pursuant to this paragraph, the Borrowers shall deposit in an account with or at the direction of the Administrative Agent, in the name of the Administrative Agent and for the benefit of the Lenders, an amount in cash equal to 103% of the L/C Exposure as of such date. Each such deposit pursuant to this paragraph shall be held by the Administrative Agent as collateral for the payment and performance of the obligations of the Borrowers under this Agreement. The Administrative Agent shall have exclusive dominion and control, including the exclusive right of

64

withdrawal, over such account. Other than any interest earned on the investment of such deposits, which investments shall be made at the option and sole discretion of (i) for so long as an Event of Default shall be continuing, the Administrative Agent and (ii) at any other time, the Lead Borrower, in each case, in Permitted Investments and at the risk and expense of the Borrowers, such deposits shall not bear interest. Interest or profits, if any, on such investments shall accumulate in such account. Moneys in such account shall be applied by the Administrative Agent to reimburse each Issuing Bank for L/C Disbursements for which such Issuing Bank has not been reimbursed and, to the extent not so applied, shall be held for the satisfaction of the reimbursement obligations of the Borrowers for the L/C Exposure at such time or, if the maturity of the Revolving Facility Loans has been accelerated (but subject to the consent of the Lenders with L/C Exposure representing greater than 50% of the total L/C Exposure), be applied to satisfy other obligations of the Borrowers under this Agreement. If the Borrowers are required to provide an amount of cash collateral hereunder, such amount (to the extent not applied as aforesaid) shall be returned to the Lead Borrower within three Business Days after all then-continuing Events of Default have been cured or waived.

(k)    Additional Issuing Banks. From time to time, the Lead Borrower may by notice to the Administrative Agent designate one or more additional Lenders as an Issuing Bank each of which shall agree (in its sole discretion) to act in such capacity and be reasonably satisfactory to the Administrative Agent. Each such additional Issuing Bank shall execute a counterpart of this Agreement upon the approval of the Administrative Agent (which approval shall not be unreasonably withheld) and shall thereafter be an Issuing Bank hereunder for all purposes.

(l)    Reporting. Unless otherwise requested by the Administrative Agent, each Issuing Bank shall (i) provide to the Administrative Agent copies of any notice received from the Lead Borrower pursuant to Section 2.05(b) no later than the next Business Day after receipt thereof and (ii) report in writing to the Administrative Agent (A) on or prior to each Business Day on which such Issuing Bank expects to issue, amend, renew or extend any Letter of Credit, the date of such issuance, amendment, renewal or extension, and the aggregate face amount of the Letters of Credit to be issued, amended, renewed or extended by it and outstanding after giving effect to such issuance, amendment, renewal or extension (and whether the amount thereof changed), and any Issuing Bank shall be permitted to issue, amend, renew or extend such Letter of Credit if the Administrative Agent shall not have advised such Issuing Bank that such issuance, amendment renewal or extension would not be in conformity with the requirements of this Agreement, (B) on each Business Day on which such Issuing Bank makes any L/C Disbursement, the date of such L/C Disbursement and the amount of such L/C Disbursement, (C) a weekly summary report of standby Letters of Credit outstanding and (D) on any other Business Day, such other information as the Administrative Agent shall reasonably request, including but not limited to prompt verification of such information as may be requested by the Administrative Agent.

(m)    Applicability of ISP98 and UCP. Unless otherwise expressly agreed by the applicable Issuing Bank and the Lead Borrower when a Letter of Credit is issued, the rules of the "International Standby Practices 1998" published by the Institute of International Banking Law & Practice (or such later version thereof as may be in effect at the time of issuance) shall apply to each Letter of Credit.

SECTION 2.06          Funding of Borrowings.

(a)        Each Lender shall make each Loan to be made by it hereunder on the proposed date thereof by wire transfer of immediately available funds by 3:00 p.m., Local Time, to the account of the Administrative Agent most recently designated by it for such purpose by notice to the Lenders; provided that Swingline Loans shall be made as provided in Section 2.04 and Protective Advances may be made as provided in Section 2.25. The Administrative Agent will make the proceeds of such Loans available to the Borrowers by promptly crediting the amounts so received, in like funds, to the Funding Account(s) designated by the Lead Borrower in the applicable Borrowing Request; provided that ABR Loans and Swingline Borrowings made to finance the reimbursement of a L/C Disbursement and reimbursements as provided in Section 2.05(e) shall be remitted by the Administrative Agent to the applicable Issuing Bank and.

(b)        Unless the Administrative Agent shall have received notice from a Lender prior to the proposed date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with paragraph (a) of this Section 2.06 and may, in reliance upon such assumption, make available to the Lead Borrower a corresponding amount. In such event, if a Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent, then the applicable Lender and the Borrowers jointly and severally agree to pay to the Administrative Agent (provided, that any such payment by a Borrower to the Administrative Agent is without prejudice to any claim such Borrower may have against the applicable Lender) promptly on demand (without duplication) such corresponding amount with interest thereon, for each day from and including the date such amount is made available to the Lead Borrower to but excluding the date of payment to the Administrative Agent, at (i) in the case of such Lender, the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation or (ii) in the case of such Borrower, the interest rate applicable to ABR Loans. If such Lender pays such amount to the Administrative Agent, then such amount shall constitute such Lender's Loan included in such Borrowing.

SECTION 2.07          Interest Elections.

(a)        Each Borrowing initially shall be of the Type specified in the applicable Borrowing Request and, in the case of a Eurodollar Borrowing, shall have an initial Interest Period as specified in such Borrowing Request. Thereafter, the Lead Borrower may elect to convert such Borrowing to a different Type or to continue such Borrowing and, in the case of a Eurodollar Borrowing, may elect Interest Periods therefor, all as provided in this Section 2.07. The Lead Borrower may elect different options with respect to different portions of the affected Borrowing, in which case each such portion shall be allocated ratably among the Lenders holding the Loans comprising such Borrowing, and the Loans comprising each such portion shall be considered a separate Borrowing. This Section shall not apply to Swingline Borrowings, which may not be converted or continued.

(b)        To make an election pursuant to this Section 2.07, the Lead Borrower shall notify the Administrative Agent of such election by the time that a Borrowing Request would be

66

required under <u>Section 2.03</u> if the Lead Borrower were requesting a Borrowing of the Type resulting from such election to be made on the effective date of such election pursuant to an irrevocable written Interest Election Request in the form of <u>Exhibit D</u>, which shall be signed by the Lead Borrower and delivered to the Administrative Agent by hand delivery, fax or other electronic transmission (including ".pdf" or ".tif").

(c)    Each written Interest Election Request shall specify the following information in compliance with <u>Section 2.02</u>:

(i)    the Borrowing to which such Interest Election Request applies and, if different options are being elected with respect to different portions thereof, the portions thereof to be allocated to each resulting Borrowing (in which case the information to be specified pursuant to <u>clauses (iii)</u> and <u>(iv)</u> below shall be specified for each resulting Borrowing);

(ii)    the effective date of the election made pursuant to such Interest Election Request, which shall be a Business Day;

(iii)    whether the resulting Borrowing is to be an ABR Borrowing or a Eurodollar Borrowing; and

(iv)    if the resulting Borrowing is a Eurodollar Borrowing, the Interest Period to be applicable thereto after giving effect to such election, which shall be a period contemplated by the definition of the term "Interest Period."

(v)    Promptly following receipt of an Interest Election Request, the Administrative Agent shall advise each Lender to which such Interest Election Request relates of the details thereof and of such Lender's portion of each resulting Borrowing.

(vi)    If the Lead Borrower fails to deliver a timely Interest Election Request with respect to a Eurodollar Borrowing prior to the end of the Interest Period applicable thereto, then, unless such Borrowing is repaid as provided herein, at the end of such Interest Period such Borrowing shall be converted to an ABR Borrowing. Notwithstanding any contrary provision hereof, if an Event of Default has occurred and is continuing and the Administrative Agent, at the written request (including a request through electronic means) of the Required Lenders, so notifies the Lead Borrower, then, so long as such Event of Default is continuing (i) no outstanding Borrowing under such Facility may be converted to or continued as a Eurodollar Borrowing and (ii) unless repaid, each Eurodollar Borrowing under such Facility shall be converted to an ABR Borrowing at the end of the Interest Period applicable thereto.

SECTION 2.08    <u>Termination and Reduction of Commitments</u>.

(a)    Unless previously terminated, the Revolving Facility Commitments shall terminate on the Maturity Date.

(b)    The Borrowers may at any time terminate, or from time to time reduce, the Revolving Facility Commitments; <u>provided</u> that the Borrowers shall not terminate or reduce the

138633067

4850-7280-1748.5

Revolving Facility Commitments if, after giving effect to any concurrent prepayment of the Revolving Facility Loans in accordance with Section 2.11, the Credit Exposure would exceed the total Revolving Facility Commitments.

(c)      The Lead Borrower shall notify the Administrative Agent of any election to terminate or reduce the Revolving Facility Commitments under paragraph (b) of this Section 2.08 at least three Business Days prior to the effective date of such termination or reduction (or such shorter period as is acceptable to the Administrative Agent), specifying such election and the effective date thereof. Promptly following receipt of any notice, the Administrative Agent shall advise the applicable Lenders of the contents thereof. Each notice delivered by the Lead Borrower pursuant to this Section 2.08 shall be irrevocable; provided that a notice of termination of the Revolving Facility Commitments delivered by the Lead Borrower may state that such notice is conditioned upon the effectiveness of other credit facilities or the successful closing of an acquisition, in which case such notice may be revoked by the Lead Borrower (by notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied. Any termination or reduction of the Revolving Facility Commitments shall be permanent. Each reduction of the Revolving Facility Commitments shall be made ratably among the Lenders in accordance with their Revolving Facility Commitments.

SECTION 2.09      Repayment of Loans; Evidence of Debt.

(a)      Each Borrower, jointly and severally, hereby unconditionally promises to pay (i) to the Administrative Agent for the account of each Lender the then unpaid principal amount of each Revolving Facility Loan on the Maturity Date, (ii) to the Swingline Lender the then unpaid principal amount of each Swingline Loan on the Maturity Date and (iii) to the Administrative Agent the then unpaid principal amount of each Protective Advance on the earlier of the Maturity Date or a demand by the Administrative Agent.

(b)      Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrowers to such Lender resulting from each Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

(c)      The Administrative Agent (or its agent or sub-agent appointed by it) shall maintain the Register, as set forth in Section 9.04(b)(iv), in which it shall record (i) the amount of each Loan made hereunder, the Facility and Type thereof and the Interest Period (if any) applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrowers to each Lender hereunder and (iii) any amount received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.

(d)      The entries made in the accounts maintained pursuant to paragraph (b) or (c) of this Section 2.09 shall be prima facie evidence of the existence and amounts of the obligations recorded therein absent manifest error; provided that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrowers to repay the Loans in accordance with the terms of this Agreement; and provided further that in the event of any inconsistency between the Register and any Lender's records, the recordations in the Register shall govern.

68

(e)    Any Lender may request that Loans made by it be evidenced by a promissory note (a "Note") in the form of Exhibit M or in another form approved by the Administrative Agent and the Lead Borrower. In such event, the Lead Borrower shall prepare, execute and deliver a Note to such Lender payable to the order of such Lender (or, if requested by such Lender, to such Lender and its registered assigns). Thereafter, the Loans evidenced by such Note and interest thereon shall at all times (including after assignment pursuant to Section 9.04) be represented by one or more Notes payable to the payee named therein

SECTION 2.10    Repayment of Revolving Facility Loans.

(a)    Prepayment of the Borrowings from:

(i)    any optional prepayments of the Revolving Facility Loans pursuant to Section 2.11(a) shall be applied to the Revolving Facility Loans as directed by the Lead Borrower (or if the Lead Borrower fails to specify, shall be applied first to ABR Loans and then to Eurodollar Loans, and with the application thereof in direct order of maturity), and

(ii)    any prepayments or reductions in the amount of any Facility hereunder (or any commitment therefor) effected as a result of transactions permitted by Section 6.01(a) or Section 9.08(d) may be applied as directed by the Lead Borrower (or if the Lead Borrower fails to specify, such prepayment shall be applied to prepay the ABR Loans and then to the Eurodollar

Loans in direct order of maturity, first to the earliest maturing portion of such Facility and then to the next earliest maturing portion of such Facility in accordance with the terms of such Facility).

(b)    Prior to any optional repayment of any Borrowing under any Facility hereunder, the Lead Borrower shall notify the Administrative Agent by written notice (confirmed by fax or other electronic transmission (including ".pdf" or ".tif") substantially in the form of Exhibit H) of the Borrowings under the applicable Facility to be repaid not later than 2:00 p.m., Local Time, (i) in the case of an ABR Borrowing, one Business Day before the scheduled date of such repayment and (ii) in the case of a Eurodollar Borrowing, three Business Days before the scheduled date of such repayment. Each repayment of a Borrowing shall be applied to the Revolving Facility Loans included in the repaid Borrowing such that each Lender receives its ratable share of such repayment (based upon the respective Credit Exposures of the Lenders at the time of such repayment). Notwithstanding anything to the contrary in the immediately preceding sentence, prior to any repayment of a Swingline Borrowing hereunder, the Lead Borrower shall select the Borrowing or Borrowings to be repaid and shall notify the Administrative Agent by written notice (confirmed by fax or other electronic transmission (including ".pdf" or ".tif")) of such selection not later than 2:00 p.m., Local Time, on the scheduled date of such repayment. In the event the Lead Borrower fails to specify the Borrowings to which any such voluntary prepayment shall be applied, such prepayment shall be applied as follows:

first, to repay outstanding Swingline Loans to the full extent thereof;

69

second, to repay outstanding Overadvance Loans and Protective Advances to the full extent thereof; and

third, to repay outstanding ABR Loans and then to outstanding Eurodollar Loans to the full extent thereof.

SECTION 2.11        Prepayment of Loans.

(a)        The Borrowers shall have the right at any time and from time to time to prepay any Borrowing in whole or in part, without premium or penalty (but subject to Section 2.16) in any aggregate principal amount, subject to prior notice in accordance with Section 2. 1 0(b).

(b)        If any Borrower shall have received net cash proceeds in excess of $2.0 million from any loss, damage, destruction or condemnation of, or any Disposition to any person of any asset or assets of the Lead Borrower or any Subsidiary that constitute ABL Priority Collateral in a single transaction or series of related transactions pursuant to Section 6.05(g), (h), (n) (other than to a Loan Party), (q) or (w), but excluding any transactions by or among the Lead Borrower and its Restricted Subsidiaries, the Lead Borrower shall deliver to the Administrative Agent an updated Borrowing Base Certificate within three (3) Business Days of receipt of such proceeds.

(c)        [Reserved].

(d)        If an Overadvance exists, the Lead Borrower shall, on the sooner of the Administrative Agent's demand or the first Business Day after the Lead Borrower has knowledge thereof (unless the Administrative Agent has waived such requirement pursuant to Section 2.24), immediately make a prepayment in an aggregate amount equal to such excess, to be applied as follows:

first, to repay outstanding Revolving Facility Loans to the full extent thereof (with no reduction of the Revolving Facility Commitment); and

second, to cash collateralize in an amount equal to 103% of the L/C Exposure (which cash collateral shall be released to the Lead Borrower promptly upon the Credit Exposure becoming less than the Availability).

(e)        During a Cash Dominion Period, all amounts deposited in each Dominion Account will be promptly applied on a daily basis by the Administrative Agent to repay the outstanding Revolving Facility Loans and, if an Event of Default has occurred and is continuing, to cash collateralize outstanding Letters of Credit.

SECTION 2.12        Fees.

(a)        The Borrowers, jointly and severally, agree to pay to each Lender (except as otherwise provided in Section 2.21 in respect of any Defaulting Lender), through the Administrative Agent, on the first day of April, July, October and January of each year and on the date on which the Revolving Facility Commitments of all the Lenders shall be terminated as

70

provided herein, a commitment fee (a "Revolving Credit Commitment Fee") on the daily amount of the Available Unused Commitment of such Lender during the preceding quarter (or other period commencing with the Closing Date or ending with the date on which the last of the Revolving Facility Commitments of such Lender shall be terminated) at the Unused Line Fee Rate. All Revolving Credit Commitment Fees shall be computed on the basis of the actual number of days elapsed in a year of 360 days. For the purpose of calculating any Lender's Revolving Credit Commitment Fee, the outstanding Swingline Loans during the period for which such Lender's Revolving Credit Commitment Fee is calculated shall be deemed to be zero (and participations in Protective Advances of such Lender shall be disregarded for such purpose unless funded pursuant to Section 2.25(b)). The Revolving Credit Commitment Fee due to each Lender shall begin to accrue on the Closing Date and shall cease to accrue on the date on which the last of the Revolving Facility Commitments of such Lender shall be terminated as provided herein.

(b)    The Borrowers, jointly and severally, agree from time to time to pay (i) to each Lender (except as otherwise provided in Section 2.21 in respect of any Defaulting Lender), through the Administrative Agent, on the first day of April, July, October and January of each year and on the date on which the Revolving Facility Commitments of all the Lenders shall be terminated as provided herein, a fee (an "L/C Participation Fee") on such Lender's Revolving Facility Percentage of the daily aggregate L/C Exposure (excluding the portion thereof attributable to unreimbursed L/C Disbursements), during the preceding quarter (or shorter period commencing with the Closing Date or ending with the Maturity Date or the date on which the Revolving Facility Commitments shall be terminated) at the rate per annum equal to the Applicable Margin for Eurodollar Borrowings effective for each day in such period and (ii) to each Issuing Bank, for its own account, (x) on the first day of April, July, October and January of each year and on the date on which the Revolving Facility Commitments of all the Lenders shall be terminated as provided herein, a fronting fee in respect of each Letter of Credit issued by such Issuing Bank computed at a rate equal to 0.125% of the daily average stated amount of such Letter of Credit, unless otherwise agreed to between the Lead Borrower and the applicable Issuing Bank, for the period from and including the date of issuance of such Letter of Credit to and including the termination of such Letter of Credit, plus (y) in connection with the issuance, amendment or transfer of any such Letter of Credit or any L/C Disbursement thereunder, such Issuing Bank's customary documentary and processing charges (collectively, "Issuing Bank Fees"). All L/C Participation Fees and Issuing Bank Fees that are payable on a per annum basis shall be computed on the basis of the actual number of days elapsed in a year of 360 days.

(c)    The Borrowers, jointly and severally, agree to pay to the Administrative Agent, for the account of the Administrative Agent, the agency fees set forth in the Fee Letter, at the times and in the amount specified therein (the "Administrative Agent Fees").

(d)    The Borrowers, jointly and severally, agree to pay to the Administrative Agent for the account of each of the Lenders the upfront fees (the "Upfront Fees") set forth in the Fee Letter and that certain letter agreement, dated as of November 5, 2020, by and between Lead Borrower and Wells Fargo Bank, N.A. The Fees shall be paid at the times and in the amount specified therein.

(e)        All Fees shall be paid on the dates due, in immediately available funds, to the Administrative Agent for distribution, if and as appropriate, among the Lenders, except that Issuing Bank Fees shall be paid directly to the applicable Issuing Banks. Once paid, none of the Fees shall be refundable under any circumstances.

SECTION 2.13        Interest.

(a)        The Loans comprising each ABR Borrowing (including each Swingline Loan) shall bear interest at the ABR plus the Applicable Margin.

(b)        The Loans comprising each Eurodollar Borrowing shall bear interest at the Adjusted Eurodollar Rate for the Interest Period in effect for such Borrowing plus the Applicable Margin.

(c)        Notwithstanding the foregoing, if any Event of Default has occurred and is continuing, at the election of Administrative Agent, (i) in the case of Loans, the Loans shall bear interest at a rate per annum equal to two percent plus the rate otherwise applicable to such Loan as provided in the preceding paragraphs of this Section 2.13 or (ii) in the case of any other Obligation, two percent plus the rate applicable to ABR Loans as provided in paragraph (a) of this Section 2.13.

(d)        Accrued interest on each Loan shall be payable in arrears (i) on each Interest Payment Date for such Loan and (ii) in the case of Revolving Facility Loans, upon termination of the Revolving Facility Commitments; provided that (i) interest accrued pursuant to paragraph (c) of this Section 2.13 shall be payable on demand, (ii) in the event of any repayment or prepayment of any Loan (other than a prepayment of an ABR Loan prior to the end of the Availability Period), accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment and (iii) in the event of any conversion of any Eurodollar Loan prior to the end of the current Interest Period therefor, accrued interest on such Loan shall be payable on the effective date of such conversion.

(e)        All interest hereunder shall be computed on the basis of a year of 360 days, except that interest computed by reference to the ABR at times when the ABR is based on the Prime Rate shall be computed on the basis of a year of 365 days or 366 days in a leap year, and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day). The applicable ABR, Eurodollar Rate or Adjusted Eurodollar Rate shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error.

SECTION 2.14        (i) Alternate Rate of Interest.  Notwithstanding anything to the contrary in this Agreement or any other Loan Document, if Administrative Agent determines (which determination shall be conclusive absent manifest error), or Lead Borrower or Required Lenders notify Administrative Agent (with, in the case of Required Lenders, a copy to Lead Borrower) that Borrowers or Required Lenders (as applicable) have determined, that:

(a)        adequate and reasonable means do not exist for ascertaining the Eurodollar Rate or the Adjusted Eurodollar Rate, as applicable, for any Interest Period for a Eurodollar Borrowing hereunder or any other tenors of the Eurodollar Rate or the Adjusted Eurodollar Rate,

as applicable, including because the Eurodollar Rate or the Adjusted Eurodollar Rate is not available or published on a current basis and such circumstances are unlikely to be temporary; or

(b)      the administrator of the Eurodollar Rate or the Adjusted Eurodollar Rate, as applicable, or a Governmental Authority having jurisdiction over Administrative Agent or such administrator has made a public statement identifying a specific date after which the Eurodollar Rate or the Adjusted Eurodollar Rate, shall no longer be made available, or used for determining the interest rate of loans, provided that, at the time of such statement, there is no successor administrator that is satisfactory to Administrative Agent that will continue to provide Eurodollar Rate or the Adjusted Eurodollar Rate, as applicable, after such specific date (such specific date, "Scheduled Unavailability Date");

(c)      the administrator of the Eurodollar Rate or the Adjusted Eurodollar Rate, as applicable, or a Governmental Authority having jurisdiction over such administrator has made a public statement announcing that all Interest Periods and other tenors of Eurodollar Rate or the Adjusted Eurodollar Rate are no longer representative;

(d)      syndicated loans currently being executed, or that include language similar to that contained in this Section, are being executed or amended (as applicable) to incorporate or adopt a new benchmark interest rate to replace Eurodollar Rate or the Adjusted Eurodollar Rate;

then, in the case of clauses (a) through (c) above, on a date and time determined by Administrative Agent (any such date, "Eurodollar Replacement Date"), which date shall be at the end of an Interest Period or on the relevant interest payment date, as applicable, for interest calculated and shall occur reasonably promptly upon the occurrence of any of the events or circumstances under clauses (a), (b) or (c) above and, solely with respect to clause (b) above, no later than the Scheduled Unavailability Date, the Eurodollar Rate or Adjusted Eurodollar Rate, as applicable, will be replaced hereunder and under the other Loan Documents with, subject to the proviso below, the first available alternative set forth in the order below for any payment period for interest calculated that can be determined by Administrative Agent, in each case, without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document ("Eurodollar Successor Rate"; and any such rate before giving effect to the Related Adjustment, "Pre-Adjustment Successor Rate"):

(x)      Term SOFR plus the Related Adjustment; and

(y)      SOFR plus the Related Adjustment;

and in the case of clause (d) above, Administrative Agent and Lead Borrower may amend this Agreement solely for the purpose of replacing the Eurodollar Rate or Adjusted Eurodollar Rate, as applicable, under this Agreement and the other Loan Documents in accordance with the definition of "Eurodollar Successor Rate" and such amendment will become effective at 5:00 p.m. on the fifth Business Day after Administrative Agent shall have notified Lenders and Lead Borrower of the occurrence of the circumstances described in clause (d) above unless, prior to such time, Required Lenders have delivered to Administrative Agent written notice that such Required Lenders object to the implementation of a Eurodollar Successor Rate pursuant to such clause; provided, that if Administrative Agent determines that Term SOFR has become available,

73

is administratively feasible for Administrative Agent and would have been identified as the Pre-Adjustment Successor Rate in accordance with the foregoing if it had been so available at the time that the Eurodollar Successor Rate then in effect was so identified, and notifies Lead Borrower and Lenders of such availability, then from and after the beginning of the Interest Period, relevant interest payment date or payment period for interest calculated, in each case, commencing no less than 30 days after the date of such notice, the Pre-Adjustment Successor Rate shall be Term SOFR and the Eurodollar Successor Rate shall be Term SOFR plus the relevant Related Adjustment.

Administrative Agent will promptly (in one or more notices) notify Lead Borrower and Lenders of (x) any occurrence of any of the events, periods or circumstances under clauses (a) through (c) above, (y) a Eurodollar Replacement Date, and (z) the Eurodollar Successor Rate. Any Eurodollar Successor Rate shall be applied in a manner consistent with market practice; provided, that to the extent such market practice is not administratively feasible for Administrative Agent, such Eurodollar Successor Rate shall be applied in a manner as otherwise reasonably determined by Administrative Agent. Notwithstanding anything else herein, if at any time any Eurodollar Successor Rate as so determined would otherwise be less than 0.25%, the LIBOR Successor Rate will be deemed to be 0.25% for the purposes of this Agreement and the other Loan Documents.

In connection with the implementation of a Eurodollar Successor Rate, Administrative Agent will have the right to make Eurodollar Successor Rate Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Eurodollar Successor Rate Conforming Changes will become effective without any further action or consent of any other party to this Agreement; provided, that with respect to any such amendment effected, Administrative Agent shall post each such amendment implementing such Eurodollar Successor Rate Conforming Changes to Lead Borrower and Lenders reasonably promptly after such amendment becomes effective.

If events or circumstances of the type described in clauses (a) through (c) above have occurred with respect to the Eurodollar Successor Rate then in effect, then the successor rate thereto shall be determined in accordance with the definition of "Eurodollar Successor Rate."

(ii)    Notwithstanding anything to the contrary herein, (a) after any such determination by Administrative Agent or receipt by Administrative Agent of any such notice described under **Section 2.14(i)(a)** through **(c)**, as applicable, if Administrative Agent determines that none of the Eurodollar Successor Rates is available on or prior to the Eurodollar Replacement Date, (ii) if the events or circumstances described in **Section 2.14(i)(d)** have occurred but none of the Eurodollar Successor Rates is available, or (iii) if the events or circumstances of the type described in **Section 2.14(i)(a)** through **(c)** have occurred with respect to the Eurodollar Successor Rate then in effect and Administrative Agent determines that none of the Eurodollar Successor Rates is available, then in each case, Administrative Agent and Lead Borrower may amend this Agreement solely for the purpose of replacing the Eurodollar Rate or the Adjusted Eurodollar Rate, as applicable, or any then current Eurodollar Successor Rate in accordance with this Section at the end of any Interest Period, relevant interest payment date or payment period for interest calculated, as applicable, with another alternate benchmark rate giving due consideration

74

to any evolving or then existing convention for similar U.S. dollar denominated syndicated credit facilities for such alternative benchmarks and, in each case, including any Related Adjustments and any other mathematical or other adjustments to such benchmark giving due consideration to any evolving or then existing convention for similar U.S. dollar denominated syndicated credit facilities for such benchmarks, which adjustment or method for calculating such adjustment shall be published on an information service as selected by Administrative Agent from time to time in its discretion and may be periodically updated.  For the avoidance of doubt, any such proposed rate and adjustments shall constitute a Eurodollar Successor Rate.  Any such amendment shall become effective at 5:00 p.m. on the fifth Business Day after Administrative Agent shall have posted such proposed amendment to Lenders and Lead Borrower unless, prior to such time, Required Lenders have delivered to Administrative Agent written notice that such Required Lenders object to such amendment.

(iii)     If, at the end of any Interest Period, relevant interest payment date or payment period for interest calculated, no Eurodollar Successor Rate has been determined in accordance with **Section 2.14(i)** or **Section 2.14(ii)** and the circumstances under **Section 2.14(i)(a)** or **(c)** above exist or the Scheduled Unavailability Date has occurred (as applicable), Administrative Agent will promptly so notify Lead Borrower and Lenders.  Thereafter, (a) the obligation of Lenders to make or maintain Eurodollar Loans shall be suspended (to the extent of the affected Eurodollar Loans, Interest Periods, interest payment dates or payment periods), and (b) the Adjusted Eurodollar Rate component shall no longer be utilized in determining the ABR, until the Eurodollar Successor Rate has been determined in accordance with **Section 2.14(i)** or **Section 2.14(ii)**. Upon receipt of such notice, Borrowers may revoke any pending request for a Borrowing of, conversion to or continuation of Eurodollar Loans (to the extent of the affected Loans, Interest Periods, interest payment dates or payment periods) or, failing that, will be deemed to have converted such request into a request for ABR Loans (subject to the foregoing clause (b)).

SECTION 2.15          Increased Costs.

(a)     If any Change in Law shall:

(i)     impose, modify or deem applicable any reserve, special deposit or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender (except any such reserve requirement reflected in the Adjusted Eurodollar Rate); or

(ii)     subject any Lender Party to any Taxes (other than in respect of (A) any Indemnified Taxes or Other Taxes indemnifiable under Section 2.17 or (B) any Excluded Taxes); or

(iii)     impose on any Lender or Issuing Bank or the London interbank market any other condition (other than with respect to Taxes) affecting this Agreement or Eurodollar Loans made by such Lender or any Letter of Credit or participation therein;

75

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any Eurodollar Loan (or of maintaining its obligation to make any such Loan) or to increase the cost to such Lender or Issuing Bank of participating in, issuing or maintaining any Letter of Credit or to reduce the amount of any sum received or receivable by such Lender or Issuing Bank hereunder (whether of principal, interest or otherwise), then within 30 days of receipt of a certificate of the type specified in paragraph (d) below, the Borrowers will pay to such Lender or Issuing Bank, as applicable, such additional amount or amounts as will compensate such Lender or Issuing Bank, as applicable, for such additional costs incurred or reduction suffered.

(b)    If any Lender or Issuing Bank determines that any Change in Law regarding capital requirements or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's or Issuing Bank's capital or on the capital of such Lender's or Issuing Bank's holding company, if any, as a consequence of this Agreement or the Loans made by, or participations in Letters of Credit held by, such Lender, or the Letters of Credit issued by such Issuing Bank, to a level below that which such Lender or such Issuing Bank or such Lender's or such Issuing Bank's holding company could have achieved but for such Change in Law (taking into consideration such Lender's or such Issuing Bank's policies and the policies of such Lender's or such Issuing Bank's holding company with respect to capital adequacy and liquidity), then from time to time within 30 days of receipt of a certificate of the type specified in paragraph (d) below, the Borrowers shall pay to such Lender or such Issuing Bank, as applicable, such additional amount or amounts as will compensate such Lender or such Issuing Bank or such Lender's or such Issuing Bank's holding company for any such reduction suffered.

(c)    Notwithstanding anything herein to the contrary, (i) all requests, rules, guidelines, requirements and directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or by United States or foreign regulatory authorities, in each case pursuant to Basel III, and (ii) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines, requirements and directives thereunder or issued in connection therewith or in implementation thereof, shall in each case be deemed to be a Change in Law, regardless of the date enacted, adopted, issued or implemented.

(d)    A certificate of a Lender or an Issuing Bank setting forth in reasonable detail the calculation of the amount or amounts necessary to compensate such Lender or Issuing Bank or its holding company, as applicable, as specified in paragraphs (a), (b) or (c) of this Section 2.15 and certifying that such Lender or such Issuing Bank, as applicable, is charging such amount or amounts to all of its similarly-situated customers generally shall be delivered to the Lead Borrower and shall be conclusive absent manifest error. The Borrowers shall pay such Lender or Issuing Bank, as applicable, the amount shown as due on any such certificate within 30 days after receipt thereof. Notwithstanding anything else in this Section 2.15 to the contrary, the Borrowers shall not be required to make any payments to any Lender for any additional amounts pursuant to this Section 2.15 unless such Lender has given written notice to the Lead Borrower, through the Administrative Agent, of its intent to request such payments prior to or within 180 days after the date on which such Lender became entitled to claim such amounts.

138633067

4850-7280-1748.5

(d)     Promptly after any Lender or any Issuing Bank has determined that it will make a request for increased compensation pursuant to this Section 2.15, such Lender or Issuing Bank shall notify the Lead Borrower thereof. Failure or delay on the part of any Lender or Issuing Bank to demand compensation pursuant to this Section 2.15 shall not constitute a waiver of such Lender's or Issuing Bank's right to demand such compensation.

SECTION 2.16     Break Funding Payments.  In the event of (a) the payment of any principal of any Eurodollar Loan other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default), (b) the conversion of any Eurodollar Loan other than on the last day of the Interest Period applicable thereto, (c) the failure to borrow, convert, continue or prepay any Eurodollar Loan on the date specified in any notice delivered pursuant hereto or (d) the assignment of any Eurodollar Loan other than on the last day of the Interest Period applicable thereto as a result of a request by the Lead Borrower pursuant to Section 2.19, then, in any such event, the Borrowers jointly and severally agree to compensate each Lender for any loss, cost and expense suffered by such Lender that is attributable to such event (excluding loss of margin); provided that, for the avoidance of doubt, the Borrowers shall not be obligated to compensate any Lender under this Section 2.16 for any loss of anticipated profits in respect of any of the foregoing. For purposes of calculating amounts payable by the Borrowers to the Lenders under this Section, each Lender shall be deemed to have funded each Eurodollar Loan made by it at the Adjusted Eurodollar Rate for such Loan by a matching deposit or other borrowing in the London interbank eurodollar market for a comparable amount and for a comparable period, whether or not such Eurodollar Loan was in fact so funded. Such loss, cost and expense to any Lender shall be deemed to be the amount reasonably determined by such Lender to be the excess, if any, of (i) the amount of interest which would have accrued on the principal amount of such Loan had such event not occurred at the Adjusted Eurodollar Rate (excluding the impact of the proviso in the definition of "Adjusted Eurodollar Rate") that would have been applicable to such Loan, but exclusive of the Applicable Margin relating thereto, for the period from the date of such event to the last day of the then current Interest Period therefor (or, in the case of a failure to borrow, convert or continue, for the period that would have been the Interest Period for such Loan), over (ii) the amount of interest which would accrue on such principal amount for such period at the interest rate which such Lender would bid were it to bid, at the commencement of such period, for U.S. Dollar deposits of a comparable amount and period from other banks in the eurodollar market. A certificate of any Lender setting forth any amount or amounts that such Lender is entitled to receive pursuant to this Section 2.16 shall be delivered to the Lead Borrower and shall be conclusive absent manifest error. The Borrowers shall pay such Lender the amount shown as due on any such certificate within 30 days after receipt thereof.

SECTION 2.17     Taxes.

(a)     Any and all payments by or on account of any obligation of any Loan Party hereunder or under any other Loan Document shall (except to the extent required by applicable law) be made free and clear of and without deduction or withholding for any Taxes; provided that if any Loan Party, the Administrative Agent or any other applicable withholding agent shall be required to deduct any Taxes from such payments, then (i) if the Tax in question is an Indemnified Tax or an Other Tax, the sum payable by the applicable Loan Party shall be increased as necessary so that after making all required deductions (including deductions

applicable to additional sums payable under this Section 2.17) each Lender (or, in the case of a payment made to the Administrative Agent for its own account, the Administrative Agent) receives an amount equal to the sum it would have received had no such deductions been made, (ii) the applicable withholding agent shall make such deductions and (iii) the applicable withholding agent shall timely pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law.

(b)     In addition, the Loan Parties shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(c)     The Loan Parties shall, jointly and severally, indemnify the Administrative Agent and each Lender, within 10 days after written demand therefor, for the full amount of any Indemnified Taxes paid or payable by the Administrative Agent or such Issuing Bank, as applicable, on or with respect to any payment under or with respect to any Loan Document, and any Other Taxes payable by such Administrative Agent or such Lender, as applicable (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section 2.17), whether or not such Taxes were correctly or legally imposed or asserted. A certificate as to the amount of such payment or liability, prepared in good faith and delivered to such Loan Party by a Lender, or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(d)     [Reserved.]

(e)     (i) Each Lender shall, at such times as are reasonably requested by the Lead Borrower or the Administrative Agent, provide the Lead Borrower and the Administrative Agent with any documentation prescribed by laws or reasonably requested by the Lead Borrower or the Administrative Agent certifying as to any entitlement of such Lender to an exemption from or reduction in any applicable withholding Tax with respect to any payments to be made to such Lender under any Loan Document. Each such Lender shall, whenever a lapse in time or change in circumstances renders any such documentation (including any specific documentation required below in this Section 2.17(e)) obsolete, expired or inaccurate in any respect, deliver promptly to the Lead Borrower and the Administrative Agent updated or other appropriate documentation (including any new documentation reasonably requested by the Lead Borrower or the Administrative Agent) or promptly notify the Lead Borrower or the Administrative Agent in writing of its legal ineligibility to do so.

(ii)     Without limiting the generality of the foregoing:

(A)     each U.S. Lender shall deliver to the Lead Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a party to this Agreement, two properly completed and duly signed original copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding;

(B)     each Foreign Lender shall deliver to the Lead Borrower and the Administrative Agent on or prior to the date on which such Foreign Lender becomes a party to this Agreement, two properly completed and duly signed original copies of whichever of the following is applicable:

(i)        IRS Form W-8BEN or W-8BEN-E (or any successor forms) claiming eligibility for the benefits of an income tax treaty to which the United States is a party;

(ii)       IRS Form W-8ECI (or any successor forms);

(iii)      in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 871 (h) or 881 (c) of the Code, (x) a certificate substantially in the form of Exhibit L-1, L-2, L-3 or L-4 (any such certificate a "U.S. Tax Compliance Certificate") and (y) IRS Form W-8BEN or W-8BEN-E(or any successor forms);

(iv)      to the extent a Foreign Lender is not the beneficial owner (for example, where the Foreign Lender is a partnership or a participating Lender), IRS Form W-8IMY (or any successor forms) of the Foreign Lender, accompanied by IRS Form W-8ECI, IRS Form W-8BEN, IRS Form W-8BEN-E, a U.S. Tax Compliance Certificate, IRS Form W-9, IRS Form W-8IMY and/or any other required information (or any successor forms) from each beneficial owner that would be required under this Section 2.17(e) if such beneficial owner were a Lender, as applicable; provided that if the Foreign Lender is a partnership (and not a participating Lender) and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate on behalf of each such direct and indirect partner(s); or

(v)       any other form prescribed by applicable U.S. federal income tax laws as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax on any payments to such Foreign Lender under the Loan Documents; and

(C)       if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Lead Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Lead Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Lead Borrower or the Administrative Agent as may be necessary for the Lead Borrower and the Administrative Agent to comply with their obligations under FATCA, to determine whether such Lender has complied with such Lender's obligations under FATCA and to determine the amount, if any, to deduct and withhold from such payment. Solely for purposes of this clause (C), "FATCA" shall include any amendments made to FATCA after the date of this Agreement or any successor to FATCA.

138633067

4850-7280-1748.5

Notwithstanding any other provision of this <u>Section 2.17(e)</u>, a Lender shall not be required to deliver any documentation that such Lender is not legally eligible to deliver.

(f)     If the Administrative Agent or a Lender determines, in its sole discretion exercised in good faith, that it has received a refund of any Indemnified Taxes or Other Taxes as to which it has been indemnified by a Loan Party or with respect to which such Loan Party has paid additional amounts pursuant to this <u>Section 2.17</u>, it shall pay over such refund to such Loan Party (but only to the extent of indemnity payments made, or additional amounts paid, by such Loan Party under this <u>Section 2.17</u> with respect to the Indemnified Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses of the Administrative Agent or such Lender (including any Taxes imposed with respect to such refund) directly related to such refund and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); <u>provided</u> that such Loan Party, upon the request of the Administrative Agent or such Lender, agrees to repay as soon as reasonably practicable the amount paid over to such Loan Party (<u>plus</u> any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent or such Lender in the event the Administrative Agent or such Lender is required to repay such refund to such Governmental Authority. This <u>Section 2.17(f)</u> shall not be construed to require the Administrative Agent or any Lender to make available its Tax returns (or any other information relating to its Taxes which it deems confidential) to the Loan Parties or any other person.

(g)     For purposes of this <u>Section 2.17</u>, the term "Lender" includes any Issuing Bank and the Swingline Lender.

SECTION 2.18     <u>Payments Generally; Pro Rata Treatment; Sharing of Set-offs</u>.

(a)     Unless otherwise specified, the Borrowers shall make each payment required to be made by it hereunder (whether of principal, interest, fees or reimbursement of L/C Disbursements, or of amounts payable under <u>Section 2.15</u>, <u>2.16</u>, or <u>2.17</u>, or otherwise) prior to 2:00 p.m., Local Time, on the date when due, in immediately available funds, without condition or deduction for any defense, recoupment, set-off or counterclaim. Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. All such payments shall be made to the Administrative Agent to the applicable account designated to the Lead Borrower by the Administrative Agent, except payments to be made directly to the applicable Issuing Bank or the Swingline Lender as expressly provided herein. The Administrative Agent shall distribute any such payments received by it for the account of any other person to the appropriate recipient promptly following receipt thereof. All payments hereunder shall be made in Dollars. Any payment required to be made by the Administrative Agent hereunder shall be deemed to have been made by the time required if the Administrative Agent shall, at or before such time, have taken the necessary steps to make such payment in accordance with the regulations or operating procedures of the clearing or settlement system used by the Administrative Agent to make such payment..

(b)     If at any time insufficient funds are received by and available to the Administrative Agent from the Borrowers to pay fully all amounts of principal, unreimbursed

138633067

4850-7280-1748.5

L/C Disbursements, interest and fees then due from the Borrowers hereunder, such funds (except as otherwise provided in the Collateral Agreement with respect to the application of amounts realized from the Collateral) shall be applied (i) <u>first</u>, towards payment of interest and fees then due from the Borrowers hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties, and (ii) <u>second</u>, towards payment of principal and unreimbursed L/C Disbursements then due from the Borrowers hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal and unreimbursed L/C Disbursements then due to such parties.

(c)    If (other than (x) any payment obtained by a Lender as consideration for the assignment or sale of a participation in any of its Loans to any assignee or participant, including any assignee or participant that is a Loan Party or an Affiliate thereof or (y) as otherwise expressly provided elsewhere herein, including, without limitation, as provided in or contemplated by <u>Section 2.19</u>, <u>Section 2.22</u>, <u>Section 2.23</u>, <u>Sections 9.04(f)</u> or <u>Section 9.08(d)</u>) any Lender shall, by exercising any right of set-off or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Revolving Facility Loans or participations in L/C Disbursements, Swingline Loans or Protective Advances resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Revolving Facility Loans and participations in L/C Disbursements, Swingline Loans and Protective Advances and accrued interest thereon than the proportion received by any other Lender, then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Revolving Facility Loans and participations in L/C Disbursements, Swingline Loans and Protective Advances of other Lenders to the extent necessary so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Revolving Facility Loans and participations in L/C Disbursements, Swingline Loans and Protective Advances; <u>provided</u> that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this <u>paragraph (c)</u> shall not be construed to apply to any payment made by any Borrower pursuant to and in accordance with the express terms of this Agreement. Each Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrowers rights of set-off and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of such Borrower in the amount of such participation.

(d)    Unless the Administrative Agent shall have received notice from the Lead Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders or the applicable Issuing Bank hereunder that the Borrowers will not make such payment, the Administrative Agent may assume that Borrowers have made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders or the applicable Issuing Bank, as applicable, the amount due. In such event, if the Borrowers have not in fact made such payment, then each of the Lenders or the applicable Issuing Bank, as applicable, severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender or Issuing Bank with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds

81

Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

(e)    If any Lender shall fail to make any payment required to be made by it pursuant to Section 2.04(c), 2.05(d) or (e), 2.06(b) or 2.18(d), then the Administrative Agent may, in its discretion (notwithstanding any contrary provision hereof), apply any amounts thereafter received by the Administrative Agent for the account of such Lender to satisfy such Lender's obligations under such Sections until all such unsatisfied obligations are fully paid.

(f)    Each Borrowing by any Borrower from the Lenders hereunder shall be made pro rata according to the respective Revolving Facility Percentages of the relevant Lenders.

SECTION 2.19        Mitigation Obligations; Replacement of Lenders.

(a)    If any Lender requests compensation under Section 2.15, or if any Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.17, then such Lender shall use reasonable efforts to designate a different Lending Office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or Affiliates, if such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 2.15 or 2.17, as applicable, and (ii) would not, in the reasonable judgment of such Lender, subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender in any material respect. The Borrowers hereby jointly and severally agree to pay all costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)    If any Lender requests compensation under Section 2.15, or if any Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.17, or if any Lender is a Defaulting Lender or becomes an Affected Lender, then the Lead Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, (i) terminate the Commitments of such Lender (if applicable) and repay all Obligations of such Borrower owing to such Lender relating to the Loans and participations held by such Lender as of the termination date or (ii) require such Lender to assign and delegate, without recourse, all of its interests, rights and obligations under this Agreement to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); provided that (v) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans and participations in L/C Disbursements, Swingline Loans and Protective Advances, accrued interest thereon, accrued fees and all other amounts payable to it hereunder from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrowers (in the case of all other amounts), (w) in the case of any such assignment resulting from a claim for compensation under Section 2.15 or payments required to be made pursuant to Section 2.17, such assignment will result in a reduction in such compensation or payments, (x) the Borrowers shall be jointly and severally liable to such Lender under Section 2.16 if any Eurodollar Loan owing to such Lender is repaid or purchased other than on the last day of the Interest Period relating thereto, (y) such assignment shall otherwise comply with Section 9.04 (provided that the Borrowers shall be obligated to pay the registration and processing fee referred to therein) and

82

(z) until such time as such Commitments are terminated, obligations repaid or such assignment is consummated, the Borrowers shall pay all additional amounts (if any) required pursuant to Section 2.15 or Section 2.17, as the case may be. Nothing in this Section 2.19 shall be deemed to prejudice any rights that any Borrower, the Administrative Agent or any Lender may have against any replaced Lender. Each Lender hereby grants to the Administrative Agent an irrevocable power of attorney (which power is coupled with an interest) to execute and deliver, on behalf of such Lender as assignor, any Assignment and Acceptance necessary to effectuate any assignment of such Lender's interests hereunder in the circumstances contemplated by this Section 2.19(b).

(c)    If any Lender (such Lender, a "Non-Consenting Lender") has failed to consent to a proposed amendment, waiver, discharge or termination which pursuant to the terms of Section 9.08 requires the consent of all of the Lenders or all of the Lenders affected and with respect to which the Required Lenders shall have granted their consent, then the Borrowers shall have the right (unless such Non-Consenting Lender grants such consent) to replace such Non-Consenting Lender by (i) terminating the Commitments of such Lender (if applicable) and repaying all obligations of the Borrowers owing to such Lender relating to the Loans and participations held by such Lender as of such termination date, or (ii) requiring such Non-Consenting Lender to assign all or the affected portion of its Loans, and its Commitments hereunder to one or more assignees; provided that (a) all Obligations of the Borrowers owing to such Non-Consenting Lender being replaced shall be paid in full to such Non-Consenting Lender concurrently with such assignment, (b) the replacement Lender shall purchase the foregoing by paying to such Non-Consenting Lender a price equal to the principal amount thereof plus accrued and unpaid interest thereon, (c) the Borrowers shall be jointly and severally liable to such Lender under Section 2.16 if any Eurodollar Loan owing to such Lender is repaid or purchased other than on the last day of the Interest Period relating thereto, (d) such assignment shall otherwise comply with Section 9.04 (provided that the Borrowers shall be obligated to pay the registration and processing fee referred to therein) and (e) the replacement Lender shall grant its consent with respect to the applicable proposed amendment, waiver, discharge or termination. Each Lender hereby grants to the Administrative Agent an irrevocable power of attorney (which power is coupled with an interest) to execute and deliver, on behalf of such Lender as assignor, any Assignment and Acceptance necessary to effectuate any assignment of such Lender's interests hereunder in the circumstances contemplated by this Section 2.19(c).

SECTION 2.20    Illegality.  If any Lender reasonably determines that any Change in Law has made it unlawful, or that any Governmental Authority has asserted after the Closing Date that it is unlawful, for any Lender or its applicable Lending Office to make or maintain any Eurodollar Loans, then, on notice thereof by such Lender to the Lead Borrower through the Administrative Agent (at which time such Lender shall be deemed an "Affected Lender"), any obligations of such Affected Lender to make or continue Eurodollar Loans or to convert ABR Borrowings to Eurodollar Borrowings shall be suspended until such Affected Lender notifies the Administrative Agent and the Lead Borrower that the circumstances giving rise to such determination no longer exist. Upon receipt of such notice, the Lead Borrower shall upon demand from such Affected Lender (with a copy to the Administrative Agent), convert all Eurodollar Borrowings of such Affected Lender to ABR Borrowings, either on the last day of the Interest Period therefor, if such Affected Lender may lawfully continue to maintain such Eurodollar Borrowings to such day, or immediately, if such Affected Lender may not lawfully

83

4850-7280-1748.5

continue to maintain such Loans. Upon any such conversion, the Borrowers shall also pay accrued interest on the amount so converted.

SECTION 2.21      Defaulting Lenders.  Notwithstanding any provision of this Agreement to the contrary, if any Lender becomes a Defaulting Lender, then the following provisions shall apply for so long as such Lender is a Defaulting Lender:

(a)      Fees shall cease to accrue on the unfunded portion of the Revolving Facility Commitment of such Defaulting Lender pursuant to Section 2.12(a);

(b)      the voting rights of a Defaulting Lender shall be subject to Section 9.08(b);

(c)      if any Swingline Exposure, L/C Exposure or Protective Advance Exposure exists at the time such Lender becomes a Defaulting Lender then:

(i)      all or any part of the Swingline Exposure, L/C Exposure and Protective Advance Exposure of such Defaulting Lender shall be automatically reallocated (effective on the date such Lender becomes a Defaulting Lender) among the Non-Defaulting Lenders in accordance with their respective Revolving Facility Percentages but only to the extent the sum of all Non-Defaulting Lenders' Credit Exposure plus such Defaulting Lender's Swingline Exposure, L/C Exposure and Protective Advance Exposure does not exceed the total of all Non-Defaulting Lenders' Revolving Facility Commitments; provided that neither such reallocation nor any payment by a Non-Defaulting Lender pursuant thereto will constitute a waiver or release of any claim by the Borrowers, the Administrative Agent, the applicable Issuing Bank, the Swingline Lender or any other Lender may have against such Defaulting Lender or cause such Defaulting Lender to be a Non-Defaulting Lender;

(ii)      if the reallocation described in clause (i) above cannot, or can only partially, be effected, the Lead Borrower shall within two Business Days following notice by the Administrative Agent (at the direction of the applicable Issuing Bank and/or the Swingline Lender), at its option, (x) prepay such Swingline Exposure and (y) cash collateralize for the benefit of the applicable Issuing Bank or the Swingline Lender, as the case may be, the Borrowers' obligations corresponding only to such Defaulting Lender's L/C Exposure, Swingline Exposure or Protective Advance Exposure (after giving effect to any partial reallocation pursuant to clause (i) above), in an amount equal to the aggregate amount of such unreallocated portion or (y) make other arrangements reasonably satisfactory to the Administrative Agent, and to the applicable Issuing Bank and the Swingline Lender, as the case may be, in their reasonable discretion to protect them against the risk of non-payment by such Defaulting Lender;

(iii)      if the Borrowers cash collateralize any portion of such Defaulting Lender's L/C Exposure pursuant to clause (ii) above, the Borrowers shall not be required to pay any fees pursuant to Section 2.12(b) with respect to such Defaulting Lender's L/C Exposure during the period such Defaulting Lender's L/C Exposure is cash collateralized;

84

(iv)    if the L/C Exposure of the Non-Defaulting Lenders is reallocated pursuant to clause (i) above, then the fees payable to the Lenders pursuant to Section 2.12(a) and Section 2.12(b) shall be adjusted in accordance with such Non-Defaulting Lenders' Revolving Facility Percentages and such fees that would have accrued for the benefit of such Defaulting Lender will instead accrue for the benefit of and be payable to such Non-Defaulting Lenders, pro rata in accordance with their respective Revolving Facility Commitments (and the pro rata provisions of Section 2.18 will automatically be deemed adjusted to reflect the provisions of this Section 2.21);

(v)    if all or any portion of such Defaulting Lender's L/C Exposure is neither reallocated nor cash collateralized pursuant to clause (i) or (ii) above, then, without prejudice to any rights or remedies of the Issuing Banks or any other Lender hereunder, all fees payable under Section 2.12(b) with respect to such Defaulting Lender's L/C Exposure shall be payable to the applicable Issuing Bank until and to the extent that such L/C Exposure is reallocated and/or cash collateralized;

(vi)    any amount paid by the Borrowers for the account of a Defaulting Lender that was or is a Lender under this Agreement (whether on account of principal, interest, fees, indemnity payments or other amounts) will not be paid or distributed to such Defaulting Lender, but will instead be retained by the Administrative Agent in a segregated account until the Termination Date (subject to paragraph (f) of this Section 2.21) and will be applied by the Administrative Agent and the Lead Borrower, to the fullest extent permitted by law, to the making of payments from time to time in the following order of priority:  first, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent under this Agreement; second, to the payment of any amounts owing by such Defaulting Lender to any Issuing Bank or the Swingline Lender (pro rata as to the respective amounts owing to each of them) under this Agreement; third, to pay any amounts owing by such Defaulting Lender in respect of the Protective Advances and Overadvances under this agreement; fourth, to satisfy the obligations, if any, of such Lender to make Revolving Facility Loans to the Borrowers; fifth, if so determined by the Administrative Agent and the Lead Borrower, to be held in a non-interest bearing deposit account and released to satisfy the obligation of such Defaulting Lender to fund Revolving Facility Loans under this Agreement; sixth, to the payment of post-default interest and then current interest due and payable to the Lenders hereunder other than Defaulting Lenders that are Lenders, ratably among them in accordance with the amounts of such interest then due and payable to them; seventh, to the payment of fees then due and payable to the Non-Defaulting Lenders that are Lenders hereunder, ratably among them in accordance with the amounts of such fees then due and payable to them; eighth, to pay principal and unreimbursed payments made by the applicable Issuing Bank pursuant to a Letter of Credit then due and payable to the Non-Defaulting Lenders that are Lenders hereunder ratably in accordance with the amounts thereof then due and payable to them; ninth, to the ratable payment of other amounts then due and payable to the Non-Defaulting Lenders that are Lenders; tenth, upon the Termination Date, to the payment of any amounts owing to the Borrowers as a result of a final judgment of a court of competent jurisdiction obtained by the Borrowers against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and eleventh, after the Termination Date, to pay amounts owing

85

under this Agreement to such Defaulting Lender or as a court of competent jurisdiction may otherwise direct; and

(vii)    so long as such Lender is a Defaulting Lender, the Swingline Lender shall not be required to fund any Swingline Loan and no Issuing Bank shall be required to issue or increase any Letter of Credit, unless it is satisfied that 100% of the related exposure and the Defaulting Lender's then outstanding L/C Exposure will be covered by the Revolving Facility Commitments of the Non-Defaulting Lenders and/or cash collateral will be provided by the Borrowers in accordance with this Section 2.21(c), and participating interests in any newly made Swingline Loan or any newly issued or increased Letter of Credit shall be allocated among Non-Defaulting Lenders in a manner consistent with Section 2.21(c)(i) (and such Defaulting Lender shall not participate therein);

(d)    [reserved];

(e)    in the event that the Administrative Agent, the Lead Borrower, the Swingline Lender and the Issuing Banks each agree in writing in their discretion that a Defaulting Lender has adequately remedied all matters that caused such Lender to be a Defaulting Lender and that such Defaulting Lender should no longer be deemed to be a Defaulting Lender, effective as of such agreement and subject to any conditions such parties hereto require (which may include arrangements with respect to any amounts then held in the segregated account referred to in Section 2.21(c)(vi)), then the Swingline Exposure, L/C Exposure and Protective Advance Exposure of the Lenders shall be readjusted to reflect the inclusion of such Lender's Revolving Facility Commitment and on such date such Lender shall purchase at par such of the Loans of the other Lenders (other than Swingline Loans) as the Administrative Agent shall determine may be necessary in order for such Lender to hold such Loans in accordance with its Revolving Facility Percentage, whereupon such Lender will cease to be a Defaulting Lender and will be a Non-Defaulting Lender (and such Revolving Facility Commitments and Loans of each Lender will automatically be adjusted on a prospective basis to reflect the foregoing); provided that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Lead Borrower while such Lender was a Defaulting Lender; and provided, further, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Non-Defaulting Lender will constitute a waiver or release of any claim of any party hereunder arising from such Lender having been a Defaulting Lender.

SECTION 2.22    Incremental Extensions of Credit.

(a)    The Borrowers and any one or more Lenders (including New Lenders) may (but shall have no obligation) from time to time agree that such Lenders shall provide to the Borrowers increased Revolving Facility Commitments (any such increased Revolving Facility Commitments, "Increased Revolving Facility Commitments"), by executing and delivering to the Administrative Agent an Increased Facility Activation Notice specifying (i) the amount of such increase, (ii) the applicable Increased Facility Closing Date, (iii) the applicable termination date in respect of such commitments and the applicable margin for Revolving Facility Loans in respect of such commitments (such loans, "Increased Revolving Facility Loans"); provided that:

(i)      immediately prior to and after giving effect to any Increased Facility Activation Notice (and the making or provision of any Increased Revolving Facility Commitments pursuant thereto), (A) no Default has occurred and is continuing or shall result therefrom and (B) the conditions set forth in Section 4.01(b) shall be satisfied,

(ii)      the aggregate principal amount (or committed amount, if applicable) of all Increased Revolving Facility Commitments pursuant to this Section 2.22 after the Closing Date, shall not exceed $50.0 million,

(iii)      any Increased Revolving Facility Commitments and the Revolving Facility Loans in respect thereof shall be pursuant to the terms hereof otherwise applicable to the Revolving Facility and such Increased Revolving Facility Commitments shall become Revolving Facility Commitments under this Agreement after giving effect to such Increased Facility Activation Notice; provided that (x) the Effective Yield on such Increased Revolving Facility Commitments may be greater than that the Effective Yield of the then existing Revolving Facility Loans so long as the Effective Yield on all Revolving Facility Loans are increased such that the Effective Yield on then-existing Revolving Facility Loans is no lower than the Effective Yield of the Increased Revolving Facility Loans, (y) any commitment, arrangement, upfront or similar fees may be agreed to among the Lead Borrower and the lenders providing such Increased Revolving Facility Commitments and (z) the final maturity date of Increased Revolving Facility Commitments shall be no earlier than the Final Revolving Maturity Date).

Notwithstanding the foregoing, without the consent of the Administrative Agent, (x) each increase effected pursuant to this paragraph shall be in a minimum amount of at least $5.0 million and increments thereof in a minimum amount of at least $5.0 million and (y) no more than two (2) Increased Facility Closing Dates may be selected by the Lead Borrower after the Closing Date. The Borrowers shall not be obligated to offer any existing Lender the opportunity to provide any Increased Revolving Facility Commitments. No Lender shall have any obligation to participate in any increase described in this paragraph unless it agrees to do so in its sole discretion.

(b)      Any additional bank, financial institution or other entity which, with the consent of the Lead Borrower and (to the extent such consent would be required under Section 9.04 with respect to an assignment of Loans or Commitments to such person) the consent of the Administrative Agent, the Issuing Banks and the Swingline Lender (which consent shall not be unreasonably withheld), elects to become a "Lender" under this Agreement in connection with any transaction described in Section 2.22(a) shall execute a New Lender Supplement (each, a "New Lender Supplement"), substantially in the form of Exhibit K, whereupon such bank, financial institution or other entity (a "New Lender") shall become a Lender for all purposes and to the same extent as if originally a party hereto and shall be bound by and entitled to the benefits of this Agreement and the other Loan Documents, and shall benefit equally and ratably from the Guarantees and security interests created by the Security Documents.

(c)      Unless otherwise agreed by the Administrative Agent, on each Increased Facility Closing Date, the Borrowers shall borrow Revolving Facility Loans under the relevant Increased Revolving Facility Commitments from each Lender participating in the relevant

87

increase in an amount determined by reference to the amount of each Type of Loan which would then have been outstanding from such Lender if (i) each such Type had been borrowed or effected on such Increased Facility Closing Date and (ii) the aggregate amount of each such Type requested to be so borrowed or effected had been proportionately increased. The Eurodollar Rate applicable to any Eurodollar Loan borrowed pursuant to the preceding sentence shall equal the Eurodollar Rate then applicable to the Eurodollar Loans of the other Lenders in the same Facility (or, until the expiration of the then-current Interest Period, such other rate as shall be agreed upon between the Lead Borrower and the relevant Lender).

(d)    Notwithstanding anything to the contrary in this Agreement, each of the parties hereto hereby agrees that, on each Increased Facility Closing Date, this Agreement shall be amended to the extent (but only to the extent) necessary to reflect the existence and terms of the Increased Revolving Facility Commitments evidenced by the relevant Increased Facility Activation Notice. Any such deemed amendment may be effected in writing by the Administrative Agent with the Lead Borrower's consent (not to be unreasonably withheld) and furnished to the other parties hereto.

(e)    Prior to the effectiveness of any Increased Facility Activation Notice and the Increased Revolving Facility Commitments thereunder, the Administrative Agent shall have received legal opinions, board resolutions and other closing documents and certificates reasonably requested by the Administrative Agent and consistent with those delivered on the Closing Date under Section 4.02. The proceeds of the Increased Revolving Facility Commitments may be used for any purpose not otherwise prohibited hereunder.

SECTION 2.23    Extensions of Commitments.

(a)    Notwithstanding anything to the contrary in this Agreement, pursuant to one or more offers (each, an "Extension Offer") made from time to time by the Lead Borrower to all Lenders of Revolving Facility Commitments with a like maturity date, in each case on a pro rata basis (based on the aggregate outstanding principal amount of the respective Revolving Facility Commitments with a like maturity date) and on the same terms to each such Lender, the Lead Borrower is hereby permitted to consummate from time to time transactions with individual Lenders that accept the terms contained in such Extension Offers to extend the maturity date of each such Lender's Revolving Facility Commitments and otherwise modify the terms of such Revolving Facility Commitments pursuant to the terms of the relevant Extension Offer (including by increasing the interest rate or fees payable in respect of such Revolving Facility Commitments (and related outstandings)) (each, an "Extension", and each group of Revolving Facility Commitments as so extended, as well as the original Revolving Facility Commitments not so extended, being a "tranche"; any Extended Revolving Facility Commitments shall constitute a separate tranche of Revolving Facility Commitments from the tranche of Revolving Facility Commitments from which they were converted), so long as the following terms are satisfied:

(i)    except as to interest rates, fees and final maturity (which shall be determined by the Lead Borrower and set forth in the relevant Extension Offer), the Revolving Facility Commitment of any Lender that agrees to an extension with respect to such Revolving Facility Commitment extended pursuant to an Extension (an "Extended

Revolving Facility Commitment"; and the Loans thereunder, "Extended Revolving Facility Loans"), and the related outstandings, shall be a Revolving Facility Commitment (or related outstandings, as the case may be) with the same terms (or terms not less favorable to existing Lenders) as the original Revolving Facility Commitments (and related outstandings); provided that (x) subject to the provisions of Section 2.04(d) and Section 2.05(b)(ii) to the extent dealing with Swingline Loans and Letters of Credit which mature or expire after a maturity date when there exist Extended Revolving Facility Commitments with a longer maturity date, all Swingline Loans and Letters of Credit shall be participated in on a pro rata basis by all Lenders with Extended Revolving Facility Commitments in accordance with their Revolving Facility Percentages (and except as provided in Section 2.04(d) and Section 2.05(b)(ii), without giving effect to changes thereto on an earlier maturity date with respect to Swingline Loans and Letters of Credit theretofore incurred or issued), (y) all borrowings and repayments (except for (A) payments of interest and fees at different rates on Extended Revolving Facility Commitments (and related outstandings), (B) repayments required upon the maturity date of the non-extending Revolving Facility Commitments and (C) repayments made in connection with a permanent repayment and reduction or termination of commitments) of Extended Revolving Facility Loans after the applicable Extension date shall be made on a pro rata basis with all other Revolving Facility Commitments and (z) at no time shall there be Revolving Facility Commitments hereunder (including Extended Revolving Facility Commitments and any original Revolving Facility Commitments) that have more than four different maturity dates,

(ii)    if the aggregate principal amount of Revolving Facility Commitments in respect of which Lenders shall have accepted the relevant Extension Offer exceeds the maximum aggregate principal amount of Revolving Facility Commitments offered to be extended by the Lead Borrower pursuant to such Extension Offer, then the Revolving Facility Loans of such Lenders shall be extended ratably up to such maximum amount based on the respective principal amounts (but not to exceed actual holdings of record) with respect to which such Lenders have accepted such Extension Offer,

(iii)    all documentation in respect of such Extension shall be consistent with the foregoing, and

(iv)    any applicable Minimum Extension Condition shall be satisfied unless waived by the Lead Borrower.

(b)    With respect to all Extensions consummated by the Lead Borrower pursuant to this Section 2.23, (i) such Extensions shall not constitute voluntary or mandatory payments or prepayments or commitment reductions for purposes of Sections 2.08, 2.09, 2.11 or 2.18 and (ii) no Extension Offer is required to be in any minimum amount or any minimum increment; provided that the Lead Borrower may at its election specify as a condition (a "Minimum Extension Condition") to consummating any such Extension that a minimum amount (to be determined and specified in the relevant Extension Offer in the Lead Borrower's sole discretion and which may be waived by the Lead Borrower) of Revolving Facility Commitments of any or all applicable tranches be tendered. The Administrative Agent and the Lenders hereby

89

consent to the transactions contemplated by this Section 2.23 (including, for the avoidance of doubt, payment of any interest, fees or premium in respect of any Extended Revolving Facility Commitments on such terms as may be set forth in the relevant Extension Offer) and hereby waive the requirements of any provision of this Agreement (including Sections 2.08, 2.09, 2.11 or 2.18) or any other Loan Document that may otherwise prohibit any such Extension or any other transaction contemplated by this Section.

(c)     No consent of any Lender or the Administrative Agent shall be required to effectuate any Extension, other than (A) the consent of each Lender agreeing to such Extension with respect to one or more of its Revolving Facility Commitments (or a portion thereof) and (B) the consent of the Issuing Banks and the Swingline Lender, which consent shall not be unreasonably withheld or delayed. All Extended Revolving Facility Commitments and all obligations in respect thereof shall be Obligations under this Agreement and the other Loan Documents that are secured by the Collateral and guaranteed on a pari passu basis with all other applicable Obligations under this Agreement and the other Loan Documents. The Lenders hereby irrevocably authorize the Administrative Agent to enter into amendments to this Agreement and the other Loan Documents with the Lead Borrower as may be necessary in order to establish new tranches or sub-tranches in respect of Revolving Facility Commitments so extended and such technical amendments as may be necessary or appropriate in the reasonable opinion of the Administrative Agent and the Lead Borrower in connection with the establishment of such new tranches or sub-tranches, in each case on terms consistent with this Section 2.23. In addition, if so provided in such amendment and with the consent of each Issuing Bank, participants in Letters of Credit expiring on or after the maturity date applicable to non-extended Revolving Facility Commitments shall be reallocated from Lenders holding non-extended Revolving Facility Commitments to Lenders holding Extended Revolving Facility Commitments in accordance with the terms of such amendment; provided, however, that the terms of such participation interests (including, without limitation, the commission applicable thereto) shall be adjusted accordingly.

(d)     In connection with any Extension, the Lead Borrower shall provide the Administrative Agent at least five Business Days' (or such shorter period as may be agreed by the Administrative Agent) prior written notice thereof and shall agree to such procedures (including regarding timing, rounding and other adjustments and to ensure reasonable administrative management of the credit facilities hereunder after such Extension), if any, as may be established by, or acceptable to, the Administrative Agent, in each case acting reasonably to accomplish the purposes of this Section 2.23.

SECTION 2.24     Overadvances.

If at any time the Credit Exposure exceeds the Borrowing Base (an "Overadvance"), the excess amount shall, subject to Section 2.11 and this Section 2.24, be immediately due and payable by the Borrowers on demand by the Administrative Agent. The Administrative Agent may require the Lenders to honor requests for Overadvance Loans and to forbear from requiring the Borrowers to cure an Overadvance, (i) when no Event of Default is known to the Administrative Agent, as long as (A) the Overadvance does not continue for more than thirty (30) consecutive days (and no Overadvance may exist for at least five (5) consecutive Business Days thereafter before further Overadvance Loans are required), and (B) the

90

Overadvance is not known by the Administrative Agent to exceed an amount equal to 10.0% of the lesser of (x) the Revolving Facility Commitments at such time and (y) the Borrowing Base at such time; and (ii) regardless of whether an Event of Default exists, if the Administrative Agent discovers an Overadvance not previously known by it to exist, as long as from the date of such discovery the Overadvance (A) is not increased by more than an amount equal to 10.0% of the lesser of (x) the Revolving Facility Commitments at such time and (y) the Borrowing Base at such time, and (B) does not continue for more than thirty (30) consecutive days. In no event shall Overadvance Loans be required that would cause the Credit Exposure to exceed the Revolving Facility Commitments. The Administrative Agent's authorization to require the Lenders to honor requests for Overadvance Loans and to forbear from requiring the Borrowers to cure an Overadvance may be revoked at any time by the Required Lenders by written notice to the Administrative Agent. Absent such revocation, the Administrative Agent's determination that funding of an Overadvance is appropriate shall be conclusive. All Overadvance Loans shall constitute Obligations secured by the Collateral and shall be entitled to all benefits of the Loan Documents. No Overadvance shall result in an Event of Default due to a Borrower's failure to comply with Section 2.01 for so long as such Overadvance remains outstanding in accordance with the terms of this paragraph, but solely with respect to the amount of such Overadvance. In no event shall any Borrower or any other Loan Party be deemed a beneficiary of this Section 2.24 nor authorized to enforce any of its terms. The Administrative Agent agrees to use its commercially reasonable best efforts to promptly notify the Lenders of the issuance of an Overadvance Loan; provided, that the Administrative Agent shall have no liability for any failure to provide any such notice.

SECTION 2.25      Protective Advances.

(a)      The Administrative Agent shall be authorized, in its discretion, at any time that any conditions in Article IV are not satisfied, to make ABR Loans (each, a "Protective Advance") (i) up to an aggregate amount (taken together with the aggregate amount of Overadvances at such time outstanding) equal to 10.0% of the lesser of (x) the Revolving Facility Commitments at such time and (y) the Borrowing Base at such time outstanding, if the Administrative Agent deems such Loans necessary or desirable to preserve or protect Collateral, or to enhance the collectability or repayment of Obligations; or (ii) to pay any other amounts chargeable to the Loan Parties under any Loan Documents, including costs, fees and expenses. Each Lender shall participate in each Protective Advance on a pro rata basis in accordance with clause (b) below. In no event shall Protective Advances be required that would cause the outstanding Revolving Facility Loans and L/C Obligations to exceed the aggregate Revolving Facility Commitments. The Required Lenders may at any time revoke the Administrative Agent's authority to make further Protective Advances to the Borrowers by written notice to the Administrative Agent. Absent such revocation, the Administrative Agent's determination that funding of a Protective Advance is appropriate shall be conclusive. All Protective Advances made by the Administrative Agent shall be Obligations secured by the Collateral. The Administrative Agent agrees to use its commercially reasonable best efforts to promptly notify the Lenders of the extension of a Protective Advance; provided, that the Administrative Agent shall have no liability for any failure to provide any such notice.

(b)      The Administrative Agent may by notice given not later than 12:00 p.m., Local Time, on any Business Day require the Lenders to acquire participations on such Business

91

Day in all or a portion of any Protective Advance outstanding. Each such notice shall specify the aggregate principal amount of the Protective Advance in which the Lenders will be required to participate and each Lender's Revolving Facility Percentage of such Protective Advance. Each Lender hereby absolutely and unconditionally agrees to pay, upon receipt of notice as provided above, to the Administrative Agent such Lender's Revolving Facility Percentage of each such Protective Advance. Each Lender acknowledges and agrees that its obligation to acquire participations in Protective Advances pursuant to this paragraph is absolute and unconditional and shall not be affected by any circumstance whatsoever, including the occurrence and continuance of a Default or Event of Default or any reduction or termination of the Revolving Facility Commitments, and that each such payment shall be made without any offset, abatement, withholding or reduction whatsoever. Each Lender shall comply with its obligation under this paragraph by wire transfer of immediately available funds, in the same manner as provided in Section 2.06 with respect to Revolving Facility Loans made by such Lender (and Section 2.06 shall apply, mutatis mutandis, to the payment obligations of the Lenders pursuant to this paragraph (b)). From and after the date, if any, on which any Lender has paid in full for its participation in any Protective Advance purchased hereunder, the Administrative Agent shall promptly distribute to such Lender its Revolving Facility Percentage of all payments of principal and interest and all proceeds of Collateral received by the Administrative Agent in respect of such Protective Advance; provided that any such payment or proceeds so distributed shall be repaid to the Administrative Agent if and to the extent such payment or proceeds is required to be refunded to the Lead Borrower for any reason. The purchase of participations in any Protective Advance pursuant to this paragraph prior to the payment therefor as set forth above shall not constitute a Loan and shall not relieve the Borrowers of their obligations to repay such Protective Advance.

ARTICLE III

Representations and Warranties

Each of Holdings (solely to the extent applicable to it) and each Borrower represents and warrants to each of the Lenders as and when required pursuant to Article IV hereof that:

SECTION 3.01    Organization; Powers.  Each of Holdings, the Lead Borrower and each of the Restricted Subsidiaries (a) is duly organized, validly existing and in good standing (or, if applicable in a foreign jurisdiction, enjoys the equivalent status under the laws of any jurisdiction of organization outside the United States) under the laws of the jurisdiction of its organization, (b) has all requisite power and authority to own its property and assets and to carry on its business as now conducted and (c) is qualified to do business and in good standing in each jurisdiction where such qualification is required; except in the cases of subclause (a) (solely with respect to the good standing or equivalent status of Holdings, the Lead Borrower and the Restricted Subsidiaries), (b) and (c) above, to the extent that failure to do so would not reasonably be expected to have a Material Adverse Effect.

SECTION 3.02    Authorization.  The execution, delivery and performance by Holdings, the Lead Borrower and each of the Subsidiary Loan Parties of each of the Loan Documents to which it is a party, and the borrowings hereunder and the transactions forming a

part of the Transactions (a) have been duly authorized by all corporate or other action required to be obtained by Holdings, the Lead Borrower and such Subsidiary Loan Parties and (b) will not (i) violate (A) any provision of (x) law, statute, rule or regulation applicable to such party, or (y) the certificate or articles of incorporation or other constitutive documents or by-laws or operating agreement of Holdings, the Lead Borrower or any such Subsidiary Loan Party or (B) any applicable order of any court or any rule, regulation or order of any Governmental Authority where any such conflict, violation, breach or default referred to in clause (b)(i) of this Section 3.02, would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (ii) conflict with or result in any breach, termination or contravention of, or constitute a default under, or require any payment to be made under any Material Indebtedness binding upon Holdings, the Lead Borrower or any of the Subsidiary Loan Parties or (iii) result in the creation or imposition of any Lien upon or with respect to any property or assets now owned or hereafter acquired by Holdings, the Lead Borrower or any such Subsidiary Loan Party, other than the Liens created by the Loan Documents and Liens permitted by Section 6.02 hereof.

SECTION 3.03    Enforceability.  This Agreement has been duly executed and delivered by Holdings and each Borrower and constitutes, and each other Loan Document when executed and delivered by each Loan Party that is party thereto will constitute, a legal, valid and binding obligation of such Loan Party enforceable against such Loan Party in accordance with its terms, subject to (i) the effects of bankruptcy, insolvency, moratorium, reorganization, fraudulent conveyance or other similar laws affecting creditors' rights generally, (ii) general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law) and (iii) implied covenants of good faith and fair dealing.

SECTION 3.04    Governmental Approvals; Consents.  No action, consent or approval of, registration or filing with, or any other action by, any Governmental Authority or any other Person is required in connection with the Transactions, except for (a) the filing of Uniform Commercial Code financing statements, (b) filings with the United States Patent and Trademark Office and the United States Copyright Office, (c) [Reserved], (d) such as have been made or obtained and are in full force and effect and (e) such actions, consents, approvals, registrations or filings the failure to obtain or make which would not reasonably be expected to have a Material Adverse Effect.

SECTION 3.05    Financial Statements.

(a)    The audited consolidated balance sheets of Holdings and its Subsidiaries, and related consolidated statements of income and cash flows of Holdings and its Subsidiaries for the fiscal year ended on or about December 31, 2019 reported on by and accompanied by an audit opinion from [_____], copies of which have heretofore been furnished to the Administrative Agent, present fairly in all material respects the consolidated financial condition of Holdings for such periods and as at such dates and the consolidated results of operations and cash flows of Holdings for the years then ended.

(b)    The unaudited consolidated quarterly balance sheet, statement of income and statement of cash flows of Holdings and its Subsidiaries for the fiscal quarter ended on or about [October 31, 2020] present fairly in all material respects the consolidated financial condition of Holdings as at such date. Such financial statements have been prepared in

93

accordance with GAAP (subject to (i) normal year-end adjustments and (ii) the absence of notes).

(c)     The consolidated pro forma balance sheet of Holdings and its Subsidiaries as at [October 31, 2020], and the related consolidated pro forma statements of income of Holdings and its Subsidiaries for the twelve month period ended [October 31, 2020], certified by the chief financial officer or treasurer of Holdings, copies of which have been furnished to the Administrative Agent, present fairly in all material respects the consolidated pro forma financial condition of Holdings and its Subsidiaries as at such date and the consolidated pro forma results of operations of Holdings and its Subsidiaries for the period ended on such date, in each case giving effect to the Transactions, all in accordance with GAAP.

SECTION 3.06     No Material Adverse Effect.  Since the date of the Chapter 11 Confirmation Order, no event, development, circumstance or change has occurred that has or would reasonably be expected to have a Material Adverse Effect.

SECTION 3.07     Title to Properties.  As of the Closing Date, each Loan Party has good record title to, or valid leasehold interests in, or easements or other limited property interests in, all real property material to its business and each of the Loan Parties owns, leases or licenses, as the case may be, all personal property purported to be owned or leased by it, in each case, free and clear of Liens except for those that do not materially interfere with its ability to conduct its business as currently conducted or to utilize such properties and assets for their intended purposes and Liens expressly permitted by Section 6.02 and except where the existence of such Lien would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

SECTION 3.08     Subsidiaries.

(a)     Schedule 3.08(a) sets forth as of the Closing Date the name and jurisdiction of incorporation, formation or organization of each Subsidiary of Holdings and, as to each such Subsidiary, the percentage of each class of outstanding Equity Interests owned by Holdings or by any such Subsidiary.

(b)     As of the Closing Date, except as set forth on Schedule 3.08(b), there are no outstanding subscriptions, options, warrants, calls, rights or other agreements or commitments (other than stock options granted to officers, employees or directors and directors' qualifying shares and Liens created under the Senior Secured Term Loan Documents of any nature relating to any Equity Interests of any Restricted Subsidiary.

SECTION 3.09     Litigation; Compliance with Laws.

(a)     Other than the Chapter 11 Cases, there are no actions, suits, investigations or proceedings at law or in equity or by or on behalf of any Person or Governmental Authority or in arbitration now pending against, or to the knowledge of any Borrower, threatened in writing against, the Lead Borrower or any of the Restricted Subsidiaries or any business, property or rights of any such person, in each case where there is a probability of adverse determination, and is reasonably likely, if adversely determined, to have a Material Adverse Effect.  Each Loan Party shall promptly notify the Administrative Agent of the filing or commencement of any

94

action, suit or proceeding by or before any arbitrator or Governmental Authority against any Loan Party with respect to the Chapter 11 Plan or the Chapter 11 Confirmation Order; provided that no Loan Party need give notice of any filings made in the Chapter 11 Cases.

(b)     None of the Lead Borrower, the Restricted Subsidiaries or their respective properties or assets is in violation of any law, rule or regulation (including any zoning, building, ordinance, code or approval or any building permit, but excluding any Environmental Laws that are the subject of Section 3.16) or any restriction of record or agreement affecting any real property, or is in default with respect to any judgment, writ, injunction or decree of any Governmental Authority, where such violation or default would reasonably be expected to have, taken as a whole, a Material Adverse Effect.

SECTION 3.10     <u>Investment Company Act</u>.  No Loan Party is an "investment company," or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended.

SECTION 3.11     [Reserved].

SECTION 3.12     <u>Federal Reserve Regulations</u>.

(a)     None of the Lead Borrower or any of the Restricted Subsidiaries is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of "purchasing" or "carrying" Margin Stock within the respective meanings of each of the quoted terms under Regulation U of the Board.

(b)     No part of the proceeds of any Loan will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately for any purpose which violates the provisions of the Regulation U or X of the Board.

SECTION 3.13     <u>Taxes</u>.

(a)     Each of Holdings, the Lead Borrower and the Restricted Subsidiaries has filed or caused to be filed all Tax returns required to have been filed, except, in each case, as would not be, individually or in the aggregate, reasonably expected to have a Material Adverse Effect; and

(b)     Each of Holdings, the Lead Borrower and the Restricted Subsidiaries has timely paid or caused to be timely paid all Taxes shown to be due and payable by it on the returns referred to in <u>clause (a)</u> and all other Taxes due and payable by it (including in its capacity as withholding agent), except (i) such Taxes that are being contested in good faith by appropriate proceedings diligently conducted and for which Holdings, the Lead Borrower or any of its Restricted Subsidiaries (as the case may be) has set aside on its books adequate reserves in accordance with GAAP or (ii) such Taxes which, if not paid, would, individually or in the aggregate, reasonably be expected to have, a Material Adverse Effect.

(c)     There is no current or proposed Tax assessment, deficiency or other claim against Holdings, the Lead Borrower or any of the Restricted Subsidiaries that would reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect.

138633067

4850-7280-1748.5

SECTION 3.14        No Material Misstatements.

(a)        As of the Closing Date only, all written information (other than any projections, other forward looking information and information of a general economic or industry specific nature) (the "Information") concerning Holdings, the Lead Borrower, its Subsidiaries and the Transactions otherwise prepared by or on behalf of the foregoing or their representatives and made available by or on behalf of Holdings or the Lead Borrower to the Lead Arranger, any Lenders or the Administrative Agent in connection with the Transactions, when taken as a whole, does not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements were made (after giving effect to all supplements and updates provided thereto).

(b)        The Projections furnished to the Lead Arranger and the Administrative Agent prior to the Closing Date are based upon assumptions believed by the Lead Borrower to be reasonable in light of conditions and facts known to the Lead Borrower at the time made as of the date the Projections were furnished to the Lead Arranger, the Administrative Agent or the Lenders and as of the Closing Date (it being acknowledged and agreed by the Lead Arranger, the Administrative Agent and the Lenders that projections as to future events are not to be viewed as facts and that any such information is subject to significant uncertainties and contingencies, many of which are beyond the Lead Borrower's control, and that no assurances can be given that future developments addressed in such information can be realized and that actual results during the period or periods covered by such Projections may vary significantly from the Projections and that such variations may be material).

SECTION 3.15        Employee Benefit Plans.

(a)        Except as would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect: (i) the operation and administration of each Employee Benefit Plan has complied in all respects with the terms of such Employee Benefit Plan, the applicable provisions of ERISA and the Code and the regulations and interpretations promulgated thereunder; (ii) no Plan has failed to satisfy the minimum funding standards (within the meaning of Sections 412 of the Code or Section 302 of ERISA) applicable to such Plan, whether or not waived; (iii) there has been no failure to make by its due date a required installment under Section 430(j) of the Code with respect to any Plan; (iv) no ERISA Event has occurred or is reasonably expected to occur; (v) the present value of all accumulated benefit obligations under any Plan did not, as of the date of the most recent financial statements reflecting such amounts, exceed the fair market value of the assets of such Plan allocable to such accrued benefits (determined in both cases using the assumptions applicable thereto promulgated under Section 430 of the Code); and (vi) the present value of all accrued benefit obligations of all underfunded Plans did not, as of the date of the most recent financial statements reflecting such amounts, exceed the value of the assets of all such underfunded Plans (determined in both cases using the assumptions applicable thereto promulgated under Section 430 of the Code).

(b)        Except as would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect, no Foreign Plan Event has occurred.

SECTION 3.16         Environmental Matters.  Except as to matters that would not reason ably be expected to have, individually or in the aggregate, a Material Adverse Effect: (i) no written notice of violation, request for information, order, claim, complaint or assertion of penalty has been received by the Lead Borrower or any of the Restricted Subsidiaries, and there are no judicial, administrative or other actions, suits or proceedings pending or, to the knowledge of each Borrower, threatened which allege a violation of or liability under any Environmental Laws or concerning Hazardous Materials, in each case relating to the Lead Borrower or any of the Restricted Subsidiaries, (ii) each of the Lead Borrower and its Restricted Subsidiaries has all permits necessary for its current operations to comply with all Environmental Laws and is, and during the term of all applicable statutes of limitation, has been, in compliance with the terms of such permits and with all Environmental Laws, (iii) no Hazardous Material is located at any property currently, or to the knowledge of the Lead Borrower or any of the Restricted Subsidiaries formerly owned, operated or leased by the Lead Borrower or any of the Restricted Subsidiaries in quantities or concentrations that would reasonably be expected to give rise to any liability of the Lead Borrower or any of the Restricted Subsidiaries under any Environmental Laws, and no Hazardous Material has been generated by or on behalf of the Lead Borrower or any of the Restricted Subsidiaries that has been transported to or Released at or from any location in a manner that would reasonably be expected to give rise to any liability or obligation of the Lead Borrower or any of the Restricted Subsidiaries, (iv) there is no agreement to which the Lead Borrower or any of the Restricted Subsidiaries is a party in which the Lead Borrower or any of the Restricted Subsidiaries has assumed or undertaken, or retained responsibility for any known or reasonably likely liability or obligation arising under or relating to Environmental Laws, and (v) to the knowledge of the Lead Borrower or any Restricted Subsidiary, there are no past or present actions, activities, circumstances, conditions or occurrences which would reasonably be expected to result in any liability of the Lead Borrower or any Restricted Subsidiary under Environmental Laws.

SECTION 3.17         Security Documents.

(a)         The Collateral Agreement is effective to create in favor of the Administrative Agent (for the benefit of the Secured Parties) a legal, valid and enforceable security interest in the Collateral described therein and proceeds thereof, subject, as to enforceability, to (i) the effects of bankruptcy, insolvency, moratorium, reorganization, fraudulent conveyance or other similar laws affecting creditors' rights generally, (ii) general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law) and (iii) implied covenants of good faith and fair dealing. When certificates or promissory notes, as applicable, representing the Pledged Collateral are delivered to the Administrative Agent (together with transfer powers or endorsements executed in blank) and Uniform Commercial Code financing statements have been filed in the appropriate offices in the appropriate jurisdictions, the Administrative Agent (for the benefit of the Secured Parties) shall have a fully perfected Lien on, and security interest in, all right, title and interest of the Loan Parties in such Collateral and, subject to Section 9-315 of the New York Uniform Commercial Code, the proceeds thereof, as security for the Obligations to the extent perfection in such Collateral (and the proceeds thereof can be obtained) (a) by possession of certificates and/or promissory notes (together with transfer powers or endorsements executed in blanks), in the case of such Pledged Collateral and (b) by the filing of Uniform Commercial Code financing

statements, in the case of the other applicable Collateral, in each case prior and superior in right to any other person (except Liens expressly permitted by Section 6.02).

(b)    When the Collateral Agreement or a summary thereof is properly filed in the United States Copyright Office or the United States Patent and Trademark Office, as applicable, and UCC-1 Financing Statements have been filed in the appropriate offices in the appropriate jurisdictions, the Administrative Agent (for the benefit of the Secured Parties) shall have a fully perfected Lien on, and security interest in, all right, title and interest of the Loan Parties thereunder in the Collateral consisting of United States registered patents, trademarks and copyrights and, in each case, applications therefor, in each case prior and superior in right to any other person except Liens expressly permitted by Section 6.02 (it being understood that subsequent recordings in the United States Copyright Office or United States Patent and Trademark Office, as the case may be, may be necessary to perfect a lien on United States registered patents, trademarks and copyrights and, in each case, applications therefor acquired or filed by the Loan Parties after the Closing Date).

SECTION 3.18    Solvency.  Immediately after giving effect to the Transactions on the Closing Date and immediately following the making of each Loan on the Closing Date and after giving effect to the application of the proceeds thereof, the Lead Borrower and its Subsidiaries on a consolidated basis are Solvent.

SECTION 3.19    Labor Matters.  Except as, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect: (a) there are no strikes or other labor disputes pending or, to the knowledge of each Borrower, threatened against the Lead Borrower or any of the Restricted Subsidiaries; (b) the hours worked and payments made to employees of the Lead Borrower and the Restricted Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable law dealing with such matters; (c) all persons treated as contractors by the Lead Borrower and the Restricted Subsidiaries are properly categorized as such, and not as employees, under applicable law; and

(a)    all payments due from the Lead Borrower or any of the Restricted Subsidiaries or for which any claim may be made against the Lead Borrower or any of the Restricted Subsidiaries, on account of wages and employee health and welfare insurance and other benefits have been paid or accrued as a liability on the books of the Lead Borrower or such Restricted Subsidiary to the extent required by GAAP. Except as, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect the consummation of the Transactions will not give rise to a right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which the Lead Borrower or any of its Restricted Subsidiaries (or any predecessor) is a party or by which the Lead Borrower or any of its Restricted Subsidiaries (or any predecessor) is bound.

SECTION 3.20    Use of Proceeds. The proceeds of the Loans will be used in accordance with Section 5.12.

SECTION 3.21    Anti-Terrorism Laws.

138633067

4850-7280-1748.5

(a)    No Loan Party or any of its Subsidiaries is in violation in any material respect of any Anti-Terrorism Law.

(b)    No Loan Party or any of its Subsidiaries is an Embargoed Person.

(c)    None of the Loan Parties nor any of their respective Subsidiaries, or, to the knowledge of each Borrower, their respective officers, directors and agents is in violation of any of the country or list based economic and trade sanctions administered and enforced by OFAC. None of the Loan Parties nor any of their respective Subsidiaries, or, to the knowledge of each Borrower, their officers, directors and agents (a) is an Embargoed Person, (b) has its assets located in a jurisdiction that is an Embargoed Person or (c) derives revenues from investments in or transactions with Embargoed Persons. No proceeds of any Loan will be used, directly or indirectly, to fund any operations in, finance any investments or activities in, or make any payments to, an Embargoed Person.

(d)    To the knowledge of each Borrower, no part of the proceeds of the Loans will be used, directly or indirectly, for any payments to any "foreign official" (as such quoted term is defined in the FCPA), any foreign political party or any official thereof, or any candidate for foreign political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the FCPA.

SECTION 3.22    Borrowing Base Certificate. At the time of delivery of each Borrowing Base Certificate, assuming that any eligibility criterion that requires the approval or satisfaction of the Administrative Agent has been approved by or is satisfactory to the Administrative Agent, each Account reflected therein as eligible for inclusion in the Borrowing Base is an Eligible Account and the inventory reflected therein as eligible for inclusion in the Borrowing Base constitutes Eligible Inventory.

SECTION 3.23    Intellectual Property; Licenses, Etc. Holdings, the Lead Borrower and each of their respective Subsidiaries own, or possess the right to use, all of the trademarks, service marks, trade names, copyrights, patents, patent rights, franchises, licenses and other intellectual property rights (collectively, "IP Rights") that are material to the operation of their respective businesses, without conflict with the rights of any other Person, except where failure to have such rights or where such conflicts would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

SECTION 3.24    Senior Indebtedness; Subordination. The Obligations hereunder and under the other Loan Documents are within the definition of "Senior Debt" (or any comparable term) and "Designated Senior Debt" (or any comparable term), to the extent applicable, under and as defined in the subordination provisions in the documentation governing Subordinated Indebtedness, if any.

SECTION 3.25    No Default. Since the Closing Date, no Default or Event of Default has occurred and is continuing or would result from the consummation of the transactions contemplated by this Agreement or any other Loan Document (other than, in each case, any Default or Event of Default that has been cured or waived).

SECTION 3.26        Chapter 11 Plan.  The Borrower has delivered to the Administrative Agent a complete and correct copy of the Chapter 11 Plan and the Chapter 11 Confirmation Order (including all schedules, exhibits, amendments, supplements, modifications and assignments thereto).  Holdings and its Subsidiaries are not in default in the performance of or compliance with any material provisions of the Chapter 11 Plan.  The Chapter 11 Plan is in full force and effect as of the date hereof and has not been terminated, rescinded or withdrawn, and the Chapter 11 Effective Date has occurred substantially concurrently with the effectiveness of this Agreement.  All conditions to confirmation and effectiveness of the Chapter 11 Plan have been satisfied or validly waived pursuant to the Chapter 11 Plan (other than conditions consisting of the effectiveness of this Agreement).  No court of competent jurisdiction has issued any injunction, restraining order or other order which prohibits consummation of any material transactions described in the Chapter 11 Confirmation Order and no governmental or other action or proceeding has been commenced, seeking any injunction, restraining order or other order which seeks to void or otherwise modify the transactions described in the Chapter 11 Confirmation Order in any material respect.

ARTICLE IV

Conditions of Lending

The obligations of (a) the Lenders (including the Swingline Lender) to make Revolving Facility Loans and Swingline Loans on and after the Closing Date and (b) any Issuing Bank to issue Letters of Credit or amend, extend or renew Letters of Credit hereunder are subject to the satisfaction of the following conditions:

SECTION 4.01        All Credit Events After the Closing Date.  After the Closing Date, on the date of each borrowing of a Revolving Facility Loan or a Swingline Loan and on the date of each issuance, amendment, extension or renewal of a Letter of Credit after the Closing Date:

(a)        The Administrative Agent shall have received, in the case of a Borrowing, a Borrowing Request as required by Section 2.03 (or a Borrowing Request shall have been deemed given in accordance with the last paragraph of Section 2.03) or, in the case of the issuance of a Letter of Credit, the applicable Issuing Bank and the Administrative Agent shall have received a notice requesting the issuance of such Letter of Credit as required by Section 2.05(b) or, in the case of a Swingline Borrowing, the Swingline Lender and the Administrative Agent shall have received a Swingline Borrowing Request as required by Section 2.04(b).

(b)        The representations and warranties set forth in Article III hereof shall be true and correct in all material respects (provided that any such representations and warranties which are qualified by materiality, Material Adverse Effect or similar language shall be true and correct in all respects (after giving effect to such qualification)) as of such date (other than on the date of any amendment, extension or renewal of a Letter of Credit without any increase in the stated amount thereof), with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct in all material respects (provided that any such representations and warranties which are qualified by materiality, Material Adverse Effect

100

or similar language shall be true and correct in all respects (after giving effect to such qualification)) as of such earlier date).

(c)     At the time of and immediately after such Borrowing, issuance, amendment, extension or renewal of a Letter of Credit (other than any amendment, extension or renewal of a Letter of Credit without any increase in the stated amount thereof), no Event of Default or Default shall have occurred and be continuing.

(d)     The applicable limitations set forth in Section 2.01, Section 2.04(a) and the last sentence in Section 2.05(b)(i) shall be satisfied.

(e)     No such Borrowing or issuance of such Letter of Credit shall exceed the then-current Excess Availability.

Each borrowing of a Revolving Facility Loan or a Swingline Loan and each issuance, amendment, extension or renewal of a Letter of Credit (other than any amendment, extension or renewal of a Letter of Credit without any increase in the stated amount thereof) shall be deemed to constitute a representation and warranty by each Borrower on the date thereof that the conditions specified in paragraphs (b) and (c) of this Section 4.01 shall have been satisfied in accordance with the terms hereof on such date in accordance with the terms of such paragraphs or waived in accordance with the terms hereof.

SECTION 4.02     Closing Date.  On the Closing Date:

(a)     The Administrative Agent (or its counsel) shall have received from each party hereto either (i) a counterpart of this Agreement signed on behalf of such party or (ii) written evidence reasonably satisfactory to the Administrative Agent (which may include fax or other electronic transmission of a signed signature page of this Agreement) that such party has signed a counterpart of this Agreement.

(b)     The Administrative Agent shall have received, on behalf of itself and the Lenders on the Closing Date, a customary written opinion of Gibson Dunn & Crutcher LLP, counsel for the Loan Parties, (A) dated the Closing Date and (B) addressed to the Administrative Agent and the Lenders on the Closing Date, and each of Holdings and the Borrowers hereby instructs its counsel to deliver such opinions.

(c)     The Administrative Agent shall have received each of the items referred to in clauses (i) through (v) below:

(i)     a copy of the certificate or articles of incorporation, certificate of limited partnership or certificate of formation, as applicable, including all amendments thereto, of each Loan Party, certified as of a recent date by the Secretary of State (or other similar official) of the jurisdiction of its organization, and a certificate as to the good standing (to the extent such concept or a similar concept exists under the laws of such jurisdiction) of each such Loan Party as of a recent date from such Secretary of State (or other similar official);

(ii)     a certificate of the secretary or assistant secretary or similar officer of each Loan Party dated the Closing Date and certifying:

(A)     that attached thereto is a true and complete copy of the by-laws (or limited partnership agreement, limited liability company agreement or other equivalent governing document) of such Loan Party as in effect on the Closing Date,

(B)     that attached thereto is a true and complete copy of resolutions duly adopted by the board of directors (or equivalent governing body) of such Loan Party (or its managing general partner or managing member or manager) authorizing the execution, delivery and performance of the Loan Documents to which such person is a party and, in the case of the Borrowers, the borrowings hereunder, and that such resolutions have not been modified, rescinded or amended and are in full force and effect on the Closing Date,

(C)     that the certificate or articles of incorporation, certificate of limited partnership or certificate of formation of such Loan Party has not been amended since the date of the last amendment thereto disclosed pursuant to clause (i) above, and

(D)     as to the incumbency and specimen signature of each officer executing any Loan Document or any other document delivered in connection therewith on behalf of such Loan Party on the Closing Date;

(iii)     a certificate of another officer as to the incumbency and specimen signature of the secretary or assistant secretary or similar officer of each Loan Party executing the certificate pursuant to clause (ii) above (which certificate may be combined with the certificate delivered pursuant to clause (ii) above);

(iv)     a certificate of a Responsible Officer of Holdings or the Lead Borrower (which certificate may be combined with the certificate delivered pursuant to clause (ii) above) certifying that as of the Closing Date the conditions in clauses (f), (l) and (m) of this Section 4.02 have been satisfied; and

(v)     a Borrowing Request relating to the initial Borrowing as required by Section 2.03.

(d)     (i) Subject to Section 5.15, the Collateral and Guarantee Requirement shall have been satisfied, (ii) the Administrative Agent shall have received the results of (A) a search of the Uniform Commercial Code (or equivalent), tax and judgment filings made with respect to the Loan Parties in their respective jurisdictions of organization and in the counties in which their respective chief executive offices are located and copies of the financing statements (or similar documents) disclosed by such search results and (B) a search of filings made with respect to the Loan Parties in the United States Patent and Trademark Office and the United States Copyright Office, (iii) the Administrative Agent shall have received evidence reasonably satisfactory to the Administrative Agent that the Liens indicated by such financing statements (or similar documents) are either permitted by Section 6.02 or have been released (or authorized for release in a manner reasonably satisfactory to the Administrative Agent) and (iv) the Administrative Agent shall have received a fully executed Perfection Certificate.

(e)     The Lenders shall have received (i) audited consolidated balance sheets of Holdings and its Subsidiaries and related consolidated statements of income and cash flows of Holdings and its Subsidiaries for the period ending [_____], (ii) the unaudited

138633067

consolidated quarterly balance sheet, statement of income and statement of cash flows of Holdings and its Subsidiaries for the fiscal quarter ended on or about [_____] and (iii) a pro forma consolidated balance sheet and related pro forma consolidated statement of income of Holdings and its consolidated Subsidiaries as of, and for the twelve-month period ending on, [_____].

(f)     On the Closing Date, substantially concurrently with the issuance of the Senior Secured Term Loan, Holdings and certain of its Subsidiaries shall (i) deliver confirmation that the Existing Debt under the Existing Credit Agreement will be repaid in full and any commitments to lend or make other extensions of credit under the Existing Credit Agreement will be terminated and (ii) deliver to the Administrative Agent all documents or instruments necessary to release all Liens securing such Existing Debt.

(g)     The Lenders shall have received a solvency certificate substantially in the form of Exhibit F and signed by a Financial Officer of the Lead Borrower.

(h)     The Administrative Agent shall have received all fees payable thereto or to any Lender or Lead Arranger on or prior to the Closing Date and, to the extent invoiced at least three Business Days prior to the anticipated Closing Date, all other amounts due and payable pursuant to the Loan Documents on or prior to the Closing Date, including reimbursement or payment of all reasonable out-of-pocket expenses required to be reimbursed or paid by the Loan Parties hereunder or under any other Loan Document.

(i)     To the extent requested in writing by the Administrative Agent not less than 10 Business Days prior to the Closing Date, the Administrative Agent shall have received, at least three Business Days prior to the Closing Date, all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the USA PATRIOT Act.

(j)     The ABL Intercreditor Agreement and the Senior Secured Term Loan Documents shall each have been duly executed and delivered by each party thereto, and shall be in full force and effect.

(k)     The Lead Borrower shall have delivered to the Administrative Agent a Borrowing Base Certificate in form reasonably satisfactory to the Administrative Agent which calculates the Borrowing Base as of [_____] (giving effect to the initial Borrowing on the Closing Date) and evidence that (i) the sum of Excess Availability and Borrowers' unrestricted cash which is subject to no Liens other than the Liens of Administrative Agent is in excess of $25.0 million and (ii) Excess Availability is not less than $20.0 million, in each case, after giving effect to the initial Loans and Letters of Credit hereunder as well as payment of all costs, fees and expenses in connection with the consummation of the Loan Documents and Senior Secured Term Loan Documents.

(l)     [Reserved.]

(m)     To the extent required by the penultimate paragraph of this Section 4.02, the representations and warranties of the Loan Parties set forth in the Loan Documents shall be true and correct (i) in the case of representations and warranties qualified as to materiality, in all

103

respects and (ii) otherwise, in all material respects, in each case on and as of the Closing Date, except in the case of any such representation and warranty that expressly relates to a prior date, in which case such representation and warranty shall be so true and correct on and as of such prior date. Since [_____], there has been no change in the condition, assets, or business of Holdings or its Subsidiaries, except such changes that have not had or would not be reasonably expected to have, individually or in the aggregate, a Material Adverse Effect.

(n)    The Borrower has delivered to the Administrative Agent a complete and correct copy of the Chapter 11 Plan and the Chapter 11 Confirmation Order (including all schedules, exhibits, amendments, supplements, modifications and assignments thereto). Holdings and its Subsidiaries are not in default in the performance of or compliance with any material provisions of the Chapter 11 Plan. The Chapter 11 Plan is in full force and effect as of the date hereof and has not been terminated, rescinded or withdrawn, and the Chapter 11 Effective Date has occurred substantially concurrently with the effectiveness of this Agreement. All conditions to confirmation and effectiveness of the Chapter 11 Plan have been satisfied or validly waived pursuant to the Chapter 11 Plan (other than conditions consisting of the effectiveness of this Agreement), including, without limitation, (i) the satisfaction or discharge of pre-existing indebtedness of Holdings and its subsidiaries to the extent set forth in the Chapter 11 Plan, (ii) the repayment in full in cash of the obligations under the Existing Credit Agreement with the proceeds of the initial Loans hereunder and Borrower's cash on hand, (iii) no existence of any default or Event of Default under any of the Loan Documents, or under any other material indebtedness of Holdings and its subsidiaries that is in effect from and after the Chapter 11 Effective Date and (iv) the issuance of new equity by Reorganized HHI which shall be entirely in the form of common equity and shall be distributed in accordance with the Chapter 11 Plan. No court of competent jurisdiction has issued any injunction, restraining order or other order which prohibits consummation of any material transactions described in the Chapter 11 Confirmation Order and no governmental or other action or proceeding has been commenced, seeking any injunction, restraining order or other order which seeks to void or otherwise modify the transactions described in the Chapter 11 Confirmation Order in any material respect.

(o)    The Bankruptcy Court shall have entered the Chapter 11 Confirmation Order, confirming the Chapter 11 Plan and the related solicitation process. In addition, (i) the time to appeal the Chapter 11 Confirmation Order or to seek review, rehearing or certiorari with respect to the Chapter 11 Confirmation Order shall have expired, unless waived by each of the Administrative Agent and Lenders in their sole discretion, (ii) no appeal or petition for review, rehearing or certiorari with respect to the Chapter 11 Confirmation Order may be pending, unless waived by each of the Administrative and Lenders in their sole discretion and (iii) the Chapter 11 Confirmation Order shall be in full force and effect and shall not be subject to any stay, motion to stay, vacatur, reversal, modification, appeal or motion for leave to appeal or have been stayed, vacated, reversed or appealed and shall not have been amended or modified in any manner by the Bankruptcy Court or by any other court having jurisdiction to issue any such stay, unless waived by the Administrative Agent in its sole discretion.

(p)    The Chapter 11 Plan shall not have been amended or modified in any manner that is materially adverse to the rights and interests of any or all of the Administrative Agent and the Lenders, relative to the version of the Chapter 11 Plan approved by the Chapter 11 Confirmation Order, without the prior written consent of the Administrative Agent.

Each Agent and each Lender, by delivering its signature page to this Agreement and funding a Loan on the Closing Date shall be deemed to have acknowledged receipt of and consented to and approved each Loan Document and each other document required to be approved by any Agent or Lender, as applicable, on the Closing Date.

ARTICLE V

Affirmative Covenants

Each of Holdings (solely as to Sections 5.01, 5.05 and 5.09 to the extent applicable to it) and each Borrower, jointly and severally, covenants and agrees with each Lender that so long as this Agreement shall remain in effect and until the Termination Date has occurred unless the Required Lenders shall otherwise consent in writing, each Borrower (and Holdings solely as to Sections 5.01, 5.05 and 5.09 to the extent applicable to it) will, and each Borrower will cause each of the Restricted Subsidiaries to:

SECTION 5.01        Existence; Businesses and Properties.

(a)        Do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence, except (i) where the failure to do so would not reasonably be expected to have a Material Adverse Effect, (ii) as otherwise expressly permitted under Section 6.05 and (iii) the liquidation or dissolution of any Restricted Subsidiary if the assets of such Restricted Subsidiary are acquired by the Lead Borrower or a Subsidiary of the Lead Borrower.

(b)        Except where the failure to do so would not reasonably be expected to have a Material Adverse Effect, do or cause to be done all things necessary to (i) preserve, renew, extend and keep in full force and effect the rights, privileges, permits, franchises, authorizations, patents, trademarks, service marks, trade names, copyrights, licenses and rights with respect thereto reasonably necessary to the normal conduct of the business of the Lead Borrower and the Restricted Subsidiaries and (ii) at all times maintain and preserve all property reasonably necessary to the normal conduct of the business of the Lead Borrower and the Restricted Subsidiaries and keep such property in satisfactory repair, working order and condition (ordinary wear and tear excepted and subject to casualty and condemnation) and from time to time make, or cause to be made, all necessary and proper repairs, renewals, additions, improvements and replacements thereto in accordance with prudent industry practice (in each case except as expressly permitted by this Agreement).

SECTION 5.02        Insurance.  Maintain, with financially sound and reputable insurance companies, insurance (which shall, for the avoidance of doubt, include business interruption insurance) in such amounts and against such risks as are customarily maintained by similarly situated companies engaged in the same or similar businesses operating in the same or similar locations. Each such policy of insurance shall (i) name the Administrative Agent, on behalf of the Secured Parties as an additional insured thereunder as its interests may appear, (ii) in the case of each casualty insurance policy, contain a loss payable clause or endorsement, reasonably satisfactory in form and substance to the Administrative Agent, that names the Administrative Agent, on behalf of the Secured Parties as the loss payee thereunder and (iii) to

105

4850-7280-1748.5

the extent available, provide for at least 30 days' prior written notice to the Administrative Agent of any cancellation of such policy.

SECTION 5.03    Taxes.  Except where the failure to do so would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, pay and discharge promptly when due all Taxes (whether or not shown on a Tax return) imposed upon it or upon its income or profits or in respect of its property, except for any Taxes the validity or amount thereof which is being contested in good faith by appropriate proceedings (notice of which shall be promptly provided by the Lead Borrower to the Administrative Agent to the extent the aggregate amount of Taxes being contested exceeds $500,000 and is not subject to indemnification in favor of the Lead Borrower and its Restricted Subsidiaries) diligently conducted, and the Lead Borrower or the affected Restricted Subsidiary, as applicable, shall have set aside on its books adequate reserves in accordance with GAAP with respect thereto.

SECTION 5.04    Financial Statements, Reports, etc.  Furnish to the Administrative Agent (which will promptly furnish such information to the Lenders):

(a)    within 90 days after the end of each fiscal year, a consolidated balance sheet and related statements of operations, cash flows and owners' equity showing the financial position of Holdings and its Subsidiaries as of the close of such fiscal year and the consolidated results of its operations during such year and setting forth in comparative form the corresponding figures for the prior fiscal year, which consolidated balance sheet and related statements of operations, cash flows and owners' equity shall be audited by independent public accountants of recognized national standing (including, for the avoidance of doubt, [McGladrey LLP]) and accompanied by (x) an opinion of such accountants (which opinion shall be without a "going concern" or like qualification or exception and without any qualification or exception as to the scope of such audit (other than such qualification relating to the impending maturity of any Indebtedness under this Agreement or the Senior Secured Term Loan Documents within the 12-month period following the date of such audit) to the effect that such consolidated financial statements fairly present, in all material respects, the financial condition and results of operations of Holdings and its Subsidiaries on a consolidated basis in accordance with GAAP (it being understood that if prior notice is given to the Administrative Agent the delivery by Holdings of an annual report on a Form 10-K of any Parent Entity shall satisfy the requirements of this Section 5.04(a) to the extent such annual report includes the information specified herein);

(b)    within 45 days after the end of each of the first three fiscal quarters of each fiscal year, a consolidated balance sheet and related statements of operations and cash flows showing the financial position of Holdings and its Subsidiaries as of the close of such fiscal quarter and the consolidated results of its operations during such fiscal quarter and the then-elapsed portion of the fiscal year and setting forth in comparative form the corresponding figures for the corresponding periods of the prior fiscal year, all of which shall be in reasonable detail and which consolidated balance sheet and related statements of operations and cash flows shall be certified by a Financial Officer of Lead Borrower as fairly presenting, in all material respects, the financial position and results of operations of Holdings and its Subsidiaries on a consolidated basis in accordance with GAAP (subject to normal year-end audit adjustments and the absence of footnotes) (it being understood that if prior notice is given to the Administrative Agent the delivery by Lead Borrower of quarterly reports on Form 10-Q of any Parent Entity shall satisfy

106

the requirements of this <u>Section 5.04(b)</u> to the extent such quarterly reports include the information specified herein);

(c) concurrently with any delivery of financial statements under <u>paragraphs (a)</u> and <u>(b)</u> above and <u>paragraph (i)</u> below, a Compliance Certificate of a Responsible Officer of the Lead Borrower in substantially the form attached hereto as <u>Exhibit I</u> (x) certifying that no Default or Event of Default has occurred and is continuing or, if such a Default or an Event of Default has occurred and is continuing, specifying the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto and (y) setting forth computations demonstrating compliance with the Financial Covenant;

(d) concurrently with each delivery of financial statements of Holdings pursuant to <u>Section 5.04(a)</u> and <u>Section 5.04(b)</u>, a summary discussion and analysis of the financial condition and results of operations of Holdings and its Restricted Subsidiaries for the relevant fiscal year or fiscal quarter (including year to date), as applicable, as compared to the comparable period of the previous fiscal year;

(e) within ninety (90) days after the beginning of each fiscal year, a consolidated quarterly budget for such fiscal year (including a projected consolidated and consolidated balance sheet of Holdings and its Subsidiaries as of the end of such fiscal year, and the related consolidated and consolidated statements of projected cash flow and projected income) and, as soon as available, significant revisions, if any, of such budget and quarterly projections with respect to such fiscal year (to the extent that such revisions have been approved by the Lead Borrower's board of directors (or equivalent governing body)), (collectively, the "<u>Financial Plan</u>");

(f) promptly following a request therefor, all documentation and other information that the Administrative Agent reasonably requests on its behalf or on behalf of any Lender in order to comply with the Administrative Agent's or such Lender's ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act;

(g) together with the delivery of the annual Compliance Certificate required by <u>Section 5.04(c)</u>, updates to the Perfection Certificate reflecting all changes in the information required to be included therein during the period covered by such Compliance Certificate;

(h) promptly following reasonable request therefor from the Administrative Agent, copies of (i) any documents described in Sections 101(f) and/or (j) of ERISA with respect to any Plan, and/or (ii) any notices or documents described in Sections 101(f), (k) and/or (l) of ERISA requested with respect to any Multiemployer Plan; <u>provided</u>, that if any Loan Party or any ERISA Affiliate has not requested such documents or notices from the administrator or sponsor of the applicable Plan or Multiemployer Plan, then, upon reasonable request of the Administrative Agent, any Loan Parties and/or the ERISA Affiliate(s) shall promptly make a request for such documents or notices from such administrator or sponsor and the Lead Borrower shall provide copies of such documents and notices to the Administrative Agent promptly after receipt thereof;

(i)    during the continuance of a Weekly Reporting Period, within 30 days after the end of each month (other than the last month of each fiscal quarter of Holdings), the consolidated balance sheet and related statements of operations and cash flows of the Lead Borrower and its Subsidiaries as at the end of such month and for the elapsed portion of the fiscal year ended with the last day of such month;

(j)    promptly, from time to time, such other information regarding the operations, business affairs and financial condition of Holdings, the Lead Borrower or any of its Restricted Subsidiaries as in each case the Administrative Agent may reasonably request (for itself or on behalf of any Lender); and

(k)    If there is a Weekly Reporting Period, concurrently with the delivery of Borrowing Base Certificates that are being delivered weekly pursuant to Section 5.13(a), on a weekly basis, on each Wednesday of each week during such Weekly Reporting Period, a schedule and aging of the Loan Parties' accounts payable as of the month then ended, delivered electronically in a text formatted file in a form reasonably acceptable to the Administrative Agent.

SECTION 5.05    Litigation and Other Notices.  Furnish to the Administrative Agent written notice of the following promptly after any Responsible Officer of Holdings or any Borrower obtains actual knowledge thereof:

(a)    any Default or Event of Default hereunder or an event of default or default under the Senior Secured Term Loan Documents specifying the nature and extent thereof and the corrective action (if any) proposed to be taken with respect thereto;

(b)    any action, suit or proceeding, whether at law or in equity or by or before any Governmental Authority or in arbitration, against Holdings, the Lead Borrower or any of its Restricted Subsidiaries that would reasonably be expected to have a Material Adverse Effect;

(c)    the occurrence of any ERISA Event or Foreign Plan Event that, individually or together with all other ERISA Events or Foreign Plan Events that have occurred, would reasonably be expected to have a Material Adverse Effect;

(d)    any casualty event with respect to ABL Priority Collateral which has resulted, or is expected to result, in damages or diminution of Value in excess of $2.0 million;

(e)    any disputes relating to rent or other amounts in excess of $500,000 owing by any Loan Party to any landlord, warehouseman, processor, repairman, mechanic, shipper, freight forwarder, broker or other Person who possesses any ABL Priority Collateral in excess of $500,000;

(f)    any other development specific to Holdings, the Lead Borrower or any of its Restricted Subsidiaries that is not a matter of general public knowledge and that has had, or would reasonably be expected to have, a Material Adverse Effect;

(g)    any labor strike or walkout, or the expiration of any material labor contract at least 60 days prior to the expiration thereof; and

138633067

4850-7280-1748.5

(h)     any judgment in an amount exceeding $3.0 million.

SECTION 5.06     Compliance with Laws.  Comply with all laws, rules, regulations and orders of any Governmental Authority applicable to it or its property including but not limited to ERISA, Anti-Terrorism Laws (including the USA PATRIOT Act), OFAC and FCPA, except where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect; provided that this Section 5.06 shall not apply to Environmental Laws, which are the subject of Section 5.08, or to laws related to Taxes, which are the subject of Section 5.03.

SECTION 5.07     Maintaining Records; Inspections and Appraisals.

(a)     Maintain all financial records in a manner sufficient to permit the preparation of consolidated financial statements in accordance with GAAP.

(b)     Permit the Administrative Agent from time to time, subject to reasonable notice and during normal business hours (except when an Event of Default exists), to visit and inspect the properties of any Loan Party or Subsidiary in the United States, including, without limitation, inspect, audit and make extracts from any Loan Party's or Subsidiary's books and records (subject to confidentiality restrictions), and discuss with its officers, employees and accountants (provided the Lead Borrower is given reasonable advance notice and the opportunity to participate in any such discussion) such Loan Party's or Subsidiary's business, financial condition, assets, prospects and results of operations; provided that, during any calendar year, absent the continuation of an Event of Default, only one (1) visit by the Administrative Agent for reasonable expenses of a reasonable number of people shall be at the Borrower's expense that is reimbursable in accordance with Section 9.05. Neither the Administrative Agent nor any Lender shall have any duty to any Loan Party to make any inspection, nor to share any results of any inspection, appraisal or report with any Loan Party (provided that, except when an Event of Default exists, a representative of the Lead Borrower is given the opportunity to be present during any discussion with any such agent, adviser or independent accountant). The Loan Parties acknowledge that all inspections, appraisals and reports are prepared by the Administrative Agent and Lenders for their purposes, and the Loan Parties shall not be entitled to rely upon them.

(c)     Reimburse the Administrative Agent in accordance with Section 9.05 for all charges, costs and expenses of the Administrative Agent in connection with examinations of any Loan Party's books and records or any other financial or Collateral matters as the Administrative Agent deems appropriate, including field audits and inventory appraisals, each up to one (1) time (or, two (2) times if such second audit and/or appraisal is commenced during an Audit Trigger Period) per twelve-month period; provided, however, that if an examination and/or appraisal is initiated during an Event of Default, all charges, costs and expenses therefor shall be reimbursed by the Loan Parties without regard to such limits. Subject to and without limiting the foregoing, the Loan Parties specifically agree to pay the Administrative Agent's then standard charges for each day that an employee of the Administrative Agent or its Affiliates is engaged in any examination activities, and shall pay the standard charges of the Administrative Agent's and/or Bank of America's (or its designated Affiliate's) internal appraisal group, as applicable. Subject to the restrictions set forth in clause (b) above and this clause (c), the Administrative

109

Agent agrees, for the benefit of the Lenders, to commence examinations as referenced in this Section 5.07 on at least an annual basis.

SECTION 5.08    Compliance with Environmental Laws.

(a)    Except as would not reasonably be expected to have a Material Adverse Effect, (i) comply with, and undertake reasonable efforts to ensure compliance by all lessees and other occupants of its properties with, all Environmental Laws; and (ii) obtain and renew, and undertake reasonable efforts to ensure that all lessees and other occupants of its properties obtain and renew, all material authorizations and permits required pursuant to Environmental Law for its current operations and properties, in each case in accordance with Environmental Laws.

(b)    Except as would not reasonably be expected to have a Material Adverse Effect, (i) generate, use, treat, store, release, dispose of, and otherwise manage Hazardous Materials in a manner that would not reasonably be expected to result in a liability to any Lead Borrower or any of the Restricted Subsidiaries or to materially affect any real property owned or leased by any of them, and (ii) take reasonable efforts to prevent any other person from generating, using, treating, storing, releasing, disposing of, or otherwise managing Hazardous Material in a manner that would reasonably be expected to result in a liability to any Lead Borrower or any of the Restricted Subsidiaries or to materially affect any real property owned or leased by any of them.

SECTION 5.09    Further Assurances.

(a)    Execute any and all further documents, financing statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements, fixture filings, and other documents and recordings of Liens in stock registries), that may be required under any applicable law, or that the Administrative Agent may reasonably request, to cause the Collateral and Guarantee Requirement to be and remain satisfied, all at the expense of the Loan Parties.

(b)    To the extent not satisfied as of the Closing Date, satisfy clause (d) and clause (j) of the definition of "Collateral and Guarantee Requirement" within the time frame set forth therein.

(c)    [Reserved].

(d)    If (i) any additional Restricted Subsidiary is formed or acquired after the Closing Date (including, without limitation, as a result of any Division) or (ii) any Restricted Subsidiary ceases to be an Excluded Subsidiary pursuant to the definition thereof, and, in each case, the relevant Restricted Subsidiary is a Subsidiary Loan Party, (x) concurrently with the delivery of financial statements pursuant to Section 5.04(a) or (b), for the fiscal year or fiscal quarter, as applicable, in which the relevant person was formed or acquired or ceased to be an Excluded Subsidiary, notify the Administrative Agent thereof and (y) within 30 Business Days after such date or such longer period as the Administrative Agent shall agree, (A) if such Subsidiary owns or acquires any assets that are to be included in the Borrowing Base and constitute ABL Priority Collateral, cause such Subsidiary to become a Subsidiary Borrower by executing a Joinder Agreement to this Agreement, (B) if such Subsidiary owns or acquires any

110

assets not included in the Borrowing Base, but that constitute Non-ABL Priority Collateral, cause such Subsidiary to become a Guarantor by executing an assumption agreement in substantially the form of <u>Annex 1</u> to the Collateral Agreement, and (C) cause the Collateral and Guarantee Requirement to be satisfied with respect to such Subsidiary [(including the delivery of the documents described in <u>clause (d)</u> of the definition of "<u>Collateral and Guaranty Requirement</u>" if such Subsidiary owns any real property having a fair market value of at least $5.0 million (as reasonably estimated by the Lead Borrower))] and with respect to any Equity Interest in such Subsidiary owned by or on behalf of any Loan Party.

(e)     Subject to Section 5.09(g), if any additional Foreign Subsidiary (which Subsidiary is a "first tier" Foreign Subsidiary), FSHCO or Special Purpose Subsidiary (to the extent a pledge of the Equity Interests of such Subsidiary is permitted under the securitization agreements applicable to such Subsidiary) is formed or acquired after the Closing Date, concurrently with the delivery of financial statements pursuant to <u>Section 5.04(a)</u> or <u>(b)</u> for the fiscal year or fiscal quarter, as applicable, in which the relevant person was formed or acquired, notify the Administrative Agent thereof and, within 30 Business Days after such date or such longer period as the Administrative Agent shall reasonably agree, cause the Collateral and Guarantee Requirement to be satisfied with respect to any Equity Interest in such Subsidiary owned by or on behalf of any Loan Party.

(f)     Furnish to the Administrative Agent prompt written notice (and in any event within 30 days) of any change in (i) any Loan Party's corporate or organizational name, (ii) any Loan Party's organizational form or jurisdiction of organization, (iii) the location of any Loan Party's chief executive office or the opening or closing of any place of business at which Collateral in excess of $1.0 million is located or (iv) any Loan Party's organizational identification number.

(g)     None of the Collateral and Guarantee Requirement, the provisions of this <u>Section 5.09</u> nor the provisions of any other Loan Document need be satisfied (and no representation or warranty shall be made in any Loan Document) with respect to (i) [reserved], (ii) any leasehold real property where a Loan Party is a tenant, (iii) other than the fee-owned real property identified to the Administrative Agent on the date hereof and set forth on <u>Schedule 5.09</u>, any fee-owned real property that has an individual fair market value in an amount less than $5.0 million (as reasonably determined by the Lead Borrower), (iv) Equity Interests in any person that is not a Wholly-Owned Subsidiary to the extent the pledge thereof is prohibited by, or creates an enforceable right of termination of any other party (other than the Lead Borrower, Holdings or any Subsidiary of the Lead Borrower) under the terms of such person's organizational documents, joint venture agreement or shareholders agreement, (v) any property or assets the pledge of which is prohibited by applicable law, rule or regulation (including any legally effective requirement to obtain the consent of any governmental authority); (vii) any governmental licenses (but not the proceeds thereof) or state or local franchises, charters and authorizations, to the extent security interests in such licenses, franchises, charters or authorizations are prohibited or restricted thereby (including any legally effective prohibition or restriction) after giving effect to the applicable anti-assignment provisions of the Uniform Commercial Code of any applicable jurisdiction other than proceeds and receivables thereof, the assignment of which is expressly deemed effective under the Uniform Commercial Code of any applicable jurisdiction or other applicable law notwithstanding such prohibition; (viii) any lease,

license or other agreement or contract or any property subject to a purchase money security interest, capital lease obligation or similar arrangement permitted hereunder to the extent that a grant of a security interest therein would violate or invalidate such lease, license or agreement or contract or purchase money, capital lease or similar arrangement or create a right of termination in favor of any other party thereto (other than a Loan Party) after giving effect to the applicable anti-assignment provisions of the Uniform Commercial Code of any applicable jurisdiction other than proceeds and receivables thereof, the assignment of which is expressly deemed effective under the Uniform Commercial Code of any applicable jurisdiction or other similar applicable law notwithstanding such prohibition, (ix) any "intent-to-use" trademark application prior to the filing of a "Statement of Use" or "Amendment to Allege Use" with respect thereto, to the extent, if any, that, and solely during the period, if any, in which, the grant of a security interest therein would impair the validity or enforceability of such intent-to-use trademark application under applicable federal law, and (x) any property or asset to the extent that the burden or cost of obtaining or perfecting a security interest therein is excessive in relation to the benefit of the security afforded thereby as reasonably determined in writing by the Lead Borrower and the Administrative Agent (collectively, "ExcludedProperty"); provided, however, that the term "Excluded Property" shall not include any proceeds, substitutions or replacements of any property described in <u>clauses (i)</u> through <u>(x)</u> above unless such proceeds, substitutions or replacements constitute property of the type described in <u>clauses (i)</u> through <u>(x)</u> above (or any of them). In addition, (a) no perfection actions shall be required with respect to (A) motor vehicles and other assets subject to certificates of title, (B) letter of credit rights, except as to which perfection is accomplished by the filing of a UCC financing statement or equivalent (it being understood that no actions shall be required to perfect a security interest in letter of credit rights, other than the filing of a UCC financing statement or equivalent), (C) commercial tort claims with a value of less than $2.0 million and (D) promissory notes in a principal amount of less than $2.0 million, (b) share certificates of non-subsidiaries shall not be required to be delivered and (c) no actions in any non-U.S. jurisdiction or required by the laws of any non-U.S. jurisdiction shall be required to be taken to create any security interests in assets located or titled outside of the U.S. or to perfect or make enforceable any security interests in any such assets (it being understood that there shall be no security agreements or pledge agreements governed under the laws of any non-U.S. jurisdiction except to the extent reasonably requested by the Administrative Agent in connection with (i) accounts owed by non-U.S. debtors or (ii) assets of any Borrower outside the U.S., in each case to the extent included in the Borrowing Base).

SECTION 5.10    <u>Conference Calls</u>.  At the Administrative Agent's reasonable request no more than one time per calendar year, at a time mutually convenient to the Lead Borrower and the Administrative Agent and whether or not any Lender participates in such conference call, the Lead Borrower shall participate in a conference call for Lenders to discuss the financial condition and results of operations of Holdings and its Subsidiaries for the most recently ended period for which financial statements have been delivered.

SECTION 5.11    [Reserved].

SECTION 5.12    <u>Use of Proceeds</u>.  Use the proceeds of the Revolving Facility Loans (i) on the Closing Date to fund the Transactions and (ii) after the Closing Date, along with the issuance of Letters of Credit for general corporate purposes of the Lead Borrower

and its Subsidiaries, including for Permitted Business Acquisitions and for any other purpose not otherwise prohibited hereunder.

SECTION 5.13    Collateral Monitoring and Reporting.

(a)    Borrowing Base Certificates.  By the fifteenth (15th) day of the following month (or, if a Weekly Reporting Period, by Wednesday of each week), or in any such case if such day is not a Business Day, on the next succeeding Business Day, in each case the Lead Borrower shall deliver to the Administrative Agent a Borrowing Base Certificate prepared as of the close of business of the previous month (or, if applicable, previous week), and, if a Default or an Event of Default has occurred and is continuing, at more frequent times as the Administrative Agent may request.  All calculations of the Borrowing Base in any Borrowing Base Certificate shall originally be made by the Lead Borrower and certified by a Responsible Officer of the Lead Borrower, provided that the Administrative Agent may from time to time in its Permitted Discretion, review and adjust any such calculation to (a) reflect its reasonable estimate of declines in value of any Collateral, due to collections received in the Dominion Account or otherwise; (b) to adjust advance rates downwards to reflect changes in dilution, quality, mix and other factors affecting Collateral; and (c) to the extent the calculation is not made in accordance with this Agreement or does not accurately reflect the Availability Reserve.

(b)    Records and Schedules of Accounts.  Each Loan Party shall keep accurate and complete records, in all material respects, of its Accounts, including all payments and collections thereon, and shall submit to the Administrative Agent (x) a detailed aged trial balance of all Accounts of the Borrowers as of the end of the preceding month (or shorter applicable period), on a monthly basis, on or before the fifteenth (15th) day of the following month, and if (i) there is a Weekly Reporting Period, on a weekly basis, on each Wednesday of each week during such Weekly Reporting Period and (ii) a Default or an Event of Default has occurred and is continuing, at more frequent times as the Administrative Agent may request and (y) if there is a Weekly Reporting Period, a summary level Accounts roll-forward detailing the sales, collections and other reconciling items and other reports in form satisfactory to the Administrative Agent, on a weekly basis, on each Wednesday of each week during such Weekly Reporting Period and at more frequent times as the Administrative Agent may request if a Default or an Event of Default has occurred and is continuing. In addition to the foregoing, on a yearly basis, Lead Borrower shall submit to the Administrative Agent a report, to the extent requested by the Administrative Agent, specifying each Account's Account Debtor name and address and the amount of Accounts owed at that time.  If an Event of Default has occurred and is continuing, in addition to providing the Administrative Agent with the information set forth in clauses (x) and (y) above, the Lead Borrower shall submit to the Administrative Agent a report, to the extent requested by the Administrative Agent, specifying each Account's Account Debtor name, address, the amount, invoice date and due date, showing any discount, allowance, credit, authorized return or dispute, and including such proof of delivery, copies of invoices (or electronic equivalents thereof) and invoice registers, copies of related documents, repayment histories, status reports and other information as the Administrative Agent may reasonably request.

(c)    Taxes.  If an Account of any Loan Party includes a charge for any Taxes, the Administrative Agent is authorized, in its discretion, after a Default or an Event of Default

has occurred and is continuing, to pay the amount thereof to the proper Governmental Authority for the account of such Loan Party and to charge the Lead Borrower therefor; provided, however, that neither the Administrative Agent nor Lenders shall be liable for any Taxes that may be due from the Loan Parties or with respect to any Collateral.

(d)     Account Verification.  he Administrative Agent shall have the right during normal business hours and with reasonable frequency, in coordination and together with the Lead Borrower to verify the validity, amount or any other matter relating to any material Accounts of the Loan Parties by mail, telephone or otherwise, and the Borrowers shall cooperate fully with the Administrative Agent in an effort to facilitate and promptly conclude any such verification process. If a Default or Event of Default has occurred and is continuing, the Administrative Agent shall have the right at any time to conduct such verifications, in the name of the Administrative Agent, the Lead Borrower or any Loan Party.

(e)     Maintenance of DACA Deposit Accounts and Dominion Accounts.  The Loan Parties shall establish a Deposit Account under the sole dominion and control of the Administrative Agent (including by designating an existing Deposit Account as such, such Deposit Account, a "Dominion Account"). The Loan Parties shall within 90 days after the Closing Date (or such later date as the Administrative Agent shall agree) (i) require each lockbox servicer of each of any Loan Party's lockboxes (if any) in the United States to deposit all Payment Items received therein directly to a Deposit Account (other than an Excluded Account) at the related financial institution, and (ii) use its commercially reasonable efforts to obtain an executed Deposit Account Control Agreement or Securities Account Control Agreement from each such lockbox servicer and each financial institution which maintains Deposit Accounts or Securities Accounts (other than any Excluded Accounts) for any Loan Party, which Deposit Account Control Agreement and Securities Account Control Agreement (a) establishes the Administrative Agent's control over the subject lockbox(es), if any, and/or DACA Deposit Accounts and such Securities Accounts of the Loan Parties maintained with such servicer or institution, which may be exercised by the Administrative Agent during any Cash Dominion Period, (b) requires daily application of amounts on deposit in the subject DACA Deposit Account or Securities Account to a Dominion Account as directed by the Administrative Agent during any Cash Dominion Period, (c) establishes that the Loan Parties shall not have any access to the DACA Deposit Accounts and such Securities Accounts during the Cash Dominion Period, (d) requires that the Administrative Agent be notified of any withdrawals from, or transfer out of, the DACA Deposit Account(s) or such Securities Accounts during any Cash Dominion Period and (e) waives offset rights of such servicer or bank, except for customary administrative charges. If such arrangements are not obtained with respect to any Deposit Account or Securities Account within 90 days after the Closing Date (or such later date as the Administrative Agent shall agree), the Loan Parties shall be required prior to the expiration of such 90-day or longer period to move each such Deposit Accounts and Securities Account to another bank, lockbox servicer or financial institution that that will provide such Deposit Account Control Agreement or Securities Account Control Agreement. If any Deposit Account (other than, during the first 90 days after the Closing Date, any Deposit Account in existence on the Closing Date) is at any time not subject to a Deposit Account Control Agreement complying with the requirements specified in clause (ii) of the second sentence of this Section 5.13(e), the Lead Borrower shall, at the Administrative Agent's request, within thirty (30) days, in coordination with Administrative Agent, cause replacement arrangements to be implemented with respect to such Deposit

114

Accounts which are reasonably satisfactory to the Administrative Agent. Neither the Administrative Agent nor the Lenders assume any responsibility to the Loan Parties for any lockbox arrangement, DACA Deposit Account or Dominion Account, including any claim of accord and satisfaction or release with respect to any Payment Items accepted by any bank.

(f)     <u>Proceeds of Collateral; Payment Items Received</u>.  The Borrowers shall take all commercially reasonable steps to ensure that all payments on Accounts included in the ABL Priority Collateral or otherwise relating to ABL Priority Collateral are made directly to a DACA Deposit Account (or a lockbox relating to a DACA Deposit Account) or a Dominion Account. If any Loan Party or Subsidiary receives cash or Payment Items with respect to any ABL Priority Collateral or any Payment Item not properly deposited by a lockbox servicer in accordance with the requirements set forth in <u>Section 5.13(e)</u>, it shall hold same in trust for the Administrative Agent and promptly deposit same into a DACA Deposit Account or a Dominion Account for application to the Obligations in accordance with <u>Section 7.03</u>.

(g)     <u>Records and Reports of Inventory</u>.  Each Loan Party shall keep accurate and complete records of its inventory in the United States consistent in all material respects with historical practices, and shall submit to the Administrative Agent inventory and reconciliation reports (which reports shall set forth the inventory information by location) in form reasonably satisfactory to Administrative Agent, on a monthly basis, on or before the 15th day of each month and if (i) there is a Weekly Reporting Period, on a weekly basis, on each Wednesday of each week during such Weekly Reporting Period and (ii) a Default or an Event of Default has occurred and is continuing, at more frequent times as the Administrative Agent may request. Subject to <u>Section 5.07</u>, the Lead Borrower shall conduct (or shall cause to be conducted) a physical inventory in the United States at least once per calendar year (and on a more frequent basis if requested by the Administrative Agent when an Event of Default exists) and periodic cycle counts consistent with historical practices, and shall provide to the Administrative Agent a report based on each such inventory and count promptly upon completion thereof, together with such supporting information as the Administrative Agent may reasonably request. The Administrative Agent may participate in and observe each physical count.

(h)     <u>Returns of Inventory</u>.  No Loan Party shall return any inventory to a supplier, vendor or other Person, whether for cash, credit or otherwise, unless (i) such return is in the ordinary course of business; (ii) no Default, Event of Default or Overadvance exists or would result therefrom; (iii) the Administrative Agent is promptly notified if the aggregate Value of all inventory returned in any month exceeds $2.0 million, in aggregate; and (iv) any payment received by a Loan Party for a return is promptly deposited to a DACA Deposit Account or a Dominion Account.

(i)     <u>Acquisition, Sale and Maintenance</u>.  With respect to inventory that has been included in the calculation of the Borrowing Base, no Loan Party shall acquire or accept any such inventory on consignment or approval and the Loan Parties shall take all commercially reasonable steps to assure that all inventory is produced in accordance with applicable law, including the Fair Labor Standards Act of 1938; except in any such case where the failure to do so could not reasonably be expected to result in a Material Adverse Effect. The Loan Parties shall use, store and maintain all inventory with reasonable care and caution, in accordance with historical practices and in conformity in all material respects with all applicable laws, and shall

make current rent payments (within applicable grace periods provided for in leases) at all locations where any ABL Priority Collateral is located.

(j)     Administration of Deposit Accounts.  Schedule 5.13(j) sets forth all lockbox arrangements and Deposit Accounts (including Dominion Accounts) maintained by the Loan Parties in the United States as of the Closing Date. The sole account holder of each Deposit Account shall be a single Loan Party and the Loan Parties shall not allow any other Person (other than the Administrative Agent and, subject to the ABL Intercreditor Agreement, the agent specified therein) to have control (as contemplated by the UCC) over a DACA Deposit Account or any property deposited therein. Each Loan Party shall promptly notify the Administrative Agent of any opening or closing of a Deposit Account in the United States and, concurrently with the opening thereof, shall ensure such account (other than any Excluded Accounts) is subject to a fully executed Deposit Account Control Agreement, an original copy of which has been delivered to the Administrative Agent.

SECTION 5.14     Designation of Subsidiaries.  The Lead Borrower may at any time designate any Restricted Subsidiary of the Lead Borrower as an Unrestricted Subsidiary; provided that the Lead Borrower shall only be permitted to so designate an Unrestricted Subsidiary (each an "Unrestricted  Subsidiary Designation") so long as (a) as of the date of such designation, no Default or Event of Default exists or would result therefrom, (b) as of the date of such designation, the designation of such Unrestricted Subsidiary shall comply with Section 6.04 (which may be by satisfying the Payment Conditions), with the amount of the fair market value of any assets owned by such Unrestricted Subsidiary and any of its Subsidiaries at the time of the designation thereof (as reasonably determined by the Lead Borrower in good faith) attributable to the Lead Borrower's ownership therein being deemed an Investment pursuant to Section 6.04, (c) the Lead Borrower and the Restricted Subsidiaries shall be in compliance on a Pro Forma Basis with a Fixed Charge Coverage Ratio, as such ratio is calculated as of the last day of the Test Period most recently ended on or prior to the date of such designation, as if such designation and any related transactions had occurred on the first day of such Test Period, of not less than 1.00: 1.00, (d) as of the date of such designation, the Lead Borrower shall have delivered to the Administrative Agent an officer's certificate executed by a Responsible Officer of the Lead Borrower, certifying to such officer's knowledge, compliance with the requirements of preceding clauses (a) through (c), inclusive, and containing the calculations required by the preceding clause (c) and (e) the Lead Borrower shall have delivered to the Administrative Agent an updated Borrowing Base Certificate within three (3) Business Days of such Unrestricted Subsidiary Designation. The Lead Borrower may designate any Unrestricted Subsidiary to be a Restricted Subsidiary for purposes of the credit documentation (each, a "Subsidiary Redesignation"); provided that (i) no Default or Event of Default then exists or would occur as a consequence of any such Subsidiary Redesignation (including, but not limited to, under Sections 6.01 and 6.02), (ii) the Lead Borrower and the Restricted Subsidiaries shall be in compliance on a Pro Forma Basis with a Fixed Charge Coverage Ratio, as such ratio is calculated as of the last day of the Test Period most recently ended on or prior to the date of such designation, as if such designation and any related transactions had occurred on the first day of such Test Period, of not less than 1.00: 1.00, (iii) the Lead Borrower shall be permitted to treat such Subsidiary Redesignation as a contribution to the capital of the Lead Borrower of an amount equal to the fair market value of such Unrestricted Subsidiary (as reasonably determined by the Lead Borrower in good faith) attributable to the Lead Borrower's ownership interest

116

therein, (iv) the Lead Borrower shall have delivered to the Administrative Agent an officer's certificate executed by a Responsible Officer of the Lead Borrower, certifying to such officer's knowledge, compliance with the requirements of preceding clauses (i) through (iii), inclusive, and containing the calculations required by the preceding clause (ii) and (e) the Lead Borrower shall have delivered to the Administrative Agent an updated Borrowing Base Certificate within three (3) Business Days of such Subsidiary Redesignation.

SECTION 5.15      Post-Closing Covenant.  Holdings and each Borrower agrees that it will, or will cause its relevant Subsidiaries to, complete each of the actions described on Schedule 5.15 as soon as commercially reasonable and by no later than the date set forth in Schedule 5.15 with respect to such action or such later date as the Administrative Agent may reasonably agree, in its sole discretion.

ARTICLE VI

Negative Covenants

Each of Holdings (solely as to Sections 6.08 and 6.10) and each Borrower, jointly and severally, covenants and agrees with each Lender that, until the Termination Date, unless the Required Lenders shall otherwise consent in writing, the Lead Borrower will not and will not permit any of the Restricted Subsidiaries to (and Holdings as to Sections 6.08 and 6.10, will not):

SECTION 6.01      Indebtedness.  Incur, create, assume or permit to exist any Indebtedness, except:

(a)      Indebtedness of any Loan Party under the Loan Documents (including Indebtedness in respect of any Increased Revolving Facility Commitments);

(b)      Indebtedness pursuant to Swap Agreements permitted by Section 6.11;

(c)      Indebtedness owed to (including obligations in respect of bank guarantees or similar instruments, other than letters of credit, for the benefit of) any person providing workers' compensation, securing unemployment insurance and other social security laws or regulation, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or other similar obligations to the Lead Borrower or any Restricted Subsidiary;

(d)      Indebtedness of the Lead Borrower to any Subsidiary and of any Subsidiary to the Lead Borrower or any other Subsidiary; provided that (i) Indebtedness of any Subsidiary that is not a Subsidiary Loan Party to any Loan Party shall be permitted under Section 6.04 and (ii) Indebtedness of the Lead Borrower and of any other Loan Party to any Subsidiary that is not a Subsidiary Loan Party shall be subordinated to the Obligations pursuant to the terms of the Global Intercompany Note or otherwise on terms;

(e)      Indebtedness in respect of bids, trade contracts (other than for debt for borrowed money), leases (other than Capital Lease Obligations), statutory obligations, surety, stay, customs and appeal bonds, performance, performance and completion and return of money bonds, government contracts, financial assurances and completion guarantees and similar

117

obligations, in each case provided in the ordinary course of business, including those incurred to secure health, safety and environmental obligations in the ordinary course of business (including Indebtedness in respect of bank guarantees or similar instruments in lieu of such items to support the issuance thereof, other than letters of credit);

(f)     obligations in respect of Bank Products and other Indebtedness in respect of netting services, overdraft protection and similar arrangements, in each case, in connection with cash management and deposit accounts;

(g)     (i) Indebtedness assumed or acquired in connection with Permitted Business Acquisitions, which Indebtedness, in each case exists at the time of such Permitted Business Acquisition and is not created in contemplation of such event; provided, that the aggregate principal amount of such Indebtedness shall not exceed the greater of (x) $7.5 million and (y) [•]% of Consolidated Total Assets; and (ii) any Permitted Refinancing Indebtedness incurred to Refinance such Indebtedness;

(h)     (i) Capital Lease Obligations, mortgage financings and purchase money Indebtedness (including any industrial revenue bond, industrial development bond and similar financings) incurred by the Lead Borrower or any Restricted Subsidiary prior to or within 270 days after the acquisition, lease, repair or improvement of the respective asset in order to finance such acquisition, lease, repair or improvement, in an aggregate outstanding principal amount that at the time of, and after giving effect to, the incurrence thereof would not exceed the greater of $7.5 million and [•]% of Consolidated Total Assets and (ii) any Permitted Refinancing Indebtedness in respect thereof;

(i)     other Indebtedness in an aggregate outstanding principal amount not to exceed for all Indebtedness incurred pursuant to this clause (i) (determined at the time of incurrence of any such Indebtedness) the greater of (x) $12.5 million and (y) [•]% of Consolidated Total Assets;

(j)     (i) Indebtedness under the Senior Secured Term Loan Documents in an aggregate principal amount (exclusive of any interest that is capitalized or paid-in-kind) not to exceed $[•] million and (ii) any Permitted Refinancing Indebtedness in respect thereof;

(k)     Guarantees (i) by the Loan Parties of the Indebtedness described in Section 6.01(o), (ii) by the Lead Borrower or any of its Subsidiaries that are Loan Parties of any Indebtedness of any other Loan Party permitted to be incurred under this Agreement, (iii) by the Lead Borrower or any other Loan Party of Indebtedness otherwise permitted hereunder of any Subsidiary that is not a Subsidiary Loan Party to the extent such Guarantees are permitted by Section 6.04 or (iv) by any Restricted Subsidiary that is not a Loan Party of Indebtedness of Holdings and its Subsidiaries; provided that Guarantees by the Lead Borrower or any other Loan Party under this Section 6.01(k) of any other Indebtedness of a person that is subordinated to the Obligations shall be expressly subordinated to the Obligations on terms not materially less favorable, taken as a whole, to the Lenders as those contained in the subordination of such other Indebtedness to the Obligations;

(l)     Indebtedness arising from agreements of the Lead Borrower or any Restricted Subsidiary providing for indemnification, adjustment of purchase or acquisition price or similar obligations (including without limitation earn-out obligations), in each case, incurred or assumed in connection with the acquisition or Disposition of any business or assets (including Equity Interests of Subsidiaries) of the Lead Borrower or any Subsidiary permitted by Section 6.04 or Section 6.05, other than Guarantees of Indebtedness incurred by any person acquiring all or any portion of such business or assets for the purpose of financing such acquisition;

(m)     Indebtedness supported by a Letter of Credit in a principal amount not in excess of the stated amount of such Letter of Credit;

(n)     Indebtedness consisting of (i) the financing of insurance premiums or (ii) take-or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business;

(o)     other unsecured Indebtedness of the Lead Borrower or any Restricted Subsidiary, so long as (A) the Payment Conditions shall have been satisfied at the time of incurrence of such Indebtedness, after giving effect thereto, (B) no scheduled principal payments are payable in respect of such Indebtedness prior to the Termination Date (other than customary amortization payments) and (C) the aggregate amount of any Indebtedness incurred pursuant to this clause (o) (determined at the time of incurrence of any such Indebtedness) by Restricted Subsidiaries that are not Loan Parties shall not exceed the greater of (x) $10.0 million and (y) [•]% of Consolidated Total Assets;

(p)     Subordinated Indebtedness;

(q)     (i) Indebtedness existing on the Closing Date, or incurred pursuant to revolving credit facilities in existence on the Closing Date, and set forth on Schedule 6.01 and (ii) any Permitted Refinancing Indebtedness incurred to Refinance such Indebtedness;

(r)     Indebtedness of any Subsidiary that is not a Loan Party in an aggregate outstanding principal amount not to exceed for all Indebtedness incurred pursuant to this clause (r) (determined at the time of incurrence of any such Indebtedness) the greater of (x) $10.0 million and (y) [•]% of Consolidated Total Assets;

(s)     Indebtedness incurred by the Lead Borrower or any of its Restricted Subsidiaries representing (i) deferred compensation to directors, officers, employees, members of management and consultants of any Parent Entity, the Lead Borrower or any Restricted Subsidiary in the ordinary course of business and (ii) deferred compensation or other similar arrangements in connection with the Transactions, any Permitted Business Acquisition or any Investment permitted hereby in the ordinary course of business;

(t)     Indebtedness consisting of promissory notes issued by the Lead Borrower and the Restricted Subsidiaries to current or former directors, officers, employees, members of management or consultants of any Parent Entity, the Lead Borrower or any Subsidiary (or their respective estates, heirs, family members, spouses, former spouses, domestic partners or former domestic partners) to finance the purchase or redemption of Equity Interests of any Parent Entity permitted by Section 6.07;

119

(u)    Indebtedness in respect of (x) letters of credit, bankers' acceptances supporting trade payables, warehouse receipts or similar facilities entered into in the ordinary course of business in an aggregate amount not to exceed $5.0 million or (y) any letter of credit issued in favor of any Issuing Bank or Swingline Lender to support any Defaulting Lender's participation in Letters of Credit or Swingline Loans, respectively;

(v)    Indebtedness for bank overdrafts or returned items that are promptly repaid;

(w)    Indebtedness arising (i) out of the creation of any Lien (other than for Liens securing debt for borrowed money) permitted under Section 6.02 or (ii) in connection with the endorsement of instruments for deposit in the ordinary course of business;

(x)    Indebtedness incurred in the ordinary course of business in respect of obligations of Holdings, the Lead Borrower or any Restricted Subsidiary to pay the deferred purchase price of goods or services or progress payments in connection with such goods and services;

(y)    unfunded pension fund and other employee benefit plan obligations and liabilities incurred in the ordinary course of business to the extent that they do not result in an Event of Default under Section 7.01(k);

(z)    Indebtedness of Foreign Subsidiaries in respect of any recourse factoring arrangements in an aggregate amount not to exceed $5.0 million; and

(aa)    Indebtedness in respect of any unsecured loan from a Governmental Authority in an aggregate amount not to exceed $5.0 million.

(bb)    [Indebtedness secured by Liens permitted by (bb)Section 6.02(z).]

SECTION 6.02    Liens. Create, incur, assume or permit to exist any Lien on any property or assets (including Equity Interests, evidences of Indebtedness or other securities of any person) at the time owned by it or on any income or revenues or rights in respect of any thereof, except:

(a)    Liens on property or assets of the Lead Borrower and the Restricted Subsidiaries existing on the Closing Date and set forth on Schedule 6.02 and any refinancing, modification, replacement, renewal or extension thereof; provided, that the Lien does not extend to any additional property other than after-acquired property to the extent required by the documentation governing such Indebtedness and the proceeds and products thereof (it being understood that liens securing individual financings which are listed on Schedule 6.02 may be cross-collateralized to other financings provided by the same lender or its affiliates);

(b)    any Lien created under the Loan Documents;

(c)    any Lien securing Indebtedness permitted by Section 6.01(g); provided that such Lien (A) in the case of Liens securing Capital Lease Obligations and purchase money Indebtedness, applies solely to the assets securing such Indebtedness immediately prior to the

120

consummation of the related Permitted Business Acquisition and after acquired property to the extent required by the documentation governing such Indebtedness (without giving effect to any amendment thereof effected in contemplation of such acquisition or assumption) and the proceeds and products thereof (it being understood that individual financings otherwise permitted to be secured hereunder provided by one person (or its affiliates) may be cross collateralized to other such financings provided by such person (or its affiliates)), (B) in the case of Liens securing Indebtedness of Loan Parties other than Capital Lease Obligations or purchase money Indebtedness, such Liens do not extend to the property of any person other than the person acquired or formed to make such acquisition and the subsidiaries of such person (and the Equity Interests in such person) and are junior in priority to the Lien in favor of the Obligations, to the extent attaching to ABL Priority Collateral and (C) in the case of clause (A) and clause (B), such Lien is not created in contemplation of or in connection with such acquisition or assumption; provided that (A) in the case of any Indebtedness of any Subsidiaries that are not Subsidiary Loan Parties, such Liens apply solely to the assets and Equity Interests of such Subsidiaries that are not Subsidiary Loan Parties and (B) in the case of any Indebtedness of the Lead Borrower or any other Loan Party, such Indebtedness is secured only by the assets acquired pursuant to such Permitted Business Acquisition, and the proceeds and products of and the accessions to such assets;

(d)     Liens for Taxes, assessments or other governmental charges or levies which are not yet due or which are being contested in good faith by appropriate proceedings diligently conducted which proceedings (or orders entered in connection with such proceedings) have the effect of suspending the enforcement or collection of such Liens and for which the Lead Borrower or the affected Restricted Subsidiary, as applicable, shall have set aside on its books adequate reserves in accordance with GAAP with respect thereto;

(e)     landlord's, (including statutory and contractual landlord's liens and rights of distress) carriers', warehousemen's, mechanics', suppliers', materialmen's, repairmen's, construction or other like Liens securing obligations that are not overdue by more than 60 days or, if more than 60 days overdue, (i) which are being contested in good faith by appropriate proceedings which proceedings (or orders entered in connection with such proceedings) have the effect of suspending the enforcement or collection of such Liens or (ii) the failure to make timely payment of which would not reasonably be expected to have a Material Adverse Effect;

(f)     (i) pledges and deposits made (including to support obligations in respect of letters of credit, bank guarantees or similar instruments to secure) in compliance with the Federal Employers Liability Act or any other workers' compensation, unemployment insurance and other social security laws or regulations and deposits securing premiums or liability to insurance carriers under insurance or self-insurance arrangements in respect of such obligations or otherwise as permitted in Section 6.01(c) and (ii) pledges and deposits securing liability for reimbursement or indemnification obligations (including to support obligations in respect of letters of credit, bank guarantees or similar instruments for the benefit of) to insurance carriers in respect of property, casualty or liability insurance to Holdings or any Subsidiary provided by such insurance carriers;

(g)     (i) deposits to secure the performance of bids, trade contracts (other than for debt for borrowed money), leases (other than Capital Lease Obligations), regulatory,

121

contractual, warranty or statutory obligations, surety, stay, customs and appeal bonds, performance, performance and completion and return of money bonds, government contracts, financial assurances and completion obligations and, in each case similar obligations, including those incurred to secure health, safety and environmental obligations and other deposits made in the ordinary course of business and (ii) Liens in respect of letters of credit or bank guarantees that have been posted to support payment of the items set forth in <u>clause (i)</u> of this <u>Section 6.02(g)</u>;

(h)    zoning restrictions, survey exceptions, easements, trackage rights, encroachments, leases (other than Capital Lease Obligations), licenses, special assessments, rights-of-way, restrictions on use of real property and other similar encumbrances and title defects that, in the aggregate, do not interfere in any material respect with the ordinary conduct of the business of the Lead Borrower or any Restricted Subsidiary;

(i)    Liens securing Capital Lease Obligations, mortgage financings, and purchase money Indebtedness or improvements thereto hereafter acquired, leased, repaired or improved by the Lead Borrower or any Restricted Subsidiary (including the interests of vendors and lessors under conditional sale and title retention agreements); <u>provided</u> that (i) such Liens secure Indebtedness permitted by <u>Section 6.01(h)</u> (including any Permitted Refinancing Indebtedness in respect thereof), (ii) such Liens are created, and the Indebtedness secured thereby is incurred, within 270 days after such acquisition, lease, completion of construction or repair or improvement (except in the case of any such Permitted Refinancing Indebtedness), (iii) the Indebtedness secured thereby does not exceed the cost of such equipment or other property or improvements at the time of such acquisition or construction, including transaction costs (including any fees, costs or expenses or prepaid interest or similar items) incurred by the Lead Borrower or any Restricted Subsidiary in connection with such acquisition or construction or material repair or improvement or financing thereof and (iv) such Liens do not apply to any other property or assets of Holdings, the Lead Borrower or any Restricted Subsidiary (other than to the proceeds and products of and the accessions to such equipment or other property or improvements but not to other parts of the property to which any such improvements are made) (it being understood that individual financings otherwise permitted to be secured hereunder provided by one person (or its affiliates) may be cross collateralized to other such financings provided by such person (or its affiliates));

(j)    [reserved];

(k)    Liens securing judgments, awards, attachments or decrees that do not constitute an Event of Default under <u>Section 7.01(j)</u>;

(l)    [Reserved];

(m)    (i) any interest or title of a lessor, sublessor, licensor or sublicensee or under any leases, subleases, licenses or sublicenses entered into by the Lead Borrower or any Restricted Subsidiary, (ii) any Lien or restriction to which the title or interest of such lessor, sublessor, licensor or sublicensor may be subject and (iii) any subordination of the interest of such lessor, sublessor, licensor or sublicensor to any Lien or restriction described in <u>clause (ii)</u> of this <u>Section 6.02(m)</u>;

122

(n)    Liens that are customary rights of set-off (A) relating to the establishment of depository relations with banks not given in connection with the issuance of Indebtedness, (B) relating to pooled deposit or sweep accounts of the Lead Borrower or any Restricted Subsidiary to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Lead Borrower or any Restricted Subsidiary, (C) relating to purchase orders and other agreements entered into with customers of the Lead Borrower or any Restricted Subsidiary in the ordinary course of business, (D) against credit balances of the Lead Borrower or any Restricted Subsidiary with credit card issuers or credit card processors or amounts owing by credit card issuers or credit card processors to the Lead Borrower or any Restricted Subsidiary to secure the obligations of the Lead Borrower or any Restricted Subsidiary in respect of fees and chargebacks, (E) attaching to commodity trading or other brokerage accounts incurred in the ordinary course of business and (F) encumbering reasonable customary initial deposits and margin deposits;

(o)    Liens arising solely by virtue of any statutory or common law provision relating to banker's liens, rights of set-off or similar rights;

(p)    (i) Liens on cash deposits of up to $1.0 million securing obligations in respect letters of credit, bankers' acceptances and similar facilities permitted under Sections 6.01(c), (e) and (u), and (ii) Liens on specific items of inventory or other goods owned by a Person securing such Person's obligations in respect of letters of credit, bankers' acceptances, supporting trade payables, warehouse receipts or similar facilities entered into in the ordinary course of business pursuant to Section 6.01(u) to facilitate the purchase, shipment, or storage of such inventory or such other goods;

(q)    (i) leases, subleases, licenses or sublicenses of property or (ii) rights reserved to or vested in any person by the terms of any lease, license, franchise, grant or permit held by the Lead Borrower or any Restricted Subsidiary or by a statutory provision to terminate any such lease, license, franchise, grant or permit or to require periodic payments as a condition to the continuance thereof;

(r)    Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods and to secure the performance of leases of real property;

(s)    Liens (i) solely on any cash earnest money deposits, Permitted Investments made by the Lead Borrower or any of the Restricted Subsidiaries in connection with any letter of intent or purchase agreement with respect to any Permitted Business Acquisition or other Investment permitted hereunder or (ii) consisting of an agreement to dispose of any property in a transaction permitted under Section 6.05;

(t)    Liens arising from precautionary UCC financing statements (or similar filings under other applicable law) regarding operating leases or consignment or bailee arrangements;

123

(u)      Liens on securities that are the subject of repurchase agreements constituting Permitted Investments under clause (c) of the definition thereof arising out of such repurchase transaction;

(v)      Liens on Equity Interests in Foreign Subsidiaries and assets of Foreign Subsidiaries securing obligations of Foreign Subsidiaries;

(w)      (i) Liens on Equity Interests in Joint Ventures or Unrestricted Subsidiaries securing capital contributions to or obligations of such Joint Venture or Unrestricted Subsidiaries, as applicable and (ii) customary rights of first refusal and tag, drag and similar rights in joint venture agreements entered into in the ordinary course of business;

(x)      Liens in favor of Holdings, the Lead Borrower or any Restricted Subsidiary securing intercompany Indebtedness permitted under Section 6.04 so long as any such Liens on the Collateral are subordinated to the Liens securing the Obligations in a manner reasonably satisfactory to the Administrative Agent;

(y)      Liens (i) arising out of conditional sale, title retention, consignment or similar arrangements for sale of goods entered into by the Lead Borrower or any Restricted Subsidiary in the ordinary course of business and (ii) arising by operation of law under Article 2 of the Uniform Commercial Code;

(z)      Liens securing other Indebtedness permitted under Section 6.01; [subject to conditions TBD, including an intercreditor agreement providing that such Liens on the Collateral are junior in priority to the Lien in favor of the Obligations and otherwise in form and substance consistent with the ABL Intercreditor Agreement or reasonably acceptable to the Required Lenders and the Lead Borrower];

(aa)     [reserved];

(bb)     Liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto;

(cc)     Liens on specific items of inventory or other goods and the proceeds thereof securing such person's obligations in respect of documentary letters of credit or banker's acceptances issued or created for the account of such person to facilitate the purchase, shipment or storage of such inventory or goods;

(dd)     ground leases in the ordinary course in respect of real property on which facilities owned or leased by Holdings, Lead Borrower or any of its Subsidiaries are located;

(ee)     Liens securing Indebtedness and other obligations incurred pursuant to Section 6.01(j); provided that any such Liens pursuant to this Section 6.02(ee) shall be subject to the ABL Intercreditor Agreement;

(ff)     other Liens securing obligations (other than obligations for debt for borrowed money) in an aggregate amount not to exceed $10.0 million at any time outstanding; and

124

(gg)    Liens securing Indebtedness incurred under Section 6.01(r) on assets or Equity Interests of Subsidiaries that are not Loan Parties in an aggregate amount not to exceed the greater of (x) $10.0 million and (y) [•]% of Consolidated Total Assets.

SECTION 6.03        [Reserved].

SECTION 6.04        Investments, Loans and Advances. Purchase, hold or acquire any Equity Interests, evidences of Indebtedness or other securities of, make or permit to exist any loans or advances to or Guarantees of the obligations of, another person or make a designation of a Restricted Subsidiary as an Unrestricted Subsidiary (each, an "Investment"), except:

(a)    to the extent constituting an Investment, the Transactions;

(b)    Investments among the Lead Borrower and its Subsidiaries; provided that the sum of Investments (valued at the time of the making thereof and without giving effect to any write-downs or write-offs thereof, but not in the case of intercompany loans, and in any event, after giving effect to any returns, profits, dividends, distributions, and similar amounts, repayment of loans and the release of guarantees) made after the Closing Date by the Lead Borrower and the Subsidiary Loan Parties in Subsidiaries (including Foreign Subsidiaries of the Lead Borrower) that are not Subsidiary Loan Parties shall not exceed [an aggregate net amount equal to (x) the greater of $20.0 million and 5.0% of Consolidated Total Assets outstanding at any time plus (y) Investments funded, directly or indirectly, with the proceeds of a Qualified Equity Contribution within 12 months of the receipt thereof by the Lead Borrower];

(c)    Permitted Investments and Investments that were Permitted Investments when made;

(d)    Investments arising out of the receipt by the Lead Borrower or any Subsidiary of promissory notes and other non-cash consideration for Dispositions permitted under Section 6.05 (excluding Section 6.05(e));

(e)    (i) loans and advances to directors, officers, employees, members of management or consultants of any Parent Entity, the Lead Borrower or any Restricted Subsidiary business (x) in connection with the relocation of such directors, officers or employees or otherwise made in the ordinary course of business in an aggregate principal amount not to exceed $1.5 million at any one time outstanding, or (y) relating to indemnification or reimbursement in respect of liability relating to their serving in any such capacity or as otherwise permitted under Section 6.07 and (ii) advances of payroll payments and expenses to directors, officers, employees, members of management or consultants in the ordinary course of business;

(f)    accounts receivable, notes receivable, security deposits and prepayments (including prepayments of expenses) arising and trade credit granted in the ordinary course of business and any Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors and other credits to suppliers made in the ordinary course of business;

(g)    Investments under Swap Agreements permitted pursuant to Section 6.11;

125

(h)    Investments existing on, or contractually committed as of, the Closing Date and set forth on Schedule 6.04 and any modification, replacement, renewal or extension thereof so long as any such modification, renewal or extension thereof does not increase the amount of such Investment except by terms thereof or as otherwise permitted by this Section 6.04;

(i)    Investments resulting from pledges and deposits permitted by Sections 6.02(f) and (g);

(j)    Investments (i) constituting Permitted Business Acquisitions, (ii) in any Subsidiary in an amount required to permit such person to consummate a Permitted Business Acquisition and (iii) in any Subsidiary that is not a Subsidiary Loan Party consisting of the Equity Interests of any person who is not a Subsidiary Loan Party;

(k)    Guarantees (i) permitted by Section 6.01 and (ii) of leases (other than Capital Lease Obligations) or of other obligations not constituting Indebtedness, in each case in the ordinary course of business;

(l)    Investments received in connection with the bankruptcy or reorganization of any person, or settlement of obligations of, or other disputes with or judgments against any person and/or upon foreclosure or deed in lieu of foreclosure with respect to any Lien held as security for an obligation;

(m)    Investments (i) held by the Lead Borrower or any Restricted Subsidiary acquired after the Closing Date or (ii) of a person merged into or consolidated with the Lead Borrower or a Restricted Subsidiary, in the case of this clause (ii), in accordance with Section 6.05 (other than Section 6.05(e)), after the Closing Date, in each case to the extent that such Investments were not made in contemplation of or in connection with such acquisition, merger or consolidation and were in existence or committed to be made on the date of such acquisition, merger or consolidation and any modification, replacement, renewal or extension thereof so long as any such modification, renewal or extension thereof does not increase the amount of such Investment except as otherwise permitted by this Section 6.04;

(n)    acquisitions by the Lead Borrower of obligations of one or more directors, officers, employees, members or management or consultants of Holdings, the Lead Borrower or its Subsidiaries in connection with such person's acquisition of Equity Interests of any Parent Entity, so long as no cash is actually advanced by the Lead Borrower or any of its Subsidiaries to such persons in connection with the acquisition of any such obligations;

(o)    Investments in Holdings in amounts and for purposes for which Restricted Payments to Holdings are permitted under Section 6.06;

(p)    Indebtedness, Liens, mergers, consolidations, Dispositions, Restricted Payments and prepayments and repurchases of Indebtedness permitted under Sections 6.01, 6.02, 6.05, 6.06, 6.09 and 9.04(f), as applicable, to the extent constituting Investments;

(q)    Investments by the Lead Borrower or any Restricted Subsidiary so long as the Payment Conditions are satisfied;

126

(r)     Investments funded, directly or indirectly, with the proceeds of a Qualified Equity Contribution within 12 months of the receipt thereof by the Lead Borrower;

(s)     Investments in the ordinary course of business consisting of (A) endorsements for collection or deposit or (B) customary trade arrangements with customers, vendors or suppliers;

(t)     Investments to the extent the consideration paid therefor consists solely of Equity Interests of the applicable person or any direct or indirect parent thereof;

(u)     (i) Investments made in the ordinary course of business in connection with obtaining, maintaining or renewing client and customer contracts and (ii) loans or advances made to, and guarantees with respect to obligations of, independent operators, distributors, suppliers, licensors and licensees in the ordinary course of business;

(v)     Investments consisting of loans and advances to employees of any Parent Entity or any Subsidiary the proceeds of which are used by such employees to simultaneously purchase the Equity Interests of the Lead Borrower or any Parent Entity so long as the proceeds of such Equity Interests are contemporaneously contributed to Holdings; and

(w)     other Investments having an aggregate fair market value (measured on the date of such Investment was made without giving effect to subsequent changes in value), when taken together with all other Investments made pursuant to this clause (u) that are at the time outstanding, not to exceed the greater of $5.0 million and [•]% of Consolidated Total Assets.

SECTION 6.05     Mergers, Consolidations and Dispositions. Merge into or consolidate with any other person, or permit any other person to merge into or consolidate with it, or Dispose of (in one transaction or in a series of related transactions) all or any part of its assets (whether now owned or hereafter acquired), or Dispose of any Equity Interests of any Restricted Subsidiary of the Lead Borrower, or effect a Division, except that this Section shall not prohibit:

(a)     (i) the Disposition of inventory and equipment in the ordinary course of business by the Lead Borrower or any Restricted Subsidiary, (ii) the Disposition of surplus, obsolete, uneconomic, used or worn out property (including leasehold property interests), whether now owned or hereafter acquired, in the ordinary course of business by the Lead Borrower or any Restricted Subsidiary, (iii) the leasing or subleasing of real property in the ordinary course of business by the Lead Borrower or any Restricted Subsidiary, (iv) the Disposition of Permitted Investments in the ordinary course of business or (v) the Disposition of property of assets of a Loan Party (whether in a single transaction or series of related transaction and including any settlement of claims) in connection with the transactions that have been approved by the Bankruptcy Court in the Chapter 11 Cases prior to the date hereof;

(b)     if at the time thereof and immediately after giving effect thereto no Event of Default shall have occurred and be continuing, (i) the merger of any Subsidiary of Holdings (which shall either be (A) newly formed expressly for the purpose of such transaction and which owns no assets or (B) a Subsidiary of the Lead Borrower) into a Borrower in a transaction in which such Borrower is the surviving or resulting person or the surviving or resulting person

127

expressly assumes the obligations of the applicable Borrower in a manner reasonably satisfactory to the Administrative Agent, (ii) the merger or consolidation of any Subsidiary with or into any other Subsidiary; <u>provided</u> that in a transaction involving any Subsidiary Loan Party, the surviving or resulting person shall be (or shall immediately become) a Subsidiary Loan Party, or such transaction shall be an Investment permitted by <u>Section 6.04</u>; or (iii) the liquidation or dissolution of any Restricted Subsidiary (other than a Borrower) or change in form of entity of any Restricted Subsidiary if the Lead Borrower determines in good faith that such liquidation, dissolution or change in form is in the best interests of the Borrowers;

(c)    Dispositions among the Lead Borrower and its Subsidiaries (upon voluntary liquidation or otherwise); <u>provided</u> that any Disposition by a Loan Party to a person that is not a Loan Party shall be for fair market value (as reasonably determined by such person) or such transaction shall, to the extent the Disposition is for less than fair market value (as reasonably estimated by the Lead Borrower), the excess value shall be deemed to be an Investment and shall be made in compliance with <u>Section 6.04</u>;

(d)    [Reserved];

(e)    Liens permitted by <u>Section 6.02</u>, Investments permitted by <u>Section 6.04</u>, and Restricted Payments permitted by <u>Section 6.06</u>;

(f)    Dispositions of receivables in the ordinary course of business and not as part of an accounts receivables financing transaction;

(g)    Dispositions by the Lead Borrower or any Restricted Subsidiary not otherwise permitted by this <u>Section 6.05</u>; <u>provided</u> that (i) with respect to any Disposition with consideration in excess of $2.5 million, at least 75% of the consideration for any Disposition under this <u>clause (g)</u> shall consist of cash or cash equivalents (<u>provided</u> that for purposes of the 75% cash consideration requirement (w) the amount of any Indebtedness or other liabilities of the Lead Borrower or any Restricted Subsidiary (as shown on such person's most recent balance sheet or in the notes thereto) that are assumed by the transferee of any such assets, (x) the amount of any trade-in value applied to the purchase price of any replacement assets acquired in connection with such Disposition, (y) any securities received by such Restricted Subsidiary from such transferee that are converted by such Restricted Subsidiary into cash or cash equivalents (to the extent of the cash or cash equivalents received) within 180 days following the closing of the applicable Disposition and (z) any Designated Non-Cash Consideration received in respect of such Disposition having an aggregate fair market value, taken together with all other Designated Non-Cash Consideration received pursuant to this <u>clause (z)</u> that is at that time outstanding, not in excess of $1.0 million shall, in each case of <u>clauses (x)</u>, <u>(y)</u> and <u>(z)</u>, be deemed to be cash or cash equivalents) and (ii) if applicable, the Lead Borrower shall have delivered to the Administrative Agent an updated Borrowing Base Certificate in accordance with <u>Section 2.11(b)</u>; <u>provided</u> <u>further</u> that immediately prior to the consummation of such Disposition, no Event of Default shall have occurred and be continuing and no Event of Default shall result therefrom;

(h)    Dispositions by the Lead Borrower or any Restricted Subsidiary of assets that were acquired in connection with Permitted Business Acquisitions; provided that (x) any

such Disposition shall be made or contractually committed to be made within 270 days of the date such assets were acquired by Holdings, the Lead Borrower or such Restricted Subsidiary and (y) the Lead Borrower shall have delivered to the Administrative Agent an updated Borrowing Base Certificate within three (3) Business Days of such Disposition;

(i)     any merger or consolidation in connection with an Investment permitted under Section 6.04 (including any Subsidiary Redesignation or Unrestricted Subsidiary Designation that is permitted under Section 6.04); provided that if a Borrower is a party thereto, such Borrower shall be the continuing or surviving person or the continuing or surviving person shall assume the obligations of the applicable Borrower in a manner reasonably acceptable to the Administrative Agent;

(j)     non-exclusive licensing and cross-licensing arrangements involving any technology or other intellectual property of the Lead Borrower or any Restricted Subsidiary in the ordinary course of business;

(k)     [reserved];

(l)     sales or discounting, on a non-recourse basis, past due Accounts in connection with the collection or compromise thereof;

(m)     the issuance of Qualified Capital Stock by the Lead Borrower;

(n)     sales or issuances of Equity Interests of any Subsidiary of the Lead Borrower; provided that, in the case of the sale of the Equity Interests of a Subsidiary Loan Party which is a Wholly-Owned Subsidiary, the purchaser shall be the Lead Borrower or another Subsidiary Loan Party or such transaction shall be permitted under another clause of this Section 6.05 or constitute an Investment permitted by Section 6.04 (other than Section 6.04(p));

(o)     Dispositions of property to the extent that (A) such property is exchanged for credit against the purchase price of similar replacement property or (B) the proceeds of such Disposition are promptly applied to the purchase price of such replacement property;

(p)     assignments, leases, subleases, licenses or sublicenses of property and which do not materially interfere with the business of the Lead Borrower and the Restricted Subsidiaries;

(q)     Dispositions of property subject to casualty or condemnation proceedings (including in lieu thereof);

(r)     Dispositions of property consisting of the abandonment or cancellation of intellectual property rights (or any registrations or applications therefor) which, in the reasonable good faith determination of the Lead Borrower, are uneconomical, negligible, not in the best interest of the owner thereof or not material to the conduct of the business of the Lead Borrower and the Restricted Subsidiaries;

138633067

4850-7280-1748.5

(s)      Dispositions of Investments in Joint Ventures to the extent required by, or made pursuant to, buy/sell arrangements between the joint venture parties set forth in joint venture arrangements and similar binding arrangements;

(t)      [reserved];

(u)      terminations of Swap Agreements;

(v)      [reserved];

(w)      Dispositions of Unrestricted Subsidiaries;

(x)      any Restricted Subsidiary of the Lead Borrower may consummate a merger, dissolution, liquidation or consolidation, the purpose of which is to effect a Disposition otherwise permitted under this Section 6.05;

(y)      [reserved];

(z)      any surrender or waiver of contractual rights or the settlement, release or surrender of contractual rights or other litigation claims in the ordinary course of business; and

(aa)      any issuance of, or Disposition in connection with, directors' qualifying shares or investments by residents of a particular jurisdiction as mandated by relevant foreign law.

Notwithstanding anything to the contrary contained above in this Section 6.05, no Disposition shall be permitted by this Section 6.05 (other than Dispositions pursuant to clauses (a)(ii), (a)(iii), (b), (c), (e), (i), (j), (n) (to the extent the relevant Disposition is to a Loan Party), (q), (r), (s), (x), (z) and (aa)) unless such Disposition is for fair market value (as reasonably determined by the Lead Borrower).

SECTION 6.06      Dividends and Distributions. Pay, directly or indirectly, any dividend or make any other distribution (by reduction of capital or otherwise), whether in cash, property, securities or a combination thereof, with respect to any Equity Interests of the Lead Borrower (other than dividends and distributions on such Equity Interests payable solely by the issuance of additional Equity Interests of the Lead Borrower) or directly or indirectly redeem, purchase, retire or otherwise acquire for value any Equity Interests of the Lead Borrower (other than through the issuance of additional Equity Interests of the person redeeming, purchasing, retiring or acquiring such shares) (a "Restricted Payment"); provided, however, that:

(a)      Holdings, the Lead Borrower and its Restricted Subsidiaries may consummate the Transactions;

(b)      the Lead Borrower may make Restricted Payments as shall be necessary to allow any Parent Entity (i) to pay operating expenses in the ordinary course of business and other corporate overhead, legal, accounting and other professional fees and expenses (including, without limitation, those owing to third parties plus any customary indemnification claims made by directors, officers, employees, members of management and consultants of any Parent Entity

130

attributable to the ownership or operations of Holdings, the Lead Borrower and the Restricted Subsidiaries); provided that the aggregate amount of such Restricted Payments under this paragraph (b)(i) shall not exceed in any fiscal year $2.5 million (it being understood that unused amounts in any fiscal year may be carried forward to the next subsequent fiscal year), (ii) to pay fees and expenses related to any debt or equity offering, investment or acquisition permitted hereunder (whether or not successful), (iii) to pay franchise or similar Taxes, and other fees and expenses, required in maintaining such Parent Entity's corporate existence, (iv) to finance any Investment permitted to be made under Section 6.04; provided, that (A) such Restricted Payments under this clause (iv) shall be made substantially concurrently with the closing of such Investment and (B) the relevant Parent Entity shall, immediately following the closing thereof, cause all property acquired to be contributed to the Lead Borrower or one of the Restricted Subsidiaries or the merger of the person formed or acquired into the Lead Borrower or one of the Restricted Subsidiaries in order to consummate such Investment; and (v) to pay customary salary, bonus and other benefits payable to directors, officers, employees, members of management or consultants of any Parent Entity attributable to the ownership or operations of the Lead Borrower and its Subsidiaries;

(c)     the Lead Borrower may make Restricted Payments the proceeds of which are used to purchase or redeem (i) the Equity Interests of any Parent Entity (including related stock appreciation rights or similar securities) held by then present or former directors, officers, employees, members of management or consultants of any Parent Entity, the Lead Borrower or any of its Subsidiaries (or the estate, heirs, family members, spouse, former spouse, domestic partner or former domestic partner of any of the foregoing) or by any Plan; provided that the aggregate amount of such Restricted Payments under this paragraph (c) shall not exceed in any fiscal year $4.0 million (it being understood that unused amounts in any fiscal year may be carried forward to the next subsequent fiscal year; provided that no unused amounts will be carried forward beyond one fiscal year) and $8.0 million in the aggregate (plus the sum of the amount of (x) net proceeds received by the Lead Borrower during such fiscal year from sales of Equity Interests of any Parent Entity to directors, officers, employees, members of management or consultants of any Parent Entity, the Lead Borrower or any Subsidiary (or the estate, heirs, family members, spouse, former spouse, domestic partner or former domestic partner of any of the foregoing), or any Plan and (y) net proceeds of any key-man life insurance policies received in any fiscal year (which net proceeds, if not used in such fiscal year may be carried forward to the next subsequent fiscal year)) and (ii) fractional shares of Equity Interests;

(d)     the Lead Borrower may make repurchases of Equity Interests in any Parent Entity, the Lead Borrower or any Restricted Subsidiary deemed to occur upon exercise of stock options or similar Equity Interests if such repurchased Equity Interests represent a portion of the exercise price of such options or Taxes to be paid in connection therewith;

(e)     the Lead Borrower may make other Restricted Payments so long as the Payment Conditions are satisfied;

(f)     [payments to the Permitted Investors as reimbursement for reasonable fees, costs and expenses and indemnification obligations pursuant to [●];]

(g)      to the extent constituting a Restricted Payment, the Lead Borrower and the Restricted Subsidiaries may enter into the transactions expressly permitted by Section 6.04 and Section 6.05 (other than Section 6.05(e));

(h)      [Reserved]; and

(i)      for any taxable period for which the Lead Borrower and/or any of its Subsidiaries are members of a consolidated, combined or similar income tax group for U.S. federal and/or applicable state or local income Tax purposes of which a direct or indirect parent of Lead Borrower is the common parent (a "Tax Group"), the Lead Borrower may make Restricted Payments to enable such common parent to pay the portion of any U.S. federal, state or local income Taxes (as applicable) of such Tax Group for such taxable period that are attributable to the income of Lead Borrower and/or its Subsidiaries; provided that (i) the amount of such dividends or other distributions for any taxable period shall not exceed the amount of such Taxes that Lead Borrower and/or its Subsidiaries, as applicable, would have paid had Lead Borrower and/or its Subsidiaries, as applicable, been a stand-alone taxpayer (or a stand-alone group) and (ii) dividends or other distributions in respect of an Unrestricted Subsidiary shall be permitted only to the extent that cash distributions were made by such Unrestricted Subsidiary to Lead Borrower or any of its Restricted Subsidiaries for such purpose (the "Tax Distributions").

SECTION 6.07        Transactions with Affiliates.

(a)      Sell or transfer any property or assets to, or purchase or acquire any property or assets from, or otherwise engage in any other transaction with, any of its Affiliates, unless such transaction is upon terms, taken as a whole, no less favorable to the Lead Borrower or such Restricted Subsidiary, as applicable, than would be obtained in a comparable arm's-length transaction with a person that is not an Affiliate.

(b)      The foregoing paragraph (a) shall not prohibit:

(i)      any issuance of securities, or other payments, awards or grants in cash, securities or otherwise pursuant to, or the funding of, employment arrangements, stock options and stock ownership plans approved by the board of directors (or equivalent governing body) of any Parent Entity or of the Lead Borrower or any Restricted Subsidiary,

(ii)      loans or advances to directors, officers, employees, members of management or consultants of Holdings, the Lead Borrower or any of its Subsidiaries permitted or not prohibited by Section 6.04,

(iii)      transactions among any Parent Entity, the Lead Borrower and/or its Subsidiaries, in each case otherwise permitted or not prohibited by the Loan Documents,

(iv)      the payment of fees and indemnities to, and the reimbursement of the expenses of, directors, officers, employees, members of management or consultants of any Parent Entity, the Lead Borrower and the Restricted Subsidiaries in the ordinary course of business,

138633067

4850-7280-1748.5

(v)    transactions under permitted agreements in existence on the Closing Date and set forth on Schedule 6.07 or any amendment thereto to the extent such amendment is not adverse to the Lenders in any material respect,

(vi)    the entry into and performance under (A) any employment, equity incentive, severance or compensation agreements or arrangements (including any collective bargaining or similar arrangement) entered into by Holdings, the Lead Borrower or any of the Restricted Subsidiaries in the ordinary course of business, (B) any subscription agreement or similar agreement pertaining to the repurchase of Equity Interests pursuant to put/call rights or similar rights with employees, officers, directors, members of management or consultants, and (C) any employee compensation, benefit plan or arrangement, vacation plans, incentive plans, deferred compensation plans, retirement or savings plans, any health, disability or similar insurance plan which covers employees, and any employment contract or arrangement and transactions pursuant thereto, in each case in respect of officers, directors, employees or constituents of any Parent Entity, Holdings, the Lead Borrower or any Restricted Subsidiary,

(vii)    Restricted Payments permitted under Section 6.06 and Investments permitted by Section 6.04,

(viii)    any purchase by Holdings of, or contributions to, the equity capital of the Lead Borrower,

(ix)    payments made by the Lead Borrower or any of the Restricted Subsidiaries to the Permitted Investors for any financial advisory, financing, underwriting or placement services or in respect of other investment banking activities, including in connection with acquisitions or divestitures, which payments are approved by the majority of the board of directors (or equivalent governing body) of the Lead Borrower, in good faith and other similar fees,

(x)    transactions among the Lead Borrower and the Restricted Subsidiaries for the purchase or sale of goods, products, parts and services entered into in the ordinary course of business,

(xi)    any transaction in respect of which the Lead Borrower delivers to the Administrative Agent (for delivery to the Lenders) a letter addressed to the board of directors (or equivalent governing body) of the Lead Borrower from an accounting, appraisal or investment banking firm, in each case of nationally recognized standing, which letter states that such transaction is on terms, taken as a whole, that are no less favorable to the Lead Borrower or the applicable Subsidiary, as applicable, than would be obtained in a comparable arm's-length transaction with a person that is not an Affiliate,

(xii)    the Transactions, including the payment of all fees, expenses, bonuses and awards (including Transaction Costs) related to the Transactions (and including, for the avoidance of doubt, the Senior Secured Term Loan Documents and the transactions undertaken with the lenders thereunder in respect of the Senior Secured Term Loan in accordance with the terms thereof and (b) the Loan Documents and the

transactions undertaken with the lenders hereunder in respect of the Obligations in accordance with the terms thereof),

(xiii)    Guarantees permitted by Section 6.01,

(xiv)    the issuance and sale of Qualified Capital Stock,

(xv)    transactions with customers, clients, suppliers or Joint Ventures for the purchase or sale of goods and services entered into in the ordinary course of business,

(xvi)    the indemnification (or similar arrangement) of directors, officers, employees, members of management or consultants of any Parent Entity, the Lead Borrower and its Subsidiaries in accordance with the organizational documents of the relevant person, applicable law or customary practice,

(xvii)    performance of customary obligations under the terms of any stockholders agreement, principal investors agreement (including any registration rights agreement or purchase agreement related thereto) to which any Parent Entity, the Lead Borrower or any Restricted Subsidiary is a party as of the Closing Date (as such agreement may be amended or otherwise modified from time to time) and any similar agreements relating to the Equity Interests of any of the foregoing which the relevant parties may enter into after the Closing Date (except to the extent the performance of such obligations is otherwise prohibited under the terms of this Agreement),

(xviii)    transactions between the Lead Borrower or any of its Restricted Subsidiaries and any Person, the sole affiliation to the Lead Borrower or any of its Restricted subsidiaries of which is that a director of such Person is also a director of the Lead Borrower or any Parent Entity; provided, however, that such director abstains from voting as a director of the Lead Borrower or such Parent Entity in any matter involving such other Person, and

(xix)    transactions with a Person (other than an Unrestricted Subsidiary of the Lead Borrower) that is an Affiliate of the Lead Borrower solely because the Lead Borrower owns, directly or through a Restricted Subsidiary, an Equity Interest in, or controls, such Person.

SECTION 6.08        Business of Holdings. In the case of Holdings, engage in any ness or business activity other than (i) ownership and acquisition of Equity Interests in the Lead Borrower, together in each case with activities directly related thereto, (ii) performance of its obligations under and in connection with the Loan Documents, the Senior Secured Term Loan Documents and the other agreements contemplated hereby and thereby, (iii) the consummation of the Transactions and actions incidental thereto, (iv) the incurrence of and performance of its obligations related to Indebtedness and Guarantees incurred by Holdings after the Closing Date and that are related to the other activities referred to in, or otherwise permitted by, this Section 6.08, including the payment by Holdings, directly or indirectly, of dividends or other distributions (by reduction of capital or otherwise), whether in cash, property, securities or a combination thereof, with respect to any of its Equity Interests, or directly or indirectly redeeming, purchasing, retiring or otherwise acquiring for value any of its Equity Interests or

134

setting aside any amount for any such purpose, (v) actions required by law to maintain its existence, the payment of taxes and other customary obligations, (vii) the issuance, sale and redemption of Equity Interests, (viii) any transaction contemplated by `or referred to in this Article VI (including guaranteeing Indebtedness or obligations of the Lead Borrower and its Subsidiaries), (ix) the receipt, holding and further distribution of the proceeds of Restricted Payments permitted by Section 6.06, (x) holding directors' and shareholders' meetings, preparing corporate and similar records and other activities required to maintain its existence and separate corporate or other legal structure, (xi) preparing reports to, and notices to and filings with, Governmental Authorities and to the holders of its Equity Interests, (xii) [Reserved], (xiii) merging and otherwise consolidating, in one or a series of related transactions, with any Parent Entity so long as the surviving entity of any such transaction (if not Holdings) expressly assumes the obligations of Holdings under the Loan Documents and (xiv) activities incidental to its maintenance and continuance and to the foregoing activities.

SECTION 6.09    Limitation on Prepayments of Certain Debt; Modifications of Indebtedness and Certain Other Agreements; Restrictions on Subsidiary Distributions; Negative Pledges.

(a)    Amend or modify in any manner materially adverse to the Lenders, or grant any waiver or release under or terminate in any manner (if such granting, release or termination shall be materially adverse to the Lenders), the articles or certificate of incorporation or formation or bylaws or limited liability company operating agreement of Holdings, the Lead Borrower or any of the Subsidiary Loan Parties; or

(b)    Make, directly or indirectly, any voluntary prepayment or other voluntary distribution (whether in cash, securities or other property), prior to the scheduled due date thereof, of or in respect of principal of or interest on (v) the Senior Secured Term Loan or any other Indebtedness subject to split collateral priorities similar to the Senior Secured Term Loan, (w) any Indebtedness of the Loan Parties secured by a lien permitted by Section 6.02(z), (x) any Indebtedness of the Loan Parties secured by a lien that is junior in priority to the liens securing the Obligations, (y) any Subordinated Indebtedness or (z) any senior unsecured Indebtedness of the Loan Parties with an aggregate outstanding principal amount (for any agreement, or series of related agreements, governing such Indebtedness) in excess of $5.0 million (any such Indebtedness, collectively, "Specified Indebtedness"), or any payment or other distribution (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of such Specified Indebtedness in respect thereof (except for (i) Refinancings otherwise permitted by Section 6.01, (ii) payments with respect to intercompany debt that are permitted by the subordination terms, if any, applicable thereto, (iii) payments on revolving credit facilities without corresponding reductions in Commitments, and (iii) the conversion of any Specified Indebtedness to Equity Interests of any Parent Entity (each such payment or distribution, a "Restricted Debt Payment")); provided, however, that Restricted Debt Payments with respect to any Specified Indebtedness shall be permitted (1) (A) so long as the Payment Conditions are satisfied, (B) if such Restricted Debt Payment constitutes an exchange of Specified Indebtedness for other Specified Indebtedness or (C) if any such Specified Indebtedness is converted to common or qualified preferred equity or (2) to the extent funded, directly or indirectly, with the

135

proceeds of a Qualified Equity Contribution within 12 months of the receipt thereof by the Lead Borrower;

(c)     Amend or modify, or permit the amendment or modification of, any Specified Indebtedness of Holdings, the Lead Borrower or any Restricted Subsidiary, or any agreement relating thereto, other than amendments or modifications that are (i) not materially adverse to the Lenders, or (ii) or would result in such Specified Indebtedness having terms permitted hereunder (it being understood that this Section 6.09(c) shall not restrict Permitted Refinancing Indebtedness permitted by Section 6.01); or

(d)     Permit (x) the Lead Borrower or any Restricted Subsidiary to enter into any agreement or instrument that by its terms restricts the payment of dividends or distributions or the making of cash advances to (or the repayment of cash advances from) the Borrowers or (y) the Borrowers or any Guarantor that is a Subsidiary of a Borrower to enter into any agreement or instrument that by its terms restricts the granting of Liens on Collateral pursuant to the Security Documents, in each case other than those arising under or in connection with any Loan Document, except, in each case:

(i)     restrictions imposed by any applicable law, statute, rule, regulation, ordinance, code, administrative or judicial precedent or authority or the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof;

(ii)     contractual encumbrances or restrictions in (A)(x) effect on the Closing Date (including pursuant to the Senior Secured Term Loan Documents entered into on the Closing Date) or contained in any agreements related to any Permitted Refinancing Indebtedness incurred to Refinance any Indebtedness existing on the Closing Date or (y) any agreements relating to any Indebtedness issued or incurred after the Closing Date or Permitted Refinancing Indebtedness in respect thereof, in each case so long as the scope of such encumbrance or restriction is no more expansive in any material respect (as determined in good faith by the Lead Borrower and the Administrative Agent) than any such encumbrance or restriction in effect on the Closing Date (or the date of issuance or incurrence as the case may be), or (B) any agreement (regardless of whether such agreement is in effect on the Closing Date) providing for the subordination of subordinated intercompany debt;

(iii)     any restriction on a Subsidiary imposed pursuant to an agreement entered into for the Disposition of all or substantially all the Equity Interests or assets of such Subsidiary pending the closing of such sale or disposition;

(iv)     customary provisions in (A) Joint Venture agreements and other similar agreements applicable to Joint Ventures and (B) in partnership agreements, limited liability company agreements and other similar agreements that restrict the transfer of ownership interests in the relevant partnership, limited liability company or other person;

138633067

4850-7280-1748.5

(v)    (A) any restrictions imposed by any agreement relating to secured Indebtedness permitted by this Agreement to the extent that such restrictions apply only to the property or assets securing such Indebtedness or to the persons (and their respective Subsidiaries) bound there-by, and (B) customary restrictions and conditions contained in any agreement relating to the disposition of any property permitted under Section 6.05 pending the closing of such sale or disposition;

(vi)    customary provisions contained in leases, subleases, licenses or sublicenses of intellectual property and other similar agreements entered into in the ordinary course of business;

(vii)    customary provisions restricting subletting or assignment of any lease governing a leasehold interest;

(viii)    customary provisions restricting assignment of any agreement (or the assets subject thereto) entered into in the ordinary course of business;

(ix)    customary restrictions and conditions contained in any agreement relating to any Disposition permitted under Section 6.05 pending the consummation of such Disposition;

(x)    customary restrictions and conditions contained in the document relating to any Lien, so long as (1) such Lien is permitted under Section 6.02 and such restrictions or conditions relate only to the specific asset subject to such Lien, the proceeds and products thereof and other assets cross-collateralized in connection therewith, and (2) such restrictions and conditions are not created for the purpose of avoiding the restrictions imposed by this Section 6.09;

(xi)    customary net worth provisions contained in real property leases entered into by the Lead Borrower or any Restricted Subsidiary, so long as the Lead Borrower has determined in good faith that such net worth provisions would not reasonably be expected to impair the ability of the Lead Borrower and its Restricted Subsidiaries to meet their ongoing obligations;

(xii)    any agreement in effect at the time such person becomes a Restricted Subsidiary, so long as such agreement was not entered into in contemplation of such person becoming a Restricted Subsidiary;

(xiii)    restrictions contained in any documents documenting permitted Indebtedness of any Subsidiary that is not a Subsidiary Loan Party and applicable solely to any such Subsidiary;

(xiv)    restrictions contained in any document renewing, extending, replacing or otherwise modifying the foregoing that are not more restrictive than provisions being modified;

(xv)    restrictions contained in any agreement governing any purchase money Indebtedness or Capital Lease Obligations otherwise permitted by this Agreement

137

(in which case, any prohibition or limitation shall only be effective against the assets financed thereby and the proceeds thereof);

(xvi)    restrictions on cash or other deposits or net worth imposed by customers under contracts entered into in the ordinary course of business;

(xvii)   restrictions in respect of cash collateral so long as the Lien in respect of such cash collateral is permitted under this Agreement; and

(xviii)  any restrictions imposed by any Swap Agreement permitted under this Agreement.

SECTION 6.10        Financial Covenant. Permit the Fixed Charge Coverage Ratio to be less than 1.0 to 1.0 upon the commencement of any Financial Covenant Trigger Period, tested for the twelve month period ending on the last day of the most recently ended fiscal quarter, and at the end of each succeeding fiscal quarter thereafter until the end of such Financial Covenant Trigger Period.

SECTION 6.11        Swap Agreements. Enter into any Swap Agreement, except any Swap Agreement entered into to hedge or mitigate interest rate, commodity or foreign exchange rate risks to which it is exposed in the conduct of its business or the management of its liabilities; provided, that such Swap Agreement shall not have been entered into for speculative purposes.

SECTION 6.12        Changes in Fiscal Year. Permit the fiscal year of the Lead Borrower to be anything other than the calendar year ending December 31 of each calendar year; provided that with the consent of the Administrative Agent (not to be unreasonably withheld), the Lead Borrower shall be entitled to change the end of its fiscal year; provided, further, that the Administrative Agent and the Lead Borrower are authorized to amend all relevant sections of the Loan Documents without the consent of any Lender to preserve the original intent thereof in light of such change in fiscal year.

SECTION 6.13        Change in Lines of Business. From and after the Closing Date, the Lead Borrower shall not, nor shall it permit any of its Subsidiaries to, engage in any material line of business other than (i) the businesses engaged in by the Lead Borrower and its Subsidiaries on the Closing Date and similar or reasonably related, ancillary businesses thereof or reasonable extensions thereof and (ii) such other lines of business as may be consented to by Required Lenders.

ARTICLE VII

Events of Default

SECTION 7.01        Events of Default. In case of the happening of any of the following events (each, an "Event of Default"):

(a)        any representation or warranty made or deemed made by Holdings, any Borrower or any other Loan Party in any Loan Document, or in any certificate or other

138

instrument required to be given by any Loan Party in writing furnished in connection with or pursuant to any Loan Document, shall prove to have been false in any material respect when so made or deemed made;

(b)        default shall be made in the payment of any principal of any Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or by acceleration thereof or otherwise;

(c)        default shall be made in the payment of any interest on any Loan or in the payment of any Fee or any other amount (other than an amount referred to in paragraph (b) above) due under any Loan Document, when and as the same shall become due and payable, and such default shall continue unremedied for a period of five Business Days;

(d)        default shall be made in the due observance or performance by Holdings, the Lead Borrower or any of the Restricted Subsidiaries of any covenant, condition or agreement contained in the third to last paragraph in Section 4.02, Section 5.01(a) (solely with respect to the existence of the Borrowers), Section 5.05(a), Section 5.12, Section 5.13(a) and (e) or in Article VI; provided that any Event of Default under Section 6.10 (a "Financial Covenant Event of Default") is subject to cure as provided in Section 7.02 hereof;

(e)        default shall be made in the due observance or performance by Holdings, the Lead Borrower or any of the Restricted Subsidiaries of any covenant, condition or agreement contained in any Loan Document (other than those specified in paragraphs (a), (b), (c) or (d) above) and such default shall continue unremedied for a period of 30 days after the earliest to occur of knowledge thereof or written notice thereof from the Administrative Agent to the Lead Borrower;

(f)        (i) any event or condition occurs that (A) results in any Material Indebtedness becoming due prior to its scheduled maturity or (B) enables or permits (with all applicable grace periods having expired) the holder or holders of any Material Indebtedness or any trustee or agent on its or their behalf to cause any such Indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity or (ii) Holdings, the Lead Borrower or any of the Restricted Subsidiaries shall fail to pay the principal of any Material Indebtedness at the stated final maturity thereof; provided that this paragraph (f) shall not apply to (A) secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness if such sale or transfer is permitted hereunder or (B) any event, condition or failure that is remedied by Holdings, the Lead Borrower or its applicable Restricted Subsidiary or waived by the holders of such Indebtedness prior to the acceleration of the Loans pursuant to this Section 7.01;

(g)        there shall have occurred a Change in Control;

(h)        an involuntary proceeding shall be commenced or an involuntary petition shall be filed in a court of competent jurisdiction seeking (i) relief in respect of Holdings, the Lead Borrower or any Restricted Subsidiary (other than any Immaterial Subsidiary), or of a substantial part of the property or assets of Holdings, the Lead Borrower or any such Restricted Subsidiary, under the Bankruptcy Code, or any other federal, state or foreign bankruptcy,

insolvency, receivership or similar law, (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for Holdings, the Lead Borrower or any such Restricted Subsidiary (other than any Immaterial Subsidiary) or for a substantial part of the property or assets of Holdings, the Lead Borrower or any such Restricted Subsidiary or (iii) the winding up or liquidation of Holdings, the Lead Borrower or any such Restricted Subsidiary (except, in the case of any such Restricted Subsidiary, in a transaction permitted by Section 6.05); and, in each case such proceeding or petition shall continue undismissed for 60 days or an order or decree approving or ordering any of the foregoing shall be entered;

(i)    Holdings, the Lead Borrower or any Restricted Subsidiary (other than any Immaterial Subsidiary) shall (i) voluntarily commence any proceeding or file any petition seeking relief under the Bankruptcy Code, or any other federal, state or foreign bankruptcy, insolvency, receivership or similar law, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or the filing of any petition described in paragraph (h) above, (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for Holdings, the Lead Borrower or any such Restricted Subsidiary or for a substantial part of the property or assets of Holdings, the Lead Borrower or any such Restricted Subsidiary, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors or (vi) become unable or admit in writing its inability or fail generally to pay its debts as they become due;

(j)    the failure by Holdings, the Lead Borrower or any Restricted Subsidiary to pay one or more final judgments (after giving effect to any appeals) aggregating in excess of $10.0 million (to the extent not covered by third-party insurance as to which the insurer has been notified of such judgment and does not deny coverage), which judgments are not discharged or effectively waived or stayed for a period of 60 consecutive days, or any action shall be legally taken by a judgment creditor to levy upon assets or properties of Holdings, the Lead Borrower or any Restricted Subsidiary to enforce any such judgment;

(k)    (i) an ERISA Event and/or a Foreign Plan Event shall have occurred, (ii) a trustee shall be appointed by a United States district court to administer any Plan(s) or (iii) any Loan Party or any ERISA Affiliate shall have been notified by the sponsor of a Multiemployer Plan that it has incurred or will be assessed Withdrawal Liability to such Multiemployer Plan and such person does not have reasonable grounds for contesting such Withdrawal Liability or is not contesting such Withdrawal Liability in a timely and appropriate manner; and in each case in clauses (i) through (iii) above, such event or condition, together with all other such events or conditions, if any, would reasonably be expected to have a Material Adverse Effect; or

(l)    (i) any Loan Document shall for any reason cease to be, or shall be asserted in writing by Holdings, the Lead Borrower or any Restricted Subsidiary not to be, a legal, valid and binding obligation of any party thereto, (ii) any security interest purported to be created by any Security Document and to extend to assets that are not immaterial to Holdings, the Lead Borrower and the Restricted Subsidiaries on a consolidated basis (it being agreed that assets having an aggregate value not in excess of (a) $3.0 million, in the case of ABL Priority Collateral and (y) $10.0 million, in the case of Non-ABL Priority Collateral, are so immaterial) shall cease to be, or shall be asserted in writing by Holdings, the Lead Borrower or any other

Loan Party not to be (other than in a notice to the Administrative Agent to take requisite actions to perfect such Lien), a valid and perfected security interest (perfected as and having the priority required by this Agreement or the relevant Security Document and subject to such limitations and restrictions as are set forth herein and therein) in the securities, assets or properties covered thereby, except to the extent (x) any such loss of perfection or priority results from the failure of the Administrative Agent to maintain possession of certificates actually delivered to it representing securities pledged under the Collateral Agreement, (y) such loss is covered by a lender's title insurance policy as to which the insurer has been notified of such loss and does not deny coverage and the Administrative Agent shall be reasonably satisfied with the credit of such insurer or (z) such loss of perfected security interest may be remedied by the filing of appropriate documentation without the loss of priority and the Loan Parties cooperate with the Administrative Agent to make such filings, (iii) the Guarantees pursuant to the Security Documents by Holdings, the Lead Borrower or the Subsidiary Loan Parties of any of the Obligations shall cease to be in full force and effect (other than in accordance with the terms thereof), or shall be asserted in writing by Holdings, the Lead Borrower or any Subsidiary Loan Party not to be in effect or not to be legal, valid and binding obligations or (iv) the Obligations of the Lead Borrower or the Guarantees pursuant to the Security Documents by Holdings, the Lead Borrower or the Subsidiary Loan Parties shall cease to constitute senior indebtedness under the subordination provisions of any indenture or other instruments, agreements and documents evidencing or governing any Material Indebtedness or such subordination provisions shall be invalidated or otherwise cease (in each case so long as such indenture, instrument, agreement or document is then in effect), or shall be asserted in writing by Holdings, the Lead Borrower or any Subsidiary Loan Party to be invalid or to cease to be legal, valid and binding obligations of the parties thereto, enforceable in accordance with their terms;

then, and in every such event, (a) if such event is an Event of Default specified in paragraph (h) or (i)(i), (ii), (iii) or (iv) above with respect to the Lead Borrower, the Commitments shall automatically terminate, the principal of the Loans then outstanding, together with accrued interest thereon and any unpaid accrued Fees and all other liabilities of the Lead Borrower accrued hereunder and under any other Loan Document, shall automatically become due and payable, (b) if such event is solely comprised of a Financial Covenant Event of Default, so long as any Financial Covenant Event of Default shall be continuing, either or both of the following actions may be taken: (i) with the consent of the Required Lenders, the Administrative Agent may, or upon the request of the Required Lenders, the Administrative Agent shall, upon notice to the Lead Borrower terminate forthwith the Commitments, whereupon the Commitments shall immediately terminate; and (ii) with the consent of the Required Lenders, the Administrative Agent may, or upon the request of the Required Lenders, the Administrative Agent shall, upon notice of default to the Lead Borrower, (A) declare all or a portion of the Loans and all other amounts under this Agreement and under any other Loan Document, hereunder to be forthwith due and payable, whereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and any unpaid accrued Fees and all other liabilities of the Borrowers accrued hereunder and under any other Loan Document, shall become forthwith due and payable, and (B) demand cash collateral pursuant to Section 2.05(j), and (c) if such event is any other Event of Default, so long as any such Event of Default shall be continuing, either or both of the following actions may be taken: (i) with the consent of the Required Lenders, the Administrative Agent may, or upon the request of the Required Lenders, the Administrative Agent shall, upon notice to the Lead Borrower terminate forthwith the

141

Commitments, whereupon the Commitments shall immediately terminate; and (ii) with the consent of the Required Lenders, the Administrative Agent may, or upon the request of the Required Lenders, the Administrative Agent shall, upon notice to the Lead Borrower, declare all or a portion of the Loans then outstanding to be forthwith due and payable in whole or in part, whereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and any unpaid accrued Fees and all other liabilities of the Borrowers accrued hereunder and under any other Loan Document, shall become forthwith due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Borrowers, anything contained herein or in any other Loan Document to the contrary notwithstanding.

(m)     Any Loan Party breaches or violates any material provision of the Chapter 11 Plan, the Chapter 11 Confirmation Order or any other material order or stipulation entered by the Bankruptcy Court in the Chapter 11 Cases as determined by a court order, or any material provision of the Chapter 11 Confirmation Order or such other material order or stipulation shall be vacated, reversed, stayed, modified or amended, without the consent of the Administrative Agent, if such vacatur, reversal, stay, modification or amendment could reasonably be expected to have a Material Adverse Effect.

SECTION 7.02        Holdings' Right to Cure.

(a)     Notwithstanding anything to the contrary contained in Section 7.01, in the event that the Lead Borrower fails (or, but for the operation of this Section 7.02, would fail) to comply with the requirements of the Financial Covenant, after the end of the applicable fiscal quarter until the later of (i) the expiration of the 10th Business Day subsequent to the date the Compliance Certificate is required to be delivered pursuant to Section 5.04(c) and (ii) the 10th Business Day after the beginning of a Financial Covenant Trigger Period (such later date, the "Cure Expiration Date"), Holdings shall have the right to issue Qualified Capital Stock for cash or to receive an equity contribution in respect of the Qualified Capital Stock of any Parent Entity or other Equity Interests of any Parent Entity, which other Equity Interests have terms and conditions reasonably acceptable to the Administrative Agent (the "Cure Right"), and upon the receipt by the Lead Borrower of such cash (the "Specified Equity Contribution") compliance with the Financial Covenant shall be recalculated giving effect to the following pro forma adjustments:

(i)     EBITDA shall be increased, solely for the purpose of determining compliance with Section 6.10 (including any determination of compliance with the Financial Covenant for purposes of satisfying the condition of lending set forth in Article IV) and not for any other purpose under this Agreement (including taking any Restricted Action), by an amount equal to the Specified Equity Contribution for the applicable fiscal quarter and each subsequent Test Period which includes such fiscal quarter; and

(ii)     if, after giving effect to the foregoing recalculations, the Lead Borrower shall then be in compliance with the requirements of the Financial Covenant, the Lead Borrower shall be deemed to have satisfied the requirements of the Financial Covenant as of the relevant date of determination with the same effect as though there had been no failure to comply therewith at such date, and the applicable breach or default

142

of the Financial Covenant that had occurred shall be deemed cured for purposes of this Agreement.

(b)    Notwithstanding anything herein to the contrary, (i) in each four fiscal quarter period there shall be at least two fiscal quarters with respect to which the Cure Right is not exercised, (ii) the Cure Right shall be exercised no more than five times over the term of this Agreement, (iii) the Specified Equity Contribution shall be no greater than the amount required for purposes of complying with the Financial Covenant, (iv) all Specified Equity Contributions shall be disregarded for all other purposes of this Agreement, including for all other purposes of Article VII, (v) any reduction in indebtedness (including as a result of any cash netting in leverage ratios) with the proceeds of any Specified Equity Contribution shall be ignored for purposes of determining compliance with the Financial Covenant for the fiscal quarter for which such Specified Equity Contribution is made and (vi) after the occurrence of an Event of Default resulting from a failure to comply with the requirements of the Financial Covenant, if Holdings has given the Administrative Agent notice that Holdings intends to cure such failure with the proceeds of a Specified Equity Contribution, neither the Lenders nor the Administrative Agent shall exercise any rights or remedies under Section 7.01 (or under any other Loan Document) available during the continuance of any Default or Event of Default on the basis of any actual or purported failure to comply with the Financial Covenant until such failure is not cured on or prior to the Cure Expiration Date (such period between notice and cure, the "Cure Period"). For the avoidance of doubt, no new Borrowings shall be permitted during the Cure Period.

SECTION 7.03        Post-Default Allocation of Payments.

(a)    Notwithstanding anything herein to the contrary, during the continuance of an Event of Default, the Administrative Agent shall apply and allocate monies to the Obligations, whether arising from payments by or on behalf of any Loan Party, realization on Collateral, setoff or otherwise, as follows, with respect to monies, payments, property or Collateral of or from any Loan Parties:

first, to all Obligations consisting of costs and expenses owing to the Administrative Agent;

second, to all amounts owing to the Swingline Lender on Swingline Loans;

third, to all amounts owing to the Issuing Bank on L/C Obligations;

fourth, to all Obligations constituting fees (excluding amounts relating to Secured Bank Product Obligations) owing by the Loan Parties;

fifth, to all Obligations constituting interest (excluding amounts relating to Secured Bank Product Obligations) owing by the Loan Parties;

sixth, to provide cash collateral for outstanding Letters of Credit;

seventh, to all Obligations constituting Overadvance Loans or Protective Advances;

143

eighth, to all other Obligations, excluding Secured Bank Product Obligations (unless such Secured Bank Product Obligations are Designated Bank Product Obligations); provided, that amounts constituting Designated Bank Product Obligations shall only be repaid to the extent (x) proper notice of such amounts has been provided pursuant to the definition of Secured Bank Product Obligations and (y) a reserve shall have been established equal to the Pari Passu Bank Product Amount related thereto;

ninth, to the payment of any remaining Secured Bank Product Obligations only to the extent (x) proper notice of such amounts has been provided pursuant to the definition of Secured Bank Product Obligations, and (y) of the Secured Bank Product Amount related thereto (less any payments therefrom made pursuant to clause "eighth"); and

tenth, after payment in full of all Obligations, the remainder to the Lead Borrower for the benefit of the Loan Parties or such other Person(s) as shall be legally entitled thereto.

(b)     Amounts shall be applied to each category of Obligations set forth above until the full payment thereof and then to the next category. If amounts are insufficient to satisfy a category, they shall be applied on a pro rata basis among the Obligations in the category. Monies and proceeds obtained from a Loan Party shall not be applied to its Excluded Swap Obligations, but appropriate adjustments shall be made with respect to amounts obtained from other Loan Parties to preserve the allocation specified above. Amounts distributed with respect to any Secured Bank Product Obligations shall be the actual Secured Bank Product Obligations as calculated using the methodology reported to the Administrative Agent for such Obligation (but no greater than the maximum amount reported to the Administrative Agent). The Administrative Agent shall have no obligation to calculate the amount of any Secured Bank Product Obligation and may request a reasonably detailed calculation thereof from the applicable Lender Counterparty. If the provider fails to deliver the calculation within five days following request therefor, the Administrative Agent may assume the amount is zero. The allocations set forth in this Section 7.03 are solely to determine the rights and priorities of the Administrative Agent and Lenders as among themselves, and may be changed by agreement among them without the consent of any Loan Party. This Section is not for the benefit of or enforceable by the Borrowers.

(c)     The Administrative Agent shall not be liable for any application of amounts made by it in good faith and, if any such application is subsequently determined to have been made in error, the sole recourse of any Lender or other Person to which such amount should have been made shall be to recover the amount from the Person that actually received it (and, if such amount was received by any Lender, such Lender hereby agrees to return it).

## ARTICLE VIII

## The Administrative Agent

SECTION 8.01     Appointment. Each Lender hereby irrevocably designates and appoints the Administrative Agent as the agent of such Lender under this Agreement and the other Loan Documents, and each such Lender irrevocably authorizes the Administrative Agent, in such capacity, to take such actions on its behalf under the provisions of this Agreement and the other Loan Documents and to exercise such powers and perform such duties as are expressly

144

delegated to the Administrative Agent by the terms of this Agreement and the other Loan Documents, together with such other powers as are reasonably incidental thereto. Notwithstanding any provision to the contrary elsewhere in this Agreement, the Administrative Agent shall not have any duties or responsibilities, except those expressly set forth herein, or any fiduciary relationship with any Lender, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against the Administrative Agent. Without limiting the generality of the foregoing, the Administrative Agent is hereby expressly authorized to execute any and all documents (including releases) with respect to the Collateral and the rights of the Secured Parties with respect thereto, as contemplated by and in accordance with the provisions of this Agreement and the Security Documents.

SECTION 8.02    Delegation of Duties. The Administrative Agent may execute any of its duties under this Agreement and the other Loan Documents by or through agents or attorneys-in-fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties. The Administrative Agent shall not be responsible for the negligence or misconduct of any agents or attorneys-in-fact selected by it with reasonable care.

SECTION 8.03    Exculpatory Provisions. The Agents and Lead Arranger shall not have any duties or obligations except those expressly set forth in the Loan Documents. None of the Agents, the Lead Arranger or any of their respective officers, directors, employees, agents, attorneys-in-fact or affiliates shall be (i) liable for any action lawfully taken or omitted to be taken by it or such person under or in connection with this Agreement or any other Loan Document or any certificate, report, statement or other document referred to or provided for in, or received by the Agents or Lead Arranger under or in connection with, this Agreement or any other Loan Document (except to the extent that any of the foregoing are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from its or such person's own gross negligence, willful misconduct, bad faith or material breach of the Loan Documents but excluding any liability for special, indirect, consequential or punitive damages) or (ii) responsible in any manner to any of the Lenders or the Borrowers for (or have any duty to as-certain or acquire into) any recitals, statements, representations or warranties made by any Loan Party, any officer thereof or any Lender contained in this Agreement, any other Loan Document or in any certificate, report, statement or other document referred to or provided for in, or received by the Agents or Lead Arranger under or in connection with, this Agreement or any other Loan Document or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document or for any failure of any Loan Party that is a party thereto to perform its obligations hereunder or thereunder or for existence of any Collateral or validity, perfection or enforceability of any Lien there-on. The Agents and Lead Arranger shall not (x) be subject to any fiduciary or other implied duties regardless of whether a Default has occurred and is continuing and (y) except as expressly set forth in the Loan Documents, have any duty to disclose, nor shall they be liable for the failure to disclose, any information relating to Holdings, the Lead Borrower or any Subsidiary that is communicated to or obtained by the bank serving as Administrative Agent or any of its affiliates in any capacity. The Agents and Lead Arranger shall not be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the properties, books or records of any Loan Party.

138633067

4850-7280-1748.5

SECTION 8.04        Reliance by Administrative Agent. The Administrative Agent shall be entitled to rely, and shall be fully protected in relying, upon any instrument, writing, resolution, notice, consent, certificate, affidavit, letter, fax, telex or teletype message, statement, order or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the proper person or persons and upon advice and statements of legal counsel (including counsel to Holdings or the Borrowers), independent accountants and other experts selected by the Administrative Agent. The Administrative Agent may deem and treat the payee of any Note as the owner thereof for all purposes unless a written notice of assignment, negotiation or transfer thereof shall have been filed with the Administrative Agent. The Administrative Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Document unless it shall first receive such advice or concurrence of the Required Lenders (or, if so specified by this Agreement, all Lenders) as it deems appropriate or it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action. The Administrative Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement and the other Loan Documents in accordance with a request of the Required Lenders (or, if so specified by this Agreement, all Lenders), and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders and all future holders of the Loans.

SECTION 8.05        Notice of Default. The Administrative Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default unless the Administrative Agent has received notice from a Lender, Holdings or the Lead Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default." In the event that the Administrative Agent receives such a notice, the Administrative Agent shall give notice thereof to the Lenders. The Administrative Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders (or, if so specified by this Agreement, all Lenders); provided that unless and until the Administrative Agent shall have received such directions, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of the Lenders.

SECTION 8.06        Non-Reliance on Administrative Agent and Other Lenders. Each Lender expressly acknowledges that none of the Agents, the Lead Arranger nor any of their respective officers, directors, employees, agents, attorneys-in-fact or affiliates have made any representations or warranties to it and that no act by any Agent or any Lead Arranger hereafter taken, including any review of the affairs of a Loan Party or any affiliate of a Loan Party, shall be deemed to constitute any representation or warranty by any Agent or any Lead Arranger to any Lender. Each Lender represents to the Agents and the Lead Arranger that it has, independently and without reliance upon the Agents, any Lead Arranger or any other Lender, and based on such documents and information as it has deemed appropriate, made its own appraisal of an investigation into the business, operations, property, financial and other condition and creditworthiness of the Loan Parties and their affiliates and made its own decision to make its Loans hereunder and enter into this Agreement. Each Lender also represents that it will, independently and without reliance upon any Agent, any Lead Arranger or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to

146

make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigation as it deems necessary to inform itself as to the business, operations, property, financial and other condition and creditworthiness of the Loan Parties and their affiliates. Except for notices, reports and other documents expressly required to be furnished to the Lenders by the Administrative Agent hereunder, the Administrative Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, operations, property, condition (financial or otherwise), prospects or creditworthiness of any Loan Party or any affiliate of a Loan Party that may come into the possession of the Administrative Agent or any of its officers, directors, employees, agents, attorneys-in-fact or affiliates.

SECTION 8.07      <u>Indemnification</u>. The Lenders agree to indemnify each Agent and each Lead Arranger in its capacity as such (to the extent not reimbursed by Holdings or the Borrowers and without limiting the obligation of Holdings or the Borrowers to do so), each in an amount equal to its pro rata share (based on its Commitments hereunder (or if such Commitments shall have expired or been terminated, in accordance with the respective principal amounts of its applicable outstanding Loans or participations in L/C Disbursements, as applicable)) thereof, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that may at any time (whether before or after the payment of the Loans) be imposed on, incurred by or asserted against such Agent or Lead Arranger in any way relating to or arising out of, the Commitments, this Agreement, any of the other Loan Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by such Agent or Lead Arranger under or in connection with any of the foregoing; provided that no Lender shall be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements that are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from such Agent's or Lead Arranger's gross negligence or willful misconduct; provided further that any action taken or not taken by the Administrative Agent at the request of the Required Lenders shall not constitute gross negligence or willful misconduct. The agreements in this Section 8.07 shall survive the payment of the Loans and all other amounts payable hereunder.

SECTION 8.08      <u>Agent in Its Individual Capacity</u>. Each Agent and Lead Arranger and their respective affiliates may make loans to, accept deposits from and generally engage in any kind of business with any Loan Party as though such Agent or Lead Arranger were not an Agent or Lead Arranger, as applicable. With respect to Loans made or renewed by it and with respect to any Letter of Credit issued or participated in by it, each Agent or each Lead Arranger shall have the same rights and powers under this Agreement and the other Loan Documents as any Lender and may exercise the same as though it were not an Agent or Lead Arranger, and the terms "<u>Lender</u>" and "<u>Lenders</u>" shall include each Agent or Lead Arranger in its individual capacity.

SECTION 8.09      <u>Successor Administrative Agent</u>. The Administrative Agent may resign as Administrative Agent upon 30 days' notice to the Lenders and the Lead Borrower. If the Administrative Agent shall resign as Administrative Agent under this Agreement and the other Loan Documents, then the Required Lenders shall appoint from among the Lenders a

147

successor agent for the Lenders, which successor agent shall (unless an Event of Default under Sections 7.01(b), (c), (h) or (i)(i), (ii), (iii) or (iv) above shall have occurred and be continuing) be subject to approval by the Lead Borrower, whereupon such successor agent shall succeed to the rights, powers and duties of the Administrative Agent, and the term "Administrative Agent" shall mean such successor agent effective upon such appointment and approval, and the former Administrative Agent's rights, powers and duties as Administrative Agent shall be terminated, without any other or further act or deed on the part of such former Administrative Agent or any of the parties to this Agreement or any holders of the Loans. If no successor agent has accepted appointment as Administrative Agent in accordance with the following sentence by the date that is 30 days following a retiring Administrative Agent's notice of resignation, the retiring Administrative Agent's resignation shall nevertheless thereupon become effective, and all payments and communications provided to be to or through the Administrative Agent shall instead be made to each Lender directly (and each Lender will cooperate with the Lead Borrower to enable the Lead Borrower to take such actions) and all determinations provided to be made by the Administrative Agent shall instead be made by the Required Lenders, until such time as the Required Lenders appoint a successor agent as provided for above; provided that nothing herein shall require that the Administrative Agent resign or retire from its role as collateral agent under any Security Document whether referred to therein as administrative agent, collateral agent or any analogous term therein. If the person serving as Administrative Agent becomes the subject of a Bankruptcy Event, the Lead Borrower may, to the extent permitted by applicable law, by notice in writing to the Administrative Agent, remove such person as Administrative Agent and, in consultation with the Required Lenders, appoint a successor; provided that upon any such removal, such person shall no longer be the Swingline Lender and, if applicable, shall be replaced as an Issuing Bank hereunder. If no successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days (or such earlier day as shall be agreed by the Required Lenders) (the "Removal Effective Date"), then such removal nonetheless shall become effective in accordance with such notice on the Removal Effective Date. After any retiring Administrative Agent's resignation as Administrative Agent or the removal of any Administrative Agent, the provisions of this Article VIII shall inure to the benefit of such retired or removed Administrative Agent and to the benefit of its officers, directors, employees, agents, attorneys-in-fact and affiliates as to any actions taken or omitted to be taken by it while it was Administrative Agent under this Agreement and the other Loan Documents. Notwithstanding the foregoing, nothing in this Section 8.09 shall require a Lender that has a legal, regulatory other contractual restriction on its ability to assume the role of an Administrative Agent or any of the obligations thereof to assume such role or obligations.

SECTION 8.10    Lead Arranger. The Lead Arranger shall have no duties or responsibilities hereunder in its capacity as such (other than pursuant to Section 9.16 hereof).

SECTION 8.11    Withholding Tax. To the extent required by any applicable laws (as determined in good faith by the Administrative Agent), the Administrative Agent may withhold from any payment to any Lender under any Loan Document an amount equivalent to any applicable withholding Tax. Without limiting or expanding the provisions of Section 2.17, each Lender shall indemnify and hold harmless the Administrative Agent against, and shall make payable in respect thereof within 10 days after demand therefor, any and all Taxes and any and all related losses, claims, liabilities and expenses (including fees, charges and disbursements of any counsel for the Administrative Agent) incurred by or asserted against the Administrative

148

Agent by the IRS or any other Governmental Authority as a result of the failure of the Administrative Agent to properly withhold Tax from amounts paid to or for the account of such Lender for any reason (including because the appropriate form was not delivered or not properly executed, or because such Lender failed to notify the Administrative Agent of a change in circumstance that rendered the exemption from, or reduction of withholding Tax ineffective). A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due the Administrative Agent under this Section 8.11. The agreements in this Section 8.11 shall survive the resignation and/or replacement of the Administrative Agent, any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all other Obligations. For purposes of this Section 8.11, the term "Lender" includes any Issuing Bank and the Swingline Lender.

SECTION 8.12    Secured Bank Product Providers. Each Lender Counterparty, by delivery of a notice to the Administrative Agent of a Bank Product, agrees to be bound by Section 7.03 and this Section 8.12. Each Lender Counterparty shall indemnify and hold harmless the Indemnitees, to the extent not reimbursed by Loan Parties, against any and all losses, claims, damages, liabilities and reasonable out-of-pocket costs and related expenses that may be incurred by or asserted against any Indemnitee in connection with such provider's Secured Bank Product Obligations.

ARTICLE IX

Miscellaneous

SECTION 9.01    Notices.

(a)    Notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by fax or other electronic transmission, (including ".pdf" or ".tif") pursuant to the terms of this Agreement, as follows:

(i)    if to any Loan Party, to Northern Hardwoods, Inc., Attention: Jeff Steed, Chief Financial Officer, Telecopier: 253-299-8679, Electronic Address: jeff.steed@northwesthardwoods.com, with a copy to [_____], Attention: [_____], Telecopier: [_____], Electronic Address: [_____], with a further copy to Gibson, Dunn & Crutcher LLP, Attention: [_____], Telecopier: [_____], Electronic Address: [_____];

(ii)    if to the Administrative Agent (other than for requests for extensions of credit), to Bank of America, N.A., 400 4th Street, Mailcode: OR1-1 10-01-15, Lake Oswego, OR 97034, Attention: Brett German, Telephone: (503) 303-6063, Telecopier: (503) 303-6076, Electronic Address: brett.germann@bofa.com;

138633067

4850-7280-1748.5

(iii)    if to the Administrative Agent for payments and requests for extensions of credit, to Bank of America, N.A., 901 Main Street, 14th Floor, Mail Code TX1-492-14-15, Dallas, Texas 75202, Attention: ABL Servicing, Telephone: (214) 209-7172, Telecopier (214) 416-0956, Electronic Address: dallas_operations@bankofamerica.com;

(iv)    if to an Issuing Bank, to it at the address, fax number or electronic address set forth separately in writing; or

(v)    if to a Lender, to it at the address, fax number or electronic address set forth on Schedule 2.01 or in the Assignment and Acceptance pursuant to which such Lender becomes a party hereto.

(b)    Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communications pursuant to procedures approved by the Administrative Agent; provided that the foregoing shall not apply to notices pursuant to Article II unless otherwise agreed by the Administrative Agent and the applicable Lender. Each of the Administrative Agent and the Lead Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided, further, that approval of such procedures may be limited to particular notices or communications.

(c)    All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt if delivered by hand or overnight courier service, sent by fax or (to the extent permitted by paragraph (b) above) electronic means or on the date that is five Business Days after dispatch by certified or registered mail if mailed, in each case delivered, sent or mailed (properly addressed) to such party as provided in this Section 9.01 or in accordance with the latest unrevoked direction from such party given in accordance with this Section 9.01.

(d)    Any party hereto may change its address or fax number for notices and other communications hereunder by notice to the other parties hereto.

SECTION 9.02    Survival of Agreement. All representations and warranties made by the Loan Parties herein and in the other Loan Documents shall be considered to have been relied upon by the Lenders and each Issuing Bank and shall survive the making of the Loans, the execution and delivery of the Loan Documents and the issuance of the Letters of Credit, and shall continue in full force and effect until the Termination Date. Without prejudice to the survival of any other agreements contained herein, obligations for taxes, costs, indemnifications, reimbursements, damages and other contingent liabilities contained herein (including pursuant to Sections 2.15, 2.17 and 9.05) shall survive the payment in full of the principal and interest hereunder, the expiration of the Letters of Credit, the termination of the Commitments or this Agreement, limited in the manner set forth herein.

SECTION 9.03    Binding Effect. This Agreement shall become effective when it shall have been executed by Holdings, the Lead Borrower, the Subsidiary Borrowers party to this Agreement as of the Closing Date and the Administrative Agent and when the

150

Administrative Agent shall have received copies hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of Holdings, the Lead Borrower, such Subsidiary Borrowers, each Issuing Bank, the Administrative Agent and each Lender and their respective permitted successors and assigns.

SECTION 9.04    <u>Successors and Assigns</u>.

(a)    The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby (including any Affiliate of any Issuing Bank that issues any Letter of Credit), except that (i) except as otherwise permitted by Section 6.05, the Borrowers may not assign or otherwise transfer any of their rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by the Borrowers without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section 9.04. Nothing in this Agreement, expressed or implied, shall be construed to confer upon any person (other than the parties hereto, their respective successors and assigns permitted hereby (including any Affiliate of any Issuing Bank that issues any Letter of Credit), Participants (to the extent provided in paragraph (c) of this Section 9.04), and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent, the Issuing Banks and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    (i) Subject to the conditions set forth in clause (ii) below, any Lender may assign to one or more Eligible Assignees (other than to (i) any Disqualified Institution, (ii) the Lead Borrower or any of its Affiliates or (iii) any natural person) all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitments and the Loans at the time owing to it) (provided, however, that each assignment shall be of a uniform, and not varying, percentage of all rights and obligations under and in respect of any applicable Loan and any related Commitments) with the prior written consent (such consent not to be unreasonably withheld, conditioned or delayed) of:

(A)    the Lead Borrower; provided that (i) no consent of the Lead Borrower shall be required (x) if an Event of Default under Sections 7.01(b), (c), (h) or (i) has occurred and is continuing and (y) with respect to an assignment in respect of Revolving Facility Loans, if such assignment is to a Lender, an Affiliate of a Lender or a Related Fund in respect of a Lender (for purposes of clarity, it is understood that no assignment may be made to a Disqualified Institution) and (ii) the Lead Borrower shall be deemed to have consented to any assignment unless it has objected thereto by written notice to the Administrative Agent within 10 Business Days following receipt of notice thereof;

(B)    the Administrative Agent; provided that no consent of the Administrative Agent shall be required with respect to any assignment of Revolving Facility Loans if such assignment is to a Lender, an Affiliate of a Lender or a Related Fund in respect of a Lender; and

(C)    the Swingline Lender and each Issuing Bank at the time of such assignment.

151

(ii)     Assignments shall be subject to the following additional conditions:

(A)     except in the case of an assignment to a Lender, an Affiliate of a Lender or Related Fund or an assignment of the entire remaining amount of the assigning Lender's Commitments or Loans under any Facility, the amount of the Commitments or Loans of the assigning Lender subject to each assignment (determined as of the date the Assignment and Acceptance with respect to such assignment is delivered to the Administrative Agent) shall not be less than $5.0 million (and if larger, shall be in an amount equal to $1.0 million or an integral multiple in excess thereof), unless each of the Lead Borrower and the Administrative Agent otherwise consents; provided that no such minimum amount shall apply to any assignment to another Lender or to an Affiliate of a Lender or a Related Fund;

(B)     the parties to each assignment (it being understood that any assignments aggregated together pursuant to the proviso to clause (b)(ii)(A) shall collectively be deemed one "assignment" for this purpose) shall execute and deliver to the Administrative Agent an Assignment and Acceptance together with a processing and recordation fee of $3,500; and

(C)     the Eligible Assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire and all applicable tax forms.

(iii)     Subject to acceptance and recording thereof pursuant to clause (b)(v) below and subject to clause (f) below, from and after the effective date specified in each Assignment and Acceptance, the Eligible Assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Acceptance, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Acceptance, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.15, 2.17 and 9.05, as well as any Fees accrued for its account and not yet paid). Except as otherwise provided under this Section 9.04, any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 9.04 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (c) of this Section 9.04.

(iv)     The Administrative Agent, acting for this purpose as a non-fiduciary agent of the Borrowers, shall maintain at one of its offices a copy of each Assignment and Acceptance delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amount (and related interest amounts) of the Loans (and stated interest thereon) owing to, each Lender pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive absent manifest error, and the Borrowers, the Administrative Agent, the Issuing Banks and the Lenders shall treat each person whose name is recorded

152

in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Lead Borrower, any Issuing Bank and any Lender (solely with respect to any entry related to such Lender's Loans), at any reasonable time and from time to time upon reasonable prior notice.

(v)    Upon its receipt of a duly completed Assignment and Acceptance executed by an assigning Lender and an Eligible Assignee (subject to clause (f) below), the Eligible Assignee's completed Administrative Questionnaire (unless the Eligible Assignee shall already be a Lender hereunder) and any applicable tax forms, and any written consent to such assignment required by clause (b)(i) above, the Administrative Agent shall accept such Assignment and Acceptance and record the information contained therein in the Register. No assignment, whether or not evidenced by a promissory note, shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this clause (v).

(c)    (i) Any Lender may, without the consent of any Borrower, the Swingline Lender, any Issuing Bank or the Administrative Agent, sell participations to one or more banks or other entities (other than to any Disqualified Institution or any natural person so long as the list of Disqualified Institutions shall have been made available to all Lenders) (a "Participant") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitments and the Loans owing to it); provided that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) the Lead Borrower, the Administrative Agent, each Issuing Bank and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any agreement pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and the other Loan Documents and to approve any amendment, modification or waiver of any provision of this Agreement and the other Loan Documents; provided that such agreement may provide that such Lender will not, without the consent of the relevant Participant, agree to any amendment, modification or waiver that requires the consent of each Lender or each Lender directly affected thereby, as applicable, pursuant to Section 9.04(a)(i) or clauses (i) through (viii) of the first proviso to Section 9.08(b). Subject to paragraph (c)(ii) of this Section 9.04, each Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.15, 2.16 and 2.17 (subject to the requirements and limitations of such Sections and Section 2.19 and it being understood that the documentation required under Section 2.17(e) shall be delivered solely to the participating Lender) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section 9.04. For the avoidance of doubt, no Participant shall have any rights of set-off. Each Lender that sells a participation shall, acting solely for this purpose as a nonfiduciary agent of the Borrowers, maintain a register on which it enters the name and address of each Participant and the principal amounts (and related interest amounts) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register to any person (including the identity of any Participant or any information relating to a Participant's interest in any Commitments, Loans or its other obligations under any Loan Document) except to the extent that such disclosure is

necessary in connection with a Tax audit or other proceeding to establish that such Commitment, Loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and the Borrowers and the Lenders shall treat each person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

(ii)    A Participant shall not be entitled to receive any greater payment under Section 2.15, 2.16 or 2.17 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, except to the extent that the Participant's right to a greater payment results from a Change in Law after the Participant became a Participant.

(d)    Any Lender may at any time, without the consent of or notice to the Administrative Agent or any Borrower, pledge or assign a security interest in all or any portion of its rights under this Agreement (other than to a Disqualified Institution or a natural person) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or other central bank having jurisdiction over such Lender, and this Section 9.04 shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee (including any Eligible Assignee) for such Lender as a party hereto.

(e)    The Lead Borrower, upon receipt of written notice from the relevant Lender, agrees to issue one or more Notes to any Lender requiring any such Note to facilitate transactions of the type described in paragraph (d) above.

(f)    If any assignment or participation under this Section 9.04 is made (or attempted to be made) (i) to any Disqualified Institution or any Affiliate of any Disqualified Institution, or (ii) to the extent the Lead Borrower's consent is required under the terms of this Section 9.04, to any other person without the Lead Borrower's consent (any such person described in clauses (i) or (ii), a "Disqualified Person"), then the Lead Borrower may, upon notice to the applicable Disqualified Person and the Administrative Agent, (A) terminate any Commitments of such Disqualified Person and repay all obligations of the Borrowers owing to such Disqualified Person relating to the Loans and participations held by such Disqualified Person (in the case of any participation in any Loan, to be applied to such participation), (B) in the case of any outstanding Loans, purchase such Loans by paying the lesser of (x) par and (y) the amount that such Disqualified Person paid to acquire such Loans and/or (C) require such Disqualified Person to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in this Section 9.04), all of its interests, rights and obligations under this Agreement to an assignee that shall assume such obligations (which assignee may be a Lender, if such Lender accepts such assignment); provided that (i) in the case of clause (C), the applicable Disqualified Person shall have received payment of an amount equal to the lesser of (x) par and (y) the amount such Disqualified Person paid for the applicable Loans and participations in L/C Disbursements and Swingline Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder, from the assignee (to the extent of the amount of outstanding principal and accrued interest and fees) or the Borrowers (in the case of all other

154

amounts), (ii) in the case of clauses (A) and (B), the Borrowers shall be liable to the applicable Disqualified Person under Section 2.16 if any Eurodollar Loan owing to such Disqualified Person is repaid or purchased other than on the last day of the Interest Period relating thereto and (iii) in the case of clause (C), the relevant assignment shall otherwise comply with this Section 9.04 (provided that no registration and processing fee referred to in this Section 9.04 shall be owing in connection with any assignment pursuant to this paragraph). Nothing in this Section 9.04(f) shall be deemed to prejudice any rights or remedies the Borrowers may otherwise have at law or equity. Each Lender acknowledges and agrees that the Borrowers would suffer irreparable harm if such Lender breaches any of its obligations under Sections 9.04(a), 9.04(c) or 9.04(d) insofar as such Sections relate to any assignment, participation or pledge to a Disqualified Institution or an Affiliate of a Disqualified Institution without the Lead Borrower's prior written consent. Additionally, each Lender agrees that the Borrowers may seek to obtain specific performance or other equitable or injunctive relief to enforce this Section 9.04(f) against such Lender with respect to such breach without posting a bond or presenting evidence of irreparable harm.

SECTION 9.05    Expenses; Indemnity.

(a)    The Borrowers jointly and severally agree to pay within 30 days following demand therefor (together with backup documentation supporting such request) (i) to the extent not previously reimbursed on the Closing Date, all reasonable out-of-pocket expenses (including Other Taxes) incurred (A) by the Administrative Agent and the Lead Arranger in connection with the preparation of this Agreement and the other Loan Documents, (B) by the Lead Arranger in connection with the syndication of the Commitments and (C) by the Administrative Agent in connection with the administration of this Agreement and any amendments, modifications or waivers of the provisions hereof or thereof (it being understood that the reimbursement obligation described in clauses (a)(i)(A) through (a)(i)(C) above shall be limited, in the case of legal expenses, to the reasonable out-of-pocket fees, disbursements and charges of one primary counsel to the Administrative Agent and the Lead Arranger, taken as a whole, and, if necessary, one local counsel to the Administrative Agent in each appropriate jurisdiction or otherwise retained with the Lead Borrower's prior written consent (such consent not to be unreasonably withheld, conditioned or delayed) and (ii) all reasonable out-of-pocket expenses incurred by the Administrative Agent or any Lender in connection with the enforcement or protection of their respective rights under this Agreement and the other Loan Documents and the Loans made or the Letters of Credit issued hereunder (it being understood that the reimbursement obligation described in this clause (a)(ii) shall be limited, in the case of legal expenses, to the reasonable out-of-pocket fees, disbursements and charges of one primary counsel to the Administrative Agent and the Lenders, taken as a whole, and, if necessary (x) the reasonable out-of-pocket fees, charges and disbursements of one local counsel in each appropriate jurisdiction or otherwise retained with the Lead Borrower's prior written consent (such consent not to be unreasonably withheld, conditioned or delayed) and (y) in the case of an actual or potential conflict of interest, the reasonable out-of-pocket fees, charges and disbursements of one additional counsel to all affected persons, taken as a whole).

(b)    The Borrowers jointly and severally agrees to indemnify the Agents, the Lead Arranger, each Issuing Bank, each Lender and each of their respective permitted assigns and Related Parties (each such person being called an "Indemnitee") against, and to hold each

Indemnitee harmless from, any and all losses, claims, damages, liabilities and reasonable out-of-pocket costs and related expenses (it being understood that the indemnification obligation described in this clause (b) shall be limited, in the case of legal costs and expenses, to the reasonable out-of-pocket documented fees, charges and disbursements of one primary counsel to all Indemnitees, taken as a whole, if necessary, one local counsel in each appropriate jurisdiction to all Indemnitees, taken as a whole, and, in the case of an actual or potential conflict of interest, one additional counsel to all affected Indemnitees, taken as a whole) incurred by or asserted against any Indemnitee arising out of, relating to, or as a result of (i) the execution, delivery or enforcement of this Agreement or any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto and thereto of their respective obligations hereunder or thereunder or the consummation of the Transactions and the other transactions contemplated hereby, (ii) the use of the proceeds of the Loans or the use of any Letter of Credit, (iii) any claim, litigation, investigation or proceeding relating to any of the foregoing, whether or not any Indemnitee is a party thereto and whether brought by the any Borrower or any third party or (iv) any actual or alleged presence or Release of Hazardous Materials at, on, under or from any property currently or formerly owned or operated by the Lead Borrower or any of its Subsidiaries, or any liability under Environmental Laws relating in any way to the Lead Borrower or any of its Subsidiaries; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that the relevant losses, claims, damages, liabilities or costs or related expenses (x) are determined by a final, non-appealable judgment of a court of competent jurisdiction to have resulted by reason of the gross negligence or willful misconduct of, or material breach of any Loan Document by, such Indemnitee or (y) arise out of any claim, litigation, investigation or proceeding brought by such Indemnitee (or any of its Related Parties) against another Indemnitee (or any of its Related Parties) (other than any claim, litigation, investigation or proceeding brought by or against any Agent, the Lead Arranger, any Issuing Bank or the Swingline Lender, acting in each of their respective capacities as such) that does not involve any act or omission of the Lead Borrower or any of its Subsidiaries. The Borrowers shall not be liable for any settlement of any proceeding referred to in this Section 9.05 effected without the Lead Borrower's written consent (such consent not to be unreasonably withheld or delayed), but if settled with the Lead Borrower's written consent, or if there is a final judgment against an Indemnitee in any such proceeding, the Borrowers jointly and severally agree to indemnify and hold harmless the applicable Indemnitee in the manner set forth above. The Lead Borrower shall not, without the prior written consent of any Indemnitee (such consent not to be unreasonably withheld), effect any settlement of any pending or threatened proceeding in respect of which such Indemnitee is a party and indemnity could have been sought hereunder by such Indemnitee unless such settlement (i) includes an unconditional release of such Indemnitee (and its Related Parties) from all liability or claims that are the subject matter of such proceeding and (ii) does not include a statement as to or an admission of fault, culpability or a failure to act by or on behalf of any Indemnitee (or its Related Parties). To the extent permitted by applicable law, each party hereto hereby waives for itself (and on behalf of its Related Parties) any claim against any other party hereto (or any of its Related Parties), on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) (whether or not the claim therefor is (A) based on contract, tort or duty imposed by any applicable legal requirement or (B) known or suspected to exist) arising out of, in connection with, as a result of, or in any way related to, (x) the execution or delivery of this Agreement or any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by

138633067

4850-7280-1748.5

the parties hereto and thereto of their respective obligations hereunder or thereunder or the consummation of the Transactions and the other transactions contemplated hereby, (y) the use of the proceeds of the Loans or the use of any Letter of Credit or (z) any claim, litigation, investigation or proceeding relating to any of the foregoing; provided that nothing contained in this sentence shall limit the Borrowers' indemnity obligations to the extent any special, indirect, consequential or punitive damages are included in any third party claim in connection with which the relevant Indemnitee is entitled to indemnification hereunder. The provisions of this Section 9.05 shall remain operative and in full force and effect regardless of the expiration of the term of this Agreement, the consummation of the transactions contemplated hereby, the repayment of any of the Obligations, the termination of the Commitments, the expiration of any Letters of Credit, the invalidity or unenforceability of any term or provision of this Agreement or any other Loan Document, or any investigation made by or on behalf of the Administrative Agent, any Issuing Bank or any Lender. All amounts due under this Section 9.05(b) shall be payable within 30 days following written demand therefor accompanied by reasonable documentation supporting the relevant indemnification or reimbursement request.

(c)      Except as expressly provided in Section 9.05(a) with respect to Other Taxes, which shall not be duplicative with any amounts paid pursuant to Section 2.17, this Section 9.05 shall not apply to Taxes other than any Taxes arising from a non-Tax claim, litigation, investigation or proceeding.

(d)      Notwithstanding the foregoing paragraphs in this Section 9.05, if it is found by a final, non-appealable judgment of a court of competent jurisdiction in any action, proceeding or investigation that any loss, claim, damage, liability or cost or related expense of any Indemnitee has resulted from the gross negligence, bad faith or willful misconduct of such Indemnitee (or any of its Related Parties) or a material breach of the Loan Documents by such Indemnitee (or any of its Related Parties), such Indemnitee will promptly repay the portion of the reimbursed amounts previously paid to such Indemnitee under this Section 9.05 that is attributable to expenses incurred in relation to the act or omission of such Indemnitee which is the subject of such finding.

SECTION 9.06      Right of Set-off. If an Event of Default shall have occurred and be continuing, with the written consent of the Administrative Agent or the Required Lenders, each Lender and each Issuing Bank is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by such Lender or such Issuing Bank to or for the credit or the account of Holdings, the Lead Borrower or any Subsidiary Loan Party (and such Lender or Issuing Bank will provide prompt notice to such Loan Party) against any and all of the obligations of Holdings or any Borrower now or hereafter existing under this Agreement or any other Loan Document held by such Lender or such Issuing Bank, irrespective of whether or not such Lender or such Issuing Bank shall have made any demand under this Agreement or such other Loan Document and although the obligations may be unmatured. The rights of each Lender and each Issuing Bank under this Section 9.06 are in addition to other rights and remedies (including other rights of set-off) that such Lender or such Issuing Bank may have. For the avoidance of doubt, Participants shall not have any rights of set-off under this Agreement or any other Loan Document.

SECTION 9.07       Applicable Law. THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (OTHER THAN LETTERS OF CREDIT AND AS EXPRESSLY SET FORTH IN OTHER LOAN DOCUMENTS) SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK. EACH LETTER OF CREDIT SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED IN ACCORDANCE WITH, THE LAWS OR RULES DESIGNATED IN SUCH LETTER OF CREDIT, OR IF NO SUCH LAWS OR RULES ARE DESIGNATED, THE UNIFORM CUSTOMS AND PRACTICE FOR DOCUMENTARY CREDITS MOST RECENTLY PUBLISHED AND IN EFFECT, ON THE DATE SUCH LETTER OF CREDIT WAS ISSUED, BY THE INTERNATIONAL CHAMBER OF COMMERCE (THE "UNIFORM CUSTOMS") AND, AS TO MATTERS NOT GOVERNED BY THE UNIFORM CUSTOMS, THE LAWS OF THE STATE OF NEW YORK.

SECTION 9.08       Waivers; Amendment; Intercreditor Agreements.

(a)       No failure or delay of the Administrative Agent, any Issuing Bank or any Lender in exercising any right or power hereunder or under any Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Administrative Agent, each Issuing Bank and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of this Agreement or any other Loan Document or consent to any departure by Holdings, the Lead Borrower or any other Loan Party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) below, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Unless otherwise required pursuant to the terms of any Loan Document, no notice or demand on Holdings, the Lead Borrower or any other Loan Party in any case shall entitle such person to any other or further notice or demand in similar or other circumstances.

(b)       Except as provided in Section 2.23 with respect to any Extension and Section 9.08(d), neither this Agreement nor any other Loan Document nor any provision hereof or thereof may be waived, amended or modified except (x) in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by Holdings, the Lead Borrower and the Required Lenders (or the Administrative Agent with the consent of the Required Lenders) and (y) in the case of any other Loan Document, pursuant to an agreement or agreements in writing entered into by each party thereto and the Administrative Agent and consented to by the Required Lenders; provided, however, that no such agreement shall:

(i)       decrease or forgive the principal amount of, extend the final maturity of, or decrease the rate of interest or fees payable on, any Loan or any L/C Disbursement, or extend the stated expiration of any Letter of Credit beyond the Maturity Date, without the prior written consent of each Lender or Issuing Bank directly and adversely affected thereby (it being understood that waivers or modifications of conditions precedent, covenants, Defaults or Events of Default or of a mandatory reduction in the aggregate Commitments shall not constitute a reduction or forgiveness in principal or an extension of any maturity date); provided, that (x) except as provided in

clause (z) below with respect to post-default interest, the consent of the Required Lenders shall not be required for any waiver, amendment or modification contemplated by this clause (i), (y) any amendment to the definition of "Excess Availability" or the component definitions thereof shall not constitute a reduction in the rate of interest for purposes of this clause (i) and (z) any waiver or reduction of a post-default increase in interest shall be effective with the consent of the Required Lenders (and shall not require the consent of each Lender directly and adversely affected thereby),

(ii)    increase the Revolving Facility Commitment of any Lender without the prior written consent of such Lender (it being understood that waivers or modifications of conditions precedent, covenants, Defaults or Events of Default or of a mandatory reduction in the aggregate Commitments shall not constitute an increase of the Commitments of any Lender); provided that the consent of the Required Lenders shall not be required for any waiver, amendment or modification contemplated by this clause (ii),

(iii)    extend the Revolving Facility Commitment of any Lender or decrease the Revolving Credit Commitment Fees or L/C Participation Fees owing to any Lender without the prior written consent of such Lender (it being understood that waivers or modifications of conditions precedent, covenants, Defaults or Events of Default, mandatory prepayments or mandatory reductions in the aggregate Commitments shall not constitute an extension of any Revolving Facility Commitment); provided, that the consent of the Required Lenders shall not be required for any waiver, amendment or modification contemplated by this clause (iii),

(iv)    extend any date on which payment of interest on any Loan or any Administrative Agent Fee is due, without the prior written consent of each Lender directly and adversely affected thereby (it being understood that waivers or modifications of conditions precedent, covenants, Defaults, Events of Default or mandatory prepayments shall not constitute any such extension, waiver or reduction); provided that the consent of the Required Lenders shall not be required with respect to any waiver, amendment or modification contemplated by this clause (iv),

(v)    except to the extent necessary to give effect to the express intentions of this Agreement (including Sections 2.19, 2.21, 2.22, 2.23, 9.04 and 9.08(d)), which, in respect of any amendment or modification to effect such express intentions, shall be effective without the consent of the Required Lenders, amend or modify the provisions of Section 2.18(b) or (c) of this Agreement in a manner that would by its terms alter the pro rata sharing of payments required thereby, without the prior written consent of each Lender,

(vi)    (A) amend or modify the provisions of Sections 9.08(a) or (b)(i) through (v) and (vii) or reduce the voting percentage set forth in the definition of "Required Lenders" or "Supermajority Required Lenders" without the prior written consent of each Lender or (B) amend or modify the provisions of Section 9.08(b)(vi) without the prior written consent of each Lender (it being understood that Extended Revolving Facility Commitments (and the related credit exposure), any additional

159

extensions of credit pursuant to this Agreement may be included in the determination of the Required Lenders on substantially the same basis as the Loans and Commitments are included on the Closing Date),

(vii)    release all or substantially all the Collateral (it being understood that a transaction permitted under Section 6.05 shall not constitute a release of all or substantially all of the Collateral), or release all or substantially all of the value of the Guarantees (except as otherwise permitted herein (including in connection with a transaction permitted under Section 6.05) or in the other Loan Documents) under the Collateral Agreement, unless, in the case of a Subsidiary Loan Party, all or substantially all of the Equity Interests of such Subsidiary Loan Party are sold or otherwise disposed of in a transaction permitted by this Agreement, without the prior written consent of each Lender,

(viii)    (a) increase any advance rate; provided that the foregoing shall not impair the ability of the Administrative Agent to add, remove, reduce or increase reserves against the Borrowing Base assets in its Permitted Discretion or (b) otherwise amend any of the following definitions or the provisions herein implementing the usage thereof, in each case the effect of which would be to increase the amounts available for borrowing hereunder: Borrowing Base, Eligible Accounts, Eligible Inventory, Eligible Foreign Accounts, Eligible In-Transit Inventory and Excess Availability (including, in each case, the defined terms used therein) without the consent of the Supermajority Required Lenders (it being understood that the establishment, modification or elimination of reserves, in each case by the Administrative Agent in accordance with the terms hereof, will not be deemed to require a Supermajority Required Lender consent), or

(ix)    alter Section 7.03 without the consent of all Lenders directly and adversely affected thereby;

provided, further, that no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent, any Issuing Bank or the Swingline Lender hereunder without the prior written consent of the Administrative Agent, such Issuing Bank or the Swingline Lender, as applicable. Each Lender shall be bound by any waiver, amendment or modification authorized by this Section 9.08, and any consent by any Lender pursuant to this Section 9.08 shall bind any successor or assignee of such Lender. Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder, except that (w) the Commitments of such Lender may not be increased or extended without the consent of such Lender, (x) the principal and accrued and unpaid interest of such Lender's Loans shall not be reduced or forgiven without the consent of such Lender and (y) the final maturity of the Loans of such Lender may not be extended without the consent of such Lender.

(c)    Without the consent of the Lead Arranger, the Syndication Agent, the Collateral Agent, any Lender or Issuing Bank, the Loan Parties and the Administrative Agent may (in their respective sole discretion, or shall, to the extent required by any Loan Document) enter into any amendment, modification or waiver of any Loan Document, or enter into any new agreement or instrument, to effect the granting, perfection, protection, expansion or enhancement

160

of any security interest in any Collateral or additional property to become Collateral for the benefit of the Secured Parties, or as required by local law to give effect to, or protect any security interest for the benefit of the Secured Parties, in any property or so that the security interests therein comply with applicable law.

(d)     Notwithstanding anything to the contrary contained in this Section 9.08 or any Loan Document, (i) the Lead Borrower and the Administrative Agent may, without the input or consent of any other Lender, effect amendments to this Agreement and the other Loan Documents as may be necessary in the reasonable opinion of the Lead Borrower and the Administrative Agent to effect the provisions of Section 2.22, 2.23, 6.12 or 9.04(f), (ii) if the Administrative Agent and the Lead Borrower have jointly identified an ambiguity, mistake, defect, inconsistency, obvious error or any error or omission of a technical nature or any necessary or desirable administrative change, in each case, in any provision of any Loan Document, then the Administrative Agent and the Lead Borrower shall be permitted to amend such provision without the consent of any Lender, and the resulting amendment shall become effective without any further action or consent of any other party to any Loan Document if the Required Lenders do not provide to the Administrative Agent written notice of their objection to such amendment within ten Business Days following receipt of written notice of such amendment and (iii) guarantees, collateral security documents and related documents executed by any Loan Party in connection with this Agreement may be in a form reasonably determined by the Administrative Agent and may be amended, supplemented or waived without the consent of any Lender if such amendment, supplement or waiver is delivered in order to (x) comply with local law or advice of local counsel, (y) cure ambiguities, omissions, mistakes or defects or (z) cause such guarantee, collateral security document or other document to be consistent with this Agreement and the other Loan Documents.

The Administrative Agent is hereby authorized to enter into the ABL Intercreditor Agreement and any other intercreditor agreement to the extent contemplated by the terms hereof, including Section 6.01(a), Section 6.02 and Section 2.22, and the parties hereto acknowledge that the ABL Intercreditor Agreement and such other intercreditor agreement is binding upon them. Each Lender (a) hereby agrees that it will be bound by and will take no actions contrary to the provisions of the ABL Intercreditor Agreement and such other intercreditor agreement and (b) hereby authorizes and instructs the Administrative Agent to enter into the ABL Intercreditor Agreement and such other intercreditor agreement and to subject the Liens on the Collateral securing the Obligations to the provisions thereof. Each Lender waives any conflict of interest, now contemplated or arising hereafter, in connection therewith and agrees not to assert against any Agent or any of its Affiliates any claims, causes of action, damages or liabilities of whatever kind or nature relating thereto.

No Lender consent is required to effect any amendment or supplement to the ABL Intercreditor Agreement, or any other intercreditor agreement contemplated by the terms hereof (i) that is expressly contemplated by the ABL Intercreditor Agreement (or the comparable provisions, if any, of any other intercreditor agreement contemplated by the terms hereof) or (ii) any other amendments to the ABL Intercreditor Agreement that are not materially adverse to the Lenders and the other Secured Parties; provided that each such amendment described in clauses (i) and (ii) shall be reasonably satisfactory to the Administrative Agent.

SECTION 9.09      Interest Rate Limitation. Notwithstanding anything herein to the contrary, if at any time the applicable interest rate on any Loan or participation in any L/C Disbursement, together with all fees and charges that are treated as interest under applicable law (collectively, the "Charges"), as provided for herein or in any other document executed in connection herewith, or otherwise contracted for, charged, received, taken or reserved by any Lender or any Issuing Bank, shall exceed the maximum lawful rate (the "Maximum Rate") that may be contracted for, charged, taken, received or reserved by such Lender in accordance with applicable law, the rate of interest payable hereunder, together with all Charges payable to such Lender or such Issuing Bank, shall be limited to the Maximum Rate, provided that such excess amount shall be paid to such Lender or such Issuing Bank on subsequent payment dates to the extent not exceeding the legal limitation.

SECTION 9.10      Entire Agreement. This Agreement, the other Loan Documents and the agreements regarding certain Fees referred to herein constitute the entire contract between the parties relative to the subject matter hereof. Any previous agreement among or representations from the parties or their Affiliates with respect to the subject matter hereof is superseded by this Agreement and the other Loan Documents. Nothing in this Agreement or in the other Loan Documents, expressed or implied, is intended to confer upon any party other than the parties hereto and thereto, and their respective successors and assigns permitted hereunder and thereunder, any rights, remedies, obligations or liabilities under or by reason of this Agreement or the other Loan Documents.

SECTION 9.11      WAIVER OF JURY TRIAL. EACH OF THE PARTIES HERETO HEREBY AGREES TO WAIVE ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING HEREUNDER OR UNDER ANY OF THE OTHER LOAN DOCUMENTS OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS LOAN TRANSACTION OR THE LENDER/BORROWERS RELATIONSHIP THAT IS BEING ESTABLISHED. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. EACH PARTY HERETO ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH HAS ALREADY RELIED ON THIS WAIVER IN ENTERING INTO THIS AGREEMENT AND THAT EACH WILL CONTINUE TO RELY ON THIS WAIVER IN ITS RELATED FUTURE DEALINGS. EACH PARTY HERETO FURTHER WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING (OTHER THAN BY A MUTUAL WRITTEN WAIVER SPECIFICALLY REFERRING TO THIS SECTION 9.11 AND EXECUTED BY EACH OF THE PARTIES HERETO), AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS HERETO OR ANY OF THE OTHER LOAN DOCUMENTS OR TO ANY OTHER DOCUMENTS OR AGREEMENTS RELATING TO THE LOANS MADE

162

HEREUNDER. IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

SECTION 9.12        Severability. In the event any one or more of the provisions contained in this Agreement or in any other Loan Document should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby. The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 9.13        Counterparts. This Agreement may be executed in two or more counterparts, each of which shall constitute an original but all of which, when taken together, shall constitute but one contract, and shall become effective as provided in Section 9.03. Delivery of an executed counterpart to this Agreement by facsimile transmission or other electronic transmission (including by ".pdf" or ".tif") shall be as effective as delivery of a manually signed original.

SECTION 9.14        Headings. Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and are not to affect the construction of, or to be taken into consideration in interpreting, this Agreement.

SECTION 9.15        Jurisdiction; Consent to Service of Process.

(a)        Each of the parties hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of any New York State court or federal court of the United States of America sitting in New York City, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or the other Loan Documents, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this agreement shall affect any right that any Lender or the Administrative Agent may otherwise have to bring any action or proceeding against any Loan Party or its properties in the courts of any other jurisdiction solely in connection with the exercise of rights under any Security Document.

(b)        Each of the parties hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or the other Loan Documents in any New York State or federal court. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(c)       Each of the parties hereto agrees that (i) service of all process in any such proceeding in any such court may be made by registered or certified mail, return receipt requested at its address provided in Section 9.01 and (ii) service as so provided in is sufficient to confer personal jurisdiction over the applicable credit party in any such proceeding in any such court, and otherwise constitutes effective and binding service in every respect.

SECTION 9.16        Confidentiality. Each of the Lenders, the Administrative Agent and the Joint Arrangers agrees that it shall maintain in confidence any information relating to Holdings, the Lead Borrower and/or its Subsidiaries furnished to it by or on behalf of Holdings, the Lead Borrower and/or its Subsidiaries (other than information that has become generally available to the public other than as a result of a disclosure by any such party) and shall not reveal the same other than to its directors, trustees, officers, employees, agents and advisors who need to know such information in connection with the Transactions or to any person that approves or administers the Loans on behalf of such Lender (so long as each such person shall have been instructed to keep the same confidential in accordance with this Section 9.16 and such Lender, such Issuing Bank or such Agent, as applicable, shall be responsible for its Affiliates' compliance with this Section 9.16 unless such Affiliate has signed a written confidentiality agreement in favor of the Lead Borrower on the terms set forth herein), except: (A) to the extent necessary to comply with law or any legal process or the requirements or any request of any Governmental Authority, self-regulatory authority (including the National Association of Insurance Commissioners) or of any securities exchange on which securities of the disclosing party or any affiliate of the disclosing party are listed or traded (in which case such Lender, Issuing Bank or Agent will promptly notify the Lead Borrower, in advance, to the extent permitted by applicable law or the rules governing the process requiring such disclosure (except with respect to any routine or ordinary course audit or examination conducted by bank accountants or any governmental bank regulatory authority exercising examination or regulatory authority) and shall use its commercially reasonable efforts to ensure that any such information so disclosed is accorded confidential treatment), (B) as part of the reporting or review procedures to, or examinations by, Governmental Authorities or self-regulatory authorities, including the National Association of Insurance Commissioners or the National Association of Securities Dealers, Inc., (C) to its parent companies, Affiliates, auditors, and permitted assignees, transferees and participants on a "need to know basis" in connection with the transactions contemplated hereby (so long as each such person shall have agreed to keep the same confidential in accordance with provisions not less restrictive than this Section 9.16 and such Lender, such Issuing Bank or such Agent, as applicable shall be responsible for its Affiliates' compliance with this Section 9.16; provided that no such disclosure shall be made by any Lender, Issuing Bank or Agent or any of their respective Affiliates to (x) any such person that is a Disqualified Institution or (y) any Affiliate that is engaged as a principal primarily in private equity or venture capital, (D) in order to enforce its rights under any Loan Document in a legal proceeding (in which case it shall use commercially reasonable efforts to ensure that any such information so disclosed is accorded confidential treatment), (E) to any pledgee under Section 9.04(d) or any other existing or prospective assignee of, or existing or prospective Participant in, any of its rights under this Agreement (so long as such person shall have been instructed to keep the same confidential in accordance with this Section 9.16 or other provisions at least as restrictive as this Section 9.16), in each case other than a Disqualified Institution, (F) to any direct or indirect contractual counterparty in Swap Agreements or such contractual counterparty's professional advisor (so long as such contractual counterparty or professional

164

advisor to such contractual counterparty agrees to be bound by the provisions of this Section 9.16), and (G) with the consent of the Lead Borrower. In addition, each Agent and each Lender may disclose the existence of this Agreement and the information about this Agreement to market data collectors, similar service providers to the lending industry, and service providers to the Administrative Agent and the Lenders in connection with the administration and management of this Agreement, the other Loan Documents or any Swap Agreement to which a Lender Counterparty is a party.

SECTION 9.17    Release of Liens and Guarantees. The Administrative Agent shall (and each Lender hereby irrevocably authorizes the Administrative Agent to):

(a)    release any Lien granted to the Administrative Agent under any Loan Document on any asset of any Loan Party (i) on the Termination Date, (ii) that is sold, transferred, encumbered or otherwise disposed of or to be sold, transferred, encumbered or otherwise disposed of as part of, or in connection with, any sale, transfer or disposition permitted under the Loan Documents to a Person that is not (and is not required to become) a Loan Party, (iii) that does not constitute (or ceases to constitute) Collateral, (iv) if such Loan Party has guaranteed the Obligations, upon the release of such Loan Party's guaranty in accordance with the terms of the Loan Documents, (v) that constitutes Excluded Property, or (vi) to the extent such release is approved, authorized or ratified in writing by the Required Lenders in accordance with Section 9.08;

(b)    release any person that has guaranteed the Obligations from its guaranty if such person ceases to be a Subsidiary Loan Party as a result of a transaction or series of transactions that is permitted under the Loan Documents; and

(c)    subordinate any Lien granted to the Administrative Agent (or any subagent or collateral agent) under any Loan Document to any Lien that is permitted by Sections 6.02(a), (c), (i) and/or, only with respect to Liens securing Capital Lease Obligations, mortgage financings and purchase money Indebtedness.

The Administrative Agent will, and each Lender hereby authorizes the Administrative Agent to, at the expense of the Borrowers, execute and deliver to the relevant Loan Party such documents and/or instruments as such Loan Party may reasonably request to evidence or effectuate the release of any Lien or guarantee or the subordination of any Lien contemplated by this Section 9.17; provided, that the Administrative Agent shall have received a certificate of a Responsible Officer of the Lead Borrower containing certifications regarding compliance with the provisions of the Loan Documents permitting the action giving rise to such action. Upon the request of the Administrative Agent, the Required Lenders will confirm in writing the Administrative Agent's authority to take the actions contemplated by this Section 9.17. Any representation, warranty or covenant contained in any Loan Document relating to any asset of any Loan Party shall no longer be deemed to be made once the Lien on such asset is released in accordance herewith.

SECTION 9.18    USA PATRIOT Act. Each Lender hereby notifies the Loan Parties that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies the Loan Parties, which information includes the

165

name and address of the Loan Parties and other information that will allow such Lender to identify the Loan Parties in accordance with the USA PATRIOT Act.

SECTION 9.19        Marshalling; Payments Set Aside. Neither any Agent nor any Lender shall be under any obligation to marshal any assets in favor of any Loan Party or any other person or against or in payment of any or all of the Obligations. To the extent that any Loan Party makes a payment or payments to the Administrative Agent or the Lenders (or to the Administrative Agent, on behalf of the Lenders), or any Agent enforces any security interests or exercises its rights of set-off, and such payment or payments or the proceeds of such enforcement or set-off or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, any other state or federal law, common law or any equitable cause, then, to the extent of such recovery, the obligation or part thereof originally intended to be satisfied, and all Liens, rights and remedies therefor or related thereto, shall be revived and continued in full force and effect as if such payment or payments had not been made or such enforcement or set-off had not occurred.

SECTION 9.20        Obligations Several; Independent Nature of Lenders' Rights. The obligations of Lenders hereunder are several and no Lender shall be responsible for the obligations or Commitment of any other Lender hereunder. Nothing contained herein or in any other Loan Document, and no action taken by Lenders pursuant hereto or thereto, shall be deemed to constitute Lenders as a partnership, an association, a joint venture or any other kind of entity. The amounts payable at any time hereunder to each Lender shall be a separate and independent debt, and each Lender shall be entitled to protect and enforce its rights arising out hereof and it shall not be necessary for any other Lender to be joined as an additional party in any proceeding for such purpose.

SECTION 9.21        Electronic Execution of Assignments. The words "execution," "signed," "signature," and words of like import in any Assignment and Acceptance shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

SECTION 9.22        Acknowledgements. Holdings and each Borrower hereby acknowledge and agree that (a) no fiduciary, advisory or agency relationship between the Loan Parties and the Lender Parties is intended to be or has been created in respect of any of the transactions contemplated by this Agreement or the other Loan Documents, irrespective of whether the Lender Parties have advised or are advising the Loan Parties on other matters, and the relationship between the Lender Parties, on the one hand, and the Loan Parties, on the other hand, in connection herewith and therewith is solely that of creditor and debtor, (b) the Lender Parties, on the one hand, and the Loan Parties, on the other hand, have an arm's length business relationship that does not directly or indirectly give rise to, nor do the Loan Parties rely on, any fiduciary duty to the Loan Parties or their affiliates on the part of the Lender Parties, (c) the Loan Parties are capable of evaluating and understanding, and the Loan Parties understand and accept,

166

the terms, risks and conditions of the transactions contemplated by this Agreement and the other Loan Documents, (d) the Loan Parties have been advised that the Lender Parties are engaged in a broad range of transactions that may involve interests that differ from the Loan Parties' interests and that the Lender Parties have no obligation to disclose such interests and transactions to the Loan Parties, (e) the Loan Parties have consulted their own legal, accounting, regulatory and tax advisors to the extent the Loan Parties have deemed appropriate in the negotiation, execution and delivery of this Agreement and the other Loan Documents, (f) each Lender Party has been, is, and will be acting solely as a principal and, except as otherwise expressly agreed in writing by it and the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for the Loan Parties or any of their respective Subsidiaries, (g) none of the Lender Parties has any obligation to the Loan Parties or any of their respective Subsidiaries with respect to the transactions contemplated by this Agreement or the other Loan Documents except those obligations expressly set forth herein or therein or in any other express writing executed and delivered by such Lender Party and the Loan Parties and (h) no joint venture is created hereby or by the other Loan Documents or otherwise exists by virtue of the transactions contemplated hereby among the Lender Parties or among the Loan Parties and the Lender Parties.

SECTION 9.23    Lender Action. Notwithstanding anything to the contrary contained herein or in any other Loan Document, (i) the authority to enforce rights and remedies hereunder and under the other Loan Documents against the Loan Parties or any of them shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by the Administrative Agent, for the benefit of the Lenders and the Issuing Banks, (ii) no Secured Party shall have any right individually to realize upon any of the Collateral under any Security Document or to enforce the Guarantee, it being understood and agreed that all powers, rights and remedies under the Security Documents may be exercised solely by the Administrative Agent, for the benefit of the Secured Parties in accordance with the terms thereof and (iii) in the event of a foreclosure by the Administrative Agent on any of the Collateral pursuant to a public or private sale, the Administrative Agent or any Lender may be the purchaser of any or all of such Collateral at any such sale and the Administrative Agent, as agent for and representative of the Lenders (but not any Lender or Lenders in its or their respective individual capacities unless the Required Lenders shall otherwise agree in writing), shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold in any such public sale, to use and apply any of the Obligations as a credit on account of the purchase price for any Collateral payable by the Administrative Agent at such sale.

SECTION 9.24    Material Non-Public Information.

(a)    THE BORROWERS AND EACH LENDER ACKNOWLEDGE THAT CERTAIN OF THE LENDERS MAY BE "PUBLIC-SIDE" LENDERS (LENDERS THAT DO NOT WISH TO RECEIVE INFORMATION OF THE TYPE THAT WOULD BE MATERIAL NON-PUBLIC INFORMATION WITH RESPECT TO THE BORROWERS, THEIR RESPECTIVE SUBSIDIARIES OR THEIR SECURITIES IF SUCH PERSONS WERE PUBLIC REPORTING ENTITIES) AND, IF DOCUMENTS OR NOTICES REQUIRED TO BE DELIVERED PURSUANT TO THIS SECTION 9.24 OR OTHERWISE ARE BEING DISTRIBUTED THROUGH INTRALINKS/INTRAAGENCY, SYNDTRAK OR ANOTHER RELEVANT WEBSITE OR OTHER INFORMATION PLATFORM (THE "PLATFORM"),

ANY DOCUMENT OR NOTICE THAT THE LEAD BORROWER HAS INDICATED CONTAINS NONPUBLIC INFORMATION SHALL NOT BE POSTED ON THAT PORTION OF THE PLATFORM DESIGNATED FOR SUCH PUBLIC-SIDE LENDERS. IF THE LEAD BORROWER HAS NOT INDICATED WHETHER A DOCUMENT OR NOTICE DELIVERED PURSUANT TO THIS SECTION 9.24 CONTAINS NONPUBLIC INFORMATION, THE ADMINISTRATIVE AGENT SHALL POST SUCH DOCUMENT OR NOTICE SOLELY ON THAT PORTION OF THE PLATFORM DESIGNATED FOR LENDERS WHO WISH TO RECEIVE INFORMATION OF THE TYPE THAT WOULD BE MATERIAL NON-PUBLIC INFORMATION WITH RESPECT TO THE BORROWERS, THEIR RESPECTIVE SUBSIDIARIES AND THEIR SECURITIES IF SUCH PERSONS WERE PUBLIC REPORTING ENTITIES. EACH BORROWER ACKNOWLEDGES AND AGREES THAT THE LIST OF DISQUALIFIED INSTITUTIONS DOES NOT CONSTITUTE NONPUBLIC INFORMATION AND SHALL BE POSTED PROMPTLY TO ALL LENDERS BY THE ADMINISTRATIVE AGENT (INCLUDING ANY UPDATES THERETO).

(b)    EACH "PUBLIC-SIDE" LENDER DESCRIBED IN PARAGRAPH (a) OF THIS SECTION 9.24 AGREES TO CAUSE AT LEAST ONE INDIVIDUAL AT OR ON BEHALF OF SUCH LENDER TO AT ALL TIMES HAVE SELECTED THE "PRIVATE SIDE INFORMATION" OR SIMILAR DESIGNATION ON THE CONTENT DECLARATION SCREEN OF THE PLATFORM IN ORDER TO ENABLE SUCH LENDER OR ITS DELEGATE, IN ACCORDANCE WITH SUCH LENDER'S COMPLIANCE PROCEDURES AND APPLICABLE LAW, INCLUDING UNITED STATES FEDERAL AND STATE SECURITIES LAWS, TO MAKE REFERENCE TO INFORMATION THAT IS NOT MADE AVAILABLE THROUGH THE "PUBLIC SIDE INFORMATION" PORTION OF THE PLATFORM AND THAT MAY CONTAIN NONPUBLIC INFORMATION WITH RESPECT TO HOLDINGS, THE BORROWERS OR THE SECURITIES OF ANY OF THE FOREGOING FOR PURPOSES OF UNITED STATES FEDERAL OR STATE SECURITIES LAWS. IN THE EVENT THAT ANY "PUBLIC-SIDE" LENDER HAS DETERMINED FOR ITSELF TO NOT ACCESS ANY INFORMATION DISCLOSED THROUGH THE PLATFORM OR OTHERWISE, SUCH "PUBLIC-SIDE" LENDER ACKNOWLEDGES THAT (I) OTHER LENDERS MAY HAVE AVAILED THEMSELVES OF SUCH INFORMATION AND (II) NONE OF THE BORROWERS, THE AGENTS OR THE LEAD ARRANGER HAS ANY RESPONSIBILITY FOR SUCH "PUBLIC-SIDE" LENDER'S DECISION TO LIMIT THE SCOPE OF THE INFORMATION IT HAS OBTAINED IN CONNECTION WITH THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS.

(c)    EACH LENDER ACKNOWLEDGES THAT INFORMATION FURNISHED TO IT PURSUANT TO THIS AGREEMENT MAY INCLUDE MATERIAL NON-PUBLIC INFORMATION CONCERNING THE BORROWERS AND THEIR RESPECTIVE RELATED PARTIES OR THEIR RESPECTIVE SECURITIES, AND CONFIRMS THAT IT HAS DEVELOPED COMPLIANCE PROCEDURES REGARDING THE USE OF MATERIAL NON-PUBLIC INFORMATION AND THAT IT WILL HANDLE SUCH MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH THOSE PROCEDURES AND APPLICABLE LAW, INCLUDING FEDERAL AND STATE SECURITIES LAWS.

138633067

(d)    ALL INFORMATION, INCLUDING REQUESTS FOR WAIVERS AND AMENDMENTS, FURNISHED BY THE LEAD BORROWER OR THE ADMINISTRATIVE AGENT PURSUANT TO, OR IN THE COURSE OF ADMINISTERING, THIS AGREEMENT WILL BE SYNDICATE-LEVEL INFORMATION, WHICH MAY CONTAIN INFORMATION OF THE TYPE THAT WOULD BE MATERIAL NON-PUBLIC INFORMATION ABOUT THE LEAD BORROWER, THE OTHER LOAN PARTIES AND THEIR RELATED PARTIES OR THEIR RESPECTIVE SECURITIES IF SUCH PERSONS WERE PUBLIC REPORTING ENTITIES. ACCORDINGLY, EACH LENDER REPRESENTS TO THE BORROWERS AND THE ADMINISTRATIVE AGENT THAT IT HAS IDENTIFIED IN ITS ADMINISTRATIVE QUESTIONNAIRE A CREDIT CONTACT WHO MAY RECEIVE INFORMATION THAT MAY CONTAIN INFORMATION OF THE TYPE THAT WOULD BE MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH ITS COMPLIANCE PROCEDURES AND APPLICABLE LAW.

SECTION 9.25    Authorization to Distribute Certain Materials to "Public-Side" Lenders.

(a)    The Lead Borrower hereby authorizes the Administrative Agent to distribute the execution versions of the Loan Documents to all Lenders, including "public-side" Lenders who indicate that they would not wish to receive information that would be deemed to be material non-public information within the meaning of the United States federal and state securities laws if the Loan Parties had publicly-traded securities outstanding.

(b)    The Lead Borrower acknowledges its understanding that "public-side" Lenders and their firms may be trading in any of the Loan Parties' respective securities while in possession of the materials, documents and information permitted to be distributed to them pursuant to the authorizations made herein.

ARTICLE X

The Borrowers' Representative; Nature of Borrowers' Obligations

SECTION 10.01    Appointment; Nature of Relationship. The Lead Borrower is hereby appointed by each of the Borrowers as its contractual representative hereunder and under each other Loan Document, and each of the Borrowers irrevocably authorizes the Lead Borrower to act as the contractual representative of such Borrower with the rights and duties expressly set forth herein and in the other Loan Documents. The Lead Borrower agrees to act as such contractual representative upon the express conditions contained in this Article X. Additionally, the Borrowers hereby appoint the Lead Borrower as their agent to receive all of the proceeds of the Loans in the Funding Account(s), at which time the Lead Borrower shall promptly disburse such Loans to the appropriate Borrower. The Administrative Agent, the Issuing Banks and the Lenders, and their respective Related Parties, shall not be liable to the Lead Borrower or any Borrower for any action taken or omitted to be taken by the Lead Borrower or the Borrowers pursuant to this Section.

SECTION 10.02    Powers. The Lead Borrower shall have and may exercise such powers under the Loan Documents as are specifically delegated to the Lead Borrower by

169

the terms of each thereof, together with such powers as are reasonably incidental thereto. The Lead Borrower shall have no implied duties to the other Borrowers, or any obligation to the Lenders to take any action thereunder except any action specifically provided by the Loan Documents to be taken by the Lead Borrower.

SECTION 10.03    Employment of Agents. The Lead Borrower may execute any of its duties as the Lead Borrower hereunder and under any other Loan Document by or through authorized officers.

SECTION 10.04    Notices. Each Borrower shall immediately notify the Lead Borrower of the occurrence of any Default hereunder referring to this Agreement describing such Default and stating that such notice is a "notice of default." In the event that the Lead Borrower receives such a notice, the Lead Borrower shall give prompt notice thereof to the Administrative Agent and the Lenders. Any notice provided to the Lead Borrower hereunder shall constitute notice to each Borrower on the date received by the Lead Borrower.

SECTION 10.05    Execution of Loan Documents; Borrowing Base Certificate. The Borrowers hereby empower and authorize the Lead Borrower, on behalf of the Borrowers, to execute and deliver to the Administrative Agent and the Lenders the Loan Documents and all related agreements, certificates, documents, or instruments as shall be necessary or appropriate to effect the purposes of the Loan Documents, including without limitation, the Borrowing Base Certificates and the Compliance Certificates. Each Borrower agrees that any action taken by the Lead Borrower or the Borrowers in accordance with the terms of this Agreement or the other Loan Documents, and the exercise by the Lead Borrower of its powers set forth therein or herein, together with such other powers that are reasonably incidental thereto, shall be binding upon all of the Borrowers.

SECTION 10.06    [Reserved].

SECTION 10.07    Joint and Several Liability.

(a)    Each Borrower hereby agrees that it is jointly and severally liable for the prompt payment and performance when due, whether at stated maturity, upon acceleration or otherwise, and at all times thereafter, of the Obligations and all reasonable costs and expenses to the extent specified in Section 9.05.

(b)    The obligations of each Borrower with respect to the Obligations are independent of the obligations of the other Borrowers or any Guarantor under its guaranty of such Borrower's Obligations, and a separate action or actions may be brought and prosecuted against each Borrower, whether or not the other Borrowers or any such Guarantor is joined in any such action or actions. Each Borrower waives, to the fullest extent permitted by law, the benefit of any statute of limitations affecting its liability hereunder or the enforcement thereof. Any payment by any Borrower or other circumstance which operates to toll any statute of limitations as to any Borrower shall, to the fullest extent permitted by law, operate to toll the statute of limitations as to each Borrower.

(c)    Each Borrower authorizes the Administrative Agent and the Lenders without no tice or demand (except as shall be required by the Loan Documents and applicable

170

statute that cannot be waived), and without affecting or impairing its liability hereunder, from time to time to:

> (i)    exercise or refrain from exercising any rights against any other Borrower or any Guarantor or others or otherwise act or refrain from acting;

> (ii)    settle or compromise any of the Borrowers' Obligations of any other Borrower, any security therefor or any liability (including any of those hereunder) incurred directly or indirectly in respect thereof or hereof, and may subordinate the payment of all or any part thereof to the payment of any liability (whether due or not) of any Borrower to its creditors other than the Lenders;

> (iii)    apply any sums paid by any other Borrower or any other Person, howsoever realized or otherwise received to or for the account of such Borrower to any liability or liabilities of such other Borrower or other Person regardless of what liability or liabilities of such other Borrower or other Person remain unpaid; and/or

> (iv)    consent to or waive any breach of, or act, omission or default under, this Agreement or any of the instruments or agreements referred to herein, or otherwise, by any other Borrower or any other Person.

(d)    It is not necessary for the Administrative Agent or any other Lender to inquire in to the capacity or powers of any Borrower or any of its Subsidiaries or the officers, directors, members, partners or agents acting or purporting to act on its behalf, and any Obligations made or created in reliance upon the professed exercise of such powers shall constitute the joint and several obligations of the Borrowers hereunder.

(e)    No Borrower shall have any rights of contribution or subrogation with respect to any other Borrower as a result of payments made by it hereunder, in each case unless and until the Commitments have been terminated and all Obligations of the Borrowers have been paid in full (other than obligations for taxes, costs, indemnifications, reimbursements damages and other contingent liabilities in respect of which no claim or demand for payment has been made or, in the case of indemnifications, no notice been given (or reasonably satisfactory arrangements have otherwise been made)).

(f)    Each Borrower waives any right to require the Administrative Agent or the other Lenders to (i) proceed against any other Borrower, any Guarantor or any other party, (ii) proceed against or exhaust any security held from any Borrower, any Guarantor or any other party or (iii) pursue any other remedy in the Administrative Agent's or the Lenders' power whatsoever. Each Borrower waives any defense based on or arising out of suretyship or any impairment of security held from any Borrower, any Guarantor or any other party or on or arising out of any defense of any other Borrower, any Guarantor or any other party other than payment in full in cash of the Obligations of the Loan Parties, including, without limitation, any defense based on or arising out of the disability of any other Borrower, any Guarantor or any other party, or the unenforceability of the Obligations of the Borrowers or any part thereof from any cause, or the cessation from any cause of the liability of any other Borrower, in each case other than as a result of the payment in full in cash of the Obligations of the Borrowers.

(g)	All provisions contained in any Loan Document shall be interpreted consistently with this Section 10.07 to the extent possible.

[Signature Pages Follow]

172

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first written above.

**BORROWERS:**                    **NORTHWEST HARDWOODS, INC.**


By: _____
Name:
Title:

**GUARANTORS:**                   **HARDWOODS INTERMEDIATE HOLDINGS II, INC.**


By: _____
Name:
Title:

**BANK OF AMERICA, N.A.**, as Lender, as the Swingline Lender, as an Issuing Bank and as Administrative Agent


By: _____
Name:
Title:

**WELLS FARGO BANK, N.A.**, as Lendert


By: _____
Name:
Title:

## **EXHIBIT B**

### **Exit Take Back Debt Agreement**

This **Exhibit B** contains the Exit Take Back Debt Agreement.  Certain documents, or portions thereof, contained in this **Exhibit B** remain subject to continuing negotiations among the Debtors, the Required Consenting Stakeholders, the Exit ABL Agent and Lenders and/or other interested parties with respect thereto and to the agreement and approval of the applicable parties. Subject to the terms and conditions of the Plan and the Restructuring Support Agreement, the Debtors reserve all rights to amend, revise, or supplement this **Exhibit B**, and any of the documents and designations contained herein, at any time before the Effective Date of the Plan, or any such other date as may be provided for by the Plan or by order of the Bankruptcy Court.  Each of the documents contained in this **Exhibit B** are subject to certain consent and approval rights to the extent provided in the Plan or the Restructuring Support Agreement.

27475409.2

**TERM LOAN CREDIT AGREEMENT**

Dated as of [●],

Among

[NORTHWEST HARDWOODS, INC.],
as the Borrower,

THE GUARANTORS PARTY HERETO FROM TIME TO TIME,

ALTER DOMUS (US) LLC

as Administrative Agent and Collateral Agent

and

THE LENDERS PARTY HERETO FROM TIME TO TIME

# TABLE OF CONTENTS

**Page**

ARTICLE I.        DEFINITIONS AND ACCOUNTING TERMS .................................................2

    Section 1.01    Defined Terms.................................................................................. 2
    Section 1.02    Terms Generally............................................................................. 45
    Section 1.03    Accounting Terms .......................................................................... 45
    Section 1.04    Rounding ......................................................................................... 46
    Section 1.05    Timing of Payment or Performance .............................................. 46
    Section 1.06    References to Laws ......................................................................... 46
    Section 1.07    Pro Forma ....................................................................................... 47
    Section 1.08    Divisions ......................................................................................... 47
    Section 1.09    Chapter 11 Restructuring Transactions .......................................... 47
    Section 1.10    Limited Condition Acquisition ...................................................... 47

ARTICLE II.       THE COMMITMENTS ..........................................................................48

    Section 2.01    The Commitments ........................................................................... 48
    Section 2.02    Repayment of Loans ....................................................................... 49
    Section 2.03    Interest ............................................................................................ 49
    Section 2.04    Computation of Interest and Fees .................................................. 49
    Section 2.05    Prepayments ................................................................................... 50
    Section 2.06    Fees ................................................................................................. 52
    Section 2.07    Evidence of Indebtedness............................................................... 53
    Section 2.08    Payments Generally ....................................................................... 53
    Section 2.09    Sharing of Payments ...................................................................... 55
    Section 2.10    Defaulting Lenders ......................................................................... 56
    Section 2.11    Incremental Term Loan Facilities .................................................. 56

ARTICLE III.      TAXES, INCREASED COSTS PROTECTION AND ILLEGALITY ............60

    Section 3.01    Taxes ............................................................................................... 60
    Section 3.02    Increased Cost and Reduced Return; Capital Adequacy.......................... 63
    Section 3.03    Matters Applicable to All Requests for Compensation.......................... 63
    Section 3.04    Replacement of Lenders under Certain Circumstances .......................... 64
    Section 3.05    Survival ........................................................................................... 65

ARTICLE IV.       CONDITIONS PRECEDENT TO EFFECTIVENESS, LENDING
                  AND WITHDRAWALS...........................................................................65

    Section 4.01    Conditions to Closing Date ........................................................... 65

ARTICLE V.        [REPRESENTATIONS AND WARRANTIES] ........................................67

    Section 5.01    Organization; Powers ..................................................................... 67
    Section 5.02    Authorization................................................................................... 67
    Section 5.03    Enforceability ................................................................................. 68

Section 5.04        Governmental Approvals; Consents ........................................ 68
Section 5.05        Financial Statements ........................................................... 68
Section 5.06        No Material Adverse Effect .................................................. 69
Section 5.07        Title to Properties .............................................................. 69
Section 5.08        Subsidiaries ....................................................................... 69
Section 5.09        Litigation; Compliance with Laws ...................................... 69
Section 5.10        Investment Company Act .................................................... 70
Section 5.11        [Reserved] .......................................................................... 70
Section 5.12        Federal Reserve Regulations ............................................... 70
Section 5.13        Taxes .................................................................................. 70
Section 5.14        No Material Misstatements .................................................. 71
Section 5.15        Employee Benefit Plans ...................................................... 71
Section 5.16        Environmental Matters ........................................................ 72
Section 5.17        Collateral Documents .......................................................... 72
Section 5.18        Solvency ............................................................................. 73
Section 5.19        Labor Matters ..................................................................... 73
Section 5.20        Use of Proceeds .................................................................. 73
Section 5.21        Anti-Terrorism Laws .......................................................... 74
Section 5.22        [Reserved] .......................................................................... 74
Section 5.23        Intellectual Property; Licenses, Etc. .................................... 74
Section 5.24        Senior Indebtedness; Subordination ..................................... 74
Section 5.25        No Default ........................................................................... 74
Section 5.26        Chapter 11 Plan .................................................................. 75

ARTICLE VI.        AFFIRMATIVE COVENANTS ......................................................... 75

Section 6.01        Existence; Businesses and Properties .................................... 75
Section 6.02        Insurance ............................................................................ 76
Section 6.03        Taxes .................................................................................. 76
Section 6.04        Financial Statements, Reports, etc ....................................... 76
Section 6.05        Litigation and Other Notices ............................................... 78
Section 6.06        Compliance with Laws ........................................................ 79
Section 6.07        Maintaining Records; Inspections and Appraisals ................. 79
Section 6.08        Compliance with Environmental Laws .................................. 80
Section 6.09        Further Assurances .............................................................. 80
Section 6.10        Conference Calls ................................................................. 82
Section 6.11        [Reserved] .......................................................................... 83
Section 6.12        Use of Proceeds .................................................................. 83
Section 6.13        [Reserved] .......................................................................... 83
Section 6.14        Designation of Subsidiaries ................................................. 83
Section 6.15        Post-Closing Matters ........................................................... 84

ARTICLE VII.       NEGATIVE COVENANTS ............................................................ 84

Section 7.01        Indebtedness ....................................................................... 84
Section 7.02        Liens .................................................................................. 87
Section 7.03        [Reserved] .......................................................................... 92
Section 7.04        Investments ........................................................................ 92

Section 7.05    Mergers, Consolidations and Dispositions ............................................. 94
Section 7.06    Dividends and Distributions ......................................................... 97
Section 7.07    Transactions with Affiliates ......................................................... 99
Section 7.08    Holding Company Covenant ......................................................... 101
Section 7.09    Restricted Debt Payments; Restrictions on Distributions; Negative
                Pledges ........................................................................................ 102
Section 7.10    [Reserved] .................................................................................... 105
Section 7.11    Swap Agreements ......................................................................... 105
Section 7.12    Changes in Fiscal Year ................................................................. 105
Section 7.13    Change in Lines of Business ......................................................... 105

ARTICLE VIII.   EVENTS OF DEFAULT AND REMEDIES ................................................105

Section 8.01    Events of Default ......................................................................... 105
Section 8.02    Remedies Upon Event of Default .................................................. 108
Section 8.03    Application of Funds ..................................................................... 108
Section 8.04    Prepayment Premium .................................................................... 109

ARTICLE IX.     ADMINISTRATIVE AGENT AND OTHER AGENTS ...............................110

Section 9.01    Appointment and Authorization of Agents ................................... 110
Section 9.02    Delegation of Duties ..................................................................... 111
Section 9.03    Liability of Agents ....................................................................... 111
Section 9.04    Reliance by Agents ....................................................................... 113
Section 9.05    Notice of Default .......................................................................... 114
Section 9.06    Credit Decision; Disclosure of Information by Agents ................. 114
Section 9.07    Indemnification of Agents ............................................................ 114
Section 9.08    Agents in Their Individual Capacities .......................................... 115
Section 9.09    Successor Agents .......................................................................... 116
Section 9.10    Administrative Agent May File Proofs of Claim ........................... 117
Section 9.11    Collateral and Guaranty Matters .................................................. 117
Section 9.12    Appointment of Supplemental Agents .......................................... 119
Section 9.13    Withholding Tax Indemnity .......................................................... 120

ARTICLE X.      MISCELLANEOUS ........................................................................120

Section 10.01   Amendments, Etc ......................................................................... 120
Section 10.02   Notices and Other Communications; Facsimile Copies ................ 122
Section 10.03   No Waiver; Cumulative Remedies ................................................ 123
Section 10.04   Attorney Costs and Expenses ....................................................... 123
Section 10.05   Indemnification by the Borrower .................................................. 124
Section 10.06   Payments Set Aside ...................................................................... 126
Section 10.07   Successors and Assigns ................................................................ 126
Section 10.08   Confidentiality ............................................................................. 130
Section 10.09   Setoff ........................................................................................... 131
Section 10.10   Interest Rate Limitation ............................................................... 132
Section 10.11   Counterparts ................................................................................. 132
Section 10.12   Integration; Termination .............................................................. 132
Section 10.13   Survival of Representations and Warranties ................................. 133

Section 10.14      Severability ........................................................................... 133
Section 10.15      GOVERNING LAW .............................................................. 133
Section 10.16      WAIVER OF RIGHT TO TRIAL BY JURY ....................... 134
Section 10.17      Binding Effect ....................................................................... 134
Section 10.18      USA Patriot Act .................................................................... 135
Section 10.19      No Advisory or Fiduciary Responsibility ............................. 135
Section 10.20      Electronic Execution ............................................................ 136
Section 10.21      Acknowledgement and Consent to Bail-in of Affected Financial
                   Institutions ............................................................................ 136

ARTICLE XI.      GUARANTY .................................................................. 137

Section 11.01      The Guaranty ......................................................................... 137
Section 11.02      Obligations Unconditional .................................................... 137
Section 11.03      Reinstatement ........................................................................ 139
Section 11.04      Subrogation; Subordination .................................................. 139
Section 11.05      Right of Contribution ............................................................ 140
Section 11.06      Remedies ............................................................................... 140
Section 11.07      Instrument for the Payment of Money ................................. 140
Section 11.08      Continuing Guaranty ............................................................ 141
Section 11.09      General Limitation on Guarantee Obligations ..................... 141
Section 11.10      Information ............................................................................ 141
Section 11.11      Release of Guarantors .......................................................... 141

**SCHEDULES**[1]

| 1.01A | Commitments |
| 1.01B | Disqualified Lenders |
| 1.01C | Collateral Documents |
| 5.05 | Certain Liabilities |
| 5.08 | Ownership of Property |
| 5.09(a) | Environmental Matters |
| 5.12 | Subsidiaries and Other Equity Investments |
| 5.16 | Insurance |
| 6.15 | Post-Closing Matters |
| 7.01 | Existing Indebtedness |
| 7.02 | Existing Liens |
| 7.04 | Existing Investments |
| 7.05 | Existing Dispositions |
| 7.07 | Transactions with Affiliates |
| 10.02 | Administrative Agent's Office, Certain Addresses for Notices |

**EXHIBITS**

| A | Form of Loan Note |
| B | Form of Compliance Certificate |
| C | Form of Assignment and Assumption |
| D | Form of Security Agreement |
| E | Form of Perfection Certificate |
| F | Form of Intercompany Note |
| G-1 | United States Tax Compliance Certificate (Foreign Non-Partnership Lenders) |
| G-2 | United States Tax Compliance Certificate (Foreign Non-Partnership Participants) |
| G-3 | United States Tax Compliance Certificate (Foreign Partnership Lenders) |
| G-4 | United States Tax Compliance Certificate (Foreign Partnership Participants) |
| H | Administrative Questionnaire |

---

[1] To be updated

## TERM LOAN CREDIT AGREEMENT

This TERM LOAN CREDIT AGREEMENT is entered into as of [●] (as amended, restated, supplemented or otherwise modified from time to time after the date hereof, this "**Agreement**") by and among [NORTHWEST HARDWOODS, INC.], a Delaware corporation (the "**Borrower**"), HARDWOODS INTERMEDIATE HOLDINGS II, INC., a Delaware corporation ("**Holdings**"), the other Guarantors party hereto from time to time, ALTER DOMUS (US) LLC ("**Alter Domus**"), as administrative agent and collateral agent (in such capacities, together with its successors and assigns, the "**Administrative Agent**"), and each lender from time to time party hereto (collectively, the "**Lenders**," and each individually, a "**Lender**").

## PRELIMINARY STATEMENTS

WHEREAS, Holdings, Borrower, as issuer, certain of Borrower's subsidiaries, and Bank of New York Mellon, as trustee and collateral agent, are party to that (i) certain Indenture, dated as of July 18, 2014 (as amended, supplemented or otherwise modified from time to time, the "**2014 Indenture**"), pursuant to which Borrower had issued 7.500% Senior Secured Notes due 2021 ("**2014 Notes**") and (ii) that certain Indenture, dated as of February 20, 2015 (as amended, supplemented or otherwise modified from time to time, the "**2015 Indenture**", and together with the 2014 Indenture, the "**Indentures**"), pursuant to which Borrower had issued 7.500% Senior Secured Notes due 2021 (together with the 2014 Notes, the "**Prepetition Notes**");

WHEREAS, Borrower and certain of its Affiliates, and certain Lenders and their respective Affiliates, have entered into that certain Restructuring Support Agreement, dated as of October 21, 2020 (as amended, restated, supplemented or otherwise modified from time to time, the "**RSA**"), by and among the Borrower, certain of its Affiliates party thereto and the Lenders party thereto;

WHEREAS, on the [Petition Date], the Debtors commenced proceedings under chapter 11 of the Bankruptcy Code, jointly administered under Case No. 20-13005 (collectively, the "**Chapter 11 Cases**"), in the U.S. Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**");

WHEREAS, pursuant to the RSA and the Chapter 11 Confirmation Order, the Debtors are required to enter into, and the Lenders have agreed to provide, this $110,000,000 term loan facility on the Chapter 11 Effective Date, pursuant to which such term loans shall be deemed advanced to the Borrower partly in exchange for the Prepetition Notes held by the Lenders [or Affiliates of such Lenders] prior to the Chapter 11 Effective Date;

WHEREAS, the Borrower and the other Loan Parties have agreed to secure all of the Obligations by granting to the Administrative Agent, for the benefit of the Administrative Agent and the other Secured Parties, a security interest in and lien upon substantially all of their existing and after-acquired personal and real property;

WHEREAS, the Borrower's and the other Loan Parties' business is a mutual and collective enterprise and the Borrower and the other Loan Parties believe that the loans and other financial accommodations to the Borrower under this Agreement and their loan relationship with the Administrative Agent and the Lenders are all to the mutual advantage of the Borrower and the other Loan Parties;

WHEREAS, each Loan Party acknowledges that it will receive substantial direct and indirect benefits by reason of the deemed making of loans and other financial accommodations to the Borrower as provided in this Agreement; and

WHEREAS, the Lenders' willingness to extend the Loans to the Borrower, and to administer the Borrower's and the other Loan Parties' collateral security therefor, on a combined basis as more fully set forth in this Agreement and the other Loan Documents, is done solely as an accommodation to the Borrower and the other Loan Parties and at the Borrower's and the other Loan Parties' request and in furtherance of the Borrower's and the other Loan Parties' mutual and collective enterprise.

All capitalized terms used in this Agreement, including in these preliminary statements, shall have the meanings ascribed to them in Section 1.01 unless otherwise specified.

In consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

## ARTICLE I.
## DEFINITIONS AND ACCOUNTING TERMS

**SECTION 1.01    Defined Terms.**

As used in this Agreement, the following terms shall have the meanings set forth below:

"**2014 Notes**" has the meaning set forth in the preliminary statements herein.

"**ABL Agent**" shall mean [Bank of America, N.A.], acting in its capacity as administrative agent and collateral agent under the ABL Revolving Credit Facility, or any successor thereto in such capacity.

"**ABL Obligations**" shall mean (i) Indebtedness outstanding under any Revolving Debt Facility that is secured by a Permitted Lien so long as any Liens in respect of such Indebtedness comply with the provisions of Section **Error! Reference source not found.**7.01(a), and all other Obligations (not constituting Indebtedness) of any Loan Party under such Revolving Debt Facility and (ii) all cash management Obligations and obligations under Swap Agreements owed to an agent, arranger or lender or other secured party under such Revolving Debt Facility (even if the respective agent, arranger or lender or other secured party subsequently ceases to be an agent, arranger or lender or other secured party under such Revolving Debt Facility for any reason) or any of their respective affiliates, assigns or successors, and more particularly described in the Intercreditor Agreement.

"**ABL Priority Collateral**" has the meaning assigned to the term ["ABL Priority Collateral"] in the Intercreditor Agreement.

"**ABL Revolving Credit Facility**" shall mean the Asset-Based Revolving Credit Agreement dated as of the Closing Date among Holdings, Borrower, the subsidiaries of Borrower from time to time party thereto, the lenders parties thereto from time to time, and the ABL Agent, together with related notes, letters of credit, guarantees and security documents, and as it may be

amended, restated, amended and restated, supplemented or modified from time to time and any renewal, increase, extension, refunding, restructuring, replacement or refinancing thereof (whether with the original administrative agent and lenders or another administrative agent, collateral agent or agents or one or more other lenders and whether provided under the original ABL Revolving Credit Facility as of the Closing Date or one or more other credit or other agreements or indentures).

"**Accounts**" shall mean all "accounts," as such term is defined in the Uniform Commercial Code as in effect in the state of New York, now owned or hereafter acquired by the Borrower or any Restricted Subsidiary.

"**Additional Lender**" has the meaning set forth in Section 2.11.

"**Ad Hoc Group**" shall mean that certain ad hoc group of holders of the Prepetition Notes represented on and prior to the Closing Date by the Ad Hoc Group Advisors.

"**Ad Hoc Group Advisors**" shall mean (i) Willkie Farr & Gallagher LLP, as legal counsel to the Ad Hoc Group, and (ii) Guggenheim Securities, LLC, as financial advisor to the Ad Hoc Group.

"**Administrative Agent**" has the meaning set forth in the introductory paragraph to this Agreement.

"**Administrative Agent's Office**" shall mean the Administrative Agent's address as set forth on Schedule 10.02, or such other address as the Administrative Agent may from time to time notify the Borrower and the Lenders.

"**Administrative Questionnaire**" shall mean an Administrative Questionnaire in the form of Exhibit H or such other form as may be supplied from time to time by the Administrative Agent.

"**Affected Financial Institution**" shall mean (a) any EEA Financial Institution or (b) any UK Financial Institution.

"**Affiliate**" shall mean, when used with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified; provided, however, no Agent or Lender shall be deemed to be an Affiliate of the Borrower and its Subsidiaries with respect to transactions evidenced by any Loan Document.

"**Agent-Related Persons**" shall mean the Agents, together with their respective Affiliates, and the officers, directors, employees, partners, agents, advisors, attorneys-in-fact and other representatives of such Persons and Affiliates.

"**Agent Required Approval Item**" has the meaning set forth in the definition of Direction of the Required Lenders.

"**Agents**" shall mean, collectively, the Administrative Agent and the Supplemental Agents (if any).

"**Aggregate Commitments**" shall mean the Commitments of all the Lenders.

"**Agreement**" has the meaning set forth in the introductory paragraph to this Agreement.

"**Alter Domus**" has the meaning set forth in the introductory paragraph herein.

"**Anti-Terrorism Laws**" shall mean (i) USA Patriot Act, and (ii) the Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) and any enabling legislation or executive order relating thereto.

"**Applicable Rate**" shall mean (a) if the Borrower has not elected to exercise the PIK Toggle pursuant to **Error! Reference source not found.**, 7.50% per annum (the "**Cash Interest Rate**") and (b) if the Borrower has elected to exercise the PIK Toggle pursuant to **Error! Reference source not found.**, 9.50% per annum (the "**PIK Interest Rate**"). Notwithstanding the foregoing, the Applicable Rate applicable to any Incremental Term Loan shall be as set forth in the Incremental Joinder relating thereto.

"**Approved Fund**" shall mean, with respect to any Lender, any Fund that is administered, advised or managed by (a) such Lender, (b) an Affiliate of such Lender or (c) an entity or an Affiliate of an entity that administers, advises or manages such Lender.

"**Assignees**" has the meaning set forth in Section 10.07(b).

"**Assignment and Assumption**" shall mean an Assignment and Assumption substantially in the form of Exhibit C, or such other form as approved (including electronic documentation generated by MarkitClear or other electronic platform) by the Administrative Agent.

"**Assignment Taxes**" has the meaning specified in Section 3.01(b).

"**Attorney Costs**" shall mean and includes all reasonable fees, expenses and disbursements of any law firm or other external legal counsel.

"**Available Amount**" shall mean, at any time, an amount equal to, without duplication, the sum of:

(1)     $25,000,000;

(2)     *plus* the Cumulative Retained Excess Cash Flow Amount at such time;

(3)     *plus* 100% of the aggregate net cash proceeds, and the Fair Market Value of any property other than cash, received by Holdings since the Closing Date as a contribution to its common equity capital or from the issue or sale of Equity Interests of Holdings (other than Disqualified Equity Interests) or from the issue or sale of convertible or exchangeable Disqualified Equity Interests or convertible or exchangeable debt securities of Holdings that have been converted into or exchanged for such Equity Interests (other than Equity Interests (or Disqualified Equity Interests or debt securities) sold to a Subsidiary of Holdings);

4

(4)    *plus* to the extent that any Restricted Investment that was made after the Closing Date is sold for cash or otherwise liquidated or repaid for cash, the cash return of capital with respect to such Restricted Investment (less the cost of disposition, if any); *plus*

(5)    *plus* Declined Proceeds permitted to be retained by the Borrower pursuant to Section 2.05(b)(v)(D);

(6)    *minus* the amount of Investments made pursuant to Section 7.04(q);

(7)    *minus* the amount of Restricted Payments made pursuant to Section 7.06(e); and

(8)    *minus* the amount of Restricted Debt Payments made pursuant to Section 7.09(b).

"**Bail-In Action**" shall mean the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"**Bail-In Legislation**" shall mean, (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"**Bankruptcy Code**" shall mean Title 11 of the United States Code, as amended, or any similar federal or state law for the relief of debtors.

"**Bankruptcy Court**" has the meaning set forth in the preliminary statements herein.

"**Borrower**" has the meaning set forth in the introductory paragraph to this Agreement.

["**Borrower Materials**" shall mean materials and/or information provided by or on behalf of the Borrower hereunder that Administrative Agent will make available to the Lenders.]

"**Business Day**" shall mean any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York or the state where the Administrative Agent's Office is located.

["**Calculation Date**" shall mean the date on which the event for which the calculation of the Consolidated Senior Secured Net Leverage Ratio or the Fixed Charge Coverage Ratio shall occur.]

"**Capital Expenditures**" shall mean for any period, with respect to any Person, the aggregate of all expenditures by such Person for the acquisition or leasing (pursuant to a capital lease) of fixed or capital assets or additions to equipment (including replacements, capitalized repairs and improvements during such period) which are required to be capitalized under GAAP on a consolidated balance sheet of such Person.

"**Capital Lease Obligations**" of any Person shall mean the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP and, for purposes hereof, the amount of such obligations at any time shall be the capitalized amount thereof at such time determined in accordance with GAAP.

"**Captive Insurance Subsidiary**" shall mean any Restricted Subsidiary that is subject to regulation as an insurance company (or any Subsidiary thereof).

"**Captive Mill Indebtedness**" shall mean Indebtedness of a lumber mill with which Holdings, any Borrower or any Restricted Subsidiary is doing business so long as (i) such Indebtedness is incurred by the lumber mill to finance Capital Expenditures, (ii) none of Holdings, any Borrowers or any Restricted Subsidiaries are obligated (directly or indirectly) for the payment or performance of such Indebtedness, (iii) the lumber mill is characterized as a "captive mill" on the audited financial statements delivered pursuant to Section 6.04(a), and (iv) such Indebtedness is required to be reflected as an Indebtedness of Holdings or its Subsidiaries on such audited financial statements.

"**Cash Equivalents**" shall mean:

(a)    [direct obligations of the United States of America or any member of the European Union or any agency thereof or obligations guaranteed by the United States of America or any member of the European Union or any agency thereof, in each case with maturities not exceeding two years;

(b)    time deposit accounts, certificates of deposit, eurodollar deposits, overnight bank deposits and money market deposits maturing within one year of the date of acquisition thereof issued by a bank or trust company that is organized under the laws of the United States of America, any state thereof or any foreign country recognized by the United States of America having capital, surplus and undivided profits in excess of $100 million;

(c)    repurchase obligations with a term of not more than 180 days for underlying securities of the types described in clause (a) above entered into with a bank meeting the qualifications described in clause (b) above;

(d)    commercial paper, maturing not more than one year after the date of acquisition, issued by a person organized and in existence under the laws of the United States of America or any foreign country recognized by the United States of America with a rating at the time as of which any investment therein is made of P-2 (or higher) according to Moody's, or A-1 (or higher) according to S&P or carrying an equivalent rating by a nationally-recognized rating agency if either Moody's or S&P cease publishing ratings of commercial paper issuers generally;

(e)    securities with maturities of two years or less from the date of acquisition issued or fully guaranteed by any State, commonwealth or territory of the United States of America, or by any political subdivision or taxing authority thereof, and rated at least A by S&P or A by Moody's;

(f)    securities with maturities of one year or less from the date of acquisition backed by standby letters of credit issued by any Lender or any commercial bank satisfying the requirements of clause (b) of this definition;

(g)    shares of mutual funds whose investment guidelines restrict 95% of such funds' investments to those satisfying the provisions of clauses (a) through (f) above and (h) and (i) below;

(h)    money market funds that (i) comply with the criteria set forth in Rule 2a-7 under the Investment Company Act of 1940, (ii) are rated AAA by S&P and Aaa by Moody's and (iii) have portfolio assets of at least $5 billion; and

(i)    other short-term investments utilized by Foreign Subsidiaries of Holdings in accordance with normal investment practices for cash management in investments of a type analogous to the foregoing.]

"**Cash Interest Expense**" shall mean, with respect to Holdings and its Subsidiaries on a consolidated basis for any period, Interest Expense for such period, *less* the sum of (a) pay-in-kind Interest Expense or other noncash Interest Expense (including as a result of the effects of purchase accounting), (b) to the extent included in Interest Expense, the amortization of any financing fees paid by, or on behalf of, Holdings or any Subsidiary thereof, including such fees paid in connection with the Transactions, (c) the amortization of debt discounts, if any, or fees in respect of Swap Agreements and (d) cash interest income of Holdings and its Subsidiaries for such period; *provided that* Cash Interest Expense shall exclude annual agency fees paid to the Administrative Agent.

"**Cash Interest Rate**" has the meaning set forth in the definition of "Applicable Rate".

"**Casualty Event**" shall mean any event that gives rise to the receipt by Holdings or any Subsidiary thereof of any insurance proceeds or condemnation awards in respect of any equipment, fixed assets or real property (including any improvements thereon) to replace or repair such equipment, fixed assets or real property.

"**CFC**" shall mean a "controlled foreign corporation" within the meaning of Section 957 of the Code.

"**Change in Law**" shall mean the occurrence, after the Closing Date, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority.

"**Change in Control**" shall be deemed to occur if:

(a)    any Person or "**group**" (within the meaning of Rule 13d-3 and 13d-5 under the Exchange Act) other than the Permitted Investors shall have (x) acquired beneficial ownership, directly or indirectly, of at least 50% of the aggregate ordinary voting power represented by the issued and outstanding Equity Interests of Borrower,

(b)      Holdings shall for any reason fail to own, directly or indirectly, 100% of the issued and outstanding Equity Interests of the Borrower, or

(c)      any "**Change in Control**" or "**Change of Control**" (or any comparable term) in the ABL Revolving Credit Facility or in any Permitted Refinancing Indebtedness in respect thereof;

provided that none of the Chapter 11 Restructuring Transactions shall constitute, or be deemed to constitute, a Change in Control.

"**Chapter 11 Cases**" has the meaning set forth in the preliminary statements herein.

"**Chapter 11 Confirmation Order**" shall mean the Order Confirming the Joint Prepackaged Chapter 11 Plan of Reorganization of Northwest Hardwoods, Inc., and Its Debtor Affiliates entered by the Bankruptcy Court in the Chapter 11 Cases on [____].

"**Chapter 11 Effective Date**" shall mean the date designated as the "**Effective Date**" under the Chapter 11 Plan after all of the conditions precedent to the effectiveness of the Chapter 11 Plan shall have been satisfied or waived in accordance with the Chapter 11 Plan.

"**Chapter 11 Plan**" shall mean that certain Joint Prepackaged Chapter 11 Plan of Reorganization of Northwest Hardwoods, Inc., and Its Debtor Affiliates filed by the Borrower and its affiliates in the Chapter 11 Cases and confirmed by the Bankruptcy Court in the Chapter 11 Confirmation Order.

"**Chapter 11 Restructuring Transactions**" has the meaning assigned to such term in Section 1.09.

"**Closing Date**" shall mean January [●], 2021.

"**Code**" shall mean the U.S. Internal Revenue Code of 1986, as amended from time to time.

"**Collateral**" shall mean (i) the "**Collateral**" as defined in the Security Agreement, (ii) all the "**Collateral**" or "**Pledged Assets**" as defined in any other Collateral Document and (iii) any other assets pledged or in which a Lien is granted or purported to be granted, in each case, pursuant to any Collateral Document.

"**Collateral and Guarantee Requirement**" shall mean the requirement that, subject in all respects to Section 6.09(g):

(a)      on the Closing Date, the Administrative Agent shall have received from Holdings, the Borrower and each Subsidiary Guarantor, a counterpart of the Security Agreement duly executed and delivered on behalf of such person,

(b)      on the Closing Date, subject to the Intercreditor Agreement, the Administrative Agent, for the benefit of Lenders on a first-priority basis and the ABL Agent on second priority basis, for the benefit of the lenders under the ABL Revolving Credit Facility, shall have received (I) a pledge of all the issued and outstanding Equity Interests (to the extent such Equity Interests

constitute Collateral) of (A) the Borrower and (B) each Restricted Subsidiary owned on the Closing Date directly by or on behalf of Holdings, the Borrower or any Subsidiary Guarantor; (II) all certificates (if any) representing such Equity Interests, together with stock powers or other instruments of transfer with respect thereto endorsed in blank; and (III) an original Intercompany Note,

(c)    on the Closing Date, and at all times thereafter, or as otherwise provided in the Security Agreement, all Indebtedness having, in the case of each instance of Indebtedness, an aggregate principal amount in excess of $2.0 million (other than (i) intercompany current liabilities incurred in the ordinary course of business in connection with the cash management operations of Holdings and its Subsidiaries or (ii) to the extent that a pledge of such promissory note or instrument would violate applicable law) that is owing to any Loan Party and evidenced by a promissory note or an instrument and constitutes Collateral shall have been pledged pursuant to the Security Agreement (including the Intercompany Note), and subject to the Intercreditor Agreement, the Administrative Agent (or, with respect to any ABL Priority Collateral, the ABL Agent acting as bailee of the Administrative Agent pursuant to the Intercreditor Agreement) shall have received all such promissory notes or instruments, together with note powers or other instruments of transfer with respect thereto endorsed in blank,

(d)    within 90 days of the Closing Date (or such longer period as the Administrative Agent shall agree), the appropriate Loan Party shall, to the extent constituting Term Priority Collateral and subject to the Intercreditor Agreement, (i) grant to the Administrative Agent first priority Mortgages on the Mortgaged Properties referred to in Schedule 6.09 owned on the Closing Date, (ii) record or file the Mortgages in such manner and in such places as is required by law to establish, perfect, preserve and protect the first priority Liens pursuant to the Mortgages and (iii) pay all Taxes, fees and other charges payable in connection therewith. Except with respect to clause (D) below, unless otherwise waived by the Administrative Agent in its reasonable discretion, with respect to each such Mortgage, the Borrower shall deliver to the Administrative Agent contemporaneously therewith (A) a policy or policies or marked up unconditional binder of title insurance ("**Title Policy**"), as applicable, paid for by the Borrower, issued by a nationally recognized title insurance company insuring the Lien of each such Mortgage as a valid Lien on the Mortgaged Property described therein, first in priority to the Lien of such mortgage granted to the ABL Agent, and free of any other Liens except Permitted Liens, together with such endorsements set forth on Exhibit S, as the same may be available in each jurisdiction in which a Mortgaged Property is located (provided such endorsements are available at commercially reasonable rates), and such coinsurance and reinsurance as the Administrative Agent may reasonably request and which are available for a commercially reasonable cost all in form and substance reasonably acceptable to the Administrative Agent (acting at the Direction of the Required Lenders), (B) legal opinions, addressed to the Administrative Agent, and the Secured Parties, reasonably acceptable to the Administrative Agent (acting at the Direction of the Required Lenders) as to such matters as the Administrative Agent (acting at the Direction of the Required Lenders) may reasonably request, (C) an existing survey together with a no change affidavit or a new 'ALTA survey' of each Mortgaged Property in such form as shall be required by the title company to issue the so-called comprehensive and other survey related endorsements and to remove the standard survey exceptions from the Title Policy and (D) a completed "Life-of-Loan" Federal Emergency Management Agency Standard Flood Hazard Determination with respect to each Mortgaged Property (together with a notice about special flood hazard area status and flood disaster assistance

duly executed by the Borrower and the applicable Loan Party relating thereto) and, if any such Mortgaged Property is located in a special flood hazard area, evidence of flood insurance to the extent required pursuant to this Agreement,

(e)       on the Closing Date, and at all times thereafter, or as otherwise provided in the Security Agreement, the Administrative Agent, for the benefit of the Secured Parties, shall have been granted, subject to the Intercreditor Agreement, security interests in the personal property Collateral of Holdings, the Borrower and any Subsidiary Guarantor in accordance with the Security Agreement,

(f)       in the case of any person that becomes (i) a Subsidiary Guarantor after the Closing Date, within the time period required by Section 6.09(d), the Administrative Agent shall have received (A) a [Joinder Agreement], duly executed and delivered on behalf of such Person, (B) a supplement to the Security Agreement, in the form specified therein, duly executed and delivered on behalf of such Person and (C) supplements to the other Loan Documents, if applicable or (ii) a Guarantor after the Closing Date, within the time period required by Section 6.09(d), the Administrative Agent shall have received (A) a supplement to the Security Agreement, in the form specified therein, duly executed and delivered on behalf of such Person and (B) supplements to the other Collateral Documents, if applicable,

(g)       after the Closing Date and subject in all respects to Section 6.09(g), (A) all outstanding Equity Interests of any person that becomes a Subsidiary Guarantor after the Closing Date, (B) all Equity Interests of the Borrower issued after the Closing Date and (C) all other Equity Interests of any Subsidiary that are acquired by a Loan Party after the Closing Date and constitute Collateral shall have been pledged on a first priority basis pursuant to the Security Agreement and subject to the Intercreditor Agreement, and the Administrative Agent (or, with respect to any ABL Priority Collateral, the ABL Agent acting as bailee of the Administrative Agent pursuant to the Intercreditor Agreement) shall, within the time period required by Section 6.09(d) and Section 6.09(e), as applicable, have received all certificates or other instruments (if any) representing such Equity Interests, together with stock powers or other instruments of transfer with respect thereto endorsed in blank,

(h)       except as contemplated by any Collateral Document or otherwise agreed by the Administrative Agent (acting at the Direction of the Required Lenders), all documents and instruments, including Uniform Commercial Code financing statements and filings with the United States Copyright Office and the United States Patent and Trademark Office, and all other actions required by law or reasonably requested by the Administrative Agent to be filed, registered or recorded to create the Liens intended to be created by the Collateral Documents (in each case, including any supplements thereto) and perfect such Liens to the extent required by, and with the priority required by, the Collateral Documents, and in each case subject to the Intercreditor Agreement, shall have been filed, registered or recorded or delivered to the Administrative Agent for filing, registration or the recording concurrently with, or promptly following, the execution and delivery of each such Collateral Document and at all times thereafter,

(i)       on the Closing Date (or such later date as the Administrative Agent (acting at the Direction of the Required Lenders) shall agree), the Administrative Agent shall have received insurance certificates from the Borrower's insurance broker(s) or other evidence reasonably

satisfactory to it (acting at the Direction of the Required Lenders) that all insurance required to be maintained pursuant to <u>Section 6.02</u> is in full force and effect and such certificates shall comply with the requirements set forth in <u>Section 6.02</u>, and

"**Collateral Documents**" shall mean, collectively, the Security Agreement, the Intellectual Property Security Agreements, any Mortgage, collateral assignments, security agreements, pledge agreements, intellectual property security agreements or other similar agreements delivered to the Administrative Agent pursuant to <u>Section 4.01</u>, <u>Section 6.09</u> or Section 6.15<u>Section 6.15</u>, and each of the other agreements, instruments or documents that creates or purports to create a Lien in favor of the Administrative Agent for the benefit of the Secured Parties.

"**Commitment**" shall mean, as to each Lender, an amount equal to its ratable share of the Loan deemed made to the Borrower pursuant to <u>Section 2.01</u>, which amount for such Lender is set forth opposite such Lender's name in <u>Schedule 1.01A</u> under the caption "**Loan Commitment**". The aggregate principal amount of all of the Commitments is $110,000,000.

"**Compensation Period**" has the meaning set forth in Section <u>2.08(c)(ii)</u>.

"**Compliance Certificate**" shall mean a certificate substantially in the form of <u>Exhibit B</u>.

"**Consolidated Cash Interest Expense**" shall mean, with respect to any Person for any period, the total interest expense actually paid in cash (including that attributable to Capital Lease Obligations) of such Person and its consolidated Subsidiaries for such period with respect to all outstanding Indebtedness of such Person and its consolidated Subsidiaries (including, without limitation, all commissions, discounts and other fees and charges paid in cash by such Person and its Subsidiaries with respect to letters of credit and bankers' acceptance financing which are classified as interest in accordance with GAAP).

"**Consolidated Net Income**" shall mean, for any period, the Net Income of Holdings and its Restricted Subsidiaries, determined on a consolidated basis in accordance with GAAP; excluding, without duplication:

(a)    the Net Income of any person (other than a Restricted Subsidiary) in which the Borrower has an ownership interest, except to the extent any such income has actually been received by the Borrower or any of its Restricted Subsidiaries in the form of cash dividends or distributions or other payments (including any ordinary course dividend, distribution or other payment and any dividend, distribution or other payment that is converted into cash),

(b)    any net gain attributable to the write-up of any asset,

(c)    (i) any net loss attributable to the write-down or write-off of any asset (other than Accounts or inventory), or (ii) any increase in amortization or depreciation or any non-cash charge or loss resulting from any amortization, write-up, write-down or write-off of assets upon the application of recapitalization accounting or purchase accounting (including tangible and intangible assets, goodwill, deferred financing costs and inventory (including any adjustment reflected in the "**cost of goods sold**" or similar line item of the financial statements)) in connection with the Transactions, Permitted Business Acquisitions or any acquisition, merger, consolidation or similar transaction not prohibited hereunder,

(d)    any net after-tax income or loss from discontinued operations (which shall not, unless the Borrower otherwise elects, include assets then held for sale) and any net after-tax gain or loss on disposal of such discontinued operations,

(e)    any net after-tax income or loss (less all fees and expenses or charged relating thereto) attributable to the early extinguishment of Indebtedness,

(f)    the cumulative effect of a change in accounting principles during such period,

(g)    any non-cash impairment charges resulting from the application of ASC 350 and ASC 360 and the amortization of intangibles arising pursuant to ASC 805, and

(d)    the effect of mark-to-market accounting for derivatives contracts under ASC 820.

"**Consolidated Senior Secured Net Debt**" shall mean as of any date of determination, Consolidated Total Net Debt that is secured by a Lien on any assets or property of Holdings or any Restricted Subsidiary (other than any (x) such Indebtedness for which the Liens on any assets of the Holdings or any Restricted Subsidiary securing such Indebtedness are expressly subordinated or junior to the Liens securing the Obligations and (y) Captive Mill Indebtedness).

"**Consolidated Senior Secured Net Leverage Ratio**" shall mean, as of any date of determination, the ratio of (a) Consolidated Senior Secured Net Debt as of the last day of the Test Period most recently ended on or prior to the date of determination to (b) EBITDA for such Test Period.

"**Consolidated Total Assets**" shall mean, for any date of determination, all amounts that, in conformity with GAAP, are set forth opposite the caption "total assets" (or any like caption) on the most recent consolidated balance sheet of Holdings delivered (or required to have been delivered) pursuant to Section 4.01 or Section 6.04.

"**Consolidated Total Net Debt**" shall mean, as of any date of determination, (a) the aggregate principal amount of Indebtedness of Holdings and the Restricted Subsidiaries outstanding on such date, determined on a consolidated basis in accordance with GAAP (but excluding the effects of any discounting of indebtedness resulting from the application of purchase accounting in connection with the Transactions, any Permitted Business Acquisition or Investments similar to those made for Permitted Business Acquisitions), consisting of Indebtedness for borrowed money, "Unpaid Drawings" (pursuant to, and as defined in, the ABL Revolving Credit Facility), Capital Lease Obligations and debt obligations evidenced by promissory notes or similar instruments minus (b) the amount of unrestricted cash and cash equivalents (other than Liens in favor of the Administrative Agent or a Lender) of Holdings and its Restricted Subsidiaries (determined in accordance with GAAP). It is understood that to the extent Holdings or any Restricted Subsidiary incurs any Indebtedness and receives the proceeds of such Indebtedness, for purposes of determining any incurrence test under this Agreement and whether Holdings is in compliance on a Pro Forma Basis with any such test, the proceeds of such incurrence shall not be considered cash or cash equivalents for purposes of any "netting" pursuant to clause (b) of this definition.

"**Contractual Obligation**" shall mean, as applied to any person, any provision of any security issued by that person or of any indenture, mortgage, deed of trust, contract, written undertaking, agreement or other instrument to which that person is a party or by which it or any of its properties is bound or to which it or any of its properties is subject.

"**Control**" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by contract or otherwise, and "**Controlling**" and "**Controlled**" shall have meanings correlative thereto.

"**Control Investment Affiliate**" shall mean as to any Person, any other Person that (a) directly or indirectly is in Control of, is Controlled by, or is under common Control with, such Person and (b) is organized by such Person primarily for the purpose of making equity or debt investments in one or more companies.

"**Corporate Parent**" the meaning assigned to such term in the definition of "Permitted Payments to Parent".

"**Cumulative Retained Excess Cash Flow Amount**" shall mean, at any time, an amount, not less than zero in the aggregate, determined on a cumulative basis equal to Excess Cash Flow for such year minus the Relevant Percentage of such Excess Cash Flow.

"**Current Assets**" shall mean, with respect to Holdings and its Subsidiaries on a consolidated basis at any date of determination, the sum of all assets (other than cash and Cash Equivalents or other cash equivalents) that would, in accordance with GAAP, be classified on a consolidated balance sheet of Holdings and its Subsidiaries as current assets at such date of determination, other than amounts related to current or deferred Taxes based on income or profits.

"**Current Liabilities**" shall mean, with respect to Holdings and its Subsidiaries on a consolidated basis at any date of determination, all liabilities that would, in accordance with GAAP, be classified on a consolidated balance sheet of Holdings and its Subsidiaries as current liabilities at such date of determination, other than (a) the current portion of any debt or Capital Lease Obligations, (b) accruals of Interest Expense (excluding Interest Expense that is due and unpaid), (c) accruals for current or deferred Taxes based on income or profits, (d) accruals, if any, of transaction costs resulting from the Transactions, (e) accruals of any costs or expenses related to (i) severance or termination of employees prior to the Closing Date or (ii) bonuses, pension and other post-retirement benefit obligations, and (f) accruals for add-backs to EBITDA included in the definition of such term.

"**Debt Service**" shall mean, with respect to Holdings and its Subsidiaries on a consolidated basis for any period, Cash Interest Expense for such period plus scheduled principal amortization of Consolidated Total Net Debt (without giving effect to clause (b) thereof) for such period.

"**Debtor Relief Laws**" shall mean the Bankruptcy Code of the United States and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"**Debtors**" has the meaning given to such term in the Chapter 11 Plan.

"**Declined Proceeds**" has the meaning set forth in **Error! Reference source not found.**.

"**Default**" shall mean any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"**Default Rate**" shall mean for Loans and any other amounts due hereunder, an interest rate equal to (a) the Applicable Rate plus (b) 2.00% per annum, to the fullest extent permitted by applicable Laws.

"**Defaulting Lender**" shall mean any Lender whose acts or failure to act, whether directly or indirectly, cause it to meet any part of the definition of "**Lender Default**."

"**Designated Non-Cash Consideration**" shall mean the Fair Market Value (as determined by the Borrower in good faith) of non-cash consideration received by the Borrower or a Restricted Subsidiary in connection with a Disposition pursuant to Section 7.05(g) and the last paragraph of Section 7.05 that is designated as Designated Non-Cash Consideration pursuant to a certificate of a Responsible Officer of the Borrower, setting forth the basis of such valuation (which amount will be reduced by the Fair Market Value of the portion of the non-cash consideration converted to cash or cash equivalents).

"**Direction of the Required Lenders**" shall mean, with respect to any Agent Required Approval Item (as defined below), a written direction or instruction from Lenders constituting the Required Lenders to the Administrative Agent directing it to (x) consent or agree to or approve, or to select or indicate its acceptance or satisfaction with, such Agent Required Approval Item and (y) if applicable, execute and deliver (or take any other applicable action with respect to) such Agent Required Approval Item, which direction or instruction may, in the sole discretion of the Administrative Agent, be in the form of an email and which may come from any of the Ad Hoc Group Advisors (or any other Lender Advisor selected by the Required Lenders and designated in writing to the Administrative Agent) on behalf of the Required Lenders, it being understood and agreed by the parties hereto that (a) the Administrative Agent may conclusively rely on any such written direction or instruction from such Ad Hoc Group Advisor or designated Lender Advisor as evidence that the Required Lenders have provided such direction or instruction and (b) any such written direction or instruction from such Ad Hoc Group Advisor or designated Lender Advisor shall be deemed to constitute a direction or instruction from the Required Lenders to the Administrative Agent, and the Administrative Agent shall (x) not be liable for any action taken or omitted to be taken by it in accordance with such direction or instruction and (y) have no duty, responsibility or obligation to inquire or ascertain whether the Required Lenders actually authorized or directed such Ad Hoc Group Advisor or designated Lender Advisor to provide such direction or instruction. For purposes hereof, "**Agent Required Approval Item**" shall mean any agreement, document, instrument, matter or other item that is required under the terms of this Agreement or any other Loan Document to be consented or agreed to, approved by, determined by, selected by, or acceptable or satisfactory to, the Administrative Agent (whether subject to a reasonableness standard or otherwise).

14

"**Disposition**" shall mean any sale, transfer, lease or other disposition of assets, including any sale and leaseback transaction, any sale or issuance of Equity Interests in a Subsidiary or a Division of a Dividing Person.  "**Dispose**" shall have a correlative meaning.

"**Disqualified Equity Interests**" shall mean any Equity Interests that are not Qualified Capital Stock.

"**Disqualified Lenders**" shall mean the Persons listed on Schedule 1.01B.

"**Distressed Person**" has the meaning assigned to such term in the definition of "**Lender-Related Distress Event**".

"**Dividing Person**" shall have the meaning assigned to such term in the definition of "Division".

"**Division**" shall mean the division of the assets, liabilities and/or obligations of a Person (the "**Dividing Person**") among two or more Persons (whether pursuant to a "plan of division" or similar arrangement, and including a statutory division of any Delaware limited liability company into two or more Delaware limited liability companies pursuant to Section 18-217 of the Delaware Limited Liability Company Act), which may or may not include the Dividing Person and pursuant to which the Dividing Person may or may not survive.

"**Dollar**" and "**$**" mean lawful money of the United States.

"**Domestic Subsidiary**" shall mean any Subsidiary that is organized under the Laws of the United States, any state thereof or the District of Columbia.

"**EBITDA**" shall mean, with respect to Holdings and its Restricted Subsidiaries on a consolidated basis for any period, (a) Consolidated Net Income for such period, less (b) (in each case to the extent included in the calculation of Consolidated Net Income for such period, but without duplication):

(i)    any net extraordinary, non-recurring or unusual gains or income (less all fees and expenses relating thereto),

(ii)   any net gain (less all fees and expenses relating thereto) arising from the sale, exchange or other disposition of assets outside of the ordinary course of business (as determined in good faith by Holdings),

(iii)  any non-cash gains (but excluding any such gains (x) in respect of which cash or other assets were received in a prior period or will be received in a future period or (y) which represent the reversal of any accrual of, or cash reserve for, anticipated cash charges in any prior period) described in clause (c)(vi) below,

(iv)   the amount added back to EBITDA pursuant to clause (c)(xi) below to the extent the relevant fees, costs and expenses were not reimbursed within the time period required by such clause (which amount shall be deducted in the next succeeding fiscal quarter following the expiration of the applicable time period),

(v)    any net unrealized gains resulting from currency gains related to currency re-measurements of Indebtedness (including any net gain resulting from Swap Agreements for currency exchange risk) and any other unrealized foreign currency transaction gains,

(vi)    the amount added back to EBITDA pursuant to clause (c)(ix) or (xi) below to the extent the relevant expenses or business interruption insurance proceeds were not received within the time period required by such clause (which amount shall be deducted in the next succeeding fiscal quarter following expiration of the applicable time period),

(vii)    the amount of any net gain associated with any Subsidiary that is attributable to non-controlling interests or minority interests of third parties, and

(viii)    any net gains with respect to Dispositions permitted by Section 7.05, Investments permitted under Section 7.04, any offering or issuance of Equity Interests or any issuance or incurrence of Indebtedness (including in connection with any exchange or refinancing, replacement, renewal or extension thereof) or early extinguishment of Indebtedness, hedging agreements or other derivative instruments, in each case whether or not consummated;

plus (c) (in the cases of clauses (i) through (xxiii) below (other than clause (ix)(B) below), to the extent deducted in the calculation of Consolidated Net Income for the period for which EBITDA is being determined), but without duplication):

(i)    any provision for Taxes based on income, profits or capital of Holdings and the Restricted Subsidiaries for such period, including state, foreign and franchise and similar taxes, and Tax Distributions made during such period,

(ii)    total interest expense of Holdings and the Restricted Subsidiaries for such period,

(iii)    (x) depreciation and amortization, (y) amortization of inventory write-up, deferred revenue adjustment or other non-cash adjustments required under business combination accounting, amortization of intangibles (including goodwill and the cost of non-competition agreements) and organization costs, including non-cash charges associated with impairment analysis, and (z) amortization of Capital Lease Obligations,

(iv)    net extraordinary, non-recurring or unusual losses or expenses, including severance expenses and costs of legal settlement, fines, judgments or orders, [but excluding any extraordinary, non-recurring or unusual losses or expenses related to the Transactions]; provided, that any decreased or reduced income as a result of COVID-19 shall not be deemed an extraordinary, non-recurring or unusual loss or expense for purposes of this clause (iv) to the extent such decreased or reduced income is disclosed to Administrative Agent in writing prior to the Closing Date and does not exceed the aggregate amount of [$_____];

(v)  any net loss arising from the sale, exchange or other disposition of assets outside of the ordinary course of business (as determined in good faith by Holdings),

(vi)  (x) any write-offs, write-downs and other non-cash losses, charges, reserves and expenses (excluding (A) non-cash losses, charges and expenses relating to write-offs, write-downs or reserves with respect to Accounts or inventory and (B) any such non-cash item to the extent it represents an accrual of, or reserve for, such expenditures in any future period, but including non-cash rent expense, non-cash expense from any employee benefit or stock option plan and purchase accounting adjustments with respect to revaluing assets and liabilities and subsequent non-cash impairment charges) and (y) adjustments for "LIFO" reserves,

(vii)  the amount of any expense or deduction associated with any Subsidiary that is attributable to non-controlling interests or minority interests of third parties,

(viii)  cash restructuring costs attributable to the Transactions incurred prior to the Closing Date or within 90 days thereafter and not exceeding the aggregate amount of [$_____] and all other fees, costs and expenses associated with the Transactions, including, management bonuses payable in connection with the Transactions,

(ix)  (A) to the extent actually covered by insurance expenses with respect to liability or casualty events or business interruption and (B) the proceeds of business interruption insurance in an amount not to exceed the earnings for the applicable period that such proceeds are intended to replace; provided that Holdings in good faith expects that it, the Borrower or a Restricted Subsidiary shall receive such expense or proceeds, as applicable, within the next four fiscal quarters,

(x)  accruals, payments, fees, costs, charges and expenses, including write-offs and write-downs, with respect to any transaction (or amendments or modifications to any such transaction) not prohibited by this Agreement, including, without limitation, Dispositions permitted by Section 7.05, Investments permitted under Section 7.04, any offering or issuance of Equity Interests or any issuance or incurrence of Indebtedness (including in connection with any exchange or refinancing, replacement, renewal or extension thereof) or early extinguishment of Indebtedness, hedging agreements or other derivative instruments, in each case whether or not consummated,

(xi)  fees, costs and expenses incurred during such period that are covered by indemnification provisions in any agreement in connection with any Investment or Permitted Business Acquisition (or similar transactions consummated prior to the Closing Date), in each case whether or not consummated; provided that Holdings in good faith expects that it, the Borrower or a Restricted Subsidiary shall receive such fees, costs and expenses covered by indemnification provisions, within the next four fiscal quarters,

(xii)  any "**Specified Equity Contribution**" as defined in, and received in respect of such period pursuant to, the ABL Revolving Credit Facility,

(xiii)  [reserved],

(xiv)  (x) costs (including restructuring costs related to acquisitions after the Closing Date), charges, accruals, reserves or expenses attributable to the undertaking and/or implementation of cost savings initiatives, operating expense reductions and other restructuring and integration and transition charges (including, without limitation, inventory optimization programs, facilities' opening and pre-opening costs and other business optimization expenses, including software development costs, transaction costs and costs related to the closure or consolidation of facilities, contract termination payments (including future lease payments), facilities and curtailments, marketing costs related to re-branding efforts, consulting fees, signing costs, retention or completion bonuses, relocation expenses, severance payments, modifications to pension and post-retirement employee benefit plans and systems design) and (y) on-going expenses associated with closed facilities; provided, that the aggregate amount of business optimization expenses, other restructuring charges or reserves added back pursuant to this clause (xiv) shall not exceed 20% of EBITDA in any Test Period (calculated after giving effect to the addbacks permitted under (A) this clause (xiv), (B) clause (xv) below and (C) the pro forma adjustments under the last paragraph of the definition of "**Pro Forma Basis**"), when taken together with (A) the amount of addbacks permitted under clause (xv) below and (B) pro forma adjustments under the last paragraph of the definition of "**Pro Forma Basis**",

(xv)  "run rate" cost savings, operating expense reductions and synergies related to the Transactions that are reasonably identifiable and factually supportable (it is understood and agreed that "run rate" means the full recurring benefit for a period that is associated with any action taken, committed to be taken or expected to be taken, net of the amount of actual benefits realized during such period from such actions) and projected by the Borrower in good faith to result from actions that have been taken or with respect to which substantial steps have been taken or are expected to be taken (in the good faith determination of the Borrower) within 18 months after the Closing Date, net the amount of actual benefits realized during such period from such actions; provided, that the aggregate amount of "run rate" cost savings, operating expense reductions and synergies related to the Transactions added back pursuant to this clause (xv) shall not exceed 20% of EBITDA in any Test Period (calculated after giving effect to the addbacks permitted under (A) this clause (xv), (B) clause (xiv) above and (C) the pro forma adjustments under the last paragraph of the definition of "**Pro Forma Basis**"), when taken together with (A) the amount of addbacks permitted under clause (xiv) above and (B) pro forma adjustments under the last paragraph of the definition of "**Pro Forma Basis**",

(xvi)  (A) any deductions, charges or expenses (including compensation charges and expenses) incurred pursuant to any management equity plan or stock option plan or any other management or employee benefit plan or agreement, pension plan, any stock subscription or shareholder agreement or any distributor equity plan or agreement or in connection with grants of stock appreciation or similar rights or other rights to directors, officers and/or employees of any Parent Entity, Holdings,

the Borrower or any of its Restricted Subsidiaries and (B) any payments, charges, costs, expenses, accruals or reserves in connection with the rollover, acceleration or payout of Equity Interests held by management or the issuance of any stock options,

(xvii) the amount of management, consulting, monitoring, transaction and advisory fees and related expenses paid to one or more Permitted Investors (or any accruals related to such fees and related expenses) during such period,

(xviii) letter of credit fees,

(xix) any net unrealized losses resulting from currency losses related to currency re-measurements of Indebtedness (including any net loss resulting from Swap Agreements for currency exchange risk) and any other unrealized foreign currency transaction losses,

(xx) earn-out obligations incurred in connection with any Permitted Business Acquisition or other Investments permitted under this Agreement and paid during the applicable period and any similar acquisitions or other investments completed prior to the Closing Date,

(xxi) cash actually received (or any netting arrangement resulting in reduced cash expenditures) during such period and not included in Consolidated Net Income in any period to the extent that the non-cash gain relating to the relevant cash receipt or netting arrangement was deducted in the calculation of EBITDA pursuant to clause (b)(iv) or clause (b)(vi) above for any previous period and not added back,

(xxii) any net losses from disposed, abandoned or discontinued operations or product lines determined in conformity with GAAP, and

(xxiii) non-cash losses attributable to adjustments to indemnification rights.

Notwithstanding the foregoing, EBITDA with respect to Holdings and its Restricted Subsidiaries for the fiscal quarters ending on or about December 31, 2019, March 31, 2020, June 30, 2020 and September 30, 2020 shall be deemed to be $[_____], $[_____], $[_____], and $[_____], respectively.]

"**EEA Financial Institution**" shall mean (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"**EEA Member Country**" shall mean any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"**EEA Resolution Authority**" shall mean any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"**Eligible Assignee**" has the meaning set forth in Section 10.07(a).

"**Embargoed Person**" shall mean any party that (i) is publicly identified on the most current list of "Specially Designated Nationals and Blocked Persons" published by the U.S. Treasury Department's Office of Foreign Assets Control ("**OFAC**") or (ii) is currently subject to any U.S. sanctions administered by OFAC.

"**Employee Benefit Plan**" shall mean any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) established or maintained by any Loan Party or, with respect to any such plan that is subject to Title IV of ERISA or Section 412 of the Code, any ERISA Affiliate.

"**Environment**" shall mean ambient and indoor air, surface water and groundwater (including potable water, navigable water and wetlands), the land surface or subsurface strata, natural resources such as wetlands, flora and fauna or as otherwise defined in any Environmental Law.

"**Environmental Laws**" shall mean all applicable laws (including common law), rules, regulations, codes, ordinances, orders, decrees or judgments, promulgated or entered into by or with any Governmental Authority, relating in any way to pollution or the protection of the Environment, preservation or reclamation of natural resources, the generation, management, Release or threatened Release of, or actual or alleged exposure to, any Hazardous Materials or to occupational health and safety (to the extent relating to the Environment or Hazardous Materials).

"**Environmental Liability**" shall mean any liability, contingent or otherwise (including any liability for damages, costs of investigation and remediation, fines, penalties or indemnities), of the Loan Parties or any Subsidiary directly or indirectly resulting from or based upon (a) any violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) any exposure to any Hazardous Materials, (d) the Release or threatened Release of any Hazardous Materials in or into the Environment or (e) any contract, agreement or other legally binding consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"**Equity Interests**" of any Person shall mean any and all shares, interests, participations or other equivalents of or interests in (however designated) equity of such Person, including any preferred stock, any limited or general partnership interest and any limited liability company membership interest and any and all warrants, rights or options to purchase or other rights to acquire any of the foregoing.

"**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated and rulings issued thereunder.

"**ERISA Affiliate**" shall mean any trade or business (whether or not incorporated) that, together with any Loan Party, is treated as a single employer under Section 414(b) or (c), (m) or (o) of the Code.

"**ERISA Event**" shall mean (a) any Reportable Event; (b) the existence with respect to any Loan Party or any Employee Benefit Plan of a non-exempt Prohibited Transaction; (c) the failure by any Plan to satisfy the minimum funding standards (within the meaning of Section 412 of the Code or Section 302 of ERISA), applicable to such Plan, whether or not waived; (d) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan, the failure to make by its due date a required installment under Section 430(j) of the Code with respect to any Plan or the failure to make any required contribution to a Multiemployer Plan; (e) the receipt by any Loan Party or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or to appoint a trustee to administer any Plan under Section 4042 of ERISA; (f) the receipt by any Loan Party or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from any Loan Party or any ERISA Affiliate of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, Insolvent, in Reorganization, or terminated (within the meaning of Section 4041A of ERISA); (g) the failure by any Loan Party or any ERISA Affiliate to pay when due (after expiration of any applicable grace period) any installment payment with respect to withdrawal liability under Section 4201 of ERISA; (h) a determination that any Plan is, or is reasonably expected to be, in "at risk" status (within the meaning of Section 430 of the Code or Section 303 of ERISA); (i) any Lien in favor of the PBGC or a Plan shall arise on the assets of any Loan Party or ERISA Affiliate; (j) any Plan shall terminate for purposes of Title IV of ERISA; or (k) the withdrawal of any Loan Party or any ERISA Affiliate from a Plan subject to Section 4063 of ERISA during a plan year in which such entity was a "substantial employer" as defined in Section 4001(a)(2) of ERISA or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA.

"**Event of Default**" has the meaning set forth in <u>Section 8.01</u>.

"**Excess Cash Flow**" shall mean, with respect to Holdings and its Subsidiaries on a consolidated basis for any Excess Cash Flow Period, EBITDA of Holdings and its Subsidiaries on a consolidated basis for such Excess Cash Flow Period, *minus*, without duplication,

(a)    Debt Service for such Excess Cash Flow Period,

(b)    Taxes paid in cash by Holdings and its Subsidiaries on a consolidated basis during such Excess Cash Flow Period (without duplication of any deductions made in a prior period), or that are attributable to such Excess Cash Flow Period and will be paid within six months after the close of such Excess Cash Flow Period (*provided that* any amount so deducted that will be paid after the close of such Excess Cash Flow Period shall not be deducted again in a subsequent Excess Cash Flow Period) and for which reserves have been established, including income tax expense and withholding tax expense incurred in connection with cross-border transactions involving the Foreign Subsidiaries,

(c)    (i) Capital Expenditures and (ii) the aggregate consideration in respect of Permitted Business Acquisitions, in each case, paid in cash by Holdings and its Subsidiaries during such Excess Cash Flow Period to the extent not financed using the proceeds of the incurrence of Indebtedness (other than revolving credit loans), capital contributions to Holdings or the issuance of Equity Interests,

(d)      an amount equal to any increase in Working Capital of Holdings and its Subsidiaries for such Excess Cash Flow Period,

(e)      cash expenditures made in respect of Swap Agreements during such Excess Cash Flow Period, to the extent not reflected in the computation of EBITDA or Cash Interest Expense,

(f)      permitted dividends or distributions or repurchases of its Equity Interests paid in cash by Holdings during such Excess Cash Flow Period and permitted dividends paid by Holdings or by any Subsidiary to any Person other than Holdings or any of the Subsidiaries during such Excess Cash Flow Period, in each case in accordance with Section 7.05 (other than Section 7.06(a)), to the extent not financed using the proceeds of the incurrence of Indebtedness (other than revolving credit loans), capital contributions to Holdings or the issuance of Equity Interests,

(g)      amounts paid in cash during such Excess Cash Flow Period on account of (x) items that were accounted for as non-cash reductions of Net Income in determining Consolidated Net Income or as noncash reductions of Consolidated Net Income in determining EBITDA of Holdings and its Subsidiaries in a prior Excess Cash Flow Period and (y) reserves or accruals established in purchase accounting,

(h)      to the extent not deducted in the computation of Net Proceeds in respect of any asset disposition or condemnation giving rise thereto, the amount of any mandatory prepayment of Consolidated Total Net Debt (without giving effect to clause (b) thereof and other than (x) prepayments of Obligations or (y) repayments that by their terms can be reborrowed or redrawn), together with any interest, premium or penalties required to be paid (and actually paid) in cash in connection therewith, in each case, to the extent not financed, or intended to be financed, using the proceeds of the incurrence of Indebtedness, capital contributions to Holdings or the issuance of Equity Interests,

(i)      the amount related to items that were added to or not deducted from Net Income in calculating Consolidated Net Income or were added to or not deducted from Consolidated Net Income in calculating EBITDA to the extent such items represented a cash payment (which had not reduced Excess Cash Flow upon the accrual thereof in a prior Excess Cash Flow Period), or an accrual for a cash payment, by Holdings and its Subsidiaries or did not represent cash received by Holdings and its Subsidiaries, in each case on a consolidated basis during such Excess Cash Flow Period,

*plus*, without duplication,

(j)      an amount equal to any decrease in Working Capital for such Excess Cash Flow Period,

(k)      cash payments received in respect of Swap Agreements during such Excess Cash Flow Period to the extent (i) not included in the computation of EBITDA or (ii) such payments do not reduce Cash Interest Expense,

(l)      any extraordinary or nonrecurring gain realized in cash during such Excess Cash Flow Period (except to the extent such gain consists of Net Proceeds subject to Section 2.05(b)(ii) or (iii)),

(m)    to the extent deducted in the computation of EBITDA, cash interest income, and

(n)    the amount related to items that were deducted from or not added to Net Income in connection with calculating Consolidated Net Income or were deducted from or not added to Consolidated Net Income in calculating EBITDA to the extent either (x) such items represented cash received by Holdings or any Subsidiary thereof or (y) does not represent cash paid by Holdings or any Subsidiary thereof, in each case on a consolidated basis during such Excess Cash Flow Period.

"**Excess Cash Flow Period**" shall mean each fiscal year of Holdings commencing with the fiscal year ending December 31, 2021.

"**Exchange Act**" shall mean the Securities Exchange Act of 1934, as amended.

"**Excluded Property**" has the meaning set forth in Section 6.09(g).

"**Excluded Subsidiary**" shall mean (a) any Restricted Subsidiary that is prohibited by Contractual Obligation existing on the Closing Date or at the time (but not in contemplation) of acquisition thereof after the Closing Date, law or regulation from providing a Guarantee of the Obligations or that would require a governmental (including regulatory) consent, approval, license or authorization in order to provide such Guarantee, (b) any not-for profit Restricted Subsidiary, Captive Insurance Subsidiary or Special Purpose Subsidiary, (c) any Restricted Subsidiary that is not a wholly owned Subsidiary, and (d) any Restricted Subsidiary to the extent that the burden or cost of obtaining a Guarantee of the Obligations from such Subsidiary outweighs the benefit afforded thereby, as reasonably determined by the Administrative Agent (acting at the Direction of the Required Lenders) and the Borrower.

"**Fair Market Value**" shall mean the value that would be paid by a willing buyer to an unaffiliated willing seller in a transaction not involving distress or necessity of either party, as determined in good faith by the Borrower.

"**FATCA**" shall mean Sections 1471 through 1474 of the Code (including, for the avoidance of doubt, any agreements entered into pursuant to Section 1471(b)(1) of the Code), as of the Closing Date (and any amended or successor version thereof that is substantively comparable and not materially more onerous to comply with) and any current or future United States Treasury Regulations or other official administrative guidance promulgated thereunder.

"**FCPA**" shall mean the United States Foreign Corrupt Practices Act of 1977, as amended.

"**Federal Funds Rate**" shall mean, for any day, the rate per annum equal to the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers on such day, as published on the next succeeding Business Day by the NYFRB; *provided that* (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published for any day that is a Business Day and such failure to publish is temporary, the average of the quotations for the day for such transactions received by the Administrative Agent from three commercial banks of recognized standing selected by it (but if such rate is determined by the

Required Lenders to be permanently unavailable, the Administrative Agent shall not have any obligation to determine the average of any quotations and the Federal Funds Rate shall be determined by the Required Lenders).

"**Fee Letter**" shall mean that certain fee letter, dated as of [●], between the Administrative Agent and the Borrower.

"**Financial Officer**" of any person shall mean the chief financial officer, director of finance, principal accounting officer, treasurer, assistant treasurer or controller of such person or, in any case, any other person with substantially equivalent duties.

"**Fixed Charge Coverage Ratio**" shall mean, for any period for Holdings and its Restricted Subsidiaries, the ratio of (a) (i) EBITDA for such period minus (ii) Capital Expenditures actually paid in cash for such period (except to the extent financed with long-term Indebtedness or equity, excluding capital expenditures financed with Indebtedness under any Revolving Debt Facility) net of sales proceeds of equipment, including fleet inventory minus (iii) income Taxes paid in cash during such period, over (b) Fixed Charges.

"**Fixed Charges**" shall mean, for any period, the sum, without duplication, of (a) Consolidated Cash Interest Expense for such period, plus (b) scheduled principal payments on Indebtedness made during such period.

"**Foreign Benefit Arrangement**" shall mean any employee benefit arrangement mandated by non-U.S. law that is maintained or contributed to by any Loan Party or any ERISA Affiliate.

"**Foreign Disposition**" has the meaning set forth in Section 2.05(b)(vii).

"**Foreign Plan**" shall mean each employee benefit plan (within the meaning of Section 3(3) of ERISA, whether or not subject to ERISA) that is not subject to U.S. law and is maintained or contributed to by any Loan Party.

"**Foreign Plan Event**" shall mean, with respect to any Foreign Benefit Arrangement or Foreign Plan, (a) the failure to make or, if applicable, accrue in accordance with normal accounting practices, any employer or employee contributions required by applicable law or by the terms of such Foreign Benefit Arrangement or Foreign Plan; (b) the failure to register or loss of good standing with applicable regulatory authorities of any such Foreign Benefit Arrangement or Foreign Plan required to be registered; or (c) the failure of any Foreign Benefit Arrangement or Foreign Plan to comply with any provisions of applicable law and regulations or with the terms of such Foreign Benefit Arrangement or Foreign Plan.

"**Foreign Subsidiary**" shall mean any direct or indirect Subsidiary of Holdings which is not a Domestic Subsidiary.

"**FRB**" shall mean the Board of Governors of the Federal Reserve System of the United States.

"**FSHCO**" shall mean any Domestic Subsidiary with no material assets other than equity interests of one or more Foreign Subsidiaries that are CFCs.

"**Fund**" shall mean any Person (other than a natural person) that is engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course.

"**GAAP**" shall mean generally accepted accounting principles in the United States of America, as in effect from time to time.

"**Governmental Authority**" shall mean any federal, state, local, county, provincial, foreign or other court or governmental agency, authority, instrumentality or regulatory or legislative body or any entity or officer exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to any government or any court, in each case whether associated with a state of the United States, the United States, or a foreign entity or government.

"**Group Member**" shall mean the Loan Parties and their respective Subsidiaries.

"**Guarantee**" of or by any person (the "**Guarantor**") shall mean (a) any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other person (the "**Primary Obligor**") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation (whether arising by virtue of partnership arrangements, by agreement to keep well, to purchase assets, goods, securities or services, to take-or-pay or otherwise) or to purchase (or to advance or supply funds for the purchase of) any security for the payment of such Indebtedness or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation, (iv) entered into for the purpose of assuring in any other manner the holders of such Indebtedness or other obligation of the payment thereof or to protect such holders against loss in respect thereof (in whole or in part) or (v) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or other obligation, or (b) any Lien on any assets of the guarantor securing any Indebtedness of any other person, whether or not such Indebtedness or other obligation is assumed by the guarantor; provided, however, that the term "**Guarantee**" shall not include endorsements for collection or deposit, in either case in the ordinary course of business, or customary and reasonable indemnity obligations in effect on the Closing Date or entered into in connection with any acquisition or disposition of assets permitted under this Agreement. The amount of any Guarantee for purposes of clause (b) shall be deemed to be equal to the lesser of (i) the aggregate unpaid amount of such Indebtedness and (ii) the fair market value of the property encumbered thereby as determined by such person in good faith. The term "**Guarantee**" as a verb has a corresponding meaning. Unless otherwise specified, all references herein to a "**Guarantee**" or to "**Guarantees**" shall refer to the Guarantee of the Guaranteed Obligations by the Guarantors pursuant to Section 11 hereof.

"**Guaranteed Obligations**" has the meaning set forth in Section 11.01.

"**Guarantors**" shall mean, collectively, (i) Holdings, (ii) Holdings, (ii) each other Subsidiary of Holdings (other than any Excluded Subsidiary) on the Closing Date, and (iii) those

Subsidiaries that issue a Guarantee of the Obligations after the Closing Date pursuant to Section 6.09, Section 6.15 or otherwise, at the option of the Borrower, issue a Guarantee of the Obligations after the Closing Date.

"**Guaranty**" shall mean, collectively, the guaranty of the Obligations by the Guarantors pursuant to this Agreement.

"**Hazardous Materials**" shall mean all pollutants, contaminants, wastes, chemicals, materials, substances and constituents of any nature which are subject to regulation by any Environmental Law, including, without limitation, explosive or radioactive substances or petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls or radon gas.

"**Holdings**" has the meaning set forth in the introductory paragraph to this Agreement.

"**Immaterial Subsidiary**" shall mean, at any time, any Restricted Subsidiary of the Borrower (i) having total assets (as determined in accordance with GAAP) in an amount of less than 2.50% of Consolidated Total Assets and (ii) contributing less than 2.50% to EBITDA for the most recently ended Test Period; *provided*, *however*, that the total assets (as so determined) and EBITDA contribution (as so determined) of all Immaterial Subsidiaries shall not exceed 5.00% of Consolidated Total Assets or 5.00% of EBITDA, as the case may be, for such Test Period.

"**Incremental Effective Date**" has the meaning set forth in Section 2.11.

"**Incremental Facility**" has the meaning set forth in Section 2.11.

"**Incremental Joinder**" has the meaning set forth in Section 2.11.

"**Incremental Term Loan**" has the meaning set forth in Section 2.11.

"**Incremental Term Loan Commitment**" has the meaning set forth in Section 2.11.

"**Indebtedness**" of any person shall mean, without duplication, (a) all obligations of such person for borrowed money, (b) all obligations of such person evidenced by bonds, debentures, notes or similar instruments to the extent the same would appear as a liability on a balance sheet prepared in accordance with GAAP, (c) all obligations of such person under conditional sale or other title retention agreements relating to property or assets purchased by such person, (d) all payments of such person issued or assumed as the deferred purchase price of property (other than (i) current intercompany liabilities incurred in the ordinary course of business and maturing within 365 days after the incurrence thereof and (ii) earnout obligations), to the extent that the same would be required to be shown as a long term liability on a balance sheet prepared in accordance with GAAP, (e) all Guarantees by such person of Indebtedness of others, (f) all Capital Lease Obligations of such person, (g) all payments that such person would have to make in the event of an early termination, on the date Indebtedness of such person is being determined, in respect of outstanding Swap Agreements net of payments such person would receive in the event of early termination on such date of determination, (h) unreimbursed payment obligations of such person as an account party in respect of letters of credit and (i) unreimbursed payment obligations of such person of such person in respect of bankers' acceptances. The Indebtedness of any person shall

include the Indebtedness of any partnership in which such person is a general partner, other than to the extent that the instrument or agreement evidencing such Indebtedness expressly limits the liability of such person in respect thereof. The Indebtedness of the Borrower and the Restricted Subsidiaries shall exclude (i) accrued expenses and accounts and trade payables, (ii) liabilities under vendor agreements to the extent such indebtedness may be satisfied through non-cash means such as purchase volume earnings credits and (iii) reserves for deferred income taxes.

"**Indemnified Liabilities**" has the meaning set forth in Section 10.05.

"**Indemnified Taxes**" shall mean, with respect to any Agent or any Lender, all Taxes other than (i) Taxes imposed on or measured by its net income, however denominated, and franchise (and similar) Taxes imposed in lieu of net income Taxes, in each case, by a jurisdiction (a) as a result of such recipient being organized in or having its principal office (or, in the case of any Lender, its applicable Lending Office) in such jurisdiction (or any political subdivision thereof), or (b) as a result of any other connection between such Lender or Agent and such jurisdiction other than any connections arising from executing, delivering, being a party to, engaging in any transactions pursuant to, performing its obligations under, receiving payments under, receiving or perfecting a security interest under, or enforcing, any Loan Document, (ii) any branch profits Taxes imposed in the United States or any similar Tax, imposed by any jurisdiction described in clause (i) above, (iii) Taxes attributable to the failure by any Agent or Lender to deliver the documentation required to be delivered pursuant to Section 3.01(d), (iv) in the case of any Lender (other than an assignee pursuant to a request by the Borrower under Section 3.04), any U.S. federal withholding Tax that is in effect on the date such Lender becomes a party to this Agreement, or designates a new Lending Office, except to the extent such Lender (or its assignor, if any) was entitled immediately prior to the time of designation of a new Lending Office (or assignment) to receive additional amounts with respect to such withholding Tax pursuant to Section 3.01, (v) any U.S. federal withholding Taxes imposed under FATCA, and (vi) any U.S. federal backup withholding imposed as a result of a failure by a Lender that is a "**United States Person**" as defined in Section 7701(a)(30) of the Code to deliver the form described in Section 3.01(d)(i).

"**Indemnitees**" has the meaning set forth in Section 10.05.

"**Indentures**" the meaning set forth in the preliminary statements herein.

"**Information**" has the meaning set forth in Section 10.08.

"**Insolvent**" with respect to any Multiemployer Plan, shall mean that such plan is insolvent within the meaning of Section 4245 of ERISA.

"**Intellectual Property Security Agreements**" shall mean each Copyright Short Form Security Agreement, Trademark Short Form Security Agreement and Patent Short Form Security Agreement (each as defined in the Security Agreement), in each case executed and delivered pursuant to the Security Agreement.

"**Intercompany Note**" shall mean a promissory note substantially in the form of Exhibit F.

"**Intercreditor Agreement**" shall mean that certain [Intercreditor Agreement], dated as of the Closing Date, by and among the Administrative Agent and the ABL Agent, and acknowledged and agreed by the Loan Parties party thereto.

"**Interest Expense**" shall mean, with respect to any Person for any period, the sum of (a) gross interest expense of such Person for such period on a consolidated basis, including (i) the amortization of debt discounts, (ii) the amortization of all fees (including fees with respect to Swap Agreements) payable in connection with the incurrence of Indebtedness to the extent included in interest expense, (iii) the portion of any payments or accruals with respect to Capital Lease Obligations allocable to interest expense and (iv) redeemable preferred stock dividend expenses, (b) capitalized interest of such Person and (c) dividends and similar distributions made in cash in respect of Disqualified Equity Interests of such Person. For purposes of the foregoing, gross interest expense shall be determined after giving effect to any net payments made or received and costs incurred by Holdings and its Subsidiaries with respect to Swap Agreements.

"**Interest Payment Date**" shall mean the last Business Day of each March, June, September and December and the Maturity Date.

"**Interest Period**" shall mean (a) for the first Interest Period, the period commencing on the Closing Date and ending on March 31, 2021, or (b) for each subsequent Interest Period, the three-month period commencing on the first day following the immediately preceding Interest Payment Date and ending on the immediately following Interest Payment Date.

"**Investment**" has the meaning set forth in Section 7.04.

"**Joint Venture**" shall mean a joint venture or similar arrangement, whether in corporate, partnership or other legal form which is not a Subsidiary but in which the Borrower or any Subsidiary owns or controls any Equity Interests.

"**Laws**" shall mean, collectively, all international, foreign, federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority.

"**LCA Election**" has the meaning set forth in Section 1.10.

"**LCA Test Date**" has the meaning set forth in Section 1.10.

"**Lender**" and "**Lenders**" have the meanings set forth in the introductory paragraph to this Agreement and, as the context requires (including, without limitation, as such term is used in Article III hereof), their respective successors and assigns as permitted hereunder, each of which is referred to herein as a "Lender."

"**Lender Advisors**" shall mean (x) the Ad Hoc Group Advisors, and (y) any other financial advisor, auditor, attorney, accountant, appraiser, auditor, business valuation expert, environmental

engineer or consultant, turnaround consultant, and other consultants, professionals and experts retained by the Ad Hoc Group and/or the Required Lenders.

"**Lender Default**" shall mean (i) the refusal (which may be given verbally or in writing and has not been retracted) or failure of any Lender to make available its portion of any reimbursement obligations required to be made by it, which refusal or failure is not cured within two business days after the date of such refusal or failure; (ii) the failure of any Lender to pay over to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder within two business days of the date when due, unless subject to a good faith dispute; (iii) a Lender has notified the Borrower or the Administrative Agent that it does not intend to comply with its payment obligations, or has made a public statement to that effect with respect to its payment obligations or under other agreements generally in which it commits to extend credit; (iv) a Lender has failed, within three Business Days after request by the Administrative Agent, to confirm that it will comply with its prospective payment obligations under this Agreement; or (v) a Lender has admitted in writing that it is insolvent or such Lender becomes subject to a Lender-Related Distress Event.

"**Lender-Related Distress Event**" shall mean, with respect to any Lender or any person that directly or indirectly controls such Lender (each, a "**Distressed Person**"), as the case may be, a voluntary or involuntary case with respect to such Distressed Person under any Debtor Relief Law, or a custodian, conservator, receiver or similar official is appointed for such Distressed Person or any substantial part of such Distressed Person's assets, or such Distressed Person or any person that directly or indirectly controls such Distressed Person is subject to a forced liquidation, or such Distressed Person makes a general assignment for the benefit of creditors or is otherwise adjudicated as, or determined by any Governmental Authority having regulatory authority over such Distressed Person or its assets to be, insolvent or bankrupt; *provided that* a Lender-Related Distress Event shall not be deemed to have occurred solely by virtue of the ownership or acquisition of any Equity Interests in any Lender or any person that directly or indirectly Controls such Lender by a Governmental Authority or an instrumentality thereof so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority or instrumentality) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender.

"**Lending Office**" shall mean, as to any Lender, the office or offices of such Lender described as such in such Lender's Administrative Questionnaire, or such other office or offices as a Lender may from time to time notify the Borrower and the Administrative Agent.

"**Lien**" shall mean, with respect to any asset, (a) any mortgage, deed of trust, lien, hypothecation, pledge, encumbrance in the nature of security, charge or security interest in or on such asset and (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset. For purposes of this Agreement and the other Loan Documents, nonexclusive licenses granted to any person to use intellectual property owned or developed by Holdings, the Borrower or any Restricted Subsidiary shall not constitute a Lien on such intellectual property.

"**Limited Condition Acquisition**" shall mean any Permitted Business Acquisition or other Permitted Investment, by Borrower or one or more of its Subsidiaries whose consummation is not conditioned on the availability of, or on obtaining, third party financing.

"**Loan Documents**" shall mean, collectively, (i) this Agreement, (ii) the Loan Notes, (iii) the Collateral Documents, (iv) the Intercreditor Agreement to the extent then in effect, (v) the Fee Letter and (vi) any Incremental Joinder, and all amendments, restatements, supplements or other modifications thereto.

"**Loan Note**" shall mean a promissory note of the Borrower payable to any Lender or its registered assigns, in substantially the form of <u>Exhibit A</u> hereto, evidencing the aggregate Indebtedness of the Borrower to such Lender resulting from the Loans made by such Lender.

"**Loan Parties**" shall mean, collectively, the Borrower and each Guarantor.

"**Loans**" shall mean the Term Loans and the Incremental Term Loans.

"**Make-Whole Amount**" shall mean with respect to any Loans prepaid, repaid, refinanced, substituted or replaced, or accelerated, the amount, calculated by the Required Lenders (or by any Lender Advisor on their behalf), equal to the sum of interest that otherwise would have accrued on such Loans so prepaid, repaid, refinanced, substituted or replaced, or accelerated, from the date of such prepayment, repayment, refinancing, substitution or replacement, or acceleration, as applicable, until the date that is thirty (30) months from the Closing Date at the Applicable Rate then in effect on such date, discounted to present value using a discount rate equal to the Treasury Rate plus 0.50%.

"**Management Group**" shall mean the group consisting of the current and former directors, officers, employees and other management personnel of any Parent Entity, Holdings, the Borrower and the Restricted Subsidiaries and, in each case, family members thereof and related trusts for the benefit of any of the foregoing.

"**Margin Stock**" has the meaning set forth in Regulation U issued by the FRB.

"**Material Adverse Effect**" shall mean any event, development or circumstance that has a material adverse effect on (a) the business, property, operations or condition (financial or otherwise) of Holdings and its Restricted Subsidiaries taken as a whole or (b) the validity or enforceability of this Agreement or any of the other Loan Documents or the rights or remedies of the Administrative Agent or the Lenders hereunder or thereunder.

"**Material Indebtedness**" shall mean Indebtedness (other than the Obligations) of any one or more of Holdings and the Restricted Subsidiaries in an aggregate principal amount exceeding $12.5 million.

"**Material Real Property**" shall mean any fee owned Real Property owned by any Loan Party with a Fair Market Value in excess of $[5,000,000] (at the Closing Date or, with respect to real property acquired after the Closing Date, at the time of acquisition, in each case, as reasonably estimated by the Borrower in good faith).

"**Maturity Date**" shall mean the date that is the earliest of (i) the fifth anniversary of the Closing Date (or, in the case of an Incremental Term Loan, the maturity date with respect thereto set forth in the applicable Incremental Joinder) and (ii) the date on which the Obligations become due and payable pursuant to this Agreement, whether by acceleration or otherwise.

"**Maximum Rate**" has the meaning set forth in <u>Section 10.10</u>.

"**Moody's**" shall mean Moody's Investors Service, Inc. and any successor thereto.

"**Mortgaged Property**" shall mean the Material Real Property listed on Schedule 5.09 and the Material Real Property of the Loan Parties encumbered by a Mortgage pursuant to Section 5.09.

"**Mortgages**" shall mean collectively, the deeds of trust, trust deeds, hypothecs and mortgages made by the Loan Parties in favor or for the benefit of the Administrative Agent on behalf of the Secured Parties creating and evidencing a Lien on a Mortgaged Property in form and substance reasonably satisfactory to the Administrative Agent (both acting on its own and acting at the Direction of the Required Lenders) with such terms and provisions as may be required by the applicable Laws of the relevant jurisdiction, and any other mortgages executed and delivered pursuant to Section 6.11, 6.13 and Section 6.14, in each case, as the same may from time to time be amended, restated, supplemented, or otherwise modified.

"**Multiemployer Plan**" shall mean a multiemployer plan as defined in Section 4001(a)(3) of ERISA to which any Loan Party or any ERISA Affiliate (other than one considered an ERISA Affiliate only pursuant to clause (m) or (o) of Code Section 414) is making or accruing an obligation to make contributions, or has within any of the preceding six plan years made or accrued an obligation to make contributions.

"**Net Income**" shall mean, with respect to any Person, the net income (loss) of such person, determined in accordance with GAAP and before any reduction in respect of preferred stock dividends.

"**Net Proceeds**" shall mean:

(a)    100% of the cash proceeds actually received by Holdings or any of Subsidiaries thereof (including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise and including casualty insurance settlements and condemnation awards, but in each case only as and when received) from any Disposition or Casualty Event, net of (i) attorneys' fees, accountants' fees, investment banking fees, survey costs, title insurance premiums, and related search and recording charges, transfer taxes, deed or mortgage recording taxes, other customary expenses and brokerage, consultant and other customary fees actually incurred in connection therewith, (ii) the principal amount, premium or penalty, if any, interest and other amounts on any Indebtedness that is secured by a Lien (other than a Lien that ranks *pari passu* with or subordinated to the Liens securing the Obligations) on the asset subject to such Disposition or Casualty Event and that is required to be repaid (and is timely repaid) in connection with such Disposition or Casualty Event (other than Indebtedness under the Loan Documents), (iii) in the case of any Disposition or Casualty Event by a non-wholly owned Subsidiary, the pro rata portion of the Net Proceeds thereof

(calculated without regard to this clause (iii)) attributable to minority interests and not available for distribution to or for the account of Holdings or a wholly owned Subsidiary as a result thereof, (iv) taxes paid or reasonably estimated to be payable as a result thereof, and (v) the amount of any reasonable reserve established in accordance with GAAP against any adjustment to the sale price or any liabilities (other than any taxes deducted pursuant to clause (i) above) (x) related to any of the applicable assets and (y) retained by Holdings or any of its Subsidiaries including, without limitation, pension and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations (however, the amount of any subsequent reduction of such reserve (other than in connection with a payment in respect of any such liability) shall be deemed to be Net Proceeds of such Disposition or Casualty Event occurring on the date of such reduction); *provided that*, if no Default or Event of Default exists, the Borrower may reinvest any portion of such proceeds received in connection with a Casualty Event or a Disposition within 12 months of such receipt in accordance with Section 2.05(b)(ii) and such portion of such proceeds shall not constitute Net Proceeds, except to the extent not, within 12 months of such receipt, so reinvested (it being understood that such proceeds shall constitute Net Proceeds notwithstanding any investment notice if there is a Default or Event of Default at the time of a proposed reinvestment unless such proposed reinvestment is made pursuant to a binding commitment entered into at a time when no Default or Event of Default was continuing); and

(b)     100% of the cash proceeds from the incurrence, issuance or sale by Holdings or any of its Subsidiaries of any Indebtedness (other than Indebtedness permitted to be incurred under this Agreement), preferred equity or other Equity Interests, net of all taxes paid or reasonably estimated to be payable as a result thereof and fees (including investment banking fees and discounts), commissions, costs and other expenses, in each case incurred in connection with such incurrence, issuance or sale.

For purposes of calculating the amount of Net Proceeds, fees, commissions and other costs and expenses payable to Holdings or any Affiliate of the foregoing shall be disregarded.

"**Non-Consenting Lender**" has the meaning set forth in Section 3.04(c).

"**Non-Defaulting Lender**" shall mean, at any time, a Lender that is not a Defaulting Lender.

"**NYFRB**" shall mean the Federal Reserve Bank of New York.

"**Obligations**" shall mean all advances to, and debts, liabilities, obligations, covenants and duties of, any Loan Party and its Subsidiaries arising under any Loan Document or otherwise with respect to any Loan, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including Post-Petition Interest and Fees. Without limiting the generality of the foregoing, the Obligations of the Loan Parties under the Loan Documents (and of their Subsidiaries to the extent they have obligations under the Loan Documents) include (a) the obligation (including guarantee obligations) to pay principal, interest, reimbursement obligations, charges, expenses, fees, Attorney Costs, indemnities and other amounts payable by any Loan Party under any Loan Document, (b) the obligation of any Loan Party to reimburse any amount in respect of any of the foregoing that any Lender, in its sole discretion, may elect to pay or advance on behalf of such Loan Party, and (c) any

Prepayment Premium payable upon any optional prepayment of the Loan pursuant to Section 2.05(a) or mandatory prepayment of the Loans pursuant to Section 2.05(b)(iii), or any acceleration of the Loans, in each case in accordance with the terms hereof.

"**OFAC**" shall have the meaning assigned to such term in the definition of "Embargoed Person."

["**Organization Documents**" shall mean (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.]

"**Other Taxes**" has the meaning specified in Section 3.01(b).

"**Outstanding Amount**" shall mean the aggregate outstanding principal amount thereof after giving effect to any borrowings (or deemed borrowings) and prepayments or repayments of the Loans occurring on such date.

"**Parent Entity**" shall mean with respect to any Person, such entity(s) with respect to whom such Person is a direct or indirect Subsidiary. Unless otherwise specified, all references herein to a "**Parent Entity**" or "**Parent Entities**" shall refer to a Parent Entity or Parent Entities of the Borrower (including but not limited to Holdings [and Holdings]).

"**Participant**" has the meaning set forth in Section 10.07(f).

"**Participant Register**" has the meaning set forth in Section 10.07(f).

"**PBGC**" shall mean the Pension Benefit Guaranty Corporation (or any successor).

"**Perfection Certificate**" shall mean a certificate in the form of Exhibit E hereto or any other form reasonably approved by the Administrative Agent (acting at the Direction of the Required Lenders), as the same shall be supplemented from time to time.

"**Permitted Business**" shall mean any business conducted by Holdings and its Subsidiaries on the Closing Date and any business reasonably related, ancillary or complimentary to, or reasonable extensions of, the business of the Holdings and its Subsidiaries on the Closing Date.

"**Permitted Business Acquisition**" shall mean any acquisition by the Borrower or any Restricted Subsidiary of all or substantially all of the assets of, or a majority of the outstanding Equity Interests (other than directors' qualifying shares and similar *de minimis* holdings required by applicable law) in, a person or division, business unit or line of business of a Person that is in the same, or a related, business to that of the Borrower and its Subsidiaries; provided that, if (with respect to any acquisition of a person or any Equity Interests in a person) the acquired person shall

not become a Subsidiary Guarantor or (with respect to any acquisition of assets) the assets shall be acquired by a Subsidiary that is not a Subsidiary Guarantor, the aggregate amount of consideration paid in respect of the portion of such acquisition attributable to any such person that does not become a Subsidiary Guarantor or any such assets that are acquired by a person that is not a Subsidiary Guarantor shall not exceed the greater of $12.5 million or [●]% of Consolidated Total Assets.

["**Permitted Holders**" shall mean the direct or indirect stockholders of Holdings on the Closing Date immediately after giving effect to the Transactions.]

"**Permitted Indebtedness**" has the meaning set forth in <u>Section 7.01</u>.

"**Permitted Investments**" has the meaning set forth in <u>Section 7.04</u>.

"**Permitted Investors**" shall mean (a) each of [●], [●] and [●], and their respective Control Investment Affiliates  and (b) the members of the Management Group.

"**Permitted Liens**" has the meaning set forth in <u>Section 7.02</u>.

["**Permitted Payments to Parent**" shall mean, without duplication as to amounts:

(a)      payments to any Parent Entity to enable any Parent Entity to purchase or redeem fractional shares (or cash payments in lieu thereof) of Equity Interests in connection with the exercise of warrants, options, other rights to acquire Equity Interests or other securities convertible or exchangeable for Equity Interests of Holdings (or any Parent Entity);

(b)      payments to any Parent Entity as shall be necessary to allow any Parent Entity to pay (A) operating expenses in the ordinary course of business and other corporate overhead, legal, accounting and other professional fees and expenses (including, without limitation, those owing to third parties) plus any customary indemnification claims made by directors, officers, employees, members of management or consultants of any Parent Entity attributable to the ownership of or operations of the Group Members; (B) fees and expenses related to any debt or equity offering, Permitted Investment or acquisition permitted hereunder (in each case, whether or not successful), and (C) customary salary, bonus, severance, indemnification obligations and other fees, benefits or expenses reimbursements payable to directors, officers, employees, members of management and consultants of any Parent Entity and any payroll, social security or similar taxes related thereto to the extent such salaries, bonuses, severance, indemnification obligations and other fees, benefits or expense reimbursements are attributable to the ownership or operation of the Group Members; *provided that* payments pursuant to this clause (2) shall not exceed $[●] in any fiscal year;

(c)      with respect to any taxable period for which Holdings and/or any of its Subsidiaries are members of a consolidated, combined, affiliated, unitary or similar income tax group for U.S. federal and/or applicable state or local income tax purposes of which a direct or indirect parent of Holdings is the common parent [(a "**Tax Group**")] or for which Holdings is a partnership or disregarded entity with a direct or indirect corporate parent (a "**Corporate Parent**"), distributions to any direct or indirect parent of Holdings to pay the income taxes of such Tax Group, or distributions to the owners of Holdings (including the Corporate Parent) to pay the income taxes of such owners, as applicable, to the extent such income taxes of such Tax Group or owners are

attributable to the income of Holdings and/or its applicable Subsidiaries, in an aggregate amount not to exceed the amount of any U.S. federal, state and/or local income taxes (as applicable) that Holdings and/or its applicable Subsidiaries would have paid for such taxable period had Holdings and/or its applicable Subsidiaries been a stand-alone corporate taxpayer or stand-alone corporate group with respect to such taxes;

(d)    payments to any Parent Entity in respect of withholding or similar taxes payable by any future, present or former officers, directors, employees, members of management or consultants of any Parent Entity or any of its Subsidiaries (or the estate, heirs, family members, spouse, former spouse, domestic partner or former domestic partner of the foregoing) and any repurchases of Equity Interests in consideration of such payments including demand repurchases in connection with the exercise of stock options; and

(e)    payments to any Parent Entity to permit such Parent Entity to pay state annual report filing fees and franchise taxes (and similar costs) required to maintain its corporate existence.]

"**Permitted Refinancing Indebtedness**" shall mean any Indebtedness issued in exchange for, or the net proceeds of which are used to Refinance the Indebtedness being Refinanced (or previous refinancings thereof constituting Permitted Refinancing Indebtedness) and, in the case of any revolving Indebtedness, the permanent reduction of commitments thereunder; provided that (a) the principal amount (or accreted value, if applicable) of such Permitted Refinancing Indebtedness does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness so Refinanced (plus unpaid accrued interest and premium thereon, any committed or undrawn amounts and underwriting discounts, fees, commissions and expenses, associated with such Permitted Refinancing Indebtedness), except as otherwise permitted under Section 7.01, (b) other than with respect to Indebtedness permitted pursuant to Section 7.01(h) and (q), such Permitted Refinancing Indebtedness has a final maturity date equal to or later than the date that is 91 days after the final maturity date of, and has a Weighted Average Life to Maturity no less than 91 days greater than the Weighted Average Life to Maturity of, the Indebtedness being Refinanced (unless such Permitted Refinancing Indebtedness is secured on a *pari passu* basis with the Indebtedness being Refinanced, in which case such maturity and Weighted Average Life to Maturity shall be no shorter than the Maturity Date of the Indebtedness being Refinanced), (c) if the Indebtedness being Refinanced is by its terms subordinated in right of payment to the Obligations under this Agreement, such Permitted Refinancing Indebtedness shall be subordinated in right of payment to such Obligations on terms not materially less favorable to the Lenders as those contained in the documentation governing the Indebtedness being Refinanced, taken as a whole, in the good faith determination of the Borrower and the Administrative Agent, (d) no Permitted Refinancing Indebtedness shall have obligors or contingent obligors that were not obligors or contingent obligors (or that would not have been required to become obligors or contingent obligors) in respect of the Indebtedness being Refinanced except to the extent otherwise permitted under Section 7.01 or Section 7.04 and (e) if the Indebtedness being Refinanced is (or would have been required to be) secured by the Collateral, such Permitted Refinancing Indebtedness may only be secured by such Collateral on terms no more favorable, taken as a whole, than those contained in the documentation governing the Indebtedness being Refinanced, taken as a whole, in each case in the good faith determination of the Borrower and the Administrative Agent (acting at the Direction of the Required Lenders).

"**Person**" shall mean any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"**Petition Date**" shall mean November 23, 2020.

"**PIK Interest**" has the meaning set forth in **Error! Reference source not found.**.

"**PIK Interest Rate**" has the meaning set forth in the definition of "Applicable Rate".

"**PIK Toggle**" has the meaning set forth in **Error! Reference source not found.**.

"**Plan**" or "**Pension Plan**" shall mean any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, and in respect of which any Loan Party or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4062 or Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"**Platform**" shall mean IntraLinks or another similar electronic system.

"**Pledged Debt**" has the meaning set forth in the Security Agreement.

"**Pledged Equity**" has the meaning set forth in the Security Agreement.

"**Post-Petition Interest and Fees**" has the meaning set forth in Section 11.04(b)(ii).

"**Prepayment Premium**" shall mean (i) at any time on or after the Closing Date and on or prior to the date that is thirty (30) months from the Closing Date , the Make-Whole Amount and (ii) thereafter, $0.

"**Prepetition Notes**" has the meaning set forth in the preliminary statements herein.

"**Pro Forma Basis**" shall mean, as to any financial calculation or compliance with any covenant or test hereunder, performing such calculation or compliance with such covenant or test, as applicable, for any event described below that occurs subsequent to the commencement of any period of four consecutive quarters (the "**Reference Period**") for which the financial effect of such event is being calculated (or compliance being tested), and giving effect to the event for which such calculation (or compliance test) is being made, such calculation (or compliance test) will give pro forma effect to such event as if such event, and all other events described below that occurred subsequent to the commencement of the Reference Period (whether or not a ratio was required to be calculated in respect thereof), occurred on the first day of the Reference Period or in the case of Consolidated Total Assets, after giving effect thereto (it being understood and agreed that (x) unless otherwise specified, such Reference Period shall be deemed to be the most recently ended Test Period and such pro forma adjustments shall be excluded to the extent already accounted for in the calculation of EBITDA for such period and (y) if any person that became a Restricted Subsidiary or was merged, amalgamated or consolidated with or into the Borrower or any Restricted Subsidiary shall have experienced any event requiring adjustment pursuant to this definition, then such calculation shall give pro forma effect thereto for such period as if such event occurred at the beginning of such period): (i) in making any determination of EBITDA pro forma

effect shall be given to any disposition by the Borrower or a Restricted Subsidiary of a person or asset, distribution facility or line of business, to any acquisition by the Borrower or any Restricted Subsidiary, any discontinued operation or any operational change and any Subsidiary Redesignation or any Unrestricted Subsidiary Designation, in each case that occurred during the Reference Period (or, in the case of determinations made with respect to any action the taking of which hereunder is subject to compliance on a Pro Forma Basis, as specified in the definition of "Consolidated Senior Secured Net Leverage Ratio" or any other test, as applicable, (any such action, a "**Restricted Action**") occurring during the Reference Period or thereafter and through and including the date of such determination) and (ii) in making any determination on a Pro Forma Basis, (x) all Indebtedness (including Indebtedness incurred or assumed and for which the financial effect is being calculated, whether incurred under this Agreement or otherwise, but excluding normal fluctuations in revolving Indebtedness incurred for working capital purposes) incurred or permanently repaid, returned, redeemed or extinguished during the Reference Period (or, in the case of determinations made with respect to any Restricted Action, occurring during the Reference Period or thereafter and through and including the date of such determination) shall be deemed to have been incurred or repaid, returned, redeemed or extinguished at the beginning of such period, (y) interest expense of such person attributable to (A) interest on any Indebtedness, for which pro forma effect is being given as provided in the preceding underline clause (x), bearing a floating interest rate shall be computed on a pro forma basis utilizing the rate which is or would be in effect with respect to such Indebtedness as at the relevant date of determination as if such rate had been actually in effect during the period for which pro forma effect is being given taking into account any interest hedging arrangements applicable to such Indebtedness, (B) any Capital Lease Obligation shall be deemed to accrue at an interest rate reasonably determined by a Responsible Officer of the Borrower to be the rate of interest implicit in such Capital Lease Obligation in accordance with GAAP and (C) interest on any Indebtedness that may optionally be determined at an interest rate based upon a factor of a prime or similar rate, a eurocurrency interbank offered rate, or other rate, shall be determined to have been based upon the rate actually chosen, or if none, then based upon such optional rate chosen as the Borrower or Restricted Subsidiary may designate, and (z) adjustments shall be made to Consolidated Total Assets for all Dispositions for proceeds exceeding $2.0 million and any Permitted Business Acquisitions occurring after the end of the most recent Reference Period (including any such transactions in relation to which Consolidated Total Assets is being calculated or to be completed concurrently therewith).

Pro forma calculations or determinations made pursuant to the definition of "Pro Forma Basis" shall be determined in good faith by a Responsible Officer of the Borrower and, for any fiscal period ending on or prior to the first anniversary of any Restricted Action, may include adjustments (estimated by the Borrower in good faith) to reflect (x) operating expense reductions and other operating improvements or synergies reasonably expected to result from such Restricted Action and such adjustments may reflect additional operating expense reductions and other additional operating improvements and synergies for which substantially all of the steps necessary for the realization thereof have been taken or are reasonably anticipated by the Borrower to be taken in the 18-month period following the relevant Restricted Action and, are estimated on a good faith basis by the Borrower and (y) the amount of "run rate" cost savings, operating expense reductions and other operating improvements or synergies related to such Restricted Action that are reasonably identifiable and factually sup-portable and projected by the Borrower in good faith to result from actions that have been taken or with respect to which substantial steps have been taken or are expected to be taken (in the good faith determination of the Borrower) within

18 months following the relevant Restricted Action, net the amount of actual benefits realized during such period from such actions; provided, however that the aggregate amount of any such adjustments pursuant to clauses (x) and (y) above shall not exceed 20% of EBITDA, for any Test Period (calculated after giving effect to such addbacks and the addbacks specified in clauses (c)(xiv) and (c)(xv) of the definition of EBITDA), taken together with EBITDA addbacks pursuant to clauses (c)(xiv) and (c)(xv) of the definition of "**EBITDA**" in such period. The Borrower shall deliver to the Administrative Agent a certificate of a Responsible Officer of the Borrower setting forth such demonstrable or additional operating expense reductions and other operating improvements or synergies and information and calculations supporting them in reasonable detail.

"**Prohibited Transaction**" shall have the meaning assigned to such term in Section 406 of ERISA and/or Section 4975(c) of the Code.

"**Projections**" shall mean the Borrower's forecasted (a) balance sheets, (b) profit and loss statements, and (c) cash flow statements, all prepared on a basis consistent with Borrower's historical financial statements, together with appropriate supporting details and a statement of underlying assumptions.

"**Pro Rata Share**" shall mean, with respect to each Lender, at any time a fraction (expressed as a percentage, carried out to the ninth decimal place), the numerator of which is the aggreagte outstanding principal amount of the Loans of such Lender at such time and the denominator of which is the aggregate outstanding principal amount of all Loans at such time.

"**Public Lender**" shall mean Lenders that do not wish to receive material non-public information with respect to the Borrower or its securities.

"**Qualified Capital Stock**" shall mean any Equity Interest of any person that does not by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable or exercisable) or upon the happening of any event (a) provide for scheduled payments of dividends in cash (other than at the option of the issuer) prior to the date that is, at the time of issuance of such Equity Interest, 91 days after the Maturity Date, (b) become mandatorily redeemable at the option of the holder thereof (other than for Qualified Capital Stock or pursuant to customary provisions relating to redemption upon a change of control, sale of assets or initial public offering) pursuant to a sinking fund obligation or otherwise prior to the date that is, at the time of issuance of such Equity Interest, 91 days after the Maturity Date or (c) become convertible or exchangeable at the option of the holder thereof for Indebtedness or Equity Interests that are not Qualified Capital Stock; provided, that if any such Equity Interest is issued pursuant to a plan for the benefit of the employees, directors, officers, managers or consultants of any Parent Entity, the Borrower or its Subsidiaries or by any such plan to such persons, such Equity Interest shall not be regarded as an Equity Interest not constituting Qualified Capital Stock solely because it may be required to be repurchased by any Parent Entity, the Borrower or its Subsidiaries in order to satisfy applicable regulatory obligations or upon termination of services to any Parent Entity, the Borrower or its Subsidiaries; provided, further, that any Equity Interest held by any future, present or former employee, director, officer, managers or consultants of any Parent Entity, the Borrower or any of its Subsidiaries shall be deemed Qualified Capital Stock, regardless of whether such stock is redeemable or subject to repurchase pursuant to any management equity subscription agreement, stock option agreement, stock ownership plan, put agreement, stockholder agreement

or similar agreement that may be in effect from time to time if, in the case of Equity Interests of the Borrower or any of its Subsidiaries, the terms of such Equity Interests provide that the Borrower or such Subsidiary may not repurchase or redeem any such Equity Interests pursuant to such provisions unless such repurchase or redemption complies with the terms of this Agreement (or is consented to by the Required Lenders).

"**Qualified Equity Contribution**" shall mean property or assets (including cash) contributed to the capital of the Borrower, or the proceeds received by the Borrower from the sale (other than to a Restricted Subsidiary) of Qualified Capital Stock of the Borrower or Equity Interests of any Parent Entity.

"**Real Property**" shall mean, collectively, all right, title and interest (including any leasehold, mineral or other estate) in and to any and all parcels of or interests in real property owned or leased by any Person, whether by lease, license or other means, together with, in each case, all easements, hereditaments and appurtenances relating thereto, all improvements and appurtenant fixtures and equipment, all general intangibles and contract rights and other property and rights incidental to the ownership, lease or operation thereof.

"**Reference Period**" has the meaning set forth in the definition of "**Pro Forma Basis**."

"**Refinance**" shall mean the extension, refinancing, renewal, replacement, defeaseance or refunding of any Indebtedness and "Refinanced" and "Refinancing" shall have a meaning correlative thereto.

"**Register**" has the meaning set forth in Section 10.07(d).

"**Release**" shall mean, with respect to Hazardous Materials, any spilling, leaking, seeping, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, disposing, depositing, or emanating in, into, onto or through the Environment.

"**Relevant Percentage**" shall mean (i) 50% if the Consolidated Senior Secured Net Leverage Ratio is equal or greater than [●] to 1.00, (ii) 25% if the Consolidated Senior Secured Net Leverage Ratio is less than [●] to 1.00 but greater than or equal to [●] to 1.00, or (iii) 0% if the Consolidated Senior Secured Net Leverage Ratio is less than [●] to 1.00.

"**Reorganization**" shall mean, with respect to any Multiemployer Plan, that such plan is in "reorganization" within the meaning of Section 4241 of ERISA.

"**Reorganized HHI**" has the meaning set forth in Section 1.09.

"**Reportable Event**" shall mean any reportable event as defined in Section 4043(c) of ERISA or the regulations issued thereunder with respect to a Plan (other than a Plan maintained by an ERISA Affiliate that is considered an ERISA Affiliate only pursuant to subsection (m) or (o) of Section 414 of the Code), other than those events as to which the 30-day notice period referred to in Section 4043(c) of ERISA has been waived.

"**Required Lenders**" shall mean, as of any date of determination, Lenders having at least 50.1% of the aggregate Outstanding Amount of the Loans at such time; provided that the portion

of the Outstanding Amount of the Loans held or deemed held by, any Defaulting Lender shall be excluded for purposes of making a determination of Required Lenders.

"**Resolution Authority**" shall mean an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"**Responsible Officer**" of any person shall mean any executive officer or Financial Officer of such person and any other officer or similar official thereof responsible for the administration of the obligations of such person in respect of this Agreement. Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"**Restricted Action**" shall have the meaning assigned to such term in the definition of "Pro Forma Basis."

"**Restricted Debt Payment**" shall have the meaning assigned to such term in Section 7.09(b).

"**Restricted Investment**" shall mean an Investment other than a Permitted Investment.

"**Restricted Payment**" shall have the meaning assigned to such term in Section 7.06.

"**Revolving Debt Facility**" shall mean, with respect to Holdings or any of its Subsidiaries, one or more revolving credit facilities (including, without limitation, the ABL Revolving Credit Facility) or commercial paper facilities with banks or other lenders providing for revolving credit loans, receivables financing (including through the sale of receivables to such lenders or to special purpose entities formed to borrow from such lenders against such receivables), letters of credit and/or bankers' acceptances, in each case, as amended, restated, supplemented, modified, renewed, refunded, replaced or refinanced (including by means of sales of debt securities to institutional investors) in whole or in part from time to time (and whether or not with the original administrative agent, lenders or another agent(s) or other lender(s) and whether provided under the ABL Revolving Credit Facility or any other credit agreement or other agreement).

"**Restricted Subsidiary**" shall mean each Subsidiary of the Borrower that is not an Unrestricted Subsidiary.

"**RSA**" has the meaning specified in the preliminary statements.

"**S&P**" shall mean Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., and any successor thereto.

"**Same Day Funds**" shall mean immediately available funds.

"**Secured Parties**" shall mean, collectively, the Agents, the Lenders and each co-agent or sub-agent appointed by the Administrative Agent from time to time pursuant to Section 9.02, and each of the successors and assigns of each of the foregoing.

"**Securities Act**" shall mean the Securities Act of 1933, as amended.

"**Security Agreement**" shall mean the [Security Agreement] substantially in the form of Exhibit D, dated as of the Closing Date.

"**Signature Law**" has the meaning set forth in Section 10.20.

"**Solvent**" shall mean, with respect to any person as of any date of determination, that, as of such date (a) the value of the assets of such person (both at fair value and present fair saleable value) is greater than the total amount of liabilities (including contingent and unliquidated liabilities) of such person, (b) such person is able to pay all liabilities of such person as such liabilities mature. In computing the amount of contingent or unliquidated liabilities at any time, such liabilities shall be computed at the amount that, in light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability, (c) has capital that is not unreasonably small for its business and is sufficient to carry on its business and transactions and all business and transactions in which it is about to engage; (d) is not "insolvent" within the meaning of Section 101(32) of the Bankruptcy Code; and (e) has not incurred (by way of assumption or otherwise) any obligations or liabilities (contingent or otherwise) under any Loan Documents, or made any conveyance in connection therewith, with actual intent to hinder, delay or defraud either present or future creditors of such Person or any of its Affiliates.

"**Specified Event of Default**" shall mean the occurrence of and continuance of any Event of Default under Section 8.01(b), (c), (h) or (i).

"**Special Purpose Subsidiary**" shall mean a Restricted Subsidiary that (a) is engaged solely in (x) the business of acquiring, selling, collecting, financing or refinancing receivables (including any thereof constituting or evidenced by chattel paper, instruments or general intangibles), accounts (as defined in the Uniform Commercial Code as in effect in any jurisdiction from time to time) and other accounts, all proceeds thereof and all rights (contractual and other), collateral and other assets relating thereto and (y) any business or activities incidental or related to such business, in each case permitted by this Agreement and (b) is designated as a "Special Purpose Subsidiary" by the Borrower.

"**Specified Indebtedness**" shall have the meaning assigned to such term in Section 7.09(b).

"**Subordinated Indebtedness**" shall mean any Indebtedness of the Borrower or any Restricted Subsidiary that is expressly subordinated in right of payment to the Obligations.

"**Subordinated Obligations**" has the meaning set forth in Section 11.04(b).

"**Subsidiary**" shall mean, with respect to any Person (herein referred to as the "**Parent**"), any corporation, partnership, association or other business entity of which securities or other ownership interests representing more than 50% of the ordinary voting power or more than 50% of the partnership interests are, at the time any determination is being made, directly or indirectly, owned, Controlled or held by the parent.

"**Subsidiary Guarantor**" shall mean any Guarantor that is a Subsidiary of Holdings (excluding any Excluded Subsidiaries).

"**Subsidiary Redesignation**" shall have the meaning assigned to such term in Section 6.14.

"**Supplemental Agent**" has the meaning set forth in Section 9.12(a) and "**Supplemental Agents**" shall have the corresponding meaning.

"**Swap Agreement**" shall mean any agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; provided that no phantom stock or other employee benefit plan providing for payments only on account of services provided by current or former directors, officers, employees, members of management or consultants of Holdings, the Borrower or any of its Subsidiaries shall be a Swap Agreement.

"**Tax Distributions**" shall have the meaning assigned to such term in Section 7.06(i).

"**Tax Group**" the meaning assigned to such term in [Section 7.06(i)][the definition of "Permitted Payments to Parent"].

"**Taxes**" shall mean all present or future taxes, levies, imposts, duties, assessments, deductions, charges, fees or withholdings imposed by any Governmental Authority and any interest, additions to tax and penalties applicable thereto.

"**Term Loans**" shall mean the term loans made by the Lenders on the Closing Date to the Borrower pursuant to Section 2.01.

"**Term Priority Collateral**" has the meaning assigned to the term ["**Term Priority Collateral**"] in the Intercreditor Agreement.

"**Termination Date**" shall mean the date on which all Commitments have been satisfied or terminated, and the principal of and interest on each Loan, plus fees and all other expenses or amounts payable, and any other Obligations under any Loan Document (other than obligations for taxes, costs, indemnifications, reimbursements damages and other contingent liabilities in respect of which no claim or demand for payment has been made or, in the case of indemnifications, no notice been given (or reasonably satisfactory arrangements have otherwise been made)) shall have been paid in full.

"**Test Period**" shall mean, on any date of determination, the period of four consecutive fiscal quarters (taken as one accounting period) of Holdings then most recently ended for which financial statements have been delivered pursuant to Section 6.04, as applicable.

"**Title Policy**" has the meaning assigned to such term in clause (d) of the definition of "Collateral and Guarantee Requirements".

"**Transaction Costs**" shall mean fees and expenses payable or otherwise borne by Holdings, any other Parent Entity, the Borrower and its Subsidiaries in connection with the Transactions.

"**Transactions**" shall mean, collectively, (a) the transactions to occur in connection with the Loan Documents, including the execution and delivery of the Loan Documents and the incurrence of the Loans hereunder, (b) the entering into of the ABL Revolving Credit Facility and the incurrence of the initial borrowings thereunder, (c) the repayment of the prepetition ABL credit facility, (d) the Chapter 11 Restructuring Transactions, (e) [Reserved] and (f) the payment of the Transaction Costs.

"**Transferred Guarantor**" has the meaning set forth in Section 11.11.

"**Treasury Rate**" shall mean, with respect to a prepayment date or acceleration date, the yield to maturity at the time of computation of United States Treasury securities with a constant maturity (as compiled and published in the most recent Federal Reserve Statistical Release H.15(519) that has become publicly available at least two Business Days prior to such prepayment date or acceleration date, as applicable (or, if such Federal Reserve Statistical Release is no longer published, any publicly available source of similar market data)), of one year from such prepayment date or acceleration date, as applicable; *provided, however,* that if the period from such prepayment date or acceleration date, as applicable, to the date that is the 12-month anniversary of the Closing Date is not equal to the constant maturity of a United States Treasury security for which a weekly average yield is given, the Treasury Rate shall be obtained by linear interpolation (calculated to the nearest one-twelfth of a year) from the weekly average yields of United States Treasury securities for which such yields are given.

"**UK Financial Institution**" shall mean any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended form time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person subject to IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"**UK Resolution Authority**" shall mean the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"**Uniform Commercial Code**" or "**UCC**" shall mean the Uniform Commercial Code as the same may from time to time be in effect in the state of New York or the Uniform Commercial Code (or similar code or statute) of another jurisdiction, to the extent it may be required to apply to any item or items of Collateral.

"**United States**" and "**U.S.**" mean the United States of America.

"**United States Tax Compliance Certificate**" shall mean a certificate substantially in the form of Exhibits G-1, G-2, G-3 and G-4 hereto, as applicable.

"**Unrestricted Subsidiary**" shall mean any Subsidiary of the Borrower that is acquired or created after the Closing Date and designated by the Borrower as an Unrestricted Subsidiary hereunder by written notice to the Administrative Agent pursuant to Section 6.14.

"**Unrestricted Subsidiary Designation**" shall have the meaning assigned to such term in Section 6.14.

"**USA Patriot Act**" shall mean the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-56), as amended or modified from time to time.

"**Weighted Average Life to Maturity**" shall mean, when applied to any Indebtedness at any date, the number of years obtained by dividing: (a) the sum of the product obtained by multiplying (ii) the amount of each then remaining installment, sinking fund, serial maturity or other scheduled payments of principal, including a payment at final maturity, in respect thereof, by (ii) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment; by (b) the outstanding principal amount of such Indebtedness.

"**wholly owned**" shall mean, with respect to a Subsidiary of a Person, a Subsidiary of such Person all of the outstanding Equity Interests of which (other than (x) director's qualifying shares and (y) shares issued to foreign nationals to the extent required by applicable Law) are owned by such Person and/or by one or more wholly owned Subsidiaries of such Person.

"**Withdrawal Liability**" shall mean liability to a Multiemployer Plan as a result of complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

"**Working Capital**" shall mean, with respect to Holdings and its Subsidiaries on a consolidated basis at any date of determination, Current Assets at such date of determination *minus* Current Liabilities at such date of determination; *provided that*, for purposes of calculating Excess Cash Flow, increases or decreases in Working Capital shall be calculated without regard to any changes in Current Assets or Current Liabilities as a result of (a) any reclassification in accordance with GAAP of assets or liabilities, as applicable, between current and noncurrent or (b) the effects of purchase accounting.

"**Write-Down and Conversion Powers**" shall mean, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

"**Yield**" has the meaning set forth in Section 2.11.

**SECTION 1.02    Terms Generally.**

With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)    The definitions set forth or referred to in <u>Section 1.01</u> shall apply equally to both the singular and plural forms of the terms defined. The words "herein," "hereto," "hereof" and "hereunder" and words of similar import when used in any Loan Document shall refer to such Loan Document as a whole and not to any particular provision thereof. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." All references herein to Articles, Sections, Exhibits and Schedules shall be deemed references to Articles and Sections of, and Exhibits and Schedules to, the Loan Documents in which the reference appears unless the context shall otherwise require.

(b)    Except as otherwise expressly provided herein, any reference in this Agreement to any Loan Document or the Chapter 11 Plan or other document, agreement, order or instrument (including any bylaws, limited partnership agreement, limited liability company agreement, articles of incorporation, certificate of limited partnership or certificate of formation, as the case may be) shall mean such Loan Document, Chapter 11 Plan, document, agreement, order or instrument as amended, restated, amended and restated, supplemented, otherwise modified, replaced, renewed, extended or refinanced from time to time and any reference in this Agreement to any person shall include a reference to such person's permitted assigns and successors-in-interest.

**SECTION 1.03    Accounting Terms.**

(a)    Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; <u>provided</u> that, if the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the Closing Date in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith; <u>provided</u> <u>further</u> that if an amendment is requested by the Borrower or the Required Lenders, then the Borrower and the Administrative Agent (acting at the Direction of the Required Lenders) shall negotiate in good faith to enter into an amendment of such affected provisions (without the payment of any amendment or similar fees to the Lenders) to preserve the original intent thereof in light of such change in GAAP or the application thereof subject to the approval of the Required Lenders (not to be unreasonably withheld, conditioned or delayed); <u>provided</u> <u>further</u> that all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made without giving effect to (i)

any election under Accounting Standards Codification 825-10-25 (previously referred to as Statement of Financial Accounting Standards 159) (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value any Indebtedness or other liabilities of the Borrower or any Subsidiary at "fair value," as defined therein and (ii) any treatment of Indebtedness in respect of convertible debt instruments under Accounting Standards Codification 470-20 (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value any such Indebtedness in a reduced or bifurcated manner as described therein, and such Indebtedness shall at all times be valued at the full stated principal amount thereof.

(b)     Notwithstanding anything to the contrary contained in paragraph (a) above or the definition of "Capital Lease Obligations," in the event of an accounting change requiring all leases to be capitalized, only those leases (assuming for purposes hereof that they were in existence on the date hereof) that would constitute Capital Lease Obligations on the date hereof shall be considered Capital Lease Obligations and all calculations and deliverables under this Agreement or any other Loan Document shall be made in accordance therewith (provided that all financial statements delivered to the Administrative Agent in accordance with the terms of this Agreement after the date of such accounting change shall contain a schedule showing the adjustments necessary to reconcile such financial statements with GAAP as in effect immediately prior to such accounting change).

(c)     Further notwithstanding anything to the contrary contained in paragraph (a) above, all terms of an accounting or financial nature construed in accordance with GAAP shall take be based on "fresh start accounting" taking into account the "Restructuring Transactions" made in accordance with (and as defined in) the Chapter 11 Plan and the Confirmation Order.

**SECTION 1.04     Rounding.**

Except as otherwise expressly provided herein, any financial ratios required to be maintained by the Borrower pursuant to this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding up if there is no nearest number).

**SECTION 1.05     Timing of Payment or Performance.**

When the payment of any obligation or the performance of any action, covenant, duty or obligation is stated to be due or performance required on a day which is not a Business Day, unless otherwise expressly provided for, the date of such payment or performance shall extend to the immediately succeeding Business Day and such extension of time shall be reflected in computing interest or fees, as the case may be. Unless otherwise specified, all references herein to times of day shall be references to Eastern Time (daylight or standard, as applicable).

**SECTION 1.06     References to Laws.**

Unless otherwise expressly provided herein, references to any law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such law.

### SECTION 1.07    Pro Forma.

Notwithstanding anything to the contrary contained herein, financial ratios and tests pursuant to this Agreement shall be calculated in the manner prescribed by the definition of "**Pro Forma Basis**."

### SECTION 1.08    Divisions.

For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests at such time.

### SECTION 1.09    Chapter 11 Restructuring Transactions.

Notwithstanding anything to the contrary in this Agreement or any other Loan Document, neither this Agreement nor any other Loan Document shall prohibit the consummation by the Borrower or its Subsidiaries of the "Restructuring Transactions" made in accordance with (and as defined in) the Chapter 11 Plan and the Chapter 11 Confirmation Order, each as in effect on the Closing Date, including (a) the conversion of Hardwoods Holdings, Inc., a Delaware corporation, to Hardwoods Holdings, LLC, a Delaware limited liability company ("**Reorganized HHI**"), and (b) the cancellation of the existing Equity Interests of Reorganized HHI and the issuance of new Equity Interests of Reorganized HHI and [Senior Secured Term Loans] as distributions for certain existing Indebtedness of the Borrower and (c) the other corporate, restructuring or other transactions expressly described in the Chapter 11 Plan or the Chapter 11 Confirmation Order, each as in effect on the Closing Date, that are necessary or appropriate to implement or effectuate the Chapter 11 Plan (collectively, the "Chapter 11 Restructuring Transactions"), and the consummation of the Chapter 11 Restructuring Transactions shall not constitute or result in (x) a breach of any representation or warranty under this Agreement or any other Loan Document, (y) a breach of any covenant set forth in this Agreement or any other Loan Document or (z) a Default or Event of Default under this Agreement or any other Loan Document.

### SECTION 1.10    Limited Condition Acquisition.

(a)    For purposes of (i) determining compliance with the provisions of the Loan Documents, including compliance with representations and warranties, and measuring the relevant ratios and baskets with respect to the incurrence of any Indebtedness (including any Incremental Term Loans) for the purposes of financing a Limited Condition Acquisition or making an Investment permitted pursuant to Section 7.04 and that is a Limited Condition Acquisition, and (ii) determining whether a Default or Event of Default (excluding any Specified Event of Default) then exists or would result therefrom to the extent that the incurrence of any Indebtedness referred to in clause (i) or the making of any Investment referred to in clause (i) would not be permitted if such Default or Event of Default then exists or would result therefrom, in each case, in connection with the consummation of such Limited Condition Acquisition, the incurrence of such

Indebtedness or the making of such Investment, as the case may be, at the Borrower's option (the exercise of such option, an "**LCA Election**"), the date of determination (other than with respect to the absence of any Specified Event of Default) of whether any such action is permitted hereunder, shall be deemed to be the date the definitive agreements for such Limited Condition Acquisition are entered into (the "**LCA Test Date**"), and if, after giving pro forma effect to the Limited Condition Acquisition and the other transactions to be entered into in connection therewith as if they had occurred at the beginning of the most recent test period ending prior to the LCA Test Date, Borrower could have taken such action on the relevant LCA Test Date in compliance with such ratio or basket, such ratio or basket shall be deemed to have been complied with

(b)     For the avoidance of doubt, if the Borrower has made an LCA Election and any of the ratios or baskets for which compliance was determined or tested as of the LCA Test Date are exceeded when the Limited Condition Acquisition is consummated as a result of fluctuations in any such ratio or basket at or prior to the consummation of the relevant Limited Condition Acquisition (including due to fluctuations of the target of any Limited Condition Acquisition), such ratios or baskets will not be deemed to have been exceeded as a result of such fluctuations. If the Borrower has made an LCA Election for any Limited Condition Acquisition, then in connection with any subsequent calculation of such ratios or baskets on or following the relevant LCA Test Date and prior to the earlier of (i) the date on which such Limited Condition Acquisition is consummated or (ii) the date that the definitive agreement for such Limited Condition Acquisition is terminated or expires without consummation of such Limited Condition Acquisition, any such ratio or basket shall be calculated on a pro forma basis assuming such Limited Condition Acquisition and other transactions in connection therewith (including any incurrence of debt and the use of proceeds thereof) have been consummated. Notwithstanding anything to the contrary contained herein, the date of determination for determining whether a Specified Event of Default exists or would result from the Limited Condition Acquisition, shall be the date any such transaction is consummated.

## ARTICLE II.
## THE COMMITMENTS

**SECTION 2.01     The Commitments.**

(a)     On the Closing Date, an aggregate principal amount of $110,000,000 of Prepetition Notes (and accrued fees and interest thereon) previously issued by the Borrower under the Indentures shall be deemed to have been converted to, and advanced as, term loans made on the Closing Date by the Lenders to the Borrower under this Agreement in the amount for each Lender equal to its Commitment, in full satisfaction, together with certain "New Common Stock" (as defined in the Plan), of such Lenders' "Secured Note Claims" pursuant to, and as defined in, the Plan.  Any amounts deemed borrowed under this Section 2.01 and repaid or prepaid may not be reborrowed.

(b)     The Commitments of each Lender shall be automatically and permanently reduced to $0 upon the Closing Date.

**SECTION 2.02     Repayment of Loans.**

The Borrower shall repay to the Administrative Agent for the ratable account of the Lenders on the applicable Maturity Date, the aggregate principal amount of all applicable Loans outstanding on such date.

**SECTION 2.03     Interest.**

(a)     Subject to the provisions of **Error! Reference source not found.**Section 2.03(b), each Loan shall bear interest on the outstanding principal amount thereof at a rate per annum equal to the Applicable Rate.

(b)     During the continuance of an Event of Default, the Borrower shall pay interest on the outstanding principal amount of the Loans and other amounts owing by it (including PIK Interest) hereunder at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws. Accrued and unpaid interest on such amounts (including interest on past due interest) shall be due and payable in cash upon demand.

(c)     Interest on each Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein. Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law.

(d)     So long as no Default or Event of Default exists or would result from the exercise of the PIK Toggle (as defined below), the Borrower may elect pursuant to this Section 2.03(d) (such right to elect, the "**PIK Toggle**") to have [all, but not less than all of the] interest that accrues on the Loan during such Interest Period be paid in kind (in lieu of payment in Same Day Funds at the Cash Interest Rate) by capitailzing and increasing the outstanding principal amount of the Loans on the relevant Interest Payment Date by the amount of accrued but unpaid interest at the PIK Interest Rate ("**PIK Interest**"). [Such election shall be made with respect to the relevant Interest Period by providing irrevocable written notice to the Administrative Agent by a Responsible Officer. Each such notice must be received by the Administrative Agent not later than 12:00 noon New York City time three (3) Business Days prior to the first day of the relevant Interest Period, and shall be effective only with respect to such Interest Period (and, for the avoidance of doubt, the Loans shall accrue interest at the Cash Interest Rate and be payable in Same Day Funds for any subsequent Interest Period unless the Borrower elects to exercise the PIK Toggle for such subsequent Interest Period in accordance with this Section 2.03(d)).] Following receipt of a PIK Toggle election, the Administrative Agent shall promptly notify each Lender thereof. Once PIK Interest is capitalized and added to the principal amount of the Loans, such PIK Interest shall thenceforth be considered principal for all purposes hereunder (and shall bear interest in accordance with this Section 2.03) from the date on which such PIK Interest has been so added.

**SECTION 2.04     Computation of Interest and Fees.**

All computations of fees and interest shall be made on the basis of a three hundred and sixty (360)-day year and actual days elapsed. Interest shall accrue on each Loan for the day on which the Loan is made and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid. Each determination by the Administrative Agent of an

interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

### SECTION 2.05        Prepayments.

(a)        *Optional.* (i) Subject to the Intercreditor Agreement, the Borrower may, subject to clause (ii) below, upon irrevocable written notice to the Administrative Agent, at any time or from time to time voluntarily prepay the Loans in whole or in part, together with any applicable Prepayment Premium; *provided that* (1) such notice must be received by the Administrative Agent not later than 12:00 noon New York City time three (3) Business Days prior to any date of prepayment; (2) any prepayment of Loans shall be in a minimum principal amount of $500,000 or a whole multiple of $100,000 in excess thereof or, if less, the entire principal amount thereof then outstanding. Each such notice shall specify the date (which shall be a Business Day) and amount of such prepayment. The Administrative Agent will promptly notify each Lender of its receipt of each such notice, and of the amount of such Lender's Pro Rata Share of such prepayment. If such notice is given by the Borrower, the Borrower shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein. Any prepayment of a Loan shall be accompanied by a cash payment of all accrued and unpaid interest thereon (regardless of whether such interest is accruing at the Cash Interest Rate or the PIK Interest Rate). In the case of each prepayment of the Loans pursuant to this Section 2.05(a), such payment shall be paid to the Lenders in accordance with their respective Pro Rata Share.

(ii)        Notwithstanding anything to the contrary contained in this Agreement, the Borrower may rescind any notice of prepayment under Section 2.05(a)(i) if such prepayment would have resulted from a refinancing of all or a portion of the Loans, which refinancing shall not be consummated or shall otherwise be delayed.

(b)        *Mandatory*. (i) Within five (5) Business Days after financial statements are required to have been delivered pursuant to **Error! Reference source not found.** (commencing with the fiscal year ending December 31, 2021) and the related Compliance Certificate is required to be have been delivered pursuant to **Error! Reference source not found.**, the Borrower shall cause to be offered to be prepaid in accordance with clause (viii) below, an aggregate principal amount of Loans in an amount equal to (A) the Relevant Percentage of Excess Cash Flow, if any, for the fiscal year covered by such financial statements minus (B) the sum of all voluntary prepayments of the Loans made during such fiscal year or after year-end and prior to when such Excess Cash Flow prepayment is due, to the extent such prepayments are funded with internally generated cash.

(ii)        If (x) Holdings or any Subsidiary of Holdings Disposes of any property or assets pursuant to **Error! Reference source not found.** or **Error! Reference source not found.** or (y) any Casualty Event occurs, which results in the realization or receipt by any Loan Party or a Subsidiary of Net Proceeds, the Borrower shall cause to be offered to be prepaid in accordance with clause (vii) below, on or prior to the date which is three (3) Business Days after the date of the realization or receipt by Holdings or any Subsidiary of such Net Proceeds an aggregate principal amount of Loans in an amount equal to 100% of all Net Proceeds received; *provided that*, so long as no Event of Default shall then exist or would immediately arise therefrom, such proceeds with respect to any such Disposition or Casualty Event shall not be required to be so

applied on such date, to the extent that Borrower shall have notified the Administrative Agent on or prior to such date, that such Net Proceeds are expected to be reinvested in assets used or useful in the business of the Loan Parties within 12 months following the date of such Disposition or Casualty Event; *provided further*, that if the property or assets subject to such Disposition or Casualty Event constituted Collateral, then all property or assets purchased or otherwise acquired with the Net Proceeds thereof pursuant to this clause (b)(ii) shall be made subject to the first priority perfected Lien (subject to Permitted Liens) of the applicable Collateral Documents in favor of the Administrative Agent, for its benefit and for the benefit of the other Secured Parties in accordance with Section 5.17; *provided further*, that if all or any portion of such Net Proceeds is neither reinvested within such 12 month period, such unused portion shall be applied within three (3) Business Days after the last day of such period as a mandatory prepayment as provided in this Section 2.05(b)(ii).

(iii)    If Holdings or any Subsidiary thereof incurs or issues any Indebtedness after the Closing Date (other than Permitted Indebtedness), Holdings shall cause to be offered to be prepaid in accordance herein an aggregate principal amount of the Loans in an amount equal to (x) 100% of all Net Proceeds received therefrom *plus* (y) any applicable Prepayment Premium, on or prior to the date which is one (1) Business Day after the receipt by Holdings or such Subsidiary of such Net Proceeds.

(iv)    Within four (4) Business Days prior to any mandatory prepayment of the Loans required to be made pursuant to clauses (i) to (iii) of this Section 2.05(b), the Borrower shall provide written notice to the Administrative Agent specifying the date of such prepayment (which shall be a Business Day) and provide a reasonably detailed calculation of the amount of such prepayment. The Administrative Agent will promptly notify each Lender of the contents of the Borrower's prepayment notice and of such Lender's Pro Rata Share of the prepayment.

(v)    With respect to each mandatory prepayment of Loans required pursuant to Section 2.05(b), (A) the Borrower shall deliver a written notice of such mandatory prepayment to the Administrative Agent (for distributions to the Lenders) in accordance with (and within the time period required by) Section 2.05(b)(iv) above, (B) each Lender will have the right to refuse such prepayment by giving written notice of such refusal to the Administrative Agent within one (1) Business Day after such Lender's receipt of notice of such prepayment from the Administrative Agent (and the Borrower shall not prepay any Loans of such Lender on the date required for such mandatory prepayment under clause (i), (ii) or (iii), as applicable of this Section 2.05(b)) (it being agreed that if a Lender fails to deliver a notice of election declining receipt of its Pro Rata Share of such mandatory prepayment to the Administrative Agent within the time frame specified above, any such failure will be deemed to constitute an acceptance of such Lender's Pro Rata Share of the total amount of such mandatory prepayment), (C) any prepayment refused by Lenders of Loans (such refused amounts, the "Declined Proceeds") shall be offered by the Borrower (by written notice to the Administrative Agent) to the other Lenders on a ratable basis (not including the Loans of the Lenders who have declined such Declined Proceeds), and all such Lenders shall have the right to refuse such Declined Proceeds by giving written notice of such refusal to the Administrative Agent within one (1) Business Day after such Lender's receipt of notice from the Administrative Agent of such offer of Declined Proceeds and (D) any Declined Proceeds not applied in accordance with clause (C) may be retained by the Borrower.

(vi)     In connection with any mandatory prepayments of the Loans pursuant to this Section 2.05(b), subject to the rights of Lenders to refuse mandatory prepayments pursuant to **Error! Reference source not found.**, such prepayments shall be applied in accordance with their respective Pro Rata Shares of the then outstanding Loans being prepaid.

(vii)     Notwithstanding any other provisions of this Section 2.05, (i) to the extent that any of or all the Net Proceeds of any Disposition by a Foreign Subsidiary ("**Foreign Disposition**") or Excess Cash Flow attributable to Foreign Subsidiaries are prohibited or delayed by applicable local law from being repatriated to the United States, the portion of such Net Proceeds or Excess Cash Flow so affected will not be required to be applied to repay the Loans at the times provided in this Section 2.05 but may be retained by the applicable Foreign Subsidiary so long, but only so long, as the applicable local law will not permit repatriation to the United States (Holdings hereby agreeing to cause the applicable Foreign Subsidiary to promptly take all actions reasonably required by the applicable local law to permit such repatriation), and once such repatriation of any of such affected Net Proceeds or Excess Cash Flow that, in each case, would otherwise be required to be used to make an offer of prepayment pursuant to Section 2.05(b)(i) to (iii), is permitted under the applicable local law, such repatriation will be immediately effected and such repatriated Net Proceeds or Excess Cash Flow will be promptly (and in any event not later than two (2) Business Days after such repatriation) applied (net of additional taxes payable or reserved against as a result thereof) to the repayment of the Loans pursuant to this Section 2.05 and (ii) to the extent that Holdings and the Required Lenders have determined in good faith (with respect to the determination of the Required Lenders, as may be evidenced by a Direction of the Required Lenders) that repatriation of any of or all the Net Proceeds of any Foreign Disposition or Foreign Subsidiary Excess Cash Flow would have material adverse tax cost consequences with respect to such Net Proceeds or Excess Cash Flow, such Net Proceeds or Excess Cash Flow so affected may be retained by the applicable Foreign Subsidiary; *provided that*, in the case of this clause (vii), on or before the date on which any such Net Proceeds so retained would otherwise have been required to be applied to reinvestments or prepayments pursuant to this Section 2.05(b) or any such Excess Cash Flow would have been required to be applied to prepayments pursuant to this Section 2.05(b), the Borrower shall apply an amount equal to such Net Proceeds or Excess Cash Flow to such reinvestments or prepayments, as applicable, as if such Net Proceeds or Excess Cash Flow had been received by the Borrower rather than such Foreign Subsidiary, less the amount of additional taxes that would have been payable or reserved against if such Net Proceeds or Excess Cash Flow had been repatriated (or, if less, the Net Proceeds or Excess Cash Flow that would be calculated if received by such Foreign Subsidiary).

**SECTION 2.06     Fees.**

The Borrower shall pay to the Administrative Agent, for its own account, the fees in the amounts and at the times set forth in the Fee Letter. The Borrower shall pay to any Agent (other than the Administrative Agent), for its own account, the fees in the amounts and at the times separately agreed to by such Agent and the Borrower.  Such fees payable to the Administrative Agent or to any other Agent shall be fully earned when due and shall not be refundable for any reason whatsoever.

**SECTION 2.07        Evidence of Indebtedness.**

(a)        The Loans made by each Lender shall be evidenced by one or more accounts or records maintained by such Lender and evidenced by one or more entries in the Register maintained by the Administrative Agent, acting solely for purposes of United States Treasury Regulations Section 5f.103-1(c), as a non-fiduciary agent for the Borrower, in each case in the ordinary course of business. The accounts or records maintained by the Administrative Agent and each Lender shall be *prima facie* evidence, absent manifest error of the amount of the Loans made by the Lenders to the Borrower and the interest and payments thereon. Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrower hereunder to pay any amount owing with respect to the Obligations. In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Administrative Agent in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error. Upon the request of any Lender, the Borrower shall execute and deliver to such Lender a Loan Note payable to such Lender, which shall evidence such Lender's Loan Loans in addition to such accounts or records. Each Lender may attach schedules to its Loan Note and endorse thereon the date, amount and maturity of its Loans and payments with respect thereto. Any Loan Notes or other evidence of indebtedness issued under the Loan Documents need not be presented or surrendered for any payment made by the Administrative Agent, and the Administrative Agent shall not have any duty or responsibility with respect thereto.

(b)        Entries made in good faith by the Administrative Agent in the Register pursuant to Section 2.07(a), and by each Lender in its account or accounts pursuant to Section 2.07(a), shall be *prima facie* evidence of the amount of principal and interest due and payable or to become due and payable from the Borrower to, in the case of the Register, each Lender and, in the case of such account or accounts, such Lender, under this Agreement and the other Loan Documents, absent manifest error; *provided that* the failure of the Administrative Agent or such Lender to make an entry, or any finding that an entry is incorrect, in the Register or such account or accounts shall not limit or otherwise affect the obligations of the Borrower under this Agreement and the other Loan Documents.

**SECTION 2.08        Payments Generally.**

(a)        All payments to be made by any Loan Party shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff. Except as otherwise expressly provided herein, all payments by any Loan Party hereunder shall be made to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, in Dollars and in Same Day Funds (except in the case of payments of PIK Interest, which shall be paid in accordance with Section 2.03(d))not later than 12:00 noon New York City time on the date specified herein. The Administrative Agent will promptly distribute to each Lender its Pro Rata Share (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's applicable Lending Office. All payments received by the Administrative Agent after 12:00 noon New York City time shall in each case be deemed received on the next succeeding Business Day, in the Administrative Agent's sole determination, and any applicable interest or fee shall continue to accrue.

(b)     Except as otherwise provided herein, if any payment to be made by any Loan Party shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

(c)     Unless the Borrower or any Lender has notified the Administrative Agent, prior to the date any payment is required to be made by it to the Administrative Agent hereunder, that the Borrower or such Lender, as the case may be, will not make such payment, the Administrative Agent may assume that the Borrower or such Lender, as the case may be, has timely made such payment and may (but shall not be so required to), in reliance thereon, make available a corresponding amount to the Person entitled thereto. If and to the extent that such payment was not in fact made to the Administrative Agent in Same Day Funds, then:

(i)     if the Borrower failed to make such payment, each Lender shall forthwith on demand repay to the Administrative Agent the portion of such assumed payment that was made available to such Lender in Same Day Funds, together with interest thereon in respect of each day from and including the date such amount was made available by the Administrative Agent to such Lender to the date such amount is repaid to the Administrative Agent in Same Day Funds at the applicable Federal Funds Rate from time to time in effect; and

(ii)     if any Lender failed to make such payment, such Lender shall forthwith on demand pay to the Administrative Agent the amount thereof in Same Day Funds, together with interest thereon for the period from the date such amount was made available by the Administrative Agent to the Borrower to the date such amount is recovered by the Administrative Agent (the "**Compensation Period**") at a rate per annum equal to the applicable Federal Funds Rate from time to time in effect. When such Lender makes payment to the Administrative Agent (together with all accrued interest thereon), then such payment amount (excluding the amount of any interest which may have accrued and been paid in respect of such late payment) shall constitute such Lender's Loan. If such Lender does not pay such amount forthwith upon the Administrative Agent's demand therefor, the Administrative Agent may make a demand therefor upon the Borrower, and the Borrower shall pay such amount to the Administrative Agent, together with interest thereon for the Compensation Period at the applicable rate of interest per annum. Nothing herein shall be deemed to relieve any Lender from its obligation to fulfill its Commitment or to prejudice any rights which the Administrative Agent or the Borrower may have against any Lender as a result of any default by such Lender hereunder.

A notice of the Administrative Agent to any Lender or the Borrower with respect to any amount owing under this Section 2.08(c) shall be conclusive, absent manifest error.

(d)     The obligations of the Lenders hereunder to make Loans are several and not joint.

(e)     Nothing herein shall be deemed to obligate any Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Loan in any particular place or manner.

(f)     Whenever any payment received by the Administrative Agent under this Agreement or any of the other Loan Documents is insufficient to pay in full all amounts due and

payable to the Administrative Agent and the Lenders under or in respect of this Agreement and the other Loan Documents on any date, such payment shall be distributed by the Administrative Agent and applied by the Administrative Agent and the Lenders in the order of priority set forth in Section 8.03. If the Administrative Agent receives funds for application to the Obligations of the Loan Parties under or in respect of the Loan Documents under circumstances for which the Loan Documents do not specify the manner in which such funds are to be applied, the Administrative Agent may (to the fullest extent permitted by mandatory provisions of applicable Law), but shall not be obligated to, elect to distribute such funds to each of the Lenders in accordance with such Lender's Pro Rata Share of the sum of the Outstanding Amount of all Loans outstanding at such time, in repayment or prepayment of such of the outstanding Loans or other Obligations then owing to such Lender.

**SECTION 2.09        Sharing of Payments.**

If, other than as expressly provided elsewhere in this Agreement (as in effect on the Closing Date), any Lender shall obtain on account of the Loans made by it, any payment (whether voluntary, involuntary, through the exercise of any right of setoff, or otherwise) in excess of its ratable share (or other share contemplated hereunder) thereof, such Lender shall immediately (a) notify the Administrative Agent of such fact, and (b) purchase from the other Lenders such participations in the Loans made by them as shall be necessary to cause such purchasing Lender to share the excess payment in respect of such Loans, pro rata with each of them; *provided that* if all or any portion of such excess payment is thereafter recovered from the purchasing Lender under any of the circumstances described in Section 10.06 (including pursuant to any settlement entered into by the purchasing Lender in its discretion), such purchase shall to that extent be rescinded and each other Lender shall repay to the purchasing Lender the purchase price paid therefor, together with an amount equal to such paying Lender's ratable share (according to the proportion of (i) the amount of such paying Lender's required repayment to (ii) the total amount so recovered from the purchasing Lender) of any interest or other amount paid or payable by the purchasing Lender in respect of the total amount so recovered, without further interest thereon. For avoidance of doubt, the provisions of this Section 2.09 shall not be construed to apply to (A) any payment made by the Loan Parties pursuant to and in accordance with the express terms of this Agreement as in effect on the Closing Date (including the application of funds arising from the existence of a Defaulting Lender) or (B) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant permitted hereunder (which, for the avoidance of doubt, shall not include Holdings or any Subsidiary thereof). The Borrower agrees that any Lender so purchasing a participation from another Lender may, to the fullest extent permitted by applicable Law, exercise all its rights of payment (including the right of setoff, but subject to Section 10.09) with respect to such participation as fully as if such Lender were the direct creditor of the Borrower in the amount of such participation. Each Lender that purchases a participation pursuant to this Section 2.09 shall from and after such purchase have the right to give all notices, requests, demands, directions and other communications under this Agreement with respect to the portion of the Obligations purchased to the same extent as though the purchasing Lender were the original owner of the Obligations purchased.

**SECTION 2.10    Defaulting Lenders.**

(a)    *Adjustments*. Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as that Lender is no longer a Defaulting Lender, to the extent permitted by applicable Law:

(i)    Waivers and Amendments. That Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in Section 10.01.

(ii)    Reallocation of Payments. Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of that Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Article VIII or otherwise) or received by the Administrative Agent from a Defaulting Lender pursuant to Section 10.09, shall be applied at such time or times as may be determined by the Administrative Agent as follows: *first*, to the payment of any amounts owing by that Defaulting Lender to the Administrative Agent hereunder; *second*, to the payment of any amounts owing to the Lenders as a result of any judgment of a court of competent jurisdiction obtained by any Lender against that Defaulting Lender as a result of that Defaulting Lender's breach of its obligations under this Agreement; *third*, so long as no Default or Event of Default has occurred and is continuing, to the payment of any amounts owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against that Defaulting Lender as a result of that Defaulting Lender's breach of its obligations under this Agreement; and *fourth*, to that Defaulting Lender or as otherwise directed by a court of competent jurisdiction; *provided that* if such Loans were made at a time when the conditions set forth in Section 4.01 were satisfied or waived, such payment shall be applied solely to pay the Loans of all Non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Loans of that Defaulting Lender. Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender shall be deemed paid to and redirected by that Defaulting Lender, and each Lender irrevocably consents hereto.

(iii)    *Defaulting Lender Cure*. If the Borrower and the Required Lenders agree in writing in their sole discretion that a Defaulting Lender should no longer be deemed to be a Defaulting Lender, the Borrower will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein, that Lender will, to the extent applicable, purchase that portion of outstanding Loans of the other Lenders; *provided that* no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while that Lender was a Defaulting Lender; and *provided further,* that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender

**SECTION 2.11    Incremental Term Loan Facilities.**

(a)    Request.    Borrower may by written notice to the Administrative Agent request commitments (each an "**Incremental Term Loan Commitment**") to provide one or more new Term Loans (each an "**Incremental Term Loan**") under a new term loan facility or under

the then-existing term loan facility (each, an "**Incremental Facility**") in an aggregate amount not to exceed $50,000,000 for all Incremental Term Loan Facilities, subject to the prior written consent of the Required Lenders and the conditions set forth in Section 2.20(c).

(b)     Notice. Each such notice shall specify (i) the date (each, an "**Incremental Effective Date**") on which Borrower propose that such Incremental Facility shall be effective, which shall be on or before 11:00 a.m. New York City time on a date not less than five (5) Business Days after the date on which such notice is delivered to the Administrative Agent (or such different date as may be agreed to by the Administrative Agent (acting at the Direction of the Required Lenders) in its sole discretion) and (ii) the identity of each Eligible Assignee (each such person, an "**Additional Lender**") to whom Borrower proposes any portion of such Incremental Facility be allocated and the amounts of such allocations; *provided* that the opportunity to commit to provide all or a portion of such Incremental Facility shall be offered by Borrower first to the existing Lenders on a *pro rata* basis and, to the extent such Lenders have not agreed to provide such Incremental Facility on the terms specified by Borrower or any arranger of such Incremental Facility after being provided a bona fide opportunity to do so, Borrower may then offer such opportunity to any other Eligible Assignees (which may include existing Lenders); *provided further*, that any existing Lender approached to provide all or a portion of such Incremental Facility may elect or decline, in its sole discretion, to provide such Incremental Term Loan; and *provided further*, that any Additional Lender that is not an existing Lender shall be required to agree to the terms of and join as a party to any agreement among lenders then in effect by and among the existing Lenders.

(c)     Conditions.  Such Incremental Facility shall become effective, as of such Incremental Effective Date; *provided* that:

(i)     no Default or Event of Default shall have occurred and be continuing at the time of funding, or would result therefrom; *provided*, that with respect to any Incremental Term Loans incurred in connection with a Limited Condition Acquisition, the foregoing condition shall not be required to be satisfied and instead no Default or Event of Default shall exist at the LCA Test Date (provided, for purposes of clarity, there shall, in any event, be no Specified Event of Default before and immediately after giving effect to any Incremental Facility);

(ii)     subject to customary "*Sungard*" limitations to the extent agreed to by the Lenders providing the Incremental Term Loans, the representations and warranties made by any Loan Party set forth in Article V hereof or in any other Loan Document shall be true and correct in all material respects (except that any representation and warranty that is qualified as to "materiality" or "Material Adverse Effect" shall be true and correct in all respects) on and as of the date of such credit extension with the same effect as though made on and as of such date, except to the extent that such representation or warranty expressly relates to an earlier date in which case such representations and warranties shall be true and correct in all material respects (except that any representation and warranty that is qualified as to "materiality" or "**Material Adverse Effect**" shall be true and correct in all respects) as of such earlier date; *provided* that, to the extent the proceeds of any Incremental Facility are being used to finance a Limited Condition Acquisition, this condition shall be tested as of the LCA Test Date in accordance with Section 1.10;

(iii)    on a pro forma basis after giving effect to any Incremental Term Loans and any Permitted Business Acquisition or other Permitted Investment consummated in connection therewith, determined on the basis of the financial statements most recently required to be delivered to the Administrative Agent pursuant to Section 6.04(a) or (b), as the case may be, [the Consolidated Senior Secured Net Leverage Ratio shall not exceed ___ to 1.00 (provided that to the extent the proceeds of any Incremental Facility are intended to be applied to finance a Limited Condition Acquisition, the Consolidated Senior Secured Net Leverage Ratio shall be tested in accordance with Section 1.10)];

(iv)    Borrower shall deliver or cause to be delivered any customary amendments to the Loan Documents or other documents reasonably requested by the Administrative Agent (including on behalf of the Lenders) in connection with any such transaction; and

(v)    any such Incremental Term Loans shall be in an aggregate amount of at least $500,000 and integral multiples of $100,000 above such amount (except, in each case, such minimum amount and integral multiples amount shall not apply when Borrower uses all of the Incremental Facility capacity available at such time).

(d)    Terms.  The terms and provisions of any Incremental Facility shall be subject to Section 2.11(f) and (g) and the following:

(i)    except as otherwise set forth herein (including Section 2.11(f)) or in the Incremental Joinder or except with respect to terms applicable only to periods after the then-existing Maturity Date, the terms and provisions of any such Incremental Facility shall be either (A) substantially consistent (taken as a whole) to the Term Loans existing immediately prior to the Incremental Effective Date or (B) no more favorable (taken as a whole) to the Incremental Term Loan Lenders providing such Incremental Term Loans than those applicable to the Term Loans existing immediately prior to the Incremental Effective Date, in each case, as reasonably determined by Borrower in consultation with the Administrative Agent (acting at the Direction of the Required Lenders), or (C) otherwise reasonably acceptable to the Administrative Agent (acting at the Direction of the Required Lenders)  (in each case, it being understood and agreed that Incremental Term Loans may be a part of the then-existing Term Loans); *provided* that, to the extent that any financial maintenance covenant is added for the benefit of the Lenders providing any Incremental Term Loans, no consent shall be required from the Administrative Agent or any Lender to the extent that such financial maintenance covenant is also added for the benefit of any corresponding then-existing Term Loans;

(ii)    any Incremental Term Loans shall rank *pari passu* in right of payment and with respect to security with the Obligations and shall benefit from the same Guarantees in accordance with Section 2.11(g); *provided*, *however*, that any Incremental Term Loans shall not be guaranteed by any Persons that are not Guarantors or be secured by any assets not constituting Collateral;

(iii)    the Weighted Average Life to Maturity of any Incremental Term Loans shall be no shorter than the Weighted Average Life to Maturity of the then-existing Term Loans; and

(iv)    the maturity date of Incremental Term Loans shall not be earlier than the then-existing Maturity Date.

(e)    <u>Joinder</u>.  Incremental Term Loan Facilities may be effected by a joinder agreement (the "**Incremental Joinder**") executed by Borrower, the Administrative Agent and each Lender providing such Incremental Facility, in form and substance reasonably satisfactory to each of them.  The Incremental Joinder may, without the consent of any other Lenders, effect such amendments to this Agreement and the other Loan Documents as may be necessary or appropriate (which may be in the form of an amendment and restatement of this Agreement), in the opinion of the Administrative Agent and Borrower, to effect the provisions of this <u>Section 2.11</u>; *provided* that the Incremental Joinder shall set forth the amount of the Incremental Term Loan Commitment for each Incremental Term Loan Lender in respect of such Incremental Facility.

(f)    <u>Yield</u>.  If the initial Yield (as defined below) on such Incremental Term Loans exceeds the Applicable Rate then in-effect on the Term Loans then outstanding *plus* 0.50% per annum, then the Applicable Rate then in effect for such Term Loans, as applicable shall automatically be increased so as to cause the Applicable Rate then in-effect on the Term Loans then outstanding to equal the Yield of such Incremental Term Loans, minus 0.50%.  For purposes of this <u>Section 2.11(f)</u>, "**Yield**" shall mean as of any date of determination, the sum of (i) the higher of (A) the LIBO rate on such date for a deposit in dollars with a maturity of one month and (B) the LIBO rate floor, if any, with respect thereto as of such date, (ii) the interest rate margins as of such date (with such interest rate margin and interest spreads to be determined by reference to the LIBO rate) and (iii) the amount of original issuance discount and/or upfront fees or recurring periodic fees thereon (converted to yield assuming a four-year average life and without any present value discount); *provided* that, customary arrangement, underwriting, structuring or commitment, amendment or other fees payable (regardless of whether paid in whole or in part to any or all Lenders) to any of the Lenders existing as of the Closing Date (or their respective affiliates) in connection with the applicable Commitments provided on the Closing Date or to one or more arrangers, bookrunners or structuring advisors (or their affiliates) in respect of any Incremental Facility, or any other fees not paid generally to all Lenders (or their respective affiliates), shall, in each case, be excluded.

(g)    <u>Equal and Ratable Benefit</u>.  The Loans and Commitments established pursuant to this <u>Section 2.11</u> shall constitute Loans and Commitments under, and shall be entitled to all the benefits afforded by, this Agreement and the other Loan Documents, and shall, without limiting the foregoing, benefit equally and ratably (i) from the Guarantees and security interests created by the Collateral Documents and (ii) any mandatory prepayments made pursuant to <u>Section 2.05</u>.  Borrower and the other Loan Parties shall take any actions reasonably required by the Administrative Agent to ensure and/or demonstrate that the Lien and security interests granted by the Collateral Documents continue to be perfected under the UCC or other comparable foreign law or otherwise after giving effect to the establishment of any such class of Incremental Term Loans or any such Incremental Term Loan Facilities.

(h)    Unless previously terminated, the Incremental Term Loan Commitment of each Lender shall automatically terminate under the making of the Incremental Term Loan of such Lender contemplated by such Incremental Term Loan Commitment.

## ARTICLE III.
## TAXES, INCREASED COSTS PROTECTION AND ILLEGALITY

### SECTION 3.01    Taxes.

(a)    Any and all payments made by or on account of the Borrower or any Loan Party under any Loan Document shall be made free and clear of and without deduction for any and all Taxes, except as required by applicable Law. If the Borrower, any Loan Party or other applicable withholding agent shall be required by any Laws to deduct any Taxes from or in respect of any sum payable under any Loan Document to any Agent or any Lender, (A) to the extent the Tax in question is an Indemnified Tax, the sum payable by the Borrower or such Loan Party shall be increased as necessary so that after making all required deductions or withholdings (including deductions or withholdings applicable to additional sums payable under this Section 3.01), each of such Agent and such Lender receives an amount equal to the sum it would have received had no such deductions or withholdings been made, (B) the applicable withholding agent shall make such deductions, (C) the applicable withholding agent shall pay the full amount deducted to the relevant Governmental Authority in accordance with applicable Laws, and (D) within thirty (30) days after the date of such payment (or, if receipts or evidence are not available within thirty (30) days, as soon as possible thereafter), if the Borrower or any Loan Party is the applicable withholding agent, the Borrower or such Loan Party shall furnish to such Agent or Lender (as the case may be) the original or a certified copy of a receipt evidencing payment thereof or other evidence reasonably acceptable to such Agent or Lender.

(b)    In addition, the Borrower agrees to pay any and all present or future stamp, court or documentary taxes and any other excise, property, intangible or mortgage recording Taxes, or Taxes of a similar character, which arise from any payment made under any Loan Document or from the execution, delivery, performance, enforcement or registration of, or otherwise with respect to, any Loan Document (including additions to tax, penalties and interest related thereto) excluding, in each case, such amounts that result from an Agent or Lender's Assignment and Assumption, grant of a participation, transfer or assignment to or designation of a new applicable Lending Office or other office for receiving payments under any Loan Document (collectively, "**Assignment Taxes**") to the extent such Assignment Taxes result from a connection that the Agent or Lender has with the taxing jurisdiction other than the connection arising out of the Loan Documents or the transactions therein, except for such Assignment Taxes resulting from an assignment, designation of a new Lending Office or participation that is requested or required in writing by the Borrower (all such non-excluded Taxes described in this Section 3.01(b) being hereinafter referred to as "**Other Taxes**").

(c)    The Borrower and each Loan Party agrees to indemnify each Agent and each Lender, within 15 days after the demand therefor, for (i) the full amount of Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 3.01) and Other Taxes payable by such Agent or such Lender (or required to be withheld from a payment to such Agent or Lender) and (ii) any reasonable expenses arising therefrom or

with respect thereto, in each case whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability prepared in good faith by such Agent or Lender (or by an Agent on behalf of such Lender), accompanied by a written statement thereof setting forth in reasonable detail the basis and calculation of such amounts shall be conclusive absent manifest error.

(d)    Each Lender shall, at such times as are reasonably requested by the Borrower or the Administrative Agent, provide the Borrower and the Administrative Agent with any documentation prescribed by Law certifying as to any entitlement of such Lender to an exemption from, or reduction in, withholding Tax with respect to any payments to be made to such Lender under the Loan Documents. Each such Lender shall, whenever a change in circumstances renders such documentation inaccurate in any material respect, deliver promptly to the Borrower and the Administrative Agent updated or other appropriate documentation (including any new documentation reasonably requested by the applicable withholding agent) or promptly notify the Borrower and the Administrative Agent in writing of its inability to do so. Unless the applicable withholding agent has received forms or other documents satisfactory to it indicating that payments under any Loan Document to or for a Lender are not subject to withholding Tax or are subject to such Tax at a rate reduced by an applicable tax treaty, the Borrower, the Administrative Agent or other applicable withholding agent shall withhold amounts required to be withheld by applicable Law from such payments at the applicable statutory rate. Notwithstanding any other provision of this clause (d), a Lender shall not be required to deliver any form or documentation pursuant to this clause (d) that such Lender is not legally able to deliver. Without limiting the foregoing:

(i)    Each Lender that is a "**United States person**" (as defined in Section 7701(a)(30) of the Code) shall deliver to the Borrower and the Administrative Agent on or before the date on which it becomes a party to this Agreement two properly completed and duly signed original copies of Internal Revenue Service Form W-9 (or any successor form) certifying that such Lender is exempt from federal backup withholding.

(ii)    Each Lender that is not a "**United States person**" (as defined in Section 7701(a)(30) of the Code) shall deliver to the Borrower and the Administrative Agent on or before the date on which it becomes a party to this Agreement whichever of the following is applicable:

(A)    two properly completed and duly signed original copies of Internal Revenue Service Form W-8BEN or W-8BEN-E, as applicable (or any successor forms), claiming eligibility for the benefits of an income tax treaty to which the United States is a party, and such other documentation as required under the Code,

(B)    two properly completed and duly signed original copies of Internal Revenue Service Form W-8ECI (or any successor forms),

(C)    in the case of a Lender claiming the benefits of the exemption for portfolio interest under Sections 871(h) or 881(c) of the Code, (1) a United States Tax Compliance Certificate and (2) two properly completed and duly signed original copies of Internal Revenue Service Form W-8BEN or W-8BEN-E, as applicable (or any successor form), or

(D)    to the extent a Lender is not the beneficial owner (for example, where the Lender is a partnership or a participating Lender), Internal Revenue Service Form W-8IMY (or any successor forms) of the Lender, accompanied by a Form W-8ECI, Form W-8BEN, Form W-8BEN-E, United States Tax Compliance Certificate, Form W-9, Form W-8IMY and/or any other required information from each beneficial owner, as applicable (*provided that*, if the Lender is a partnership, and one or more beneficial partners of such Lender are claiming the portfolio interest exemption, the United States Tax Compliance Certificate may be provided by such Lender on behalf of such partner).

(iii)    If a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent, at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent, such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower or the Administrative Agent to comply with its obligations under FATCA, to determine whether such Lender has or has not complied with such Lender's obligations under FATCA and, as necessary, to determine the amount to deduct and withhold from such payment. Solely for purposes of this <u>Section 3.01(d)(iii)</u>, "**FATCA**" shall include any amendments made to FATCA after the Closing Date.

(e)    Any Lender claiming any additional amounts payable pursuant to this <u>Section 3.01</u> and Section <u>3.02(a)</u> shall, if requested by the Borrower, use its reasonable efforts to change the jurisdiction of its Lending Office (or take any other measures reasonably requested by the Borrower) if such a change or other measures would reduce any such additional amounts (including any such additional amounts that may thereafter accrue) and would not, in the sole determination of such Lender, result in any unreimbursed cost or expense or be otherwise materially disadvantageous to such Lender.

(f)    If any Lender or Agent receives a refund in respect of any Indemnified Taxes or Other Taxes as to which indemnification or additional amounts have been paid to it by the Borrower or any Loan Party pursuant to this <u>Section 3.01</u>, it shall promptly remit such refund to the Borrower or such Loan Party (but only to the extent of indemnification or additional amounts paid by the Borrower or such Loan Party under this Section <u>3.01</u> with respect to Indemnified Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses (including any Taxes) of the Lender or Agent, as the case may be, and without interest (other than any interest paid by the relevant taxing authority with respect to such refund, net of any Taxes payable by any Agent or Lender on such interest); *provided that* the Borrower or such Loan Party, upon the request of the Lender or Agent, as the case may be, agrees promptly to return such refund (plus any penalties, interest or other charges imposed by the relevant taxing authority) to such Lender or Agent in the event such Lender or Agent is required to repay such refund to the relevant taxing authority. Notwithstanding anything to the contrary in this clause (f), in no event will any indemnified party be required to pay any amount to the indemnifying party pursuant to this clause (f) the payment of which would place such indemnified party in a less favorable net after-Tax position than such indemnified party would have been in if the Tax subject to indemnification and giving rise to such

refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This clause (f) shall not be construed to require the Administrative Agent or any Lender to make available its tax returns (or any other information relating to Taxes that it deems confidential) to the Borrower or any other person.

(g)    The Administrative Agent shall act as the withholding agent under this Agreement with respect to U.S. withholding only. The Administrative Agent shall have the right to withhold amounts from any payments under the Loan Documents, and shall not be liable for such withholding, as required to comply with applicable law.

(h)    The Lenders and any transferees or assignees after the Closing Date will be required to provide to the Administrative Agent or its agents all information, documentation or certifications reasonably requested by the Administrative Agent to permit the Administrative Agent to comply with its tax reporting obligations under applicable laws, including any applicable cost basis reporting obligations.

**SECTION 3.02    Increased Cost and Reduced Return; Capital Adequacy.**

(a)    If any Lender determines that any Change in Law regarding capital adequacy, or compliance by such Lender (or its Lending Office) therewith, has the effect of reducing the rate of return on the capital of such Lender or any corporation Controlling such Lender as a consequence of such Lender's obligations hereunder (taking into consideration its policies with respect to capital adequacy and such Lender's desired return on capital), then from time to time upon demand of such Lender setting forth in reasonable detail the charge and the calculation of such reduced rate of return (with a copy of such demand to the Administrative Agent given in accordance with Section 3.03), the Borrower shall pay to such Lender such additional amounts as will compensate such Lender for such reduction within fifteen (15) days after receipt of such demand.  Failure or delay on the part of any Lender to demand compensation pursuant to this Section 3.02 shall not constitute a waiver of such Lender's right to demand such compensation.

(b)    If any Lender requests compensation under this Section 3.02, then such Lender will, if requested by the Borrower, use commercially reasonable efforts to designate another Lending Office for any Loan affected by such event if such designation would eliminate or reduce the compensation payable under this Section 3.02; *provided that* such efforts are made on terms that, in the reasonable judgment of such Lender, cause such Lender and its Lending Office(s) to suffer no material economic, legal or regulatory disadvantage or any unreimbursed cost or expense; and *provided further* that nothing in this Section 3.02(b) shall affect or postpone any of the Obligations of the Borrower or the rights of such Lender pursuant to Section 3.02(a).

**SECTION 3.03    Matters Applicable to All Requests for Compensation.**

Any Agent or any Lender claiming compensation under this Article III shall deliver a certificate to the Borrower (with a copy to the Administrative Agent) setting forth the additional amount or amounts to be paid to it hereunder which shall be conclusive in the absence of manifest error. In determining such amount, such Agent or such Lender may use any reasonable averaging and attribution methods.

**SECTION 3.04        Replacement of Lenders under Certain Circumstances.**

(a)        If at any time (i) any Loan Party becomes obligated to pay additional amounts or indemnity payments described in Section 3.01 (with respect to Indemnified Taxes), (ii) any Lender becomes a Defaulting Lender or (iii) any Lender becomes a Non-Consenting Lender, then the Borrower may, so long as no Event of Default has occurred and is continuing, at its sole cost and expense, on ten (10) Business Days' prior written notice to the Administrative Agent and such Lender, (x) replace such Lender by causing such Lender to (and such Lender shall be obligated to) assign pursuant to Section 10.07(b) (with the assignment fee to be paid by the Borrower in such instance) all of its rights and obligations under this Agreement to one or more Eligible Assignees; *provided that* neither the Administrative Agent nor any Lender shall have any obligation to the Borrower to find a replacement Lender or other such Person; and *provided further* that (A) in the case of any such assignment resulting from a claim for payments required to be made pursuant to Section 3.01 (with respect to Indemnified Taxes), such assignment will result in a material reduction in such compensation or payments and (B) in the case of any such assignment resulting from a Lender becoming a Non-Consenting Lender, the applicable Eligible Assignees shall have agreed to, and shall be sufficient (together with all other consenting Lenders) to cause the adoption of, the applicable departure, waiver or amendment of the Loan Documents; or terminate the Commitment of such Lender (in respect of any applicable Loans only in the case of clause (i) or clause (iii)), and repay all Obligations of the Borrower owing to such Lender relating to the Loans and participations held by such Lender as of such termination date; *provided that* in the case of any such termination of a Non-Consenting Lender such termination shall be sufficient (together with all other consenting Lenders) to cause the adoption of the applicable departure, waiver or amendment of the Loan Documents and such termination shall be in respect of any applicable Loans only in the case of clause (i).

(b)        Any Lender being replaced pursuant to Section 3.04(a)(x) above shall promptly (i) execute and deliver an Assignment and Assumption with respect to such Lender's applicable Commitment and outstanding Loans, and (ii) deliver any Loan Notes evidencing such Loans to the Borrower. Pursuant to such Assignment and Assumption, (A) the assignee Lender shall acquire all or a portion, as the case may be, of the assigning Lender's Commitment and outstanding Loans, (B) all obligations of the Borrower owing to the assigning Lender relating to the Loans, Commitments and participations so assigned shall be paid in full by the assignee Lender to such assigning Lender concurrently with such Assignment and Assumption and (C) upon such payment and, if so requested by the assignee Lender, delivery to the assignee Lender of the appropriate Loan Note or Loan Notes executed by the Borrower, the assignee Lender shall become a Lender hereunder and the assigning Lender shall cease to constitute a Lender hereunder with respect to such assigned Loans, Commitments and participations, except with respect to indemnification provisions under this Agreement, which shall survive as to such assigning Lender. In connection with any such replacement, if any such Non-Consenting Lender or Defaulting Lender does not execute and deliver to the Administrative Agent a duly executed Assignment and Assumption reflecting such replacement within five (5) Business Days of the date on which the assignee Lender executes and delivers such Assignment and Assumption to such Non-Consenting Lender or Defaulting Lender, then such Non-Consenting Lender or Defaulting Lender shall be deemed to have executed and delivered such Assignment and Assumption without any action on the part of the Non-Consenting Lender or Defaulting Lender.

(c)     In the event that (i) the Borrower or the Administrative Agent has requested that the Lenders consent to a departure or waiver of any provisions of the Loan Documents or agree to any amendment thereto, (ii) the consent, waiver or amendment in question requires the agreement of each Lender, each affected Lender in accordance with the terms of Section 10.01 and (iii) the Required Lenders have agreed to such consent, waiver or amendment, then any Lender who does not agree to such consent, waiver or amendment shall be deemed a "**Non-Consenting Lender**."

**SECTION 3.05     Survival.**

All of the Borrower's and the other Loan Parties' obligations under this Article III shall survive resignation or removal of the Administrative Agent, termination of the Aggregate Commitments and repayment of all other Obligations hereunder.

**ARTICLE IV.**
**CONDITIONS PRECEDENT TO EFFECTIVENESS, LENDING AND WITHDRAWALS**

**SECTION 4.01     Conditions to Closing Date.**

The effectiveness of this Agreement and the obligation of each Lender to make its Loans hereunder on the Closing Date is subject to satisfaction (or waiver, by the Required Lenders in their sole discretion) of the following conditions precedent:

(a)     The Administrative Agent's and the Required Lenders' receipt of the following, each of which shall be pdf copies unless otherwise specified, each properly executed by a Responsible Officer of the signing Loan Party, each in form and substance reasonably satisfactory to the Required Lenders:

(i)     executed counterparts of this Agreement;

(ii)     each Collateral Document set forth on Schedule 1.01C required to be executed on the Closing Date as indicated on such schedule, duly executed by each Loan Party thereto, together with:

(A)     subject to the Intercreditor Agreement, certificates, if any, representing the Pledged Equity referred to therein accompanied by undated stock powers executed in blank and instruments evidencing the Pledged Debt indorsed in blank (or confirmation in lieu thereof that such certificates, powers and instruments have been sent for overnight delivery to the Administrative Agent); and

(B)     evidence that all other actions, recordings and filings required by the Collateral Documents that the Required Lenders may deem reasonably necessary to satisfy the Collateral and Guarantee Requirement shall have been taken, completed or otherwise provided for in a manner reasonably satisfactory to the Required Lenders;

(iii)     a copy of the Intercreditor Agreement duly executed and delivered by each party thereto;

(iv)    a copy of the ABL Revolving Credit Facility duly executed and delivered by each party thereto and on terms as contemplated by the RSA and the Chapter 11 Plan;

(v)    a Loan Note executed by the Borrower in favor of each Lender that has requested a Loan Note at least two (2) Business Days in advance of the Closing Date;

(vi)    such certificates of good standing (to the extent such concept exists) from the applicable secretary of state of the state of organization of each Loan Party, certificates of resolutions or other action, specimen signatures and/or incumbency certificates and/or other certificates of Responsible Officers of each Loan Party as the Required Lenders may reasonably require evidencing the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such Loan Party is a party or is to be a party on the Closing Date;

(vii)    an opinion from Gibson, Dunn and Crutcher, as counsel to the Loan Parties, in form and substance reasonably satisfactory to the Ad Hoc Group Advisors;

(viii)    certificates of insurance coverage of the Loan Parties evidencing that the Loan Parties are carrying insurance in accordance with Section 6.02.

(ix)    a certificate, dated the Closing Date and signed by a Responsible Officer of the Borrower, certifying:

(A)    the representations and warranties of a Loan Party set forth in Article V and in each other Loan Document shall be true and correct in all material respects (except that any representation and warranty that is qualified as to "materiality" or "**Material Adverse Effect**" shall be true and correct in all respects as so qualified) as of the Closing Date, except to the extent that such representations and warranties expressly relate to an earlier date, in which case they shall be true and correct in all material respects as of such earlier date; and

(B)    no Default or Event of Default shall have occurred or shall be continuing or shall arise hereunder immediately after giving effect to this Agreement and the Transactions hereby; and

(x)    copies of a recent Lien and judgment search in each jurisdiction reasonably requested by the Ad Hoc Group Advisors with respect to the Loan Parties;

(b)    All fees and expenses due to the Administrative Agent invoiced at least three (3) Business Days before the Closing Date (except as otherwise reasonably agreed by the Borrower), and the Administrative Agent shall have received a fully executed copy of the Fee Letter;

(c)    The RSA shall not have been terminated as to all parties signatory thereto;

(d)    The Administrative Agent shall have received (i) at least three (3) Business Days prior to the Closing Date (or such later date as the Administrative Agent shall reasonably agree) all documentation and other information about the Borrower and the other Loan Parties required under applicable "know your customer" and anti-money laundering rules and regulations,

including the USA Patriot Act, that has been requested by the Administrative Agent in writing at least four (4) Business Days prior to the Closing Date and (ii) an IRS Form W-9 or applicable W-8 duly completed and executed by the Borrower and each Guarantor;

(e)    The Administrative Agent and the Required Lenders shall have received appropriate termination statements, mortgage releases and such other documentation as shall be necessary to terminate, release or assign to the Administrative Agent all Liens encumbering the Real Estate of the Loan Parties and their Subsidiaries, other than Permitted Liens, in each case, in proper form for filing, registration or recordation in the appropriate jurisdictions

(f)    The entry of the Chapter 11 Confirmation Order shall have occurred; and

(g)    The Chapter 11 Effective Date shall have occurred.

Without limiting the generality of the provisions of <u>Section 9.03(b)</u>, for purposes of determining compliance with the conditions specified in this Section <u>4.01</u>, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received written notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

## ARTICLE V.
## REPRESENTATIONS AND WARRANTIES

In order to induce the Administrative Agent and the Lenders to enter into this Agreement and, in the case of the Lenders, to furnish the Loans hereunder, each of the Loan Parties and their Subsidiaries represent and warrant to the Agents and the Lenders at the time of the Closing Date that:

**SECTION 5.01    Organization; Powers.** **Each of Holdings, the Borrower and each of the Restricted Subsidiaries (a) is duly organized, validly existing and in good standing (or, if applicable in a foreign jurisdiction, enjoys the equivalent status under the laws of any jurisdiction of organization outside the United States) under the laws of the jurisdiction of its organization, (b) has all requisite power and authority to own its property and assets and to carry on its business as now conducted and (c) is qualified to do business and in good standing in each jurisdiction where such qualification is required; except in the cases of <u>subclause (a)</u> (solely with respect to the good standing or equivalent status of Holdings, the Borrower and the Restricted Subsidiaries), <u>(b)</u> and <u>(c)</u> above, to the extent that failure to do so would not reasonably be expected to have a Material Adverse Effect.**

**SECTION 5.02    Authorization.** **The execution, delivery and performance by Holdings, the Borrower and each of the Subsidiary Guarantors of each of the Loan Documents to which it is a party, and the borrowings hereunder and the transactions forming a part of the Transactions (a) have been [(or, in the case of the Mortgages, will be)] duly authorized by all corporate or other action required to be obtained by Holdings, the Borrower and such Subsidiary Guarantors and (b) will not (i) violate (A) any provision of (x) law, statute, rule or regulation applicable to such party, or (y) the certificate or articles of incorporation or other constitutive documents or by-laws or operating agreement of**

Holdings, the Borrower or any such Subsidiary Guarantor or (B) any applicable order of any court or any rule, regulation or order of any Governmental Authority where any such conflict, violation, breach or default referred to in <u>clause (b)(i)</u> of this <u>Section 5.02</u>, would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (ii) conflict with or result in any breach, termination or contravention of, or constitute a default under, or require any payment to be made under any Material Indebtedness binding upon Holdings, the Borrower or any of the Subsidiary Guarantors or (iii) result in the creation or imposition of any Lien upon or with respect to any property or assets now owned or hereafter acquired by Holdings, the Borrower or any such Subsidiary Guarantor, other than the Liens created by the Loan Documents and Permitted Liens.

SECTION 5.03     Enforceability. This Agreement has been duly executed and delivered by Holdings and each Loan Party and constitutes, and each other Loan Document when executed and delivered by each Loan Party that is party thereto will constitute, a legal, valid and binding obligation of such Loan Party enforceable against such Loan Party in accordance with its terms, subject to (i) the effects of bankruptcy, insolvency, moratorium, reorganization, fraudulent conveyance or other similar laws affecting creditors' rights generally, (ii) general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law) and (iii) implied covenants of good faith and fair dealing.

SECTION 5.04     Governmental Approvals; Consents.

No action, consent or approval of, registration or filing with, or any other action by, any Governmental Authority or any other Person is required in connection with the Transactions, except for (a) the filing of Uniform Commercial Code financing statements, (b) filings with the United States Patent and Trademark Office and the United States Copyright Office, (c) [recordation of any Mortgages], (d) those that have been made or obtained and are in full force and effect and (e) such actions, consents, approvals, registrations or filings the failure to obtain or make which would not reasonably be expected to have a Material Adverse Effect.

SECTION 5.05     Financial Statements.

(a)     The audited consolidated balance sheets of Holdings and its Subsidiaries, and related consolidated statements of income and cash flows of Holdings and its Subsidiaries for the fiscal year ended on or about December 31, 2019 reported on by and accompanied by an audit opinion from [_____], copies of which have heretofore been furnished to the Administrative Agent, present fairly in all material respects the consolidated financial condition of Holdings for such periods and as at such dates and the consolidated results of operations and cash flows of Holdings for the years then ended.

(b)     The unaudited consolidated quarterly balance sheet, statement of income and statement of cash flows of Holdings and its Subsidiaries for the fiscal quarter ended on or about [October 31, 2020] present fairly in all material respects the consolidated financial condition of Holdings as at such date. Such financial statements have been prepared in accordance with GAAP (subject to (i) normal year-end adjustments and (ii) the absence of notes).

(c)    The consolidated pro forma balance sheet of Holdings and its Subsidiaries as at [October 31, 2020], and the related consolidated pro forma statements of income of Holdings and its Subsidiaries for the twelve month period ended [October 31, 2020], certified by the chief financial officer or treasurer of Holdings, copies of which have been furnished to the Administrative Agent, present fairly in all material respects the consolidated pro forma financial condition of Holdings and its Subsidiaries as at such date and the consolidated pro forma results of operations of Holdings and its Subsidiaries for the period ended on such date, in each case giving effect to the Transactions, all in accordance with GAAP.

**SECTION 5.06    No Material Adverse Effect.**

Since the date of the Chapter 11 Confirmation Order, no event, development, circumstance or change has occurred that has or would reasonably be expected to have a Material Adverse Effect.

**SECTION 5.07    Title to Properties.**

As of the Closing Date, each Loan Party and their respective Restricted Subsidiaries has good record title to, or valid leasehold interests in, or easements or other limited property interests in, all real property, including the Mortgaged Properties, material to its business and each of the Loan Parties and their respective Restricted Subsidiaries owns, leases or licenses, as the case may be, all personal property purported to be owned or leased by it, in each case, free and clear of Liens except for those that do not materially interfere with its ability to conduct its business as currently conducted or to utilize such properties and assets for their intended purposes and Permitted Liens and except where the existence of such Lien would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. As of the Closing Date, <u>Schedule 5.07</u> sets forth a complete and accurate list of the Mortgaged Properties.

**SECTION 5.08    Subsidiaries.**

(a)    <u>Schedule 5.08(a)</u> sets forth as of the Closing Date the name and jurisdiction of incorporation, formation or organization of each Subsidiary of Holdings and, as to each such Subsidiary the percentage of each class of outstanding Equity Interests owned by Holdings or by any such Subsidiary.

(b)    As of the Closing Date, except as set forth on <u>Schedule 5.08(b)</u>, there are no outstanding subscriptions, options, warrants, calls, rights or other agreements or commitments (other than stock options granted to officers, employees or directors and directors' qualifying shares and Permitted Liens) relating to any Equity Interests of any Restricted Subsidiary.

**SECTION 5.09    Litigation; Compliance with Laws.**

(a)    Other than the Chapter 11 Cases, there are no actions, suits, investigations or proceedings at law or in equity or by or on behalf of any Person or Governmental Authority or in arbitration now pending against, or to the knowledge of the Borrower, threatened in writing against, the Borrower or any of the Restricted Subsidiaries or any business, property or rights of any such person, in each case where there is a probability of adverse determination, and is reasonably likely, if adversely determined, to have a Material Adverse Effect.  Each Loan Party

shall promptly notify the Administrative Agent of the filing or commencement of any action, suit or proceeding by or before any arbitrator or Governmental Authority against any Loan Party with respect to the Chapter 11 Plan or the Chapter 11 Confirmation Order.

(b)    None of the Borrower, the Restricted Subsidiaries or their respective properties or assets is in violation of any law, rule or regulation (including any zoning, building, ordinance, code or approval or any building permit, but excluding any Environmental Laws that are the subject of Section 5.16 or any restriction of record or agreement affecting any real property, or is in default with respect to any judgment, writ, injunction or decree of any Governmental Authority, where such violation or default would reasonably be expected to have, taken as a whole, a Material Adverse Effect.

**SECTION 5.10    Investment Company Act.**

No Loan Party is an "investment company," or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended.

**SECTION 5.11    [Reserved].**

**SECTION 5.12    Federal Reserve Regulations.**

(a)    None of the Borrower or any of the Restricted Subsidiaries is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of "purchasing" or "carrying" Margin Stock within the respective meanings of each of the quoted terms under Regulation U of the FRB.

(b)    No part of the proceeds of any Loan will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately for any purpose which violates the provisions of the Regulation U or X of the FRB.

**SECTION 5.13    Taxes.**

(a)    Each of Holdings, the Borrower and the Restricted Subsidiaries has filed or caused to be filed all Tax returns required to have been filed, except, in each case, as would not be, individually or in the aggregate, reasonably expected to have a Material Adverse Effect; and

(b)    Each of Holdings, the Borrower and the Restricted Subsidiaries has timely paid or caused to be timely paid all Taxes shown to be due and payable by it on the returns referred to in clause (a) and all other Taxes due and payable by it (including in its capacity as withholding agent), except (i) such Taxes that are being contested in good faith by appropriate proceedings diligently conducted and for which Holdings, the Borrower or any of its Restricted Subsidiaries (as the case may be) has set aside on its books adequate reserves in accordance with GAAP or (ii) such Taxes which, if not paid, would, individually or in the aggregate, reasonably be expected to have, a Material Adverse Effect.

(c)    There is no current or proposed Tax assessment, deficiency or other claim against Holdings, the Borrower or any of the Restricted Subsidiaries that would reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect.

**SECTION 5.14    No Material Misstatements.**

(a)    As of the Closing Date only, all written information (other than any projections, other forward-looking information and information of a general economic or industry specific nature) (the "**Information**") concerning the Loan Parties, their respective Subsidiaries and the Transactions otherwise prepared by or on behalf of the foregoing or their representatives and made available by or on behalf of Holdings or the Borrower to any Lender or the Administrative Agent in connection with the Transactions, when taken as a whole, does not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements were made (after giving effect to all supplements and updates provided thereto).

(b)    The Projections furnished to the Lenders prior to the Closing Date are based upon assumptions believed by the Borrower to be reasonable in light of conditions and facts known to the Borrower at the time made as of the date the Projections were furnished to the Lenders and as of the Closing Date (it being acknowledged and agreed by the Lenders and the Administrative Agent that projections as to future events are not to be viewed as facts and that any such information is subject to significant uncertainties and contingencies, many of which are beyond the Borrower's control, and that no assurances can be given that future developments addressed in such information can be realized and that actual results during the period or periods covered by such Projections may vary significantly from the Projections and that such variations may be material).

**SECTION 5.15    Employee Benefit Plans.**

(a)    Except as would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect: (i) the operation and administration of each Employee Benefit Plan has complied in all respects with the terms of such Employee Benefit Plan, the applicable provisions of ERISA and the Code and the regulations and interpretations promulgated thereunder; (ii) no Pension Plan has failed to satisfy the minimum funding standards (within the meaning of Section 412 of the Code or Section 302 of ERISA) applicable to such Pension Plan, whether or not waived; (iii) there has been no failure to make by its due date a required installment under Section 430(j) of the Code with respect to any Pension Plan; (iv) no ERISA Event has occurred or is reasonably expected to occur; (v) the present value of all accumulated benefit obligations under any Pension Plan did not, as of the date of the most recent financial statements reflecting such amounts, exceed the Fair Market Value of the assets of such Pension Plan allocable to such accrued benefits (determined in both cases using the assumptions applicable thereto promulgated under Section 430 of the Code); and (vi) the present value of all accrued benefit obligations of all underfunded Pension Plans did not, as of the date of the most recent financial statements reflecting such amounts, exceed the value of the assets of all such underfunded Pension Plans (determined in both cases using the assumptions applicable thereto promulgated under Section 430 of the Code).

(b)    Except as would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect, no Foreign Plan Event has occurred.

**SECTION 5.16    Environmental Matters.**

Except as to matters that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect: (i) no written notice of violation, request for information, order, claim, complaint or assertion of penalty has been received by any Loan Party or any of the Restricted Subsidiaries, and there are no judicial, administrative or other actions, suits or proceedings pending or, to the knowledge of any Loan Party or any of the Restricted Subsidiaries, threatened which allege a violation of or liability under any Environmental Laws or concerning Hazardous Materials, in each case relating to any Loan Party or any of the Restricted Subsidiaries, (ii) each Loan Party and the Restricted Subsidiaries have all permits necessary for its current operations to comply with all Environmental Laws and is, and during the term of all applicable statutes of limitation, has been, in compliance with the terms of such permits and with all Environmental Laws, (iii) no Hazardous Material is located at any property currently, or to the knowledge of any Loan Party or any of the Restricted Subsidiaries, formerly owned, operated or leased by any Loan Party or any of the Restricted Subsidiaries in quantities or concentrations that would reasonably be expected to give rise to any liability of any Loan Party or any of the Restricted Subsidiaries under any Environmental Laws, and no Hazardous Material has been generated by or on behalf of any Loan Party or any of the Restricted Subsidiaries that has been transported to or Released at or from any location in a manner that would reasonably be expected to give rise to any liability or obligation of any Loan Party or any of the Restricted Subsidiaries, (iv) there is no agreement to which any Loan Party or any of the Restricted Subsidiaries is a party in which any Loan Party or any of the Restricted Subsidiaries has assumed or undertaken, or retained responsibility for any known or reasonably likely liability or obligation arising under or relating to Environmental Laws, and (v) to the knowledge of any Loan Party or any of the Restricted Subsidiaries, there are no past or present actions, activities, circumstances, conditions or occurrences which would reasonably be expected to result in any liability of any Loan Party or any of the Restricted Subsidiaries under Environmental Laws.

**SECTION 5.17    Collateral Documents.**

(a)    The Collateral Documents are effective to create in favor of the Administrative Agent (for the benefit of the Secured Parties) a legal, valid and enforceable security interest in the Collateral described therein and proceeds thereof, subject, as to enforceability, to (i) the effects of bankruptcy, insolvency, moratorium, reorganization, fraudulent conveyance or other similar laws affecting creditors' rights generally, (ii) general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law) and (iii) implied covenants of good faith and fair dealing. When certificates or promissory notes, as applicable, representing the [Pledged Collateral (as defined in the Security Agreement)] are delivered to the Administrative Agent (together with transfer powers or endorsements executed in blank) and Uniform Commercial Code financing statements have been filed in the appropriate offices in the appropriate jurisdictions, the Administrative Agent (for the benefit of the Secured Parties) shall have a fully perfected Lien on, and security interest in, all right, title and interest of the Loan Parties in such Collateral and, subject to Section 9-315 of the New York Uniform Commercial Code, the proceeds thereof, as security for the Obligations to the extent perfection in such Collateral (and the proceeds thereof can be obtained) (a) by possession of certificates and/or promissory notes (together with transfer powers or endorsements executed in blanks), in the case of such [Pledged Collateral (as defined in the Security Agreement)] and (b) by the filing of Uniform Commercial Code financing

statements, in the case of the other applicable Collateral, in each case prior and superior in right to any other person (except Permitted Liens).

(b)     When the relevant Collateral Documents or a summary thereof is properly filed in the United States Copyright Office or the United States Patent and Trademark Office, as applicable, and UCC- 1 Financing Statements have been filed in the appropriate offices in the appropriate jurisdictions, the Administrative Agent (for the benefit of the Secured Parties) shall have a fully perfected Lien on, and security interest in, all right, title and interest of the Loan Parties thereunder in the Collateral consisting of United States registered patents, trademarks and copyrights and, in each case, applications therefor, in each case prior and superior in right to any other person except Permitted Liens (it being understood that subsequent recordings in the United States Copyright Office or United States Patent and Trademark Office, as the case may be, may be necessary to perfect a lien on United States registered patents, trademarks and copyrights and, in each case, applications therefor acquired or filed by the Loan Parties after the Closing Date).

**SECTION 5.18     Solvency.**

Immediately after giving effect to the Transactions on the Closing Date and immediately following the making of each Loan on the Closing Date and after giving effect to the application of the proceeds thereof, the Borrower and its Subsidiaries on a consolidated basis are Solvent.

**SECTION 5.19     Labor Matters.**

(a)     Except as, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect: (a) there are no strikes or other labor disputes pending or, to the knowledge of each Loan Party, threatened against the Loan Parties or any of their Subsidiaries; (b) the hours worked and payments made to employees of the Loan Parties and their Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable law dealing with such matters; (c) all persons treated as contractors by the Loan Parties and their Subsidiaries are properly categorized as such, and not as employees, under applicable law; and

(b)     all payments due from the Loan Parties and their Subsidiaries or for which any claim may be made against the Loan Parties and their Subsidiaries, on account of wages and employee health and welfare insurance and other benefits have been paid or accrued as a liability on the books of such Loan Party or Subsidiary to the extent required by GAAP. Except as, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect the consummation of the Transactions will not give rise to a right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which the Loan Parties or any of their Subsidiaries (or any predecessor) is a party or by which the Loan Parties or any of their Subsidiaries (or any predecessor) is bound.

**SECTION 5.20     Use of Proceeds.**

The proceeds of the Loans will be used in accordance with Section 6.12

**SECTION 5.21    Anti-Terrorism Laws.**

(a)    No Loan Party or any of its Subsidiaries is in violation in any material respect of any Anti-Terrorism Law.

(b)    No Loan Party or any of its Subsidiaries is an Embargoed Person.

(c)    None of the Loan Parties nor any of their respective Subsidiaries, or, to the knowledge of each Borrower, their respective officers, directors and agents is in violation of any of the country or list based economic and trade sanctions administered and enforced by OFAC. None of the Loan Parties nor any of their respective Subsidiaries, or, to the knowledge of each Borrower, their officers, directors and agents (a) is an Embargoed Person, (b) has its assets located in a jurisdiction that is an Embargoed Person or (c) derives revenues from investments in or transactions with Embargoed Persons. No proceeds of any Loan will be used, directly or indirectly, to fund any operations in, finance any investments or activities in, or make any payments to, an Embargoed Person.

(d)    To the knowledge of each Borrower, no part of the proceeds of the Loans will be used, directly or indirectly, for any payments to any "foreign official" (as such quoted term is defined in the FCPA), any foreign political party or any official thereof, or any candidate for foreign political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the FCPA.

**SECTION 5.22    [Reserved].**

**SECTION 5.23    Intellectual Property; Licenses, Etc.**

Each Loan Party and their respective Subsidiaries owns, or possesses the right to use, all of the trademarks, service marks, trade names, copyrights, patents, patent rights, franchises, licenses and other intellectual property rights that are material to the operation of their respective businesses, without conflict with the rights of any other Person, except where failure to have such rights or where such conflicts would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

**SECTION 5.24    Senior Indebtedness; Subordination.**

The Obligations hereunder and under the other Loan Documents are within the definition of "**Senior Debt**" (or any comparable term) and "**Designated Senior Debt**" (or any comparable term), to the extent applicable, under and as defined in the subordination provisions in the documentation governing Subordinated Indebtedness, if any.

**SECTION 5.25    No Default.**

No Default or Event of Default has occurred and is continuing or would result from Transactions or the consummation of any other transaction contemplated by this Agreement or any other Loan Document (other than, in each case, any Default or Event of Default that has been cured or waived).

**SECTION 5.26        Chapter 11 Plan.**

The Borrower has delivered to the Administrative Agent a complete and correct copy of the Chapter 11 Plan and the Chapter 11 Confirmation Order (including all schedules, exhibits, amendments, supplements, modifications and assignments thereto).  Holdings and its Subsidiaries are not in default in the performance of or compliance with any material provisions of the Chapter 11 Plan.  The Chapter 11 Plan is in full force and effect as of the date hereof and has not been terminated, rescinded or withdrawn, and the Chapter 11 Effective Date has occurred substantially concurrently with the effectiveness of this Agreement.  All conditions to confirmation and effectiveness of the Chapter 11 Plan have been satisfied or validly waived pursuant to the Chapter 11 Plan (other than conditions consisting of the effectiveness of this Agreement).  No court of competent jurisdiction has issued any injunction, restraining order or other order which prohibits consummation of any material transactions described in the Chapter 11 Confirmation Order and no governmental or other action or proceeding has been commenced, seeking any injunction, restraining order or other order which seeks to void or otherwise modify the transactions described in the Chapter 11 Confirmation Order in any material respect.

## ARTICLE VI.
## AFFIRMATIVE COVENANTS

Each Loan Party, jointly and severally, covenants and agrees with each Lender that so long as this Agreement shall remain in effect and until the Termination Date has occurred unless the Required Lenders shall otherwise consent in writing, each Loan Party will, and each Loan Party will cause each of the Restricted Subsidiaries to:

**SECTION 6.01        Existence; Businesses and Properties.**

(a)        Do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence, except (i) where the failure to do so would not reasonably be expected to have a Material Adverse Effect, (ii) as otherwise expressly permitted under Section 7.05 and (iii) the liquidation or dissolution of any Restricted Subsidiary if the assets of such Restricted Subsidiary are acquired by the Borrower or a Subsidiary of the Borrower.

(b)        Except where the failure to do so would not reasonably be expected to have a Material Adverse Effect, do or cause to be done all things necessary to (i) preserve, renew, extend and keep in full force and effect the rights, privileges, permits, franchises, authorizations, patents, trademarks, service marks, trade names, copyrights, licenses and rights with respect thereto reasonably necessary to the normal conduct of the business of the Borrower and the Restricted Subsidiaries and (ii) at all times maintain and preserve all property reasonably necessary to the normal conduct of the business of the Borrower and the Restricted Subsidiaries and keep such property in satisfactory repair, working order and condition (ordinary wear and tear excepted and subject to casualty and condemnation) and from time to time make, or cause to be made, all necessary and proper repairs, renewals, additions, improvements and replacements thereto in accordance with prudent industry practice (in each case except as expressly permitted by this Agreement).

**SECTION 6.02      Insurance.**

Maintain, with financially sound and reputable insurance companies, insurance (which shall, for the avoidance of doubt, include business interruption insurance) in such amounts and against such risks as are customarily maintained by similarly situated companies engaged in the same or similar businesses operating in the same or similar locations. Each such policy of insurance shall (i) name the Administrative Agent, on behalf of the Secured Parties as an additional insured thereunder as its interests may appear, (ii) in the case of each casualty insurance policy, contain a loss payable clause or endorsement, reasonably satisfactory in form and substance to the Administrative Agent, that names the Administrative Agent, on behalf of the Secured Parties as the loss payee thereunder and (iii) to the extent available, provide for at least 30 days' prior written notice to the Administrative Agent of any cancellation of such policy.

**SECTION 6.03      Taxes.**

Except where the failure to do so would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, pay and discharge promptly when due all Taxes (whether or not shown on a Tax return) imposed upon it or upon its income or profits or in respect of its property, except for any Taxes the validity or amount thereof which is being contested in good faith by appropriate proceedings (notice of which shall be promptly provided by the Borrower to the Administrative Agent to the extent the aggregate amount of Taxes being contested exceeds $500,000 and is not subject to indemnification in favor of the Borrower and its Restricted Subsidiaries) diligently conducted, and the Borrower or the affected Restricted Subsidiary, as applicable, shall have set aside on its books adequate reserves in accordance with GAAP with respect thereto.

**SECTION 6.04      Financial Statements, Reports, etc. Furnish to the Administrative Agent (which will promptly furnish such information to the Lenders):**

(a)      within 90 days after the end of each fiscal year, a consolidated balance sheet and related statements of operations, cash flows and owners' equity showing the financial position of Holdings and its Subsidiaries as of the close of such fiscal year and the consolidated results of its operations during such year and setting forth in comparative form the corresponding figures for the prior fiscal year, which consolidated balance sheet and related statements of operations, cash flows and owners' equity shall be audited by independent public accountants of recognized national standing (including, for the avoidance of doubt, [McGladrey LLP]) and accompanied by (x) an opinion of such accountants (which opinion shall be without a "going concern" or like qualification or exception and without any qualification or exception as to the scope of such audit (other than such qualification relating to the impending maturity of any Indebtedness under this Agreement or the ABL Revolving Credit Facility within the 12-month period following the date of such audit) to the effect that such consolidated financial statements fairly present, in all material respects, the financial condition and results of operations of Holdings and its Subsidiaries on a consolidated basis in accordance with GAAP (it being understood that if prior notice is given to the Administrative Agent the delivery by Holdings of an annual report on a Form 10-K of any Parent Entity shall satisfy the requirements of this Section 6.04(a) to the extent such annual report includes the information specified herein);

(b)      [within 45 days after the end of each of the first three fiscal quarters of each fiscal year, a consolidated balance sheet and related statements of operations and cash flows showing the financial position of Holdings and its Subsidiaries as of the close of such fiscal quarter and the consolidated results of its operations during such fiscal quarter and the then-elapsed portion of the fiscal year and setting forth in comparative form the corresponding figures for the corresponding periods of the prior fiscal year, all of which shall be in reasonable detail and which consolidated balance sheet and related statements of operations and cash flows shall be certified by a Financial Officer of Borrower as fairly presenting, in all material respects, the financial position and results of operations of Holdings and its Subsidiaries on a consolidated basis in accordance with GAAP (subject to normal year-end audit adjustments and the absence of footnotes) (it being understood that if prior notice is given to the Administrative Agent the delivery by Borrower of quarterly reports on Form 10-Q of any Parent Entity shall satisfy the requirements of this Section 5.04(b) to the extent such quarterly reports include the information specified herein);]

(c)      concurrently with any delivery of financial statements under paragraphs (a) and (b) above and paragraph (i) below, a Compliance Certificate of a Responsible Officer of the Borrower in substantially the form attached hereto as Exhibit B certifying that no Default or Event of Default has occurred and is continuing or, if such a Default or an Event of Default has occurred and is continuing, specifying the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto;

(d)      concurrently with each delivery of financial statements of Holdings pursuant to Section 6.04(a) and Section 6.04(b), a summary discussion and analysis of the financial condition and results of operations of Holdings and its Restricted Subsidiaries for the relevant fiscal year or fiscal quarter (including year to date), as applicable, as compared to the comparable period of the previous fiscal year;

(e)      [within ninety (90) days after the beginning of each fiscal year, a consolidated quarterly budget for such fiscal year (including a projected consolidated and consolidated balance sheet of Holdings and its Subsidiaries as of the end of such fiscal year, and the related consolidated and consolidated statements of projected cash flow and projected income) and, as soon as available, significant revisions, if any, of such budget and quarterly projections with respect to such fiscal year (to the extent that such revisions have been approved by the Borrower's board of directors or equivalent governing body), which budget and quarterly projections shall have been prepared in good faith on the basis of the assumptions stated therein, which assumptions were believed to be reasonable at the time of the preparation of such budget and quarterly projections, it being understood that actual results may vary from such budget and quarterly projections and that such variations may be material;]

(f)      promptly following a request therefor, all documentation and other information that the Administrative Agent reasonably requests on its behalf or on behalf of any Lender in order to comply with the Administrative Agent's or such Lender's ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act;

(g)    together with the delivery of the annual Compliance Certificate required by Section 6.04(c), updates to the Perfection Certificate reflecting all changes in the information required to be included therein during the period covered by such Compliance Certificate;

(h)    promptly following reasonable request therefor from the Administrative Agent, copies of (i) any documents described in Sections 101(f) and/or (j) of ERISA with respect to any Plan, and/or (ii) any notices or documents described in Sections 101(f), (k) and/or (l) of ERISA requested with respect to any Multiemployer Plan; provided, that if any Loan Party or any ERISA Affiliate has not requested such documents or notices from the administrator or sponsor of the applicable Plan or Multiemployer Plan, then, upon reasonable request of the Administrative Agent, any Loan Parties and/or the ERISA Affiliate(s) shall promptly make a request for such documents or notices from such administrator or sponsor and the Borrower shall provide copies of such documents and notices to the Administrative Agent promptly after receipt thereof;

(i)    [during the continuance of a Weekly Reporting Period (as defined under the ABL Revolving Credit Facility), within 30 days after the end of each month (other than the last month of each fiscal quarter of Holdings), the consolidated balance sheet and related statements of operations and cash flows of the Borrower and its Subsidiaries as at the end of such month and for the elapsed portion of the fiscal year ended with the last day of such month;] and

(j)    promptly, from time to time, such other information regarding the operations, business affairs and financial condition of Holdings, the Borrower or any of its Restricted Subsidiaries as in each case the Administrative Agent may reasonably request (for itself or on behalf of any Lender).

**SECTION 6.05    Litigation and Other Notices. Furnish to the Administrative Agent written notice of the following promptly after any Responsible Officer of any Loan Party obtains actual knowledge thereof:**

(a)    any Default or Event of Default hereunder or an event of default or default under the ABL Revolving Credit Facility specifying the nature and extent thereof and the corrective action (if any) proposed to be taken with respect thereto;

(b)    any action, suit or proceeding, whether at law or in equity or by or before any Governmental Authority or in arbitration, against Holdings, the Borrower or any of its Restricted Subsidiaries that would reasonably be expected to have a Material Adverse Effect;

(c)    the occurrence of any ERISA Event or Foreign Plan Event that, individually or together with all other ERISA Events or Foreign Plan Events that have occurred, would reasonably be expected to have a Material Adverse Effect;

(d)    any casualty event with respect to Term Priority Collateral which has resulted, or is expected to result, in damages or diminution of value in excess of $2.0 million;

(e)    any disputes relating to rent or other amounts in excess of $500,000 owing by any Loan Party to any landlord, warehouseman, processor, repairman, mechanic, shipper, freight forwarder, broker or other Person who possesses any Term Priority Collateral in excess of $500,000;

(f)     any other development specific to Holdings, the Borrower or any of its Restricted Subsidiaries that is not a matter of general public knowledge and that has had, or would reasonably be expected to have, a Material Adverse Effect;

(g)     any labor strike or walkout, or the expiration of any material labor contract at least 60 days prior to the expiration thereof; and

(h)     any judgment in an amount exceeding $3.0 million.

**SECTION 6.06     Compliance with Laws.**

Comply with all laws, rules, regulations and orders of any Governmental Authority applicable to it or its property including but not limited to ERISA, Anti-Terrorism Laws (including the USA PATRIOT Act), OFAC and FCPA, except where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect; provided that this Section 6.06 shall not apply to Environmental Laws, which are the subject of Section 6.08, or to laws related to Taxes, which are the subject of Section 6.03.

**SECTION 6.07     Maintaining Records; Inspections and Appraisals.**

(a)     Maintain all financial records in a manner sufficient to permit the preparation of consolidated financial statements in accordance with GAAP.

(b)     Permit the Administrative Agent from time to time, subject to reasonable notice and during normal business hours (except when an Event of Default exists), to visit and inspect the properties of any Loan Party or Subsidiary in the United States, including, without limitation, inspect, audit and make extracts from any Loan Party's or Subsidiary's books and records (subject to confidentiality restrictions), and discuss with its officers, employees and accountants (provided the Borrower is given reasonable advance notice and the opportunity to participate in any such discussion) such Loan Party's or Subsidiary's business, financial condition, assets, prospects and results of operations; provided that, during any calendar year, absent the continuation of an Event of Default, only one (1) visit by the Administrative Agent for reasonable expenses of a reasonable number of people shall be at the Borrower's expense that is reimbursable in accordance with Section 10.04 and/or 10.05. Neither the Administrative Agent nor any Lender shall have any duty to any Loan Party to make any inspection, nor to share any results of any inspection, appraisal or report with any Loan Party (provided that, except when an Event of Default exists, a representative of the Borrower is given the opportunity to be present during any discussion with any such agent, adviser or independent accountant). The Loan Parties acknowledge that all inspections, appraisals and reports are prepared by the Administrative Agent and Lenders for their purposes, and the Loan Parties shall not be entitled to rely upon them.

(c)     Reimburse the Administrative Agent (or its designee) in accordance with Section 10.04 and/or 10.05 for all charges, costs and expenses of the Administrative Agent (or its designee) in connection with examinations of any Loan Party's books and records or any other financial or Collateral matters as the Administrative Agent (or its designee) deems appropriate, including field audits and inventory appraisals, each up to one (1) time (or, two (2) times if such second audit and/or appraisal is commenced during an Audit Trigger Period (as defined and under the ABL Revolving Credit Facility)) per twelve-month period; provided, however, that if an examination

and/or appraisal is initiated during an Event of Default, all charges, costs and expenses therefor shall be reimbursed by the Loan Parties without regard to such limits. Subject to and without limiting the foregoing, the Loan Parties specifically agree to pay the Administrative Agent's (or its designee's) then standard charges for each day that an employee of the Administrative Agent (or its designee) or its Affiliates is engaged in any examination activities, and shall pay the standard charges of the Administrative Agent's (or its designee's) appraisal group.

**SECTION 6.08    Compliance with Environmental Laws.**

(a)    Except as would not reasonably be expected to have a Material Adverse Effect, (i) comply with, and undertake reasonable efforts to ensure compliance by all lessees and other occupants of its properties with, all Environmental Laws; and (ii) obtain and renew, and undertake reasonable efforts to ensure that all lessees and other occupants of its properties obtain and renew, all material authorizations and permits required pursuant to Environmental Law for its current operations and properties, in each case in accordance with Environmental Laws.

(b)    Except as would not reasonably be expected to have a Material Adverse Effect, (i) generate, use, treat, store, release, dispose of, and otherwise manage Hazardous Materials in a manner that would not reasonably be expected to result in a liability to the Borrower or any of the Restricted Subsidiaries or to materially affect any real property owned or leased by any of them, and (ii) take reasonable efforts to prevent any other person from generating, using, treating, storing, releasing, disposing of, or otherwise managing Hazardous Material in a manner that would reasonably be expected to result in a liability to the Borrower or any of the Restricted Subsidiaries or to materially affect any real property owned or leased by any of them.

**SECTION 6.09    Further Assurances.**

(a)    Execute any and all further documents, financing statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements, fixture filings, and other documents and recordings of Liens in stock registries), that may be required under any applicable law, or that the Administrative Agent may reasonably request (acting on behalf of itself or at the direction of the Required Lenders), to cause the Collateral and Guarantee Requirement to be and remain satisfied, all at the expense of the Loan Parties.

(b)    To the extent not satisfied as of the Closing Date, satisfy clause (d) and clause (i) of the definition of "**Collateral and Guarantee Requirement**" within the time frame set forth therein.

(c)    Grant to the Administrative Agent (or, if the Administrative Agent shall so direct, a collateral agent, sub-agent or similar agent) security interests and lien on any Material Real Property of any Loan Party acquired after the Closing Date pursuant to a Mortgage and constituting valid and enforceable Liens subject to no other Liens except as are permitted by Section 7.02, within ninety (90) days (or such longer period as the Administrative Agent (acting at the Direction of the Required Lenders) may agree in its reasonable discretion) of such request. Unless otherwise waived by the Administrative Agent (acting at the Direction of the Required Lenders) in its reasonable discretion, with respect to each such Mortgage, the Borrower shall deliver (at their

expense) to the Administrative Agent contemporaneously therewith all other documents described in clause (d) of the definition of "**Collateral and Guarantee Requirement**".

(d)    If (i) any additional Restricted Subsidiary is formed or acquired after the Closing Date (including, without limitation, as a result of any Division) or (ii) any Restricted Subsidiary ceases to be an Excluded Subsidiary pursuant to the definition thereof, and, in each case, the relevant Restricted Subsidiary is a Subsidiary Guarantor, (x) concurrently with the delivery of financial statements pursuant to Section 5.04(a) or (b), for the fiscal year or fiscal quarter, as applicable, in which the relevant person was formed or acquired or ceased to be an Excluded Subsidiary, notify the Administrative Agent thereof and (y) within 30 Business Days after such date or such longer period as the Administrative Agent (acting at the Direction of the Required Lenders) shall agree, cause such Subsidiary to become a [Grantor] by executing a [Joinder Agreement] in substantially the form of [Annex 1 to the Security Agreement], and (C) cause the Collateral and Guarantee Requirement to be satisfied with respect to such Subsidiary (including the delivery of the documents described in clause (d) of the definition of "Collateral and Guarantee Requirement" if such Subsidiary owns any Material Real Property) and with respect to any Equity Interest in such Subsidiary owned by or on behalf of any Loan Party.

(e)    Subject to Section 6.09(g), if any additional Foreign Subsidiary (which Subsidiary is a "first tier" Foreign Subsidiary), FSHCO or Special Purpose Subsidiary (to the extent a pledge of the Equity Interests of such Subsidiary is permitted under the securitization agreements applicable to such Subsidiary) is formed or acquired after the Closing Date, concurrently with the delivery of financial statements pursuant to Section 6.04(a) or (b) for the fiscal year or fiscal quarter, as applicable, in which the relevant person was formed or acquired, notify the Administrative Agent thereof and, within 30 Business Days after such date or such longer period as the Administrative Agent (acting at the Direction of the Required Lenders) shall reasonably agree, cause the Collateral and Guarantee Requirement to be satisfied with respect to any Equity Interest in such Subsidiary owned by or on behalf of any Loan Party.

(f)    Furnish to the Administrative Agent prompt written notice (and in any event within 30 days) of any change in (i) any Loan Party's corporate or organizational name, (ii) any Loan Party's organizational form or jurisdiction of organization, (iii) the location of any Loan Party's chief executive office or the opening or closing of any place of business at which Collateral in excess of $1.0 million is located or (iv) any Loan Party's organizational identification number.

(g)    None of the Collateral and Guarantee Requirement, the provisions of this Section 6.09 nor the provisions of any other Loan Document need be satisfied (and no representation or warranty shall be made in any Loan Document) with respect to (i) [reserved], (ii) any leasehold real property where a Loan Party is a tenant, (iii) other than the fee-owned real property identified to the Administrative Agent on the date hereof and set forth on [Schedule 6.09], any Material Real Property, (iv) Equity Interests in any person that is not a wholly owned Subsidiary to the extent the pledge thereof is prohibited by, or creates an enforceable right of termination of any other party (other than the Borrower, Holdings or any Subsidiary of the Borrower) under the terms of such person's organizational documents, joint venture agreement or shareholders agreement, (v) any property or assets the pledge of which is prohibited by applicable law, rule or regulation (including any legally effective requirement to obtain the consent of any governmental authority); (vii) any governmental licenses (but not the proceeds thereof) or state or

local franchises, charters and authorizations, to the extent security interests in such licenses, franchises, charters or authorizations are prohibited or restricted thereby (including any legally effective prohibition or restriction) after giving effect to the applicable anti-assignment provisions of the Uniform Commercial Code of any applicable jurisdiction other than proceeds and receivables thereof, the assignment of which is expressly deemed effective under the Uniform Commercial Code of any applicable jurisdiction or other applicable law notwithstanding such prohibition; (viii) any lease, license or other agreement or contract or any property subject to a purchase money security interest, capital lease obligation or similar arrangement permitted hereunder to the extent that a grant of a security interest therein would violate or invalidate such lease, license or agreement or contract or purchase money, capital lease or similar arrangement or create a right of termination in favor of any other party thereto (other than a Loan Party) after giving effect to the applicable anti-assignment provisions of the Uniform Commercial Code of any applicable jurisdiction other than proceeds and receivables thereof, the assignment of which is expressly deemed effective under the Uniform Commercial Code of any applicable jurisdiction or other similar applicable law notwithstanding such prohibition, (ix) any "intent-to-use" trademark application prior to the filing of a "**Statement of Use**" or "**Amendment to Allege Use**" with respect thereto, to the extent, if any, that, and solely during the period, if any, in which, the grant of a security interest therein would impair the validity or enforceability of such intent-to-use trademark application under applicable federal law, and (x) any property or asset to the extent that the burden or cost of obtaining or perfecting a security interest therein is excessive in relation to the benefit of the security afforded thereby as reasonably determined in writing by the Borrower and the Administrative Agent (acting at the Direction of the Required Lenders) (collectively, "**Excluded Property**"); provided, however, that the term "**Excluded Property**" shall not include any proceeds, substitutions or replacements of any property described in clauses (i) through (x) above unless such proceeds, substitutions or replacements constitute property of the type described in clauses (i) through (x) above (or any of them). In addition, (a) no perfection actions shall be required with respect to (A) motor vehicles and other assets subject to certificates of title, (B) letter of credit rights, except as to which perfection is accomplished by the filing of a UCC financing statement or equivalent (it being understood that no actions shall be required to perfect a security interest in letter of credit rights, other than the filing of a UCC financing statement or equivalent), (C) commercial tort claims with a value of less than $2.0 million and (D) promissory notes in a principal amount of less than $2.0 million, (b) share certificates of non-subsidiaries shall not be required to be delivered and (c) no actions in any non-U.S. jurisdiction or required by the laws of any non-U.S. jurisdiction shall be required to be taken to create any security interests in assets located or titled outside of the U.S. or to perfect or make enforceable any security interests in any such assets (it being understood that there shall be no security agreements or pledge agreements governed under the laws of any non-U.S. jurisdiction except to the extent reasonably requested by the Administrative Agent in connection with (i) accounts owed by non-U.S. debtors or (ii) assets of the Borrower outside the U.S.).

**SECTION 6.10    Conference Calls.**

[At the Administrative Agent's reasonable request no more than one time per calendar year, at a time mutually convenient to the Borrower and the Administrative Agent and whether or not any Lender participates in such conference call, the Borrower shall participate in a conference call for Lenders to discuss the financial condition and results of operations of Holdings and its

Subsidiaries for the most recently ended period for which financial statements have been delivered.]

**SECTION 6.11    [Reserved].**

**SECTION 6.12    Use of Proceeds.**

The proceeds of the Loans deemed to be made on the Closing Date shall be used solely as distributions on account of the "**Secured Note Claims**" pursuant to, and as defined in, the Chapter 11 Plan.

**SECTION 6.13    [Reserved].**

**SECTION 6.14    Designation of Subsidiaries.**

The Borrower may at any time designate any Restricted Subsidiary of the Borrower as an Unrestricted Subsidiary; provided that the Borrower shall only be permitted to so designate an Unrestricted Subsidiary (each an "**Unrestricted Subsidiary Designation**") so long as (a) as of the date of such designation, no Default or Event of Default exists or would result therefrom, (b) as of the date of such designation, the designation of such Unrestricted Subsidiary shall comply with Section 7.04, with the amount of the fair market value of any assets owned by such Unrestricted Subsidiary and any of its Subsidiaries at the time of the designation thereof (as reasonably determined by the Borrower in good faith) attributable to the Borrower's ownership therein being deemed an Investment pursuant to Section 7.04, (c) the Borrower and the Restricted Subsidiaries shall be in compliance on a Pro Forma Basis with a Fixed Charge Coverage Ratio, as such ratio is calculated as of the last day of the Test Period most recently ended on or prior to the date of such designation, as if such designation and any related transactions had occurred on the first day of such Test Period, of not less than 1.00: 1.00, (d) as of the date of such designation, the Borrower shall have delivered to the Administrative Agent an officer's certificate executed by a Responsible Officer of the Borrower, certifying to such officer's knowledge, compliance with the requirements of preceding clauses (a) through (c), inclusive, and containing the calculations required by the preceding clause (c) and (e) such Unrestricted Subsidiary shall be designated an "Unrestricted Subsidiary" under the ABL Revolving Credit Facility. The Borrower may designate any Unrestricted Subsidiary to be a Restricted Subsidiary for purposes of the credit documentation (each, a "**Subsidiary Redesignation**"); provided that (i) no Default or Event of Default then exists or would occur as a consequence of any such Subsidiary Redesignation (including, but not limited to, under Sections 7.01 and 7.02), (ii) the Borrower and the Restricted Subsidiaries shall be in compliance on a Pro Forma Basis with a Fixed Charge Coverage Ratio, as such ratio is calculated as of the last day of the Test Period most recently ended on or prior to the date of such designation, as if such designation and any related transactions had occurred on the first day of such Test Period, of not less than 1.00: 1.00, (iii) the Borrower shall be permitted to treat such Subsidiary Redesignation as a contribution to the capital of the Borrower of an amount equal to the fair market value of such Unrestricted Subsidiary (as reasonably determined by the Borrower in good faith) attributable to the Borrower's ownership interest therein, and (iv) the Borrower shall have delivered to the Administrative Agent an officer's certificate executed by a Responsible Officer of the Borrower, certifying to such officer's knowledge, compliance with the requirements of

preceding clauses (i) through (iii), inclusive, and containing the calculations required by the preceding clause (ii).

SECTION 6.15    Post-Closing Matters.

Within the time periods set forth in Schedule 6.15, or within such longer period or periods that the Administrative Agent (acting at the Direction of the Required Lenders) in its sole determination may permit, Holdings and its Subsidiaries shall deliver to the Administrative Agent the documents, and perform the actions, set forth on Schedule 6.15.

ARTICLE VII.
NEGATIVE COVENANTS

Each Loan Party, jointly and severally, covenants and agrees with each Lender that, until the Termination Date, unless the Required Lenders shall otherwise consent in writing, each Loan Party will not and will not permit any of the Restricted Subsidiaries to:

SECTION 7.01    Indebtedness.

Incur, create, assume or permit to exist any Indebtedness, except ("**Permitted Indebtedness**"):

(a)    Indebtedness of any Loan Party under the Loan Documents (including Indebtedness in respect of any Incremental Facility);

(b)    Indebtedness pursuant to Swap Agreements permitted by [Section 7.11];

(c)    Indebtedness owed to (including obligations in respect of bank guarantees or similar instruments, other than letters of credit, for the benefit of) any person providing workers' compensation, securing unemployment insurance and other social security laws or regulation, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or other similar obligations to the Borrower or any Restricted Subsidiary;

(d)    Indebtedness of the Borrower to any Subsidiary and of any Subsidiary to the Borrower or any other Subsidiary; provided that (i) Indebtedness of any Subsidiary that is not a Subsidiary Guarantor to any Loan Party shall be permitted under Section 7.04 and (ii) Indebtedness of the Borrower and of any other Loan Party to any Subsidiary that is not a Subsidiary Guarantor shall be subordinated to the Obligations pursuant to the terms of the Intercompany Note or otherwise on terms;

(e)    Indebtedness in respect of bids, trade contracts (other than for debt for borrowed money), leases (other than Capital Lease Obligations), statutory obligations, surety, stay, customs and appeal bonds, performance, performance and completion and return of money bonds, government contracts, financial assurances and completion guarantees and similar obligations, in each case provided in the ordinary course of business, including those incurred to secure health, safety and environmental obligations in the ordinary course of business (including Indebtedness in respect of bank guarantees or similar instruments in lieu of such items to support the issuance thereof, other than letters of credit);

(f)     obligations in respect of Bank Products (as defined under the ABL Revolving Credit Facility) and other Indebtedness in respect of netting services, overdraft protection and similar arrangements, in each case, in connection with cash management and deposit accounts;

(g)     (i) Indebtedness assumed or acquired in connection with Permitted Business Acquisitions, which Indebtedness, in each case exists at the time of such Permitted Business Acquisition and is not created in contemplation of such event; provided, that the aggregate principal amount of such Indebtedness shall not exceed the greater of (x) $7.5 million and (y) [●]% of Consolidated Total Assets; and (ii) any Permitted Refinancing Indebtedness incurred to Refinance such Indebtedness;

(h)     (i) Capital Lease Obligations, mortgage financings and purchase money Indebtedness (including any industrial revenue bond, industrial development bond and similar financings) incurred by the Borrower or any Restricted Subsidiary prior to or within 270 days after the acquisition, lease, repair or improvement of the respective asset in order to finance such acquisition, lease, repair or improvement, in an aggregate outstanding principal amount that at the time of, and after giving effect to, the incurrence thereof would not exceed the greater of $7.5m and [●]% of Consolidated Total Assets and (ii) any Permitted Refinancing Indebtedness in respect thereof;

(i)     other Indebtedness in an aggregate outstanding principal amount not to exceed for all Indebtedness incurred pursuant to this clause (i) (determined at the time of incurrence of any such Indebtedness) the greater of (x) $12.5 million and (y) [●]% of Consolidated Total Assets;

(j)     Indebtedness (including letters of credit) of the Loan Parties under Revolving Debt Facilities in an aggregate principal amount at any one time outstanding under this clause (j) (with letters of credit being deemed to have a principal amount equal to the maximum potential liability of the Loan Parties and its Subsidiaries thereunder) not to exceed (A) $150.0 million; plus (B) in the event of any Refinancing of such Indebtedness, the aggregate amount of fees, underwriting discounts, premiums and other costs and expenses incurred in connection with such Refinancing;

(k)     Guarantees (i) by the Loan Parties of the Indebtedness described in Section 7.01(o), (ii) by the Borrower or any of its Subsidiaries that are Loan Parties of any Indebtedness of any other Loan Party permitted to be incurred under this Agreement, (iii) by the Borrower or any other Loan Party of Indebtedness otherwise permitted hereunder of any Subsidiary that is not a Subsidiary Guarantor to the extent such Guarantees are permitted by Section 7.04 or (iv) by any Restricted Subsidiary that is not a Loan Party of Indebtedness of Holdings and its Subsidiaries; provided that Guarantees by the Borrower or any other Loan Party under this Section 7.01(k) of any other Indebtedness of a person that is subordinated to the Obligations shall be expressly subordinated to the Obligations on terms not materially less favorable, taken as a whole, to the Lenders as those contained in the subordination of such other Indebtedness to the Obligations;

(l)     Indebtedness arising from agreements of the Borrower or any Restricted Subsidiary providing for indemnification, adjustment of purchase or acquisition price or similar obligations (including without limitation earn-out obligations), in each case, incurred or assumed in connection with the acquisition or Disposition of any business or assets (including Equity Interests of Subsidiaries) of the Borrower or any Subsidiary permitted by Section 7.04 or Section 7.05, other

than Guarantees of Indebtedness incurred by any person acquiring all or any portion of such business or assets for the purpose of financing such acquisition;

(m)     Indebtedness supported by a Letter of Credit in a principal amount not in excess of the stated amount of such Letter of Credit;

(n)     Indebtedness consisting of (i) the financing of insurance premiums or (ii) take-or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business;

(o)     other unsecured Indebtedness of the Borrower or any Restricted Subsidiary, so long as at the time of incurrence thereof, the Borrower would be in compliance with a Consolidated Senior Secured Net Leverage Ratio, calculated on a Pro Forma Basis as of the last date of the Test Period most recently ended on or prior to the first day of such Test Period (for purposes of such calculation, any Indebtedness incurred under this clause (o) shall be deemed Consolidated Senior Secured Net Debt), that is no greater than 3.00:1.00;

(p)     Subordinated Indebtedness;

(q)     (i) Indebtedness existing on the Closing Date, or incurred pursuant to revolving credit facilities in existence on the Closing Date, and set forth on Schedule 7.01 and (ii) any Permitted Refinancing Indebtedness incurred to Refinance such Indebtedness;

(r)     Indebtedness of any Subsidiary that is not a Loan Party in an aggregate outstanding principal amount not to exceed for all Indebtedness incurred pursuant to this clause (r) (determined at the time of incurrence of any such Indebtedness) the greater of (x) $10.0m and (y) [●]% of Consolidated Total Assets;

(s)     Indebtedness incurred by the Borrower or any of its Restricted Subsidiaries representing (i) deferred compensation to directors, officers, employees, members of management and consultants of any Parent Entity, the Borrower or any Restricted Subsidiary in the ordinary course of business and (ii) deferred compensation or other similar arrangements in connection with the Transactions, any Permitted Business Acquisition or any Investment permitted hereby in the ordinary course of business;

(t)     Indebtedness consisting of promissory notes issued by the Borrower and the Restricted Subsidiaries to current or former directors, officers, employees, members of management or consultants of any Parent Entity, the Borrower or any Subsidiary (or their respective estates, heirs, family members, spouses, former spouses, domestic partners or former domestic partners) to finance the purchase or redemption of Equity Interests of any Parent Entity permitted by Section 7.07;

(u)     Indebtedness in respect of (x) letters of credit, bankers' acceptances supporting trade payables, warehouse receipts or similar facilities entered into in the ordinary course of business in an aggregate amount not to exceed $5.0 million or (y) any letter of credit issued in favor of any "Issuing Bank" (as defined under the ABL Revolving Credit Facility) or "Swingline Lender" (as defined in the ABL Revolving Credit Facility) to support any Defaulting Lender's participation in "Letters of Credit" (as defined in the ABL Revolving Credit Facility) or "Swingline Loans" (as defined in the ABL Revolving Credit Facility), respectively;

(v)      Indebtedness for bank overdrafts or returned items that are promptly repaid;

(w)      Indebtedness arising (i) out of the creation of any Lien (other than for Liens securing debt for borrowed money) permitted under <u>Section 7.02</u> or (ii) in connection with the endorsement of instruments for deposit in the ordinary course of business;

(x)      Indebtedness incurred in the ordinary course of business in respect of obligations of Holdings, the Borrower or any Restricted Subsidiary to pay the deferred purchase price of goods or services or progress payments in connection with such goods and services;

(y)      unfunded pension fund and other employee benefit plan obligations and liabilities incurred in the ordinary course of business to the extent that they do not result in an Event of Default under <u>Section 8.01(k)</u>;

(z)      Indebtedness of Foreign Subsidiaries in respect of any recourse factoring arrangements in an aggregate amount not to exceed $5.0 million;

(aa)      Indebtedness in respect of any unsecured loan from a Governmental Authority in an aggregate amount not to exceed $5.0 million; and

(bb)      [Indebtedness secured by Liens permitted by <u>(bb)Section 7.02(z)</u>.]

**SECTION 7.02      Liens.**

Create, incur, assume or permit to exist any Lien on any property or assets (including Equity Interests, evidences of Indebtedness or other securities of any person) at the time owned by it or on any income or revenues or rights in respect of any thereof, except (the following, "**Permitted Liens**"):

(a)      Liens on property or assets of the Borrower and the Restricted Subsidiaries existing on the Closing Date and set forth on <u>Schedule 7.02</u> and any refinancing, modification, replacement, renewal or extension thereof; <u>provided</u>, that the Lien does not extend to any additional property other than after-acquired property to the extent required by the documentation governing such Indebtedness and the proceeds and products thereof (it being understood that liens securing individual financings which are listed on <u>Schedule 7.02</u> may be cross-collateralized to other financings provided by the same lender or its affiliates);

(b)      any Lien created under the Loan Documents;

(c)      any Lien securing Indebtedness permitted by <u>Section 7.01(g)</u>; <u>provided</u> that such Lien (A) in the case of Liens securing Capital Lease Obligations and purchase money Indebtedness, applies solely to the assets securing such Indebtedness immediately prior to the consummation of the related Permitted Business Acquisition and after acquired property to the extent required by the documentation governing such Indebtedness (without giving effect to any amendment thereof effected in contemplation of such acquisition or assumption) and the proceeds and products thereof (it being understood that individual financings otherwise permitted to be secured hereunder provided by one person (or its affiliates) may be cross collateralized to other such financings provided by such person (or its affiliates)), (B) in the case of Liens securing

Indebtedness of Loan Parties other than Capital Lease Obligations or purchase money Indebtedness, such Liens do not extend to the property of any person other than the person acquired or formed to make such acquisition and the subsidiaries of such person (and the Equity Interests in such person) and are junior in priority to the Lien in favor of the Obligations, to the extent attaching to ABL Priority Collateral and (C) in the case of underline(clause (A)) and underline(clause (B)), such Lien is not created in contemplation of or in connection with such acquisition or assumption; underline(provided) that (A) in the case of any Indebtedness of any Subsidiaries that are not Subsidiary Guarantors, such Lien applies solely to the assets and Equity Interests of such Subsidiaries that are not Subsidiary Guarantors and (B) in the case of any Indebtedness of the Borrower or any other Loan Party, such Indebtedness is secured only by the assets acquired pursuant to such Permitted Business Acquisition, and the proceeds and products of and the accessions to such assets;

(d)    Liens for Taxes, assessments or other governmental charges or levies which are not yet due or which are being contested in good faith by appropriate proceedings diligently conducted which proceedings (or orders entered in connection with such proceedings) have the effect of suspending the enforcement or collection of such Liens and for which the Borrower or the affected Restricted Subsidiary, as applicable, shall have set aside on its books adequate reserves in accordance with GAAP with respect thereto;

(e)    landlord's, (including statutory and contractual landlord's liens and rights of distress) carriers', warehousemen's, mechanics', suppliers', materialmen's, repairmen's, construction or other like Liens securing obligations that are not overdue by more than sixty (60) days or, if more than sixty (60) days overdue, (i) which are being contested in good faith by appropriate proceedings which proceedings (or orders entered in connection with such proceedings) have the effect of suspending the enforcement or collection of such Liens or (ii) the failure to make timely payment of which would not reasonably be expected to have a Material Adverse Effect;

(f)    (i) pledges and deposits made (including to support obligations in respect of letters of credit, bank guarantees or similar instruments to secure) in compliance with the Federal Employers Liability Act or any other workers' compensation, unemployment insurance and other social security laws or regulations and deposits securing premiums or liability to insurance carriers under insurance or self-insurance arrangements in respect of such obligations or otherwise as permitted in underline(Section 7.01(c)) and (ii) pledges and deposits securing liability for reimbursement or indemnification obligations (including to support obligations in respect of letters of credit, bank guarantees or similar instruments for the benefit of) to insurance carriers in respect of property, casualty or liability insurance to Holdings or any Subsidiary provided by such insurance carriers;

(g)    (i) deposits to secure the performance of bids, trade contracts (other than for debt for borrowed money), leases (other than Capital Lease Obligations), regulatory, contractual, warranty or statutory obligations, surety, stay, customs and appeal bonds, performance, performance and completion and return of money bonds, government contracts, financial assurances and completion obligations and, in each case similar obligations, including those incurred to secure health, safety and environmental obligations and other deposits made in the ordinary course of business and (ii) Liens in respect of letters of credit or bank guarantees that have been posted to support payment of the items set forth in underline(clause (i)) of this underline(Section 7.02(g));

(h)      zoning restrictions, survey exceptions, easements, trackage rights, encroachments, leases (other than Capital Lease Obligations), licenses, special assessments, rights-of-way, restrictions on use of real property and other similar encumbrances and title defects that, in the aggregate, do not interfere in any material respect with the ordinary conduct of the business of the Borrower or any Restricted Subsidiary;

(i)      Liens securing Capital Lease Obligations, mortgage financings, and purchase money Indebtedness or improvements thereto hereafter acquired, leased, repaired or improved by the Borrower or any Restricted Subsidiary (including the interests of vendors and lessors under conditional sale and title retention agreements); provided that (i) such Liens secure Indebtedness permitted by Section 7.01(h) (including any Permitted Refinancing Indebtedness in respect thereof), (ii) such Liens are created, and the Indebtedness secured thereby is incurred, within 270 days after such acquisition, lease, completion of construction or repair or improvement (except in the case of any such Permitted Refinancing Indebtedness), (iii) the Indebtedness secured thereby does not exceed the cost of such equipment or other property or improvements at the time of such acquisition or construction, including transaction costs (including any fees, costs or expenses or prepaid interest or similar items) incurred by the Borrower or any Restricted Subsidiary in connection with such acquisition or construction or material repair or improvement or financing thereof and (iv) such Liens do not apply to any other property or assets of Holdings, the Borrower or any Restricted Subsidiary (other than to the proceeds and products of and the accessions to such equipment or other property or improvements but not to other parts of the property to which any such improvements are made) (it being understood that individual financings otherwise permitted to be secured hereunder provided by one person (or its affiliates) may be cross collateralized to other such financings provided by such person (or its affiliates));

(j)      [reserved];

(k)      Liens securing judgments, awards, attachments or decrees that do not constitute an Event of Default under Section 8.01(j);

(l)      [Reserved];

(m)      (i) any interest or title of a lessor, sublessor, licensor or sublicensee or under any leases, subleases, licenses or sublicenses entered into by the Borrower or any Restricted Subsidiary, (ii) any Lien or restriction to which the title or interest of such lessor, sublessor, licensor or sublicensor may be subject and (iii) any subordination of the interest of such lessor, sublessor, licensor or sublicensor to any Lien or restriction described in clause (ii) of this Section 7.02(m);

(n)      Liens that are customary rights of set-off (A) relating to the establishment of depository relations with banks not given in connection with the issuance of Indebtedness, (B) relating to pooled deposit or sweep accounts of the Borrower or any Restricted Subsidiary to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Borrower or any Restricted Subsidiary, (C) relating to purchase orders and other agreements entered into with customers of the Borrower or any Restricted Subsidiary in the ordinary course of business, (D) against credit balances of the Borrower or any Restricted Subsidiary with credit card issuers or credit card processors or amounts owing by credit card issuers or credit card

processors to the Borrower or any Restricted Subsidiary to secure the obligations of the Borrower or any Restricted Subsidiary in respect of fees and chargebacks, (E) attaching to commodity trading or other brokerage accounts incurred in the ordinary course of business and (F) encumbering reasonable customary initial deposits and margin deposits;

(o)     Liens arising solely by virtue of any statutory or common law provision relating to banker's liens, rights of set-off or similar rights;

(p)     (i) Liens on cash deposits of up to $1.0 million securing obligations in respect letters of credit, bankers' acceptances and similar facilities permitted under Sections 7.01(c), (e) and (u), and (ii) Liens on specific items of inventory or other goods owned by a Person securing such Person's obligations in respect of letters of credit, bankers' acceptances, supporting trade payables, warehouse receipts or similar facilities entered into in the ordinary course of business pursuant to Section 7.01(u) to facilitate the purchase, shipment, or storage of such inventory or such other goods;

(q)     (i) leases, subleases, licenses or sublicenses of property or (ii) rights reserved to or vested in any person by the terms of any lease, license, franchise, grant or permit held by the Borrower or any Restricted Subsidiary or by a statutory provision to terminate any such lease, license, franchise, grant or permit or to require periodic payments as a condition to the continuance thereof;

(r)     Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods and to secure the performance of leases of real property;

(s)     Liens (i) solely on any cash earnest money deposits, Permitted Investments made by the Borrower or any of the Restricted Subsidiaries in connection with any letter of intent or purchase agreement with respect to any Permitted Business Acquisition or other Investment permitted hereunder or (ii) consisting of an agreement to dispose of any property in a transaction permitted under Section 7.05;

(t)     Liens arising from precautionary UCC financing statements (or similar filings under other applicable law) regarding operating leases or consignment or bailee arrangements;

(u)     Liens on securities that are the subject of repurchase agreements constituting Permitted Investments under clause (c) of the definition thereof arising out of such repurchase transaction;

(v)     Liens on Equity Interests in Foreign Subsidiaries and assets of Foreign Subsidiaries securing obligations of Foreign Subsidiaries;

(w)     (i) Liens on Equity Interests in Joint Ventures or Unrestricted Subsidiaries securing capital contributions to or obligations of such Joint Venture or Unrestricted Subsidiaries, as applicable and (ii) customary rights of first refusal and tag, drag and similar rights in joint venture agreements entered into in the ordinary course of business;

(x)     Liens in favor of Holdings, the Borrower or any Restricted Subsidiary securing intercompany Indebtedness permitted under Section 7.04 so long as any such Liens on the Collateral are subordinated to the Liens securing the Obligations in a manner reasonably satisfactory to the Administrative Agent (acting at the Direction of the Required Lenders);

(y)     Liens (i) arising out of conditional sale, title retention, consignment or similar arrangements for sale of goods entered into by the Borrower or any Restricted Subsidiary in the ordinary course of business and (ii) arising by operation of law under Article 2 of the Uniform Commercial Code;

(z)     [Liens securing other Indebtedness permitted under Section 7.01; provided that, (i) with respect to Liens securing Consolidated Senior Secured Net Debt, (x) at the time of incurrence thereof, the Borrower would be in compliance with a Consolidated Senior Secured Net Leverage Ratio, calculated on a Pro Forma Basis as of the last date of the Test Period most recently ended on or prior to the first day of such Test Period, that is no greater than 2.00:1.00, and (y) to the extent such Lien is on the Collateral and secured Indebtedness for borrowed money, the holder of such Indebtedness (or agent or representatives in respect thereof) shall have entered into the Intercreditor Agreement or another intercreditor agreement in form and substance reasonably satisfactory to the Required Lenders and the Borrower providing that such Liens on the Collateral are junior in priority to the Lien in favor of the Obligations, to the extent attaching to Term Priority Collateral, and (ii) with respect to Liens securing Indebtedness that are expressly subordinated or junior to the Liens on such Collateral securing the Obligations, (x) at the time of incurrence thereof, the Borrower would be in compliance with a Consolidated Senior Secured Net Leverage Ratio, calculated on a Pro Forma Basis as of the last date of the Test Period most recently ended on or prior to the first day of such Test Period (for purposes of such calculation under this clause (z)(ii), any Indebtedness secured by a Lien under this clause (z)(ii) shall be deemed Consolidated Senior Secured Net Debt), that is no greater than 3.00:1.00, and (y) to the extent such Lien is on the Collateral and secured Indebtedness for borrowed money, the holder of such Indebtedness (or agent or representatives in respect thereof) shall have entered into an intercreditor agreement providing that such Liens on the Collateral are junior in priority to the Lien in favor of the Obligations and otherwise in form and substance consistent with the Intercreditor Agreement or reasonably acceptable to the Required Lenders and the Borrower;]

(aa)     [reserved];

(bb)     Liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto;

(cc)     Liens on specific items of inventory or other goods and the proceeds thereof securing such person's obligations in respect of documentary letters of credit or banker's acceptances issued or created for the account of such person to facilitate the purchase, shipment or storage of such inventory or goods;

(dd)     ground leases in the ordinary course in respect of real property on which facilities owned or leased by Holdings, Borrower or any of its Subsidiaries are located;

(ee)    Liens securing Indebtedness and other obligations incurred pursuant to Section 7.01(j); provided that any such Liens pursuant to this Section 7.02(ee) shall be subject to the Intercreditor Agreement;

(ff)    other Liens securing obligations (other than obligations for debt for borrowed money) in an aggregate amount not to exceed $10.0 million at any time outstanding; and

(gg)    Liens securing Indebtedness incurred under Section 7.01(r) on assets or Equity Interests of Subsidiaries that are not Loan Parties in an aggregate amount not to exceed the greater of (x) $10.0 million and (y) [●]% of Consolidated Total Assets.

**SECTION 7.03    [Reserved]**

**SECTION 7.04    Investments.**

Purchase, hold or acquire any Equity Interests, evidences of Indebtedness or other securities of, make or permit to exist any loans or advances to or Guarantees of the obligations of, another person or make a designation of a Restricted Subsidiary as an Unrestricted Subsidiary (each, an "**Investment**"), except (the following, "**Permitted Investments**"):

(a)    to the extent constituting an Investment, the Transactions;

(b)    [Investments among the Borrower and its Restricted Subsidiaries; provided that the sum of Investments (valued at the time of the making thereof and without giving effect to any write-downs or write-offs thereof, but not in the case of intercompany loans, and in any event, after giving effect to any returns, profits, dividends, distributions, and similar amounts, repayment of loans and the release of guarantees) made after the Closing Date by the Borrower and the Subsidiary Guarantors in Restricted Subsidiaries (including Foreign Subsidiaries of the Borrower) that are not Subsidiary Guarantors shall not exceed an aggregate net amount equal to (x) the greater of $20.0 million and 5.0% of Consolidated Total Assets outstanding at any time plus (y) Investments funded, directly or indirectly, with the proceeds of a Qualified Equity Contribution within 12 months of the receipt thereof by the Borrower;]

(c)    Permitted Investments and Investments that were Permitted Investments when made;

(d)    Investments arising out of the receipt by the Borrower or any Subsidiary of promissory notes and other non-cash consideration for Dispositions permitted under Section 7.05 (excluding Section 7.05(e));

(e)    (i) loans and advances to directors, officers, employees, members of management or consultants of any Parent Entity, the Borrower or any Restricted Subsidiary business (x) in connection with the relocation of such directors, officers or employees or otherwise made in the ordinary course of business in an aggregate principal amount not to exceed $1.5 million at any one time outstanding, or (y) relating to indemnification or reimbursement in respect of liability relating to their serving in any such capacity or as otherwise permitted under Section 7.07 and (ii) advances of payroll payments and expenses to directors, officers, employees, members of management or consultants in the ordinary course of business;

(f)      accounts receivable, notes receivable, security deposits and prepayments (including prepayments of expenses) arising and trade credit granted in the ordinary course of business and any Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors and other credits to suppliers made in the ordinary course of business;

(g)      Investments under Swap Agreements permitted pursuant to Section 7.11;

(h)      Investments existing on, or contractually committed as of, the Closing Date and set forth on Schedule 7.04 and any modification, replacement, renewal or extension thereof so long as any such modification, renewal or extension thereof does not increase the amount of such Investment except by terms thereof or as otherwise permitted by this Section 7.04;

(i)      Investments resulting from pledges and deposits permitted by Sections 7.02(f) and (g);

(j)      Investments (i) constituting Permitted Business Acquisitions, (ii) in any Subsidiary in an amount required to permit such person to consummate a Permitted Business Acquisition and (iii) in any Subsidiary that is not a Subsidiary Guarantor consisting of the Equity Interests of any person who is not a Subsidiary Guarantor;

(k)      Guarantees (i) permitted by Section 7.01 and (ii) of leases (other than Capital Lease Obligations) or of other obligations not constituting Indebtedness, in each case in the ordinary course of business;

(l)      Investments received in connection with the bankruptcy or reorganization of any person, or settlement of obligations of, or other disputes with or judgments against any person and/or upon foreclosure or deed in lieu of foreclosure with respect to any Lien held as security for an obligation;

(m)      Investments (i) held by the Borrower or any Restricted Subsidiary acquired after the Closing Date or (ii) of a person merged into or consolidated with the Borrower or a Restricted Subsidiary, in the case of this clause (ii), in accordance with Section 7.05 (other than Section 7.05(e)), after the Closing Date, in each case to the extent that such Investments were not made in contemplation of or in connection with such acquisition, merger or consolidation and were in existence or committed to be made on the date of such acquisition, merger or consolidation and any modification, replacement, renewal or extension thereof so long as any such modification, renewal or extension thereof does not increase the amount of such Investment except as otherwise permitted by this Section 7.04;

(n)      acquisitions by the Borrower of obligations of one or more directors, officers, employees, members or management or consultants of Holdings, the Borrower or its Subsidiaries in connection with such person's acquisition of Equity Interests of any Parent Entity, so long as no cash is actually advanced by the Borrower or any of its Subsidiaries to such persons in connection with the acquisition of any such obligations;

(o)      Investments in Holdings in amounts and for purposes for which Restricted Payments to Holdings are permitted under Section 7.06;

(p)      Indebtedness, Liens, mergers, consolidations, Dispositions, Restricted Payments and prepayments and repurchases of Indebtedness permitted under <u>Sections 7.01</u>, <u>7.02</u>, <u>7.05</u>, <u>7.06</u> and <u>7.09</u>, as applicable, to the extent constituting Investments;

(q)      Investments by the Borrower or any Restricted Subsidiary in an amount not to exceed the Available Amount;

(r)      Investments funded, directly or indirectly, with the proceeds of a Qualified Equity Contribution within 12 months of the receipt thereof by the Borrower;

(s)      Investments in the ordinary course of business consisting of (A) endorsements for collection or deposit or (B) customary trade arrangements with customers, vendors or suppliers;

(t)      Investments to the extent the consideration paid therefor consists solely of Equity Interests of the applicable person or any direct or indirect parent thereof;

(u)      (i) Investments made in the ordinary course of business in connection with obtaining, maintaining or renewing client and customer contracts and (ii) loans or advances made to, and guarantees with respect to obligations of, independent operators, distributors, suppliers, licensors and licensees in the ordinary course of business;

(v)      Investments consisting of loans and advances to employees of any Parent Entity or any Subsidiary the proceeds of which are used by such employees to simultaneously purchase the Equity Interests of the Borrower or any Parent Entity so long as the proceeds of such Equity Interests are contemporaneously contributed to Holdings; and

(w)      other Investments having an aggregate fair market value (measured on the date of such Investment was made without giving effect to subsequent changes in value), when taken together with all other Investments made pursuant to this clause (w) that are at the time outstanding, not to exceed the greater of $5.0 million and [●]% of Consolidated Total Assets.

**SECTION 7.05        Mergers, Consolidations and Dispositions.**

Merge into or consolidate with any other person, or permit any other person to merge into or consolidate with it, or Dispose of (in one transaction or in a series of related transactions) all or any part of its assets (whether now owned or hereafter acquired), or Dispose of any Equity Interests of any Restricted Subsidiary of the Borrower, or effect a Division, except that this Section 7.05 shall not prohibit:

(a)      (i) the Disposition of inventory and equipment in the ordinary course of business by the Borrower or any Restricted Subsidiary, (ii) the Disposition of surplus, obsolete, uneconomic, used or worn out property (including leasehold property interests), whether now owned or hereafter acquired, in the ordinary course of business by the Borrower or any Restricted Subsidiary, (iii) the leasing or subleasing of real property in the ordinary course of business by the Borrower or any Restricted Subsidiary, (iv) the Disposition of Permitted Investments in the ordinary course of business or (v) the Disposition of property of assets of a Loan Party (whether in a single transaction or series of related transaction and including any settlement of claims) in

connection with the transactions that have been approved by the Bankruptcy Court in the Chapter 11 Cases prior to the date hereof;

(b)      if at the time thereof and immediately after giving effect thereto no Event of Default shall have occurred and be continuing, (i) the merger of any Subsidiary of Holdings (which shall either be (A) newly formed expressly for the purpose of such transaction and which owns no assets or (B) a Subsidiary of the Borrower) into the Borrower in a transaction in which the Borrower is the surviving or resulting person or the surviving or resulting person expressly assumes the obligations of the applicable Borrower in a manner reasonably satisfactory to the Administrative Agent (acting at the Direction of the Required Lenders), (ii) the merger or consolidation of any Subsidiary with or into any other Subsidiary; provided that in a transaction involving any Subsidiary Guarantor, the surviving or resulting person shall be (or shall immediately become) a Subsidiary Guarantor, or such transaction shall be an Investment permitted by Section 7.04; or (iii) the liquidation or dissolution of any Restricted Subsidiary (other than the Borrower) or change in form of entity of any Restricted Subsidiary if the Borrower determines in good faith that such liquidation, dissolution or change in form is in the best interests of the Borrower;

(c)      Dispositions among the Borrower and its Subsidiaries (upon voluntary liquidation or otherwise); provided that any Disposition by a Loan Party to a person that is not a Loan Party shall be for fair market value (as reasonably determined by such person) or such transaction shall, to the extent the Disposition is for less than fair market value (as reasonably estimated by the Borrower), the excess value shall be deemed to be an Investment and shall be made in compliance with Section 7.04;

(d)      [reserved];

(e)      Permitted Liens, Permitted Investments, and Restricted Payments permitted by Section 7.06;

(f)      Dispositions of receivables in the ordinary course of business and not as part of an accounts receivables financing transaction;

(g)      Dispositions by the Borrower or any Restricted Subsidiary not otherwise permitted by this Section 7.05; provided that with respect to any Disposition with consideration in excess of $2.5 million, at least 75% of the consideration for any Disposition under this clause (g) shall consist of cash or cash equivalents (provided that for purposes of the 75% cash consideration requirement (w) the amount of any Indebtedness or other liabilities of the Borrower or any Restricted Subsidiary (as shown on such person's most recent balance sheet or in the notes thereto) that are assumed by the transferee of any such assets, (x) the amount of any trade-in value applied to the purchase price of any replacement assets acquired in connection with such Disposition, (y) any securities received by such Restricted Subsidiary from such transferee that are converted by such Restricted Subsidiary into cash or cash equivalents (to the extent of the cash or cash equivalents received) within 180 days following the closing of the applicable Disposition and (z) any Designated Non-Cash Consideration received in respect of such Disposition having an aggregate fair market value, taken together with all other Designated Non-Cash Consideration received pursuant to this clause (z) that is at that time outstanding, not in excess of $1.0 million shall, in each case of clauses (x), (y) and (z), be deemed to be cash or cash equivalents); provided further

that immediately prior to the consummation of such Disposition, no Event of Default shall have occurred and be continuing and no Event of Default shall result therefrom;

(h)     Dispositions by the Borrower or any Restricted Subsidiary of assets that were acquired in connection with Permitted Business Acquisitions; provided that any such Disposition shall be made or contractually committed to be made within 270 days of the date such assets were acquired by Holdings, the Borrower or such Restricted Subsidiary;

(i)     any merger or consolidation in connection with an Investment permitted under Section 7.04 (including any Subsidiary Redesignation or Unrestricted Subsidiary Designation that is permitted under Section 7.04); provided that if the Borrower is a party thereto, the Borrower shall be the continuing or surviving person;

(j)     non-exclusive licensing and cross-licensing arrangements involving any technology or other intellectual property of the Borrower or any Restricted Subsidiary in the ordinary course of business;

(k)     [reserved];

(l)     sales or discounting, on a non-recourse basis, past due Accounts in connection with the collection or compromise thereof;

(m)     the issuance of Qualified Capital Stock by the Borrower;

(n)     sales or issuances of Equity Interests of any Subsidiary of the Borrower; provided that, in the case of the sale of the Equity Interests of a Subsidiary Guarantor which is a wholly owned Subsidiary, the purchaser shall be the Borrower or another Subsidiary Guarantor or such transaction shall be permitted under another clause of this Section 7.05 or constitute an Investment permitted by Section 7.04 (other than Section 7.04(p));

(o)     Dispositions of property to the extent that (A) such property is exchanged for credit against the purchase price of similar replacement property or (B) the proceeds of such Disposition are promptly applied to the purchase price of such replacement property;

(p)     assignments, leases, subleases, licenses or sublicenses of property and which do not materially interfere with the business of the Borrower and the Restricted Subsidiaries;

(q)     Dispositions of property subject to casualty or condemnation proceedings (including in lieu thereof);

(r)     Dispositions of property consisting of the abandonment or cancellation of intellectual property rights (or any registrations or applications therefor) which, in the reasonable good faith determination of the Borrower, are uneconomical, negligible, not in the best interest of the owner thereof or not material to the conduct of the business of the Borrower and the Restricted Subsidiaries;

(s)      Dispositions of Investments in Joint Ventures to the extent required by, or made pursuant to, buy/sell arrangements between the joint venture parties set forth in joint venture arrangements and similar binding arrangements;

(t)      [reserved];

(u)      terminations of Swap Agreements;

(v)      [reserved];

(w)      Dispositions of Unrestricted Subsidiaries;

(x)      any Restricted Subsidiary of the Borrower may consummate a merger, dissolution, liquidation or consolidation, the purpose of which is to effect a Disposition otherwise permitted under this Section 7.05;

(y)      [reserved];

(z)      any surrender or waiver of contractual rights or the settlement, release or surrender of contractual rights or other litigation claims in the ordinary course of business; and

(aa)      any issuance of, or Disposition in connection with, directors' qualifying shares or investments by residents of a particular jurisdiction as mandated by relevant foreign law.

Notwithstanding anything to the contrary contained above in this Section 7.05, no Disposition shall be permitted by this Section 7.05 (other than Dispositions pursuant to clauses (a)(ii), (a)(iii), (b), (c), (e), (i), (j), (n) (to the extent the relevant Disposition is to a Loan Party), (q), (r), (s), (x), (z) and (aa)) unless such Disposition is for fair market value (as reasonably determined by the Borrower).

**SECTION 7.06      Dividends and Distributions.**

Pay, directly or indirectly, any dividend or make any other distribution (by reduction of capital or otherwise), whether in cash, property, securities or a combination thereof, with respect to any Equity Interests of the Borrower (other than dividends and distributions on such Equity Interests payable solely by the issuance of additional Equity Interests of the Borrower) or directly or indirectly redeem, purchase, retire or otherwise acquire for value any Equity Interests of the Borrower (other than through the issuance of additional Equity Interests of the person redeeming, purchasing, retiring or acquiring such shares) (a "**Restricted Payment**"); provided, however, that:

(a)      the Holdings, the Borrower and its Restricted Subsidiaries may consummate the Transactions;

(b)      the Borrower may make Restricted Payments as shall be necessary to allow any Parent Entity (i) to pay operating expenses in the ordinary course of business and other corporate overhead, legal, accounting and other professional fees and expenses (including, without limitation, those owing to third parties plus any customary indemnification claims made by directors, officers, employees, members of management and consultants of any Parent Entity

attributable to the ownership or operations of Holdings, the Borrower and the Restricted Subsidiaries); provided that the aggregate amount of such Restricted Payments under this clause (b)(i) shall not exceed in any fiscal year $2.5 million (it being understood that unused amounts in any fiscal year may be carried forward to the next subsequent fiscal year), (ii) to pay fees and expenses related to any debt or equity offering, investment or acquisition permitted hereunder (whether or not successful), (iii) to pay franchise or similar Taxes, and other fees and expenses, required in maintaining such Parent Entity's corporate existence, (iv) to finance any Investment permitted to be made under Section 7.04; provided, that (A) such Restricted Payments under this clause (iv) shall be made substantially concurrently with the closing of such Investment and (B) the relevant Parent Entity shall, immediately following the closing thereof, cause all property acquired to be contributed to the Borrower or one of the Restricted Subsidiaries or the merger of the person formed or acquired into the Borrower or one of the Restricted Subsidiaries in order to consummate such Investment; and (v) to pay customary salary, bonus and other benefits payable to directors, officers, employees, members of management or consultants of any Parent Entity attributable to the ownership or operations of the Borrower and its Subsidiaries;

(c)    the Borrower may make Restricted Payments the proceeds of which are used to purchase or redeem (i) the Equity Interests of any Parent Entity (including related stock appreciation rights or similar securities) held by then present or former directors, officers, employees, members of management or consultants of any Parent Entity, the Borrower or any of its Subsidiaries (or the estate, heirs, family members, spouse, former spouse, domestic partner or former domestic partner of any of the foregoing) or by any Plan; provided that the aggregate amount of such Restricted Payments under this clause (c) shall not exceed in any fiscal year $4.0 million (it being understood that unused amounts in any fiscal year may be carried forward to the next subsequent fiscal year; provided that no unused amounts will be carried forward beyond one fiscal year) and $8.0 million in the aggregate (plus the sum of the amount of (x) net proceeds received by the Borrower during such fiscal year from sales of Equity Interests of any Parent Entity to directors, officers, employees, members of management or consultants of any Parent Entity, the Borrower or any Subsidiary (or the estate, heirs, family members, spouse, former spouse, domestic partner or former domestic partner of any of the foregoing), or any Plan and (y) net proceeds of any key-man life insurance policies received in any fiscal year (which net proceeds, if not used in such fiscal year may be carried forward to the next subsequent fiscal year)) and (ii) fractional shares of Equity Interests;

(d)    the Borrower may make repurchases of Equity Interests in any Parent Entity, the Borrower or any Restricted Subsidiary deemed to occur upon exercise of stock options or similar Equity Interests if such repurchased Equity Interests represent a portion of the exercise price of such options or Taxes to be paid in connection therewith;

(e)    the Borrower may make other Restricted Payments in an amount not to exceed the Available Amount;

(f)    [payments to the Permitted Investors as reimbursement for reasonable fees, costs and expenses and indemnification obligations pursuant to [●];]

(g)    to the extent constituting a Restricted Payment, the Borrower and the Restricted Subsidiaries may enter into the transactions expressly permitted by Section 7.04 and Section 7.05 (other than Section 7.05(e));

(h)    [reserved]; and

(i)    for any taxable period for which the Borrower and/or any of its Subsidiaries are members of a consolidated, combined or similar income tax group for U.S. federal and/or applicable state or local income Tax purposes of which a direct or indirect parent of Borrower is the common parent [(a "**Tax Group**")], the Borrower may make Restricted Payments to enable such common parent to pay the portion of any U.S. federal, state or local income Taxes (as applicable) of such Tax Group for such taxable period that are attributable to the income of Borrower and/or its Subsidiaries; provided that (i) the amount of such dividends or other distributions for any taxable period shall not exceed the amount of such Taxes that Borrower and/or its Subsidiaries, as applicable, would have paid had Borrower and/or its Subsidiaries, as applicable, been a stand-alone taxpayer (or a stand-alone group) and (ii) dividends or other distributions in respect of an Unrestricted Subsidiary shall be permitted only to the extent that cash distributions were made by such Unrestricted Subsidiary to Borrower or any of its Restricted Subsidiaries for such purpose (the "**Tax Distributions**").

## SECTION 7.07    Transactions with Affiliates

(a)    Sell or transfer any property or assets to, or purchase or acquire any property or assets from, or otherwise engage in any other transaction with, any of its Affiliates, unless such transaction is upon terms, taken as a whole, no less favorable to the Borrower or such Restricted Subsidiary, as applicable, than would be obtained in a comparable arm's-length transaction with a person that is not an Affiliate;

(b)    The foregoing paragraph (a) shall not prohibit:

(i)    any issuance of securities, or other payments, awards or grants in cash, securities or otherwise pursuant to, or the funding of, employment arrangements, stock options and stock ownership plans approved by the board of directors (or equivalent governing body) of any Parent Entity or of the Borrower or any Restricted Subsidiary,

(ii)    loans or advances to directors, officers, employees, members of management or consultants of Holdings, the Borrower or any of its Subsidiaries permitted or not prohibited by Section 7.04,

(iii)    transactions among any Parent Entity, the Borrower and/or its Subsidiaries, in each case otherwise permitted or not prohibited by the Loan Documents,

(iv)    the payment of fees and indemnities to, and the reimbursement of the expenses of, directors, officers, employees, members of management or consultants of any Parent Entity, the Borrower and the Restricted Subsidiaries in the ordinary course of business,

(v)    transactions under permitted agreements in existence on the Closing Date and set forth on Schedule 7.07 or any amendment thereto to the extent such amendment is not adverse to the Lenders in any material respect,

(vi)    the entry into and performance under (A) any employment, equity incentive, severance or compensation agreements or arrangements (including any collective bargaining or similar arrangement) entered into by Holdings, the Borrower or any of the Restricted Subsidiaries in the ordinary course of business, (B) any subscription agreement or similar agreement pertaining to the repurchase of Equity Interests pursuant to put/call rights or similar rights with employees, officers, directors, members of management or consultants, and (C) any employee compensation, benefit plan or arrangement, vacation plans, incentive plans, deferred compensation plans, retirement or savings plans, any health, disability or similar insurance plan which covers employees, and any employment contract or arrangement and transactions pursuant thereto, in each case in respect of officers, directors, employees or constituents of any Parent Entity, Holdings, the Borrower or any Restricted Subsidiary,

(vii)    Restricted Payments permitted under Section 7.06 and Investments permitted by Section 7.04,

(viii)    any purchase by Holdings of, or contributions to, the equity capital of the Borrower,

(ix)    payments made by the Borrower or any of the Restricted Subsidiaries to the Permitted Investors for any financial advisory, financing, underwriting or placement services or in respect of other investment banking activities, including in connection with acquisitions or divestitures, which payments are approved by the majority of the board of directors (or equivalent governing body) of the Borrower, in good faith and other similar fees,

(x)    transactions among the Borrower and the Restricted Subsidiaries for the purchase or sale of goods, products, parts and services entered into in the ordinary course of business,

(xi)    any transaction in respect of which the Borrower delivers to the Administrative Agent (for delivery to the Lenders) a letter addressed to the board of directors (or equivalent governing body) of the Borrower from an accounting, appraisal or investment banking firm, in each case of nationally recognized standing, which letter states that such transaction is on terms, taken as a whole, that are no less favorable to the Borrower or the applicable Subsidiary, as applicable, than would be obtained in a comparable arm's-length transaction with a person that is not an Affiliate,

(xii)    the Transactions, including the payment of all fees, expenses, bonuses and awards (including Transaction Costs) related to the Transactions (and including, for the avoidance of doubt, the Loan Documents and the transactions undertaken with the lenders thereunder in respect of the Loans in accordance with the terms thereof and (b) the Loan Documents and the transactions undertaken with the lenders hereunder in respect of the Obligations in accordance with the terms thereof),

(xiii)    Guarantees permitted by Section 7.01,

(xiv)    the issuance and sale of Qualified Capital Stock,

(xv)    transactions with customers, clients, suppliers or Joint Ventures for the purchase or sale of goods and services entered into in the ordinary course of business,

(xvi)    the indemnification (or similar arrangement) of directors, officers, employees, members of management or consultants of any Parent Entity, the Borrower and its Subsidiaries in accordance with the organizational documents of the relevant person, applicable law or customary practice,

(xvii)    performance of customary obligations under the terms of any stockholders agreement, principal investors agreement (including any registration rights agreement or purchase agreement related thereto) to which any Parent Entity, the Borrower or any Restricted Subsidiary is a party as of the Closing Date (as such agreement may be amended or otherwise modified from time to time) and any similar agreements relating to the Equity Interests of any of the foregoing which the relevant parties may enter into after the Closing Date (except to the extent the performance of such obligations is otherwise prohibited under the terms of this Agreement),

(xviii)    transactions between the Borrower or any of its Restricted Subsidiaries and any Person, the sole affiliation to the Borrower or any of its Restricted Subsidiaries of which is that a director of such Person is also a director of the Borrower or any Parent Entity; provided, however, that such director abstains from voting as a director of the Borrower or such Parent Entity in any matter involving such other Person,

(xix)    transactions with a Person (other than an Unrestricted Subsidiary of the Borrower) that is an Affiliate of the Borrower solely because the Borrower owns, directly or through a Restricted Subsidiary, an Equity Interest in, or controls, such Person, and

(xx)    [(x) the purchase of debt or securities of Holdings, the Borrower or any Subsidiary thereof in primary issuances on the same terms as are applicable to non-Affiliates and (y) purchases or other acquisitions (other than from the Loan Parties or any of the Restricted Subsidiaries) of debt or securities of the Loan Parties or any of its Subsidiaries by Affiliates in bona fide secondary transactions.]

**SECTION 7.08    Holding Company Covenant.**

In the case of Holdings, engage in any ness or business activity other than (i) ownership and acquisition of Equity Interests in the Borrower, together in each case with activities directly related thereto, (ii) performance of its obligations under and in connection with the Loan Documents, the ABL Revolving Credit Facility and the other agreements contemplated hereby and thereby, (iii) the consummation of the Transactions and actions incidental thereto, (iv) the incurrence of and performance of its obligations related to Indebtedness and Guarantees incurred by Holdings after the Closing Date and that are related to the other activities referred to in, or otherwise permitted by, this Section 7.08, including the payment by Holdings, directly or indirectly, of dividends or other distributions (by reduction of capital or otherwise), whether in cash, property, securities or a combination thereof, with respect to any of its Equity Interests, or directly or indirectly redeeming, purchasing, retiring or otherwise acquiring for value any of its Equity Interests or setting aside any amount for any such purpose, (v) actions required by law to

maintain its existence, the payment of taxes and other customary obligations, (vii) the issuance, sale and redemption of Equity Interests, (viii) any transaction contemplated by or referred to in this Article VII (including guaranteeing Indebtedness or obligations of the Borrower and its Subsidiaries), (ix) the receipt, holding and further distribution of the proceeds of Restricted Payments permitted by Section 7.06, (x) holding directors' and shareholders' meetings, preparing corporate and similar records and other activities required to maintain its existence and separate corporate or other legal structure, (xi) preparing reports to, and notices to and filings with, Governmental Authorities and to the holders of its Equity Interests, (xii) [reserved], (xiii) merging and otherwise consolidating, in one or a series of related transactions, with any Parent Entity so long as the surviving entity of any such transaction (if not Holdings) expressly assumes the obligations of Holdings under the Loan Documents and (xiv) activities incidental to its maintenance and continuance and to the foregoing activities.

**SECTION 7.09     Restricted Debt Payments; Restrictions on Distributions; Negative Pledges.**

(a)     Amend or modify in any manner materially adverse to the Lenders, or grant any waiver or release under or terminate in any manner (if such granting, release or termination shall be materially adverse to the Lenders), the articles or certificate of incorporation or formation or bylaws or limited liability company operating agreement of Holdings, the Borrower or any of the Subsidiary Guarantors; or

(b)     Make, directly or indirectly, any voluntary prepayment or other voluntary distribution (whether in cash, securities or other property), prior to the scheduled due date thereof, of or in respect of principal of or interest on (w) any Indebtedness of the Loan Parties secured by a lien permitted by Section 7.02(z), (x) any Indebtedness of the Loan Parties secured by a lien that is junior in priority to the liens securing the Obligations, (y) any Subordinated Indebtedness or (z) any senior unsecured Indebtedness of the Loan Parties with an aggregate outstanding principal amount (for any agreement, or series of related agreements, governing such Indebtedness) in excess of $5.0 million (any such Indebtedness, collectively, "**Specified Indebtedness**"), or any payment or other distribution (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of such Specified Indebtedness in respect thereof (except for (i) Refinancings otherwise permitted by Section 7.01, (ii) payments with respect to intercompany debt that are permitted by the subordination terms, if any, applicable thereto, (iii) payments on revolving credit facilities without corresponding reductions in Commitments, and (iv) the conversion of any Specified Indebtedness to Equity Interests of any Parent Entity) (each such payment or distribution, a "**Restricted Debt Payment**"); provided, however, that Restricted Debt Payments with respect to any Specified Indebtedness shall be permitted (1) in an amount not to exceed the Available Amount, (2)(A) if such Restricted Debt Payment constitutes an exchange of Specified Indebtedness for other Specified Indebtedness or (B) if any such Specified Indebtedness is converted to common or qualified preferred equity or (3) to the extent funded, directly or indirectly, with the proceeds of a Qualified Equity Contribution within 12 months of the receipt thereof by the Borrower;

(c)     Amend or modify, or permit the amendment or modification of, any Specified Indebtedness of Holdings, the Borrower or any Restricted Subsidiary, or any agreement relating

thereto, other than amendments or modifications that are (i) not materially adverse to the Lenders, or (ii) or would result in such Specified Indebtedness having terms permitted hereunder (it being understood that this <u>Section 7.09(c)</u> shall not restrict Permitted Refinancing Indebtedness permitted by <u>Section 7.01</u>); or

(d)     Permit (x) the Borrower or any Restricted Subsidiary to enter into any agreement or instrument that by its terms restricts the payment of dividends or distributions or the making of cash advances to (or the repayment of cash advances from) the Borrower or (y) the Borrower or any Guarantor that is a Subsidiary of the Borrower to enter into any agreement or instrument that by its terms restricts the granting of Liens on Collateral pursuant to the Collateral Documents, in each case other than those arising under or in connection with any Loan Document, except, in each case:

(i)     restrictions imposed by any applicable law, statute, rule, regulation, ordinance, code, administrative or judicial precedent or authority or the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof;

(ii)     contractual encumbrances or restrictions in (A)(x) effect on the Closing Date (including pursuant to the ABL Revolving Credit Facility entered into on the Closing Date) or contained in any agreements related to any Permitted Refinancing Indebtedness incurred to Refinance any Indebtedness existing on the Closing Date or (y) any agreements relating to any Indebtedness issued or incurred after the Closing Date or Permitted Refinancing Indebtedness in respect thereof, in each case so long as the scope of such encumbrance or restriction is no more expansive in any material respect (as determined in good faith by the Borrower and the Administrative Agent) than any such encumbrance or restriction in effect on the Closing Date (or the date of issuance or incurrence as the case may be), or (B) any agreement (regardless of whether such agreement is in effect on the Closing Date) providing for the subordination of subordinated intercompany debt;

(iii)     any restriction on a Subsidiary imposed pursuant to an agreement entered into for the Disposition of all or substantially all the Equity Interests or assets of such Subsidiary pending the closing of such sale or disposition;

(iv)     customary provisions in (A) Joint Venture agreements and other similar agreements applicable to Joint Ventures and (B) in partnership agreements, limited liability company agreements and other similar agreements that restrict the transfer of ownership interests in the relevant partnership, limited liability company or other person;

(v)     (A) any restrictions imposed by any agreement relating to secured Indebtedness permitted by this Agreement to the extent that such restrictions apply only to the property or assets securing such Indebtedness or to the persons (and their respective Subsidiaries) bound there-by, and (B) customary restrictions and conditions contained in any agreement relating to the disposition of any property permitted under <u>Section 7.05</u> pending the closing of such sale or disposition;

(vi)    customary provisions contained in leases, subleases, licenses or sublicenses of intellectual property and other similar agreements entered into in the ordinary course of business;

(vii)    customary provisions restricting subletting or assignment of any lease governing a leasehold interest;

(viii)    customary provisions restricting assignment of any agreement (or the assets subject thereto) entered into in the ordinary course of business;

(ix)    customary restrictions and conditions contained in any agreement relating to any Disposition permitted under <u>Section 7.05</u> pending the consummation of such Disposition;

(x)    customary restrictions and conditions contained in the document relating to any Lien, so long as (1) such Lien is permitted under <u>Section 7.02</u> and such restrictions or conditions relate only to the specific asset subject to such Lien, the proceeds and products thereof and other assets cross-collateralized in connection therewith, and (2) such restrictions and conditions are not created for the purpose of avoiding the restrictions imposed by this <u>Section 7.09</u>;

(xi)    customary net worth provisions contained in real property leases entered into by the Borrower or any Restricted Subsidiary, so long as the Borrower has determined in good faith that such net worth provisions would not reasonably be expected to impair the ability of the Borrower and its Restricted Subsidiaries to meet their ongoing obligations;

(xii)    any agreement in effect at the time such person becomes a Restricted Subsidiary, so long as such agreement was not entered into in contemplation of such person becoming a Restricted Subsidiary;

(xiii)    restrictions contained in any documents documenting permitted Indebtedness of any Subsidiary that is not a Subsidiary Guarantor and applicable solely to any such Subsidiary;

(xiv)    restrictions contained in any document renewing, extending, replacing or otherwise modifying the foregoing that are not more restrictive than provisions being modified;

(xv)    restrictions contained in any agreement governing any purchase money Indebtedness or Capital Lease Obligations otherwise permitted by this Agreement (in which case, any prohibition or limitation shall only be effective against the assets financed thereby and the proceeds thereof);

(xvi)    restrictions on cash or other deposits or net worth imposed by customers under contracts entered into in the ordinary course of business;

(xvii)    restrictions in respect of cash collateral so long as the Lien in respect of such cash collateral is permitted under this Agreement; and

(xviii)    any restrictions imposed by any Swap Agreement permitted under this Agreement.

**SECTION 7.10**       **[Reserved].**

**SECTION 7.11**       **Swap Agreements.**

Enter into any Swap Agreement, except any Swap Agreement entered into to hedge or mitigate interest rate, commodity or foreign exchange rate risks to which it is exposed in the conduct of its business or the management of its liabilities; provided, that such Swap Agreement shall not have been entered into for speculative purposes.

**SECTION 7.12**       **Changes in Fiscal Year.**

Permit the fiscal year of the Borrower to be anything other than the calendar year ending December 31 of each calendar year; provided that with the consent of the Administrative Agent (acting at the Direction of the Required Lenders) (not to be unreasonably withheld), the Borrower shall be entitled to change the end of its fiscal year; provided, further, that the Administrative Agent (acting at the Direction of the Required Lenders) and the Borrower are authorized to amend all relevant sections of the Loan Documents without the consent of any Lender to preserve the original intent thereof in light of such change in fiscal year.

**SECTION 7.13**       **Change in Lines of Business.**

From and after the Closing Date, the Borrower shall not, nor shall it permit any of its Subsidiaries to, engage in any material line of business other than (i) the businesses engaged in by the Borrower and its Subsidiaries on the Closing Date and similar or reasonably related, ancillary businesses thereof or reasonable extensions thereof and (ii) such other lines of business as may be consented to by Required Lenders.

## ARTICLE VIII.
## EVENTS OF DEFAULT AND REMEDIES

**SECTION 8.01**       **Events of Default.**

In case of the happening of any of the following events (each, an "**Event of Default**"):

(a)       any representation or warranty made or deemed made by Holdings, Borrower or any other Loan Party in any Loan Document, or in any certificate or other instrument required to be given by any Loan Party in writing furnished in connection with or pursuant to any Loan Document, shall prove to have been false in any material respect when so made or deemed made;

(b)       default shall be made in the payment of any principal of any Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or by acceleration thereof or otherwise;

(c)       default shall be made in the payment of any interest on any Loan or in the payment of any fee or any other amount (other than an amount referred to in paragraph (b) above) due under any Loan Document, when and as the same shall become due and payable, and such default shall continue unremedied for a period of five (5) Business Days;

(d)    default shall be made in the due observance or performance by Holdings, the Borrower or any of the Restricted Subsidiaries of any covenant, condition or agreement contained in Section 6.01(a) (solely with respect to the existence of the Borrower), Section 6.05(a) or in Article VII;

(e)    default shall be made in the due observance or performance by Holdings, the Borrower or any of the Restricted Subsidiaries of any covenant, condition or agreement contained in any Loan Document (other than those specified in paragraphs (a), (b), (c) or (d) above) and such default shall continue unremedied for a period of 30 days after the earliest to occur of knowledge thereof or written notice thereof from the Administrative Agent to the Borrower;

(f)    (i) any event or condition occurs that (A) results in any Material Indebtedness becoming due prior to its scheduled maturity or (B) enables or permits (with all applicable grace periods having expired) the holder or holders of any Material Indebtedness or any trustee or agent on its or their behalf to cause any such Indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity or (ii) Holdings, the Borrower or any of the Restricted Subsidiaries shall fail to pay the principal of any Material Indebtedness at the stated final maturity thereof; provided that this paragraph (f) shall not apply to (A) secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness if such sale or transfer is permitted hereunder or (B) any event, condition or failure that is remedied by Holdings, the Borrower or its applicable Restricted Subsidiary or waived by the holders of such Indebtedness prior to the acceleration of the Loans pursuant to this Section 8.01;

(g)    there shall have occurred a Change in Control;

(h)    an involuntary proceeding shall be commenced or an involuntary petition shall be filed in a court of competent jurisdiction seeking (i) relief in respect of Holdings, the Borrower or any Restricted Subsidiary (other than any Immaterial Subsidiary), or of a substantial part of the property or assets of Holdings, the Borrower or any such Restricted Subsidiary, under the Bankruptcy Code, or any other federal, state or foreign bankruptcy, insolvency, receivership or similar law, (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for Holdings, the Borrower or any such Restricted Subsidiary (other than any Immaterial Subsidiary) or for a substantial part of the property or assets of Holdings, the Borrower or any such Restricted Subsidiary or (iii) the winding up or liquidation of Holdings, the Borrower or any such Restricted Subsidiary (except, in the case of any such Restricted Subsidiary, in a transaction permitted by Section 7.05); and, in each case such proceeding or petition shall continue undismissed for 60 days or an order or decree approving or ordering any of the foregoing shall be entered;

(i)    Holdings, the Borrower or any Restricted Subsidiary (other than any Immaterial Subsidiary) shall (i) voluntarily commence any proceeding or file any petition seeking relief under the Bankruptcy Code, or any other federal, state or foreign bankruptcy, insolvency, receivership or similar law, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or the filing of any petition described in paragraph (h) above, (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for Holdings, the Borrower or any such Restricted Subsidiary or for a substantial part of

the property or assets of Holdings, the Borrower or any such Restricted Subsidiary, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors or (vi) become unable or admit in writing its inability or fail generally to pay its debts as they become due;

(j)      the failure by Holdings, the Borrower or any Restricted Subsidiary to pay one or more final judgments (after giving effect to any appeals) aggregating in excess of $10.0 million (to the extent not covered by third-party insurance as to which the insurer has been notified of such judgment and does not deny coverage), which judgments are not discharged or effectively waived or stayed for a period of sixty (60) consecutive days, or any action shall be legally taken by a judgment creditor to levy upon assets or properties of Holdings, the Borrower or any Restricted Subsidiary to enforce any such judgment;

(k)      (i) an ERISA Event and/or a Foreign Plan Event shall have occurred, (ii) a trustee shall be appointed by a United States district court to administer any Plan(s) or (iii) any Loan Party or any ERISA Affiliate shall have been notified by the sponsor of a Multiemployer Plan that it has incurred or will be assessed Withdrawal Liability to such Multiemployer Plan and such person does not have reasonable grounds for contesting such Withdrawal Liability or is not contesting such Withdrawal Liability in a timely and appropriate manner; and in each case in clauses (i) through (iii) above, such event or condition, together with all other such events or conditions, if any, would reasonably be expected to have a Material Adverse Effect; or

(l)      (i) any Loan Document shall for any reason cease to be, or shall be asserted in writing by Holdings, the Borrower or any Restricted Subsidiary not to be, a legal, valid and binding obligation of any party thereto, (ii) any security interest purported to be created by any Collateral Document and to extend to assets that are not immaterial to Holdings, the Borrower and the Restricted Subsidiaries on a consolidated basis (it being agreed that assets having an aggregate value not in excess of (a) $3.0 million, in the case of Term Priority Collateral and (y) $10.0 million, in the case of ABL Priority Collateral, are so immaterial) shall cease to be, or shall be asserted in writing by Holdings, the Borrower or any other Loan Party not to be (other than in a notice to the Administrative Agent to take requisite actions to perfect such Lien), a valid and perfected security interest (perfected as and having the priority required by this Agreement or the relevant Collateral Document and subject to such limitations and restrictions as are set forth herein and therein) in the securities, assets or properties covered thereby, except to the extent (x) any such loss of perfection or priority results from the failure of the Administrative Agent to maintain possession of certificates actually delivered to it representing securities pledged under the Security Agreement, (y) such loss is covered by a lender's title insurance policy as to which the insurer has been notified of such loss and does not deny coverage and the Administrative Agent (acting at the Direction of the Required Lenders) shall be reasonably satisfied with the credit of such insurer or (z) such loss of perfected security interest may be remedied by the filing of appropriate documentation without the loss of priority and the Loan Parties cooperate with the Administrative Agent to make such filings, (iii) the Guarantees pursuant to the Collateral Documents by Holdings, the Borrower or the Subsidiary Guarantors of any of the Obligations shall cease to be in full force and effect (other than in accordance with the terms thereof), or shall be asserted in writing by Holdings, the Borrower or any Subsidiary Guarantor not to be in effect or not to be legal, valid and binding obligations or (iv) the Obligations of the Borrower or the Guarantees pursuant to the Collateral Documents by Holdings, the Borrower or the Subsidiary Guarantors shall cease to constitute senior

indebtedness under the subordination provisions of any indenture or other instruments, agreements and documents evidencing or governing any Material Indebtedness or such subordination provisions shall be invalidated or otherwise cease (in each case so long as such indenture, instrument, agreement or document is then in effect), or shall be asserted in writing by Holdings, the Borrower or any Subsidiary Guarantor to be invalid or to cease to be legal, valid and binding obligations of the parties thereto, enforceable in accordance with their terms; or

(m)     Any Loan Party breaches or violates any material provision of the Chapter 11 Plan, the Chapter 11 Confirmation Order or any other material order or stipulation entered by the Bankruptcy Court in the Chapter 11 Cases as determined by a court order, or any material provision of the Chapter 11 Confirmation Order or such other material order or stipulation shall be vacated, reversed, stayed, modified or amended, without the consent of the Administrative Agent (acting at the Direction of the Required Lenders), if such vacatur, reversal, stay, modification or amendment could reasonably be expected to have a Material Adverse Effect.

**SECTION 8.02      Remedies Upon Event of Default. If any Event of Default occurs and is continuing, the Administrative Agent (acting at the direction of the Required Lenders) shall take any or all of the following actions:**

(a)     if such event is an Event of Default specified in Section 8.01(h) or (i)(i), (ii), (iii) or (iv) above with respect to the Borrower, the Commitments shall automatically terminate, the principal of the Loans then outstanding, together with accrued interest thereon and any unpaid accrued fees, any Prepayment Premium and all other liabilities of the Borrower accrued hereunder and under any other Loan Document, shall automatically become due and payable;

(b)     if such event is any other Event of Default, so long as any such Event of Default shall be continuing, either or both of the following actions may be taken: (i) with the consent of the Required Lenders, the Administrative Agent may, or upon the request of the Required Lenders, the Administrative Agent shall, upon notice to the Borrower terminate forthwith the Commitments, whereupon the Commitments shall immediately terminate; and (ii) with the consent of the Required Lenders, the Administrative Agent may, or upon the request of the Required Lenders, the Administrative Agent shall, upon notice to the Borrower, declare all or a portion of the Loans then outstanding to be forthwith due and payable in whole or in part, whereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and any unpaid accrued fees, any Prepayment Premium, and all other liabilities of the Borrower accrued hereunder and under any other Loan Document, shall become forthwith due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Borrower, anything contained herein or in any other Loan Document to the contrary notwithstanding; and

(c)     exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents and/or applicable Law.

**SECTION 8.03      Application of Funds.**

Subject to the terms of the Intercreditor Agreement, after the exercise of remedies provided for in Section 8.02 (or after the Loans have automatically become immediately due and payable), any

amounts received on account of the Obligations shall be applied by the Administrative Agent in the following order (to the fullest extent permitted by mandatory provisions of applicable Law):

(a)    *First*, to payment of that portion of the Obligations constituting fees, indemnities, expenses, losses and other amounts (other than principal and interest, but including Attorney Costs payable under Section 10.04 and amounts payable under Article III) payable to the Administrative Agent in its capacity as such;

(b)    *Second*, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal, interest and the prepayment premium) payable to the Lenders (including Attorney Costs payable under Section 10.04 and amounts payable under Article III), ratably among them in proportion to the amounts described in this clause *Second* payable to them;

(c)    *Third*, to payment of that portion of the Obligations constituting accrued and unpaid interest of the Loans, and any fees and premiums (including the Prepayment Premium) (with the Prepayment Premium being payable prior to any interest payments under this clause Third), ratably among the Secured Parties in proportion to the respective amounts described in this clause Third payable to them;

(d)    *Fourth*, to payment of that portion of the Obligations constituting unpaid principal of the Loans, ratably among the Secured Parties in proportion to the respective amounts described in this Fourth held by them;

(e)    *Fifth*, to the payment of all other Obligations (including accrued and unpaid interest) of the Borrower that are due and payable to the Administrative Agent and the other Secured Parties on such date, ratably based upon the respective aggregate amounts of all such Obligations owing to the Administrative Agent and the other Secured Parties on such date; and

(f)    *Last*, the balance, if any, after all of the Obligations have been paid in full, to the Borrower or as otherwise required by Law.

**SECTION 8.04    Prepayment Premium.**

In view of the impracticability and extreme difficulty of ascertaining actual damages and by mutual agreement of the parties as to a reasonable calculation of the Lenders' lost profits as a result thereof, any Prepayment Premium that is due and payable upon an optional or mandatory prepayment of the Loans pursuant to Section 2.05(a) or (b)(iii), respectively, or upon an acceleration pursuant to Section 8.02, shall in each case be presumed to be the liquidated damages sustained by the Lenders as the result of payment or acceleration, as applicable, prior to the 30th month anniversary of the Closing Date, and the Borrower and the other Loan Parties agree that the Prepayment Premium is reasonable under the circumstances currently existing. The Prepayment Premium shall also be payable in the event the Obligations (and/or this Agreement) are satisfied or released by foreclosure (whether by power of judicial proceeding), deed in lieu of foreclosure or by any other similar means. THE BORROWER AND EACH LOAN PARTY EXPRESSLY WAIVES (TO THE FULLEST EXTENT IT MAY LAWFULLY DO SO) THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE OR LAW THAT PROHIBITS OR MAY PROHIBIT THE COLLECTION OF THE FOREGOING PREPAYMENT PREMIUM IN

CONNECTION WITH ANY ACCELERATION OF THE LOANS. The Borrower and each Loan Party expressly agrees (to the fullest extent that it may lawfully do so) that: (A) the Prepayment Premium is reasonable and is the product of an arm's-length transaction between sophisticated business people, ably represented by counsel; (B) the Prepayment Premium shall be payable notwithstanding the then prevailing market rates at the time payment is made; (C) there has been a course of conduct between the Lenders and the Borrower and other Loan Parties giving specific consideration in this transaction for such agreement to pay the Prepayment Premium; and (D) the Borrower and each Loan Party shall each be estopped hereafter from claiming differently than as agreed to in this Section 8.04. The Borrower and each Loan Party expressly acknowledges that its agreement to pay the Prepayment Premium to the Lenders as herein described is a material inducement to the Lenders to provide the Commitments and make the Loans.

## ARTICLE IX.
## ADMINISTRATIVE AGENT AND OTHER AGENTS

**SECTION 9.01        Appointment and Authorization of Agents.**

(a)        Each of the Lenders hereby irrevocably appoints Alter Domus as the Administrative Agent hereunder and under the other Loan Documents and authorizes Alter Domus to act as the Administrative Agent in accordance with the terms hereof and of the other Loan Documents (including the Collateral Documents) and to take such action on its behalf under the provisions of this Agreement and each other Loan Document to which the Administrative Agent is a party and to exercise such powers and perform such duties as are expressly delegated to it by the terms of this Agreement or any other Loan Document to which the Administrative Agent is a party, together with such powers as are reasonably incidental thereto. Notwithstanding any provision to the contrary contained elsewhere herein or in any other Loan Document, the Administrative Agent shall have no duties or responsibilities except those expressly set forth herein or in the other Loan Documents to which the Administrative Agent is a party, nor shall the Administrative Agent have or be deemed to have any fiduciary relationship with any Person, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against the Administrative Agent. Without limiting the generality of the foregoing sentence, the use of the term "agent" herein and in the other Loan Documents with reference to any Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable Law. Instead, such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties.Each of the Secured Parties hereby irrevocably appoints and authorizes the Administrative Agent to act as the agent of (and to hold any security interest created by the Collateral Documents for and on behalf of ) such Secured Party for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by the Loan Parties to secure any of the Obligations, together with such powers as are reasonably incidental thereto. In this connection, the Administrative Agent (and any co-agents, sub-agents and attorneys-in-fact appointed by the Administrative Agent pursuant to Section 9.02 for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral Documents, or for exercising any rights and remedies thereunder at the direction of the Administrative Agent), shall be entitled to the benefits of all provisions of this Article IX (including Section 9.07, as though such co-agents, sub-agents and attorneys-in-fact were the Administrative Agent under the Loan Documents) as if set forth in full herein with respect thereto.

(b)        Each Lender hereby (i) acknowledges that it has received a copy of the Intercreditor Agreement, (ii) agrees that it will be bound by and will take no actions contrary to the provisions of the Intercreditor Agreement to the extent then in effect, and (iii) authorizes and instructs the Administrative Agent to enter into the Intercreditor Agreement as the [Term Credit Agreement Authorized Representative] and the [Term Credit Agreement Collateral Agent] and on behalf of such Lender.

(c)        Except as provided in <u>Section 9.09</u> andSection <u>9.11</u>, the provisions of this Article IX are solely for the benefit of the Administrative Agent and the Lenders, and neither the Borrower nor any other Loan Party shall have rights as a third-party beneficiary of any of such provisions.

**SECTION 9.02        Delegation of Duties.**

The Administrative Agent may execute any of its duties under this Agreement or any other Loan Document (including for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral Documents or of exercising any rights and remedies thereunder) by or through agents, employees or attorneys-in-fact and shall be entitled to advice of counsel and other consultants or experts concerning all matters pertaining to such duties. The Administrative Agent shall not be responsible for the negligence or misconduct of any agent or sub-agent or attorney-in-fact that it selects in the absence of gross negligence or willful misconduct (as determined in the final non-appealable judgment of a court of competent jurisdiction).

**SECTION 9.03        Liability of Agents.**

No Agent-Related Person shall (a) be liable for any action taken or omitted to be taken by any of them under or in connection with this Agreement or any other Loan Document or the transactions contemplated hereby (i) with the consent or at the request or direction of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith shall be necessary, under the circumstances) or (ii) in the absence of its own gross negligence or willful misconduct, as determined by the final non-appealable judgment of a court of competent jurisdiction or (b) be responsible in any manner to any Lender or Participant for any recital, statement, representation or warranty made by any Loan Party or any officer thereof, contained herein or in any other Loan Document, or in any certificate, report, statement or other document referred to or provided for in, or received by the Administrative Agent under or in connection with, this Agreement or any other Loan Document or for the financial condition or business affairs of any Loan Party or any other Person liable for the payment of any Obligations, or the execution, validity, effectiveness, genuineness, enforceability, collectability or sufficiency of this Agreement or any other Loan Document, or the perfection or priority of any Lien or security interest created or purported to be created under the Collateral Documents, or for any failure of any Loan Party or any other party to any Loan Document to perform its obligations hereunder or thereunder. No Agent-Related Person shall be under any obligation to any Lender or Participant to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the properties, books or records of any Loan Party or any Affiliate thereof. Anything contained herein to the contrary notwithstanding, the Administrative Agent shall not have any liability to any Lender or any other Secured Party arising from confirmations of the amount of outstanding Loans or the component amounts thereof. No Agent-Related Person shall

have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents to which the Administrative Agent is a party that the Administrative Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents); *provided that* the Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Administrative Agent to liability or that is contrary to any Loan Document or applicable law.

The Administrative Agent shall not be responsible or have any liability for, or have any duty to ascertain, inquire into, monitor or enforce, compliance with the provisions hereof relating to Disqualified Lenders. Without limiting the generality of the foregoing, the Administrative Agent shall not (x) be obligated to ascertain, monitor or inquire as to whether any Lender or participant or prospective Lender or participant is a Disqualified Lender or (y) have any liability with respect to or arising out of any assignment or participation of Loans, or disclosure of confidential information, to any Disqualified Lender.

Each Lender authorizes and directs the Administrative Agent to enter into the Loan Documents to which it is a party on the Closing Date on behalf of and for the benefit of the Lenders and the other Secured Parties. Whether or not so expressly stated therein, in entering into, or taking (or forbearing from taking) any action under or pursuant to, the Loan Documents, the Administrative Agent shall have all of the rights, immunities, indemnities and other protections granted to it under this Agreement (in addition to those that may be granted to it under the terms of such other agreement or agreements).

The Administrative Agent shall never be required to use, risk or advance its own funds or otherwise incur any liability, financial or otherwise, in the performance of any of its duties or the exercise of any of its rights and powers under the Loan Documents. In no event shall the Administrative Agent be responsible or liable for delays or failures in performance resulting from acts beyond its control. Such acts shall include, but not be limited to, acts of God, strikes, lockouts, riots, acts of war, epidemics, governmental regulations superimposed after the fact, fire, communication line failures, computer viruses, power failures, earthquakes, terrorist attacks or other disasters. Delivery of reports, documents and other information to the Administrative Agent is for informational purposes only and the Administrative Agent's receipt of the foregoing shall not constitute constructive knowledge of any event or circumstance or any information contained therein or determinable from information contained therein. The Administrative Agent shall have no responsibility for interest or income on any funds held by it under the Loan Documents and any funds so held shall be held uninvested pending distribution thereof.

Not less than two (2) Business Days (or such shorter period as may be agreed to by the Administrative Agent) prior to any payment, distribution or transfer of funds by the Administrative Agent to any Person under the Loan Documents, the payee shall provide to the Administrative Agent such documentation and information as may be requested by the Administrative Agent (unless such Person has previously provided the documentation or information, and so long as such documentation or information remain accurate and true). The Administrative Agent shall have no duty, obligation or liability to make any payment to any Person unless it has timely

received such documentation and information with respect to such Person, which documentation and information shall be reasonably satisfactory to the Administrative Agent.

**SECTION 9.04    Reliance by Agents.**

Each Agent shall be entitled to rely, and shall be fully protected in relying, upon any writing, communication, signature, resolution, representation, notice, consent, certificate, affidavit, letter, telegram, facsimile, telex or telephone message, electronic mail message, statement or other document or conversation believed by it to be genuine and to have been signed, sent or made by the proper Person or Persons. The Administrative Agent may consult with legal counsel (who may be counsel for the Loan Parties), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts. Each Agent shall be fully justified in failing or refusing to take any action under any Loan Document unless it shall first receive such advice, direction or concurrence of the Required Lenders as it deems appropriate, and if it so requests, it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action. Each Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement or any other Loan Document in accordance with a request, direction or consent of the Required Lenders (or such greater number of Lenders as may be expressly required hereby in any instance) and such request, direction or consent and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders.

Notwithstanding anything to the contrary contained herein, in any other Loan Document or elsewhere, each Lender and each Loan Party hereby acknowledges and agrees that (i) in the case of any Agent Required Approval Item or with respect to any action hereunder or under any other Loan Document to be taken (or not taken) by the Administrative Agent at the direction of the Required Lenders or acting at the Direction of the Required Lenders, a written direction or instruction from any of the Ad Hoc Group Advisors (or any other Lender Advisor selected by the Required Lenders and designated in writing to the Administrative Agent) on behalf of the Required Lenders, which may be in the form of an email to the Administrative Agent, may be conclusively relied upon by the Administrative Agent as being a written direction or instruction from the Required Lenders (to the same extent as if the Required Lenders executed and delivered to the Administrative Agent a writing signed by the Required Lenders and containing such direction or instruction), it being understood and agreed by the parties hereto that (a) the Administrative Agent may conclusively rely on any such written direction or instruction from such Ad Hoc Group Advisor or designated Lender Advisor as evidence that the Required Lenders have provided such direction or instruction and (b) the Administrative Agent shall (x) not be liable for any action taken or omitted to be taken by it in accordance with such written direction or instruction from any of the Ad Hoc Group Advisors (or any other Lender Advisor selected by the Required Lenders and designated in writing to the Administrative Agent) on behalf of the Required Lenders and (y) have no duty, responsibility or obligation to inquire or ascertain whether the Required Lenders actually authorized or directed such Ad Hoc Group Advisor or designated Lender Advisor to provide such direction or instruction.  Each Lender and each Loan Party hereby acknowledges and agrees that (i) in the case of any Agent Required Approval Item, the Administrative Agent shall be entitled to withhold its consent, agreement or approval to, its determination or selection of, or its acceptance or satisfaction with, or (if applicable) its signature to, such Agent Required Approval Item unless

and until the Administrative Agent has received a Direction of the Required Lenders and (ii) neither the Administrative Agent nor any of its Agent-Related Persons shall have any liability to any Lender, any Loan Party or other Person as a result of the Administrative Agent withholding its consent or approval to, its selection of, or its acceptance or satisfaction with, or (if applicable) its signature to, any Agent Required Approval Item in the absence of a Direction of the Required Lenders in respect thereof.  The provisions of this paragraph are in addition to, and not in limitation of, the other exculpatory provisions set forth herein.

### SECTION 9.05    Notice of Default.

The Administrative Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default, unless the Administrative Agent shall have received written notice from a Lender or the Borrower referring to this Agreement, describing such Default and stating that such notice is a "notice of default". The Administrative Agent will notify the Lenders of its receipt of any such notice. The Administrative Agent shall take such action with respect to any Event of Default as may be directed by the Required Lenders in accordance with Article VIII.

### SECTION 9.06    Credit Decision; Disclosure of Information by Agents.

Each Lender acknowledges that no Agent-Related Person has made any representation or warranty to it, and that no act by any Agent hereafter taken, including any consent to and acceptance of any assignment or review of the affairs of any Loan Party or any Affiliate thereof, shall be deemed to constitute any representation or warranty by any Agent-Related Person to any Lender as to any matter, including whether Agent-Related Persons have disclosed material information in their possession. Each Lender represents to each Agent that it has, independently and without reliance upon any Agent-Related Person and based on such documents and information as it has deemed appropriate, made its own appraisal of, and investigation into, the business, prospects, operations, property, financial and other condition and creditworthiness of the Loan Parties and their Subsidiaries, and all applicable bank or other regulatory Laws relating to the transactions contemplated hereby, and made its own decision to enter into this Agreement and to extend credit to the Borrower hereunder. Each Lender also represents that it will, independently and without reliance upon any Agent-Related Person and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigations as it deems necessary to inform itself as to the business, prospects, operations, property, financial and other condition and creditworthiness of the Loan Parties. Except for notices, reports and other documents expressly required to be furnished to the Lenders by any Agent herein, such Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of any of the Loan Parties or any of their Affiliates which may come into the possession of any Agent-Related Person.

### SECTION 9.07    Indemnification of Agents.

The Lenders shall indemnify upon demand each Agent-Related Person (to the extent not reimbursed by or on behalf of any Loan Party and without limiting the obligation of any Loan

Party to do so), ratably according to their respective Pro Rata Shares (determined on the date on which indemnification is sought under this <u>Section 9.07</u> (or, if indemnification is sought after the date on which the Loans are paid in full and the Commitments are terminated, in accordance with their respective Pro Rata Shares immediately prior to such date), and hold harmless each Agent-Related Person from and against any and all Indemnified Liabilities incurred by it; provided that no Lender shall be liable for the payment to any Agent-Related Person of any portion of such Indemnified Liabilities resulting from such Agent-Related Person's own gross negligence or willful misconduct, as determined by the final non-appealable judgment of a court of competent jurisdiction; provided further, that no action taken in accordance with the directions of the Required Lenders (or such other number or percentage of the Lenders as shall be required by the Loan Documents) shall be deemed to constitute gross negligence or willful misconduct for purposes of this <u>Section 9.07</u>. In the case of any investigation, litigation or proceeding giving rise to any Indemnified Liabilities, this <u>Section 9.07</u> applies whether any such investigation, litigation or proceeding is brought by any Lender or any other Person. Without limitation of the foregoing, each Lender shall reimburse each Agent-Related Person upon demand ratably according to their respective Pro Rata Shares (determined on the date on which reimbursement payment is sought under this <u>Section 9.07</u> (or, if reimbursement payment is sought after the date on which the Loans are paid in full and the Commitments are terminated, in accordance with their respective Pro Rata Shares immediately prior to such date) for any costs or out-of-pocket expenses (including Attorney Costs) incurred by such Agent-Related Person, as the case may be, in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, this Agreement, any other Loan Document, or any document contemplated by or referred to herein, to the extent that such Agent-Related Person, as the case may be, is not reimbursed for such expenses by or on behalf of the Loan Parties. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to such Lender from any source against any amount due to the Agent under this <u>Section 9.07</u>.  The undertaking in this <u>Section 9.07</u> shall survive termination of the Aggregate Commitments, the payment of all other Obligations and the resignation or removal of the Administrative Agent. If any indemnity furnished to any Agent for any purpose shall, in the opinion of such Agent, be insufficient or become impaired, such Agent may call for additional indemnity and cease, or not commence, to do the acts indemnified against until such additional indemnity is furnished.

> **SECTION 9.08**        **Agents in Their Individual Capacities.**

Alter Domus and its Affiliates may make loans to, issue letters of credit for the account of, accept deposits from, acquire Equity Interests from, and generally engage in any kind of banking, trust, financial advisory, underwriting or other business with the Borrower and its respective Affiliates as though Alter Domus were not the Administrative Agent hereunder and without notice to or consent of the Lenders. The Lenders acknowledge that, pursuant to such activities, Alter Domus or its Affiliates may receive information regarding the Borrower or its Affiliates (including information that may be subject to confidentiality obligations in favor of the Borrower or such Affiliate) and acknowledge that the Administrative Agent shall be under no obligation to provide such information to them. With respect to its Loans (if any), Alter Domus and its Affiliates shall have the same rights and powers under this Agreement as any other Lender and may exercise such

rights and powers as though it were not the Administrative Agent, and the terms "Lender" and "Lenders" include, if applicable, Alter Domus in its individual capacity. Knowledge of or notices or other documents delivered to Alter Domus in any capacity shall not constitute knowledge of or delivery to Alter Domus in any other capacity under the Loan Documents or to any affiliate or other division of Alter Domus. Any successor to Alter Domus as the Administrative Agent shall also have the rights attributed to Alter Domus under this Section 9.08.

**SECTION 9.09    Successor Agents.**

The Administrative Agent may resign as the Administrative Agent upon thirty (30) days' notice to the Lenders and the Borrower. If the Administrative Agent resigns under this Agreement, the Required Lenders shall appoint a successor agent for the Lenders. If no successor agent is appointed prior to the effective date of the resignation of the Administrative Agent, the Administrative Agent may (but shall not be obligated to) appoint, after consulting with the Required Lenders and the Borrower, a successor agent from among the Lenders. Upon the acceptance of its appointment as successor agent hereunder, the Person acting as such successor agent shall succeed to all the rights, powers and duties of the retiring Administrative Agent and the term "**Administrative Agent**" shall mean such successor Administrative Agent and/or Supplemental Agent, as the case may be, and the retiring Administrative Agent's appointment, powers and duties as the Administrative Agent shall be terminated (if not earlier terminated as described in this Section 9.09). After the retiring Administrative Agent's resignation hereunder as the Administrative Agent, the provisions of this Article IX and Sections 10.04 and Section 10.05 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was the Administrative Agent under this Agreement. Notwithstanding any other provision of this Agreement, if no successor agent has accepted appointment as the Administrative Agent by the date which is thirty (30) days following the retiring Administrative Agent's notice of resignation, the retiring Administrative Agent's resignation shall nevertheless thereupon become effective, the retiring Administrative Agent's appointment, powers and duties shall be terminated and discharged and the Lenders shall perform all of the duties of the Administrative Agent hereunder until such time, if any, as the Required Lenders appoint a successor agent as provided for above. Upon the acceptance of any appointment as the Administrative Agent hereunder by a successor and upon the execution and filing or recording of such financing statements, or amendments thereto, and such other instruments or notices, as may be necessary or desirable, or as the Required Lenders may request, in order to (a) continue the perfection of the Liens granted or purported to be granted by the Collateral Documents or (b) otherwise ensure that Section 6.09 and Section 6.15Section 6.15 is satisfied, the successor Administrative Agent shall thereupon succeed to and become vested with all the rights, powers, discretion, privileges, and duties of the retiring Administrative Agent (other than any rights to indemnity or other payments owed to the retiring Administrative Agent), and the retiring Administrative Agent shall be discharged from its duties and obligations under the Loan Documents (if not earlier terminated as described in this Section 9.09). Any Person into which the Administrative Agent may be merged or converted or with which it may be consolidated, or any Person resulting from any merger, conversion or consolidation to which the Administrative Agent shall be a party, or any Person succeeding to the business of the Administrative Agent shall be the successor of the Administrative Agent hereunder without the execution or filing of any paper with any party hereto or any further act on the part of any of the parties hereto, except where an instrument of transfer or assignment is required by law to effect such succession, anything herein to the contrary notwithstanding.

**SECTION 9.10        Administrative Agent May File Proofs of Claim.**

In case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceeding relative to any Loan Party,

(a)        the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower or the Administrative Agent) shall be (to the fullest extent permitted by mandatory provisions of applicable Law) entitled and empowered, by intervention in such proceeding or otherwise, (i) acting at the Direction of the Required Lenders, to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders, the Agents (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and the Administrative Agent under the Loan Documents) allowed in such judicial proceeding, and (ii) to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same; and

(b)        any custodian, curator, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent, and in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Agents and their respective agents and counsel, and any other amounts due the Administrative Agent under the Loan Documents.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

**SECTION 9.11        Collateral and Guaranty Matters.**

The Lenders irrevocably agree:

(a)        that any Lien on any property granted to or held by the Administrative Agent under any Loan Document shall be automatically released (i) upon termination of the Aggregate Commitments and payment in full of all Obligations (other than contingent indemnification obligations not yet accrued and payable), (ii) at the time the property subject to such Lien is Disposed of in connection with any Disposition permitted hereunder or under any other Loan Document to any Person other than a Person required to grant a Lien to the Administrative Agent under the Loan Documents, (iii) subject to <u>Section 10.01</u>, if the release of such Lien is approved, authorized or ratified in writing by the Required Lenders or (iv) if the property subject to such

Lien is owned by a Guarantor, upon release of such Guarantor from its obligations under its Guaranty pursuant to clause (c) below;

(b)     to release or subordinate any Lien on any property granted to or held by the Administrative Agent under any Loan Document to the holder of any Lien on such property that is permitted by **Error! Reference source not found.**]; and

(c)     that any Subsidiary Guarantor shall be automatically released from its obligations under the Guaranty if such Person ceases to be a Subsidiary or becomes an Excluded Subsidiary as a result of a transaction or designation permitted hereunder; *provided that* no such release shall occur if such Guarantor continues to be a guarantor in respect of the ABL Obligations.

Upon request by the Administrative Agent at any time, the Required Lenders will confirm in writing the Administrative Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations under the Guaranty pursuant to this Section 9.11. In each case as specified in this Section 9.11, the Administrative Agent will promptly (and each Lender irrevocably authorizes the Administrative Agent to), at the Borrower's expense, execute and deliver to the applicable Loan Party such documents as the Borrower may reasonably request to evidence the release or subordination of such item of Collateral from the assignment and security interest granted under the Collateral Documents, or to evidence the release of such Guarantor from its obligations under the Guaranty, in each case in accordance with the terms of the Loan Documents and this Section 9.11; provided, that if requested by the Administrative Agent, the Borrower shall deliver to the Administrative Agent a certificate of a Responsible Officer of the Borrower certifying to the Administrative Agent that the transaction giving rise to such release or subordination is permitted under the Loan Documents (and the Secured Parties hereby authorize and direct the Administrative Agent to conclusively rely on such certificate in performing its obligations under this paragraph).

The Administrative Agent shall not have any obligation whatsoever to assure that the Collateral exists or is owned (whether in fee or by leasehold) by the Person purporting to own it or is cared for, protected, or insured or has been encumbered or that the Liens granted to the Administrative Agent pursuant to the Loan Documents have been properly or sufficiently or lawfully created, perfected, protected, or enforced, or are entitled to any particular priority. Notwithstanding anything contained in the Loan Documents or otherwise to the contrary, the Administrative Agent shall not have any duty to (i) file or prepare any financing or continuation statements or record any documents or instruments in any public office for purposes of creating, perfecting or maintaining any Lien or security interest created under the Loan Documents; (ii) take any necessary steps to preserve rights against any parties with respect to any Collateral; or (iii) take any action to protect against any diminution in value of the Collateral. The Administrative Agent's sole duty with respect to the custody, safekeeping and physical preservation of the Collateral in its possession, under the UCC or otherwise, shall be to deal with it in the same manner as the Administrative Agent deals with similar property for the account of other customers in similar transactions. The Administrative Agent shall be accountable only for amounts that it actually receives as a result of the exercise of its rights and powers.

In the event that the Administrative Agent is required to acquire title to an asset for any reason, or take any managerial action of any kind in regard thereto, in order to carry out any

obligation for the benefit of another, which in the Administrative Agent's sole determination may cause the Administrative Agent to be considered an "owner or operator" under any environmental laws or otherwise cause the Administrative Agent to incur, or be exposed to, any environmental liability or any liability under any applicable law, the Administrative Agent reserves the right, instead of taking such action, either to resign as Administrative Agent or to arrange for the transfer of the title or control of the asset to a court appointed receiver (at the expense of the Borrower).

**SECTION 9.12    Appointment of Supplemental Agents.**

(a)    It is the purpose of this Agreement and the other Loan Documents that there shall be no violation of any Law of any jurisdiction denying or restricting the right of banking corporations or associations to transact business as agent or trustee in such jurisdiction. It is recognized that in case of litigation under this Agreement or any of the other Loan Documents, and in particular in case of the enforcement of any of the Loan Documents, or in case the Administrative Agent deems that by reason of any present or future Law of any jurisdiction it may not exercise any of the rights, powers or remedies granted herein or in any of the other Loan Documents or take any other action which may be desirable or necessary in connection therewith, the Administrative Agent is hereby authorized to appoint an additional individual or institution selected by the Administrative Agent in its sole determination as a separate trustee, co-trustee, administrative agent, collateral agent, administrative sub-agent or administrative co-agent (any such additional individual or institution being referred to herein individually as a "**Supplemental Agent**" and collectively as "**Supplemental Agents**").

(b)    In the event that the Administrative Agent appoints a Supplemental Agent with respect to any Collateral, (i) each and every right, power, privilege or duty expressed or intended by this Agreement or any of the other Loan Documents to be exercised by or vested in or conveyed to the Administrative Agent with respect to such Collateral shall be exercisable by and vest in such Supplemental Agent to the extent, and only to the extent, necessary to enable such Supplemental Agent to exercise such rights, powers and privileges with respect to such Collateral and to perform such duties with respect to such Collateral, and every covenant and obligation contained in the Loan Documents and necessary to the exercise or performance thereof by such Supplemental Agent shall run to and be enforceable by either the Administrative Agent or such Supplemental Agent, and (ii) the provisions of this Article IX and of Section 10.04 and Section Section 10.05 that refer to the Administrative Agent shall inure to the benefit of such Supplemental Agent and all references therein to the Administrative Agent shall be deemed to be references to the Administrative Agent and/or such Supplemental Agent, as the context may require.

(c)    Should any instrument in writing from any Loan Party be required by any Supplemental Agent so appointed by the Administrative Agent for more fully and certainly vesting in and confirming to him or it such rights, powers, privileges and duties, such Loan Party shall execute, acknowledge and deliver any and all such instruments promptly upon request by the Administrative Agent. In case any Supplemental Agent, or a successor thereto, shall die, become incapable of acting, resign or be removed, all the rights, powers, privileges and duties of such Supplemental Agent, to the extent permitted by Law, shall vest in and be exercised by the Administrative Agent until the appointment of a new Supplemental Agent.

**SECTION 9.13**        **Withholding Tax Indemnity.**

To the extent required by any applicable law, the Administrative Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding Tax. If the Internal Revenue Service or any other authority of the United States or other jurisdiction asserts a claim that the Administrative Agent did not properly withhold Tax from amounts paid to or for the account of any Lender for any reason (including, without limitation, because the appropriate form was not delivered or not properly executed, or because such Lender failed to notify the Administrative Agent of a change in circumstance that rendered the exemption from, or reduction of, withholding Tax ineffective), or if the Administrative Agent reasonably determines that a payment was made to a Lender pursuant to this Agreement without deduction of applicable withholding tax from such payment or if any Taxes result from any Lender's failure to comply with the provisions of Section 10.07(f) relating to the maintenance of a Participant Register, such Lender shall, within 10 days after written demand therefor, indemnify and hold harmless the Administrative Agent (to the extent that the Administrative Agent has not already been reimbursed by the Borrower pursuant to Section 3.01 and Section 3.02 and without limiting or expanding the obligation of the Borrower to do so) for all amounts paid, directly or indirectly, by the Administrative Agent as Taxes or otherwise, together with all expenses incurred, including legal expenses and any other out-of-pocket expenses, whether or not such Tax was correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due the Administrative Agent under this Section 9.13. The agreements in this Section 9.13 shall survive the resignation and/or replacement of the Administrative Agent, any assignment of rights by, or the replacement of, a Lender and the repayment, satisfaction or discharge of all other Obligations.

## ARTICLE X.
## MISCELLANEOUS

**SECTION 10.01**        **Amendments, Etc.**

Except as otherwise set forth in this Agreement, no amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by any Loan Party therefrom, shall be effective unless in writing signed by the Required Lenders, or by the Administrative Agent with the consent of the Required Lenders, and such Loan Party and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; *provided further* that no such amendment, waiver or consent shall:

(a)        postpone any date scheduled for, or reduce or forgive the amount of, any payment of principal or interest without the written consent of each Lender holding the applicable Obligation (it being understood that the waiver of (or amendment to the terms of) any mandatory prepayment of the Loans shall not constitute a postponement of any date scheduled for the payment of principal or interest and it being understood that any change to the definitions of "Consolidated Senior Secured Net Leverage Ratio", "Fixed Charge Coverage Ratio" or in the component definitions thereof shall not constitute a reduction or forgiveness in any rate of interest);

(b)     reduce or forgive the principal of, or the rate of interest specified herein on, any Loan, or any fees or other amounts payable hereunder or under any other Loan Document (or change the timing of payments of such fees or other amounts) without the written consent of each Lender holding such Loan or to whom such fee or other amount is owed (it being understood that any change to the definition of "Consolidated Senior Secured Net Leverage Ratio", "Fixed Charge Coverage Ratio" or in the component definitions thereof shall not constitute a reduction or forgiveness in any rate of interest); *provided that* only the consent of the Required Lenders shall be necessary to amend the definition of "Default Rate" or to waive any obligation of the Borrower to pay interest at the Default Rate;

(c)     change any provision of <u>Section 8.03</u> or <u>Section 10.01</u> or the definition of "Required Lenders" or any other provision specifying the number of Lenders or portion of the Loans or Commitments required to take any action under the Loan Documents, without the written consent of each Lender directly affected thereby;

(d)     other than in connection with a transaction permitted under <u>Section 7.04</u> or <u>Section 7.05</u> release or subordinate the Liens on all or substantially all of the Collateral in any transaction or series of related transactions, without the written consent of each Lender;

(e)     other than in connection with a transaction permitted under <u>Section 7.04</u> or <u>Section 7.05</u> release or subordinate all or substantially all of the aggregate value of the Guaranty, without the written consent of each Lender;

(f)     waive any condition set forth in Section <u>4.01</u> without the consent of the Required Lenders; or

(g)     change the definition of "Pro Rata Share", any provision of Section 2.02, Section 2.05(b)(vi), or <u>Section 2.09</u> hereof or <u>Section 4.02</u> of the Security Agreement or any other provision of any Loan Document in a manner that would alter the pro rata sharing of payments required thereby without the written consent of each Lender affected thereby;

and *provided further,* that (x) no amendment, waiver or consent shall, unless in writing and signed by the Administrative Agent in addition to the Lenders required above, affect the rights or duties of, or any fees or other amounts payable to, the Administrative Agent under this Agreement or any other Loan Document and (y) any amendment or waiver to the Fee Letter, or waiver of any rights or privileges thereunder, shall only require the consent of the Borrower and the Administrative Agent.. Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder (and any amendment, waiver or consent which by its terms requires the consent of all Lenders or each affected Lender may be effected with the consent of the applicable Lenders other than Defaulting Lenders), except that (x) the Commitment of any Defaulting Lender may not be increased or extended, nor may any date scheduled for the payment of principal under <u>Section 10.07</u> be extended or delayed with respect to payment to such Defaulting Lender, in each case without the consent of such Lender and (y) any waiver, amendment or modification requiring the consent of all Lenders or each affected Lender that by its terms materially and adversely affects any Defaulting Lender (as if such Lender were not a Defaulting Lender) to a greater extent than other affected Lenders shall require the consent of such Defaulting Lender.

Notwithstanding anything to the contrary contained in this Section 10.01, guarantees, collateral Collateral Documents and related documents executed by Subsidiaries in connection with this Agreement may be in a form reasonably determined by the Administrative Agent (acting at the Direction of the Required Lenders).

Holdings and its Subsidiaries will not, directly or indirectly, pay any remuneration or other thing of value, whether by way of additional interest, fee or otherwise, to any Lender (in its capacity as a Lender hereunder) as consideration for the consent of such Lender to any amendment, waiver, consent to departure, forbearance or other modification of any Loan Document, unless such remuneration or value is offered to all Lenders and concurrently paid, on the same terms, on a ratable basis to all Lenders that timely provide their consent.

**SECTION 10.02    Notices and Other Communications; Facsimile Copies.**

(a)    *General.* Unless otherwise expressly provided herein, all notices and other communications provided for hereunder or under any other Loan Document shall be in writing (including by electronic mail transmission). All such written notices shall be mailed or delivered to the applicable address or electronic mail address, as follows:

(i)    if to the Borrower (or any other Loan Party) or the Administrative Agent, to the address or electronic mail address specified for such Person on Schedule 10.02 or to such other address, facsimile number or electronic mail address as shall be designated by such party in a notice to the other parties; and

(ii)    if to any Lender, to the address, facsimile number or electronic mail address specified in its Administrative Questionnaire or to such other address, facsimile number or electronic mail address as shall be designated by such party in a notice to the Borrower and the Administrative Agent.

(b)    All such notices and other communications shall be deemed to be given or made upon the earlier to occur of (i) actual receipt by the relevant party hereto and (ii) (A) if delivered by hand or by courier, when signed for by or on behalf of the relevant party hereto; (B) if delivered by mail, four (4) Business Days after deposit in the mails, postage prepaid; and (C) if delivered by electronic mail, when delivered; *provided that* notices and other communications to the Administrative Agent pursuant to Article II shall not be effective until actually received by such Person. In no event shall a voice mail message be effective as a notice, communication or confirmation hereunder.

(c)    The Administrative Agent may, but shall not be obligated to, make the Communications (as defined below) available to the Lenders by posting the Communications on the Platform. The Platform is provided "as is" and "as available." The Agent-Related Persons do not warrant the adequacy of the Platform and expressly disclaim liability for errors or omissions in the Communications. No warranty of any kind, express, implied or statutory, including any warranty of merchantability, fitness for a particular purpose, non-infringement of third-party rights or freedom from viruses or other code defects, is made by any Agent-Related Person in connection with the Communications or the Platform. In no event shall the Agent-Related Person have any liability to the Borrower, any Lender or any other Person or entity for damages of any kind,

including direct or indirect, special, incidental or consequential damages, losses or expenses (whether in tort, contract or otherwise) arising out of the Borrower's or the Administrative Agent's transmission of communications through the Platform. "**Communications**" as used in this paragraph means, collectively, any notice, demand, communication, information, document or other material provided by or on behalf of the Borrower pursuant to any Loan Document or the transactions contemplated therein that is distributed to the Administrative Agent or any Lender by means of electronic communications pursuant to this Section 10.02, including through the Platform.

(d)     *Effectiveness of Facsimile Documents and Signatures.* Loan Documents may be transmitted and/or signed by facsimile or other electronic communication. The effectiveness of any such documents and signatures shall, subject to applicable Law, have the same force and effect as manually signed originals and shall be binding on all Loan Parties, the Agents and the Lenders.

(e)     *Reliance by Agents and Lenders.* The Administrative Agent and the Lenders shall be entitled to rely and act upon any notices purportedly given by or on behalf of the Borrower even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof. The Borrower shall indemnify each Agent-Related Person and each Lender from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Borrower in the absence of gross negligence or willful misconduct as determined in a final and non-appealable judgment by a court of competent jurisdiction.

**SECTION 10.03     No Waiver; Cumulative Remedies.**

No failure by any Lender or the Administrative Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided, and provided under each other Loan Document, are cumulative and not exclusive of any rights, remedies, powers and privileges provided by Law.

**SECTION 10.04     Attorney Costs and Expenses.**

The Borrower agrees (a) to pay or reimburse the Administrative Agent, the Ad Hoc Group and the Lender Advisors for all reasonable and documented out-of-pocket costs and expenses incurred in connection with the preparation, negotiation, syndication and execution, performance and administration of this Agreement and the other Loan Documents, and any amendment, waiver, consent or other modification of the provisions hereof and thereof (whether or not the transactions contemplated thereby are consummated), and the consummation and administration of the transactions contemplated hereby and thereby (including all Attorney Costs, which, with respect to the Ad Hoc Group, shall be limited to Willkie Farr & Gallagher LLP and one local counsel as reasonably necessary in each relevant jurisdiction material to the interests of the Lenders taken as a whole); and (b) from and after the Closing Date, to pay or reimburse the Administrative Agent, the Ad Hoc Group, the Lender Advisors and each other Lender for all reasonable and documented

out-of-pocket costs and expenses incurred in connection with the enforcement (whether through negotiations, legal proceedings or otherwise) of any rights or remedies under this Agreement or the other Loan Documents (including all such costs and expenses incurred during any legal proceeding, including any proceeding under any Debtor Relief Law, and including all respective Attorney Costs which shall be limited to Attorney Costs of (i) counsel of the Administrative Agent and (ii) the Lender Advisors (and one local counsel as reasonably necessary in each relevant jurisdiction material to the interests of the Lenders taken as a whole)), and solely in the case of a conflict of interest in connection with such enforcement, one additional counsel in each relevant jurisdiction to each group of similarly situated affected Persons. The foregoing costs and expenses shall include all reasonable search, filing, recording and title insurance charges and fees related thereto, and other reasonable and documented out-of-pocket expenses incurred by any Agent. The agreements in this Section 10.04 shall survive the resignation or removal of the Administrative Agent termination of the Aggregate Commitments and repayment of all other Obligations. All amounts due under this Section 10.04 shall be paid within ten (10) days following receipt by the Borrower of an invoice relating thereto setting forth such expenses in reasonable detail including, if requested by the Borrower and to the extent reasonably available, backup documentation supporting such reimbursement request; *provided that*, with respect to the Closing Date, all amounts due under this Section 10.04 shall be paid on the Closing Date solely to the extent invoiced to the Borrower within three (3) Business Days of the Closing Date.

SECTION 10.05    **Indemnification by the Borrower.**

The Loan Parties shall, jointly and severally, indemnify and hold harmless each Agent-Related Person, each Lender, the Ad Hoc Group Advisors and their respective Affiliates, and their respective officers, directors, employees, partners, agents, advisors and other representatives of each of the foregoing and their respective successors and permitted assignees (collectively, the "**Indemnitees**") from and against any and all liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, fees, costs, expenses and disbursements (including all fees, expenses and costs incurred by any Indemnitee in connection with any dispute, action, claim or suit brought to enforce the right to indemnification and including Attorney Costs but limited in the case of legal fees and expenses to the reasonable and documented out-of-pocket fees, disbursements and other charges of (i) one counsel to the Agent-Related Persons and if reasonably necessary, one local counsel for all Agent-Related Persons taken as a whole in each relevant jurisdiction that is material to the interests of the Agent-Related Persons and (ii) one counsel to all other Indemnitees taken as a whole, and if reasonably necessary, one local counsel for all other Indemnitees taken as a whole in each relevant jurisdiction that is material to the interests of the Lenders, and in the case of an actual or potential conflict of interest, where the Indemnitees affected by such conflict notify the Borrower of the existence of such conflict and thereafter, after receipt of the Borrower's consent (which consent shall not be unreasonably withheld or delayed), one additional counsel to each group of similarly situated affected Indemnitees), joint or several, of any kind or nature whatsoever which may at any time be imposed on, incurred by or asserted against any such Indemnitee in any way relating to or arising out of or in connection with (a) the execution, delivery, enforcement, performance or administration of any Loan Document or any other agreement, letter or instrument delivered in connection with the transactions contemplated thereby or the consummation of the transactions contemplated thereby (including, without limitation, any amount payable by the Administrative Agent to a bank under a control agreement, including any amounts for fees, expenses or indemnification of the bank), (b) any Commitment or

Loan, (c) any actual or alleged presence or Release of Hazardous Materials at, in, on, under or from any property or facility currently or formerly owned, leased or operated by the Loan Parties or any Subsidiary thereof, or any Environmental Liability or (d) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory (including any investigation of, preparation for, or defense of any pending or threatened claim, investigation, litigation or proceeding) and regardless of whether any Indemnitee is a party thereto or whether or not such proceeding is brought by the Borrower or any other person, and in each case, whether or not caused by or arising, in whole or in part, out of the negligence of the Indemnitee (all the foregoing, collectively, the "**Indemnified Liabilities**"); *provided that* such indemnity shall not, as to any Indemnitee, be available to the extent that such liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses or disbursements resulted from (w) the gross negligence or willful misconduct of such Indemnitee, as determined by a final non-appealable judgment of a court of competent jurisdiction, (x) other than in the case of the Agent-Related Persons a material breach of any obligations under any Loan Document by such Indemnitee to the extent caused by the gross negligence or willful misconduct of such Indemnitee, as determined by a final non-appealable judgment of a court of competent jurisdiction, or (y) any dispute solely among Indemnitees (other than any claims against an Indemnitee in its capacity or in fulfilling its role as an Agent or arranger or any similar role and other than any claims arising out of any act or omission of the Borrower or any of its Subsidiaries) (but any Indemnitee shall be entitled to indemnification of all amounts incurred prior to any such determination). No Indemnitee shall be liable for any damages arising from the use by others of any information or other materials obtained through IntraLinks or other similar information transmission systems in connection with this Agreement, nor shall any Indemnitee, Loan Party or any Subsidiary have any liability for any special, punitive, indirect or consequential damages relating to this Agreement or any other Loan Document or arising out of its activities in connection herewith or therewith (whether before or after the Closing Date) (other than, in the case of any Loan Party, in respect of any such damages incurred or paid by an Indemnitee to a third party and for any out-of-pocket expenses); it being agreed that this sentence shall not limit the indemnification obligations of the Borrower or any Subsidiary thereof. In the case of an investigation, litigation or other proceeding to which the indemnity in this Section 10.05 applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by any Loan Party, any Subsidiary of any Loan Party, its directors, stockholders or creditors or an Indemnitee or any other Person, whether or not any Indemnitee is otherwise a party thereto and whether or not any of the transactions contemplated hereunder or under any of the other Loan Documents are consummated. All amounts due under this Section 10.05 shall be paid within fifteen (15) days after written demand therefor (together with backup documentation supporting such reimbursement request); *provided, however,* that such Indemnitee shall promptly refund such amount to the extent that there is a final judicial or arbitral determination that such Indemnitee was not entitled to indemnification rights with respect to such payment pursuant to the express terms of this Section 10.05. All amounts reimbursable by the Borrower under this Section 10.05 shall constitute Obligations secured by the Collateral. The agreements in this Section 10.05 shall survive the resignation of the Administrative Agent, the replacement of any Lender, the termination of the Aggregate Commitments, and the repayment, satisfaction or discharge of all the other Obligations. This Section 10.05 shall not apply with respect to Taxes, other than any Taxes that represent liabilities, obligations, losses, damages, penalties, costs, expenses or disbursements arising from any non-Tax claim.

**SECTION 10.06     Payments Set Aside.**

To the extent that any payment by or on behalf of the Borrower is made to the Administrative Agent or any Lender, or the Administrative Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Administrative Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall, to the fullest extent possible under provisions of applicable Law, be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to the Administrative Agent upon demand its applicable share of any amount so recovered from or repaid by any Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the applicable Federal Funds Rate from time to time in effect.

**SECTION 10.07     Successors and Assigns.**

(a)     The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that the Loan Parties may not assign or otherwise transfer any of their respective rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer to which such Lenders have not consented shall be null and void) and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an Assignee pursuant to an assignment made in accordance with the provisions of Section 10.07(b) (such an assignee, an "**Eligible Assignee**"), (ii) by way of participation in accordance with the provisions of Section 10.07(f), or (iii) by way of pledge or assignment of a security interest subject to the restrictions of Section 10.07(h) (and any other attempted assignment or transfer by any party hereto shall be null and void); *provided, however,* that notwithstanding anything to the contrary, no Lender may assign or transfer by participation any of its rights or obligations hereunder to (i) any Person that is a Defaulting Lender or a Disqualified Lender, (ii) a natural Person or (iii) the Borrower or any of its Subsidiaries. Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in Section 10.07(f) and, to the extent expressly contemplated hereby, the Indemnitees) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)     (i) Subject to the conditions set forth in clause (b)(ii) below, any Lender may assign to one or more assignees ("**Assignees**") all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it) with the prior written consent (such consent not to be unreasonably withheld, conditioned or delayed) of:

(A)     the Borrower; provided that no consent of the Borrower shall be required (i) for an assignment of all or any portion of the Loans to a Lender, an Affiliate of a Lender or an Approved Fund or (ii) if an Event of Default has occurred and is continuing; provided further, that Borrower shall be deemed to have consented to any such assignment

unless it shall have objected thereto by written notice to the Administrative Agent within five (5) Business Days after having received written notice thereof; and

(B)    the Administrative Agent; *provided that* no consent of the Administrative Agent shall be required for an assignment of all or any portion of a Loan to a Lender, an Affiliate of a Lender or an Approved Fund;

(ii)    Assignments shall be subject to the following additional conditions:

(A)    except in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Commitment or Loans, the amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than an amount of $1,000,000 (*provided that* simultaneous assignments to or from two or more Approved Funds shall be aggregated for purposes of determining compliance with this Section 10.07(b)(ii)(A)), unless the Borrower and the Administrative Agent otherwise consents; *provided that* such amounts shall be aggregated in respect of each Lender and its Affiliates or Approved Funds, if any;

(B)    the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption via an electronic settlement system acceptable to the Administrative Agent (or if previously agreed with the Administrative Agent, manually), together with a processing and recordation fee of $3,500 (which fee may be waived or reduced in the sole discretion of the Administrative Agent); *provided that* only one such fee shall be payable in the event of simultaneous assignments to or from two or more Approved Funds; and

(C)    the Assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire (in which the Assignee shall designate one or more credit contacts to whom all syndicate-level information (which may contain material non-public information about the Loan Parties and their Affiliates or their respective securities) will be made available and who may receive such information in accordance with the Assignee's compliance procedures and applicable laws, including federal and state securities laws), all applicable tax forms required pursuant to Section 3.01(d) and all documentation and other information about such Assignee as shall have been reasonably requested by the Administrative Agent in connection with applicable "know your customer" and anti-money laundering rules and regulations, including the Patriot Act.

This clause (b) shall not prohibit any Lender from assigning all or a portion of its rights and obligations among separate Loans on a non-pro rata basis among such Loans.

In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof

as appropriate (which may be outright payment, purchases by the assignee of participations or subparticipations, or other compensating actions, including funding, with the consent of the Borrower and the Administrative Agent, the applicable pro rata share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Administrative Agent or any Lender hereunder (and interest accrued thereon) and (y) acquire (and fund as appropriate) its full pro rata share of all Loans. Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable Law without compliance with the provisions of this clause (b), then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

(c)     Subject to acceptance and recording thereof by the Administrative Agent pursuant to Section 10.07(d) and **Error! Reference source not found.**, from and after the effective date specified in each Assignment and Assumption, (1) the Eligible Assignee thereunder shall be a party to this Agreement, and to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and (2) the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Section 3.01, Section 3.02, Section 10.04 and Section 10.05 with respect to facts and circumstances occurring prior to the effective date of such assignment). Upon request, and the surrender by the assigning Lender of its Loan Note, the Borrower (at its expense) shall execute and deliver a Loan Note to the assignee Lender. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this clause (c) shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 10.07(f).

(d)     The Administrative Agent, acting solely for this purpose as a non-fiduciary agent of the Borrower, shall maintain a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts (and related interest amounts) of the Loans, owing to, each Lender pursuant to the terms hereof from time to time (the "**Register**"). The entries in the Register shall be conclusive, absent manifest error, and the Borrower, the Agents and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrower, any Agent and any Lender, at any reasonable time and from time to time upon reasonable prior notice. This Section 10.07(d) and Section 2.07 shall be construed so that all Loans are at all times maintained in "registered form" within the meaning of Section 163(f), 871(h)(2) and 881(c)(2) of the Code and any related United States Treasury Regulations (or any other relevant or successor provisions of the Code or of such United States Treasury Regulations).

(e)     Upon its receipt of, and consent to, a duly completed Assignment and Assumption executed by an assigning Lender and an Assignee, an Administrative Questionnaire completed in respect of the assignee (unless the Assignee shall already be a Lender hereunder), the processing

and recordation fee referred to in clause (b) above, if applicable, and the written consent of the Administrative Agent, if required, and, if required, the Borrower, any applicable tax forms required pursuant to Section 3.01(d) and all documentation and other information about such Assignee as shall have been reasonably requested by the Administrative Agent in connection with applicable "know your customer" and anti-money laundering rules and regulations, including the Patriot Act, the Administrative Agent shall promptly (i) accept such Assignment and Assumption and (ii) record the information contained therein in the Register. No assignment shall be effective unless it has been recorded in the Register as provided in this clause (e).

(f)      Any Lender may at any time sell participations to any Person, subject to the proviso to Section 10.07(a) (each, a "**Participant**"), in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans owing to it); *provided that* (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrower, the Agents and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and the other Loan Documents and to approve any amendment, modification or waiver of any provision of this Agreement or the other Loan Documents; *provided that* such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in the first proviso to Section 10.01 that requires the affirmative vote of such Lender. Subject to Section 10.07(g), the Borrower agrees that each Participant shall be entitled to the benefits of Section 3.01 and Section Section 3.02 (subject to the requirements and limitations of such Sections (it being understood that the documentation required under Section 3.01(d) shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 10.07(c). To the extent permitted by applicable Law, each Participant also shall be entitled to the benefits of Section 10.09 as though it were a Lender; *provided that* such Participant agrees to be subject to Section 10.13Section 2.09 as though it were a Lender. Each Lender that sells a participation shall, acting solely for this purpose as an agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each participant's interest in the Loans or other obligations under this Agreement (the "**Participant Register**"); *provided that* no Lender shall have any obligation to disclose all or any portion of the Participant Register to any Person (including the identity of any Participant or any information relating to a Participant's interest in any Commitments, Loans or its other obligations under any Loan Document) except to the extent that such disclosure is necessary in connection with an audit or other proceeding to establish that such Commitment, Loan, or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive and such Lender shall treat each person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(g)      A Participant shall not be entitled to receive any greater payment under Section 3.01 or Section  Section 3.02 than the applicable Lender would have been entitled to receive with

respect to the participation sold to such Participant, except to the extent that such participation to such Participant is made with the Borrower's prior written consent, not to be unreasonably withheld or delayed; for the avoidance of doubt, the Borrower shall have reasonable basis for withholding consent if such exercise by a Participant after the sale would result in materially increased obligations to the Borrower at such time under Section 3.01 and/or Section Section 3.02.

(h)    Any Lender may, without the consent of the Borrower or the Administrative Agent, at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Loan Note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or any central bank having jurisdiction over such Lender; *provided that* no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(i)    Notwithstanding anything to the contrary contained herein, without the consent of the Borrower or the Administrative Agent, (1) any Lender may in accordance with applicable Law create a security interest in all or any portion of the Loans owing to it and the Loan Note, if any, held by it and (2) any Lender that is a Fund may create a security interest in all or any portion of the Loans owing to it and the Loan Note, if any, held by it to the trustee for holders of obligations owed, or securities issued, by such Fund as security for such obligations or securities; *provided that* unless and until such trustee actually becomes a Lender in compliance with the other provisions of this Section 10.07, (i) no such pledge shall release the pledging Lender from any of its obligations under the Loan Documents and (ii) such trustee shall not be entitled to exercise any of the rights of a Lender under the Loan Documents even though such trustee may have acquired ownership rights with respect to the pledged interest through foreclosure or otherwise.

### SECTION 10.08    Confidentiality.

Each of the Agents and the Lenders agrees to maintain the confidentiality of the Information and not to disclose such information, except that Information may be disclosed (a) to its Affiliates and its and its Affiliates' managers, administrators, directors, officers, employees, trustees, partners, investors, investment advisors and agents, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential); (b) to the extent requested by any Governmental Authority or self-regulatory authority having or asserting jurisdiction over such Person (including any Governmental Authority regulating any Lender or its Affiliates); (c) to the CUSIP Service Bureau or any similar agency in connection with the issuance and monitoring of CUSIP numbers or market data collectors, similar service providers to the lending industry and service providers to the Administrative Agent in connection with the administration and management of this Agreement and the Loan Documents; (d) to the extent required by applicable Laws or regulations or by any subpoena or similar legal process; (e) to any other party to this Agreement; (f) to any pledgee referred to in Section 10.07(h), counterparty to a Swap Agreement, Eligible Assignee of or Participant in, or any prospective Eligible Assignee of or Participant in any of its rights or obligations under this Agreement (*provided that* the disclosure of any such Information to any Lenders, Eligible Assignees or Participants (or prospective Eligible Assignees or Participants) shall be made subject to the acknowledgement and acceptance by such Lender, Eligible Assignee or Participant (or prospective

Eligible Assignee or Participant) that such Information is being disseminated on a confidential basis (on substantially the terms set forth in this Section 10.08 or as otherwise reasonably acceptable to the Borrower, including, without limitation, as agreed in any Borrower Materials) in accordance with the standard processes of the Administrative Agent or customary market standards for dissemination of such type of Information); (g) with the written consent of the Borrower; (h) to the extent such Information becomes publicly available other than as a result of a breach of this Section 10.08 or becomes available to the Administrative Agent, any Lender or any of their respective Affiliates on a non-confidential basis from a source other than a Loan Party or its Affiliates (so long as such source is not known to the Administrative Agent, such Lender or any of their respective Affiliates to be bound by confidentiality obligations to any Loan Party); (i) to any Governmental Authority or examiner (including the National Association of Insurance Commissioners or any other similar organization) regulating any Lender; (j) to any rating agency when required by it (it being understood that, prior to any such disclosure, such rating agency shall undertake to preserve the confidentiality of any Information relating to Loan Parties and their Subsidiaries received by it from such Lender) or to the CUSIP Service Bureau or any similar organization; (k) in connection with the exercise of any remedies hereunder, under any other Loan Document or the enforcement of its rights hereunder or thereunder or (l) to the extent such Information is independently developed by the Administrative Agent, such Lender or any of their respective Affiliates; *provided that* no disclosure shall be made to any Disqualified Lender. In addition, the Agents and the Lenders may disclose the existence of this Agreement and publicly available information about this Agreement to market data collectors, similar service providers to the lending industry, and service providers to the Agents and the Lenders in connection with the administration and management of this Agreement, the other Loan Documents and the Commitments. For the purposes of this Section 10.08, "**Information**" shall mean all information received from the Loan Parties relating to any Loan Party, its Affiliates or its Affiliates' directors, managers, officers, employees, trustees, investment advisors or agents, relating to the Borrower or any of its Subsidiaries or its business, other than any such information that is publicly available to any Agent or any Lender prior to disclosure by any Loan Party other than as a result of a breach of this Section 10.08; *provided that*, in the case of information received from a Loan Party after the Closing Date, such information is clearly identified at the time of delivery as confidential or is delivered pursuant to Section 6.04 or 6.05 hereof (except "public-side" Borrower Materials made available to Public Lenders).

### SECTION 10.09    Setoff.

In addition to any rights and remedies of the Lenders provided by Law, upon the occurrence and during the continuance of any Event of Default, each Agent, each Lender and their respective Affiliates is authorized at any time and from time to time, without prior notice to the Borrower, any such notice being waived by the Borrower (on its own behalf and on behalf of each Loan Party and each of its Subsidiaries) to the fullest extent permitted by applicable Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held by, and other Indebtedness at any time owing by, such Agent, such Lender and such Affiliates to or for the credit or the account of the respective Loan Parties and their Subsidiaries against any and all Obligations owing to such Agent, such Lender and such Affiliates hereunder or under any other Loan Document, now or hereafter existing, irrespective of whether or not such Agent or such Lender or Affiliate shall have made demand under this Agreement or any other Loan Document and although such Obligations may be contingent or unmatured or denominated in a currency

different from that of the applicable deposit or Indebtedness; *provided that* in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of Section 2.10 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent and the Lenders, and (y) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff. Each Lender agrees promptly to notify the Borrower and the Administrative Agent after any such set off and application made by such Lender; *provided that* the failure to give such notice shall not affect the validity of such setoff and application. The rights of each Agent and each Lender under this Section 10.09 are in addition to other rights and remedies (including other rights of setoff) that such Agent and such Lender may have.

SECTION 10.10    Interest Rate Limitation.

Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "**Maximum Rate**"). If any Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans, or if it exceeds such unpaid principal, refunded to the Borrower. In determining whether the interest contracted for, charged, or received by an Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

SECTION 10.11    Counterparts.

This Agreement and each other Loan Document may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Delivery by telecopier or other electronic transmission of an executed counterpart of a signature page to this Agreement and each other Loan Document shall be effective as delivery of an original executed counterpart of this Agreement and such other Loan Document. The Agents may also require that any such documents and signatures delivered by telecopier or other electronic transmission be confirmed by a manually signed original thereof; *provided that* the failure to request or deliver the same shall not limit the effectiveness of any document or signature delivered by telecopier or other electronic transmission.

SECTION 10.12    Integration; Termination.

This Agreement, together with the other Loan Documents, comprises the complete and integrated agreement of the parties on the subject matter hereof and thereof and supersedes all prior agreements, written or oral, on such subject matter. THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT AMONG THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO

UNWRITTEN ORAL AGREEMENTS AMONG THE PARTIES. In the event of any conflict between the provisions of this Agreement and those of any other Loan Document, the provisions of this Agreement shall control; *provided that* the inclusion of supplemental rights or remedies in favor of the Agents or the Lenders in any other Loan Document shall not be deemed a conflict with this Agreement. Each Loan Document was drafted with the joint participation of the respective parties thereto and shall be construed neither against nor in favor of any party, but rather in accordance with the fair meaning thereof.

**SECTION 10.13    Survival of Representations and Warranties.**

All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof. Such representations and warranties have been or will be relied upon by each Agent and each Lender, regardless of any investigation made by any Agent or any Lender or on their behalf and notwithstanding that any Agent or any Lender may have had notice or knowledge of any Default, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied.

**SECTION 10.14    Severability.**

If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby. The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. Without limiting the foregoing provisions of this <u>Section 10.14</u>, if and to the extent that the enforceability of any provisions in this Agreement relating to Defaulting Lenders shall be limited by Debtor Relief Laws, then such provisions shall be deemed to be in effect only to the extent not so limited.

**SECTION 10.15    GOVERNING LAW.**

(a)    THIS AGREEMENT AND EACH OTHER LOAN DOCUMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

(b)    ANY LEGAL ACTION OR PROCEEDING ARISING UNDER ANY LOAN DOCUMENT OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO ANY LOAN DOCUMENT, OR THE TRANSACTIONS RELATED THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, MAY BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK CITY OR OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK SITTING IN THE BOROUGH OF MANHATTAN, AND BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH LOAN PARTY, EACH AGENT AND EACH LENDER CONSENTS, FOR ITSELF AND IN RESPECT OF ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THOSE COURTS. EACH LOAN PARTY, EACH AGENT AND EACH LENDER IRREVOCABLY WAIVES ANY OBJECTION, INCLUDING ANY OBJECTION TO THE

LAYING OF VENUE OR BASED ON THE GROUNDS OF *FORUM NON CONVENIENS*, WHICH IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY ACTION OR PROCEEDING IN SUCH JURISDICTION IN RESPECT OF ANY LOAN DOCUMENT OR OTHER DOCUMENT RELATED THERETO. EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO ANY LOAN DOCUMENTS IN THE MANNER PROVIDED FOR NOTICES (OTHER THAN TELECOPIER OR OTHER ELECTRONIC TRANSMISSION) IN Section 10.02. NOTHING IN THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT WILL AFFECT ANY RIGHT THAT ANY PARTY HERETO MAY OTHERWISE HAVE TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW OR TO BRING PROCEEDINGS RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST ANY LOAN PARTY IN THE COURTS OF ANY OTHER JURISDICTION (I) IN CONNECTION WITH THE EXERCISE OF ANY RIGHTS AGAINST ANY COLLATERAL IN A JURISDICTION WHERE SUCH COLLATERAL IS LOCATED OR (II) FOR PURPOSES OF ENFORCING ANY JUDGMENT, AND EACH LOAN PARTY SUBMITS TO THE JURISDICTION OF, AND CONSENTS TO VENUE IN, ANY SUCH COURT.

**SECTION 10.16    WAIVER OF RIGHT TO TRIAL BY JURY.**

TO THE EXTENT PERMITTED BY APPLICABLE LAW, EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING UNDER ANY LOAN DOCUMENT OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO ANY LOAN DOCUMENT, OR THE TRANSACTIONS RELATED THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER FOUNDED IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS Section 10.16 WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE SIGNATORIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

**SECTION 10.17    Binding Effect.**

This Agreement shall become effective when it shall have been executed by the Loan Parties, the Administrative Agent, and the Administrative Agent shall have been notified by each Lender that each Lender has executed it, and thereafter this Agreement shall be binding upon and inure to the benefit of the Loan Parties, each Agent and each Lender and their respective successors and assigns, in each case in accordance with Section 10.07 (if applicable) and except that no Loan Party shall have the right to assign its rights hereunder or any interest herein without the prior written consent of the Lenders (and any attempted assignment or transfer to which such Lenders have not consented shall be null and void).

**SECTION 10.18    USA Patriot Act.**

Each Lender that is subject to the USA Patriot Act and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Borrower and each Guarantor that pursuant to the requirements of the USA Patriot Act, it is required to obtain, verify and record information that identifies the Borrower and each Guarantor, which information includes the name, address and tax identification number of the Borrower and the Guarantors and other information regarding the Borrower and the Guarantors that will allow such Lender or the Administrative Agent, as applicable, to identify the Borrower and the Guarantors in accordance with the USA Patriot Act. This notice is given in accordance with the requirements of the USA Patriot Act and is effective as to the Lenders and the Administrative Agent.

**SECTION 10.19    No Advisory or Fiduciary Responsibility.**

(a)    In connection with all aspects of each transaction contemplated hereby, each Loan Party acknowledges and agrees, and acknowledges its Affiliates' understanding, that (i) the facilities provided for hereunder and any related arranging or other services in connection therewith (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document) are an arm's-length commercial transaction between the Borrower and its Affiliates, on the one hand, and the Agents and the Lenders, on the other hand, and the Borrower is capable of evaluating and understanding and understands and accepts the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents (including any amendment, waiver or other modification hereof or thereof), (ii) in connection with the process leading to such transaction, each of the Agents and the Lenders is and has been acting solely as a principal and is not the financial advisor, agent or fiduciary, for the Borrower or any of its Affiliates, stockholders, creditors or employees or any other Person, (iii) none of the Agents or the Lenders has assumed or will assume an advisory, agency or fiduciary responsibility in favor of the Borrower with respect to any of the transactions contemplated hereby or the process leading thereto, including with respect to any amendment, waiver or other modification hereof or of any other Loan Document (irrespective of whether any Agent or Lender has advised or is currently advising the Borrower or any of its Affiliates on other matters) and none of the Agents or the Lenders has any obligation to the Borrower or any of its Affiliates with respect to the financing transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents, (iv) the Agents and the Lenders and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from, and may conflict with, those of the Borrower and its Affiliates, and none of the Agents or the Lenders has any obligation to disclose any of such interests by virtue of any advisory, agency or fiduciary relationship and (v) the Agents and the Lenders have not provided and will not provide any legal, accounting, regulatory or tax advice with respect to any of the transactions contemplated hereby (including any amendment, waiver or other modification hereof or of any other Loan Document) and the Loan Parties have consulted their own legal, accounting, regulatory and tax advisors to the extent they have deemed appropriate. Each Loan Party hereby waives and releases, to the fullest extent permitted by law, any claims that it may have against the Agents and the Lenders with respect to any breach or alleged breach of agency or fiduciary duty under applicable law relating to agency and fiduciary obligations.

(b)      Each Loan Party acknowledges and agrees that each Lender and any affiliate thereof may lend money to, invest in, and generally engage in any kind of business with, any of the Borrower, any Affiliate thereof or any other person or entity that may do business with or own securities of any of the foregoing, all as if such Lender or Affiliate thereof were not a Lender (or an agent or any other person with any similar role with respect to the Loans) and without any duty to account therefor to any other Lender, the Borrower or any Affiliate thereof. Each Lender and any affiliate thereof may accept fees and other consideration from the Borrower or any Affiliate thereof for services in connection with this Agreement, the Loans or otherwise without having to account for the same to any other Lender, the Borrower or any Affiliate thereof. Some or all of the Lenders may have directly or indirectly acquired certain equity interests (including warrants) in the Borrower or an Affiliate thereof or may have directly or indirectly extended credit on a subordinated basis to the Borrower or an Affiliate thereof. Each party hereto, on its behalf and on behalf of its affiliates, acknowledges and waives the potential conflict of interest resulting from any such Lender or an Affiliate thereof holding disproportionate interests in the Loans or otherwise acting as arranger or agent thereunder and such Lender or Affiliate thereof directly or indirectly holding equity interests in or subordinated debt issued by the Borrower or an Affiliate thereof.

**SECTION 10.20      Electronic Execution.**

The Loan Documents shall be valid, binding, and enforceable against a party when executed and delivered by an authorized individual on behalf of the party by means of (i) an original manual signature; (ii) a faxed, scanned, or photocopied manual signature, or (iii) any other electronic signature permitted by the federal Electronic Signatures in Global and National Commerce Act, state enactments of the Uniform Electronic Transactions Act, and/or any other relevant electronic signatures law, including any relevant provisions of the UCC (collectively, "**Signature Law**"), in each case to the extent applicable. Each faxed, scanned, or photocopied manual signature, or other electronic signature, shall for all purposes have the same validity, legal effect, and admissibility in evidence as an original manual signature. Each party hereto shall be entitled to conclusively rely upon, and shall have no liability with respect to, any faxed, scanned, or photocopied manual signature, or other electronic signature, of any other party and shall have no duty to investigate, confirm or otherwise verify the validity or authenticity thereof. For the avoidance of doubt, original manual signatures shall be used for execution or indorsement of writings when required under the UCC or other Signature Law due to the character or intended character of the writings.

**SECTION 10.21      Acknowledgement and Consent to Bail-in of Affected Financial Institutions.**

Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Lender that is an Affected Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)     the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any Lender that is an Affected Financial Institution; and

(b)     the effects of any Bail-In Action on any such liability, including, if applicable:

(i)     a reduction in full or in part or cancellation of any such liability;

(ii)     a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)     the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of the applicable Resolution Authority.

## ARTICLE XI.
## GUARANTY

### SECTION 11.01     The Guaranty.

Each Guarantor hereby jointly and severally with the other Guarantors guarantees, as a primary obligor and not merely as a surety to each Secured Party and their respective successors and assigns, the prompt payment in full when due (whether at stated maturity, by required prepayment, declaration, demand, acceleration or otherwise) of the principal of and interest (including Post-Petition Interest and Fees) on the Loans made by the Lenders to, and the Loan Notes held by each Lender of, the Borrower, and all other Obligations from time to time owing to the Secured Parties by any Loan Party under any Loan Document, in each case strictly in accordance with the terms thereof (such obligations being herein collectively called the "**Guaranteed Obligations**"). The Guarantors hereby jointly and severally agree that if the Borrower or other Guarantor(s) shall fail to pay in full when due (whether at stated maturity, by acceleration or otherwise) any of the Guaranteed Obligations, the Guarantors will promptly pay the same in cash, without any demand or notice whatsoever, and that in the case of any extension of time of payment or renewal of any of the Guaranteed Obligations, the same will be promptly paid in full when due (whether at extended maturity, by acceleration or otherwise) in accordance with the terms of such extension or renewal.

### SECTION 11.02     Obligations Unconditional.

The obligations of the Guarantors under Section 11.01 shall constitute a guarantee of payment and to the fullest extent permitted by applicable Law, are absolute, irrevocable and unconditional, joint and several, irrespective of the value, genuineness, validity, regularity or enforceability of the Guaranteed Obligations of the Borrower under this Agreement, the Loan Notes, if any, or any other agreement or instrument referred to herein or therein, or any substitution, release or exchange of any other guarantee of or security for any of the Guaranteed Obligations, and irrespective of any other circumstance whatsoever that might otherwise constitute a legal or equitable discharge or defense of a surety or Guarantor (except for payment in full). Without

limiting the generality of the foregoing, it is agreed that the occurrence of any one or more of the following shall not alter or impair the liability of the Guarantors hereunder (and each Guarantor hereby also waives to the extent permitted by Law any defenses it may have arising from the following), which shall remain absolute, irrevocable and unconditional under any and all circumstances as described above:

(i)    at any time or from time to time, without notice to the Guarantors, to the extent permitted by Law, the time for any performance of or compliance with any of the Guaranteed Obligations shall be extended, or such performance or compliance shall be waived;

(ii)    any of the acts mentioned in any of the provisions of this Agreement or the Loan Notes, if any, or any other agreement or instrument referred to herein or therein shall be done or omitted;

(iii)    the maturity of any of the Guaranteed Obligations shall be accelerated, or any of the Guaranteed Obligations shall be amended in any respect, or any right under the Loan Documents or any other agreement or instrument referred to herein or therein shall be amended or waived in any respect or any other guarantee of any of the Guaranteed Obligations or except as permitted pursuant to Section 11.11 any security therefor shall be released or exchanged in whole or in part or otherwise dealt with;

(iv)    any Lien or security interest granted to, or in favor of, any Lender or Agent as security for any of the Guaranteed Obligations shall fail to be perfected; or

(v)    the release of any other Guarantor pursuant to Section 11.11.

The Guarantors hereby expressly waive diligence, presentment, demand of payment, protest, and to the extent permitted by Law, all notices whatsoever, and any requirement that any Secured Party exhaust any right, power or remedy or proceed against the Borrower under this Agreement or the Loan Notes, if any, or any other agreement or instrument referred to herein or therein, or against any other person under any other guarantee of, or security for, any of the Guaranteed Obligations. The Guarantors waive, to the extent permitted by Law, any and all notice of the creation, renewal, extension, waiver, termination or accrual of any of the Guaranteed Obligations and notice of or proof of reliance by any Secured Party upon this Guaranty or acceptance of this Guaranty, and the Guaranteed Obligations, and any of them, shall conclusively be deemed to have been created, contracted or incurred in reliance upon this Guaranty, and all dealings between the Borrower and the Secured Parties shall likewise be conclusively presumed to have been had or consummated in reliance upon this Guaranty. This Guaranty shall be construed as a continuing, absolute, irrevocable and unconditional guarantee of payment without regard to any right of offset with respect to the Guaranteed Obligations at any time or from time to time held by Secured Parties, and the obligations and liabilities of the Guarantors hereunder shall not be conditioned or contingent upon the pursuit by the Secured Parties or any other person at any time of any right or remedy against the Borrower or against any other person which may be or become liable in respect of all or any part of the Guaranteed Obligations or against any collateral security or guarantee therefor or right of offset with respect thereto. This Guaranty shall remain in full force and effect and be binding in accordance with and to the extent of its terms upon the Guarantors and the successors and assigns thereof, and shall inure to the benefit of the Lenders, and their

respective successors and assigns, notwithstanding that from time to time during the term of this Agreement there may be no Guaranteed Obligations outstanding.

**SECTION 11.03    Reinstatement.**

The obligations of the Guarantors under this Article XI shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of the Borrower or other Loan Party in respect of the Guaranteed Obligations is rescinded or must be otherwise restored by any holder of any of the Guaranteed Obligations, whether as a result of any proceedings in insolvency, bankruptcy or reorganization or otherwise.

**SECTION 11.04    Subrogation; Subordination.**

(a)    Each Guarantor hereby agrees that until the payment and satisfaction in full in cash of all Guaranteed Obligations and the expiration and termination of the Commitments of the Lenders under this Agreement it shall waive any claim and shall not exercise any right or remedy, direct or indirect, arising by reason of any performance by it of its guarantee in Section 11.01, whether by subrogation or otherwise, against the Borrower or any other Guarantor of any of the Guaranteed Obligations or any security for any of the Guaranteed Obligations.

(b)    Each Guarantor hereby subordinates any and all debt liabilities and other obligations owed to such Guarantor by each other Loan Party (the "**Subordinated Obligations**") to the Guaranteed Obligations to the extent and in the manner hereinafter set forth in this Section 11.04(b).

(i)    Except during the continuation of an Event of Default (including, without limitation, the commencement and continuation of any proceeding under applicable Debtor Relief Laws relating to any other Loan Party), each Guarantor may receive payments from any other Loan Party on account of the Subordinated Obligations. After the occurrence and during the continuation of any Event of Default (including, without limitation, the commencement and continuation of any proceeding under any Debtor Relief Law relating to any other Loan Party), however, unless the Administrative Agent shall otherwise agree, no Guarantor shall demand, accept or take any action to collect any payment on account of the Subordinated Obligations, other than the filing of proofs of claim or other similar requirements to preserve its rights as creditor.

(ii)    In any proceeding under any Debtor Relief Law relating to any other Loan Party, each Guarantor agrees that the Secured Parties shall be entitled to receive payment in full in cash of all Guaranteed Obligations (including any interest, fees, costs or charges that accrue or would accrue but for the provisions of the Bankruptcy Code or any other Debtor Relief Laws after the commencement of a proceeding under the Bankruptcy Code or any other Debtor Relief Laws whether or not constituting an allowed claim in such proceeding ("**Post-Petition Interest and Fees**")) before such Guarantor receives payment of any Subordinated Obligations.

(iii)    After the occurrence and during the continuation of any Event of Default (including, without limitation, the commencement and continuation of any proceeding under any Debtor Relief Law relating to any other Loan Party), each Guarantor shall collect, enforce and receive payments on account of the Subordinated Obligations as trustee for the Secured Parties and deliver such payments to the Administrative Agent on account of the Guaranteed Obligations

(including all Post-Petition Interest and Fees), together with any necessary endorsements or other instruments of transfer, but without reducing or affecting in any manner the liability of such Guarantor under the other provisions of this Agreement.

(c)    After the occurrence and during the continuation of any Event of Default (including, without limitation, the commencement and continuation of any proceeding under any Debtor Relief Law relating to any other Loan Party), the Administrative Agent (acting at the Direction of the Required Lenders) is authorized and empowered (but without any obligation to so do), in its determination, (i) in the name of each Guarantor, to collect and enforce, and to submit claims in respect of, Subordinated Obligations and to apply any amounts received thereon to the Guaranteed Obligations (including any and all Post-Petition Interest and Fees), and (ii) to require each Guarantor (A) to collect and enforce, and to submit claims in respect of, Subordinated Obligations and (B) to pay any amounts received on such obligations to the Administrative Agent for application to the Obligations (including any and all Post-Petition Interest and Fees).

### SECTION 11.05    Right of Contribution.

Each Guarantor hereby agrees that to the extent that a Subsidiary Guarantor shall have paid more than its proportionate share of any payment made hereunder, such Subsidiary Guarantor shall be entitled to seek and receive contribution from and against any other Guarantor hereunder which has not paid its proportionate share of such payment. Each Subsidiary Guarantor's right of contribution shall be subject to the terms and conditions of Section 11.04. The provisions of this Section 11.05 shall in no respect limit the obligations and liabilities of any Subsidiary Guarantor to the Administrative Agent, and the Lenders, and each Subsidiary Guarantor shall remain liable to the Administrative Agent, and the Lenders for the full amount guaranteed by such Subsidiary Guarantor hereunder.

### SECTION 11.06    Remedies.

The Guarantors jointly and severally agree that, as between the Guarantors and the Secured Parties, the obligations of the Borrower under this Agreement and the Loan Notes, if any, may be declared to be forthwith due and payable as provided in Section 8.02 (and shall be deemed to have become automatically due and payable in the circumstances provided in Section 8.02) for purposes of Section 11.01, notwithstanding any stay, injunction or other prohibition preventing such declaration (or such obligations from becoming automatically due and payable) as against the Borrower and that, in the event of such declaration (or such obligations being deemed to have become automatically due and payable), such obligations (whether or not due and payable by the Borrower) shall forthwith become due and payable by the Guarantors for purposes of Section 11.01.

### SECTION 11.07    Instrument for the Payment of Money.

Each Guarantor hereby acknowledges that the guarantee in this Article XI constitutes an instrument for the payment of money, and consents and agrees that any Lender or Agent, at its sole option, in the event of a dispute by such Guarantor in the payment of any moneys due hereunder, shall have the right to bring a motion-action under New York CPLR Section 3213.

SECTION 11.08    **Continuing Guaranty.**

The guarantee in this Article XI is a continuing guarantee of payment, and shall apply to all Guaranteed Obligations whenever arising.

SECTION 11.09    **General Limitation on Guarantee Obligations.**

In any action or proceeding involving any state corporate limited partnership or limited liability company law, or any applicable state, federal or foreign bankruptcy, insolvency, reorganization or other Law affecting the rights of creditors generally, if the obligations of any Guarantor under Section 11.01 would otherwise be held or determined to be void, voidable, invalid or unenforceable, or subordinated to the claims of any other creditors, on account of the amount of its liability under Section 11.01, then, notwithstanding any other provision to the contrary, the amount of such liability shall, without any further action by such Guarantor, any Loan Party or any other person, be automatically limited and reduced to the highest amount (after giving effect to the right of contribution established in Section 11.05) that is valid and enforceable and not subordinated to the claims of other creditors as determined in such action or proceeding.

SECTION 11.10    **Information.**

Each Guarantor assumes all responsibility for being and keeping itself informed of the Borrower's financial condition and assets, and of all other circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations and the nature, scope and extent of the risks that each Guarantor assumes and incurs under this Guaranty, and agrees that none of the Secured Parties shall have any duty to advise any Guarantor of information known to it regarding those circumstances or risks.

SECTION 11.11    **Release of Guarantors.**

If, in compliance with the terms and provisions of the Loan Documents, (i) all or substantially all of the Equity Interests or property of any Guarantor are sold or otherwise transferred (a "**Transferred Guarantor**") to a person or persons, none of which is a Loan Party or (ii) any Subsidiary Guarantor becomes an Excluded Subsidiary, such Transferred Guarantor shall, upon the consummation of such sale or transfer, be automatically released from its obligations under this Agreement (including under Section 10.05 hereof) and its obligations to pledge and grant any Collateral owned by it pursuant to any Collateral Document and, in the case of a sale of all or substantially all of the Equity Interests of the Transferred Guarantor, the pledge of such Equity Interests to the Administrative Agent pursuant to the Collateral Documents shall be automatically released, and, so long as the Borrower shall have provided the Agents such certifications or documents as any Agent shall reasonably request (which certifications and documents the Lenders hereby authorize and direct the Administrative Agent to conclusively rely upon in performing its obligations under this Section 11.11), the Administrative Agent shall, at such Transferred Guarantor's or the Borrower's expense, take such actions as are reasonably requested by the Borrower to effect each release described in this Section 11.11 in accordance with the relevant provisions of the Collateral Documents.

When all Commitments hereunder have terminated, and all Loans or other Obligations hereunder which are accrued and payable have been paid or satisfied, the guarantees made herein

shall terminate with respect to all Obligations, except with respect to Obligations that expressly survive such repayment pursuant to the terms of this Agreement.

[SIGNATURE PAGES FOLLOW]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

## EXHIBIT C

**Exit Intercreditor Agreement**

This **Exhibit C** contains the Exit Intercreditor Agreement.  Certain documents, or portions thereof, contained in this **Exhibit C** remain subject to continuing negotiations among the Debtors, the Required Consenting Stakeholders, the Exit ABL Agent and Lenders and/or other interested parties with respect thereto and to the agreement and approval of the applicable parties.  Subject to the terms and conditions of the Plan and the Restructuring Support Agreement, the Debtors reserve all rights to amend, revise, or supplement this **Exhibit C**, and any of the documents and designations contained herein, at any time before the Effective Date of the Plan, or any such other date as may be provided for by the Plan or by order of the Bankruptcy Court.  Each of the documents contained in this **Exhibit C** are subject to certain consent and approval rights to the extent provided in the Plan or the Restructuring Support Agreement.

## INTERCREDITOR AGREEMENT

This INTERCREDITOR AGREEMENT ("**Agreement**"), is dated as of January [__], 2021, and entered into by and among Northwest Hardwoods, Inc., a Delaware corporation (in each case, the "**Borrower**"), Hardwoods Intermediate Holdings II, Inc., a Delaware corporation ("**Holdings**"), the subsidiaries of Holdings party hereto (the "**Subsidiary Guarantors,**" and together with Holdings, the "**Guarantors**"), Bank of America, N.A., in its capacity as administrative agent for the holders of the ABL Obligations (as defined below) (together with its permitted successors and assigns, the "**Initial ABL Collateral Agent**") and [_____], in its capacity as collateral agent under the Term Loan Documents (as defined below) (together with its permitted successors and assigns, the "**Initial Term Loan Collateral Agent**") for the Term Loan Claimholders (as defined below). Capitalized terms used in this Agreement have the meanings assigned to them in Section 1 below or, if not otherwise defined, the ABL Credit Agreement (as such term is defined below).

## RECITALS

The Borrower, Holdings, the Subsidiary Guarantors, the Initial ABL Collateral Agent, the lenders party thereto, have entered into that certain Credit Agreement, dated as of the date hereof, providing asset-based revolving credit and letter-of-credit facilities to the Borrower (as amended, supplemented, amended and restated, replaced, Refinanced or otherwise modified from time to time, the "**Initial ABL Credit Agreement**");

The Borrower, Holdings, the Subsidiary Guarantors, the Initial Term Loan Collateral Agent and the lenders party thereto have entered into that certain [credit agreement], dated as of the date hereof, providing a term loan to Borrower (as amended, supplemented, amended and restated, replaced, Refinanced or otherwise modified from time to time, the "**Initial Term Loan Credit Agreement**");

The ABL Credit Agreement and the Term Loan Credit Agreement permit the Borrower to incur additional indebtedness secured by a Lien (as defined in the ABL Credit Agreement) on the Collateral ranking equal to the Lien securing the obligations of the Borrower and the Subsidiary Guarantors under the Term Loan;

In order to induce the ABL Collateral Agent, the other agents under the ABL Credit Agreement, and the ABL Lenders to enter into the ABL Credit Agreement and in order to induce the holders of the Term Loan Collateral Agent and Term Loan Lenders to enter into the Term Loan Credit Agreement, the ABL Collateral Agent (on behalf of itself and the other ABL Claimholders) and the Term Loan Collateral Agent (on behalf of itself and the other Term Loan Claimholders) have agreed to the relative priority of their respective Liens on the Collateral and certain other rights, priorities and interests as set forth in this Agreement.

## AGREEMENT

In consideration of the foregoing, the mutual covenants and obligations herein set forth and for other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

# SECTION 1.  Definitions.

      **1.1**     Defined Terms. As used in the Agreement, the following terms shall have the following meanings:

      "**ABL Claimholders**" means, at any relevant time, the holders of ABL Obligations at that time, including the ABL Lenders, the Issuing Banks (as defined in the ABL Credit Agreement), the ABL Collateral Agent, the other Secured Parties (as defined in the ABL Credit Agreement) and the other agents under the ABL Documents.

      "**ABL Collateral Agent**" means the Initial ABL Collateral Agent and any successor or other agent in such capacity under any ABL Credit Agreement.

      "**ABL Collateral Documents**" means the Security Documents (as defined in the ABL Credit Agreement) and any other agreement, document or instrument pursuant to which a Lien is granted by any Grantor securing any ABL Obligations or under which rights or remedies with respect to such Liens are governed.

      "**ABL Credit Agreement**" means, collectively, (a) the Initial ABL Credit Agreement and, subject to Section 5.4, any Refinancing thereof and (b) at any time the Initial ABL Credit Agreement is no longer outstanding, subject to Section 5.4, any other credit agreement or credit agreements, one or more debt facilities or commercial paper facilities, in each case, with banks or other lenders providing for revolving credit loans, term loans, receivables financing (including through the sale of receivables to such lenders or to special purpose entities formed to borrow from (or sell such receivables to) such lenders), letters of credit, bankers' acceptances, or other borrowings, that have been incurred to increase, replace (whether upon or after termination or otherwise), refinance or refund in whole or in part from time to time the Obligations outstanding under the Initial ABL Credit Agreement or any other agreement or instrument referred to in this clause, whether or not such increase, replacement, refinancing or refunding occurs (i) with the original parties thereto, (ii) on one or more separate occasions or (iii) simultaneously or not with the termination or repayment of the Initial ABL Credit Agreement or any other agreement or instrument referred to in this clause, unless such agreement or instrument expressly provides that it is not intended to be and is not an ABL Credit Agreement, or such agreement or instrument does not constitute a Refinancing of the ABL Credit Agreement. Any reference to the ABL Credit Agreement hereunder shall be deemed a reference to any ABL Credit Agreement then in existence.

      "**ABL Default**" means an "**Event of Default**" (as defined in the ABL Credit Agreement).

      "**ABL Documents**" means the ABL Credit Agreement, the Loan Documents (as defined in the ABL Credit Agreement), and each of the other agreements, documents and instruments providing for or evidencing any other ABL Obligation, and any other document or instrument executed or delivered at any time in connection with any ABL Obligations, including any intercreditor or joinder agreement among holders of ABL Obligations to the extent such are effective at the relevant time, as each may be amended, restated, supplemented, modified, renewed, extended or Refinanced from time to time in accordance with the provisions of this Agreement.

2

"**ABL Facility Collateral**" means all assets and property of any Grantor over which a Lien has been granted, or is purported to have been granted in favor of any ABL Claimholder under any ABL Collateral Document other than ABL Priority Collateral.

"**ABL Lenders**" means the "**Lenders**" under and as defined in the ABL Credit Agreement.

"**ABL Obligations**" means all "**Obligations**" (as defined in the ABL Credit Agreement), including, without limitation, all obligations of every nature of each Grantor under the ABL Documents, including obligations from time to time owed to the ABL Collateral Agent, the ABL Lenders and/or any other ABL Claimholders or any of them under any ABL Document, whether for principal, interest (including Post-Petition Interest which, but for the filing of an Insolvency or Liquidation Proceeding with respect to such Grantor, would have accrued on any such obligation, whether or not a claim is allowed against such Grantor for such Post-Petition Interest in the related Insolvency or Liquidation Proceeding), reimbursement of amounts drawn under letters of credit, fees, expenses, indemnification or otherwise.

"**ABL Priority Collateral**" means the following assets of the Borrower and the Guarantors: (a) all Accounts Receivable (except to the extent constituting proceeds of equipment, real property or Intellectual Property); (b) all inventory; (c) all instruments, chattel paper and other contracts, in each case evidencing, or substituted for, any Accounts Receivable referred to in clause (a) above; (d) all guarantees, supporting obligations and related letters of credit, security and other credit enhancements in each case for the Accounts Receivable referred to in clause (a) above; (e) all documents of title for any inventory; (f) all commercial tort claims and general intangibles, including contracts, to the extent relating to any of the items of property included within the other clauses of this paragraph; (g) all cash, cash equivalents, Deposit Accounts and Securities Accounts (including all cash and other funds on deposit therein and including "uncertificated securities" and "securities entitlements" (as defined in Article 8 of the UCC), except to the extent constituting identifiable proceeds of the Term Loan Priority Collateral); (h) all tax refunds (other than tax refunds relating to equipment, real property or Intellectual Property); (i) all Documents and books and records relating to any of the foregoing; (j) proceeds and receivables arising under policies of business interruption insurance, to the extent such proceeds relate to ABL Priority Collateral and (k) all substitutions, replacements, accessions, products or proceeds (including, without limitation, insurance proceeds) of any of the foregoing, in each case, to the extent a Lien has been granted or is purported to have been granted in favor of any ABL Claimholder under any ABL Collateral Document; provided, however, that to the extent that identifiable proceeds of Term Loan Priority Collateral are deposited or held in any Deposit Accounts or Securities Accounts that constitute ABL Priority Collateral after an Enforcement Notice, then (as provided in Section 3.5 below) such Collateral or other identifiable proceeds shall be treated as Term Loan Priority Collateral for purposes of this Agreement. For greater certainty, ABL Priority Collateral does not include any Intellectual Property or the Capital Stock of any Subsidiary of any Grantor. Terms used in this definition and not otherwise defined herein shall have the meanings given to them in the UCC as in effect in the State of New York.

"**ABL Standstill Period**" has the meaning set forth in Section 3.2(a)(1).

"**Access Acceptance Notice**" has the meaning assigned to that term in Section 3.3(b).

"**Access Period**" means for each parcel of real property secured by a Mortgage, the period, after the commencement of an Enforcement Period, which begins on the day that the ABL Collateral Agent provides the Term Loan Collateral Agent with the notice of its election to request access to any real property secured by a Mortgage pursuant to Section 3.3(b) below and ends on the earliest of (i) the 180th day after the ABL Collateral Agent obtains the ability to use, take physical possession of, remove or otherwise control the use or access to the Collateral located on such parcel of real property plus such number of days, if any, after the ABL Collateral Agent obtains access to such Collateral that it is stayed or otherwise prohibited by law or court order from exercising remedies with respect to Collateral located on such property secured by a Mortgage, (ii) the date on which all or substantially all of the ABL Priority Collateral located on such parcel of real property is sold, collected or liquidated, (iii) the date on which the Discharge of ABL Obligations occurs and (iv) the date on which the ABL Default that was the subject of the applicable Enforcement Notice relating to such Enforcement Period has been cured to the satisfaction of the ABL Collateral Agent or waived in writing in accordance with the requirements of the applicable Credit Document.

"**Accounts Receivable**" means (i) all "accounts," as such term is defined in the UCC as in effect in the State of New York and (ii) all other rights to payment of money or funds, whether or not earned by performance, (a) for inventory that has been or are to be sold, leased, licensed, assigned, or otherwise disposed of, (b) for services rendered or to be rendered, or (c) owed by a credit card issuer or by a credit card processor resulting from purchases by customers using credit or debit cards issued by such issuer in connection with the transactions described in clauses (a) and (b) above, whether such rights to payment constitute payment intangibles, letter-of-credit rights or any other classification of property, or are evidenced in whole or in part by instruments, chattel paper, general intangibles or documents.

"**Additional Pari Passu Obligations**" means Indebtedness of the Grantors issued following the date of this Agreement (together with all obligations in respect of such Indebtedness, including all principal, premium, interest, fees, attorney's fees, costs, charges, expenses, reimbursement obligations, indemnities, guarantees, and all other amounts payable under or secured by any Additional Pari Passu Obligations Agreement (including, in each case, all Post-Petition Interest)) to the extent (a) such Indebtedness is permitted by the terms of the ABL Credit Agreement, the Term Loan Credit Agreement and each other Additional Pari Passu Obligations Agreement then in effect to be secured by Liens on the Collateral ranking *pari passu* with the Liens securing the Term Loan Obligations, (b) the Grantors have granted Liens on the Collateral to secure such Indebtedness and the obligations in respect of such Indebtedness, and (c) the Additional Pari Passu Obligations Agent, for the holders of such Indebtedness, has (x) prior to the Discharge of Term Loan Obligations, executed a joinder agreement to the applicable Term Loan Collateral Documents in the form attached thereto (or other form reasonably satisfactory to the Term Loan Collateral Agent) agreeing on behalf of itself and such holders to (i) be bound by the terms of this Agreement applicable to them, (ii) appoint the Term Loan Collateral Agent to act as their collateral agent and representative hereunder and (iii) agree to be bound by the *pari passu* intercreditor provisions contained in the Term Loan Collateral Documents entered into in connection with the Term Loan Credit Agreement (which provisions are binding on the Term Loan

Claimholders only) or (y) from and after the Discharge of Term Loan Obligations, either complied with clause (x) above or executed a joinder agreement to this Agreement in form and substance reasonably acceptable to the ABL Collateral Agent and the Term Loan Collateral Agent.

"**Additional Pari Passu Obligations Agent**" means the Person appointed to act as trustee, agent or representative for the holders of Additional Pari Passu Obligations pursuant to any Additional Pari Passu Obligations Agreement.

"**Additional Pari Passu Obligations Agreement**" means the indenture, credit agreement or other agreement under which any Additional Pari Passu Obligations are incurred.

"**Affiliate**" means, as applied to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, that Person. For the purposes of this definition, "**control**" (including, with correlative meanings, the terms "**controlling,**" "**controlled by**" and "**under common control with**"), as applied to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of that Person, whether through the ownership of voting securities or by agreement or otherwise.

"**Agreement**" means this Intercreditor Agreement, as amended, restated, renewed, extended, supplemented or otherwise modified from time to time.

"**Bankruptcy Code**" means Title 11 of the United States Code entitled "**Bankruptcy,**" as now and hereafter in effect, or any successor statute.

"**Borrower**" has the meaning assigned to such term in the Recitals.

"Capital Stock" means:

(1)     in the case of a corporation, corporate stock;

(2)     in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock;

(3)     in the case of a partnership or limited liability company, partnership interests (whether general or limited) or membership interests; and

(4)     any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person, but excluding from all of the foregoing any debt securities convertible into Capital Stock, whether or not such debt securities include any right of participation with Capital Stock.

"**Claimholders**" means, collectively, the ABL Claimholders and the Term Loan Claimholders.

"**Closing Date**" means [_____].

"**Collateral**" means all of the assets and property of any Grantor, whether now owned or hereafter acquired, whether real, personal or mixed, constituting either ABL Priority Collateral or Term Loan Priority Collateral.

"**Collateral Agents**" means, collectively, the ABL Collateral Agent and the Term Loan Collateral Agent and "**Collateral Agent**" shall mean either the ABL Collateral Agent or the Term Loan Collateral Agent, as the context may require.

"**Collateral Enforcement Action**" means, collectively or individually for one or more of the Collateral Agents, when an ABL Default or Term Loan Default, as the case may be, has occurred and is continuing, whether or not in consultation with any other Collateral Agent, any action by any Collateral Agent to repossess or join any Person in repossessing, or exercise or join any Person in exercising, or institute or maintain or participate in any action or proceeding with respect to, any remedies with respect to any Collateral or commence the judicial enforcement of any of the rights and remedies with respect to Collateral under the Credit Documents or under any applicable law, but in all cases (i) including, without limitation, (a) instituting or maintaining, or joining any Person in instituting or maintaining, any enforcement, contest, protest, attachment, collection, execution, levy or foreclosure action or proceeding with respect to any Collateral, whether under any Credit Document or otherwise, (b) exercising any right of setoff with respect to any Credit Party or (c) exercising any remedy under any Deposit Account Control Agreement (as defined in the ABL Credit Agreement), landlord access agreement, bailee letter or similar agreement or arrangement and (ii) excluding the imposition of a default rate or late fee; provided, that notwithstanding anything to the contrary in the foregoing, the exercise of rights or remedies by the ABL Collateral Agent under any Deposit Account Control Agreement during a Cash Dominion Period (as defined in the ABL Credit Agreement) shall not constitute a Collateral Enforcement Action under this Agreement.

"**Contingent Obligations**" means at any time, any indemnification or other similar contingent obligations which are not then due and owing at the time of determination.

"**Corporate Trust Office**" means the office of the Term Loan Collateral Agent at which at any particular time its corporate trust business shall be principally administered, which office at the date of the execution of this instrument is located at the address listed in Exhibit B, or such other address as the Term Loan Collateral Agent may designate from time to time by notice to the Borrower and the ABL Collateral Agent, or the principal corporate trust office of any successor Term Loan Collateral Agent (or such other address as such successor Term Loan Collateral Agent may designate from time to time by notice to the Borrower and the ABL Collateral Agent).

"**Credit Documents**" means, collectively, the ABL Documents and the Term Loan Documents.

"**Credit Party**" means the Borrower and each of the Guarantors.

"**Debtor Relief Laws**" means the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement,

138905220_2

receivership, insolvency, reorganization, or similar debtor relief laws of any state or other applicable jurisdictions from time to time in effect.

"**Deposit Account**" as defined in the UCC.

"**DIP Financing**" has the meaning assigned to that term in Section 6.1.

"**Discharge of ABL Obligations**" means, except to the extent otherwise expressly provided in Section 5.4:

(a)     payment in full in cash of the principal of and interest (including Post-Petition Interest), on all Indebtedness outstanding under the ABL Documents and constituting ABL Obligations;

(b)     payment in full in cash of all other ABL Obligations that are due and payable or otherwise accrued and owing at or prior to the time such principal and interest are paid (other than any indemnification obligations for which no claim or demand for payment, whether oral or written, has been made at such time);

(c)     termination or expiration of all commitments, if any, to extend credit that would constitute ABL Obligations; and

(d)     termination of all letters of credit issued under the ABL Documents and constituting ABL Obligations or providing cash collateral or backstop letters of credit acceptable to the ABL Collateral Agent in an amount equal to 103% of the applicable outstanding reimbursement obligation (in a manner reasonably satisfactory to the ABL Collateral Agent).

"**Discharge of Term Loan Obligations**" means, except to the extent otherwise expressly provided in Section 5.4:

(a)     payment in full in cash of all Term Loan Obligations (other than any indemnification obligations for which no claim or demand for payment, whether oral or written, has been made at such time), including Post-Petition Interest, and termination or expiration of all commitments, if any, to extend credit that would constitute Term Loan Obligations; or

(b)     (x) satisfaction and discharge of the Term Loan Credit Agreement and any Additional Pari Passu Obligations Agreement pursuant to the respective terms thereof as a result of which the Term Loan Obligations are no longer secured by Collateral; or

(b)     legal or covenant defeasance of the Term Loan Credit Agreement and any Additional Pari Passu Obligations Agreement pursuant to the respective terms thereof pursuant to its terms as a result of which the Term Loan Obligations are no longer secured by Collateral.

"**Disposition**" has the meaning assigned to that term in Section 5.1(b).

"**Enforcement Notice**" means a written notice delivered, at a time when an ABL Default or Term Loan Default has occurred and is continuing, by either (a) in the case of an ABL Default, the ABL Collateral Agent to the Term Loan Collateral Agent or (b) in the case of a Term

Loan Default, the Term Loan Collateral Agent to the ABL Collateral Agent, in each case, announcing that an Enforcement Period has commenced, specifying the relevant event of default and stating the current balance of the ABL Obligations or the Term Loan Obligations, as applicable.

"**Enforcement Period**" means the period of time following the receipt by either the ABL Collateral Agent or the Term Loan Collateral Agent of an Enforcement Notice until the earliest of (i) in the case of an Enforcement Period commenced by the Term Loan Collateral Agent, the Discharge of Term Loan Obligations, (ii) in the case of an Enforcement Period commenced by the ABL Collateral Agent, the Discharge of ABL Obligations, (iii) the ABL Collateral Agent or the Term Loan Collateral Agent (as applicable) agrees in writing to terminate the Enforcement Period, or (iv) the date on which the ABL Default or the Term Loan Default that was the subject of the Enforcement Notice relating to such Enforcement Period has been cured to the satisfaction of the ABL Collateral Agent or the Term Loan Collateral Agent, as applicable, or waived in writing in accordance with the requirements of the applicable Credit Documents.

"**Grantors**" means the Borrower, Holdings, each other Guarantor and each other Person that has or may from time to time hereafter execute and deliver a Term Loan Collateral Document or an ABL Collateral Document as a "**grantor**" or "**pledgor**" (or the equivalent thereof).

"**Guarantor**" has the meaning set forth in the Preamble to this Agreement. "**Holdings**" has the meaning set forth in the Preamble to this Agreement.

"**Indebtedness**" means and includes all Obligations that constitute "Indebtedness" within the meaning of the Term Loan Credit Agreement or the ABL Credit Agreement, as applicable.

"**Initial ABL Credit Agreement**" has the meaning assigned to that term in the Recitals to this Agreement.

"**Initial ABL Collateral Agent**" has the meaning assigned to that term in the Recitals to this Agreement.

"**Initial Borrower**" has the meaning assigned to such term in the Recitals.

"**Initial Term Loan Collateral Agent**" has the meaning assigned to that term in the Recitals to this Agreement.

"Insolvency or Liquidation Proceeding" means:

(a)        any voluntary or involuntary case or proceeding under the Bankruptcy Code or any other Debtor Relief Law with respect to any Grantor;

(b)        any other voluntary or involuntary insolvency, reorganization, winding-up or bankruptcy case or proceeding, or any receivership, liquidation, reorganization or other similar case or proceeding with respect to any Grantor or with respect to a material portion of their respective assets (other than any merger or consolidation, liquidation, windup or dissolution not

involving bankruptcy that is expressly permitted pursuant to the terms of the ABL Credit Agreement, the Term Loan Credit Agreement and each Additional Pari Passu Obligations Agreement then in effect);

(c)     any liquidation, dissolution, reorganization or winding up of any Grantor whether voluntary or involuntary and whether or not involving insolvency or bankruptcy (other than any merger or consolidation, liquidation, windup or dissolution not involving bankruptcy that is expressly permitted pursuant to the terms of the ABL Credit Agreement, the Term Loan Credit Agreement and each Additional Pari Passu Obligations Agreement then in effect);

(d)     any case or proceeding seeking arrangement, adjustment, protection, relief or composition of any debt or other property of any Grantor;

(e)     any case or proceeding seeking the entry of an order of relief or the appointment of a custodian, receiver, trustee or other similar proceeding with respect to any Grantor or any property or Indebtedness of any Grantor; or

(f)     any assignment for the benefit of creditors or any other marshalling of assets and liabilities of any Grantor.

"**Intellectual Property**" means all forms of U.S. and non-U.S. intellectual property rights and protections, including all title, interests and other proprietary rights in and to: (i) trademarks and goodwill; (ii) patents; (iii) copyrights; (iv) confidential and proprietary information, trade secrets and knowhow, including, without limitation, in processes, schematics, databases, formulae, drawings, prototypes, models, designs and customer lists; and (v) all other intellectual property or proprietary rights and claims or causes of action arising out of or related to any infringement, misappropriation or other violation of any of the foregoing, including, without limitation, rights to recover for past, present and future violations thereof.

["**Mortgage**" means each mortgage, deed of trust, deed of hypothec, or deed to secure debt pursuant to which a Grantor grants to (a) the ABL Collateral Agent, for the benefit of the ABL Claimholders, Liens upon the real property Collateral owned or leased by such Grantor, as security for the ABL Obligations or (b) the Term Loan Collateral Agent, for the benefit of the Term Loan Claimholders, Liens upon the real property Collateral owned or leased by such Grantor, as security for the Term Loan Obligations.]

"**New Agent**" has the meaning assigned to that term in Section 5.4.

"**New Debt Notice**" has the meaning assigned to that term in Section 5.4.

"**Notice of Occupancy**" has the meaning assigned to that term in Section 3.3(b).

"**Obligations**" means, as applicable, (a) all ABL Obligations and (b) all Term Loan Obligations.

"**Other Obligations**" means, (x) in the case of the Discharge of ABL Obligations, the Term Loan Obligations and (y) in the case of the Discharge of Term Loan Obligations, the ABL Obligations.

9

"**Person**" has the meaning assigned to that term in the ABL Credit Agreement. "**Pledged Collateral**" has the meaning set forth in Section 5.3.

"**Post-Petition Interest**" means, with respect to any obligations, interest, fees, expenses and other charges that pursuant to the Term Loan Documents or the ABL Documents, as applicable, continue to accrue after the commencement of any Insolvency or Liquidation Proceeding, whether or not such interest, fees, expenses and other charges are allowed or allowable under the Debtor Relief Laws or in any such Insolvency or Liquidation Proceeding.

"**Priority Collateral**" with respect to the ABL Claimholders, all ABL Priority Collateral, and with respect to the Term Loan Claimholders, all Term Loan Priority Collateral.

"**Recovery**" has the meaning set forth in Section 6.4.

"**Refinance**" means, in respect of any Indebtedness, to refinance, extend, renew, defease, amend, modify, supplement, restructure, replace, refund or repay, or to issue other indebtedness, in exchange or replacement for, such Indebtedness in whole or in part. "**Refinanced**" and "**Refinancing**" shall have correlative meanings.

"**Securities Account**" as defined in the UCC.

"**Subsidiary**" has the meaning assigned to that term in the Term Loan Credit Agreement.

"**Subsidiary Guarantors**" has the meaning set forth in the Preamble to this Agreement.

"**Term Loan Claimholders**" means at any relevant time, the holders of Term Loan Obligations at that time, including the Term Loan Lenders, the Term Loan Collateral Agent, the other Secured Parties (as defined in the Term Loan Credit Agreement) and the other agents under the Term Loan Documents.

"**Term Loan Collateral**" means all of the assets and property of any Grantor, whether real, personal or mixed, with respect to which a Lien is granted as security for any Term Loan Obligations.

"**Term Loan Collateral Agent**" (i) prior to the Discharge of Term Loan Obligations, the Initial Term Loan Collateral Agent and any successor or other agent in such capacity and (ii) from and after the Discharge of Term Loan Obligations, means the Additional Pari Passu Obligations Agent, and if there is more than one Additional Pari Passu Obligations Agent at such time, the Additional Pari Passu Obligations Agent designated in writing delivered to the ABL Collateral Agent by the holders of a majority of the then outstanding principal amount of the Additional Pari Passu Obligations to act as Term Loan Collateral Agent hereunder and such Additional Pari Passu Obligations Agent shall have become a party to this Agreement and the other applicable Term Loan Collateral Documents. Each reference hereunder to Term Loan Collateral Agent acting on behalf of itself refers to it not in its individual capacity, but solely as Term Loan Collateral Agent.

"**Term Loan Collateral Documents**" means the Term Loan Security Agreement and any other agreement pursuant to which a Lien is granted securing (or purporting to secure) any Term Loan Obligations or under which rights or remedies with respect to such Liens are governed.

"**Term Loan Credit Agreement**" means, collectively, (a) the Initial Term Loan Credit Agreement and, subject to Section 5.4, any Refinancing thereof and (b) at any time the Initial Term Loan Credit Agreement is no longer outstanding, subject to Section 5.4, any other credit agreement or credit agreements, one or more debt facilities or commercial paper facilities, in each case, with banks or other lenders providing for term loans or other borrowings, that have been incurred to increase, replace (whether upon or after termination or otherwise), refinance or refund in whole or in part from time to time the Obligations outstanding under the Initial Term Loan Credit Agreement or any other agreement or instrument referred to in this clause, whether or not such increase, replacement, refinancing or refunding occurs (i) with the original parties thereto, (ii) on one or more separate occasions or (iii) simultaneously or not with the termination or repayment of the Initial Term Loan Credit Agreement or any other agreement or instrument referred to in this clause, unless such agreement or instrument expressly provides that it is not intended to be and is not a Term Loan Credit Agreement, or such agreement or instrument does not constitute a Refinancing of the Term Loan Credit Agreement. Any reference to the Term Loan Credit Agreement hereunder shall be deemed a reference to any Term Loan Credit Agreement then in existence.

"**Term Loan Default**" means an "**Event of Default**" or equivalent term (as defined in the Term Loan Credit Agreement or in any Additional Pari Passu Obligations Agreement).

"**Term Loan Documents**" means the Term Loan Credit Agreement, the Term Loan Collateral Documents, each Additional Pari Passu Obligations Agreement, and each of the other agreements, documents and instruments executed pursuant thereto, and any other document or instrument executed or delivered at any time in connection with any Term Loan Obligations, including any intercreditor or joinder agreement among holders of Term Loan Obligations to the extent such are effective at the relevant time.

"**Term Loan Lenders**" means the "**Lenders**" under and as defined in the Term Loan Credit Agreement.

"**Term Loan Obligations**" means the ["**Secured Obligations**"] as that term is defined in the Term Loan Security Agreement and all other obligations, Indebtedness, liabilities and other amounts owing, due, or secured under the terms of the Term Loan Credit Agreement, any Additional Pari Passu Obligations Agreement or any other Term Loan Document, whether now existing or arising hereafter, including all principal, premium, interest, fees, attorney's fees, costs, charges, expenses, reimbursement obligations, indemnities, guarantees, and all other amounts payable under or secured by any Term Loan Document (including, in each case, all Post-Petition Interest accruing on or after the commencement of any Insolvency or Liquidation Proceeding at the rate provided in the relevant Term Loan Document, whether or not a claim for such Post-Petition Interest is allowed or allowable in any such Insolvency or Liquidation Proceeding).

"**Term Loan Priority Collateral**" means all equipment, fixtures, real property, Capital Stock of Subsidiaries, Intellectual Property and all other assets and property of any Grantor over which a Lien has been granted, or is purported to have been granted in favor of any Term Loan Claimholder under any Term Loan Collateral Document other than the ABL Priority Collateral.

"**Term Loan Security Agreement**" means the Collateral Agreement, dated as of the date hereof, between the Borrower, the Guarantors and the Term Loan Collateral Agent and shall include any comparable pledge and security agreement securing any Refinancing of the Term Loan Obligations, in each case, as amended, supplemented or otherwise modified from time to time.

"**Term Loan Standstill Period**" has the meaning set forth in Section 3.1(a)(1).

"**UCC**" means the Uniform Commercial Code as in effect from time to time in any applicable jurisdiction.

     **1.2**    <u>Terms Generally</u>. The definitions of terms in this Agreement shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise:

    (a)    any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, supplemented, modified, renewed or extended in accordance with the terms of this Agreement (including in connection with any Refinancing);

    (b)    any reference herein to any Person shall be construed to include such Person's permitted successors and assigns;

    (c)    the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof;

    (d)    all references herein to Sections shall be construed to refer to Sections of this Agreement;

    (e)    all references to terms defined in the UCC in effect in the State of New York shall have the meaning ascribed to them therein (unless otherwise specifically defined herein); and

    (f)    the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

138905220_2

**SECTION 2.  Lien Priorities.**

      **2.1**    Relative Priorities. Notwithstanding the date, time, method, manner or order of grant, attachment or perfection of any Liens securing the Term Loan Obligations granted on the Collateral or of any Liens securing the ABL Obligations granted on the Collateral and notwithstanding any provision of any UCC or any other applicable law or the ABL Loan Documents or the Term Loan Documents or any defect or deficiencies in, or failure to perfect, the Liens securing the ABL Obligations or Term Loan Obligations or any other circumstance whatsoever, the ABL Collateral Agent, on behalf of itself and/or the ABL Claimholders, and the Term Loan Collateral Agent, on behalf of itself and/or the Term Loan Claimholders, hereby each agrees that:

      (a)    any Lien of the ABL Collateral Agent on the ABL Priority Collateral, whether now or hereafter held by or on behalf of the ABL Collateral Agent or any ABL Claimholders or any agent or trustee therefor, regardless of how acquired, whether by grant, possession, statute, operation of law, subrogation or otherwise, shall be senior in all respects and prior to all Liens on the ABL Priority Collateral securing any Term Loan Obligations; and

      (b)    any Lien of the Term Loan Collateral Agent on the Term Loan Priority Collateral, whether now or hereafter held by or on behalf of the Term Loan Collateral Agent, any Term Loan Claimholder or any agent or trustee therefor regardless of how acquired, whether by grant, possession, statute, operation of law, subrogation or otherwise, shall be senior in all respects to all Liens on the Term Loan Priority Collateral securing any ABL Obligations.

      **2.2**    Prohibition on Contesting Liens. The Term Loan Collateral Agent, for itself and on behalf of each Term Loan Claimholder, and the ABL Collateral Agent, for itself and on behalf of each ABL Claimholder, agrees that it will not (and hereby waives any right to) contest or support any other Person in contesting, in any proceeding (including any Insolvency or Liquidation Proceeding), the perfection, priority, validity or enforceability of a Lien held by or on behalf of any of the ABL Claimholders or any of the Term Loan Claimholders in the Collateral, or the provisions of this Agreement; provided that nothing in this Agreement shall be construed to prevent or impair the rights of any Collateral Agent or any ABL Claimholder or Term Loan Claimholder to (i) enforce this Agreement, including the provisions of this Agreement relating to the priority of the Liens securing the Obligations as provided in Sections 2.1, 3.1 and 3.2 and (ii) challenge the characterization of any item of Collateral as ABL Priority Collateral, ABL Facility Collateral, Term Loan Priority Collateral or Term Loan Collateral or the value of items of Term Loan Priority Collateral or ABL Priority Collateral.

      **2.3**    No New Liens. Until the Discharge of ABL Obligations or the Discharge of Term Loan Obligations has occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against the Borrower or any other Grantor, the parties hereto acknowledge and agree that it is their intention that:

(a)      there shall be no Liens on any asset or property of any Grantor to secure any Term Loan Obligations unless a Lien on such asset or property also secures the ABL Obligations; or

(b)      there shall be no Liens on any asset or property of any Grantor to secure any ABL Obligations unless a Lien on such asset or property also secures the Term Loan Obligations.

The Borrower shall not, and shall not permit any other Grantor to (a) grant or permit any additional Liens on any asset or property to secure any Term Loan Obligations unless it has granted or concurrently grants a Lien on such asset or property to secure the ABL Obligations, or (b) grant or permit any additional Liens on any asset or property to secure any ABL Obligations unless it has granted or concurrently grants a Lien on such asset or property to secure the Term Loan Obligations.

To the extent any additional Liens are granted on any asset or property as described above, the priority of such additional Liens shall be determined in accordance with Section 2.1. In addition, to the extent that Liens are granted on any asset or property to secure any Term Loan Obligation or ABL Obligation, as applicable, and a corresponding Lien is not granted to secure the ABL Obligations or Term Loan Obligations, as applicable, without limiting any other rights and remedies available hereunder, the ABL Collateral Agent, on behalf of the ABL Claimholders and the Term Loan Collateral Agent, on behalf of the Term Loan Claimholders, shall be deemed to hold such Lien on behalf of all ABL Claimholders and Term Loan Claimholders and any amounts received by or distributed to any of them pursuant to or as a result of Liens granted in contravention of this Section 2.3 shall be subject to Section 4.2.

2.4      Similar Liens and Agreements. The parties hereto agree that it is their intention that the ABL Facility Collateral and the Term Loan Collateral (except as set forth in Section 2.4(c)) be identical. In furtherance of the foregoing and of Section 8.9, the parties hereto agree, subject to the other provisions of this Agreement:

(a)      upon request by the ABL Collateral Agent or the Term Loan Collateral Agent, to cooperate in good faith (and to direct their counsel to cooperate in good faith) from time to time in order to determine the specific items included in the ABL Facility Collateral and the Term Loan Collateral and the steps taken to perfect their respective Liens thereon and the identity of the respective parties obligated under the ABL Documents and the Term Loan Documents; and

(b)      that the ABL Collateral Documents, taken as a whole, and the Term Loan Collateral Documents, taken as a whole, shall be in all material respects the same forms of documents other than with respect to differences to reflect the nature of the lending arrangements and the first and second lien nature of the Obligations thereunder with respect to the Term Loan Priority Collateral and the ABL Priority Collateral.

(c)      Notwithstanding anything in this Agreement or any other Credit Documents to the contrary, collateral consisting of cash and deposit account balances pledged to secure ABL Obligations consisting of reimbursement obligations in respect of Letters of Credit

held by the ABL Collateral Agent pursuant to Section 2.05 of the ABL Credit Agreement (or any equivalent successor provision) shall be applied as specified in the ABL Credit Agreement and will not be subject to provisions of Sections 2.3 and 2.4 of this Agreement.

## SECTION 3.  Enforcement.

      3.1    Exercise of Remedies – Restrictions on Term Loan Collateral Agent.

(a)    Until the Discharge of ABL Obligations has occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against any Grantor, the Term Loan Collateral Agent and the Term Loan Claimholders:

(1)    will not exercise or seek to exercise any rights or remedies with respect to any ABL Priority Collateral (including the exercise of any right of setoff or any right under any lockbox agreement or any control agreement with respect to Deposit Accounts) or institute any action or proceeding with respect to such rights or remedies (including any action of foreclosure); provided, however, that the Term Loan Collateral Agent (or any Person authorized by it) may exercise any or all such rights or remedies after the passage of a period of at least 180 days has elapsed since the later of: (A) the date on which the Term Loan Collateral Agent declared the existence of a Term Loan Default under the Term Loan Credit Agreement or any document governing any Additional Pari Passu Obligations and demanded the repayment of all of the principal amount of the Term Loan Obligations under the Term Loan Credit Agreement and the Term Loan (or the Additional Pari Passu Obligations Agent for such series of Additional Pari Passu Obligations demanded the repayment of all Additional Pari Passu Lien Obligations of such series); and (B) the date on which the ABL Collateral Agent received notice from the Term Loan Collateral Agent of such declaration of a Term Loan Default and such demand (the "**Term Loan Standstill Period**"); provided, further, however, that notwithstanding anything herein to the contrary, in no event shall the Term Loan Collateral Agent or any Term Loan Claimholder exercise any rights or remedies with respect to the ABL Priority Collateral if, notwithstanding the expiration of the Term Loan Standstill Period, the ABL Collateral Agent or ABL Claimholders shall have commenced and be diligently pursuing the exercise of their rights or remedies with respect to all or any material portion of the ABL Collateral (prompt notice of such exercise to be given to the Term Loan Collateral Agent);

(2)    will not contest, protest or object to, or otherwise interfere with, any foreclosure proceeding or action brought by the ABL Collateral Agent or any ABL Claimholder or any other exercise by the ABL Collateral Agent or any ABL Claimholder of any rights and remedies relating to the ABL Priority Collateral, whether under the ABL Documents or otherwise;

(3)    subject to their rights under clause (a)(1) above and except as may be permitted in Section 3.1(c), will not object to the forbearance by the ABL Collateral Agent or any of the ABL Claimholders from bringing or pursuing any Collateral Enforcement Action; and

(4)     will not challenge the validity or enforceability of any Obligations under the ABL Documents or any Lien of the ABL Collateral Agent;

provided, however, that, in the case of (1), (2) and (3) above, the Liens granted to secure the Term Loan Obligations of the Term Loan Claimholders shall attach to the proceeds of any enforcement or exercise of remedies by the ABL Claimholders subject to the relative priorities described in Section 2.

(b)     Until the Discharge of ABL Obligations has occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against any Grantor, the Term Loan Collateral Agent, for itself and on behalf of the Term Loan Claimholders, agrees that the ABL Collateral Agent and the ABL Claimholders shall have the right to enforce rights, exercise remedies (including setoff and the right to credit bid their debt) and, in connection therewith (including voluntary Dispositions of ABL Priority Collateral by the respective Grantors after an ABL Default) make determinations regarding the release, disposition, or restrictions with respect to the ABL Priority Collateral (including, without limitation, exercising remedies under Deposit Account Control Agreements) without any consultation with or the consent of the Term Loan Collateral Agent or any Term Loan Claimholder; provided, however, that the Lien securing the Term Loan Obligations shall remain on the proceeds (other than those properly applied to the ABL Obligations) of such Collateral released or disposed of subject to the relative priorities described in Section 2. The Term Loan Collateral Agent, for itself and on behalf of the Term Loan Claimholders, agrees that, in exercising rights and remedies with respect to the ABL Priority Collateral, the ABL Collateral Agent and the ABL Claimholders may enforce the provisions of the ABL Documents and exercise remedies thereunder, all in such order and in such manner as they may determine in the exercise of their sole discretion. Such exercise and enforcement shall include the rights of an agent appointed by them to sell or otherwise dispose of the ABL Priority Collateral upon foreclosure, to incur expenses in connection with such sale or disposition, and to exercise all the rights and remedies of a secured creditor under the UCC and of a secured creditor under the Debtor Relief Laws of any applicable jurisdiction.

(c)     Notwithstanding anything herein to the contrary, the Term Loan Collateral Agent and any Term Loan Claimholder may:

(1)     file a claim or statement of interest with respect to the Term Loan Obligations; provided that an Insolvency or Liquidation Proceeding has been commenced by or against any Grantor;

(2)     take any action in order to create, perfect, preserve or protect (but not enforce) its Lien on any of the Collateral; provided that such action shall not be inconsistent with the terms of this Agreement and shall not be adverse to the priority status of the Liens on the ABL Priority Collateral, or the rights of the ABL Collateral Agent or the ABL Claimholders to exercise remedies in respect thereof;

(3)     file any necessary or appropriate responsive or defensive pleadings in opposition to any motion, claim, adversary proceeding or other pleading made by any Person objecting to or otherwise seeking the disallowance of the claims or Liens of the

16

Term Loan Claimholders, including any claims secured by the ABL Priority Collateral, if any, in each case in accordance with the terms of this Agreement;

(4)     file any pleadings, objections, motions or arguments which assert rights or interests available to unsecured creditors of the Grantors arising under either any Insolvency or Liquidation Proceeding or applicable non-bankruptcy law, in each case not inconsistent with the terms of this Agreement;

(5)     vote on any plan of reorganization, file any proof of claim, make other filings and make any arguments and motions that are, in each case, in accordance with the terms of this Agreement, with respect to the Term Loan Obligations and the Term Loan Collateral; and

(6)     exercise any of its rights or remedies with respect to any of the Collateral after the termination of the Term Loan Standstill Period to the extent permitted by Section 3.1(a)(1).

The Term Loan Collateral Agent, on behalf of itself and the Term Loan Claimholders, agrees that it will not take or receive any ABL Priority Collateral or any proceeds of such Collateral in connection with the exercise of any right or remedy (including setoff) with respect to any such Collateral in its capacity as a secured creditor in violation of this Agreement. Without limiting the generality of the foregoing, unless and until the Discharge of ABL Obligations has occurred, except as expressly provided in Sections 3.1(a), 6.3(c)(1) and this Section 3.1(c), the sole right of the Term Loan Collateral Agent and the Term Loan Claimholders with respect to the ABL Priority Collateral is to hold a Lien on such Collateral pursuant to the Term Loan Collateral Documents for the period and to the extent granted therein and to receive a share of the proceeds thereof, if any, after the Discharge of ABL Obligations has occurred.

(d)     Subject to Sections 3.l(a) and (c) and Section 6.3(c)(1):

(1)     the Term Loan Collateral Agent, for itself and on behalf of the Term Loan Claimholders, agrees that it will not, except as not prohibited herein, take any action that would hinder any exercise of remedies under the ABL Documents or that is otherwise prohibited hereunder, including any sale, lease, exchange, transfer or other disposition of the ABL Priority Collateral, whether by foreclosure or otherwise;

(2)     the Term Loan Collateral Agent, for itself and on behalf of the Term Loan Claimholders, hereby waives any and all rights it or the Term Loan Claimholders may have as a junior lien creditor with respect to the ABL Priority Collateral or otherwise to object to the manner in which the ABL Collateral Agent or the ABL Claimholders seek to enforce or collect the ABL Obligations or the Liens on the ABL Priority Collateral securing the ABL Obligations granted in any of the ABL Documents or undertaken in accordance with this Agreement, regardless of whether any action or failure to act by or on behalf of the ABL Collateral Agent or ABL Claimholders is adverse to the interest of the Term Loan Claimholders; and

(3)     the Term Loan Collateral Agent hereby acknowledges and agrees that no covenant, agreement or restriction contained in any of the Term Loan Collateral

17

Documents or any other Term Loan Document (other than this Agreement) shall be deemed to restrict in any way the rights and remedies of the ABL Collateral Agent or the ABL Claimholders with respect to the ABL Priority Collateral as set forth in this Agreement and the ABL Documents.

(e)      Except as otherwise specifically set forth in Sections 3.1(a) and (d) and 3.5, the Term Loan Collateral Agent and the Term Loan Claimholders may exercise rights and remedies as unsecured creditors, to the extent not in contravention of the terms of this Agreement, against any Grantor and may exercise rights and remedies with respect to the Term Loan Collateral, in each case, in accordance with the terms of the applicable Term Loan Documents and applicable law; provided, however, that in the event that any Term Loan Claimholder becomes a judgment Lien creditor in respect of ABL Priority Collateral as a result of its enforcement of its rights as an unsecured creditor with respect to the Term Loan Obligations, such judgment Lien shall be subject to the terms of this Agreement for all purposes (including in relation to the ABL Obligations) as the other Liens securing the Term Loan Obligations are subject to this Agreement.

(f)      Nothing in this Agreement shall prohibit the receipt by the Term Loan Collateral Agent or any Term Loan Claimholders of payments of interest, principal and other amounts owed in respect of the applicable Term Loan Obligations so long as such receipt is not the direct or indirect result of the exercise by the Term Loan Collateral Agent or any Term Loan Claimholders of rights or remedies as a secured creditor (including setoff) or enforcement of any Lien held by any of them, in each case in contravention of this Agreement. Nothing in this Agreement impairs or otherwise adversely affects any rights or remedies the ABL Collateral Agent or the ABL Claimholders may have against the Grantors under the ABL Documents, other than with respect to the Term Loan Priority Collateral solely to the extent expressly provided herein.

**3.2**      Exercise of Remedies – Restrictions on ABL Collateral Agent.

(a)      Until the Discharge of Term Loan Obligations has occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against any Grantor, the ABL Collateral Agent and the ABL Claimholders:

(1)      will not exercise or seek to exercise any rights or remedies with respect to any Term Loan Priority Collateral or institute any action or proceeding with respect to such rights or remedies (including any action of foreclosure); provided, however, that the ABL Collateral Agent (or any Person authorized by it) may exercise the rights provided for in Section 3.3 (with respect to any Access Period) and may exercise any or all such other rights or remedies after the passage of a period of at least 180 days has elapsed since the later of: (A) the date on which the ABL Collateral Agent declared the existence of any ABL Default and demanded the repayment of all the principal amount of the ABL Obligations with respect to which it is acting as Collateral Agent; and (B) the date on which the Term Loan Collateral Agent received notice from the ABL Collateral Agent of such declaration of an ABL Default and such demand (the "**ABL Standstill Period**"); provided, further, however, that notwithstanding anything herein to the contrary, in no event shall the ABL Collateral Agent or any ABL Claimholder exercise any rights or remedies (other than those under Section 3.3) with respect to the Term Loan Priority Collateral if, notwithstanding the expiration of the ABL Standstill Period, the Term Loan Collateral

Agent or any Term Loan Claimholder shall have commenced and be diligently pursuing the exercise of their rights or remedies with respect to all or any material portion of the Term Loan Priority Collateral (prompt notice of such exercise to be given to the ABL Collateral Agent);

(2)     will not contest, protest or object to, or otherwise interfere with, any foreclosure proceeding or action brought by the Term Loan Collateral Agent or any Term Loan Claimholder or any other exercise by the Term Loan Collateral Agent or any Term Loan Claimholder of any rights and remedies relating to the Term Loan Collateral, whether under the Term Loan Documents or otherwise;

(3)     subject to their rights under clause (a)(1) above and except as may be permitted in Section 3.2(c), will not object to the forbearance by the Term Loan Collateral Agent or Term Loan Claimholders from bringing or pursuing any Collateral Enforcement Action; and

(4)     will not challenge the validity or enforceability of any Obligations under the Term Loan Documents or any Lien of the Term Loan Collateral Agent;

provided, however, that in the case of (1), (2) and (3) above, the Liens granted to secure the ABL Obligations of the ABL Claimholders shall attach to the proceeds of any enforcement or exercise of remedies by the ABL Claimholders subject to the relative priorities described in Section 2.

(b)     Until the Discharge of Term Loan Obligations has occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against any Grantor, the ABL Collateral Agent, on behalf of itself and the ABL Claimholders, agrees that the Term Loan Collateral Agent and the Term Loan Claimholders shall have the right to enforce rights, exercise remedies (including setoff and the right to credit bid their debt) and, in connection therewith (including voluntary Dispositions of Term Loan Priority Collateral by the respective Grantors after a Term Loan Default) make determinations regarding the release, disposition, or restrictions with respect to the Term Loan Priority Collateral without any consultation with or the consent of the ABL Collateral Agent or any ABL Claimholder; provided, however, that the Lien securing the ABL Obligations shall remain on the proceeds (other than those properly applied to the Term Loan Obligations) of such Collateral released or disposed of subject to the relative priorities described in Section 2. The ABL Collateral Agent, on behalf of itself and the ABL Claimholders, agrees that, in exercising rights and remedies with respect to the Term Loan Priority Collateral, the Term Loan Collateral Agent and the Term Loan Claimholders may enforce the provisions of the Term Loan Documents and exercise remedies thereunder, all in such order and in such manner as they may determine in the exercise of their sole discretion. Such exercise and enforcement shall include the rights of an agent appointed by them to sell or otherwise dispose of the Term Loan Priority Collateral upon foreclosure, to incur expenses in connection with such sale or disposition, and to exercise all the rights and remedies of a secured creditor under the UCC and of a secured creditor under the Debtor Relief Laws of any applicable jurisdiction.

(c)     Notwithstanding anything herein to the contrary, the ABL Collateral Agent and any ABL Claimholder may:

(1)    file a claim or statement of interest with respect to the ABL Obligations; provided that an Insolvency or Liquidation Proceeding has been commenced by or against any Grantor;

(2)    take any action in order to create, perfect, preserve or protect (but not enforce) its Lien on any of the Collateral; provided that such action shall not be inconsistent with the terms of this Agreement and shall not be adverse to the priority status of the Liens on the Term Loan Priority Collateral, or the rights of the Term Loan Collateral Agent or any of the Term Loan Claimholders to exercise remedies in respect thereof;

(3)    file any necessary or appropriate responsive or defensive pleadings in opposition to any motion, claim, adversary proceeding or other pleading made by any Person objecting to or otherwise seeking the disallowance of the claims or Liens of the ABL Claimholders, including any claims secured by the Term Loan Priority Collateral, if any, in each case in accordance with the terms of this Agreement;

(4)    file any pleadings, objections, motions or arguments which assert rights or interests available to unsecured creditors of the Grantors arising under either any Insolvency or Liquidation Proceeding or applicable non-bankruptcy law, in each case not inconsistent with the terms of this Agreement;

(5)    vote on any plan of reorganization, file any proof of claim, make other filings and make any arguments and motions that are, in each case, in accordance with the terms of this Agreement, with respect to the ABL Obligations, the ABL Priority Collateral and the ABL Facility Collateral; and

(6)    exercise any of its rights or remedies with respect to any of the Collateral after the termination of the ABL Standstill Period to the extent permitted by Section 3.2(a)(1).

The ABL Collateral Agent, on behalf of itself and the ABL Claimholders, agrees that it will not take or receive any Term Loan Priority Collateral or any proceeds of such Collateral in connection with the exercise of any right or remedy (including setoff) with respect to any such Collateral in its capacity as a secured creditor in violation of this Agreement. Without limiting the generality of the foregoing, unless and until the Discharge of Term Loan Obligations has occurred, except as expressly provided in Sections 3.2(a), 3.3, 3.4, 6.3(c)(2) and this Section 3.2(c), the sole right of the ABL Collateral Agent and the ABL Claimholders with respect to the Term Loan Priority Collateral is to hold a Lien on such Collateral pursuant to the ABL Collateral Documents for the period and to the extent granted therein and to receive a share of the proceeds thereof, if any, after the Discharge of Term Loan Obligations has occurred.

(d)    Subject to Sections 3.2(a) and (c) and Sections 3.3 and 6.3(c)(2):

(1)    the ABL Collateral Agent, for itself and on behalf of the ABL Claimholders, agrees that the ABL Collateral Agent and the ABL Claimholders will not, except as not prohibited herein, take any action that would hinder any exercise of remedies under the Term Loan Documents or that is otherwise prohibited hereunder, including any sale, lease,

20

exchange, transfer or other disposition of the Term Loan Priority Collateral, whether by foreclosure or otherwise;

(2)      the ABL Collateral Agent, for itself and on behalf of the ABL Claimholders, hereby waives any and all rights it or the ABL Claimholders may have as a junior lien creditor with respect to the Term Loan Priority Collateral or otherwise to object to the manner in which the Term Loan Collateral Agent or the Term Loan Claimholders seek to enforce or collect the Term Loan Obligations or the Liens on the Term Loan Priority Collateral securing the Term Loan Obligations granted in any of the Term Loan Documents or undertaken in accordance with this Agreement, regardless of whether any action or failure to act by or on behalf of the Term Loan Collateral Agent or the Term Loan Claimholders is adverse to the interest of the ABL Claimholders; and

(3)      the ABL Collateral Agent hereby acknowledges and agrees that no covenant, agreement or restriction contained in any of the ABL Collateral Documents or any other ABL Document (other than this Agreement) shall be deemed to restrict in any way the rights and remedies of the Term Loan Collateral Agent or the Term Loan Claimholders with respect to the Term Loan Priority Collateral as set forth in this Agreement and the Term Loan Documents.

(e)      Except as otherwise specifically set forth in Sections 3.2(a) and (d) and 3.5, the ABL Collateral Agent and the ABL Claimholders may exercise rights and remedies as unsecured creditors, to the extent not in contravention of the terms of this Agreement, against any Grantor and may exercise rights and remedies with respect to the ABL Priority Collateral, in each case, in accordance with the terms of the ABL Documents and applicable law; provided, however, that in the event that any ABL Claimholder becomes a judgment Lien creditor in respect of Term Loan Priority Collateral as a result of its enforcement of its rights as an unsecured creditor with respect to the ABL Obligations, such judgment Lien shall be subject to the terms of this Agreement for all purposes (including in relation to the Term Loan Obligations) as the other Liens securing the ABL Obligations are subject to this Agreement.

(f)      Nothing in this Agreement shall prohibit the receipt by the ABL Collateral Agent or any ABL Claimholders of payments of interest, principal and other amounts owed in respect of the ABL Obligations so long as such receipt is not the direct or indirect result of the exercise by the ABL Collateral Agent or any ABL Claimholders of rights or remedies as a secured creditor (including setoff) or enforcement of any Lien held by any of them, in each case in contravention of this Agreement. Nothing in this Agreement impairs or otherwise adversely affects any rights or remedies the Term Loan Collateral Agent or the Term Loan Claimholders may have against the Grantors under the Term Loan Documents, other than with respect to the ABL Priority Collateral solely to the extent expressly provided herein.

### 3.3      Exercise of Remedies – Collateral Access Rights.

(a)      The ABL Collateral Agent and the Term Loan Collateral Agent agree to use their commercially reasonable efforts to give an Enforcement Notice to the other Collateral Agent prior to commencement of any Collateral Enforcement Action; provided that a failure to give such notice shall not affect their rights hereunder. Subject to the provisions of Sections 3.1 and 3.2

above, either Collateral Agent may join in any judicial proceedings commenced by the other Collateral Agent to enforce Liens on the Collateral, provided that neither Collateral Agent, nor the ABL Claimholders or the Term Loan Claimholders, as the case may be, shall interfere with the Collateral Enforcement Actions of the other with respect to Collateral in which such party has the priority Lien in accordance herewith.

(b)     If the Term Loan Collateral Agent, or any agent or representative of the Term Loan Collateral Agent, or any receiver, shall obtain possession or physical control of any of the real properties subject to a Mortgage, the Term Loan Collateral Agent shall promptly notify the ABL Collateral Agent of that fact (such notice, a "**Notice of Occupancy**") and the ABL Collateral Agent shall, within ten (10) Business Days thereafter, notify the Term Loan Collateral Agent as to whether the ABL Collateral Agent desires to exercise access rights under this Agreement (such notice, an "**Access Acceptance Notice**"), at which time the parties shall confer in good faith to coordinate with respect to the ABL Collateral Agent's exercise of such access rights. Access rights may apply to differing parcels of real properties subject to a Mortgage at differing times, in which case, a differing Access Period may apply to each such property. In the event that the ABL Collateral Agent elects to exercise its access rights as provided in this Agreement, the Term Loan Collateral Agent agrees, for itself and on behalf of the Term Loan Claimholders, that in the event that any Term Loan Claimholder exercises its rights to sell or otherwise dispose of any real property subject to a Mortgage, whether before or after the delivery of a Notice of Occupancy to the ABL Collateral Agent, the Term Loan Collateral Agent shall (i) provide access rights to the ABL Collateral Agent for the duration of the Access Period in accordance with this Agreement and (ii) if such a sale or other disposition occurs prior to the ABL Collateral Agent delivering an Access Acceptance Notice during the time period provided therefor, or if applicable, the expiration of the applicable Access Period, shall ensure that the purchaser or other transferee of such real property subject to a Mortgage agrees to provide the ABL Collateral Agent access rights for the duration of the applicable Access Period, in the manner and to the extent required by this Agreement.

(c)     Upon delivery of notice to the Term Loan Collateral Agent as provided in Section 3.3(b), the Access Period shall commence for the subject parcel of real property subject to a Mortgage. During the Access Period, the ABL Collateral Agent and its agents, representatives and designees shall have a nonexclusive right to have access to, and a rent free right to use, the Term Loan Priority Collateral for the purpose of arranging for and effecting the sale or disposition of ABL Priority Collateral, including the production, completion, packaging and other preparation of such ABL Priority Collateral for sale or disposition. During any such Access Period, the ABL Collateral Agent and its agents, representatives and designees (and Persons employed on their respective behalves), may continue to operate, service, maintain, process and sell the ABL Priority Collateral, as well as to engage in bulk sales of ABL Priority Collateral. The ABL Collateral Agent shall take proper care of any Term Loan Priority Collateral that is used by the ABL Collateral Agent during the Access Period and repair and replace any damage (ordinary wear-and-tear excepted) caused by the ABL Collateral Agent or its agents, representatives or designees and the ABL Collateral Agent shall comply with all applicable laws in connection with its use or occupancy of the Term Loan Priority Collateral. The ABL Collateral Agent and the ABL Claimholders shall (to the extent that there are sufficient available proceeds of ABL Priority Collateral for the purposes of paying such indemnity) indemnify and hold harmless the Term Loan Collateral Agent and the Term Loan Claimholders for any injury or damage to Persons or property

directly caused by the acts or omissions of Persons under its control. The ABL Collateral Agent and the Term Loan Collateral Agent shall cooperate and use reasonable efforts to ensure that their activities during the Access Period as described above do not interfere materially with the activities of the other as described above, including the right of the Term Loan Collateral Agent to show the Term Loan Priority Collateral to prospective purchasers and to ready the Term Loan Priority Collateral for sale.

(d)    If any order or injunction is issued or stay is granted which prohibits the ABL Collateral Agent from exercising any of its rights hereunder, then at the ABL Collateral Agent's option, the Access Period granted to the ABL Collateral Agent under this Section 3.3 shall be stayed during the period of such prohibition and shall continue thereafter for the number of days remaining as required under this Section 3.3. If the Term Loan Collateral Agent shall foreclose or otherwise sell any of the Term Loan Collateral, the Term Loan Collateral Agent will notify the buyer thereof of the existence of this Agreement and that the buyer is acquiring the Term Loan Collateral subject to the terms of this Section 3.3.

(e)    The Grantors hereby agree with the Term Loan Collateral Agent that the ABL Collateral Agent shall have access, during the Access Period, as described herein.

**3.4**    Exercise of Remedies – Intellectual Property Rights/Access to Information. The Term Loan Collateral Agent and each Grantor hereby grant (to the full extent of their respective rights and interests) the ABL Collateral Agent and its agents, representatives and designees (a) a royalty free, rent free nonexclusive license and lease to use all of the Term Loan Priority Collateral constituting Intellectual Property, to complete the sale of inventory and (b) a royalty free nonexclusive license (which will be binding on any successor or assignee of the Intellectual Property) to use any and all Intellectual Property, in each case, at any time in connection with its Collateral Enforcement Action; provided, however, the royalty free, rent free nonexclusive license and lease granted in clause (a) shall immediately expire upon the sale, lease, transfer or other disposition of all such inventory, provided further that the royalty free nonexclusive license granted in clause (b) shall expire upon the Discharge of ABL Obligations.

**3.5**    Exercise of Remedies – Set Off and Tracing of and Priorities in Proceeds.

(a)    The ABL Collateral Agent, for itself and on behalf of the ABL Claimholders, and the Term Loan Collateral Agent, for itself and on behalf of the Term Loan Claimholders, also agrees that prior to an issuance of an Enforcement Notice, all funds deposited in an account subject to a Deposit Account Control Agreement (as defined in the ABL Credit Agreement) that constitute ABL Priority Collateral and then applied to the ABL Obligations shall be treated as ABL Priority Collateral and, unless the ABL Collateral Agent has actual knowledge to the contrary, any claim that payments made to the ABL Collateral Agent through the Deposit Accounts that are subject to such Deposit Account Control Agreements are proceeds of or otherwise constitute Term Loan Priority Collateral are waived by the Term Loan Collateral Agent and the Term Loan Claimholders; provided that after receipt by the ABL Collateral Agent of an Enforcement Notice or commencement of an Insolvency or Liquidation Proceeding against the Borrower or any applicable Grantor, all identifiable proceeds of Term Loan Priority Collateral shall be Term Loan Priority Collateral whether or not deposited in an account subject to such Deposit Account Control Agreement.

(b)     The ABL Collateral Agent, for itself and on behalf of the ABL Claimholders, and the Term Loan Collateral Agent, for itself and on behalf of the Term Loan Claimholders, further agree that prior to an issuance of an Enforcement Notice, any proceeds of Collateral, whether or not deposited in an account subject to a Deposit Account Control Agreement, shall not (as between the Collateral Agents, the ABL Claimholders and the Term Loan Claimholders) be treated as proceeds of Collateral for purposes of determining the relative priorities in the Collateral.

## SECTION 4.  Payments.

### 4.1    Application of Proceeds.

(a)     So long as the Discharge of ABL Obligations has not occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against any Grantor, all ABL Priority Collateral or proceeds thereof received in connection with the sale or other disposition of, or collection on, such Collateral upon the exercise of remedies by the ABL Collateral Agent or any ABL Claimholder, shall be applied by the ABL Collateral Agent to the ABL Obligations in such order as specified in Section 7.03 of the ABL Credit Agreement. Upon the Discharge of ABL Obligations, the ABL Collateral Agent shall deliver to the Term Loan Collateral Agent any Collateral and proceeds of Collateral held by it as a result of the exercise of remedies in the same form as received, with any necessary endorsements or as a court of competent jurisdiction may otherwise direct to be applied by the Term Loan Collateral Agent to the Term Loan Obligations in such order as specified in Section 4.1(b).

(b)     So long as the Discharge of Term Loan Obligations has not occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against any Grantor, all Term Loan Priority Collateral or proceeds thereof received in connection with the sale or other disposition of, or collection on, such Collateral upon the exercise of remedies by any Term Loan Collateral Agent or any Term Loan Claimholder after the payment of all fees and expenses of the Term Loan Collateral Agent, shall be applied by the Term Loan Collateral Agent to or on account of the Term Loan Obligations in such order, if any, as specified in the relevant Term Loan Documents or as a court of competent jurisdiction may otherwise direct. Upon the Discharge of Term Loan Obligations, the Term Loan Collateral Agent shall deliver to the ABL Collateral Agent any Collateral and proceeds of Collateral held by it as a result of the exercise of remedies in the same form as received, with any necessary endorsements or as a court of competent jurisdiction may otherwise direct to be applied by the ABL Collateral Agent to the ABL Obligations in such order as specified in the ABL Collateral Documents.

### 4.2    Payments Over in Violation of Agreement. So long as neither the Discharge of ABL Obligations nor the Discharge of Term Loan Obligations has occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against any Grantor, any Collateral or proceeds thereof received by any Collateral Agent or any Term Loan Claimholders or ABL Claimholders in connection with the exercise of any right or remedy (including setoff) relating to the Collateral in contravention of this Agreement shall be segregated and held in trust and forthwith paid over to the appropriate Collateral Agent for the benefit of the Term Loan Claimholders or the ABL Claimholders, as the case may be, in the same form as received, with any necessary endorsements or as a court of competent jurisdiction may otherwise direct. Each

24

Collateral Agent is hereby authorized by the other Collateral Agent to make any such endorsements as agent for the other Collateral Agent or any Term Loan Claimholders or ABL Claimholders, as the case may be. This authorization is coupled with an interest and is irrevocable until the Discharge of ABL Obligations and Discharge of Term Loan Obligations.

4.3    Application of Payments. Subject to the other terms of this Agreement, all payments received by (a) the ABL Collateral Agent or the ABL Claimholders may be applied, reversed and reapplied, in whole or in part, to the ABL Obligations to the extent provided for in the ABL Documents and (b) the Term Loan Collateral Agent or the Term Loan Claimholders may be applied, reversed and reapplied, in whole or in part, to the Term Loan Obligations in the order set forth in the Term Loan Documents.

4.4    Reinstatement.

(a)    To the extent any payment with respect to any ABL Obligation (whether by or on behalf of any Grantor, as proceeds of security, enforcement of any right of setoff or otherwise) is declared to be a fraudulent conveyance or a preference in any respect, set aside or required to be paid to a debtor in possession, any Term Loan Claimholders, receiver or similar Person, whether in connection with any Insolvency or Liquidation Proceeding or otherwise, then the obligation or part thereof originally intended to be satisfied shall, for the purposes of this Agreement and the rights and obligations of the ABL Claimholders and the Term Loan Claimholders, be deemed to be reinstated and outstanding as if such payment had not occurred. To the extent that any interest, fees, expenses or other charges (including, without limitation, Post-Petition Interest) to be paid pursuant to the ABL Documents are disallowed by order of any court, including, without limitation, by order of a bankruptcy court in any Insolvency or Liquidation Proceeding, such interest, fees, expenses and charges (including, without limitation, Post-Petition Interest) shall, as between the ABL Claimholders and the Term Loan Claimholders, be deemed to continue to accrue and be added to the amount to be calculated as the "ABL Obligations."

(b)    To the extent any payment with respect to any Term Loan Obligation (whether by or on behalf of any Grantor, as proceeds of security, enforcement of any right of setoff or otherwise) is declared to be a fraudulent conveyance or a preference in any respect, set aside or required to be paid to a debtor in possession, any ABL Claimholders, receiver or similar Person, whether in connection with any Insolvency or Liquidation Proceeding or otherwise, then the obligation or part thereof originally intended to be satisfied shall, for the purposes of this Agreement and the rights and obligations of the Term Loan Claimholders and the ABL Claimholders, be deemed to be reinstated and outstanding as if such payment had not occurred. To the extent that any interest, fees, expenses or other charges (including, without limitation, Post-Petition Interest) to be paid pursuant to the Term Loan Documents are disallowed by order of any court, including, without limitation, by order of a bankruptcy court in any Insolvency or Liquidation Proceeding, such interest, fees, expenses and charges (including, without limitation, Post-Petition Interest) shall, as between the Term Loan Claimholders and the ABL Claimholders, be deemed to continue to accrue and be added to the amount to be calculated as the "Term Loan Obligations."

138905220_2

**SECTION 5.  Other Agreements**.

      5.1   Releases.

      (a)   (i) If in connection with the exercise of the ABL Collateral Agent's remedies in respect of any Collateral as provided for in Section 3.1, the ABL Collateral Agent, for itself or on behalf of any of the ABL Claimholders, releases any of its Liens on any part of the ABL Priority Collateral, then the Liens, if any, of the Term Loan Collateral Agent, for itself or for the benefit of the Term Loan Claimholders, on the ABL Priority Collateral sold or disposed of in connection with such exercise, shall be automatically, unconditionally and simultaneously released. The Term Loan Collateral Agent, for itself or on behalf of the Term Loan Claimholders, promptly shall execute and deliver to the ABL Collateral Agent or such Grantor such termination statements, releases and other documents as the ABL Collateral Agent or such Grantor may request to effectively confirm such release.

      (ii)   If in connection with the exercise of the Term Loan Collateral Agent's remedies in respect of any Collateral as provided for in Section 3.2, the Term Loan Collateral Agent, for itself or on behalf of any of the Term Loan Claimholders, releases any of its Liens on any part of the Term Loan Priority Collateral, then the Liens, if any, of the ABL Collateral Agent, for itself or for the benefit of the ABL Claimholders, on the Term Loan Priority Collateral sold or disposed of in connection with such exercise, shall be automatically, unconditionally and simultaneously released. The ABL Collateral Agent, for itself or on behalf of any such ABL Claimholders, promptly shall execute and deliver to the Term Loan Collateral Agent or such Grantor such termination statements, releases and other documents as the Term Loan Collateral Agent or such Grantor may request to effectively confirm such release.

      (a)   If in connection with any sale, lease, exchange, transfer or other disposition of any Collateral (collectively, a "**Disposition**") permitted under the terms of both the ABL Documents and the Term Loan Documents (other than in connection with the exercise of the respective Collateral Agent's rights and remedies in respect of the Collateral as provided for in Sections 3.1 and 3.2), (i) the ABL Collateral Agent, for itself or on behalf of any of the ABL Claimholders, releases any of its Liens on any part of the ABL Priority Collateral, in each case other than (A) in connection with the Discharge of ABL Obligations or (B) after the occurrence and during the continuance of a Term Loan Default, then the Liens, if any, of the Term Loan Collateral Agent, for itself or for the benefit of the Term Loan Claimholders, on such Collateral shall be automatically, unconditionally and simultaneously released, and (ii) the Term Loan Collateral Agent, for itself or on behalf of any of the Term Loan Claimholders, releases any of its Liens on any part of the Term Loan Priority Collateral, in each case other than (A) in connection with the Discharge of Term Loan Obligations or (B) after the occurrence and during the continuance of an ABL Default, then the Liens, if any, of the ABL Collateral Agent, for itself or for the benefit of the ABL Claimholders, on such Collateral (or, if such Collateral includes the Capital Stock of any Subsidiary, the Liens on Term Loan Priority Collateral owned by such Subsidiary) shall be automatically, unconditionally and simultaneously released. The ABL Collateral Agent and the Term Loan Collateral Agent, each for itself and on behalf of any such ABL Claimholders or Term Loan Claimholders, as the case may be, promptly shall execute and deliver to the other Collateral Agents or such Grantor such termination statements, releases and

other documents as the other Collateral Agents or such Grantor may request to effectively confirm such release.

(b)     Until the Discharge of ABL Obligations and Discharge of Term Loan Obligations shall occur, the ABL Collateral Agent, for itself and on behalf of the ABL Claimholders, and the Term Loan Collateral Agent, for itself and on behalf of the Term Loan Claimholders, as the case may be, hereby irrevocably constitutes and appoints the other Collateral Agent and any officer or agent of the other Collateral Agent, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of the other Collateral Agent or such holder or in the Collateral Agent's own name, from time to time in such Collateral Agent's discretion, for the purpose of carrying out the terms of this Section 5.1, to take any and all appropriate action and to execute any and all documents and instruments which may be necessary to accomplish the purposes of this Section 5.1, including any endorsements or other instruments of transfer or release.

(c)     Until the Discharge of ABL Obligations and Discharge of Term Loan Obligations shall occur, to the extent that the Collateral Agents or the ABL Claimholders or the Term Loan Claimholders (i) have released any Lien on Collateral and such Lien is later reinstated or (ii) obtain any new Liens from any Grantor, then the other Collateral Agent, for itself and for the ABL Claimholders or Term Loan Claimholders, as the case may be, shall be granted a Lien on any such Collateral, subject to the lien priority provisions of this Agreement and subject to the exclusions set forth in Sections 2.3(a) and (b).

5.2     Insurance.

(a)     Unless and until the Discharge of ABL Obligations has occurred, subject to the terms of, and the rights of the Grantors under, the ABL Documents, the Term Loan Collateral Agent, for itself and on behalf of the Term Loan Claimholders agrees, that (i) in accordance with the terms of the applicable Credit Documents, the ABL Collateral Agent shall have the sole and exclusive right to adjust settlement for any insurance policy covering the ABL Priority Collateral in the event of any loss thereunder and to approve any award granted in any condemnation or similar proceeding (or any deed in lieu of condemnation) affecting such Collateral; (ii) in accordance with the terms of the applicable Credit Documents, all proceeds of any such policy and any such award (or any payments with respect to a deed in lieu of condemnation) if in respect of such Collateral and to the extent required by the ABL Documents shall be paid to the ABL Collateral Agent for the benefit of the ABL Claimholders pursuant to the terms of the ABL Documents (including, without limitation, for purposes of cash collateralization of letters of credit) and thereafter, to the extent no ABL Obligations are outstanding, and subject to the rights of the Grantors under the Term Loan Documents, to the Term Loan Collateral Agent for the benefit of the Term Loan Claimholders to the extent required under the Term Loan Collateral Documents and then, to the extent no Term Loan Obligations are outstanding, to the owner of the subject property, such other Person as may be entitled thereto or as a court of competent jurisdiction may otherwise direct, and (iii) if any Term Loan Collateral Agent or any Term Loan Claimholders shall, at any time, receive any proceeds of any such insurance policy or any such award or payment in contravention of this Agreement, it shall segregate and hold in trust and forthwith pay such proceeds over to the ABL Collateral Agent in accordance with the terms of Section 4.2.

(b)    Unless and until the Discharge of Term Loan Obligations has occurred, subject to the terms of, and the rights of the Grantors under, the Term Loan Documents, the ABL Collateral Agent, for itself and on behalf of the ABL Claimholders, agrees that (i) in accordance with the terms of the applicable Credit Documents, the Term Loan Collateral Agent, for itself and on behalf of the Term Loan Claimholders, shall have the sole and exclusive right to adjust settlement for any insurance policy covering the Term Loan Priority Collateral in the event of any loss thereunder and to approve any award granted in any condemnation or similar proceeding (or any deed in lieu of condemnation) affecting such Collateral; (ii) in accordance with the terms of the applicable Credit Documents, all proceeds of any such policy and any such award (or any payments with respect to a deed in lieu of condemnation) if in respect of such Collateral and to the extent required by the Term Loan Documents shall be paid to the Term Loan Collateral Agent for the benefit of the Term Loan Claimholders pursuant to the terms of the Term Loan Documents and thereafter, to the extent no Term Loan Obligations are outstanding, and subject to the rights of the Grantors under the ABL Documents, to the ABL Collateral Agent for the benefit of the ABL Claimholders to the extent required under the ABL Collateral Documents and then, to the extent no ABL Obligations are outstanding, to the owner of the subject property, such other Person as may be entitled thereto or as a court of competent jurisdiction may otherwise direct, and (iii) in accordance with the terms of the applicable Credit Documents, if the ABL Collateral Agent or any ABL Claimholders shall, at any time, receive any proceeds of any such insurance policy or any such award or payment in contravention of this Agreement, it shall segregate and hold in trust and forthwith pay such proceeds over to the Term Loan Collateral Agent in accordance with the terms of Section 4.2.

(c)    To effectuate the foregoing, the Collateral Agents shall each receive separate lender's loss payable endorsements naming themselves as loss payee and additional insured, as their interests may appear, with respect to policies which insure Collateral hereunder. To the extent any proceeds are received for business interruption or for any liability or indemnification and those proceeds are not compensation for a casualty loss with respect to the Term Loan Priority Collateral, such proceeds shall first be applied to repay the ABL Obligations (to the extent required pursuant to the ABL Credit Agreement) and then be applied, to the extent required by the Term Loan Documents, to the Term Loan Obligations.

**5.3**    Bailees for Perfection.

(a)    Each Collateral Agent agrees to hold that part of the Collateral that is in its possession or control (or in the possession or control of its agents or bailees) to the extent that possession or control thereof is taken to perfect a Lien thereon under the UCC (such Collateral being the "**Pledged Collateral**") as collateral agent for the ABL Claimholders or the Term Loan Claimholders, as the case may be, and as bailee for the other Collateral Agents (such bailment being intended, among other things, to satisfy the requirements of Sections 8106(d)(3), 8301(a)(2) and 9313(c) of the UCC) and any assignee solely for the purpose of perfecting the security interest granted under the ABL Documents and the Term Loan Documents, respectively, subject to the terms and conditions of this Section 5.3. The Term Loan Collateral Agent and the Term Loan Claimholders hereby appoint the ABL Collateral Agent as their agent for the purposes of perfecting their security interest in all Deposit Account and Securities Accounts subject to control agreements with the ABL Collateral Agent. The ABL Collateral Agent hereby accepts such appointments pursuant to this Section 5.3(a) and acknowledges and agrees that it shall act for the

benefit of the Term Loan Claimholders with respect to any such Deposit Accounts or Securities Accounts pursuant to each applicable control agreement solely for the purpose of perfecting the security interest granted under the Term Loan Documents. In furtherance of the foregoing, each Grantor hereby grants a security interest in the Deposit Accounts and Securities Accounts to the ABL Collateral Agent for the benefit of the Term Loan Claimholders as security for the Term Loan Obligations.

(b)     Neither Collateral Agent shall have any obligation whatsoever to the other Collateral Agent, to any ABL Claimholder, or to any Term Loan Claimholder to ensure that the Pledged Collateral is genuine or owned by any of the Grantors or to preserve rights or benefits of any Person except as expressly set forth in this Section 5.3. The duties or responsibilities of the respective Collateral Agents under this Section 5.3 shall be limited solely to holding the Pledged Collateral as bailee in accordance with this Section 5.3 and delivering the Pledged Collateral upon a Discharge of ABL Obligations or Discharge of Term Loan Obligations, as the case may be, as provided in paragraph (d) below.

(c)     Neither Collateral Agent acting pursuant to this Section 5.3 shall have by reason of the ABL Documents, the Term Loan Documents, this Agreement or any other document a fiduciary relationship in respect of the other Collateral Agent, or any ABL Claimholders or any Term Loan Claimholders.

(d)     Upon the Discharge of ABL Obligations or the Discharge of Term Loan Obligations, as the case may be, the Collateral Agent under the debt facility which has been discharged shall deliver the remaining Pledged Collateral (if any) together with any necessary endorsements and without recourse or warranty, first, to the other Collateral Agent (for the avoidance of doubt, in the case of the Discharge of ABL Obligations, to the Term Loan Collateral Agent) to the extent the Other Obligations (other than Contingent Obligations) remain outstanding, and second, to the applicable Grantor to the extent no ABL Obligations or Term Loan Obligations, as the case may be, remain outstanding (in each case, so as to allow such Person to obtain possession or control of such Pledged Collateral). Each Collateral Agent further agrees, to the extent that any Other Obligations (other than applicable Contingent Obligations) remain outstanding, to take all other commercially reasonable action as shall be reasonably requested by the other Collateral Agent, at the sole cost and expense of the Credit Parties, to permit such other Collateral Agent to obtain, for the benefit of the ABL Claimholders or Term Loan Claimholders, as applicable, a first-priority interest in the Collateral or as a court of competent jurisdiction may otherwise direct.

(e)     Promptly following the Discharge of ABL Obligations, unless a New Debt Notice in respect of new ABL Documents shall have been delivered as provided in Section 5.4 below, the ABL Collateral Agent hereby agrees to deliver, at the cost and expense of the Credit Parties, to each counterparty to a Deposit Account Control Agreement written notice as contemplated in such Deposit Account Control Agreement directing such counterparty to comply with the instructions of the Term Loan Collateral Agent.

**5.4**     When Discharge of ABL Obligations and Discharge of Term Loan Obligations Deemed to Not Have Occurred. If in connection with the Discharge of ABL Obligations or the Discharge of Term Loan Obligations, the Borrower substantially concurrently

or subsequently enters into a Refinancing of the ABL Obligations or Term Loan Obligations as the case may be, being discharged at that time, which Refinancing is permitted by both the Term Loan Documents and the ABL Documents, in each case, to the extent such documents will remain in effect following such Refinancing, then such Discharge of ABL Obligations or the Discharge of Term Loan Obligations, shall automatically be deemed not to have occurred for all purposes of this Agreement (other than with respect to any actions taken pursuant to this Agreement as a result of the occurrence of such Discharge of ABL Obligations or Discharge of Term Loan Obligations, as applicable) and, from and after the date on which the New Debt Notice is delivered to the appropriate Collateral Agents in accordance with the next sentence, the obligations under such Refinancing shall automatically be treated as ABL Obligations or Term Loan Obligations for all purposes of this Agreement, including for purposes of the Lien priorities and rights in respect of Collateral set forth herein, and the ABL Collateral Agent or Term Loan Collateral Agent, as the case may be, under such new ABL Documents or new Term Loan Documents shall be the ABL Collateral Agent or the Term Loan Collateral Agent for all purposes of this Agreement. Upon receipt of a notice (the "**New Debt Notice**") stating that the Borrower has entered into new ABL Documents or new Term Loan Documents (which notice shall include a complete copy of the relevant new documents and provide the identity of the new collateral agent, such agent, the "**New Agent**"), the other Collateral Agents shall promptly (a) enter into such documents and agreements (including amendments or supplements to or amendment and restatement of this Agreement) as the Borrower or such New Agent shall reasonably request in order to provide to the New Agent the rights contemplated hereby, in each case consistent in all material respects with the terms of this Agreement and (b) deliver to the New Agent any Pledged Collateral (that is Term Loan Priority Collateral, in the case of a New Agent that is the agent under any new Term Loan Document or that is ABL Priority Collateral, in the case of a New Agent that is the agent under any new ABL Documents) held by it together with any necessary endorsements (or otherwise allow the New Agent to obtain control of such Pledged Collateral). The New Agent shall agree in a writing addressed to the other Collateral Agents for the benefit of the ABL Claimholders or the Term Loan Claimholders, as the case may be, to be bound by the terms of this Agreement. If the new ABL Obligations under the new ABL Documents or the new Term Loan Obligations under the new Term Loan Documents are secured by assets of the Grantors constituting Collateral that do not also secure the other Obligations, then (unless permitted to be excluded pursuant to Section 2.3(a) or (b)) the other Obligations shall be secured at such time by a second priority Lien on such assets to the same extent provided in the ABL Documents, Term Loan Collateral Documents and this Agreement.

**5.5**    Additional Pari Passu Obligations. The Borrower and the other applicable Grantors will be permitted to designate as an additional holder of Term Loan Obligations hereunder each Person who is, or who becomes or who is to become, the holder of any Additional Pari Passu Obligations incurred by the Borrower or such Grantor after the date of this Agreement in accordance with the terms of all applicable Credit Documents. Upon the issuance or incurrence of any such Additional Pari Passu Obligations:

(a)    the Borrower shall deliver to the Term Loan Collateral Agent and the ABL Collateral Agent an officers' certificate stating that the Borrower or such Grantor intends to enter into an Additional Pari Passu Obligations Agreement and certifying that the issuance or incurrence of Additional Pari Passu Obligations under such Additional Pari Passu Obligations Agreement is permitted by each applicable Credit Document;

30

(b)    the administrative agent or trustee and collateral agent for such Additional Pari Passu Obligations shall execute a joinder agreement to the applicable Term Loan Collateral Documents; and

(c)    each existing Collateral Agent shall promptly enter into such documents and agreements (including amendments or supplements to or amendment and restatement of this Intercreditor Agreement) as the Borrower or the administrative agent or trustee and collateral agent for such Additional Pari Passu Obligations may reasonably request in order to provide to them the rights, remedies and powers and authorities contemplated hereby, in each case consistent in all respects with the terms of this Intercreditor Agreement.

Notwithstanding anything herein to the contrary, including Section 8.1, nothing in this Agreement will be construed to allow Holdings or any other Grantor to incur additional indebtedness unless otherwise permitted by the terms of each applicable Credit Document.

## SECTION 6.  **Insolvency or Liquidation Proceedings**.

**6.1**    Finance Issues.

(a)    Until the Discharge of the ABL Obligations has occurred, if any Grantor shall be subject to any Insolvency or Liquidation Proceeding and the ABL Collateral Agent shall desire to permit or not object to the use of "Cash Collateral" (as such term is defined in Section 363(a) of the Bankruptcy Code) constituting ABL Priority Collateral on which the ABL Collateral Agent or any other creditor has a Lien or to permit any Grantor to obtain financing, whether from the ABL Claimholders or any other Person under Section 364 of the Bankruptcy Code or any similar Debtor Relief Law ("**DIP Financing**") to be secured by the ABL Priority Collateral then the Term Loan Collateral Agent, on behalf of itself and the Term Loan Claimholders, agrees that it will raise no objection to such Cash Collateral use or DIP Financing so long as such Cash Collateral use or DIP Financing meet the following requirements: (i) the Term Loan Collateral Agent and the Term Loan Claimholders retain the right to object to any ancillary agreements or arrangements regarding the Cash Collateral use or the DIP Financing that are materially prejudicial to their interests in the Term Loan Priority Collateral, and (ii) the terms of the Cash Collateral use or the DIP Financing (A) do not compel the applicable Grantor to seek confirmation of a specific plan of reorganization for which all or substantially all of the material terms are set forth in the Cash Collateral Order, DIP Financing documentation or a related document, (B) do not expressly require the liquidation of the Collateral prior to a default under the DIP Financing documentation or Cash Collateral order, and (C) do not require that any Lien of the Term Loan Collateral Agent on the Term Loan Priority Collateral be subordinated to or made to rank *pari passu* with the Lien on the Term Loan Priority Collateral securing such DIP Financing. To the extent the Liens securing the ABL Obligations are subordinated to or made to rank *pari passu* with such DIP Financing which meets the requirements of clauses (i) and (ii) above, the Term Loan Collateral Agent will subordinate its Liens in the ABL Priority Collateral to (i) the Liens thereon securing such DIP Financing (and all Obligations relating thereto) and (ii) any professional fee and Trustee "carve out" consented to in writing by the ABL Collateral Agent to be paid prior to the Discharge of ABL Obligations and will not request adequate protection for its Liens in the ABL Priority Collateral or any other relief in connection therewith (except, as expressly agreed by the ABL Collateral Agent or to the extent permitted by Section 6.3).

(b)    Until the Discharge of Term Loan Obligations has occurred, if any Grantor shall be subject to any Insolvency or Liquidation Proceeding and the Term Loan Collateral Agent shall desire to permit or not object to the use of "Cash Collateral" (as such term is defined in Section 363(a) of the Bankruptcy Code) constituting Term Loan Priority Collateral on which the Term Loan Collateral Agent or any other creditor has a Lien or to permit any Grantor to obtain DIP Financing, whether from the Term Loan Claimholders or any other Person, to be secured by the Term Loan Priority Collateral then each ABL Collateral Agent, on behalf of itself and the ABL Claimholders, agrees that it will raise no objection to such Cash Collateral use or DIP Financing so long as such Cash Collateral use or DIP Financing meet the following requirements: (i) the ABL Collateral Agent and the ABL Claimholders retain the right to object to any ancillary agreements or arrangements regarding the Cash Collateral use or the DIP Financing that are materially prejudicial to their interests in the ABL Priority Collateral, and (ii) the terms of the Cash Collateral use or the DIP Financing (A) do not compel the applicable Grantor to seek confirmation of a specific plan of reorganization for which all or substantially all of the material terms are set forth in the Cash Collateral Order, DIP Financing documentation or a related document, (B) do not expressly require the liquidation of the Collateral prior to a default under the DIP Financing documentation or Cash Collateral order, and (C) do not require that any Lien of the ABL Collateral Agents on the ABL Priority Collateral be subordinated to or made to rank *pari passu* with the Lien on the ABL Priority Collateral securing such DIP Financing. To the extent the Liens securing the Term Loan Obligations are subordinated to or made to rank *pari passu* with such DIP Financing which meets the requirements of clauses (i) and (ii) above, the ABL Collateral Agent will subordinate its Liens in the Term Loan Priority Collateral to (i) the Liens thereon securing such DIP Financing (and all Obligations relating thereto) and (ii) any professional fee and Trustee "carve out" consented to in writing by the Term Loan Collateral Agent to be paid prior to the Discharge of Term Loan Obligations and will not request adequate protection for its Liens in the Term Loan Priority Collateral or any other relief in connection therewith (except, as expressly agreed by the Term Loan Collateral Agent or to the extent permitted by Section 6.3).

**6.2**    Relief from the Automatic Stay.

(a)    Until the Discharge of ABL Obligations has occurred, the Term Loan Collateral Agent, on behalf of itself and the Term Loan Claimholders, agrees that none of them shall seek (or support any other Person seeking) relief from the automatic stay or any other stay in any Insolvency or Liquidation Proceeding in respect of the ABL Priority Collateral, without the prior written consent of the ABL Collateral Agent, unless a motion for adequate protection or similar relief permitted under Section 6.3 has been denied by the bankruptcy court or other court of competent jurisdiction in respect of any Insolvency or Liquidation Proceeding.

(b)    Until the Discharge of Term Loan Obligations has occurred, the ABL Collateral Agent, on behalf of itself and the ABL Claimholders, agrees that none of them shall seek (or support any other Person seeking) relief from the automatic stay or any other stay in any Insolvency or Liquidation Proceeding in respect of the Term Loan Priority Collateral (other than to the extent such relief is required to exercise its rights under Section 3.3), without the prior written consent of the Term Loan Collateral Agent, unless a motion for adequate protection or similar relief permitted under Section 6.3 has been denied by the bankruptcy court or other court of competent jurisdiction in respect of any Insolvency or Liquidation Proceeding.

**6.3**    Adequate Protection.

(a)    The Term Loan Collateral Agent, on behalf of itself and the Term Loan Claimholders, agrees that none of them shall contest (or support any other Person contesting):

(1)    any request by the ABL Collateral Agent or the ABL Claimholders for adequate protection or similar relief with respect to the ABL Facility Collateral; provided that if such adequate protection claim seeks the creation of any Lien over additional assets or property of any Grantor that shall also constitute Term Loan Priority Collateral, (i) a Lien shall have been created in favor of the Term Loan Claimholders in respect of such Collateral and (ii) the Lien thereon in favor of the ABL Claimholders shall be subordinated to the extent set forth in this Agreement; or

(2)    any objection by the ABL Collateral Agent or the ABL Claimholders to any motion, relief, action or proceeding based on the ABL Collateral Agent or the ABL Claimholders claiming a lack of adequate protection; provided that if the ABL Collateral Agent is granted adequate protection or similar relief in the form of additional or replacement collateral, the Term Loan Collateral Agent and the Term Loan Claimholders may seek or request adequate protection in the form of Lien on such additional or replacement collateral; it being understood and agreed that (1) if such additional or replacement collateral shall also constitute Term Loan Priority Collateral, the Lien on such additional or replacement collateral constituting Term Loan Priority Collateral in favor of the ABL Collateral Agent shall be subordinate to the Lien on such additional or replacement collateral in favor of the Term Loan Collateral Agent and (2) if such additional or replacement collateral shall also constitute ABL Priority Collateral, the Lien on such additional or replacement collateral constituting ABL Priority Collateral in favor of the ABL Collateral Agent shall be senior to the Lien on such additional or replacement collateral in favor of the Term Loan Collateral Agent, in each case with respect to the foregoing clauses (1) and (2), to the extent required by this Agreement.

(b)    The ABL Collateral Agent, on behalf of itself and the ABL Claimholders, agrees that none of them shall contest (or support any other Person contesting):

(1)    any request by the Term Loan Collateral Agent or the Term Loan Claimholders for adequate protection or similar relief with respect to the Term Loan Priority Collateral; provided that if such adequate protection claim seeks the creation of any Lien over additional assets or property of any Grantor that shall also constitute ABL Priority Collateral, (i) a Lien shall have been created in favor of the ABL Claimholders in respect of such Collateral and (ii) the Lien thereon in favor of the Term Loan Claimholders shall be subordinated to the extent set forth in this Agreement; or

(2)    any objection by the Term Loan Collateral Agent or the Term Loan Claimholders to any motion, relief, action or proceeding based on the Term Loan Collateral Agent claiming a lack of adequate protection or similar relief; provided that if the Term Loan Collateral Agent or the Term Loan Claimholders are granted adequate protection or similar relief in the form of additional or replacement collateral, the ABL Collateral Agent and the ABL Claimholders may seek or request adequate protection in the form of Lien on

33

such additional or replacement collateral; it being understood and agreed that (1) if such additional or replacement collateral shall also constitute ABL Priority Collateral, the Lien on such additional or replacement collateral constituting ABL Priority Collateral in favor of the Term Loan Collateral Agent shall be subordinate to the Lien on such additional or replacement collateral in favor of the ABL Collateral Agent and (2) if such additional or replacement collateral shall also constitute Term Loan Priority Collateral, the Lien on such additional or replacement collateral constituting Term Loan Priority Collateral in favor of the Term Loan Collateral Agent shall be senior to the Lien on such additional or replacement collateral in favor of the ABL Collateral Agent, in each case with respect to the foregoing clauses (1) and (2), to the extent required by this Agreement.

(c)    Notwithstanding the foregoing provisions in this Section 6.3, in any Insolvency or Liquidation Proceeding:

(1)    if the ABL Claimholders (or any subset thereof) are granted adequate protection or similar relief with respect to the ABL Priority Collateral (unless such ABL Priority Collateral is of a type permitted by Section 2.4 to not also constitute Term Loan Collateral) in the form of additional or replacement collateral of the Credit Parties (even if such collateral is not of a type which would otherwise have constituted ABL Priority Collateral) in connection with any Cash Collateral use or DIP Financing, then the Term Loan Collateral Agent, on behalf of itself or any of the Term Loan Claimholders, may seek or request adequate protection or similar relief with respect to its interests in such Collateral in the form of a Lien on the same additional or replacement collateral, which Lien (other than on any collateral constituting Term Loan Priority Collateral) will be subordinated to the Liens securing the ABL Obligations and such Cash Collateral use or DIP Financing (and all Obligations relating thereto) on the same basis as the other Liens of the Term Loan Collateral Agent on ABL Priority Collateral;

(2)    if the Term Loan Claimholders (or any subset thereof) are granted adequate protection or similar relief with respect to the Term Loan Priority Collateral in the form of additional or replacement collateral of the Credit Parties (even if such collateral is not of a type which would otherwise have constituted Term Loan Priority Collateral) in connection with any Cash Collateral use or DIP Financing, then the ABL Collateral Agent, on behalf of itself or any of the ABL Claimholders, may seek or request adequate protection or similar relief with respect to its interests in such Collateral in the form of a Lien on the same additional or replacement collateral, which Lien (other than on any ABL Priority Collateral) will be subordinated to the Liens securing the Term Loan Obligations and such Cash Collateral use or DIP Financing (and all Obligations relating thereto) on the same basis as the other Liens of the ABL Collateral Agent on Term Loan Priority Collateral;

(3)    in the event the ABL Collateral Agent, on behalf of itself or any of the ABL Claimholders, seeks or requests adequate protection or similar relief in respect of its interests in the Term Loan Priority Collateral and such adequate protection or similar relief is granted in the form of additional or replacement collateral of the Credit Parties, then the ABL Collateral Agent, on behalf of itself and any of the ABL Claimholders, agrees that the Term Loan Collateral Agent shall also be granted a Lien on the same additional or replacement collateral as adequate protection for the Term Loan Obligations and for any

Cash Collateral use or DIP Financing provided by the Term Loan Claimholders, and the ABL Collateral Agent, on behalf of itself and any of the ABL Claimholders, agrees that any Lien on such additional or replacement collateral granted as adequate protection for the Term Loan Obligations (other than any such collateral that constitutes ABL Priority Collateral) shall be senior to the Liens on such collateral securing the ABL Obligations, any such use of Cash Collateral or any such DIP Financing provided by the ABL Claimholders (and all Obligations relating thereto) and to any other Liens granted to the ABL Loan Claimholders as adequate protection, all on the same basis as the other Liens of the Term Loan Collateral Agent on Term Loan Priority Collateral; and

(4)     in the event the Term Loan Collateral Agent, on behalf of itself or any of the Term Loan Claimholders, seeks or requests adequate protection or similar relief in respect of its interests in the ABL Facility Collateral and such adequate protection is granted in the form of additional or replacement collateral of the Credit Parties, then the Term Loan Collateral Agent, on behalf of itself and the Term Loan Claimholders, agrees that the ABL Collateral Agent shall also be granted a Lien on the same additional or replacement collateral as adequate protection for the ABL Obligations and for any Cash Collateral use or DIP Financing provided by the ABL Claimholders, and the Term Loan Collateral Agent, on behalf of itself and any of the Term Loan Claimholders, agrees that any Lien on such additional or replacement collateral granted as adequate protection for the ABL Obligations (other than any such collateral that constitutes Term Loan Priority Collateral) shall be senior to the Liens on such collateral securing the Term Loan Obligations, any such use of cash Collateral or any such DIP Financing provided by the Term Loan Claimholders (and all Obligations relating thereto) and to any other Liens granted to the Term Loan Claimholders as adequate protection, all on the same basis as the other Liens of the ABL Collateral Agent on Term Loan Priority Collateral.

(d)     Except as otherwise expressly set forth in this Section 6 or in connection with the exercise of remedies with respect to (i) the ABL Priority Collateral, nothing herein shall limit the rights of the Term Loan Collateral Agent or the Term Loan Claimholders from seeking adequate protection or similar relief with respect to their rights in the Term Loan Priority Collateral in any Insolvency or Liquidation Proceeding (including adequate protection or similar relief in the form of a cash payment, periodic cash payments, superpriority administrative claims, or otherwise) or (ii) the Term Loan Priority Collateral, nothing herein shall limit the rights of the ABL Collateral Agent or the ABL Claimholders from seeking adequate protection or similar relief with respect to their rights in the ABL Priority Collateral in any Insolvency or Liquidation Proceeding (including adequate protection or similar relief in the form of a cash payment, periodic cash payments, superpriority administrative claims, or otherwise).

**6.4**    <u>Avoidance Issues</u>. If any ABL Claimholder or Term Loan Claimholder is required in any Insolvency or Liquidation Proceeding or otherwise to turn over or otherwise pay to the estate of the applicable Grantor any amount paid in respect of ABL Obligations or the Term Loan Obligations, as the case may be (a "**Recovery**"), then such ABL Claimholders or Term Loan Claimholders shall be entitled to a reinstatement of ABL Obligations or the Term Loan Obligations, as the case may be, with respect to all such recovered amounts. If this Agreement shall have been terminated prior to such Recovery, this Agreement shall be reinstated in full force

and effect, and such prior termination shall not diminish, release, discharge, impair or otherwise affect the obligations of the parties hereto from such date of reinstatement.

### 6.5    Post-Petition Interest.

(a)    Neither the Term Loan Collateral Agent nor any Term Loan Claimholder shall oppose or seek to challenge any claim by the ABL Collateral Agent or any ABL Claimholder for allowance in any Insolvency or Liquidation Proceeding of ABL Obligations consisting of Post-Petition Interest, fees or expenses to the extent of the value of the Lien securing any ABL Claimholder's claim, without regard to the existence of the Lien of the Term Loan Collateral Agent on behalf of the Term Loan Claimholders on the Collateral.

(b)    Neither the ABL Collateral Agent nor any other ABL Claimholder shall oppose or seek to challenge any claim by the Term Loan Collateral Agent or any Term Loan Claimholder for allowance in any Insolvency or Liquidation Proceeding of Term Loan Obligations consisting of Post-Petition Interest, fees or expenses to the extent of the value of the Lien securing any Term Loan Claimholder's claim, without regard to the existence of the Lien of the ABL Collateral Agent on behalf of the ABL Claimholders on the Collateral.

### 6.6    Waivers.

(a)    The Term Loan Collateral Agent, for itself and on behalf of the Term Loan Claimholders, waives any claim it may hereafter have against any ABL Claimholder arising out of the election of any ABL Claimholder of the application of Section 1111(b)(2) of the Bankruptcy Code or out of any grant of a security interest in connection with the ABL Priority Collateral in any Insolvency or Liquidation Proceeding. The ABL Collateral Agent, for itself and on behalf of the ABL Claimholders, waives any claim it may hereafter have against any Term Loan Claimholder arising out of the election of any Term Loan Claimholder of the application of Section 1111(b)(2) of the Bankruptcy Code or out of any grant of a security interest in connection with the Term Loan Priority Collateral in any Insolvency or Liquidation Proceeding.

(b)    The Term Loan Collateral Agent, for itself and on behalf of the Term Loan Claimholders, agrees that it shall not assert or enforce any claim under Section 506(c) of the Bankruptcy Code senior to or on a parity with the Liens securing the ABL Obligations for costs or expenses of preserving or disposing of the ABL Priority Collateral. The ABL Collateral Agent, for itself and on behalf of the ABL Claimholders, agrees that it shall not assert or enforce any claim under Section 506(c) of the Bankruptcy Code senior to or on a parity with the Liens securing the Term Loan Obligations for costs or expenses of preserving or disposing of the Term Loan Priority Collateral.

### 6.7    Separate Grants of Security and Separate Classification.

(a)    The Term Loan Collateral Agent, for itself and on behalf of the Term Loan Claimholders, and the ABL Collateral Agent, for itself and on behalf of the ABL Claimholders, acknowledge and agree that the grants of Liens pursuant to the ABL Collateral Documents and the Term Loan Collateral Documents constitute separate and distinct grants of Liens, and because of, among other things, their differing rights in the Collateral, the Term Loan Obligations are fundamentally different from the ABL Obligations and must be separately classified in any plan

of reorganization proposed or adopted in an Insolvency or Liquidation Proceeding. In furtherance of the foregoing, the Term Loan Collateral Agent, for itself and on behalf of the Term Loan Claimholders, and the ABL Collateral Agent, for itself and on behalf of the ABL Claimholders, each agrees that the Term Loan Claimholders and the ABL Claimholders will vote as separate classes in connection with any plan of reorganization in any Insolvency or Liquidation Proceeding and that no Collateral Agent nor any Claimholder will seek to vote with the other as a single class in connection with any plan of reorganization in any Insolvency or Liquidation Proceeding.

(b)      To further effectuate the intent of the parties as provided in this Section 6.7, if it is held that the claims of the Term Loan Claimholders and the ABL Claimholders in respect of the Term Loan Collateral constitute only one secured claim (rather than separate classes of secured claims), then the Term Loan Collateral Agent, for itself and on behalf of the Term Loan Claimholders, and the ABL Collateral Agent, for itself and on behalf of the ABL Claimholders, hereby acknowledge and agree that, subject to Sections 2.1 and 4.1, all distributions shall be made as if there were separate classes of senior and junior secured claims against the Grantors in respect of the Term Loan Collateral (with the effect being that, to the extent that the aggregate value of the Term Loan Collateral is sufficient (for this purpose ignoring all claims held by the ABL Claimholders), the Term Loan Claimholders shall be entitled to receive, in addition to amounts distributed to them in respect of principal, prepetition interest and other claims, all amounts owing in respect of Post-Petition Interest, including any additional interest payable pursuant to the Term Loan Documents arising from or related to a default, regardless of whether any claim therefor is allowed or allowable in any Insolvency or Liquidation Proceeding) before any distribution is made from the Term Loan Priority Collateral in respect of the claims held by the ABL Claimholders, with the ABL Collateral Agent, for itself and on behalf of the ABL Claimholders, hereby acknowledging and agreeing to turn over to the Term Loan Collateral Agent, for itself and on behalf of the Term Loan Claimholders, amounts otherwise received or receivable by them from the Term Loan Priority Collateral to the extent necessary to effectuate the intent of this sentence, even if such turnover has the effect of reducing the claim or recovery of the ABL Claimholders).

(c)      To further effectuate the intent of the parties as provided in this Section 6.7, if it is held that the claims of the Term Loan Claimholders and the ABL Claimholders in respect of the ABL Facility Collateral constitute only one secured claim (rather than separate classes of secured claims), then the Term Loan Collateral Agent, for itself and on behalf of the Term Loan Claimholders, and the ABL Collateral Agent, for itself and on behalf of the ABL Claimholders, hereby acknowledge and agree that, subject to Sections 2.1 and 4.1, all distributions shall be made as if there were separate classes of senior and junior secured claims against the Grantors in respect of the ABL Facility Collateral (with the effect being that, to the extent that the aggregate value of the ABL Facility Collateral is sufficient (for this purpose ignoring all claims held by the Term Loan Claimholders), the ABL Claimholders shall be entitled to receive, in addition to amounts distributed to them in respect of principal, prepetition interest and other claims, all amounts owing in respect of Post-Petition Interest, including any additional interest payable pursuant to the ABL Credit Agreement arising from or related to a default, regardless of whether any claim therefor is allowed or allowable in any Insolvency or Liquidation Proceeding) before any distribution is made from the ABL Priority Collateral in respect of the claims held by the Term Loan Claimholders, with the Term Loan Collateral Agent, for itself and on behalf of the Term Loan Claimholders, hereby acknowledging and agreeing to turn over to the ABL Collateral Agent, for itself and on behalf of the ABL Claimholders, amounts otherwise received or receivable by them from the ABL

Priority Collateral to the extent necessary to effectuate the intent of this sentence, even if such turnover has the effect of reducing the claim or recovery of the Term Loan Claimholders).

(d)      Notwithstanding anything in the foregoing to the contrary, the Term Loan Collateral Agent and the Term Loan Claimholders, on the one hand, and the ABL Collateral Agent and the ABL Claimholders, on the other hand, shall retain the right to vote and otherwise act in any Insolvency or Liquidation Proceeding (including the right to vote to accept or reject any plan of reorganization) to the extent not inconsistent with the provisions hereof.

**6.8**    <u>Enforceability and Continuing Priority</u>. This Agreement shall be applicable both before and after the commencement of any Insolvency or Liquidation Proceeding and all converted or succeeding cases in respect thereof. The relative rights of Claimholders in or to any distributions from or in respect of any Collateral or proceeds of Collateral shall continue after the commencement of any Insolvency Proceeding. Accordingly, the provisions of this Agreement (including, without limitation, Section 2.1 hereof) are intended to be and shall be enforceable as a subordination agreement within the meaning of Section 510(a) of the Bankruptcy Code.

**6.9**    <u>Sales</u>. Subject to Sections 3.1(c)(5) and 3.2(c)(5) and 3.3, each Collateral Agent agrees that it will consent, and will not object or oppose, or support any party in opposing, a motion to dispose of any Priority Collateral of the other party free and clear of any Liens or other claims under Section 363 of the Bankruptcy Code if the requisite ABL Claimholders under the ABL Credit Agreement or Term Loan Claimholders under the applicable Term Loan Documents, as the case may be, have consented to such disposition of their respective Priority Collateral, such motion does not impair, subject to the priorities set forth in this Agreement, the rights of such party under Section 363(k) of the Bankruptcy Code (so long as the right of any Term Loan Claimholder to offset its claim against the purchase price for any ABL Priority Collateral exists only after the ABL Obligations have been paid in full in cash, and so long as the right of any ABL Claimholder to offset its claim against the purchase price for any Term Loan Priority Collateral exists only after the Term Loan Obligations have been paid in full in cash), and the terms of any proposed order approving such transaction provide for the respective Liens to attach to the proceeds of the Priority Collateral that is the subject of such disposition, subject to the Lien priorities in Section 2.1 and the other terms and conditions of this Agreement. Each of the Term Loan Collateral Agent and the ABL Collateral Agent further agrees that it will not oppose, or support any party in opposing, the right of the other party to credit bid under Section 363(k) of the Bankruptcy Code, subject to the provision of the immediately preceding sentence.

**6.10**    <u>Reorganization Securities</u>. If, in any Insolvency or Liquidation Proceeding debt obligations of the reorganized debtor secured by Liens upon any property of the reorganized debtor are distributed pursuant to a plan of reorganization or similar dispositive plan, both on account of ABL Obligations and on account of Term Loan Obligations, then, to the extent the debt obligations distributed on account of the ABL Obligations and on account of the Term Loan Obligations are secured by Liens upon property that would constitute ABL Priority Collateral or Term Loan Priority Collateral under the terms of this Agreement, the provisions of this Agreement will survive the distribution of such debt obligations pursuant to such plan and will apply with like effect to the debt obligations so distributed, to the Liens securing such debt obligations, and the distribution of proceeds thereof.

138905220_2

**SECTION 7.  Reliance; Waivers, Etc**.

      **7.1**    Reliance. Other than any reliance on the terms of this Agreement, the ABL Collateral Agent, on behalf of itself and the ABL Claimholders under its ABL Documents, acknowledges that it and such ABL Claimholders have, independently and without reliance on the Term Loan Collateral Agent or any Term Loan Claimholders, and based on documents and information deemed by them appropriate, made their own credit analysis and decision to enter into such ABL Documents and be bound by the terms of this Agreement and they will continue to make their own credit decision in taking or not taking any action under the ABL Credit Agreement or this Agreement. Other than any reliance on the terms of this Agreement, the Term Loan Collateral Agent, on behalf of itself and the Term Loan Claimholders, acknowledges that it and the Term Loan Claimholders have, independently and without reliance on the ABL Collateral Agent or any ABL Claimholder, made their own decision to enter into each of the Term Loan Documents and be bound by the terms of this Agreement and they will not rely on the ABL Collateral Agent or any ABL Claimholder in taking or not taking any action under the Term Loan Documents or this Agreement.

      **7.2**    No Warranties or Liability. The ABL Collateral Agent, on behalf of itself and the ABL Claimholders under the ABL Documents, acknowledges and agrees that neither the Term Loan Collateral Agent nor any Term Loan Claimholder has made any express or implied representation or warranty, including with respect to the execution, existence, genuineness, condition, validity, legality, completeness, collectability or enforceability of any of the Term Loan Documents, the ownership, value, existence, genuineness or condition of any Collateral or the existence, validity, enforceability, perfection or priority of any Liens thereon. Except as otherwise provided in this Agreement, the Term Loan Collateral Agent and the Term Loan Claimholders will be entitled to manage and supervise their respective loans and extensions of credit under the Term Loan Documents in accordance with law and the Term Loan Documents, as they may, in their sole discretion, deem appropriate. The Term Loan Collateral Agent, on behalf of itself and the Term Loan Claimholders, acknowledges and agrees that neither the ABL Collateral Agent nor any ABL Claimholder has made any express or implied representation or warranty, including with respect to the execution, validity, legality, completeness, collectability or enforceability of any of the ABL Documents, the ownership of any Collateral or the perfection or priority of any Liens thereon. Except as otherwise provided in this Agreement, the ABL Collateral Agent and the ABL Claimholders will be entitled to manage and supervise their respective loans and extensions of credit under their respective ABL Documents in accordance with law and the ABL Documents, as they may, in their sole discretion, deem appropriate. Neither the Term Loan Collateral Agent nor any Term Loan Claimholders shall have any duty to the ABL Collateral Agent or any of the ABL Claimholders, and the ABL Collateral Agent and the ABL Claimholders shall have no duty to the Term Loan Collateral Agent or any of the Term Loan Claimholders, to act or refrain from acting in a manner which allows, or results in, the occurrence or continuance of an event of default or default under any agreements with any Grantor (including the ABL Documents and the Term Loan Documents), regardless of any knowledge thereof which they may have or be charged with.

      **7.3**    No Waiver of Lien Priorities.

      (a)    No right of the Collateral Agents, the ABL Claimholders or the Term Loan Claimholders to enforce any provision of this Agreement or any ABL Document or Term Loan

138905220_2

Document shall at any time in any way be prejudiced or impaired by any act or failure to act on the part of any Grantor or by any act or failure to act by such Collateral Agents, ABL Claimholders or Term Loan Claimholders or by any noncompliance by any Person with the terms, provisions and covenants of this Agreement, any of the ABL Documents or any of the Term Loan Documents, regardless of any knowledge thereof which the Collateral Agents or the ABL Claimholders or Term Loan Claimholders, or any of them, may have or be otherwise charged with.

(b)    Without in any way limiting the generality of the foregoing paragraph subject to the provisions of Sections 2.3, 2.4, 5.3 and 5.5, the Collateral Agents, the ABL Claimholders and the Term Loan Claimholders may, at any time and from time to time in accordance with the ABL Documents and Term Loan Documents and/or applicable law, without the consent of, or notice to, the other Collateral Agent or the ABL Claimholders or the Term Loan Claimholders (as the case may be), without incurring any liabilities to such Persons and without impairing or releasing the Lien priorities and other benefits provided in this Agreement (even if any right of subrogation or other right or remedy is affected, impaired or extinguished thereby) do any one or more of the following:

(1)    change the manner, place or terms of payment or change or extend the time of payment of, or amend, renew, exchange, increase or alter, the terms of any of the Obligations or any Lien or guaranty thereof or any liability of any Grantor, or any liability incurred directly or indirectly in respect thereof (including any increase in or extension of the Obligations, without any restriction as to the tenor or terms of any such increase or extension) or otherwise amend, renew, exchange, extend, modify or supplement in any manner any Liens held by the Collateral Agents or any rights or remedies under any of the ABL Documents or the Term Loan Documents;

(2)    sell, exchange, release, surrender, realize upon, enforce or otherwise deal with in any manner and in any order any part of the Collateral (except to the extent provided in this Agreement) or any liability of any Grantor or any liability incurred directly or indirectly in respect thereof;

(3)    settle or compromise any Obligation or any other liability of any Grantor or any security therefor or any liability incurred directly or indirectly in respect thereof and apply any sums by whomsoever paid and however realized to any liability in any manner or order that is not inconsistent with the terms of this Agreement; and

(4)    exercise or delay in or refrain from exercising any right or remedy against any security or any Grantor or any other Person, elect any remedy and otherwise deal freely with any Grantor.

(c)    Except as otherwise provided herein, the ABL Collateral Agent, on behalf of itself and the ABL Claimholders, also agrees that the Term Loan Claimholders and the Term Loan Collateral Agent shall have no liability to the ABL Collateral Agent or any ABL Claimholders, and the ABL Collateral Agent, on behalf of itself and the ABL Claimholders, hereby waives any claim against any Term Loan Claimholder or the Term Loan Collateral Agent, arising out of any and all actions which the Term Loan Claimholders or the Term Loan Collateral Agent may take or permit or omit to take with respect to:

(1)     the Term Loan Documents;

(2)     the collection of the Term Loan Obligations; or

(3)     the foreclosure upon, or sale, liquidation or other disposition of, any Term Loan Priority Collateral.

The ABL Collateral Agent, on behalf of itself and the ABL Claimholders, agrees that the Term Loan Claimholders and the Term Loan Collateral Agent have no duty to them in respect of the maintenance or preservation of the Term Loan Priority Collateral, the Term Loan Obligations or otherwise.

(d)     Except as otherwise provided herein, the Term Loan Collateral Agent, on behalf of itself and the Term Loan Claimholders, also agrees that the ABL Claimholders and the ABL Collateral Agent shall have no liability to the Term Loan Collateral Agent or any Term Loan Claimholders, and the Term Loan Collateral Agent, on behalf of itself and the Claimholders, hereby waives any claim against any ABL Claimholder or the ABL Collateral Agent, arising out of any and all actions which the ABL Claimholders or the ABL Collateral Agent may take or permit or omit to take with respect to:

(1)     the ABL Documents;

(2)     the collection of the ABL Obligations; or

(3)     the foreclosure upon, or sale, liquidation or other disposition of, any ABL Priority Collateral.

The Term Loan Collateral Agent, on behalf of itself and the Term Loan Claimholders, agrees that the ABL Claimholders and the ABL Collateral Agent have no duty to them in respect of the maintenance or preservation of the ABL Collateral, the ABL Obligations or otherwise.

(e)     Until the Discharge of Term Loan Obligations, the ABL Collateral Agent, on behalf of itself and the ABL Claimholders, agrees not to assert and hereby waives, to the fullest extent permitted by law, any right to demand, request, plead or otherwise assert or otherwise claim the benefit of, any marshalling, appraisal, valuation or other similar right that may otherwise be available under applicable law with respect to the Term Loan Priority Collateral or any other similar rights a junior secured creditor may have under applicable law.

(f)     Until the Discharge of ABL Obligations, the Term Loan Collateral Agent, on behalf of itself and the Term Loan Claimholders, agrees not to assert and hereby waives, to the fullest extent permitted by law, any right to demand, request, plead or otherwise assert or otherwise claim the benefit of, any marshalling, appraisal, valuation or other similar right that may otherwise be available under applicable law with respect to the ABL Priority Collateral or any other similar rights a junior secured creditor may have under applicable law.

**7.4**     <u>Obligations Unconditional</u>. All rights, interests, agreements and obligations of the ABL Collateral Agent and the ABL Claimholders and the Term Loan Collateral Agent and

41

the Term Loan Claimholders, respectively, hereunder shall remain in full force and effect irrespective of:

        (a)      any lack of validity or enforceability of any ABL Documents or any Term Loan Documents;

        (b)      except as otherwise expressly set forth in this Agreement, any change in the time, manner or place of payment of, or in any other terms of, all or any of the ABL Obligations or Term Loan Obligations, or any amendment or waiver or other modification, including any increase in the amount thereof, whether by course of conduct or otherwise, of the terms of any ABL Document or any Term Loan Document;

        (c)      except as otherwise expressly set forth in this Agreement, any exchange of any security interest in any Collateral or any other collateral, or any amendment, waiver or other modification, whether in writing or by course of conduct or otherwise, of all or any of the ABL Obligations or Term Loan Obligations or any guaranty thereof;

        (d)      the commencement of any Insolvency or Liquidation Proceeding in respect of the any Grantor; or

        (e)      any other circumstances which otherwise might constitute a defense available to, or a discharge of, any Grantor in respect of the ABL Collateral Agent, the ABL Obligations, any ABL Claimholder, the Term Loan Collateral Agent, the Term Loan Obligations or any Term Loan Claimholder in respect of this Agreement.

        **7.5**      <u>The Term Loan Collateral Agent</u>. The Term Loan Collateral Agent shall have all of the rights (including indemnification rights), benefits, privileges, protections and immunities granted to the Term Loan Collateral Agent in its capacity as such under the Term Loan Credit Agreement, all of which are incorporated herein *mutatis mutandis*.

**SECTION 8.**  **<u>Miscellaneous</u>**.

        **8.1**      <u>Conflicts</u>. In the event of any conflict between the provisions of this Agreement and the provisions of any ABL Document or any Term Loan Document, the provisions of this Agreement shall govern and control.

        **8.2**      <u>Effectiveness; Continuing Nature of This Agreement; Severability</u>. This Agreement shall become effective when executed and delivered by the parties hereto. This is a continuing agreement of lien subordination and the ABL Claimholders and Term Loan Claimholders may continue, at any time and without notice to any Collateral Agent, to extend credit and other financial accommodations and lend monies to or for the benefit of any Grantor in reliance hereon. Each of the Collateral Agents, on behalf of itself and the ABL Claimholders or the Term Loan Claimholders, as the case may be, hereby waives any right it may have under applicable law to revoke this Agreement or any of the provisions of this Agreement. The terms of this Agreement shall survive, and shall continue in full force and effect, in any Insolvency or Liquidation Proceeding. Consistent with, but not in limitation of, the preceding sentence, each Collateral Agent, on behalf of the applicable Claimholders, irrevocably acknowledges that this Agreement constitutes a "subordination agreement" within the meaning of both New York law

and Section 510(a) of the Bankruptcy Code. Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall not invalidate the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. All references to any Grantor shall include such Grantor as debtor and debtor-in-possession and any receiver or trustee for any Grantor (as the case may be) in any Insolvency or Liquidation Proceeding. This Agreement shall terminate and be of no further force and effect on the earlier of:

      (a)    the date of the Discharge of ABL Obligations, subject to the rights of the ABL Claimholders under Section 6.4; and

      (b)    the date of the Discharge of Term Loan Obligations, subject to the rights of the Term Loan Claimholders under Section 6.4.

      **8.3**    <u>Amendments; Waivers</u>. No amendment, modification or waiver of any of the provisions of this Agreement by the Term Loan Collateral Agent or the ABL Collateral Agent shall be deemed to be made unless the same shall be in writing signed on behalf of each party hereto or its authorized agent and each waiver, if any, shall be a waiver only with respect to the specific instance involved and shall in no way impair the rights of the parties making such waiver or the obligations of the other parties to such party in any other respect or at any other time. Notwithstanding the foregoing, no Grantor shall have any right to consent to or approve any amendment, modification, supplement or waiver of any provision of this Agreement (other than any amendment, modification, supplement or waiver to this Section 8.3 or Section 8.16) except to the extent that such amendment, modification, supplement or waiver (i) directly, negatively or adversely affects or impairs its rights or privileges hereunder, under the Term Loan Documents or under the ABL Documents or (ii) imposes any additional obligation or liability upon it. The Collateral Agents shall provide the Borrower with written notice of each proposed amendment, modification, supplement or waiver, with a true and correct copy thereof prior to the effectiveness thereof.

      **8.4**    <u>Information Concerning Financial Condition of the Grantors and their Subsidiaries</u>. The ABL Collateral Agent and the ABL Claimholders, on the one hand, and the Term Loan Claimsholders (other than the Term Loan Collateral Agent in its capacity as such), on the other hand, shall be responsible for keeping themselves informed of (a) the financial condition of the Grantors and their Subsidiaries and all endorsers and/or guarantors of the ABL Obligations or the Term Loan Obligations and (b) all other circumstances bearing upon the risk of nonpayment of the ABL Obligations or the Term Loan Obligations. Neither the ABL Collateral Agent and the ABL Claimholders, on the one hand, nor the Term Loan Collateral Agent and the Term Loan Claimholders, on the other hand, shall have any duty to advise the other of information known to it or them regarding such condition or any such circumstances or otherwise. In the event that either the ABL Collateral Agent or any of the ABL Claimholders, on the one hand, or the Term Loan Collateral Agent and the Term Loan Claimholders, on the other hand, undertakes at any time or from time to time to provide any such information to any of the others, it or they shall be under no obligation:

138905220_2

(a)    to make, and shall not make, any express or implied representation or warranty, including with respect to the accuracy, completeness, truthfulness or validity of any such information so provided;

(b)    to provide any additional information or to provide any such information on any subsequent occasion;

(c)    to undertake any investigation; or

(d)    to disclose any information, which pursuant to accepted or reasonable commercial finance practices, such party wishes to maintain confidential or is otherwise required to maintain confidential.

**8.5**    Subrogation.

(a)    With respect to the value of any payments or distributions in cash, property or other assets that any of the Term Loan Claimholders or the Term Loan Collateral Agent pays over to the ABL Collateral Agent or the ABL Claimholders under the terms of this Agreement, the Term Loan Claimholders and Term Loan Collateral Agent shall be subrogated to the rights of the ABL Collateral Agent and the ABL Claimholders; provided, however, that the Term Loan Collateral Agent, on behalf of itself and the Term Loan Claimholders, hereby agrees not to assert or enforce all such rights of subrogation it may acquire as a result of any payment hereunder until the Discharge of ABL Obligations has occurred. The Grantors acknowledge and agree that, to the extent permitted by applicable law, the value of any payments or distributions in cash, property or other assets received by the Term Loan Collateral Agent or the Term Loan Claimholders that are paid over to the ABL Collateral Agent or the ABL Claimholders pursuant to this Agreement shall not reduce any of the Term Loan Obligations.

(b)    With respect to the value of any payments or distributions in cash, property or other assets that any of the ABL Claimholders or the ABL Collateral Agent pays over to the Term Loan Collateral Agent or the Term Loan Claimholders under the terms of this Agreement, the ABL Claimholders and the ABL Collateral Agent shall be subrogated to the rights of the Term Loan Collateral Agent and the Term Loan Claimholders; provided, however, that, the ABL Collateral Agent, on behalf of itself and the ABL Claimholders, hereby agrees not to assert or enforce all such rights of subrogation it may acquire as a result of any payment hereunder until the Discharge of Term Loan Obligations has occurred. The Grantors acknowledge and agree that, to the extent permitted by applicable law, the value of any payments or distributions in cash, property or other assets received by the ABL Collateral Agent or the ABL Claimholders that are paid over to the Term Loan Collateral Agent or the Term Loan Claimholders pursuant to this Agreement shall not reduce any of the ABL Obligations.

**8.6**    [RESERVED]

**8.7**    SUBMISSION TO JURISDICTION, WAIVERS.

(a)    **ALL JUDICIAL PROCEEDINGS BROUGHT AGAINST ANY PARTY ARISING OUT OF OR RELATING HERETO MAY BE BROUGHT IN ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION IN THE STATE,**

44

COUNTY AND CITY OF NEW YORK. BY EXECUTING AND DELIVERING THIS AGREEMENT, EACH PARTY HERETO, IRREVOCABLY:

(1)    ACCEPTS GENERALLY AND UNCONDITIONALLY THE EXCLUSIVE JURISDICTION AND VENUE OF SUCH COURTS;

(2)    WAIVES ANY DEFENSE OF FORUM NON CONVENIENS;

(3)    AGREES THAT SERVICE OF ALL PROCESS IN ANY SUCH PROCEEDING IN ANY SUCH COURT MAY BE MADE BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO THE APPLICABLE PARTY AT ITS ADDRESS PROVIDED IN ACCORDANCE WITH SECTION 8.8; AND

(4)    AGREES THAT SERVICE AS PROVIDED IN CLAUSE (3) ABOVE IS SUFFICIENT TO CONFER PERSONAL JURISDICTION OVER THE APPLICABLE PARTY IN ANY SUCH PROCEEDING IN ANY SUCH COURT, AND OTHERWISE CONSTITUTES EFFECTIVE AND BINDING SERVICE IN EVERY RESPECT.

(b)    EACH OF THE PARTIES HERETO, AND EACH OTHER TERM LOAN CLAIMHOLDER, HEREBY AGREES TO WAIVE ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING HEREUNDER. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALLENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER HEREOF, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. EACH PARTY HERETO ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH HAS ALREADY RELIED ON

THIS WAIVER IN ENTERING INTO THIS AGREEMENT, AND THAT EACH WILL CONTINUE TO RELY ON THIS WAIVER IN ITS RELATED FUTURE DEALINGS. EACH PARTY HERETO FURTHER WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. THIS WAIVER IS IRREVOCABLE; MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING (OTHER THAN BY A MUTUAL WRITTEN WAIVER SPECIFICALLY REFERRING TO THIS SECTION 8.7(b) AND EXECUTED BY EACH OF THE PARTIES HERETO), AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS HERETO. IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

(c)    EACH OF THE PARTIES HERETO WAIVES ANY RIGHT IT MAY HAVE TO TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED ON, OR

45

**ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER ABL DOCUMENT OR TERM LOAN DOCUMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, VERBAL OR WRITTEN STATEMENT OR ACTION OF ANY PARTY HERETO.**

8.8    Notices. All notices to the Term Loan Claimholders and the ABL Claimholders permitted or required under this Agreement shall also be sent to the Term Loan Collateral Agent and the ABL Collateral Agent, respectively. Unless otherwise specifically provided herein, any notice hereunder shall be in writing and may be personally served, telexed or sent by telefacsimile or United States mail or courier service and shall be deemed to have been given when delivered in person or by courier service and signed for against receipt thereof, upon receipt of telefacsimile or telex, or three Business Days after depositing it in the United States mail with postage prepaid and properly addressed, except in the case of notices or communications given to the Term Loan Collateral Agent, which shall be effective only upon actual receipt by the Term Loan Collateral Agent at its Corporate Trust Office. For the purposes hereof, the addresses of the parties hereto shall be as set forth below each party's name on Exhibit B hereto, or, as to each party, at such other address as may be designated by such party in a written notice to all of the other parties.

8.9    Further Assurances. The ABL Collateral Agent, on behalf of itself and the ABL Claimholders under the ABL Documents, and the Term Loan Collateral Agent, on behalf of itself and the Term Loan Claimholders under the Term Loan Documents, and the Grantors, agree that each of them shall take such further action and shall execute and deliver such additional documents and instruments (in recordable form, if requested) as the Borrower, ABL Collateral Agent or the Term Loan Collateral Agent may reasonably request to effectuate the terms of and the Lien priorities contemplated by this Agreement.

8.10    **APPLICABLE LAW. THIS AGREEMENT SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.**

8.11    Binding on Successors and Assigns. This Agreement shall be binding upon the ABL Collateral Agent, the ABL Claimholders, the Term Loan Collateral Agent, the Term Loan Claimholders and their respective successors and assigns.

8.12    Specific Performance. Each of the ABL Collateral Agent and the Term Loan Collateral Agent may demand specific performance of this Agreement. The ABL Collateral Agent, on behalf of itself and the ABL Claimholders, and the Term Loan Collateral Agent, on behalf of itself and the Term Loan Claimholders, hereby irrevocably waive any defense based on the adequacy of a remedy at law and any other defense which might be asserted to bar the remedy of specific performance in any action which may be brought by the ABL Collateral Agent or the ABL Claimholders or the Term Loan Collateral Agent or the Term Loan Claimholders, as the case may be.

8.13    Headings. Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose or be given any substantive effect.

**8.14**    Counterparts. This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page of this Agreement or any document or instrument delivered in connection herewith by facsimile transmission or by email as a ".pdf" or ".tif" attachment shall be effective as delivery of a manually executed counterpart of this Agreement or such other document or instrument, as applicable.

**8.15**    Authorization. By its signature, each Person executing this Agreement on behalf of a party hereto represents and warrants to the other parties hereto that it is duly authorized to execute this Agreement.

**8.16**    No Third Party Beneficiaries. This Agreement and the rights and benefits hereof (and with respect to any Grantor, solely the terms of Section 8.3) shall inure to the benefit of each of the parties hereto (including Grantors for the purposes set forth in the preceding parenthetical) and its respective successors and assigns and shall inure to the benefit of each of the Collateral Agents, the ABL Claimholders and the Term Loan Claimholders. Nothing in this Agreement shall impair, as between the Grantors and the ABL Collateral Agent and the ABL Claimholders, or as between the Grantors and the Term Loan Collateral Agent and the Term Loan Claimholders, the obligations of the Grantors to pay principal, interest, fees and other amounts as provided in the ABL Documents and the Term Loan Documents, respectively.

**8.17**    Provisions to Define Relative Rights. The provisions of this Agreement are and are intended for the purpose of defining the relative rights of the ABL Collateral Agent and the ABL Claimholders on the one hand and the Term Loan Collateral Agent and the Term Loan Claimholders on the other hand. Nothing in this Agreement is intended to or shall impair the obligations of any Grantor, which are absolute and unconditional, to pay the ABL Obligations and the Term Loan Obligations as and when the same shall become due and payable in accordance with their terms.

**8.18**    Additional Grantors. The Borrower will cause each Person that is required after the date hereof by any Term Loan Document or ABL Document, as applicable, to guarantee any of the Borrower's Obligations, or grant a Lien on any of its property or assets as collateral security for the Obligations, to acknowledge and agree to the terms of this Agreement, by causing such Person to execute and deliver to each of the ABL Collateral Agent, on behalf of itself and the other ABL Claimholders, and the Term Loan Collateral Agent, on behalf of itself and the other Term Loan Claimholders, an Intercreditor Agreement Acknowledgment in substantially the form of Exhibit A hereto. The Company shall, promptly after the execution and delivery thereof, provide each Collateral Agent with a copy of each Intercreditor Agreement Acknowledgment executed and delivered pursuant to this Section 8.18.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the parties hereto have executed this Intercreditor Agreement as of the date first written above.

[_____],
as Collateral Agent

By: _____

Name:
Title:

138905220_2

**BANK OF AMERICA, N.A.,**
as Administrative Agent


By:  _____
       Name: John W. Mundstock
       Title:  SVP

[Intercreditor Agreement]

# FORM OF
# INTERCREDITOR AGREEMENT ACKNOWLEDGMENT

Reference is made to the Intercreditor Agreement, dated as of [_____] (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Intercreditor Agreement**"), among NORTHWEST HARDWOODS, INC., a Delaware corporation, HARDWOODS INTERMEDIATE HOLDINGS II, INC., a Delaware corporation ("**Holdings**"), the other GRANTORS from time to time party thereto, BANK OF AMERICA, N.A., as ABL Collateral Agent, and [_____], as Term Loan Collateral Agent, and certain other Persons party or that may become party thereto from time to time. Capitalized terms used but not defined herein shall have the meanings assigned to such terms in the Intercreditor Agreement.

This Intercreditor Agreement Acknowledgment, dated as of [_____], 201_ (this "**Intercreditor Agreement Acknowledgment**"), is being delivered pursuant to requirements of the Intercreditor Agreement.

1.    <u>Acknowledgment.</u> The undersigned Grantor hereby acknowledges and agrees, for the enforceable benefit of all existing and future ABL Claimholders and all existing and future Term Loan Claimholders that the undersigned (a) has received a copy of the foregoing Intercreditor Agreement and consents thereto, (b) agrees to recognize all rights granted thereby to the ABL Collateral Agent, the ABL Claimholders, the Term Loan Collateral Agent and the Term Loan Claimholders, and (c) will not do any act or perform any obligation which is not in accordance with the agreements set forth therein. The undersigned further acknowledges and agrees that it is not an intended beneficiary or third party beneficiary under the foregoing Intercreditor Agreement.

2.    <u>Notice Information.</u> The address of the undersigned Grantor for purposes of all notices and other communications hereunder and under the Intercreditor Agreement is [●], Attention of [●] (Facsimile No. [●], electronic mail address: [●]).

3.    <u>Counterparts.</u> This Intercreditor Agreement Acknowledgment may be executed in two or more counterparts, each of which shall constitute an original but all of which when taken together shall constitute one contract. Delivery of an executed signature page to this Intercreditor Agreement Acknowledgment by facsimile transmission or by email as a ".pdf" or ".tif" attachment shall be as effective as delivery of a manually signed counterpart of this Intercreditor Agreement Acknowledgment.

4.    <u>Governing Law.</u> THIS INTERCREDITOR AGREEMENT ACKNOWLEDGMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

5.    <u>Loan Document.</u> This Intercreditor Agreement Acknowledgment shall constitute an ABL Document and a Term Loan Document.

6.      <u>Miscellaneous.</u> The provisions of Section 8 of the Intercreditor Agreement will apply with like effect to this Intercreditor Agreement Acknowledgment.

Agreement Acknowledgment to be duly executed by its authorized representative, and each of the ABL Collateral Agent and the Term Loan Collateral Agent has caused the same to be accepted by its authorized representative, as of the day and year first above written.

[**NAME OF GRANTOR**],
as Grantor

By: _____
     Name:
     Title:

Acknowledged and Agreed to by:

**BANK OF AMERICA, N.A.**,
as ABL Collateral Agent

By: _____
     Name:
     Title:

[_____],
as Term Loan Collateral Agent

By: _____
     Name:
     Title:

**Exhibit B**

**Notice Addresses**

If to Borrower and Grantors:

Northern Hardwoods, Inc.,
[_____]

If to the ABL Collateral Agent:

Bank of America, N.A.,

Attention:
Address:

If to the Term LoanCollateral Agent:

[_____]
[_____]
Attention:

B-1

## **EXHIBIT D**

**Reorganized HHI Limited Liability Company Agreement Term Sheet**

This **Exhibit D** contains a term sheet setting forth the key terms of the Reorganized HHI Limited Liability Company Agreement.  Certain documents, or portions thereof, contained in this **Exhibit D** remain subject to continuing negotiations among the Debtors, the Required Consenting Stakeholders, the Exit ABL Agent and Lenders and/or other interested parties with respect thereto and to the agreement and approval of the applicable parties.  Subject to the terms and conditions of the Plan and the Restructuring Support Agreement, the Debtors reserve all rights to amend, revise, or supplement this **Exhibit D**, and any of the documents and designations contained herein, at any time before the Effective Date of the Plan, or any such other date as may be provided for by the Plan or by order of the Bankruptcy Court.  Each of the documents contained in this **Exhibit D** are subject to certain consent and approval rights to the extent provided in the Plan or the Restructuring Support Agreement.

**LLC Agreement of Reorganized HHI[1]**
**Principal Terms for Discussion**

| Issue | Principal Terms |
|---|---|
| **Definitions[2]** | - "<u>Board</u>" means the Board of Directors of Reorganized HHI.<br><br>- "<u>Company Group</u>" means Reorganized HHI and its direct and indirect subsidiaries.<br><br>- "<u>CVC Investors</u>" means Unitholders which are affiliates of or controlled by CVC Credit Partners, LLC.<br><br>- "<u>Glendon Investors</u>" means Unitholders which are affiliates of or controlled by Glendon Capital Management L.P.<br><br>- "<u>Unitholders</u>" means any holder of Units in Reorganized HHI.<br><br>- "<u>Units</u>" means the membership interests of Reorganized HHI, which will be issued as one class of units. |
| **Board Composition and Representation** | - <u>Board</u>: Reorganized HHI will be managed by a Board of Directors (serving as managers as described in the Delaware Limited Liability Company Act) and Unitholders will not be entitled to manage the Company other than in respect of the consent rights over amendments to the Limited Liability Company Agreement of Reorganized HHI as described in "LLCA Amendments" below.  The initial Board will be composed of five members:<br><br>    o  Two individuals designated by the Glendon Investors (the "<u>Glendon Directors</u>");<br><br>    o  One individual designated by the CVC Investors (the "<u>CVC Director</u>");<br><br>    o  The Chief Executive Officer of Reorganized HHI (the "<u>CEO Director</u>"); and<br><br>    o  One individual designated jointly by the Glendon Investors and CVC Investors in good faith consultation with other members of the ad hoc group, who will be an independent Board member identified through a third-party search process (the "<u>Independent Director</u>"). Independence will mean that an Independent Director may not be an employee, officer, director, or equityholder of a Unitholder or of an affiliate of a Unitholder.<br><br>- <u>Majority Vote</u>: Board actions will require a simple majority (*i.e.*, 3 of 5).<br><br>- <u>Board Designees</u>: |

---

[1] On or prior to the Effective Date, either (i) HHI will be converted into a Delaware limited liability company, taxed as a corporation or (ii) a newly formed Delaware limited liability company, taxed as a corporation will be inserted above HHI. References to "Reorganized HHI" in this term sheet are to the limited liability company referred to in either clause (i) or (ii).

[2] Capitalized terms used and not otherwise defined herein have the meanings ascribed to such terms in the Plan.

| Issue | Principal Terms |
|---|---|
| |   o So long as the Glendon Investors hold at least 20% of the outstanding Units, the Glendon Investors will be entitled to designate two individuals to the Board. |
| |   o At such time as the Glendon Investors hold less than 20% of the outstanding Units, the Glendon Investors will be entitled to designate only one individual to the Board. |
| |   o So long as the Glendon Investors and the CVC Investors each respectively hold at least 10% of the outstanding Units, the Glendon Investors and the CVC Investors will each be entitled to designate one individual to the Board. |
| |   o At such time as the Glendon Investors or the CVC Investors hold less than 10% of the outstanding Units, such investors will no longer be entitled to designate an individual to the Board or, if applicable with respect to the CVC Investors, an observer to the Board. |
| |   o For so long as the Glendon Investors hold more than 50% of the outstanding Units, the Glendon Investors will be entitled to remove the CVC Director, with or without cause.  If the CVC Director is removed, the Glendon Investors will be entitled to designate an individual to replace the removed CVC Director, which replacement director will become a "Glendon Director." If the CVC Director is removed, the CVC Investors will be entitled to designate one observer to the Board, which individual will be entitled to customary observer rights and subject to customary restrictions (e.g. confidentiality and conflict of interest matters). |
| | - <u>Vacant Seats</u>: |
| |   o A vacancy in the Independent Director Board seat will be filled (i) by one individual designated jointly by the Glendon Investors and CVC Investors, in good faith consultation with other members of the ad hoc group, or (ii) if the Glendon Investors and CVC Investors cannot agree upon a designee, by the vote of holders of a majority of outstanding Units (excluding Units held by the Glendon Investors and CVC Investors) from a choice of two candidates (with each of the Glendon Investors and CVC Investors nominating one candidate). The Glendon Investors and the CVC Investors may, but will not be required to, engage a third party search firm to identify Board candidates but in any event, such Board candidate must not be affiliated with the Glendon Investors or CVC Investors or employed by the Company Group. |
| |   o Board seats formerly held by designees of the Glendon Investors or the CVC Investors (or their respective permitted transferees) that are forfeited due to lack of threshold Unit ownership (and not due to removal) will become independent Board seats and will be filled by a vote of holders of a majority of outstanding Units from candidates for such open Board seat as may be submitted to such Unitholders by the Company or the remaining members of the Board. |
| |   o A vacancy in the CEO Director seat will be filled by the then-serving CEO of Reorganized HHI. |

| Issue | Principal Terms |
|---|---|
| | - Transferability of Board / Observer Seats: Rights to appoint Board members (or, if applicable, observers) will not be personal to the Glendon Investors or CVC Investors and may be transferred in connection with a transfer of Units; provided that the Units being transferred are sufficient to designate Board members or observers as set forth above (*i.e.*, at least 20% or at least 10%). |
| **LLCA Amendments** | - [Reorganized HHI and the Unitholders would be restricted from executing targeted amendments to the organizational documents of Reorganized HHI that have a disproportionate and adverse impact on (i) an individual Unitholder (as compared to the Unitholders holding the same class of Units), without the approval of such Unitholder, or (ii) a particular class of Units (as compared to other classes of Units), without the approval of Unitholders holding a majority of such class of Units]. |
| **Transfer Restrictions** | - ROFR: Any transfer of Units (other than a transfer of Units effected for customary estate planning purposes) by a Unitholder that holds [4.5]% or less of the outstanding Units will be subject to a right of first refusal in favor of the Unitholders that hold more than 10% of the outstanding Units.<br><br>- Transfers: Units will otherwise be freely transferable (subject to compliance with ministerial requirements and applicable securities laws); provided Unitholders may not transfer Units to a competitor of Reorganized HHI and the other members of the Company Group, which competitors will be set forth in an exhibit to the LLC Agreement ("Competitors").  A super-majority (*i.e.*, 4 out of 5 directors) of the Board will have the right to waive the application of such restriction on a case-by-case basis, as well as the right to amend the list of Competitors from time to time. |
| **Drag-Along Rights** | - Unitholders holding 75% of the outstanding Units will have the ability to drag along all other Unitholders with a sale of at least a majority of the Units and to initiate a sale of Reorganized HHI[; provided, that, in connection with such drag along transaction, management Unitholders will not be required to agree to restrictive covenants that are more onerous or restrictive than those to which they are subject immediately prior to such drag along transaction]. |
| **Preemptive Rights / Registration Rights** | - Preemptive Rights: Unitholders that hold at least [4.5]% of the outstanding Units [and then-current members of management that are Unitholders] will be entitled to customary preemptive rights with respect to issuances of equity or hybrid/convertible securities by Reorganized HHI.<br><br>- Registration Rights: Unitholders will be entitled to customary demand and piggyback registration rights. |
| **Information Rights** | - Unitholders (other than Unitholders that are Competitors) will be entitled to receive copies of the annual (including audited) and quarterly financial statements of Reorganized HHI via a virtual data room |
| **Fiduciary Duties** | - Fiduciary duties of Unitholders and Board designees to Reorganized HHI and other Unitholders will be waived to the extent permitted by applicable law.  Officers of Reorganized HHI will have fiduciary duties to Reorganized HHI and the Unitholders as they would as officers of a Delaware corporation. |

| Issue | Principal Terms |
|-------|-----------------|
| **Voting** | -   Reorganized HHI shall not issue non-voting equity securities; *provided, however*, that the foregoing restriction shall (i) have no further force and effect beyond that required under section 1123(a)(6) of the Bankruptcy Code, (ii) only have such force and effect for so long as section 1123 of the Bankruptcy Code is in effect and applicable to Reorganized HHI, and (iii) in all events may be amended or eliminated in accordance with applicable law as from time to time may be in effect. |

## Exhibit E

### Rejected Executory Contract and Unexpired Lease List

This **Exhibit E** contains the Rejected Executory Contract and Unexpired Lease List. Certain documents, or portions thereof, contained in this **Exhibit E** remain subject to continuing negotiations among the Debtors, the Required Consenting Stakeholders, the Exit ABL Agent and Lenders and/or other interested parties with respect thereto and to the agreement and approval of the applicable parties.  Subject to the terms and conditions of the Plan and the Restructuring Support Agreement, the Debtors reserve all rights to amend, revise, or supplement this **Exhibit E**, and any of the documents and designations contained herein, at any time up to and including the date that is seven (7) days prior to the Effective Date of the Plan, or any such other date as may be provided for by the Plan or by order of the Bankruptcy Court.  Each of the documents contained in this **Exhibit E** are subject to certain consent and approval rights to the extent provided in the Plan or the Restructuring Support Agreement.

27475409.2

## <u>Rejected Executory Contract and Unexpired Lease List</u>

On the Effective Date,[1] except as otherwise provided in the Plan, each of the Debtors' Executory Contracts and Unexpired Leases listed below on this Rejected Executory Contract and Unexpired Lease List shall be rejected unless any such Executory Contract or Unexpired Lease is removed from this Rejected Executory Contract and Unexpired Lease List. Any objection to the rejection of an Executory Contract or Unexpired Lease, as applicable, must be filed, served, and actually received by the counsel to the Debtors, counsel to the Consenting Creditors, the clerk of the Bankruptcy Court, and the United States Trustee on or before **December 23, 2020 at 5:00 p.m. (Prevailing Eastern Time)**. The Bankruptcy Court shall rule on any such objection at the time of the Confirmation Hearing or such other date and time agreed by the parties or ordered by the Bankruptcy Court. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the rejection will be deemed to have assented to such rejection.

Entry of the Confirmation Order by the Bankruptcy Court shall constitute an order approving the rejection of Executory Contracts and Unexpired Leases identified on this Rejected Executory Contract and Unexpired Lease List. Notwithstanding anything to the contrary in the Plan, the Debtors or Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Rejected Executory Contract and Unexpired Lease List no later than seven (7) days prior to the Effective Date.

If certain, but not all, of a contract counterparty's Executory Contracts and/or Unexpired Leases are assumed pursuant to the Plan, the Confirmation Order shall be a determination that such counterparty's Executory Contracts and/or Unexpired Leases that are being rejected pursuant to the Plan are severable agreements that are not integrated with those Executory Contracts and/or Unexpired Leases that are being assumed pursuant to the Plan. Parties seeking to contest this finding with respect to their Executory Contracts and/or Unexpired Leases must file a timely objection to the Plan on the grounds that their agreements are integrated and not severable, and any such dispute shall be resolved by the Bankruptcy Court at the Confirmation Hearing (to the extent not resolved by the parties prior to the Confirmation Hearing).

As provided in <u>Article V.E.</u> of the Plan, (a) in full and complete satisfaction of any and all Claims, rights or obligations under the MSA and the rejection thereof, the Sponsor Equityholder shall be entitled to the MSA Claim and (b) in full and complete satisfaction of any and all Claims, rights or obligations under the CITIC Agreement and the rejection thereof, CITIC shall be entitled to the CITIC Claim. As of the Effective Date, each of the MSA Claim and the CITIC Claim shall be Allowed General Unsecured Claims. For the avoidance of doubt, (i) the Allowed General Unsecured Claims in respect of the MSA Claim and the CITIC Claim shall be paid in Cash on the Effective Date, (ii) there is no requirement for the Sponsor Equityholder or CITIC to file a Proof of Claim and (iii) any Claims asserted by the Sponsor Equityholder or CITIC in excess of the MSA Claim or the CITIC Claim respectively on account of the Debtors' rejection thereof, including in any Proof of Claim, shall be Disallowed.

---

[1] All capitalized terms used and not defined herein shall have the meanings ascribed to them in the *Joint Prepackaged Chapter 11 Plan of Reorganization of Northwest Hardwoods, Inc. and Its Debtor Affiliates* [Docket No. 15] (the "<u>Plan</u>")

**Rejected Executory Contract and Unexpired Lease List**

| No. | Contract Party | Contract Counterparty (Name) | Description of Agreement | Agreement Date |
|---|---|---|---|---|
| 1. | Northwest Hardwoods, Inc. | CCIP III Advisory Ltd. ("CITIC") | Director Services and Fee Agreement (the "CITIC Agreement") | September 4, 2014 |
| 2. | Northwest Hardwoods, Inc. | Littlejohn & Co. LLC (the "Sponsor Equityholder") | Management Services and Fee Agreement (the "MSA") | July 18, 2014 |

## EXHIBIT F

### Identities of the Members of the New Board

This **Exhibit F** contains the identities of the members of the New Board.  Certain documents, or portions thereof, contained in this **Exhibit F** remain subject to continuing negotiations among the Debtors, the Required Consenting Stakeholders, the Exit ABL Agent and Lenders and/or other interested parties with respect thereto and to the agreement and approval of the applicable parties.  Subject to the terms and conditions of the Plan and the Restructuring Support Agreement, the Debtors reserve all rights to amend, revise, or supplement this **Exhibit F**, and any of the documents and designations contained herein, at any time before the Effective Date of the Plan, or any such other date as may be provided for by the Plan or by order of the Bankruptcy Court.  Each of the documents contained in this **Exhibit F** are subject to certain consent and approval rights to the extent provided in the Plan or the Restructuring Support Agreement.

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the identities and affiliations of the members of the New Board and any Person proposed to serve as an officer of the Reorganized Debtors shall be disclosed at or before the Confirmation Hearing, in each case to the extent the identity of such proposed director or officer is known at such time.

27475409.2

[TO COME]

27475409.2