## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| NORTHWEST HARDWOODS, INC., *et al.*,[1] | ) | Case No. 20-13005 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re. Docket Nos. 2, 14, 15, 16, 57, 64, 68, 116, 119, 122, 132** |

## MEMORANDUM OF LAW IN SUPPORT OF AN ORDER (I) APPROVING THE ADEQUACY OF THE DISCLOSURE STATEMENT AND THE PREPETITION SOLICITATION PROCEDURES AND (II) CONFIRMING THE SECOND AMENDED JOINT PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION OF NORTHWEST HARDWOODS, INC. AND ITS DEBTOR AFFILIATES

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Northwest Hardwoods, Inc. (5401), Hardwoods Intermediate Holdings II, Inc. (7760), and Hardwoods Holdings, Inc. (3443).  The location of the Debtors' service address in these chapter 11 cases is: 1313 Broadway, Suite 300, Tacoma, WA 98402.

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................ 1

BACKGROUND ................................................................................................... 3

    I.    General Background of the Chapter 11 Cases ........................................ 3

    II.   Solicitation of Plan and Noticing .......................................................... 5

ARGUMENT ....................................................................................................... 7

    I.    Approval of the Disclosure Statement, Solicitation and Solicitation Procedures ... 8

        A.    The Disclosure Statement Should Be Approved. ...................... 8

        B.    The Solicitation Procedures Should Be Approved. ................... 9

    II.   The Plan Satisfies Each Requirement for Confirmation and Should Be Approved ... 17

        A.    The Plan Satisfies Bankruptcy Code Section 1129(a)(1). ....... 17

        B.    The Plan Releases and Exculpation Should Be Approved. ..... 24

        C.    The Plan Satisfies Bankruptcy Code Section 1129(a)(2). ....... 35

        D.    The Plan Has Been Proposed in Good Faith under Section 1129(a)(3) of the Bankruptcy Code. ......................................... 36

        E.    The Plan Complies with Section 1129(a)(4) of the Bankruptcy Code. .... 37

        F.    The Debtors Have Complied with Section 1129(a)(5). ........... 37

        G.    The Plan Does Not Contain Any Rate Changes Subject to 1129(a)(6). ... 38

        H.    The Plan Is in the Best Interests of All Creditors and Equity Security Holders under 1129(a)(7) ......................................... 39

        I.    The Plan Has Been Accepted by Impaired Voting Classes (Bankruptcy Code Section 1129(a)(8)). ......................................... 40

        J.    Payment in Full of All Allowed Priority Claims (Bankruptcy Code Section 1129(a)(9)). ......................................... 41

        K.    The Plan Satisfies Bankruptcy Code 1129(a)(10). ................. 42

L.     The Plan Is Feasible and Satisfies Section 1129(a)(11)............................ 43

M.    The Plan Complies with Bankruptcy Code Section 1129(a)(12). ............ 46

N.    Bankruptcy Code Section 1129(a)(13) Is Not Applicable........................ 46

O.    The Plan Satisfies "Cramdown" Requirements under Section 1129(b) of the Bankruptcy Code. .......................................................................... 47

P.    The Plan's Principal Purpose Is Not Avoidance of Taxes (11 U.S.C. § 1129(d))................................................................................................. 48

III.    Cause Exists To Waive the Stay of the Confirmation Order. ............................... 48

CONCLUSION.................................................................................................................... 49

## TABLE OF AUTHORITIES

**Page(s)**

OTHER AUTHORITIES

*Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
    526 U.S. 434 (1999)..................................................................................... 38

*First Fid. Bank v. McAteer*, 985 F.2d 118 (3d Cir. 1993) ........................................ 30

*In re Arsenal Resources Development LLC, et al.*,
    No. 19-12347 (BLS) (Bankr. D. Del Dec. 19, 2019)............................................ 14

*In re ATD Corporation, et al.*,
    No. 18-12221 (KJC) (Bankr. D. Del. Oct. 4, 2018)............................................. 33

*In re Blackhawk Mining LLC*,
    No. 19-11595 (LSS) (Bankr. D. Del. July 22, 2019)........................................... 14

*In re Coram Healthcare Corp.*,
    315 B.R. 321 (Bankr. D. Del. 2004) ............................................................ 18, 25

*In re Curtis Ctr. Ltd. P'ship*,
    195 B.R. 631 (Bankr. E.D. Pa 1996) .................................................................. 42

*In re EV Energy Partners, L.P., et al.*,
    No. 18-10814 (CSS) (Bankr. D. Del Apr. 2, 2018) .............................................. 33

*In re Genesis Health*,
    266 B.R. 591 (Bankr. D. Del. 2001) .................................................................. 32

*In re Indianapolis Downs, LLC*,
    486 B.R. 286 (Bankr. D. Del. 2013) ................................................. 26, 27, 34, 43

*In re Jersey City Med. Ctr.*,
    817 F.2d 1055 (3d Cir. 1987)............................................................................. 18

*In re Paragon Offshore PLC*,
    No. 16-10386 (CSS), 2016 WL 6699318 (CSS) (Bankr. D. Del. Nov. 15,
    2016) ................................................................................................................. 43

*In re Philadelphia Rittenhouse Developer, L.P.*,
    2011 WL 13043475 (Bankr. E.D. Pa. May 25, 2011) .......................................... 42

*In re PPI Enters. (U.S.), Inc.*,
    228 B.R. 339 (Bankr. D. Del. 1998) .................................................................. 35

*In re PWS Holding Corp.*,
  228 F.3d 224 (3d Cir. 2000)..................................................................... 34

*In re Sound Radio, Inc.*,
  93 B.R. 849 (Bankr. D.N.J. 1988) .......................................................... 35

*In re Spansion, Inc.*,
  426 B.R. 114 (Bankr. D. Del. 2010) ................................................. 25, 31

*In re Tribune Co.*,
  464 B.R. 126 (Bankr. D. Del. 2011) ................................................. 32, 43

*In re U.S. Truck Co.*,
  47 B.R. 932 (E.D. Mich. 1985)................................................................ 43

*In re W.R. Grace & Co.*,
  475 B.R. 34 (Bankr. D. Del. 2012) .......................................... 17, 18, 43

*In re Wash. Mut., Inc.*,
  442 B.R. 314 (Bankr. D. Del. 2011) ....................................................... 26

*In re Zenith Electronics Corp.*,
  241 B.R. 92 (Bankr. D. Del. 1999) .................................. 25, 26, 32, 35

*Oneida Motor Freight, Inc. v. United Jersey Bank*,
  848 F.2d 414 (3d Cir. 1988)..................................................................... 8

*Tex. Extrusion Corp. v. Lockheed Corp. (In re Tex. Extrusion Corp.)*,
  844 F.2d 1142 (5th Cir. 1988) ................................................................. 9

*United States v. Energy Res. Co.*,
  495 U.S. 545 (1990)................................................................................. 43

## REGULATIONS

11 U.S.C. § 1103...................................................................................... 37

11 U.S.C. § 1122(a) ................................................................................. 17

11 U.S.C. § 1122(b) ................................................................................. 17

11 U.S.C. § 1123(a) ............................................................................ 19, 20

11 U.S.C. § 1123(a)(1).............................................................................. 19

11 U.S.C. § 1123(a)(2).............................................................................. 19

11 U.S.C. § 1123(a)(3).............................................................................. 19

11 U.S.C. § 1123(a)(4)..................................................................................................... 19

11 U.S.C. § 1123(a)(5)..................................................................................................... 19

11 U.S.C. § 1123(a)(6)..................................................................................................... 19

11 U.S.C. § 1123(a)(7)..................................................................................................... 20

11 U.S.C. § 1123(b)................................................................................................... 20, 21

11 U.S.C. § 1123(b)(1)..................................................................................................... 20

11 U.S.C. § 1123(b)(2).......................................................................................... 20, 21, 23

11 U.S.C. § 1123(b)(3)(A)................................................................................... 20, 25

11 U.S.C. § 1123(b)(3)(B)................................................................................................ 20

11 U.S.C. § 1123(b)(5)..................................................................................................... 20

11 U.S.C. § 1123(b)(6)..................................................................................................... 20

11 U.S.C. § 1125(a)(1)................................................................................................. 8, 11

11 U.S.C. § 1125(e)......................................................................................................... 34

11 U.S.C. § 1125(g).................................................................................................. 9, 10, 11

11 U.S.C. § 1126................................................................................................... 35, 40

11 U.S.C. § 1126(b)................................................................................................. 9, 10, 11

11 U.S.C. § 1126(b)(2)............................................................................................... 10, 11

11 U.S.C. § 1126(c)......................................................................................................... 40

11 U.S.C. § 1126(d)......................................................................................................... 40

11 U.S.C. § 1126(f).......................................................................................................... 14

11 U.S.C. § 1129................................................................................................... 3, 7, 48

11 U.S.C. § 1129(a)(1)..................................................................................................... 17

11 U.S.C. § 1129(a)(10)............................................................................................. 41, 42

11 U.S.C. § 1129(a)(11)................................................................................................... 42

11 U.S.C. § 1129(a)(12)............................................................................................. 45, 46

11 U.S.C. § 1129(a)(13)................................................................................................ 46

11 U.S.C. § 1129(a)(2).................................................................................................. 35

11 U.S.C. § 1129(a)(3).................................................................................................. 35

11 U.S.C. § 1129(a)(4).................................................................................................. 36

11 U.S.C. § 1129(a)(5)............................................................................................. 37, 38

11 U.S.C. § 1129(a)(6).................................................................................................. 38

11 U.S.C. § 1129(a)(7).................................................................................................. 38

11 U.S.C. § 1129(a)(8).................................................................................................. 40

11 U.S.C. § 1129(a)(9).................................................................................................. 41

11 U.S.C. § 1129(a)(9)(A) ........................................................................................... 41

11 U.S.C. § 1129(a)(9)(C) ........................................................................................... 41

11 U.S.C. § 1129(b) ................................................................................................. 41, 46

11 U.S.C. § 1129(b)(1) ................................................................................................. 46

11 U.S.C. § 1129(b)(2) ................................................................................................. 46

11 U.S.C. § 1129(d) ...................................................................................................... 47

11 U.S.C. § 1141 ........................................................................................................... 34

11 U.S.C. § 1145(a) ...................................................................................................... 20

11 U.S.C. § 327.............................................................................................................. 37

11 U.S.C. § 328.............................................................................................................. 37

11 U.S.C. § 330.............................................................................................................. 37

11 U.S.C. § 331.............................................................................................................. 37

11 U.S.C. § 363.............................................................................................................. 37

11 U.S.C. § 365.............................................................................................................. 21

11 U.S.C. § 365(a) .................................................................................................... 21, 23

11 U.S.C. § 365(b)(1) ................................................................................................... 22

11 U.S.C. § 503 .................................................................................................................. 37

11 U.S.C. § 507 .................................................................................................................. 45

11 U.S.C. § 507(a)(2) ......................................................................................................... 45

11 U.S.C. § 524(e) .............................................................................................................. 34

15 U.S.C. §§ 77a–77aa ....................................................................................................... 10

28 U.S.C. § 1930 ................................................................................................................ 45

**RULES**

Fed. R. Bankr. P. 2002 ....................................................................................................... 16

Fed. R. Bankr. P. 3017 ............................................................................................... 16, 35, 51

Fed. R. Bankr. P. 3017(d) ........................................................................................... passim

Fed. R. Bankr. P. 3017(d)(2) .............................................................................................. 16

Fed. R. Bankr. P. 3017(e) ..................................................................................................... 9

Fed. R. Bankr. P. 3018 ................................................................................................... 35, 51

Fed. R. Bankr. P. 3018(b) ......................................................................................... 10, 13, 14

Fed. R. Bankr. P. 3018(c) ......................................................................................... 10, 12, 13

Fed. R. Bankr. P. 3020(b)(2) .............................................................................................. 36

Fed. R. Bankr. P. 3020(e) ............................................................................................... 8, 50

Fed. R. Bankr. P. 9019 ................................................................................................... 25, 26

**OTHER AUTHORITIES**

H.R. Rep. No. 95-595, at 409 (1977) ............................................................................ 9, 18, 35

S. Rep. No. 95-989, at 126 (1978) ..................................................................................... 18

The debtors and debtors in possession (collectively the "<u>Debtors</u>") in the above-caption chapter 11 cases (the "<u>Chapter 11 Cases</u>") submit this memorandum of law (this "<u>Memorandum</u>") (i) in support of the request for entry of an order (the "<u>Confirmation Order</u>") (A) approving the *Disclosure Statement for Joint Prepackaged Chapter 11 Plan of Reorganization of Northwest Hardwoods, Inc. and Its Debtor Affiliates* [Docket No. 16] (as amended, modified or supplemented from time to time, the "<u>Disclosure Statement</u>"), the Solicitation (defined below) and the solicitation procedures described in the Scheduling Motion (defined below) (the "<u>Solicitation Procedures</u>"), including the Ballots (defined below), and (B) confirming the *Joint Prepackaged Chapter 11 Plan of Reorganization of Northwest Hardwoods, Inc. and Its Debtor Affiliates* [Docket No. 15][2] (as amended by the First Amended Plan and Second Amended Plan and supplemented by the Plan Supplement (defined below) and, collectively, as the same may be amended, modified and supplemented from time to time, the "<u>Plan</u>").[3]

## **<u>PRELIMINARY STATEMENT</u>**

1.      With the support of all of their key stakeholders, the Debtors respectfully request entry of the Confirmation Order as the final step to a restructuring that will be consummated promptly thereafter.  The Plan—which implements the terms of the Restructuring Support Agreement, dated as of October 21, 2020 (the "<u>Restructuring Support Agreement</u>"), among the Debtors and the Consenting Stakeholders—has been accepted by overwhelming majorities of the Classes of Claims and Interests that were entitled to vote.

---

[2]      The Debtors filed blacklines showing all changes made to the Plan on December 20, 2020 [Docket No. 119] (the "<u>First Amended Plan</u>") and December 28, 2020 [Docket No. 132] (the "<u>Second Amended Plan</u>").

[3]      Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

2.      As set forth in greater detail in the Voting Affidavit (as defined below), as of the Voting Deadline (as defined below), the percentages of Holders of Claims in Classes entitled to vote on the Plan that voted to accept or reject the Plan are as follows:

| Plan Class | Amount Accepting Plan (% of Amount Voted) | Amount Rejecting Plan (% of Amount Voted) | Number Accepting Plan (% of Number Voted) | Number Rejecting Plan (% of Number Voted) |
|---|---|---|---|---|
| Class 4 (Secured Notes Claims) | 98.04% | 1.96% | 98.82% | 1.18% |
| Class 9 (Existing Equity Interests) | 100% | 0% | 100% | 0% |

3.      The Plan maximizes the value of the Debtors and is in the best interest of all of their stakeholders.  It significantly delevers the Debtors by eliminating approximately $269 million of net principal indebtedness from their balance sheet.  The Plan contemplates equitizing a significant portion of the Secured Notes Claims and canceling Existing Equity Interests, in each case in exchange for a portion of New Common Stock.  Most importantly, under the Plan, the Debtors will pay the Claims of their employees, vendors, suppliers, trade and all other General Unsecured Claims in full on the Effective Date or afterwards in the ordinary course of business if such Claims are not due and payable on the Effective Date.  Finally, the Restructuring Transactions contemplated by the Plan include, upon emergence, entry by the Debtors into an up to $100 million Exit ABL Facility and $110 million Exit Take Back Debt Facility, ensuring that the Debtors will have ample working capital to operate their business.  In short, the Plan protects stakeholders most involved in the Debtors' day-to-day operations while maximizing recoveries for Holders of funded debt, and it does so consensually with the support of the Consenting Stakeholders.

4. The Plan is a paradigmatic example of a successful reorganization under chapter 11 and, for the reasons stated herein and the supporting declarations, satisfies the requirements of section 1129 of the Bankruptcy Code.  Further, the Debtors have worked diligently to resolve all objections to the Plan, and approval of the Plan is now fully-consensual.  Accordingly, the Debtors respectfully request that the Court confirm the Plan.

## **BACKGROUND**

### I.    **General Background of the Chapter 11 Cases**

5. For an overview of the Debtors' business and other facts relevant to the relief discussed herein, the Debtors respectfully refer the Court to the record of the Chapter 11 Cases, including:

(a)    the Disclosure Statement;

(b)    the Plan;

(c)    the *Declaration of Nathan Jeppson in Support of Debtors' Chapter 11 Petitions and Requests for First Day Relief*, filed November 23, 2020 [Docket No. 2] (the "First Day Declaration");

(d)    the *Motion of Debtors for Entry of an Order (I) Scheduling Combined Hearing on Adequacy of Disclosure Statement and Confirmation of Prepackaged Plan; (II) Fixing Deadline to Object to Disclosure Statement and Prepackaged Plan; (III) Approving Prepetition Solicitation Procedures and Form and Manner of Notice of Commencement, Combined Hearing and Objection Deadline; (IV) Approving Notice and Objection Procedures for the Assumption and Rejection of Executory Contracts and Unexpired Leases; (V) Conditionally (A) Directing the United States Trustee Not to Convene Section 341(a) Meeting of Creditors and (B) Waiving Requirement of Filing Statements of Financial Affairs and Schedules of Assets and Liabilities and Rule 2015.3 Reports; and (VI) Granting Related Relief*, filed November 23, 2020 [Docket No. 14] (the "Scheduling Motion");

(e)    the *Order (I) Scheduling Combined Hearing on Adequacy of Disclosure Statement and Confirmation of Prepackaged Plan; (II) Fixing Deadline to Object to Disclosure Statement and Prepackaged Plan; (III) Conditionally Approving Prepetition Solicitation Procedures; (IV) Approving the Form and Manner of Notice of the Combined Hearing and Objection Deadline; (V) Approving Notice and Objection Procedures for the Assumption and Rejection of Executory*

*Contracts and Unexpired Leases; (VI) (A) Providing that the United States Trustee Shall Not be Required to Convene Section 341(a) Meeting of Creditors and (B) Extending the Time for Debtors to File Statements of Financial Affairs and Schedules of Assets and Liabilities and Rule 2015.3 Reports and Permanently Waiving the Requirement to File Same Upon Confirmation of the Debtors' Prepackaged Plan; and (VII) Granting Related Relief*, entered on November 24, 2020 [Docket No. 64] (the "<u>Scheduling Order</u>");

(f)    the *Notice of (I) Commencement of Prepackaged Chapter 11 Cases, (II) Combined Hearing to Consider (A) Adequacy of Disclosure Statement and (B) Confirmation of Prepackaged Plan, (III) Assumption and Rejection of Executory Contracts and Unexpired Leases and (IV) Objection Deadlines and Summary of Prepackaged Plan*, filed on November 24, 2020 [Docket No. 68] (the "<u>Combined Notice</u>");

(g)    the *Declaration of James F. Daloia of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Joint Prepackaged Chapter 11 Plan of Reorganization of Northwest Hardwoods, Inc., and Its Debtor Affiliates*, filed substantially contemporaneously herewith (the "<u>Voting Affidavit</u>");

(h)    the *Declaration of Nathan Jeppson, in Support of an Order (I) Approving the Adequacy of the Disclosure Statement and the Prepetition Solicitation Procedures and (II) Confirming the Joint Prepackaged Chapter 11 Plan of Reorganization of Northwest Hardwoods, Inc., and Its Debtor Affiliates*, dated as of the date hereof and filed substantially contemporaneously herewith (the "<u>Jeppson Declaration</u>");

(i)    the *Declaration of Aaron Kibbey in Support of an Order (I) Approving the Adequacy of the Disclosure Statement and the Prepetition Solicitation Procedures and (II) Confirming the Joint Prepackaged Chapter 11 Plan of Reorganization of Northwest Hardwoods, Inc., and Its Debtor Affiliates*, dated as of the date hereof and filed substantially contemporaneously herewith (the "<u>Kibbey Declaration</u>");

(j)    the *Declaration of Stephen Darr in Support of an Order (I) Approving the Adequacy of the Disclosure Statement and the Prepetition Solicitation Procedures and (II) Confirming the Joint Prepackaged Chapter 11 Plan of Reorganization of Northwest Hardwoods, Inc., and Its Debtor Affiliates*, dated as of the date hereof and filed substantially contemporaneously herewith (the "<u>Darr Declaration</u>"); and

(k)    the various affidavits and declarations of service relating to the foregoing.

The Debtors incorporate herein, by this reference, the foregoing documents and any testimony and other declarations that may be adduced or submitted at or in connection with the Combined Hearing (defined below).

## II.    Solicitation of Plan and Noticing

6.    In accordance with the Restructuring Support Agreement, on November 13, 2020, the Debtors solicited votes on the Plan (the "Solicitation") from Holders of record as of November 11, 2020 (the "Voting Record Date") of Claims in Class 4 and Existing Common Equity Interests in Class 9 (collectively, the "Voting Classes")[4] in accordance with the Solicitation Procedures, the Bankruptcy Code[5] and the Local Rules[6] by causing Prime Clerk LLC (the "Voting Agent")[7] to distribute copies of the solicitation package (the "Solicitation Package") to members of the Voting Classes.  The Solicitation Package included copies of the Disclosure Statement and the Exhibits thereto, including the Plan, and ballots (the "Ballots") for each Holder of a Claim or Interest in a Voting Class (the "Voting Parties").

7.    Voting Parties were required to submit their completed Ballots to the Voting Agent on or prior to 5:00 p.m. (prevailing Eastern Time) on December 23, 2020 (the "Voting Deadline").[8]  An overwhelming majority in amount of the Claims and Interests held by the Voting Parties are parties to the Restructuring Support Agreement (the "Consenting Stakeholders") and, as such, were familiar with the terms of the Plan and the Debtors' business

---

[4]    Aff. of Service of Solicitation Materials, filed November 23, 2020 [Docket No. 45] ("Solicitation Affidavit").

[5]    "Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532.

[6]    "Local Rules" means the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware.

[7]    On November 24, 2020, the Court entered an order authorizing the appointment of Prime Clerk LLC as the claims and noticing agent for the Debtors [Docket No. 57].  Additionally, on December 16, 2020, the Debtors filed the *Debtors' Application for an Order, Pursuant to Section 327(a) of the Bankruptcy Code, Authorizing the Retention and Employment of Prime Clerk LLC as Administrative Advisor to the Debtors, Effective as of the Petition Date* [Docket No. 109] requesting authority to retain Prime Clerk LLC as Voting Agent to assist with, among other things, solicitation, balloting and tabulation of votes, and prepare any related reports, as required in support of confirmation of a chapter 11 plan.

[8]    Scheduling Order [Docket No. 64].

and financial condition much earlier than the commencement of the Solicitation.  Accordingly, the Debtors believe that the forty (40)-day solicitation period provided Voting Parties was more than sufficient time to vote on the Plan.

8.      The Debtors did not solicit votes from the Holders that were presumed to accept or deemed to reject the Plan (collectively, the "Non-Voting Holders") and did not cause the Voting Agent to serve a Solicitation Package on such Holders.[9]  Rather, on November 24, 2020 (i.e., more than 35 days before the date scheduled for the "Combined Hearing" on the adequacy of the Disclosure Statement and confirmation of the Plan), the Debtors, in accordance with the Scheduling Order, caused the Voting Agent to serve the Combined Notice on:  (a) all known Holders of Claims and Interests (and their nominees, as applicable); (b) the U.S. Trustee; and (c) all other parties entitled to notice in the Chapter 11 Cases.  In addition, the Debtors caused the publication form of the Combined Notice (the "Publication Notice") to be published on November 30, 2020 in the national edition of *The Washington Post*.[10]

9.      The Combined Notice includes, among other things:    (i) notice of the commencement of the Chapter 11 Cases; (ii) notice of the date, time and place of the Combined Hearing; (iii) instructions for obtaining copies of the Disclosure Statement and Plan from the Debtors' website maintained by the Voting Agent at https://cases.primeclerk.com/NWH (the "Case Website"); (iv) procedures for the Debtors' assumption and rejection of Executory Contracts and Unexpired Leases; (v) a summary of the Plan, including a summary of the treatment of certain Classes and a chart summarizing Plan distributions and descriptions of the

---

[9]      The Holders of Claims and Interests that are Unimpaired under the Plan are conclusively presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code, and Holders of Claims or Interests that are not entitled to receive any property on account of their Claims or Interests (or are so designated) are deemed to reject the Plan under section 1126(g) of the Bankruptcy Code.

[10]     Aff. of Publication of Liliya Kulyk, dated December 8, 2020 [Docket No. 76].

release, exculpation and injunctive provisions; and (vi) the deadlines and procedures for filing objections or responses to the adequacy of the Disclosure Statement, confirmation of the Plan, and the assumption of Executory Contracts or Unexpired Leases (the "Objection Deadline"). As indicated in the Combined Notice, the Debtors have made the Combined Notice, the Disclosure Statement and the Plan available at no cost on the Case Website.

10.    On December 16, 2020, as updated, modified or amended on December 21, 2020, the Debtors filed the Plan Supplement documents [Docket Nos. 116, 122] and caused such documents to be posted on the Case Website. The Plan Supplement consists of the: (i) Reorganized HHI LLC Agreement, (ii) Rejected Executory Contract, (iii) identities of the New Board,[11] and Unexpired Lease List, and (iv) forms of Exit Facility Documents.[12]

## ARGUMENT

11.    In Part I of this section, the Debtors set forth the basis for approval of the Disclosure Statement, the Solicitation and the Solicitation Procedures. In Part II, the Debtors demonstrate that the Plan satisfies each requirement for confirmation under section 1129 of the Bankruptcy Code. Finally, Part III addresses the Debtors' request for waiver of the fourteen (14)-day stay imposed by operation of Bankruptcy Rule 3020(e) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

---

[11]    The Debtors' Plan Supplement filing on December 16, 2020 to disclose the identities of the New Board noted that the identities of the New Board would be disclosed at or prior to the Combined Hearing to the extent known at such time. *See* [Docket No. 116], Ex. F. The Debtors intend to supplement their disclosures regarding the identities of the New Board either prior to or at the Combined Hearing.

[12]    The Debtors caused, or will cause, as applicable, the Voting Agent to serve the Plan Supplement documents on those creditors holding the thirty (30) largest unsecured claims against the Debtors' estates (on a consolidated basis) and all parties requesting notice pursuant to Rule 2002-1(b) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"). *See Aff. of Service* dated December 21, 2020 [Docket No. 121]; *Aff. of Service* dated December 23, 2020 [Docket No. 125].

I.    **Approval of the Disclosure Statement, Solicitation and Solicitation Procedures**

A.    **The Disclosure Statement Should Be Approved.**

12.    The Disclosure Statement contains the "adequate information" regarding the Plan required by section 1125 of the Bankruptcy Code, and there have been no objections to its approval.  For the reasons set forth below, the Debtors respectfully request that it be approved.

13.    Section 1125 of the Bankruptcy Code defines "adequate information" as:

> [I]nformation of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan.

11 U.S.C. § 1125(a)(1).

14.    Whether a disclosure statement contains adequate information is intended by Congress to be a flexible, fact-specific inquiry left within the discretion of the bankruptcy court:

> Precisely what constitutes adequate information in any particular instance will develop on a case-by-case basis.  Courts will take a practical approach as to what is necessary under the circumstances of each case, such as the cost of preparation of the statements, the need for relative speed in solicitation and confirmation, and, of course, the need for investor protection.  There will be a balancing of interests in each case.   In reorganization cases, there is frequently great uncertainty.  Therefore the need for flexibility is greatest.

H.R. Rep. No. 95-595, at 409 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6365.  *See also Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988) (observing that "adequate information will be determined by the facts and circumstances of each case"); *Tex. Extrusion Corp. v. Lockheed Corp. (In re Tex. Extrusion Corp.)*, 844 F.2d 1142, 1157

(5th Cir. 1988) (opining that what constitutes adequate information is "subjective," "made on a case by case basis," and "largely in the discretion of the bankruptcy court").

15.     The Disclosure Statement is detailed and comprehensive, includes the elements required by section 1125, and provides more than sufficient information to permit the Voting Parties to make "an informed judgment about the plan."  It contains descriptions of, among other things:  (i) the Plan; (ii) the Debtors' business, including disclosure regarding their operations; (iii) reasons for this restructuring; (iv) the Debtors' significant prepetition indebtedness; (v) the proposed capital structure of the Reorganized Debtors; (vi) financial information relevant to creditors' determinations of whether to accept or reject the Plan; (vii) the Liquidation Analysis (defined below) setting forth the estimated return that Holders would receive in a hypothetical chapter 7 liquidation; (viii) risk factors regarding the Debtors and the Plan; and (ix) federal tax law consequences of the Plan.  Accordingly, the Debtors submit that the Disclosure Statement contains "adequate information" within the meaning of section 1125 of the Bankruptcy Code and should be approved.

**B.      The Solicitation Procedures Should Be Approved.**

16.     To determine whether the Solicitation should be approved, courts consider whether the solicitation process complied with (i) sections 1125 and 1126(b) of the Bankruptcy Code and (ii) Bankruptcy Rules 3017(d) and (e) and 3018(b) and (c).  As discussed below, the Solicitation was fully compliant with these requirements.

**1.      The Prepetition Solicitation of Votes Satisfies Sections 1125(g) and 1126(b) of the Bankruptcy Code.**

17.     Sections 1125(g) and 1126(b) of the Bankruptcy Code govern the acceptance of a chapter 11 plan by a holder of a claim or interest solicited prior to the commencement of a chapter 11 case.  Section 1125(g) provides in relevant part:  "[A]n acceptance or rejection of the

plan may be solicited from a holder of a claim or interest if such solicitation complies with applicable nonbankruptcy law and if such holder was solicited before the commencement of the case in a manner complying with applicable nonbankruptcy law." 11 U.S.C. § 1125(g). The Debtors' solicited votes from Holders before the commencement of the Chapter 11 Cases in a manner that complied with nonbankruptcy law, thereby satisfying section 1125(g).

18.     Pursuant to section 1126(b), a holder of a claim or interest that has accepted or rejected a plan prepetition is deemed to have accepted or rejected the plan if:

> (1)    the solicitation of such acceptance or rejection was in compliance with any applicable nonbankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation; or
>
> (2)    if there is not any such law, rule or regulation, such acceptance or rejection was solicited after disclosure to such holder of adequate information, as defined in section 1125(a) of this title.

11 U.S.C. § 1126(b).

19.     Because the Debtors' prepetition Solicitation was made in reliance on exemptions from the registration requirements provided under the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa and under similar state securities laws and regulations, the registration requirements of the federal or state securities laws and regulations (including the disclosure requirements thereof) do not apply to the Debtors' prepetition Solicitation. As such, there is no nonbankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with the Debtors' Solicitation, and pursuant to section 1126(b)(2) of the Bankruptcy Code, the disclosure provided to each voting Holder in connection with the Solicitation must include disclosure of "adequate information" as defined in section 1125(a) of the Bankruptcy Code. 11 U.S.C. § 1126(b)(2). As discussed above in paragraphs 13 through 15, all solicited Holders of Claims in the Voting

Classes received "adequate information" as defined by section 1125(a)(1) of the Bankruptcy Code, in accordance with section 1126(b)(2) of the Bankruptcy Code.

20.    The Debtors submit that the Solicitation complies with sections 1125(g) and 1126(b) of the Bankruptcy Code and should be approved.

### 2.    The Solicitation Procedures and Ballots Comply with Bankruptcy Rules 3017 and 3018.

21.    Pursuant to Bankruptcy Rule 3017(d), unless a court orders otherwise, a debtor must transmit to all creditors, equity security holders and the Office of the United States Trustee:

(1)    the plan or a court-approved summary of the plan;

(2)    the disclosure statement approved by the court;[13]

(3)    notice of the time within which acceptances and rejections of the plan may be filed; and

(4)    any other information as the court may direct, including any court opinion approving the disclosure statement or a court-approved summary of the opinion.

Fed. R. Bankr. P. 3017(d).

22.    Bankruptcy Rule 3017(d) also requires the debtor to mail an appropriate form of ballot to all holders of claims and equity interests entitled to vote on the plan, and to provide all creditors and equity security holders with notice of the time fixed for (i) filing objections to confirmation of the Plan and (ii) the hearing on confirmation. *Id.*

23.    Bankruptcy Rule 3018(c) provides in relevant part: "An acceptance or rejection shall be in writing, identify the plan or plans accepted or rejected, be signed by the creditor or equity security holder or an authorized agent, and conform to the appropriate Official Form." Fed. R. Bankr. P. 3018(c).

---

[13]    As discussed above, the Debtors commenced and concluded the Solicitation prior to the Petition Date and, therefore, prior to obtaining court approval of the Disclosure Statement, as permitted by section 1126(b) of the Bankruptcy Code.

24.    As outlined below, the Ballots and Solicitation Procedures comply with the requirements of the Bankruptcy Code and the Bankruptcy Rules.

(a)    <b>Solicitation Packages.</b>

25.    As required by Bankruptcy Rule 3017(d) and as discussed above, the Debtors caused the Voting Agent to distribute copies of the Solicitation Package on November 13, 2020, which included the Disclosure Statement, the Plan and the applicable Ballots, to the Voting Parties.[14]  Among other things, the Disclosure Statement and the applicable Ballot(s) provided the Voting Parties with instructions regarding, and the Voting Deadline for, properly submitting a completed Ballot to the Voting Agent.

26.    Accordingly, the Solicitation Package satisfies Bankruptcy Rules 3017(d) and 3018(c).

(b)    <b>Ballots.</b>

27.    Bankruptcy Rules 3017(d) and 3018(c) require that the Debtors use a form of ballot substantially conforming to Official Form No. 14. Fed. R. Bankr. P. 3017(d).  Bankruptcy Rule 3018(c) provides that a vote to accept or reject a plan shall be in writing, identify the plan accepted or rejected, be signed by the creditor or equity security holder or an authorized agent thereof, and conform to the appropriate Official Form.  Fed. R. Bankr. P. 3018(c).

28.    The Ballots[15] were based on Official Form No. 14 but were modified to address the particular aspects of the Chapter 11 Cases and the Plan and to be relevant and appropriate for each Voting Class.  Each Ballot specifically identified the Plan being voted on and contained detailed voting instructions for voting to accept or reject the Plan, and the manner in which the

---

[14]    *See* Solicitation Aff. ¶¶ 2-3.

[15]    With respect to the Voting Classes, the Debtors distributed three forms of Ballots:  (i) a Master Ballot for Holders of Secured Notes Claims (ii) a Beneficial Ballot for Holders of Secured Notes Claims (Class 4); and (iii) a Ballot for Holders of Existing Equity Interests (Class 9).  *See id.*

Ballot(s) must be returned to the Voting Agent.  As set forth above, to be counted as votes to accept or reject the Plan, the Ballots were required to be properly executed, completed and delivered to the Voting Agent so that they were received no later than the Voting Deadline.

29.    For the foregoing reasons, the Ballots satisfy Bankruptcy Rules 3017(d) and 3018(c).

**(c)    The Solicitation Period.**

30.    Bankruptcy Rule 3018(b) provides, among other things, that prepetition acceptances or rejections of a plan are valid only if the plan was "transmitted to substantially all creditors and equity security holders of the same class" and that the time for voting was not "unreasonably short."  Fed. R. Bankr. P. 3018(b).

31.    As described above, copies of the Solicitation Package were distributed on November 13, 2020 to all Holders of Claims or Existing Common Equity Interests in the Voting Classes as of the Voting Record Date of November 11, 2020.  The Voting Deadline was established as 5:00 p.m. (prevailing Eastern Time) on December 23, 2020.  The Voting Record Date and the Voting Deadline were identified clearly in the Disclosure Statement and in each of the Ballots.

32.    The Voting Parties were provided sufficient time to vote and to review the terms of the Plan and Disclosure Statement and other exhibits.  Further, a significant number of the Voting Parties were already familiar with the Debtors' business and financial condition through information provided in connection with the negotiation of the Restructuring Support Agreement or due to their status as current or former directors or employees of the Debtors.

33.    Accordingly, the Debtors submit that the forty (40)-day solicitation period was sufficient and appropriate and satisfied the requirements of Bankruptcy Rules 3017(d) and 3018(b).  Courts in this jurisdiction have routinely approved solicitation periods of this length or

13

shorter, especially where the holders being solicited were sophisticated parties.  *See*, *e.g.*, *In re Arsenal Resources Development LLC, et al.*, No. 19-12347 (BLS) (Bankr. D. Del. Dec. 19, 2019) (approving a one-day solicitation period); *In re Blackhawk Mining LLC*, No. 19-11595 (LSS) (Bankr. D. Del. July 22, 2019) (approving an 11-day solicitation period); *In re PES Holdings, LLC*, No. 18-10122 (KG) (Bankr. D. Del. Jan. 29, 2018) (approving a two-day solicitation period).

### 3.    The Debtors Are Not Required to Solicit Votes from Holders of Claims or Interests in Classes Presumed to Accept or Deemed to Reject the Plan.

34.    Pursuant to section 1126(f) of the Bankruptcy Code, each holder of a claim or interest in an unimpaired class is "conclusively presumed to have accepted the plan, and solicitation of acceptances with respect to such class . . . is not required."  11 U.S.C. § 1126(f). Conversely, section 1126(g) of the Bankruptcy Code provides that "a class is deemed not to have accepted a plan if such plan provides that the claims or interests of such class do not entitle the holders of such claims or interests to receive or retain any property under the plan on account of such claims or interests."  11 U.S.C. § 1126(g).

35.    The Plan provides that certain Classes of Claims against or Interests in the Debtors are presumed to accept or deemed to reject the Plan.  Specifically, the Plan provides that the Holders of Claims or Interests in the Presumed Accepting Classes,[16] which are Unimpaired, and, therefore, are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  The Plan further provides that the Holders of Claims or Interests in the

---

[16]    The following Classes comprise the "Presumed Accepting Classes":  Other Secured Claims (Class 1), Other Priority Claims (Class 2), ABL Claims (Class 3) and General Unsecured Claims (Class 5), as well as the Intercompany Claims (Class 6) and Intercompany Interests (Class 8), to the extent treated as Unimpaired.

14

Deemed Rejecting Classes,[17] which are not entitled to any distribution or to retain any property pursuant to the Plan or are designated as deemed rejecting, are not entitled to vote because they are deemed not to have accepted the Plan. Accordingly, the Debtors did not solicit votes to accept or reject the Plan from Holders of Claims or Interests in the Presumed Accepting Classes or the Deemed Rejecting Classes.

36.    Bankruptcy Rule 3017(d) requires transmission to creditors of a "disclosure statement approved by the court." Fed. R. Bankr. P. 3017(d)(2). However, in accordance with common practice and pursuant to the Scheduling Order, the Debtors were authorized by the Court to mail the Combined Notice to the Non-Voting Holders in lieu of sending them copies of the Disclosure Statement and the Plan under Bankruptcy Rule 3017(d).[18] As described above, the Combined Notice summarized the Plan, the treatment of Claims and Interests and the terms of the releases in the Plan; provided the manner in which a copy of the Plan and the Disclosure Statement may be obtained; and explained that the Plan and the Disclosure Statement would be made available at no cost on the Voting Agent's website.

37.    Further, the Combined Notice was served on Non-Voting Holders on November 24, 2020, which date is more than twenty-eight (28) days prior to the deadline to object to the adequacy of the Disclosure Statement or confirmation of the Plan, and more than thirty-five (35) days prior to the date of the Combined Hearing, in each case, in accordance with Bankruptcy Rules 2002 and 3017, as well as Local Rule 3017-1.[19] Accordingly, the Debtors respectfully submit that the service of the Combined Notice afforded parties in interest timely, sufficient,

---

[17]    The following Classes comprise the "Deemed Rejecting Classes": Section 510(b) Claims (Class 7), as well as Intercompany Claims (Class 6) and Intercompany Interests (Class 8) to the extent treated as Impaired.

[18]    Scheduling Order ¶ 12.

[19]    Aff. of Service [Docket No. 75].

appropriate and adequate notice of the Combined Hearing, and the noticing procedures undertaken by the Debtors and described herein with respect to the Non-Voting Holders complied with the Scheduling Order and applicable law, and should be approved.

      **4.**      **The Modifications to the Plan Should Be Permitted Without the Need for Further Solicitation of Votes on the Plan.**

38.      Section 1127(a) of the Bankruptcy Code provides that a plan proponent may modify its plan at any time before confirmation so long as such modified plan meets the requirements of sections 1122 and 1123 of the Bankruptcy Code. *See* 11 U.S.C. § 1127(a). Bankruptcy Rule 3019 provides that modifications after a plan has been accepted will be deemed accepted by all creditors and equity security holders who previously accepted the plan, if the court finds that the proposed modifications do not adversely change the treatment of the claim of any creditor or interest of any equity security holder. *See* Fed. R. Bankr. P. 3019(a). Courts interpreting Bankruptcy Rule 3019 have held that a proposed modification to a previously accepted plan will be deemed accepted if such modification is not material or does not adversely affect the way creditors and stakeholders are treated. *See, e.g.*, *In re Glob. Safety Textiles Holdings LLC*, No. 09-12234 (KG), 2009 WL 6825278, at *4 (Bankr. D. Del. Nov. 30, 2009).

39.      The Debtors made certain changes to the Plan as originally filed, including as reflected in the First Amended Plan and Second Amended Plan. None of the changes adversely affects the rights of any Holder of a Claim that previously accepted the Plan and are largely clarifying or have the consent of each affected party.

40.      In addition, the Plan as amended continues to comply with the requirements of sections 1122 and 1123 of the Bankruptcy Code. Accordingly, no further solicitation is required.

41.      In light of the arguments set forth in this <u>Part I</u>, the Debtors respectfully submit that the Disclosure Statement, the Solicitation and the Solicitation Procedures satisfy the

requirements of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules and the Scheduling Order, and should be approved.

## II.    The Plan Satisfies Each Requirement for Confirmation and Should Be Approved.

42.    For the Plan to be confirmed, the Debtors must "show by a preponderance of the evidence that a reorganization plan is feasible." *See*, *e.g.*, *In re W.R. Grace & Co.*, 475 B.R. 34, 109–10 (Bankr. D. Del. 2012), *aff'd sub nom. In re WR Grace & Co.*, 729 F.3d 332 (3d Cir. 2013).   The Debtors respectfully submit that the Plan should be confirmed because it satisfies each of the applicable provisions of section 1129 of the Bankruptcy Code.

### A.    The Plan Satisfies Bankruptcy Code Section 1129(a)(1).

43.    Pursuant to section 1129(a)(1) of the Bankruptcy Code, a plan must comply with the applicable provisions of the Bankruptcy Code.   11 U.S.C. § 1129(a)(1).   The legislative history of section 1129(a)(1) indicates that this provision encompasses the requirements of sections 1122 and 1123 of the Bankruptcy Code governing classification of claims and equity interests and contents of the Plan, respectively.   *See* H.R. Rep. No. 95-595, at 412 (1977); S. Rep. No. 95-989, at 126 (1978).   As explained below, the Plan complies with sections 1122 and 1123 of the Bankruptcy Code in all respects.

#### 1.    The Plan's Classification of Claims and Interests Complies with Bankruptcy Code Section 1122.

44.    Section 1122(a) of the Bankruptcy Code provides that, "[e]xcept as otherwise provided in [section 1122(b) of the Bankruptcy Code], a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."   11 U.S.C. § 1122(a).   In addition to Administrative Claims (including Professional Fee Claims) and Priority Tax Claims, which need not be classified, the Plan classifies nine (9) Classes.

45.    The Debtors are entitled to significant flexibility in classifying claims and interests into different classes as long as a rational legal or factual basis for separate classification exists and all claims or equity interests within a particular class are substantially similar.  *See*, *e.g.*, *In re W.R. Grace*, 475 B.R. at 109–10 (noting that "[i]n analyzing whether claims within a given class are substantially similar, the focus of the classification should be on the legal character of the claim as it relates to the assets of the debtor").  The Debtors, in creating the Classes, ensured that each Class of Claims or Interests contains only Claims or Interests that are substantially similar to the other Claims or Interests within such Class.  The Plan separately classifies Claims and Interests based upon differences in the legal or factual nature of those Claims and Interests or other relevant criteria.  *See In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1061 (3d Cir. 1987); *In re Coram Healthcare Corp.*, 315 B.R. 321, 350–51 (Bankr. D. Del. 2004) (finding noteholders represented "a voting interest that is sufficiently distinct from the trade creditors to merit a separate voice in this reorganization case").

46.    The classification scheme of the Plan is rational and complies with the Bankruptcy Code.  The Plan incorporates a classification and distribution scheme that strictly follows the statutory priorities prescribed in the Bankruptcy Code.  The Debtors classified Claims and Interests based on a number of factors, including:  whether such Class is comprised of Claims or Interests; whether the Claims in a Class are unsecured or secured; and whether an unsecured creditor's claim arises out of a trade relationship or funded debt.  *See In re Coram Healthcare Corp.*, 315 B.R. at 350–51 (finding noteholders represented "a voting interest that is sufficiently distinct from the trade creditors to merit a separate voice in this reorganization case").

47.    Here, Claims were properly classified based on the underlying nature of the Claim or Interest.  The Plan's classification scheme was not promulgated for any improper purpose, is necessary to implement the Plan and should be approved.

> **2.    The Plan Complies with the Requirements of Section 1123(a) of the Bankruptcy Code.**

48.    Section 1123(a) of the Bankruptcy Code lists seven applicable requirements that a chapter 11 plan proponent must satisfy when seeking plan confirmation.  11 U.S.C. § 1123(a).  The Plan fully complies with each such requirement:

(a)    The Plan designates Classes of Claims and Interests as required under section 1123(a)(1) of the Bankruptcy Code.  *See* Plan Art. III.

(b)    The Plan identifies each Class of Claims and Interests that is not Impaired under the Plan and sets forth the treatment of Impaired Claims and Interests, pursuant to sections 1123(a)(2) and (3) of the Bankruptcy Code.  *See* Plan Art. III.

(c)    The Plan provides for the same treatment of each Claim or Interest in each respective Class (unless otherwise agreed to by a Holder of a particular Claim or Interest) as required under section 1123(a)(4) of the Bankruptcy Code.  *See* Plan Art. III.

(d)    The Plan provides adequate means for implementation of the Plan, thereby satisfying section 1123(a)(5) of the Bankruptcy Code, including (i) the continued corporate existence of the Reorganized Debtors, (ii) the authorization, issuance and delivery of the New Common Stock, (iii) all actions set forth in Article IV.B of the Plan, (iv) assumption of Executory Contracts and Unexpired Leases and (v) taking of all necessary and appropriate actions by the Debtors or Reorganized Debtors, as applicable, to effectuate the transactions under and in connection with the Plan.  *See* Plan Arts. IV and V.[20]

---

[20]    Under the provisions of the Delaware General Corporation Act, including section 303 thereof, and the comparable provisions of the Delaware Limited Liability Company Act or any analogous provisions of the application business organizations law or code of each other state in which the Reorganized Debtors are incorporated or organized, and section 1142(b) of the Bankruptcy Code, no action of the directors, equity holders, managers or members of the Debtors or Reorganized Debtors is required to authorize the Debtors or Reorganized Debtors to enter into or effectuate the Plan, the Restructuring or the Restructuring Transactions.  Specifically, Delaware General Corporation Act section 303 provides that "[a]ny corporation of this State, an order for relief with respect to which has been entered pursuant to the Federal Bankruptcy Code . . . may put into effect and carry out any decrees and orders of the court or judge in such bankruptcy proceeding and may take any corporate action provided or directed by such decrees and orders, without further action by its directors or stockholders."

(e)     In accordance with section 1123(a)(6) of the Bankruptcy Code, the Reorganized HHI LLC Agreement shall contain provisions prohibiting the issuance of non-voting equity securities, thereby satisfying section 1123(a)(6) of the Bankruptcy Code.

(f)     Prior to or at the Combined Hearing, the Debtors will disclose the identity of the members of the New Board of Reorganized HHI, and prior to or at the Combined Hearing, the Debtors will disclose the identity of the officers of the Reorganized Debtors, in each case to the extent known.  Any provisions of the Plan and Plan Supplement provisions governing the manner of selection of any officer, director or manager under the Plan are consistent with the interests of creditors and equity security holders and with public policy in accordance with section 1123(a)(7) of the Bankruptcy Code.

In light of the foregoing, the Debtors respectfully submit that the requirements of section 1123(a) of the Bankruptcy Code have been satisfied.

### 3.     The Plan Complies with Section 1123(b) of the Bankruptcy Code.

49.     Section 1123(b) of the Bankruptcy Code sets forth permissive provisions that may be incorporated into a chapter 11 plan.  Each provision of the Plan is consistent with section 1123(b):

(a)     As permitted by section 1123(b)(1) of the Bankruptcy Code, the Plan provides that (i) Classes 1, 2, 3, and 5, as well as Classes 6 and 8 (if so treated) are Unimpaired, and (ii) Classes 4, 7, and 9, as well as Classes 6 and 8 (if so treated) are Impaired.

(b)     As permitted by section 1123(b)(2) of the Bankruptcy Code, the Plan provides for the assumption of all Executory Contracts and Unexpired Leases unless otherwise provided therein.

(c)     As permitted by section 1123(b)(3)(A) of the Bankruptcy Code, Articles VIII.D and VIII.E of the Plan provide for a release of Claims and Causes of Action owned by the Debtors and by third parties in connection with the restructuring (as further described in this Part II.A).  Additionally, as permitted by section 1123(b)(3)(B) of the Bankruptcy Code, Article IV.O of the Plan preserves for the Reorganized Debtors any rights, Claims, Causes of Action, rights of setoff or recoupment or other legal or equitable defenses that the Debtors had immediately prior to the Effective Date, except as otherwise provided in the Plan.

(d)     As permitted by section 1123(b)(5) of the Bankruptcy Code, the Plan modifies the rights of Holders of Claims or Interests in the Impaired Classes and leaves unaffected the rights of Holders of Claims or Interests in the Unimpaired Classes.

(e)    As permitted under section 1123(b)(6) of the Bankruptcy Code, a plan may include other appropriate provisions not inconsistent with the applicable provisions of the Bankruptcy Code.  In accordance with section 1123(b)(6) of the Bankruptcy Code, Articles VIII.B–VIII.G of the Plan contain discharge, release, exculpation and injunctive provisions that are not inconsistent with the applicable provisions of the Bankruptcy Code and are essential to the reorganization.  In addition, Article IV.G of the Plan provides that the issuance and distribution of the New Common Stock will be exempt from registration under applicable securities law in reliance on the exemption provided by section 1145(a) of the Bankruptcy Code or section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder, in each case, to the extent applicable.

50.    Each of the foregoing permissive provisions is consistent with section 1123(b) of the Bankruptcy Code and should be approved.

**(a)    The Debtors' Proposed Assumption and/or Rejection of Executory Contracts and Unexpired Leases Pursuant to the Plan Is an Appropriate Exercise of the Debtors' Business Judgment and Should Be Approved.**

51.    Pursuant to section 1123(b)(2) of the Bankruptcy Code, a plan may, subject to section 365, provide for the assumption, rejection or assignment of an executory contract or unexpired lease.  11 U.S.C. § 1123(b)(2).  Section 365(a) of the Bankruptcy Code provides that a debtor, subject to the court's approval, may assume or reject any executory contract or unexpired lease upon a showing that such action will benefit the debtor's estate and is an exercise of sound business judgment.

52.    Article V of the Plan provides that, pursuant to, and subject to the requirements of, sections 365 and 1123 of the Bankruptcy Code, as of the Effective Date all Executory Contracts and Unexpired Leases of the Debtors shall be deemed to have been assumed by such Debtor, *provided*, *however*, that any Executory Contract or Unexpired Lease (a) assumed or rejected previously by such Debtor; (b) expired or terminated pursuant to its own terms prior to the Effective Date; (c) is the subject of a motion to reject filed on or before the Effective Date; or (d) identified on the Rejected Executory Contract and Unexpired Lease List as an Executory

Contract or Unexpired Lease designated for rejection shall not be deemed assumed as of the Effective Date.  Such treatment of Executory Contracts and Unexpired Leases is typical in chapter 11 cases and is appropriate here.

53.    The Debtors do not believe any payment of a Cure is required to cure any defaults under the Executory Contracts and Unexpired Leases to be assumed.  Nevertheless, Article V of the Plan further provides that the Reorganized Debtors, except as otherwise agreed to by the parties or ordered by the Court, shall satisfy any monetary defaults under any Executory Contract or Unexpired Lease to be assumed hereunder, to the extent required by section 365(b)(1) of the Bankruptcy Code, upon assumption thereof in the ordinary course of business.  Lastly, the substantially improved financial condition of the Reorganized Debtors, including the substantial deleveraging and infusion of new liquidity upon emergence, together with the operational expertise of the Debtors' management team, collectively provides counterparties with "adequate assurance of future performance" as required by section 365 of the Bankruptcy Code.[21]

54.    Here, the Debtors undertook an extensive review of the Executory Contracts and Unexpired Leases to be assumed and/or rejected on the Effective Date pursuant to the Plan and believe that each Executory Contract and Unexpired Lease assumed is integral to the Debtors' continued post-bankruptcy operations.  Assuming all Executory Contracts and Unexpired Leases not specifically designated for rejection is critical to preserving all trade relationships and paying trade creditors in full in the ordinary course of business in connection with the restructuring.[22] The only contracts designated for rejection pursuant to the Plan are the MSA and the CITIC

---

[21]    Jeppson Decl. ¶ 15.

[22]    Jeppson Decl. ¶ 16.

Agreement (the "Rejected Agreements").  Each of the counterparties to the Rejected Agreements are Consenting Stakeholders under the Restructuring Support Agreement, and have therefore consented to the rejection of their respective Rejected Agreement, which will give rise to the MSA Claim and the CITIC Claim respectively as provided for in the Restructuring Support Agreement.  As such, the assumption and/or rejection of the identified Executory Contracts and Unexpired Leases is in the best interests of the Debtors' estates, complies with applicable bankruptcy law, and should be approved as a sound exercise of the Debtors' business judgment.

55.    The Debtors have provided non-Debtor counterparties to the Executory Contracts and Unexpired Leases with appropriate notice of the assumption and/or rejection of their respective Executory Contracts and Unexpired Leases.  In particular, the Debtors filed the Combined Notice on November 24, 2020, and served the Combined Notice on all non-Debtor counterparties to any Executory Contracts and Unexpired Leases and on all other known creditors on November 24, 2020.  In addition, all non-Debtor counterparties were provided with the opportunity to be placed on the Debtors' 2002 notice list and informed that entry of the Confirmation Order will constitute court approval of the assumption and/or rejection of their respective Executory Contracts.

56.    Despite providing such notice, the Debtors received no objections to the proposed assumption or rejection of any of the Executory Contracts and Unexpired Leases.

57.    Accordingly, the Plan satisfies the provisions of sections 1123(b)(2) and 365(a) of the Bankruptcy Code.

**B.      The Plan Releases and Exculpation Should Be Approved.**

58.      The Plan provides that the Released Parties[23] will be released of specified claims by the Debtors, the Reorganized Debtors and the Debtors' Estates (the "Debtor Releases") and of specified claims by the Releasing Parties (the "Third-Party Releases").[24]   Further, the Plan includes exculpation for the benefit of the Exculpated Parties (defined below) (the "Exculpation").[25]

59.      The release and exculpation provisions in the Plan comply with the Bankruptcy Code and applicable nonbankruptcy law and are necessary and integral components of the restructuring.  The releases in the Plan are in exchange for, and are supported by, fair, sufficient and adequate consideration provided by the parties receiving such releases—in particular, each Holder of a General Unsecured Claim providing a release under the Plan is being paid in full, even as Claims of secured creditors are being substantially impaired under the Plan. Furthermore, the release and exculpation provisions in the Plan constitute a good faith settlement and compromise of the Claims released.  As is customary, the releases do not extend to Claims arising out of or relating to any act or omission of a Released Party that constitutes actual fraud or willful misconduct.  More generally, the release and exculpation provisions in the Plan are substantially similar to analogous provisions in numerous plans confirmed by Courts in this District.

60.      The Exculpation protects the estate fiduciaries from having to defend costly and time-consuming litigation related to the administration and consummation of the Plan.  The Exculpation does not extend to claims resulting from fraud, willful misconduct and gross

---

[23]      Plan Arts. I.A and VIII.D.

[24]      Plan Arts. I.A and VIII.F.

negligence and is wholly appropriate given the facts and circumstances of the Chapter 11 Cases. The releases and exculpation contained in Articles VIII.D, VIII.E and VIII.F of the Plan were disclosed and explained in the Disclosure Statement and the Plan and described in the Combined Notice served on all parties in interest, and the Combined Notice instructed parties entitled to opt-out of the third-party releases of the process for doing so. Such notice was timely, sufficient and appropriate and was reasonably calculated, under the circumstances, to reach all affected parties. In resolution of comments from the U.S. Trustee, the Debtors have made certain modifications to the release and Exculpation provisions that are reflected in the Plan. The Debtors have received no other objections to the contents of the release and exculpation provisions. Accordingly, the releases in Article VIII.D and VIII.E and the Exculpation in Article VIII.F of the Plan should be approved.

### 1.    Debtor Releases.

61.    Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code, a plan may "provide for the settlement or adjustment of any claim or interest belonging to the debtor or the estate." 11 U.S.C. § 1123(b)(3)(A). Claims belonging to a debtor are property of the debtor's estate and may properly be released as part of a settlement, including pursuant to a plan of reorganization. *See In re Spansion, Inc.*, 426 B.R. 114, 143 (Bankr. D. Del. 2010) ("[A] debtor may release claims in a plan . . . if the release is a valid exercise of the debtor's business judgment, is fair, reasonable, and in the best interests of the estate.").

62.    The standards for approval of a settlement and releases under section 1123(b)(3)(A) of the Bankruptcy Code are generally the same as those utilized in connection with Bankruptcy Rule 9019. A settlement must only exceed "the lowest point in the range of

---

[25]    Plan Arts. I.A. and VIII.F

reasonableness" of litigation outcomes.  *See In re Coram Healthcare Corp.*, 315 B.R. at 330.  As to weighing the appropriateness of releases by debtors embodied in a plan of reorganization, courts in this District consider a five-factor test set forth in *In re Zenith Electronics Corp.*, 241 B.R. 92 (Bankr. D. Del. 1999).[26]  The five factors are:

> (i)  An identity of interest between the debtor and the third party, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete the assets of the estate;
>
> (ii)  Substantial contribution by the non-debtor of assets to the reorganization;
>
> (iii)  The essential nature of the injunction to the reorganization to the extent that, without the injunction, there is little likelihood of success;
>
> (iv)  An agreement by a substantial majority of creditors to support the injunction, specifically if creditors in the impaired class or classes overwhelmingly vote to accept the plan; and
>
> (v)  A provision in the plan for payment of all or substantially all of the claims of the class or classes affected by the injunction.[27]

63.    No single *Zenith* factor is dispositive, nor is a plan proponent required to establish each factor for the release to be approved; rather the factors are intended to provide guidance to the Court in determining the fairness of the proposed releases.  *See In re Indianapolis Downs, LLC*, 486 B.R. 286, 304 (Bankr. D. Del. 2013) (approving the debtors' releases despite not meeting the third and fifth *Zenith* factors); *In re Wash. Mut., Inc.*, 442 B.R. 314, 346 (Bankr. D. Del. 2011) (noting the factors "are neither exclusive nor conjunctive requirements, but simply provide guidance in the Court's determination of fairness").  As discussed below, the Debtor Releases easily satisfy these factors.

---

[26]    The Debtors submit that the proper standard for evaluation of debtor releases is the settlement standard of Bankruptcy Rule 9019 and the related case law and that the *Zenith* factors are inapplicable to debtor releases.  Nevertheless, the Debtor Releases are appropriate under the *Zenith* factors, as described herein.

[27]    *See In re Zenith*, 241 B.R. at 92.

> **(a)    Identity of Interest Between the Debtors and the Released Parties.**

64.     The identity-of-interest factor is met where the debtor and the released party share a common goal of achieving the successful reorganization of the debtor.  In *In re Zenith*, the court found that this factor was satisfied where certain released parties who "were instrumental in formulating the [p]lan" shared an identity of interest with the debtor "in seeing that the [p]lan succeed and the company reorganize."[28]

65.     Here, such an identity exists between the Debtors and many of the Released Parties.  The Debtors share an identity of interest with each of the Consenting Stakeholders, each of whom is party to the Restructuring Support Agreement and helped develop, and ultimately agreed to support, the Plan being proposed today.  The Consenting Stakeholders will be the owners of the Reorganized Debtors, creating a further shared identity of interest.  Furthermore, other Released Parties that are related parties to the Debtors (e.g., directors, officers, managers and advisors) have served the Debtors in connection with the Chapter 11 Cases and worked to protect general unsecured creditors and, more generally, maximize the value of the Debtors for the benefit of all stakeholders.[29]  Finally, the Debtors are required to indemnify a number of the Released Parties, including the Debtors' directors and officers (under the Debtors' organizational documents); therefore, if the Debtor Releases are not granted, any litigation undertaken against such Released Parties would amount to litigation against the Debtors.  *See*, *e.g.*, *In re Indianapolis Downs*, 486 B.R. at 303 (holding that "[a]n identity of interest exists when, among other things, the debtor has a duty to indemnify the nondebtor receiving the release").

---

[28]     241 B.R. at 110.

[29]     Jeppson Decl. ¶ 20.

Accordingly, the Debtors submit that they have satisfied the first *Zenith* factor—identity of interest—with respect to many of the Released Parties.

**(b)        Substantial Contribution to the Debtors' Reorganization.**

66.        The Released Parties have made and will continue to make substantial contributions to the Debtors' reorganization leading up to and including the commencement of the Chapter 11 Cases through the Effective Date.  These contributions include, among other things, formulating, negotiating and agreeing to the Restructuring Support Agreement, the Plan, the Exit Facilities, providing other material support to the Debtors' overall restructuring, and, most critically, consenting to and providing the liquidity to fund the unimpairment of General Unsecured Claims.[30]

67.        Among other things, the Released Parties who are managers, officers and certain of the employees have continued to operate the Debtors' businesses throughout the Chapter 11 Cases, have worked to stabilize the business and preserve going-concern value for the benefit of all stakeholders and helped to develop consensus regarding the restructuring strategy and navigate the Debtors through the restructuring process.[31]

68.        Additionally, the Consenting Stakeholders have made meaningful contributions and concessions prior to and during the Chapter 11 Cases, including supporting the Debtors' reorganization as parties to the Restructuring Support Agreement, agreeing to compromise Claims and Interests while supporting unimpairment of other creditors, and, as applicable, voting

---

[30]        Jeppson Decl. ¶ 21.  The Debtors note that the Consenting Noteholders are providing the Exit Take Back Debt that, in part, funds the payment-in-full of General Unsecured Claims; and all Consenting Stakeholders are consenting to such repayment of General Unsecured Claims even as their own Claims are significantly impaired.

[31]        *Id*. ¶ 22.

to approve the Plan and agreeing to provide critical capital both during and upon emergence from the Chapter 11 Cases.[32]

69.     These meaningful concessions and contributions by all of the Released Parties have enabled the Debtors to develop their restructuring strategy and work toward formulating and promptly executing the Plan on an entirely consensual basis with their economic stakeholders.  The support of the Released Parties helped the Debtors avoid unnecessary, burdensome and time-consuming litigation that could have significantly disrupted the Chapter 11 Cases and the Debtors' ordinary course of business.  Accordingly, the Debtors submit that they have satisfied the second *Zenith* factor—substantial contribution to the reorganization—with respect to each of the Released Parties.

### (c)     The Debtor Releases Are Essential to the Reorganization.

70.     The Debtor Releases, which are commonplace in cases of this size and complexity, were necessary to build the extraordinary level of consensus with respect to the Plan. The Debtor Releases were a material inducement to and condition of the concessions by and substantial contributions received from the Released Parties under the Plan, including: the $110 million Exit Take Back Debt to help fund distributions under the Plan and the ongoing operations of the Reorganized Debtors.[33]

### (d)     Agreement by a Substantial Majority of Creditors to Support the Release.

71.     As set forth in the Voting Affidavit, the Debtor Releases were approved by nearly all members of the Voting Classes, and there are no objections to the Debtor Releases from

---

[32]     *Id*. ¶ 23.

[33]     Jeppson Decl. ¶ 25.

Holders of Claims or Interests.  Accordingly, the Debtors submit that the fourth *Zenith* factor has been met with respect to approval of the Debtor Releases.

**(e)     Payment of All or Substantially All of the Claims of the Class or Classes Affected by the Injunction.**

72.     Here, the Classes of Claims specially affected by the Injunction include the Holders of Unimpaired Claims, who are "Releasing Parties" but not "Released Parties," meaning they release and discharge any potential claims they may have against the Released Parties but do not benefit from a corresponding release.  However, such Unimpaired Holders will have their Claims either paid in full on the Effective Date or reinstated, preserving all of their legal, equitable and contractual rights.  The Debtor Releases (and corresponding Third-Party Releases) were an integral component to the Restructuring Transactions and induced the Consenting Stakeholders to voluntarily accept substantial impairment while Unimpaired Claims are being paid in full.  Further, such releases are an integral part of the Restructuring Transactions pursuant to which many of the Consenting Stakeholders are committing new capital to support and expand the Reorganized Debtors, which in turn will enhance the value of the business relationships between the Unimpaired Holders and Reorganized Debtors that are being preserved by this Plan and the reorganization it implements.  Accordingly, the Debtors submit that the fifth *Zenith* factor has been met with respect to approval of the Debtor Releases.

73.     Having satisfied the *Zenith* factors, the Debtors submit that the Debtor Releases have been proposed based on the Debtors' business judgment, are fair and reasonable, fall well within the range of customarily approved releases and should be approved.

**2.     Third-Party Releases.**

74.     In addition to the Debtor Releases, the Plan contains the Third-Party Releases. The Third-Party Releases satisfy the standards for approval of third-party releases employed in

30

the Third Circuit, are appropriate, and are consistent with the applicable provisions of the Bankruptcy Code and, therefore, should be approved.

75.    In this District, courts "have consistently held that a plan may provide for a release of third party claims against a non-debtor upon consent of the party affected." *In re Indianapolis Downs*, 486 B.R. at 305 (citing *In re Zenith.*, 241 B.R. at 111); *see also First Fid. Bank v. McAteer*, 985 F.2d 114, 118 (3d Cir. 1993) (stating that a consensual third-party release is no different from any other settlement or contract and does not implicate section 524(e)). In other cases in this District in which holders of claims or interests had an opportunity, but chose not, to opt out of releases, courts have approved third-party releases as consensual. *See In re Indianapolis Downs*, 486 B.R. at 306.  Courts in this District have also approved third-party releases that are binding on unimpaired creditors that do not object to the plan or the release, reasoning that the lack of objection is tantamount to consent. *See In re Spansion, Inc.*, 426 B.R. at 144 (overruling an objection to a release that bound unimpaired creditors, noting that "no creditor or interest holder whose rights are affected by the 'deemed' acceptance language has objected to the Plan" and the "silence of the unimpaired classes on this issue is persuasive"); *In re Orchard Acquisition Company, LLC* No. 17-12914 (KG) (Bankr. D. Del. Dec. 12, 2017) (overruling an objection to a release that bound unimpaired creditors and deeming the objecting creditors' "silence" tantamount to consent and the release as "consensual.").[34]

76.    Under the foregoing authority, the Third-Party Releases are consensual and supported by fair consideration.  In this case, the scope of the Releasing Parties is consistent with

---

[34]    Courts in this District have also approved *non-consensual* third-party releases from unimpaired creditors, concluding that the payment in full of such creditors was adequate consideration supporting such releases. *See*, *e.g.*, *Indianapolis Downs*, 486 B.R. at 306.  This factor is particularly salient in these cases, where Holders of Unimpaired General Unsecured Claims would be receiving *de minimis* recoveries absent the Released Parties' consent to the treatment of General Unsecured Claims under the Plan.

that of other third-party releases approved in this District and includes those Holders of Claims

or Interests (i) who vote to accept the Plan, (ii) whose vote to accept or reject the Plan is solicited

but who vote to reject the Plan or do not vote and, in either case, do not opt out of granting the

releases in the Plan by timely objecting in writing, or (iii) who are not entitled to vote under the

Plan and do not opt out of granting the releases in the Plan by timely objecting in writing.[35]  The

Disclosure Statement, the Ballots and the Combined Notice provided recipients with timely,

sufficient, appropriate and adequate notice of the Third-Party Releases, including that the Third-

Party Releases would be provided by the Releasing Parties.[36]  In addition, the Combined Notice,

which was approved by the Scheduling Order, included the Third-Party Releases and contained

prominent instructions that these Third-Party Releases would bind Holders of Claims or Interests

if such Holders did not timely object, so all parties in interest had ample opportunity to evaluate

and opt out of the Third-Party Releases by objecting if they wished to.[37]

77.    Importantly, as shown above, all parties in interest were provided extensive notice

of these Chapter 11 Cases, the Plan, the Objection Deadline, and the Third-Party Releases.

Despite this, not a single party opted out of the Third-Party Releases by filing an objection to the

Third-Party Releases prior to the Objection Deadline.  Finally, the Consenting Stakeholders

consented to the releases in the Restructuring Support Agreement.  As such, the Third-Party

Releases are fully consensual releases by all of the Releasing Parties.[38]

---

[35]    Plan Art. VIII.E.

[36]    Disclosure Statement Art. V.

[37]    Combined Notice, "Releases by Holders of Claims and Interests", p. 9–10 [Docket No. 68].

[38]    Although the Debtors believe the Third-Party Releases are fully consensual, the Third-Party Releases also
satisfy the heightened standard for a non-consensual third-party release, as articulated in *In re Genesis* and
further described in *In re Tribune*, and which was derived from the standard for a non-consensual debtor
release in *In re Zenith* and described more fully in paragraphs 78–90.  Here, (i) the Third-Party Releases are
necessary to the success of the reorganization, (ii) the releasees have provided critical contributions to the

78.     Indeed, Courts in this District have approved similar third-party releases in other recent chapter 11 cases. *See In re Arsenal Resources Development LLC, et al.*, No. 19-12347 (BLS) (Bankr. D. Del. Dec. 19, 2019) [Docket Nos. 202 (brief) and 216 (order)] (court approving the third-party releases where "the scope of the Releasing Parties . . . includes those Holders of Claims or Interests (i) who vote to accept the Plan, (ii) whose vote to accept or reject the Plan is solicited but who vote to reject the Plan or do not vote and, in either case, do not opt out of granting the releases in the Plan by timely objecting, (iii) who are Unimpaired under the Plan and presumed to accept the Plan, or (iv) who are deemed to reject the Plan and do not affirmatively elect to opt out by timely objecting, formally or informally in writing, to the releases in the Plan"); *In re ATD Corporation, et al.*, No. 18-12221 (KJC) (Bankr. D. Del. Oct. 4, 2018) [Docket No. 620] (court approving third-party releases where to opt out, a party must not vote for, and not be deemed to accept, the plan and must timely file an objection with the bankruptcy court that is not resolved before confirmation); *In re EV Energy Partners, L.P., et al.*, No. 18-10814 (CSS) (Bankr. D. Del. Apr. 2, 2018) [Docket No. 238] (court approving third-party releases where parties had to timely file an objection with the bankruptcy court to opt out of releases).

79.     To reiterate, the Third-Party Releases are fully consensual. Accordingly, for the reasons described above, the Third-Party Releases are appropriate consensual releases and should be approved.

---

Debtors' Plan, (iii) the financial contributions of many of the releasees are necessary to make the plan feasible and (iv) the creditors received reasonable compensation in exchange for the Third-Party Releases, and thus the Third-Party Releases are fair.

### 3.    The Plan's Exculpation Should Be Approved.

80.    Like the releases discussed above, the Exculpation contained in Article VIII.F of the Plan should be approved.  Article VIII.F of the Plan provides exculpation for the Exculpated Parties.[39]  The Exculpation expressly does not release or exculpate the Exculpated Parties from any acts or omissions that constitute actual fraud, willful misconduct or gross negligence.

81.    The Exculpation is fair and appropriate under both applicable law and the facts and circumstances of the Chapter 11 Cases.  In determining the appropriateness of limiting liability under a plan of reorganization, such as through exculpation, courts in this Circuit assess such provisions in light of the particular circumstances at issue.  *See In re PWS Holding Corp.*, 228 F.3d 224, 247 (3d Cir. 2000) (rejecting any "per se rule barring any provision in a reorganization plan limiting the liability of third parties", including exculpation, by virtue of section 524(e) of the Bankruptcy Code); *see also In re Indianapolis Downs, LLC*, 486 B.R. at 306 (Bankr. D. Del. 2013) (concluding that exculpation provisions are appropriate for estate fiduciaries committees and their members and debtor directors and officers).

82.    Here the Exculpation is limited to estate fiduciaries, and all other persons entitled to the protections of section 1125(e) of the Bankruptcy Code.  Moreover, the scope of the Exculpation is appropriately limited, primarily to actions taken or failed to be taken in connection with, arising out of and related to the Chapter 11 Cases, and the formulation, preparation, dissemination, negotiation, filing, or termination of the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan, or any

---

[39]    "Exculpated Party" is defined in the Plan as "collectively, and in each case in its capacity as such: the Debtors and the Reorganized Debtors, the directors and officers of any of the Debtors who served during any portion of the Chapter 11 Cases, and the Debtors' professionals retained in these Chapter 11 Cases." Plan Art. I.A.

Restructuring Transaction, as described in more detail in the Plan.[40]  For all these reasons, the Exculpation is appropriate and should be approved.

### 4. The Plan's Injunction Provision Should Be Approved.

83.  Article VIII.G of the Plan enjoins parties from pursuing Claims discharged or Interests released under the Plan.  This injunction provision is necessary to implement the Debtors' reorganization, to give effect to the discharge of the Debtors pursuant to section 1141 of the Bankruptcy Code and to preserve and to enforce the Debtor Releases, the Third-Party Releases and the Exculpation, and is appropriately tailored to achieve these purposes.  The injunction provision is comparable to other provisions previously approved by Courts in this District.  Accordingly, the Debtors submit that the Plan's injunction provision should be approved.

### C. The Plan Satisfies Bankruptcy Code Section 1129(a)(2).

84.  Section 1129(a)(2) of the Bankruptcy Code requires that plan proponents comply with the applicable provisions of the Bankruptcy Code.  11 U.S.C. § 1129(a)(2).  This provision is intended to encompass the disclosure and solicitation requirements under sections 1125 and 1126 of the Bankruptcy Code, as well as Bankruptcy Rules 3017 and 3018, as described above. *See* H.R. Rep. No. 95-595, at 412 (1977) ("Paragraph (2) [of § 1129(a)] requires that the proponent of the plan comply with the applicable provisions of chapter 11, such as section 1125 regarding disclosure.").  As set forth in more detail above in paragraphs 12 through 21, the Debtors have complied with the applicable provisions of the Bankruptcy Code, including sections 1125 and 1126 of the Bankruptcy Code regarding disclosure and plan solicitation. Accordingly, the Debtors have satisfied section 1129(a)(2) of the Bankruptcy Code.

---

[40]     Plan Art. VIII.F.

### D.  The Plan Has Been Proposed in Good Faith under Section 1129(a)(3) of the Bankruptcy Code.

85.    Section 1129(a)(3) of the Bankruptcy Code requires that "[t]he plan has been proposed in good faith and not by any means forbidden by law."  11 U.S.C. § 1129(a)(3).  In the Third Circuit, "good faith" requires that a "plan be 'proposed with honesty, good intentions and a basis for expecting that a reorganization can be effected with results consistent with the objectives and purposes of the Bankruptcy Code.'"  *In re Zenith*, 241 B.R. at 107 (quoting *In re Sound Radio, Inc.*, 93 B.R. 849, 853 (Bankr. D.N.J. 1988)); *see also In re PPI Enters. (U.S.), Inc.*, 228 B.R. 339, 347 (Bankr. D. Del. 1998) ("[C]ourts have held a plan is to be considered in good faith 'if there is a reasonable likelihood that the plan will achieve a result consistent with the standards prescribed under the Code.'").  Bankruptcy Rule 3020(b)(2) provides that the Court may confirm the Plan without hearing evidence specifically addressing the requirements of section 1129(a)(3), so long as no objection has been filed on such grounds.  *See* Fed. R. Bankr. P. 3020(b)(2).

86.    The Plan was proposed with the legitimate and honest purposes of maximizing the value of the Estates, effectuating a comprehensive and feasible balance sheet reorganization of the Debtors, and enabling the Reorganized Debtors to emerge from bankruptcy with a sound capital structure and to conduct their businesses and satisfy their obligations.  The Debtors pursued these Chapter 11 Cases only after they determined that an out-of-court restructuring was not feasible.  The Plan (including all documents necessary to effectuate the Plan) was negotiated extensively, at arm's length and in good faith among representatives of the Debtors and the Consenting Stakeholders, all of whom have worked diligently to effectuate the Debtors' restructuring in an efficient manner to preserve and enhance the going concern value of the Debtors' Estates.  Each of the Consenting Stakeholders supports confirmation of the Plan.  The

Plan received overwhelming approval from the Voting Classes, evidencing the Plan's fairness and the good-faith efforts that drove its formulation. Finally, none of the transactions contemplated by the Plan is forbidden by law.

87.     Accordingly, the Plan has been proposed in good faith and satisfies section 1129(a)(3).

### E.     The Plan Complies with Section 1129(a)(4) of the Bankruptcy Code.

88.     Under section 1129(a)(4) of the Bankruptcy Code, the Court must find that "[a]ny payment made or to be made by the proponent . . . for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case" be approved by the Court or subject to the Court's approval, as reasonable. *See* 11 U.S.C. § 1129(a)(4). Article II.B of the Plan provides that all professionals requesting compensation pursuant to sections 328, 330, 331, 363, 503 or 1103 of the Bankruptcy Code for services rendered or reimbursement of costs, expenses or other charges incurred before the Effective Date must be approved by the Court pursuant to final fee applications filed no later than forty-five (45) days after the Effective Date.[41] With respect to Debtor professionals retained pursuant to section 327 of the Bankruptcy Code, the fees and expenses of such professionals are subject to approval by this Court. Accordingly, the Debtors submit that the Plan satisfies the requirements of section 1129(a)(4).

### F.     The Debtors Have Complied with Section 1129(a)(5).

89.     Section 1129(a)(5) of the Bankruptcy Code requires that: (i) the plan proponent disclose the identity and affiliations of the persons proposed to serve as the initial directors and officers of the reorganized debtors; (ii) the appointment or continuance of such officers or

---

[41]     Plan Art. II.B.

directors be consistent with the interests of creditors, equity security holders and public policy; and (iii) the plan proponents disclose the identities of, and the nature of any compensation paid to, insiders that will be retained or employed by the reorganized debtors, if any.  *See* 11 U.S.C. § 1129(a)(5).

90.     The identity and affiliations of the persons proposed to serve as the initial directors and the officers of the Reorganized Debtors shall be identified prior to or at the Combined Hearing, in each case to the extent known.  The appointment to, or the continuation in, such offices of such persons is consistent with the interests of the Debtors' creditors and with public policy.  The identity of any insider who will be employed or retained by the Reorganized Debtors and the nature of such insider's compensation, to the extent applicable, also will be fully disclosed.

91.     The proposed directors and officers of the Reorganized Debtors will all be highly skilled, have relevant and valuable business and industry experience and will provide beneficial insight in conducting the Reorganized Debtors' business.  Accordingly, the Debtors submit that the Plan satisfies the requirements of section 1129(a)(5) of the Bankruptcy Code.

**G.      The Plan Does Not Contain Any Rate Changes Subject to 1129(a)(6).**

92.     Section 1129(a)(6) of the Bankruptcy Code provides that "[a]ny governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor[s] has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval."  11 U.S.C. § 1129(a)(6).  The Debtors are not subject to any regulatory approval over rate changes, and the Plan does not provide for any rate changes by the Reorganized Debtors; therefore, section 1129(a)(6) of the Bankruptcy Code is inapplicable to the Chapter 11 Cases.

**H.    The Plan Is in the Best Interests of All Creditors and Equity Security Holders under 1129(a)(7).**

93.    Section 1129(a)(7) of the Bankruptcy Code requires that a plan be in the best interests of creditors and equity security holders of the Debtors.  This "best interests" test, focusing on potential individual dissenting creditors, requires that each holder of a claim or equity interest either accept the plan or receive or retain property under the plan that is not less than the amount such a holder would receive or retain in a chapter 7 liquidation.  *See Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441 n.13 (1999) (noting that "the 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan").

94.    As described in the liquidation analysis contained in **Exhibit E** of the Disclosure Statement (the "Liquidation Analysis"), the Plan satisfies the best interests test.  Each Holder of an Impaired Claim or Interest has voted to accept the Plan or will receive or retain property under the Plan on the Effective Date that is not less than the amount such Holder would receive if the Debtors liquidated under chapter 7 of the Bankruptcy Code.[42]

95.    Here, in a chapter 7 liquidation, the Deemed Rejecting Classes would receive no recovery on account of their Claims and/or Interests given the contractual and structurally senior priority of the Other Secured Claims, Other Priority Claims, ABL Claims, Secured Notes Claims and General Unsecured Claims.  Each of those senior Classes of Claims will have to be satisfied in full before the Deemed Rejecting Classes would receive any liquidation proceeds.[43]  The Liquidation Analysis demonstrates that after satisfying the Other Secured Claims, Other Priority Claims, ABL Claims and Secured Notes Claims in full, even a best-case liquidation scenario

---

[42]    *See* Liquidation Analysis, Ex. E to the Disclosure Statement.

[43]    *See id.*

would not leave any residual value for Holders of General Unsecured Claims, Intercompany Claims, Section 510(b) Claims, Intercompany Interests or Existing Equity Interests.[44]   By contrast, under the Plan, Holders of General Unsecured Claims will receive a projected recovery of 100%,[45] and Holders of Existing Equity Interests will receive a projected recovery of approximately $1 million, comprised of their pro rata share of the Equity Recovery.

96.     In addition, Holders of Secured Notes Claims are receiving a projected recovery of 52% pursuant to the Plan, while the Liquidation Analysis estimates that, in a liquidation, Secured Notes Claims would receive a recovery of between 14% to 23%.[46]   Accordingly, the value of the distributions provided to each Holder of Allowed Claims or Allowed Interests under the Plan would not be less than those received under a hypothetical chapter 7 liquidation.   The Plan therefore satisfies the "best interests" test with respect to each of the Debtors.

## I.    The Plan Has Been Accepted by Impaired Voting Classes (Bankruptcy Code Section 1129(a)(8)).

97.     Section 1129(a)(8) of the Bankruptcy Code requires that, "[w]ith respect to each class of claims or interests" either "such class has accepted the plan" or "such class is not impaired under the plan."   11 U.S.C. § 1129(a)(8).   Section 1126(c) of the Bankruptcy Code provides that a plan is accepted by an impaired class of claims if the accepting class members hold at least two-thirds in amount and more than one-half in number of the voting claims in their respective class.   11 U.S.C. § 1126(c).   Section 1126(d) of the Bankruptcy Code provides that a plan is accepted by an impaired class of interests if the accepting class members hold at least two-thirds in amount of the allowed interests of their respective class.   11 U.S.C. § 1126(d).   As

---

[44]      *See id.*

[45]      Disclosure Statement I.C. [Docket No. 16]; Combined Notice, "Summary of Estimated Recoveries", p. 7 [Docket No. 68].

[46]      *Id.*

set forth above and in the Voting Affidavit, nearly all Holders in the Voting Classes (i.e., Classes 4 and 9) voted to accept the Plan in accordance with section 1126 of the Bankruptcy Code.[47] Additionally, Holders of Claims or Interests in Unimpaired Classes are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

98.    Under section 1126(g) of the Bankruptcy Code, impaired classes that neither receive nor retain property under a plan are deemed to have rejected the plan.   11 U.S.C. § 1126(g).  Holders of Claims or Interests in the Deemed Rejecting Classes are either not entitled to receive any recoveries or retain any property on account of their Claims or Interests under the Plan or otherwise not entitled to vote on the Plan and, therefore, conclusively are deemed to have rejected the Plan in accordance with section 1126(g) of the Bankruptcy Code.  Notwithstanding the deemed rejection by such Classes, the Plan may still be confirmed because it satisfies sections 1129(a)(10) and 1129(b) of the Bankruptcy Code, as demonstrated below.

**J.      Payment in Full of All Allowed Priority Claims (Bankruptcy Code Section 1129(a)(9)).**

99.    Section 1129(a)(9) of the Bankruptcy Code requires that holders of allowed claims entitled to priority under sections 503(b) and 507(a) receive payment in cash under the plan, unless the holder of a particular claim agrees to a different treatment with respect to such claim.  11 U.S.C. § 1129(a)(9).  The Plan complies with section 1129(a)(9) of the Bankruptcy Code.

100.    Article II.A of the Plan provides that Holders of Allowed Administrative Claims, including Professional Fee Claims filed according to procedures set forth in Article II.A of the Plan, shall receive Cash in an amount equal to such Allowed Administrative Claim on the later of (a) the Effective Date, or as soon thereafter as is reasonably practicable, and (b) as soon as

---

[47]      Voting Aff., Ex. A.

practicable after such Allowed Administrative Claim becomes due and payable; *provided*, *however*, that Administrative Claims incurred by the Debtors in the ordinary course of business may be paid in the ordinary course of business in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Court.  The treatment of Allowed Administrative Claims and Professional Fee Claims, therefore, satisfies section 1129(a)(9)(A) of the Bankruptcy Code.

101.    The treatment of Priority Tax Claims satisfies section 1129(a)(9)(C) of the Bankruptcy Code since Article II.C of the Plan provides that Holders of Allowed Priority Tax Claims "will be treated in accordance with section 1129(a)(9)(C) of the Bankruptcy Code."[48]

### K.    The Plan Satisfies Bankruptcy Code 1129(a)(10).

102.    Section 1129(a)(10) of the Bankruptcy Code requires at least one class of impaired claims to affirmatively accept a plan "without including any acceptance of the plan by any insider."  11 U.S.C. § 1129(a)(10).  Section 1129(a)(10) was promulgated to conform to "the original intention of Congress to reverse pre-[Bankruptcy] Code Chapter XII cases, which permitted the use of cramdown powers without the consent of any class of creditors."  7 COLLIER ON BANKRUPTCY ¶ 1129[10][a] (Alan N. Resnick & Henry J. Sommer, eds., 16th ed.).[49]

103.    With respect to each Debtor that included an Impaired Class of Claims, at least one such Class voted to accept the Plan in the requisite number and amount, without including

---

[48]    Plan Art. II.C.

[49]    *See also In re Philadelphia Rittenhouse Developer, L.P.*, No. BR 10-31201 SR, 2011 WL 13043475, at *21 (Bankr. E.D. Pa. May 25, 2011) ("As this Court has previously observed § 1129(a)(10) operates as a statutory gatekeeper barring access to cramdown where there is absent even one impaired class accepting the plan. Cramdown is a powerful remedy available to plan proponents under which dissenting classes are compelled to rely on judicial valuations, judgements and determinations. The policy underlying § 1129(a)(10) is that before embarking upon the tortuous path of cramdown, and compelling the target of the cramdown to shoulder the risks of error (and related expenses) necessarily associated with forced confirmation, there must be some other properly classified group that is also hurt and nonetheless favors the plan.") (citing *In re Curtis Ctr. Ltd. P'ship*, 195 B.R. 631, 636 (Bankr. E.D. Pa. 1996)) (internal quotation marks omitted).

any acceptance of the Plan by any insider.[50]   Specifically, the only Voting Class of Claims, consisting of the Secured Notes Claims, overwhelmingly voted to accept the Plan.  The Plan therefore complies with section 1129(a)(10) of the Bankruptcy Code.

> **L.      The Plan Is Feasible and Satisfies Section 1129(a)(11).**

104.    Section 1129(a)(11) of the Bankruptcy Code requires that the Court determine that the Plan is feasible prior to confirmation.  Specifically, it requires that confirmation "is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan."  11 U.S.C. § 1129(a)(11).  The feasibility test requires that the Court determine whether a plan may be implemented and has a reasonable likelihood of success.  *See United States v. Energy Res. Co.*, 495 U.S. 545, 549 (1990).  However, section 1129(a)(11) does not require a guarantee of a plan's success; rather, applicable case law makes clear that the appropriate question is whether a plan offers a reasonable assurance of success.  *In re Tribune Co.*, 464 B.R. 126, 185 (Bankr. D. Del. 2011) ("Feasibility does not require that success be guaranteed but rather only a reasonable assurance of compliance with plan terms" (internal quotation omitted)).  A debtor must establish a chapter 11 plan's feasibility by a preponderance of the evidence.  *In re W.R. Grace*, 475 B.R. at 114 (holding that "[t]he debtor bears the burden of proof on this inquiry, and must show by a preponderance of the evidence that a reorganization plan is feasible").

105.    Whether a plan is feasible turns on whether there is a reasonable probability that the plan provisions can be implemented and performed.  The purpose of the feasibility test is to protect against visionary or speculative plans.  *In re Indianapolis Downs, LLC*, 486 B.R. at 298.

---

[50]        Voting Aff., Ex. A.

To assess feasibility, courts look to a variety of factors, including:  (i) the capital structure and earning power of the reorganized debtors; (ii) applicable economic conditions; (iii) the ability of the reorganized debtors to meet capital expenditure requirements; and (iv) the ability of the debtor's management and the likelihood that current management will continue.  *See*, *e.g.*, *In re Paragon Offshore PLC*, No. 16-10386 (CSS), 2016 WL 6699318, at *16 (CSS) (Bankr. D. Del. Nov. 15, 2016) (also stating that "[t]he [d]ebtors are not required to view their business and economic prospects in the worst possible light" (internal quotation omitted)); *see also In re U.S. Truck Co.*, 47 B.R. 932, 944 (E.D. Mich. 1985), *aff'd*, 800 F.2d 581 (6th Cir. 1986) (stating that the mere prospect of financial uncertainty cannot defeat confirmation on feasibility grounds).

106.    Here, the Plan is feasible in that, at minimum, there are sufficient means of implementation and it offers a reasonable assurance of success.  The Plan reflects a carefully conceived restructuring, developed over months of constructive negotiations among the Debtors, their advisors, the Ad Hoc Noteholder Group and the Sponsor Equityholder, to ensure that the Debtors' business remains viable and well-positioned for future growth.[51]  Together, the Consenting Stakeholders hold more than ninety-five (95)% of the Secured Notes Claims and approximately ninety-four (94)% of the common stock in Debtor HHI.  The Plan effects a substantial deleveraging of the Debtors' balance sheet, and contemplates a new-money Exit ABL Facility and an Exit Take Back Debt Facility to recapitalize the Debtors and provide ample liquidity for go-forward operations and value-maximizing transactions.  As such, the Plan will allow the Debtors to emerge from the Chapter 11 Cases as a stronger and more competitive enterprise.[52]

---

[51]      Jeppson Decl. ¶ 42.

[52]      *Id.*

107.    The Debtors will have more than adequate sources of cash to fund distributions under the Plan.  Further, the willingness of the Consenting Stakeholders to take distributions in New Common Stock, respectively, of Reorganized HHI shows that the Debtors' key stakeholders believe that the Reorganized Debtors will be fiscally secure and that equity interests in the Reorganized Debtors will have value.

108.    The feasibility of the Plan is supported by the financial projections contained in **Exhibit D** of the Disclosure Statement (the "Financial Projections"), which the Debtors prepared with the assistance of their advisors for the balance of the 2020 calendar year and for calendar years 2021 through 2024.  The Financial Projections were prepared based on assumptions made by the Debtors' management regarding the future performance of the Reorganized Debtors and reflect management's judgment and expectations regarding their future operations and financial position.[53]    The Financial Projections demonstrate that the Reorganized Debtors, on a consolidated basis, will have positive EBITDA in each of the years during the projection period and will be able to meet their obligations as they come due.[54]

109.    Based upon the Financial Projections, the Debtors believe they will have sufficient resources to make all payments required pursuant to the Plan (including the satisfaction of all unimpaired unsecured claims in the ordinary course of business) and that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization.[55]

---

[53]        *See* Financial Projections, Ex. D to the Disclosure Statement; *see also* Jeppson Decl. ¶ 44.

[54]        *See* Financial Projections, Ex. D to the Disclosure Statement.

[55]        *Id.*

110.    Accordingly, the Plan satisfies the feasibility requirements of section 1129(a)(11) and should be confirmed.

**M.    The Plan Complies with Bankruptcy Code Section 1129(a)(12).**

111.    Section 1129(a)(12) requires that all fees currently payable under 28 U.S.C. § 1930 "have been paid or the plan provides for the payment of all such fees on the effective date." 11 U.S.C. § 1129(a)(12).  Section 507 of the Bankruptcy Code provides that any such fees are afforded priority as administrative expenses.  11 U.S.C. § 507(a)(2).  Article II.D of the Plan provides that such fees due and owing to the U.S. Trustee at the time of Confirmation shall be paid, in full, in Cash, on the Effective Date and shall be paid quarterly, together with any interest thereon, on and after the Effective Date until the Debtors' or Reorganized Debtors', as applicable, case is closed, dismissed or converted to a case under chapter 7 of the Bankruptcy Code.  Accordingly, the Plan complies with section 1129(a)(12) of the Bankruptcy Code.

**N.    Bankruptcy Code Section 1129(a)(13) Is Not Applicable.**

112.    Section 1129(a)(13) requires that:

> The plan provides for the continuation after its effective date of payment of all retiree benefits, as that term is defined in section 1114 of this title, at the level established pursuant to subsection (e)(1)(B) or (g) of section 1114 of this title, at any time prior to confirmation of the plan, for the duration of the period the debtor has obligated itself to provide such benefits.

11 U.S.C. § 1129(a)(13).  The Debtors do not have any obligations relating to retiree benefits, and therefore, section 1129(a)(13) of the Bankruptcy Code is not applicable to the Debtors.[56]

---

[56]    In addition, sections 1129(a)(14), 1129(a)(15) and 1129(a)(16) of the Bankruptcy Code are not applicable here, where each of the Debtors has no domestic support obligations, is not an individual, and is a moneyed, business or commercial corporation.

O.    **The Plan Satisfies "Cramdown" Requirements under Section 1129(b) of the Bankruptcy Code.**

113.    As noted above, Class 7, as well as Classes 6 and 8 (if so treated), are deemed to have rejected the Plan.  As such, to confirm the Plan, the Debtors must satisfy the Bankruptcy Code's "cramdown" requirements as to the Deemed Rejecting Classes pursuant to section 1129(b) of the Bankruptcy Code.  The cramdown requirements provide that a plan that satisfies all of the requirements of section 1129(a) of the Bankruptcy Code, other than section 1129(a)(8), may be confirmed so long as it does not discriminate unfairly and is fair and equitable with respect to each class of claims or equity interests that is impaired under the plan and has not voted to accept the plan.  11 U.S.C. § 1129(b)(1), (b)(2).

114.    Here, the Plan does not discriminate unfairly against any Class of Claims or Interests.  As described in Part II(A)(1) hereof, each Deemed Rejecting Class is classified separately because it is legally distinct from other Classes, and all Claims or Interests in Deemed Rejecting Classes are classified with Claims or Interests of a similar legal nature that are afforded the same treatment under the Plan.[57]  Accordingly, given the distinctly different legal and economic character from the other Claims and Interests, the Claims and Interests in the Deemed Rejecting Classes are not similarly situated to any other Claims or Interests, or to the extent that they are, the same treatment is being provided.  Therefore, the different treatment is not discriminatory, and/or justified, and the Plan does not discriminate unfairly with respect to any Impaired Classes of Claims or Interests.

115.    Further, the Plan is in compliance with the "fair and equitable" standard under section 1129(b)(1) of the Bankruptcy Code with respect to the Deemed Rejecting Classes.

---

[57]    Disclosure Statement Section V.B.1.; Plan Art. III.A.

Accordingly, the Plan is consistent with the requirements of section 1129(b) of the Bankruptcy Code and may be confirmed despite the rejection of the Deemed Rejecting Classes

> **P.      The Plan's Principal Purpose Is Not Avoidance of Taxes (11 U.S.C. § 1129(d)).**

116.      Section 1129(d) of the Bankruptcy Code states that "the court may not confirm a plan if the principal purpose of the plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933." 11 U.S.C. § 1129(d). The purpose of the Plan is not to avoid taxes or the application of section 5 of the Securities Act. The Plan, therefore, satisfies the requirements of section 1129(d) of the Bankruptcy Code.

## III.      Cause Exists To Waive the Stay of the Confirmation Order.

117.      Bankruptcy Rule 3020(e) provides that a confirmation order "is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 3020(e). The Debtors respectfully submit that cause exists to waive and eliminate the stay of the Confirmation Order so that such order may be effective immediately upon its entry. A stay of the Confirmation Order will delay the Debtors' implementation of the Plan, extending the time that the Debtors must remain in chapter 11. The Plan (including all documents necessary to effectuate the Plan) enjoys overwhelming support among the Debtors' creditors entitled to vote on the Plan and is the product of extensive, good-faith negotiations among the Debtors and their key stakeholders, including those Voting Parties. Extending the length of time the Debtors remain in chapter 11 would only serve to increase the administrative and professional costs incurred by the Debtors' Estates, as well as the opportunity costs the Debtors experience while the Chapter 11 Cases continue. Deferring the Effective Date at this juncture could detrimentally impact Debtors' relationships with customers, employees and vendors, and could negatively impact value for stakeholders across the enterprise, risks that are unnecessary

given the unanimous support for the Plan by voting economic stakeholders.  For all of these reasons, the Debtors request a waiver of the stay imposed by the Bankruptcy Rules so that the Court's order confirming the Plan may be effective immediately upon its entry.

## **CONCLUSION**

118.    For all of the foregoing reasons, the Debtors submit that (i) the Disclosure Statement, the Solicitation and the Solicitation Procedures satisfy the requirements of sections 1125 and 1126(b) of the Bankruptcy Code, the Bankruptcy Rules, including Bankruptcy Rules 3017 and 3018, the Local Rules, the Scheduling Order, and any applicable rules, laws and regulations and are appropriate and satisfactory and should be approved in all respects, and (ii) the Plan complies with all of the requirements of section 1129 of the Bankruptcy Code and should be confirmed in all respects.

Dated:   January 4, 2021
         Wilmington, Delaware

*/s/ Sean M. Beach*

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Sean M. Beach (No. 4070)
Jacob D. Morton (No. 6684)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Tel:    (302) 571-6600
Fax:    (302) 571-1253
Email: sbeach@ycst.com
        jmorton@ycst.com

GIBSON, DUNN & CRUTCHER LLP
David M. Feldman  (admitted *pro hac vice*)
J. Eric Wise (admitted *pro hac vice*)
Matthew K. Kelsey  (admitted *pro hac vice*)
Alan Moskowitz (admitted *pro hac vice*)
200 Park Avenue
New York, New York 10166
Tel:    (212) 351-4000
Fax:    (212) 351-4035
Email: dfeldman@gibsondunn.com
         ewise@gibsondunn.com
         mkelsey@gibsondunn.com
         amoskowitz@gibsondunn.com

*Co-Counsel to the Debtors and Debtors in Possession*